**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Cohen, | No. CV-21-01178-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Arizona State University, et al., | |
| Defendants. | |

Before the Court is Arizona State University ("ASU"), Raymond Anderson ("Mr. Anderson"), and the Arizona Board of Regents' ("ABOR," and collectively "Defendants") 12(b)(6) Motion to Dismiss First Amended Complaint (Doc. 14). For the following reasons, Defendants' motion is granted in part and denied in part.[1]

**BACKGROUND**

The following allegations from the First Amended Complaint ("FAC") are construed in the light most favorable to Plaintiff. David Cohen ("Plaintiff") served as the Senior Associate Athletic Director at ASU from June 2014 through December 2019. (Doc. 13 ¶ 2.) For most of his tenure, Plaintiff reported to Mr. Anderson, ASU's Vice President for University Athletics. *Id.* ¶¶ 5, 19. ABOR is the governing body for Arizona's public university system, including ASU. *Id.* ¶ 18.

---

[1] The Defendants' request for oral argument is denied because they have had an adequate opportunity to discuss the law and evidence, and oral argument will not aid the Court's decision. *See Lake at Las Vegas Invs. Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991).

As Senior Associate Athletic Director, Plaintiff was responsible for "overseeing ticketing for all ASU athletics, and the day-to-day operations of the men's basketball and ASU swimming and diving programs." *Id.* ¶ 20. In his role, Plaintiff was also a mandatory reporter, obligated to report "any sexual harassment he witnessed in his role." *Id.* ¶ 21. To that end, Plaintiff was trained annually on his reporting obligations. *Id.* ¶ 22. He was trained to report "any sexual assault or harassment of which" he became aware in his role, regardless of whether the victims and perpetrators were "employees, students, or other members of the ASU community." *Id.* ¶ 23. During a training led by Mr. Anderson, Mr. Anderson recounted that a prominent donor had been recently reprimanded for sexual harassment. *Id.* ¶ 27. The trainings repeatedly stressed the "mandatory nature of this reporting obligation." *Id.* ¶ 26. Plaintiff was informed that if he made a report, he would be protected from retaliation. *Id.* However, if Plaintiff failed to make a report, he would face punishment up to and including termination. *Id.*

Bart Wear ("Mr. Wear") was a prominent donor to ASU athletics who shared a close relationship with Mr. Anderson. *Id.* ¶¶ 30, 34. Due to his history as a donor, ASU granted Mr. Wear wide-ranging access to ASU athletics facilities and events. *Id.* ¶ 30. Mr. Wear could travel with ASU teams and attend ASU practices, and had "[e]xclusive and seemingly unfettered access to ASU practice facilities, coaches' offices and training facilities, including the team locker rooms." *Id.* Mr. Wear also "supported Mr. Anderson throughout his tenure," and Mr. Anderson told Plaintiff "to grant Mr. Wear access to ASU athletics programs because he 'writes checks.'" *Id.* ¶ 34.

On March 14, 2019, Mr. Wear was ASU's guest at the PAC-12 NCAA Men's Basketball tournament in Las Vegas, Nevada. *Id.* ¶ 31. Mr. Wear sat in a section where seats were "only made available to ASU staff, family, and prominent donors." *Id.* ¶ 31. There, Mr. Wear sexually harassed two women. *Id.* ¶ 28. One of those women was Plaintiff's wife. *Id.* Mr. Wear also sexually harassed another woman "on several [other] occasions" at an ASU Men's Basketball home game at the Wells Fargo Arena, and had been removed from "at least one ASU basketball game" for belligerent conduct involving

women after consuming alcohol. *Id.* ¶¶ 29, 37.

Plaintiff reported Mr. Wear's conduct to Mr. Anderson at a meeting on March 25, 2019. *Id.* ¶ 33. Also present was Scott Nelson ("Mr. Nelson"), who appears to have been involved in some capacity with the Sun Devil Club, which as alleged in the FAC appears to have a donor-relations function for ASU athletics. *Id.* ¶¶ 33, 52. At that meeting, Plaintiff reported that Mr. Wear had inappropriately touched Plaintiff's wife in Las Vegas. *Id.* ¶ 33. Plaintiff also reported Mr. Wear's sexual harassment of another woman at Men's Basketball home games on ASU's campus. *Id.* ¶ 35. Mr. Anderson told Plaintiff that he would address Mr. Wear's conduct as he found it unacceptable and indicated that ASU had recently addressed a similar situation with another donor. *Id.* ¶¶ 35–36. Mr. Anderson, however, did not take any action with respect to Mr. Wear's conduct. *Id.* ¶ 35.

News of Mr. Wear's conduct spread. Rick Shangraw, CEO of ASU Enterprise Partners, learned of it in early April 2019, and told Mr. Anderson it was "inappropriate and unacceptable." *Id.* ¶ 38. Jay Heiler, a member of ABOR, learned of the allegations and Mr. Anderson's decision not to further investigate in mid-April. *Id.* ¶ 39. ASU's Deputy Athletics Director, Jean Boyd, learned of the conduct on April 22. *Id.* ¶ 40.

On May 3, 2019, Plaintiff told Mr. Anderson that he was concerned about Mr. Wear's attendance at an upcoming event where alcohol would be served. *Id.* ¶ 41. In Plaintiff's opinion, Mr. Wear posed a "danger to those around him" when he consumed alcohol, and his presence at the event put members of the ASU community in harm's way. *Id.* Mr. Anderson told Plaintiff to stay away from the event if he felt uncomfortable. *Id.*

On May 20, 2019, Plaintiff discussed Mr. Wear's conduct with Mr. Boyd. *Id.* ¶ 43. Plaintiff indicated he was displeased that Mr. Anderson had not taken further action. *Id.* Mr. Boyd subsequently told Mr. Anderson he was required to "respond and report" Plaintiff's complaint about Mr. Wear. *Id.* ¶ 44. Mr. Anderson was again reminded of Plaintiff's complaint in June 2019, when Mr. Shangraw informed him that it had been inappropriate to take a golfing trip with Mr. Wear and other ASU employees in May. *Id.* ¶ 47. Mr. Anderson represented that he planned to "take care of" Mr. Wear's conduct at

the end of the summer, after both his and Mr. Wear's planned vacations. *Id.*

Plaintiff's annual performance review took place on June 13, 2019. *Id.* ¶ 62. At this review, he was informed that he would no longer be responsible for administrating the ASU swimming program, and that he was to dedicate more focus on ticketing. *Id.* ¶ 63. After his review, Mr. Anderson told Plaintiff that there would be "changes" in the athletic department. *Id.* ¶ 64. Plaintiff asked Frank Ferrara, the Senior Associate Athletic Director and Chief Financial Officer, whether these changes would involve Plaintiff reporting to Mr. Ferrara. *Id.* Mr. Ferrara "said that if [Plaintiff] reported to him, he would fire him the next day." *Id.*

On June 19, 2019, Plaintiff's bonus structure changed. Mr. Anderson informed him that his new bonus structure was entirely at Mr. Anderson's discretion, and that he could find alternative employment if he did not like the change. *Id.* ¶ 65. Plaintiff agreed to the change, after which point "nearly 40% of his overall compensation was completely at Mr. Anderson's discretion." *Id.* That same day, Plaintiff again discussed his concerns about Mr. Wear with Mr. Boyd. *Id.* ¶ 48. Plaintiff subsequently reminded Mr. Anderson about his concerns about Mr. Wear twice in July, on July 5 and 24. *Id.* ¶¶ 49–50.

On August 12, 2019, Plaintiff was informed that he would now report to Mr. Ferrara. *Id.* ¶ 66. Plaintiff told Mr. Anderson that he viewed this, combined with the change in bonus structure and alteration of his job responsibilities, as retaliation for reporting Mr. Wear's conduct. *Id.* In response, Mr. Anderson asserted that Plaintiff had not reported Mr. Wear's conduct until three months after the basketball season, when Plaintiff alleges to have done so days after the PAC-12 tournament. *Id.* ¶ 67. Mr. Anderson then asked Plaintiff why he hadn't taken any action about Mr. Wear. *Id.* Plaintiff told Mr. Anderson that by reporting Mr. Wear's conduct to him, Plaintiff had acted as he believed was required by ASU's sexual harassment training. *Id.* Mr. Anderson then said that "neither [Plaintiff] nor Mr. Shangraw was going to tell him how or when to 'talk to a[n] [expletive] donor.'" *Id.*

Plaintiff met with two HR officials in the subsequent days, where he was told it

appeared he was being retaliated against for reporting Mr. Wear's conduct and demanding an investigation. *Id.* ¶ 68. He also met with Mr. Shangraw and James Rund, a Senior Vice President at ASU. *Id.* ¶ 69. Both individuals indicated that retaliation appeared to be the likely explanation. *Id.*

Mr. Anderson attempted to terminate Plaintiff's employment on August 15, 2019. *Id.* ¶ 70. Mr. Anderson believed termination was appropriate because Plaintiff was not a "team player" or "cultural fit." *Id.* Plaintiff was subsequently informed he was not terminated, but rather placed on administrative leave. *Id.*

After Plaintiff was placed on administrative leave, he formally complained to ASU about his treatment. *Id* ¶ 51. ASU subsequently opened an investigation into Mr. Wear. *Id.* During the investigation, Mr. Wear continued to attend ASU events. *Id.* ¶ 52. The investigation determined that Mr. Wear had sexually harassed three women, including Plaintiff's wife, on three separate occasions. *Id.* ¶ 56. After ASU completed the report in November 2019, Mr. Wear was given courtside seats at an ASU basketball game in December 2019. *Id.*

Plaintiff was eventually terminated on December 12, 2019, effective December 13. *Id.* He filed a charge of retaliation with the EEOC on March 12, 2020. *Id.* ¶ 9. Under a work sharing agreement, the Civil Rights Division of the Arizona Attorney General's office also received his charge. *Id.* Plaintiff exchanged calls and emails with the EEOC through July 8, 2020, when he submitted his reply to ASU's Position Statement. *Id.* ¶ 11. He did not hear from the EEOC again until 2021, when he followed up on the status of his case in late January. *Id.* ¶ 12. Plaintiff learned in February 2021 that his charge was being handled by the EEOC's Los Angeles office. *Id.* When contacted, the Los Angeles office informed Plaintiff that it had not begun its investigation of his charge. *Id.* ¶ 13. Plaintiff requested a right to sue letter, which he received on May 4, 2021. *Id.* ¶ 14. Plaintiff filed his initial complaint on July 7, 2021, which he subsequently amended. (Doc. 1); (Doc. 13.) The FAC seeks relief under three causes of action: (1) retaliation under Title VII of the Civil Rights Act of 1964, (2) wrongful termination in violation of public policy under Arizona

law, and (3) retaliation under Title IX of the Education Amendments of 1972. (Doc. 13 at 21–23.)

# DISCUSSION

## I. Legal Standard

Federal Rule of Civil Procedure 8(a) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a), so that the defendant receives "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). To survive dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Twombly*, a plaintiff's factual allegations in the complaint "must . . . suggest that the claim has at least a plausible chance of success." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013)). Factual allegations in the complaint are accepted as true and the pleading is construed "in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)). Further, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998).

## II. Analysis

### A. State Law Claims

Defendants argue Plaintiff's state law claim should be dismissed as barred by the statute of limitations. (Doc. 14 at 11.) "When a district court sits in diversity, or hears

state law claims based on supplemental jurisdiction, the court applies state substantive law to the state law claims." *Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*, 632 F.3d 1056, 1060 (9th Cir. 2011). State substantive law includes the state statute of limitations. *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011). Federal courts must also "abide by a state's tolling rules, which are integrally related to statutes of limitations." *Id.* In Arizona, a statute of limitations defense may be raised on a motion to dismiss "if it appears on the face of the complaint that the claim is barred." *Republic Nat'l Bank of N.Y. v. Pima Cnty.*, 200 Ariz. 199, 204, 25 P.3d 1, 6 (Ct. App. 2001). "However, courts disfavor statute of limitations defenses, preferring instead to resolve litigation on the merits when possible." *City of Tucson v. Clear Channel Outdoor, Inc.*, 218 Ariz. 172, 178, 181 P.3d 219, 225 (Ct. App. 2008).

At the outset, the parties appear to dispute whether the second cause of action in the FAC arises under the Arizona Employment Protection Act's ("AEPA") protections against retaliatory wrongful termination in violation of public policy, Ariz. Rev. Stat. § 23-1501(A)(3)(c); (Doc. 13 ¶ 82), or the Arizona Civil Rights Act ("ACRA"), Ariz. Rev. Stat. §§ 41-1461–1468. (Doc. 13 ¶¶ 1, 83, 84, 86.) Both statutes carry a one-year limitations period, but the relevant provisions are worded differently. *Compare* Ariz. Rev. Stat. § 12-541 (imposing one year statute of limitation for both claims for "wrongful termination" and "[u]pon a liability created by statute") *with* Ariz. Rev. Stat. § 41-1481(D) (providing that for ACRA claims, "[i]n no event shall any action be brought pursuant to this article more than one year after the charge to which the action relates has been filed.").

Plaintiff's state law claim is time-barred under either theory. Plaintiff was terminated effective December 13, 2019, (Doc. 13 ¶ 70), and filed his claim with the EEOC and the Arizona Attorney General on March 12, 2020. (Doc. 13 ¶ 9.) If the AEPA applies, the cause of action accrued on the date of his termination and lapsed on December 13, 2020. If the ACRA applies, he needed to file suit by March 12, 2021. Plaintiff filed suit in this Court on July 7, 2021. (Doc. 1.) Under either theory, it is apparent from the face

of the complaint that Plaintiff's state law claim is untimely.[2]

Nor does equitable tolling apply. As to the ACRA, its indication that "*[i]n no event shall any action be brought pursuant to this article more than one year after the charge to which the action relates has been filed*," appears to foreclose any tolling. Ariz. Rev. Stat. § 41-1481(D) (emphasis added). Moreover, several federal cases applying the ACRA have refused to apply equitable tolling when the reason for the delay was belated notification of the right to sue. *See, e.g.*, *Wood v. Univ. Physicians Healthcare*, No. CV-13-00063-PHX-JAT, 2014 WL 3721207, at *13 (D. Ariz. July 28, 2014); *Strand v. John C. Lincoln Health Network, Inc.*, No. CV-10-02112-PHX-NVW, 2011 WL 1253408, at *2 (D. Ariz. Mar. 31, 2011); *Enriquez v. Gemini Motor Transp. LP*, No. CV 19-04759-PHX-GMS, 2021 WL 5908208, at *6 (D. Ariz. Dec. 14, 2021).[3]

However, even assuming equitable tolling did apply, Plaintiff has failed to show why it is appropriate in this case. Plaintiff's justification for the delay is that the EEOC did not process his charge in a timely fashion because of the COVID-19 pandemic. (Doc. 13 ¶¶ 10–14); (Doc. 15 at 17.) Plaintiff submitted his charge on March 12, 2020. Under federal law, Plaintiff could have requested his notice of right to sue from the EEOC after his charge had been pending 180 days. 42 U.S.C. § 2000e-5(f)(1); *see also Smith v. Johnson*, No. C 11–4823 MMC, 2012 WL 1438898, at *2 (N.D. Cal. Apr. 25, 2012) ("Before filing a complaint under Title VII, a plaintiff ordinarily files a charge with the [EEOC] and, if . . . the EEOC fails to so act on the charge within 180 days, the plaintiff may file suit without such letter."). Consequently, Plaintiff was eligible to request a notice of right to sue on September 8, 2020. Plaintiff offers no explanation for why he failed to request such a notice from the EEOC until "late January 2021." (Doc. 1 ¶ 12.) In the

---

[2] Because Plaintiff does not argue that the discovery rule operates to defer the date his state law claim accrued under either the ACRA or the AEPA, the Court does not address its applicability in this Order.

[3] *Salgado v. Atlantic Richfield Co.*, 823 F.2d 1322, 1324–25 (9th Cir. 1987), is inapposite because the court was interpreting California law, which did not include the "in no event" language present in Ariz. Rev. Stat. § 41-1481. *Id.* at 1324 n.1; 1984 Cal. Stat. 1792. Moreover, the California statute of limitations was based on when the notice of the right to sue was issued, not when the charge was filed. 823 F.2d at 1324 n.1; 1984 Cal. Stat. 1792.

absence of such justification, the Court will not apply equitable tolling. As it is untimely, Plaintiff's state-law cause of action is dismissed with leave to amend should Plaintiff wish to plead additional facts in support of equitable tolling.

### B. Federal Claims

Defendants argue Plaintiff's federal retaliation claims should be dismissed because Plaintiff did not engage in protected activity under either Title VII or Title IX. (Doc. 14 at 4, 9.)

#### 1. Title VII

To make a prima facie showing of retaliation under Title VII, an employee must establish that (1) they engaged in a protected activity, (2) they were subjected to an adverse employment action, and (3) the "employer would not have taken the adverse employment action but for a design to retaliate." *Maner v. Dignity Health*, 350 F. Supp. 3d 899, 906 (D. Ariz. 2018), *aff'd*, 9 F.4th 1114 (9th Cir. 2021); *Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007).

##### a. Protected Activity

An employee engages in protected activity when they "oppose[] any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a). "Courts have interpreted 'unlawful employment practices' to include a panoply of actions involving discrimination and sexual harassment." *Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 525–26 (9th Cir. 1994). Because Title VII is liberally construed to "implement the Congressional purpose of eliminating discrimination in employment," *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978), "[a]n employee need not establish that the opposed conduct in fact violated the Act in order to establish a valid claim of retaliation." *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988). Protection under Title VII's "opposition clause . . . will be accorded whenever the opposition is based on a 'reasonable belief' that the employer has engaged in an unlawful employment practice." *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983); *see also Maner v. Dignity Health*, 9 F.4th 1114, 1127 (9th Cir. 2021) ("[O]ur precedents have

long recognized that the statute protects an employee who opposes employer conduct in the mistaken but reasonable belief that the conduct is unlawful.").

The parties dispute the proper legal standard for determining when an employee's belief that they were opposing an unlawful employment practice was reasonable. Defendants urge the Court to follow *Learned* and find a reasonable belief exists only when the conduct at issue "fairly fall[s] within the protection of Title VII." *Learned*, 860 F.2d at 932. Plaintiff, on the other hand, suggests the Court should follow *Moyo v. Gomez*, 32 F.3d 1382 (9th Cir. 1994), and find that "an erroneous belief . . . is reasonable . . . if premised on" a good faith mistake of fact or law. *Id.* at 1385; *Steinaker v. Sw. Airlines, Co.*, 472 F. Supp. 3d 540, 557 (D. Ariz. 2020). The two standards are evidently in tension: While under *Learned*, the conduct at issue must fairly fall under Title VII, under *Moyo*, conduct "can fall outside Title VII so long as the plaintiff had limited knowledge and simply made a mistake of law." *Maner*, 350 F. Supp. 3d at 908. However, this Court is not the first to be confronted with this issue. In *Maner*, the court considered both *Learned* and *Moyo*, and concluded that it should follow *Learned* rather than *Moyo* for three specific reasons:

> First, the Ninth Circuit has instructed that the earlier case (*Learned*) controls over the later inconsistent case (*Moyo*) because the panel that decided the later case had no authority to overrule Ninth Circuit precedent . . . Second, the inconsistent statement in *Moyo* can be viewed as dictum because it was one of three different reasons the court gave for its ruling . . . Third, no Ninth Circuit decision has cited *Moyo* for the proposition that mistakes of law can support a retaliation claim, while the Ninth Circuit has reiterated *Learned*'s holding that complained-of conduct must "fairly fall" within Title VII to constitute protected activity for purposes of a retaliation claim.

*Id.* at 909; *see also Schneider v. Scottsdale Unified Sch. Dist. No. 48*, No. CV-21-01521-PHX-SPL, 2022 WL 901418, at *5 (D. Ariz. Mar. 28, 2022) (favorably citing *Maner*'s analysis on this issue and finding *Learned*'s "fairly fall[s]" test controls under the Fair Labor Standards Act's substantially identical anti-retaliation provision). The Court finds *Maner*'s discussion of this issue persuasive and will assess the reasonableness of Plaintiff's belief that he was opposing an employment practice made unlawful by Title VII by

determining whether the challenged conduct "fairly fall[s] within the protection of Title VII." *Learned*, 860 F.2d at 932.

Defendants do not argue that the alleged conduct of Mr. Wear would not give rise to a duty on Plaintiff's part to report under ASU training and policy. Rather, Defendants argue that as neither Mr. Wear nor his victims were ASU employees, Plaintiff did not engage in protected activity because Mr. Wear's conduct did not fairly fall within Title VII. Defendants contend that even if Plaintiff believed he was opposing an unlawful employment practice, his belief was objectively unreasonable and not protected by the statute. (Doc. 14 at 6); (Doc. 20 at 4.) Defendants' argument lacks merit in this circumstance. Even if Mr. Wear's status as a non-employee makes his harassment not subject to Title VII, there is no dispute that Plaintiff was required by ASU policy to report all instances of sexual harassment. *Id.* ¶ 23. These trainings made no distinction between "assaults involving employees, students, or other members of the ASU community." *Id.* Plaintiff alleges he was explicitly informed during these trainings that another prominent donor had been reprimanded for "acting inappropriately towards women in the ASU community." *Id.* ¶ 24. The trainings also instructed Plaintiff that failure to report sexual assault or harassment could result in his termination, but that he would be shielded from retaliation for any reports he did make. *Id.* ¶ 26. It is, of course, appropriate for ASU to require such reporting because under appropriate circumstances, which may have been present here, ASU can be deemed to have ratified Mr. Wear's conduct, thereby creating an unlawful employment practice. (Doc. 15 at 12); *see Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006) ("[E]mployers are liable for harassing conduct by non-employees 'where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct.'" (quoting *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997))).

Mr. Wear, a prominent donor to ASU, was granted "nearly unrestricted access to ASU athletics," including sporting events, team practices, athletic facilities, and coaches' offices. (Doc. 13 ¶ 30.) Mr. Wear allegedly harassed Plaintiff's wife at an ASU Men's

Basketball game while sitting in an area restricted to "ASU staff, family, and prominent donors." *Id.* ¶ 31. At that same game, Mr. Wear allegedly harassed another woman. *Id.* ¶ 28. The FAC also alleges that "on several occasions" Mr. Wear harassed a third victim at ASU Men's Basketball home games. *Id.* ¶ 29. While the FAC does not allege that Mr. Wear, who was not an ASU employee, harassed any ASU employees, it plausibly alleges that Mr. Wear's prior incidents took place where ASU employees were present, and that he had a pattern of harassing women in ASU-sponsored spaces. The FAC further alleges that Plaintiff reported Mr. Wear's conduct in part because of his concern for the safety of the "ASU community," a population which necessarily includes its employees. *Id.* ¶ 41.

Based on the foregoing, the FAC plausibly alleges that Plaintiff held a reasonable belief that he was engaging in protected activity because the subject of his complaint fairly falls within Title VII. Because Mr. Wear's alleged conduct fairly falls within Title VII, Plaintiff's decision to report him to Mr. Anderson was reasonable and constitutes protected activity for purposes of the motion to dismiss.

### b. Adverse Employment Action

Because Plaintiff plausibly alleged that he engaged in protected activity, the Court next considers whether Plaintiff was subjected to an adverse employment action. "[A]n adverse employment action is adverse treatment that is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1237 (9th Cir. 2000). To show an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). "The requirement of 'material adversity' is meant 'to separate significant from trivial harms.'" *Alozie v. Ariz. Bd. of Regents*, --- F. Supp. 3d ----, 2021 WL 5578857, at *6 (D. Ariz. Nov. 30, 2021) (quoting *Burlington N.*, 548 U.S. at 68). "Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 & n.11 (9th

Cir. 2000) (collecting cases).

Plaintiff alleges that he was subject to several adverse employment actions after he reported Mr. Wear's conduct. Among others, the FAC alleges that in June 2019, Plaintiff was relieved of his duties administering the swimming program, (Doc. 13 ¶ 63), Mr. Anderson changed the structure of Plaintiff's annual bonus to be completely at Mr. Anderson's discretion, *id.* ¶ 65, and Plaintiff was made a direct report of a man who had expressed interest in firing him. *Id.* ¶ 66. The FAC also alleges Plaintiff was placed on administrative leave after Mr. Anderson attempted to terminate him on August 15, 2019 because he "wasn't 'a team player' or 'cultural fit,'" and that Plaintiff was eventually terminated by Mr. Anderson on December 13, 2019. *Id.* ¶ 70. Plaintiff has adequately alleged that he was subject to an adverse employment action because he was terminated and had his job responsibilities and compensation meaningfully altered. *Brooks*, 229 F.3d at 928; *Ray*, 217 F.3d at 1244 (holding that reduction in pay qualifies as adverse employment action); *see also Foraker v. Apollo Grp., Inc.*, 427 F. Supp. 2d 936, 942 (D. Ariz. 2006) (finding an adverse employment action when the plaintiff was stripped of job responsibilities, lost his title, and was denied a promised salary increase).

### c.     Causation

A Title VII retaliation plaintiff must also prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "In other words, the standard is but-for causation." *Alozie*, 2021 WL 5578857, at *7. Causation may be inferred by circumstantial evidence, including "the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011). Here, the FAC alleges that Plaintiff reported his concerns about Mr. Wear to ASU officials on at least six occasions between March and July 2019. (Doc 13 ¶¶ 33, 41, 43, 48–50.) As discussed above, Plaintiff began experiencing adverse employment actions in June 2019. When Plaintiff told Mr. Anderson he believed he was being retaliated against on August 12, 2019, Mr.

Anderson allegedly misstated when Plaintiff first made his report, asked why Plaintiff didn't "do anything" about it, and said that Plaintiff was not going to tell him "how or when to 'talk to a[n] [expletive] donor.'" *Id.* ¶ 67. Mr. Anderson's first attempt to terminate Plaintiff took place three days later, and Plaintiff was ultimately terminated on December 13. *Id.* ¶ 70. Mr. Anderson's comments explicitly referencing Mr. Wear's conduct in relation to Plaintiff's complaint, and Mr. Anderson's attempt to terminate Plaintiff only three days later, plausibly demonstrate that had Plaintiff not continued to press his complaint about Mr. Wear—after Mr. Anderson allegedly had ignored it for several months—he would not have been terminated. As such, the FAC adequately alleges a causal link between Plaintiff's protected activity and the adverse employment actions.

As Plaintiff has adequately alleged he was engaged in protected activity, suffered an adverse employment action, and that a causal link existed between the two, he has alleged a prima facie case of retaliation under Title VII. Defendants' motion to dismiss his first cause of action is denied.

### 2. Title IX

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has interpreted the statute's prohibition on sex-based discrimination to include "[r]etaliation against a person because that person has complained of sex discrimination," and that the statute's private right of action encompasses actions seeking damages for retaliation. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Due to the similarity between the statutes, "Title IX's protections [are construed] consistently with those of Title VII." *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022). Consequently, claims for retaliation under Title IX are governed by the same framework as Title VII: the plaintiff must show "(a) that he or she was engaged in protected activity, (b) that he or she suffered an adverse action, and (c) that there was a causal link between the two." *Emeldi v. Univ. of Or.*, 698 F.3d 715, 724 (9th Cir. 2012).

As the parties appear to agree that the second and third prongs overlap entirely with the Title VII analysis, the Court incorporates and adopts its Title VII analysis for purposes of the Title IX retaliation claim on these issues. (Doc. 14 at 9); (Doc. 15 at 15.) Therefore, the central issue is whether Plaintiff engaged in protected activity under Title IX when he reported Mr. Wear's conduct to Mr. Anderson and other ASU officials. As in Title VII, opposition may constitute protected activity if the complainant reasonably believed the conduct at issue was unlawful. *See Grabowski v. Ariz. Bd. of Regents*, No. CV-19-00460-TUC-SHR, 2022 WL 1128936, at \*3 (D. Ariz. Apr. 15, 2022). Consequently, the inquiry is the same as above: Whether Mr. Wear's conduct fairly fell within the scope of Title IX.

Title IX's prohibition against gender discrimination in education protects students and employees of the educational institution. *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 540 (1982). Here, the FAC alleges that Mr. Wear engaged in a pattern of sexual harassment while at ASU athletic events where both students and employees were present, and that he had nearly unrestricted access to ASU athletic facilities. Plaintiff's complaints about Mr. Wear's conduct were therefore aimed at not only seeking redress for Mr. Wear's actions against the three existing victims, but also to protect other members of the ASU community—including both students and employees—from future harassment. For purposes of the present motion, Plaintiff has adequately alleged that he engaged in protected activity because he reasonably believed he was reporting conduct prohibited by Title IX.

C.    **Non-Jural Entity**

Finally, Defendants move to dismiss ASU from the FAC as it is a non-jural entity under Arizona law and not subject to suit. In Arizona, a governmental agency may only be sued if the "statutes creating the entity . . . provide the agency with the power to sue and be sued." *Lazarescu v. Ariz. State Univ.*, 230 F.R.D. 596, 601 (D. Ariz. 2005); *Kimball v. Shofstall*, 17 Ariz. App. 11, 13, 494 P.2d 1357, 1359 (Ct. App. 1972). Ariz. Rev. Stat. § 15-1601 authorizes ABOR "to create and maintain ASU, but contains no indication that ASU . . . may be sued." *Krist v. Arizona*, No. CV17-2524 PHX DGC, 2018 WL 1570260,

at *2 (D. Ariz. Mar. 30, 2018). On the other hand, Ariz. Rev. Stat. § 15-1625 expressly provides that that ABOR is to exercise "jurisdiction and control over the universities" and may "sue and be sued." Ariz. Rev. Stat. § 15-1625. "The effect of Arizona Revised Statutes §§ 15–1601 and 15–1625 is clear. [ASU] cannot be subject to suit because the Arizona Legislature has not so provided. However, [ABOR] is an entity subject to suit pursuant to § 15–1625." *Lazarescu*, 230 F.R.D. at 601. As ASU is not properly subject to suit, Plaintiff's complaint against ASU is dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. As it is not subject to suit, ASU is dismissed from the action. Plaintiff's state law claim is time barred and dismissed with leave to amend should Plaintiff wish to plead additional facts supporting equitable tolling on the AEPA claim. Plaintiff's Title VII and Title IX claims remain.

**IT IS THEREFORE ORDERED** that Defendants' 12(b)(6) Motion to Dismiss First Amended Complaint (Doc. 14) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that the Clerk of Court shall dismiss Defendant Arizona State University from the action with prejudice.

**IT IS FURTHER ORDERED** granting Plaintiff leave to amend his complaint in a manner consistent with this Order. Plaintiff will have **thirty days** from the date of this order to file a Second Amended Complaint.

Dated this 31st day of May, 2022.

G. Murray Snow
Chief United States District Judge