# EXHIBIT 1

[Placeholder for Document to be Filed Pending Defendant Approval of Process and Otherwise Lodged]

# EXHIBIT 2

11:00 LTE

RA

Ray >

- Should I let him know we'd like to see a $175/$200M model? We had originally been talking about a $50M level.

Yes, for both the basketball and hockey arenas combined. Anywhere between $175-$200M would be optimal.
Thanks.
BTW, Crow really likes you!
Merry Christmas on that!

Dec 23, 2018 at 7:34 PM

That's great to hear on MMC. Will be fun to hear the back story on that!!!

Dec 24, 2018 at 10:09 AM

Also, include Becky in our discussions with the Oakview group. Thanks.

Yes. She was originally on the group. I had forget to ask you about that at the game.
I'm going to ask CW to set up an internal meeting to get everyone on the same page this week or next - pending holiday schedule

iMessage

# EXHIBIT 3

**In the Matter of:**

*Cohen*

*vs*

***Arizona Board of Regents, and Anderson***

---

*Frank Ferrara*

*April 10, 2024*

---

GRIFFIN GROUP
INTERNATIONAL
3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

UNITED STATES DISTRICT COURT

For the

District of Arizona

David Cohen,

Plaintiff,

v.

Arizona Board of Regents and Raymond Anderson,

Defendants.

Civil Action No. 2:21-CV-01778-GMS

ZOOM DEPOSITION OF FRANK FERRARA

Wednesday, April 10, 2024

FRANK FERRARA - APRIL 10, 2024

A P P E A R A N C E S

For the Plaintiff:

CHRISTOPHER W. ROWLETT, ESQ.
PEREZ VAUGHN & FEASBY
600 B. STREET, #2100
SAN DIEGO, CALIFORNIA 92101
Phone: (619) 741-0282
Email: perez@pvflaw.com

For the Defendants:

JENNIFER LEE-COTA, ESQ.
HEATHER ROBLES, ESQ.
ROBERT McKIRGAN, ESQ.
PAPETTI SAMUELS WEISS MCKIRGAN, LLP
16430 NORTH SCOTTSDALE ROAD, SUITE 290
SCOTTSDALE, AZ 85254
Phone: (480) 800-3535
Email: jleecota@pswmlaw.com
hrobles@pswmlaw.com
rmckirgan@pswmlaw.com

For Arizona State University Office of General Counsel:

KWAN PIENSOOK, ESQ.
ASU OFFICE OF GENERAL COUNSEL
P.O. BOX 877405
TEMPE, ARIZONA 85287-7405
Phone: (480) 965-4550
Fax: (480) 965-0984
Email: ogcmail@asu.edu

PURSUANT TO NOTICE, the deposition of FRANK FERRARA, called for examination by the Plaintiff, was taken via Zoom videoconferencing, commencing at 8:02 a.m., on April 10, 2024, before Dalia Ambriz, RPR, CSR (IL, AZ).

I N D E X


| EXAMINATION | PAGE |
|---|---|
| Mr. Rowlett | 4 |

| EXHIBIT | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 91 | ABOR Cohen2016 - 2021 | 8 |
| Exhibit 92 | ABOR Cohen 317, 318, 315, 314, 999, 1000, 311 | 131 |

P R O C E E D I N G S

- - -

WHEREUPON,

FRANK FERRARA,

having been first duly sworn, was examined and testified as follows:

MR. ROWLETT: Thank you, madam court reporter. We're on the record at 8:02 a.m.

EXAMINATION

BY MR. ROWLETT:

Q Good morning, Mr. Ferrara. My name is Chris Rowlett. I represent plaintiff, David Cohen. How are you today?

**A Good. How are you, Christopher?**

Q I'm well, thank you.

Have we met before today?

**A I don't believe we have.**

Q I don't believe we have either.

**A In this matter, you are being represented for purposes of this deposition -- well, withdrawn.**

**Are you being represented by any attorneys for purposes of this deposition?**

**A I am not -- well, I'm not being represented personally, if that's what you're**

**asking, Christopher.**

Q Okay. What's your understanding of your representation?

**A My representation is as to Former Employee E of Arizona State University.**

Q Okay. What did you do to prepare for your deposition today, Mr. Ferrara?

**A I had a two-hour prep call with ASU attorneys two days ago.**

Q Who was on that call?

**A It was Bob, who's -- I'm not sure his last name. Jenny Lee-Cota was on, as well as Kwan from Kwan Piensook from Arizona State.**

Q Okay. And did you go over any documents during this call?

**A We did. We did go through documents.**

Q What documents did you review?

MS. LEE-COTA: Objection. Hold on a second, Frank.

So, Chris, are you going to clarify whether these documents were used to refresh his recollection?

MR. ROWLETT: If that's important to you. I think I'm entitled to understand what documents he reviewed during a meeting. I don't think the documents

are not attorney-client privilege communication.

MS. LEE-COTA: If he needs to refresh his recollection, then I would agree with that.

MR. ROWLETT: Okay.

BY MR. ROWLETT:

Q Mr. Ferrara, did any of these documents help refresh your recollection about any facts related to this case?

**A No.**

Q No. Had you seen any of those documents before?

**A Yes.**

Q What documents do you remember seeing at that meeting?

**A They were documents --**

MS. LEE-COTA: Hold on a second. So, yeah, so I'm going to go ahead and just allow Frank to describe the documents that we discussed.

You can go ahead and just do a brief description of the documents.

**THE WITNESS: They were copies of items that were found in Mr. Cohen's office shortly after he departed.**

BY MR. ROWLETT:

Q Anything else?

**A No.**

Q Okay. Let's take a look at those real quick; get that out of the way.

What do you remember about those items that you found in Mr. Cohen's office?

**A Christopher, they were -- they were multiple types of items. Are you referring just to the items that I reviewed, or the stuff that was in his office?**

Q The items that you reviewed.

**A They were copies of checks and also other items that -- of Cohen Consulting checks, and other items that were in his office.**

Q Okay. I'm going to -- actually, let me withdraw that.

MR. ROWLETT: Jenny, what's our current exhibit number, do you know?

MS. LEE-COTA: That's a great question, Chris. I -- perhaps Heather knows?

MR. ROWLETT: I can find my notes from the prior deposition.

MS. LEE-COTA: I was not at the last deposition of Kevin Saucedo, so I don't have --

MR. ROWLETT: I wasn't either.

MS. LEE-COTA: -- that offhand, but --

MR. ROWLETT: I wasn't either.
MS. LEE-COTA: Perhaps Heather --
MR. ROWLETT: I know we finished with 50 with Ms. Hatfield Club (phonetic), but I do know that we went past that.
MS. LEE-COTA: Yeah, we went past that significantly because we had plaintiff's deposition --
MS. PIENSOOK: Excuse the interruption. I believe it's 90.
MR. ROWLETT: I'm fine with that.
MS. PIENSOOK: So the next exhibit would be 91.
MR. ROWLETT: Thank you, Ms. Piensook.
BY MR. ROWLETT:
Q So let's mark -- I'm going to show you, via screen share, what will be marked as Exhibit 91. It is a six-page document, Bates-labeled ABOR Cohen2016 through ABOR Cohen2021.
(Deposition Exhibit 91 marked.)
BY MR. ROWLETT:
Q Mr. Ferrara, are you able to see these -- my screenshare?
**A Yes.**
Q This is, again, the first page of this document is a document Bates-labeled, ABOR.Cohen2016.

Is this one of the documents that you're referring to that were left in Mr. Cohen's office after his termination?

A It is, Christopher.

Q Okay. Is this one of the documents you reviewed today?

A I didn't review it today.

Q I'm sorry. It was earlier this week?

A Correct.

Q Are these one of those documents?

A Yes.

Q Thank you. What is this document?

A This is a document that was created by Mr. Cohen back in early 2017 that showed a deep discount, and what I mean, about a 50 percent discount of ticketing packages, both season tickets and what will be referred to as single game tickets for all conference games that he offered to Vivid Seats for a total of $591,000.

Q How do you know Mr. Cohen created this document?

A Because he gave it back to me in January, and I recognized it.

Q So he gave this to you in January 2017?

A That is correct.

Q And at that time, he told you he created it?

**A Yes.**

Q So you already had it in January 2017, and then you went into his office after his chasten and found another copy?

**A Correct.**

MS. LEE-COTA: Object to form.

BY MR. ROWLETT:

Q That's correct?

**A Yes.**

Q And what is this handwriting on here?

**A The hand -- well, which handwriting are you referring to, Christopher?**

Q Any of it.

**A The handwriting on the lower left is David's handwriting. And the handwriting on the top and the lower right is my handwriting.**

Q When did you put your handwriting on the top of that document?

**A It would have been some time after August --**

Q August of?

**A -- or right after.**

**I don't recall exactly when, Christopher,**

**the date, if that's what you're asking. But, clearly, it was after I found the documents I found this document.**

Q Thank you, Mr. Ferrara.

And that was in the midst of 2019?

**A Yes, after 2019. It was in August of 2019. I put my handwriting on this.**

Q Who asked you to put your handwriting on this document?

**A No one.**

Q Why did you put the handwriting on this document?

**A Because I wanted to create a record of when I was meeting with -- we had a meeting with our outside counsel, and I don't recall exactly when that was, Christopher, but I think it was October of that same year, and I was creating, I guess, a time line of the things that I had found in there.**

Q Okay. So do you think that -- does that October 2019 date, does that refresh your recollection as to when you may have put the handwriting on this document?

**A Well, it was some time between August and October let me say that.**

Q Okay. And the handwriting in the bottom

left of the data, as we look at it, I believe it said: Code all the season tickets. Just don't ship first to home games of individual game prorated account VS Corp.

Did I read that correctly? Is that your understanding?

**A That appears to be correct, yes.**

Q And your testimony is that Mr. Cohen wrote that on there?

**A That is correct.**

Q And how do you know that?

**A I know his handwriting, and when he showed it to me, I recognize that that was on the document when he showed it to me back in 2017.**

Q Why did he show this to you back in 2017?

**A I'm sorry, did I cut someone off?**

Q It was just me.

If you knew why he showed it to you.

**A Yes. So in 2017, he had asked if I was okay with offering this to our, let's call it, a secondary ticket provider at this price.**

Q And what did you say?

**A Maybe I didn't want to -- Christopher, I was the chief financial officer at the time, which you may or may not know. That was the purpose of him coming to talk to me about it.**

Q Yeah, we'll get into your work history, and we'll get into that. We'll start with this document because this is something you recently went over and recently reviewed. And it, you know, it was important enough for you to talk about it at that meeting, so I'm just trying to understand what's going on with this document.

So did Dave Cohen come to you and pitch this as a potential partnership?

**A Well, yes. He pitched it, as listen, we need to -- I'm having trouble -- I'm sorry, David was having trouble selling certain seats in certain sections in the coming year and thought it would be a good idea to get a secondary provider, also known as a broker, all right, just so we're clear, to help distribute some of these tickets.**

**So he was coming to me to say this and this the, I think, this is a price that we should be selling for. And there was some discussion, some healthy discussion back and forth. I thought the price was too low.**

Q Okay. So, in your mind, is there anything surreptitious about this document, is there anything surreptitious about trying to find a broker and bringing it to the CFO to see if they could sell some

seats they were having trouble selling?

**A I had concerns about the price, Christopher.**

Q This price was too low in your mind?

**A Yes, it was at a 50 percent -- it was half price.**

Q Did you voice those concerns to Mr. Cohen?

**A Yes.**

Q And what happened after that?

**A Dave felt that we were going to have trouble. He knew -- my recollection, Christopher, was that he -- he felt, listen, we have a new coach, we don't know what's going to be happening. If we get out of the gates low, we have a very tough match-up in our second game against Michigan State, albeit at home, and if things go off the rails, we can have a big problem with selling tickets.**

**He also felt strongly that it was very important to our campus leadership that we show -- we would come and -- this is our -- either our first or second year with our new renovated building, that we show that we could, you know, if not sell it out, come as close to selling out as possible. And I did not disagree with any of that, per se. What I disagreed**

**with was the amount. I thought it was too much of a discount to be offering.**

Q Okay. So was this discount ultimately -- what's the name of the broker; is that Vivid Seats?

**A That's correct. And I believe, Christopher, that's what the VS stands for.**

Q Understood. The VS down at the bottom left, VS Corp.?

**A That is correct.**

Q Thank you. That's helpful.

Did, ultimately, were these tickets offered at this price point?

**A They were.**

Q Okay. And did you voice your concerns about the depth of the discount to anyone else within Arizona State University athletics?

**A I did. I did. I discussed it, and it was after January. I discussed it with our -- well, at January, of course, but then, also, as we let it, it just didn't sit right with me. I voiced it with other members of the ticketing staff.**

Q Who were those members?

**A It was Mike Mateen (phonetic) but that would have been after that 'cause I don't think Mike started until after January. And then Mike's**

**predecessor, I cannot remember his name. I believe his name was Nate -- well, I know his first name was Nate. I don't recall his last name at the moment, Christopher.**

Q And do you recall their views of this discount offer to ticket broker?

**A Yes. Mike and, again, this was after because Mike was hired around this time, Mike had concerns, as well. He said, listen, this is just too deep; it doesn't smell right to me.**

Q And were the tickets ultimately sold?

**A They were sold to Vivid Seats.**

Q Okay. And did Vivid Seats fill those seats?

**A I'm sure they filled some of them. I don't know. I would have no way of knowing whether they filled all of them or not.**

Q Okay. So, at least this document, you were aware of its existence before August of 2019 when you found it in Dave Cohen's office; correct?

**A Correct.**

Q In fact, Dave Cohen had presented this to you as a potential, sounds like, ticket partnership?

**A He did.**

Q And you had a difference of opinion about whether or not the pricing was correct?

A We did.
Q And who was in charge of ticketing at that point?
A Dave was.
Q So whose decision was it, at that time, in terms of what price to offer ticket partners?
A Ultimately, it would be Ray's, as the athletic director, you know, I don't have -- and there's good reason for that. Dave didn't report to me, whatever.
And by the way, the debate we had, I believe, you know, I know you're not asking, it was healthy. It was not confrontational in my view.
My recollection it was just, you know, I wanted -- I agreed with the premise. I just was concerned about the price, so -- and Dave felt concerned, jeez, the goal here, Frank, is not the revenue, the goal is, I believe, his words were affinity, meaning that we needed to just -- we had to really make sure that we did the best job we could to fill this house, especially since it was our, again, either our first or second year with the new complete building. And there had been some pressures on all of us from campus, mainly from President Crow, about not having sold out games.

Q Needed to put bunson (phonetic) seats?
**A Needed to put bunson seats.**
Q And did -- are you aware if Mr. Anderson weighed in on this, you know, let's say, healthy difference of opinion you had regarding the discount to the ticket broker?
**A He did.**
Q And what was his decision?
**A He heard us out and he felt like -- he eventually gave his approval to offer this.**
Q Okay. So this discount, that was ultimately offered to Vivid Seats, was approved by Ray Anderson some time in the 2017 time frame; is that correct?
**A Yes. Some time in the 2017 time frame, yes.**
Q Excellent. Let's go to page 2. What is page 2?
**A So page 2 is a copy of Dave's -- sorry, Cohen Consulting's checkbook.**
Q Okay. Who made this copy?
**A I did.**
Q And there's some handwriting on this. Is that your handwriting?
**A It is, Christopher.**

Q And what does it say there?

**A $690,000 deposit received from Vivid. Check number 1154 written to Edward Jones account.**

Q What's the significance of this document?

**A Because he received a payment of $690,000 from Vivid Seats.**

Q That's what the checkbook reflects?

**A Yes -- well, that's what it says, yeah.**

Q Did you ask -- are you an owner or member in Cohen Consulting?

**A No.**

Q Did you ask Dave Cohen if you could make a copy of this checkbook?

**A I did not.**

Q Did you ever tell Dave Cohen that you made a copy of this checkbook?

**A I did not.**

Q Did anyone ask you to make a copy of this checkbook?

MS. LEE-COTA: Object to form -- I'm sorry, objection. Hold on a second.

To the extent, Frank, that this requires you to divulge attorney-client information, I'm going to caution you not to answer.

So just for context, Chris, there's

investigations going on that we've disclosed and discussed related to Vivid tickets.

So, Frank, if you can answer -- if you can answer this without going into attorney-client communication.

**THE WITNESS: I'm sorry, how do I do that then?**

MS. LEE-COTA: Okay. Well, then I'm going to instruct you not to answer.

**THE WITNESS: Okay.**

MR. ROWLETT: Thank you.

BY MR. ROWLETT:

Q Just so I'm clear, I was confused. I thought you went into his office in August of 2019 and found some documents and made some copies. Did someone ask you to do that?

MS. LEE-COTA: So, Chris, we're getting into instructions provided by --

MR. ROWLETT: I'm just asking if someone asked him to do that. I didn't ask who.

BY MR. ROWLETT:

Q Did someone, Frank, ask you to go into Dave's office and make copies of documents?

**A Yes.**

Q Was that someone an attorney?

A Yes.
Q Was that an attorney in the general counsel's office of the university -- or Arizona State University?
A Yes.
Q When did you go into Dave Cohen's office to make these copies?
A It was prior -- it was after he left, but prior to him, obviously, picking them up. So some time in August.
Q This first document that we looked at, Bates-labeled 2016, you already had a copy of this -- withdrawn.
Did you already have a copy of this before you went into Dave Cohen's office in August of 2019?
A I don't recall.
Q But this one that we see here --
A Oh, no, which one? I'm sorry, I'm looking at the wrong doc- -- this one I did, yes. I thought you were talking about the other one.
Q Do you have some documents in front of you, sir?
A It's the same ones.
Q The same six documents -- we haven't --

we've only gone through two, but the same six documents that I just --

**A Correct.**

Q -- marked as Exhibit 91?

**A Yes.**

Q Do you have any other documents in front of you right now, sir?

**A I do not. Nothing, Christopher.**

Q Thank you.

Where are you physically located today, Mr. Ferrara?

**A I'm in Arizona today.**

Q So let's get through these documents and then we'll go back. So let's look at document number three then. What's document number three?

**A Christopher, can I look at my copy? I can't see that. Can I look at my copies?**

Q Sure. Is it Bates-labeled ABOR.Cohen2018 on the bottom right corner.

**A Yes.**

Q Do you have any other notes or anything -- is there any other notes beyond what's in this document here?

**A No, it's the exact same. I can't see what's on the screen.**

**There you go, that's better. Okay.**
Q What's this document we're looking at here. This is -- document Bates-labeled ABOR.Cohen2018.
**A So it's a copy of -- it says February 2017 Edward Jones' statements, showing the addition of $690,000 and note: There is no withdrawal of $690,000 yet.**
Q Okay. And this is your handwriting at the top?
**A That is my handwriting.**
Q Okay. How many pages did you copy after the general counsel asked you to go in and search Dave Cohen's office?
MS. LEE-COTA: Object to form.
Frank, you can answer that one.
**THE WITNESS: So yeah -- these are the only copies -- I don't recall if there were more than this, if I made any. And if there are, I don't have them right now.**
BY MR. ROWLETT:
Q Okay. And did the handwriting at the top here, this is your handwriting?
**A Yes.**
Q Okay. And did anyone ask you to make these handwritten notes on this document?

A No.

Q Why did you do it?

A I did it to -- for the same reason I stated earlier, to provide a record to the attorneys that were asking as part of the investigation.

Q Is this Mr. Cohen's personal Edward Jones' account, or is this Cohen Consulting's Edward Jones account statement, do you know?

A I do not know.

MS. LEE-COTA: Object, foundation.

BY MS. LEE-COTA:

Q Did you tell Dave Cohen that you were making copies of his Edward Jones' accounts statements?

A No.

Q Let's look at the next page. I'm going to rotate this on the viewer 'cause it seems the handwriting is at the bottom of the page.

Let's read the handwriting and then we'll go back -- this is document Bates-labeled, ABOR Cohen2019. What's this document, Mr. Ferrara?

A It's February 2017 Edward Jones statement is detailed. And it says check received from Cohen Consulting number 1154 on February 21st.

Q And was this another one of the documents that you copied from Mr. Cohen's office pursuant to

counsel's instructions?

**A Yes. You keep saying that and I don't know if that's accurate. I just wanted you -- you keep saying per their instructions. It was found in the office by someone else, and we told counsel what was in the office.**

Q Who found it in the office?

**A Mike Chismar (phonetic) found it.**

Q Was Mike Chismar asked to go in and search Dave Cohen's office?

**A There were items that were left --**

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: Maybe I should --**

MS. LEE-COTA: Hold on. Hold on, Frank, just a second.

So, Frank, if you know the answer to this question, and it doesn't go into any attorney-client privilege communications, then you can go ahead and answer. But if you -- I'm just going to instruct you not to answer if it goes into information you know because of attorney-client communications.

**THE WITNESS: I'll try to answer the best way I can.**

**Mark Chismar was going through his office**

**to clear it out for another employee to take the office over, and there were items that were found after he left -- after Dave -- at least what was left the first time. He subsequently came and picked them up, I think, a couple of weeks later.**

BY MR. ROWLETT:

Q Did you ask Mark Chismar to go collect -- well, withdrawn.

Is it fair to say that Mr. Chismar was asked to collect Mr. Cohen's personal effects from his office to clear it out?

MS. LEE-COTA: Object to foundation.

**THE WITNESS: Yeah.**

BY MR. ROWLETT:

Q You don't know?

**A No.**

Q Is this your -- we see a picture here. Is this your hand?

**A That's my hand.**

Q Where were you when you took this picture?

**A I was in the office.**

Q Your office?

**A No -- well, all of our offices, I guess. I was at Arizona State University. I don't have a copy**

**machine in my office, so I believe that was the copy machine in the hallway, Christopher.**

Q Thank you. And did Mr. Chismar provide -- how did you get these documents -- withdrawn.

How did you get these documents from Mr. Chismar?

**A Mr. Chismar called me and said, listen, we found some things in his office. It looks like a checkbook and some other documents. So I walked in there with him. He was already looking at -- and there were other items, too, that were, obviously -- we were trying to question whether they belong to Dave or whether they belong to ASU. And I opened up the checkbook, and it said, no, this is his checkbook, this is not ours.**

Q At that point you identified this was Dave Cohen's personal property, not Arizona State property; is that correct?

MS. LEE-COTA: Object to form.

**THE WITNESS: That is correct.**

BY MR. ROWLETT:

Q I'm sorry, your answer was that's correct?

**A My answer was that's correct.**

Q And you decided to make copies of some of

Dave Cohen's personal property?
MS. LEE-COTA: Object to form.
**THE WITNESS: Does that mean I can answer? I've never done --**
MS. LEE-COTA: Yeah, yeah, Frank, you can answer.
**THE WITNESS: Okay. Christopher would you mind repeating the question?**
BY MR. ROWLETT:
Q Yeah. When you -- after you identified certain items, as Dave Cohen's personal property, at that point you decided to make copies of those items?
MS. LEE-COTA: Object to form.
**THE WITNESS: I did.**
BY MR. ROWLETT:
Q And was this before or after you had a conversation with counsel?
**A After.**
Q So what happened between when you determined that this was Dave Cohen's personal property and when you made copies. Did you call counsel, did they call you?
**A I did not call counsel and they did not call me.**
Q How did you get from identifying this as

Dave Cohen's personal property to making copies of it?

**THE WITNESS: Can I answer, guys?**

MS. LEE-COTA: Yeah.

So, sorry, Chris. Go ahead and finish your question.

MR. ROWLETT: That was it.

BY MR. ROWLETT:

Q I'm trying to understand what happened here between when you identify a former employee's personal property, and then, at some point, it sounds like counsel asked him to make copies of it. And I'm trying to understand how we get from identifying, in his personal property to counsel, saying send us copies of this.

MS. LEE-COTA: Yeah. So there's -- yeah, so there's -- okay, well, I don't know that Frank --

Frank, I don't know that you can answer this without going into attorney-client privilege.

**THE WITNESS: Can I give historical context?**

MS. LEE-COTA: Yeah. If there's facts that don't involve --

**THE WITNESS: Yes.**

MS. LEE-COTA: -- discussions, yeah, with counsel.

**THE WITNESS: Sure.**

**Christopher, there's historical context here when he was caught two years earlier doing this exact same thing. At the end of the day, I'm the chief financial officer of Sun Belt Athletics. While this is his personal property, I have to safeguard whether he's stealing our assets.**

BY MR. ROWLETT:

Q So it sounds like you made this decision to copy the documents on your own; is that fair?

MS. LEE-COTA: Object to form. Asked and answered.

BY MR. ROWLETT:

Q I mean, did you or did you not. If you're acting as the CFO, Mr. Ferrara, I just heard you tell me that you're acting as the CFO, and you want to make sure that this former -- this former employee, to your understanding, was not stealing. I'll get into the he was caught two years ago, but -- so you made the decision on your own to make these copies?

MS. LEE-COTA: Object to form.

BY MR. ROWLETT:

Q You can answer, sir.

MS. LEE-COTA: Yeah.

So, Frank, if you can answer -- and

sorry, he's already answered this, and he's already explained what he did and when he did it. And there's, to the extent there's attorney client-privilege instructions that you're being given, Frank, don't discuss that.

MR. ROWLETT: Well, Jenny, here's my concern is that, presumably, you're going to try to use these documents at trial or some later date. But I'm being cutoff from asking questions because you're colloquialling them in attorney-client privilege about their origin. I have got black and white copies of portions of pages of Dave Cohen's personal property. It seems like if either I'm going to be able to ask questions about the origin, the chain of custody of these documents or I'm not going to be able to, and you're not going to be able to use them.

MS. LEE-COTA: Well, you've already asked -- you've already asked the origin. He's already explained that this was documents that were collected as a result of cleaning out Dave Cohen's office by ASU employees. There's -- you know, that there's instructions from ASU counsel related to these documents.

MR. ROWLETT: But how we got --

MS. LEE-COTA: You know the origin --

MR. ROWLETT: -- those instructions, that's where we're at. I'm trying to understand how he got those instructions. Did he call someone and say, oh, we got a smoking gun here, do you guys want copies; or were they instructed, hey, listen, look for dirt on Dave Cohen.

I'm trying to understand how this went in the process because there's a gap here between cleaning out an office and making handwritten notes of things that Dave Cohen did wrong and sent to general counsel. So you see, there's a big difference between we're cleaning out a former employee's office. So we can bring in someone new in to our six pages of what I view are theft by a former employer. There's something that happened in between, and I'm trying to understand how we got there.

MS. LEE-COTA: First of all, there's no expectation of privacy in a university employee's office. The characterization of this action is theft is incorrect.

MR. ROWLETT: No, no, I didn't say -- I'm saying Frank Ferrara -- Mr. Ferrara just said that he was concerned that Dave was stealing from Arizona State. I'm not saying that Frank stole these documents. I did say he copied his personal property, but I didn't say

Frank Ferrara stole these documents. I was saying that Mr. Ferrara said that he was concerned Mr. Cohen was stealing; that was the theft I was referring to.

MS. LEE-COTA: Yes. And he explained the historical context of this.

I don't know that Frank has the answer that you're looking for, Chris. I don't know that he is part of that discussion related to what Office of General Counsel is instructing at the time.

So to the extent that -- I mean, we can go ahead and ask a question.

MR. ROWLETT: Let me back up. Let me go it a different way.

MS. LEE-COTA: Yeah.

BY MR. ROWLETT:

Q Mr. Ferrara, you referenced a guy named Mike Chismar. Is that who you said cleaned out his office?

**A No, Chismar.**

Q Chismar. Thank you. Is it C-H-I-S-M-A-R?

**A That's correct.**

Q You don't know who instructed Mr. Chismar to clean out Dave Cohen's office; is that correct?

**A I wasn't part of the conversation. I'd**

**be guessing.**

Q Okay. No need to guess.

Did Mr. Chismar call you and bring you into Dave Cohen's office to look at these documents, or did he bring the documents to you?

**A He called me in.**

Q So now you and Mr. Chismar are in Dave Cohen's office in August of 2019; correct?

**A His former office, yes.**

Q Thank you. His former office. Because, at that point, he had been terminated; correct?

MS. LEE-COTA: Object to form.

**THE WITNESS: I think he was on administrative leave was the proper term. He left the office, right, it was right after he was let go.**

BY MR. ROWLETT:

Q Was Dave Cohen escorted out of the office?

**A I wasn't there, Christopher. You know, I don't know. I was not there.**

Q And when you -- when Mr. Chismar brings you into the office, you see these documents. What do you do?

**A I look at them. He thought -- he said, I think these might be ticket-office checkbooks, and I**

**looked, no, no, this is his. This is his. And that was it.**

Q Well, then, what did you do?

**A He showed me other items that he was wondering whether they were truly Dave's or not. There were other items in there. There was things like multiple boxes of brand new sneakers from Adidas. There was a refrigerator from Coke, there was helmets, there was all sorts of things in there that they were trying to get a determination of whether they truly belonged to Dave or whether they belonged to Arizona State.**

Q Okay. Focussing specifically on the documents, what did you do. It sounds like you identified this as documents that were of concern to you. What did you do next?

**A I copied them.**

Q So before anyone asked you to do anything, you copied the documents?

MS. LEE-COTA: Object to form.

**THE WITNESS: And I don't recall the time line. I'm not trying to be cute. I know you have -- I don't recall this here, so I don't know when we were told -- we were told what was in the office. I don't recall the exact steps of when I exactly copied them, Christopher. I know why I copied them. I can talk --**

**speak to that, but I don't know the answers -- the answers to the questions you're asking me.**

BY MR. ROWLETT:

Q And the reason you copied them was because counsel for Arizona State asked you to copy them?

**A No.**

MS. LEE-COTA: Object to form.

**THE WITNESS: I feel like I answered this already, you know.**

BY MR. ROWLETT:

Q And maybe I misunderstood 'cause I had the time line wrong in my head, and I'm sorry, that's my fault.

Why did you copy them?

**A Perhaps, yeah, but I -- my -- the reason why I wanted -- let me say it. The reason why I wanted to copy them was because there was a historical context of him, you know, getting in between transactions with brokers and profiting on them. And so I needed to find out before, you know, anything -- if there was anything else going on, I wanted to know about it as chief financial officer.**

**I want to be clear. There was nothing in my intent to do anything that that would hurt**

**Dave Cohen. I never would throw this on social media or do anything that would prevent someone that I -- you know, Dave from getting another job. I did not want to hurt him in any way. But, yeah, I needed to know if he was getting involved in that and that transaction was something because I felt it was low, something I had my eye on.**

Q And then after you made the copies -- well, it sounds like you made the copies before -- withdrawn.

No one asked you to make these copies. You just made the copies; is that correct?

MS. LEE-COTA: Object to form.

**THE WITNESS: No, it's not.**

BY MR. ROWLETT:

Q Oh.

**A I told you what I wanted to do, and we're getting close to the attorney-client privilege, so I'm not going to -- you keep asking; I can't answer it, Christopher.**

Q And I get it, I'm not -- believe it or not, at this point, I'm not trying to get into attorney-client privileged communications. Jenny and Bob and Heather and I can have that conversation later. But right now, I'm just trying to understand the order

of operation 'cause I thought what you just told me is that you saw these documents, they were concerning to you, and you make copies.

**A I wanted to badly because for the reasons that I did.**

Q Okay. You wanted to make copies, but you didn't make copies at that time?

**A No, not at that time, Christopher, not immediate.**

Q That clarifies it, thank you.

What did you do with the documents at that point?

**A I -- we -- I told -- I instructed -- I asked Mike Chismar what is he doing with everything else. He said he was locking it up in the office until Dave had an opportunity to pick up certain things that he still believed was his. And there were other things in it. It wasn't just his checkbook, like I said. There were other things in there.**

**I seem to remember a Coke machine like a -- not a Coke machine, a refrigerator that was branded Coke that Dave believed was his, and I think we did give that to him, and there was other things, as well. So we did not let the next employee, if you will, the future employee occupy the office until Dave came and took**

**everything in. So things were put back in his office --**

Q Thank you, I didn't mean to cut you off. I thought you were done, my apologies.

Were these documents in the office when Dave came to clean out his personal effects?

**A Yes.**

MS. LEE-COTA: Object to foundation.

BY MR. ROWLETT:

Q Yes, to your knowledge they were?

**A To my knowledge they were because I say that only because I know, at some point, he picked them up, so --**

Q So if I'm understanding the order of operations here, Mike Chismar was asked to clean up Dave Cohen's old office for another Arizona State employee to occupy. He saw some things. He had some questions about what was and was not Dave's personal effects. He calls you in. You see some things, including these documents. They raise some concern for you. You want to make copies at the time but don't. You lock everything in the office and then, at some point, you're told to make copies, you make copies, handwritten notes; I found those. And then those documents -- the originals are put back in Dave Cohen's office and then he collects his small effects.

Do I have that right?

MS. LEE-COTA: Object to form. Yeah, object to form.

MR. ROWLETT: Do I have that right, Mr. Ferrara?

MS. LEE-COTA: You can answer -- Frank, if you can answer that, you can answer it.

**THE WITNESS: Yeah, I think that's -- to the best of my recollection, Christopher, I believe that's what had happened.**

BY MR. ROWLETT:

Q Okay. Thank you. And did you send these copies to anyone other than Arizona State University --

**A No.**

Q -- attorneys?

**A No.**

Q Did you send copies of these documents to Mr. Anderson?

MS. LEE-COTA: Object to form.

**THE WITNESS: No.**

BY MR. ROWLETT:

Q Did you talk to Mr. Anderson about these documents that you found?

**A I believe I did, yes.**

Q When did you talk to Mr. Anderson?

A And I don't know that I necessarily showed them to him. I don't recall if I did or didn't. But my guess -- my best recollection, Christopher, would have been prior to, and I'm trying to remember when I first was -- when they were doing the investigation they were. And that -- my recollection was October-ish of that same year. I think prior to that I had told Ray.

Q And you said the investigation. At some point did you meet with an attorney named Carrie Love regarding --

A I did. Yes.

Q And that is the investigation to which you are referring?

A Yes. And I don't know if that's the proper term, Christopher. She interviewed me, she was the outside counsel at the time, and she had interviewed me and, I believe, others were interviewed, as well. And I gave these documents to her.

Q Thank you. That was going to be my next question.

You gave copies of these documents to Ms. Love.

A I gave -- I gave the only copies I had to Ms. Love.

Q Okay. Other than the copies that you

gave to Ms. Love, did you give copies to anyone else?

A No, no.

Q So you never sent copies to ASU's general office?

MS. LEE-COTA: Object to form.

THE WITNESS: I had one copy, and I gave it to Ms. Love.

BY MR. ROWLETT:

Q And did you send it to her via E-mail, or did you physically hand it to her?

A I physically handed it to her.

Q When you handed it to her, did it have your handwriting on it already?

A It did. The handwriting was for Ms. Love.

Q Ms. Love asked you to put the handwriting on it?

A No, no, that's not what I said, Christopher.

Q Oh.

A The handwriting I done it was in advance of that meeting so that someone who may not be financial savvy, or whoever's looking at it, I had not met her at the time. I was giving it to her so that she could understand how things were.

Q Thank you. So to be -- sorry, to be -- no one asked you to put the handwriting on it. You did it just as a way to make sure that whoever saw those documents in the future could understand what you understood them to be?

**A That's correct.**

Q Thank you. Okay. Next document -- I'm going to rotate this 'cause now we're upside down.

**A Christopher, again, I'm looking at my document. It's the same thing that you're looking at.**

Q Document Bates-labeled ABOR Cohen2020.

**A Okay.**

Q This appears to be a copy of Dave Cohen and Kathy Cohen's personal Edward Jones statement; is that correct?

MS. LEE-COTA: Object to form, foundation.

BY MR. ROWLETT:

Q Is that your understanding, Mr. Ferrara?

**A I'm looking at it now, Christopher, and it says on the top left corner that it's David H. Cohen and Kathy N. Cohen.**

Q Was this a document you found in -- withdrawn.

Was this a document that was found in

Dave Cohen's former office at Arizona State University?
A Yes.
Q And the statement date is for the period November 25th through December 31, 2017; is that correct?
A Yes.
Q Kind of the fifth line down at the top of the page?
A Yes, that is correct.
Q Without getting into attorney-client privileged communication, are you able to tell me who asked you to copy this document?
A Same answer as before. They were all part of the same. They were done at the same time, Christopher, all these documents.
Q This handwriting next to number five and a circle, is that your handwriting?
A That is my handwriting.
Q And what does it say, sir?
A It says December 2017. Edward Jones statement, annual column. It shows both the $690,000 coming in and being sent out from the account.
Q Why does this document concern you?
A Because it shows that he made a hundred-thousand dollars personally on that

**$590,000 transaction.**

Q And you're getting that from -- where is there a $590,000 transaction?

**A That first page, Christopher, 595,000 and change, yes.**

Q This is, up on the screen, I'm looking at, and you have a copy, but ABOR Cohen2016. This is the spreadsheet that Dave Cohen showed you back in 2017, reflecting a total amount of 59055 circled?

**A Correct.**

Q And what is that? I see that's in the column for total. But what does that total mean?

**A That's the total amount that Arizona State received for those tickets.**

Q And did Vivid Seats write Arizona State University a check for $591,055?

**A Many months later.**

MS. LEE-COTA: Object to foundation.

BY MR. ROWLETT:

Q So, yes, at some point in time, Arizona -- Vivid Seats wrote Arizona State -- you received a check for $591,055?

**A I believe that was in -- yes. And that was about four or five months later I thought.**

Q Why is the timing of that significant?

**A Because in the middle, there was a $690,000 transaction that they paid Dave Cohen.**

Q And -- withdrawn.

Arizona State agreed to sell certain block of tickets to Vivid Seats for $591,055; correct?

**A Dave Cohen -- you need to replace Arizona State with Dave Cohen set that price. It was eventually agreed to, but he's the one who set that price.**

Q Sure. But Dave Cohen -- Arizona State University agreed to sell Vivid Seats a block of tickets for $591,055; correct?

**A Dave Cohen set that price, and it was low, and, eventually, it was agreed to. But it was something that we were all concerned that was low.**

Q Okay. I understand that. Let me ask it a different way, so we can get an answer.

Arizona State University agreed to sell a block of tickets to Vivid Seats for $591,055, a price that you believed to be low; is that correct?

**A And it was set by Dave Cohen and then I'll say yes.**

Q Okay. Dave Cohen representing Arizona State University -- withdrawn.

**A You had it.**

Q You told me earlier that Ray Anderson agreed to that price; correct?

**A He did. After some considerable back and forth, yes.**

Q And you told me earlier that, ultimately, it was Ray Anderson's decision; correct?

**A Yes. That's correct.**

Q So Ray Anderson agreed to sell Vivid Seats a block of tickets for $591,055; correct?

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: Can I answer one of those? Again, I've never been deposed before.**

MS. LEE-COTA: You can answer -- you can answer, Frank.

**THE WITNESS: I understand.**

**So, yes, if this answers your question, Christopher. Eventually the amount was blessed by Ray. We did have some -- a very healthy -- it was not confrontational, it was not, the discussion about whether that's too low or not, and we eventually agreed to do it.**

**As you can -- I was suspicious, all right. I'm going to be honest with you. At the time I was suspicious. And then in the middle of this**

transaction, if you're wondering what happened here, it's time to just stop this 'cause we'll be here all day, all right.

The other investigation started on a much smaller transaction where Dave did get caught stealing tickets, and he got caught in the middle of a transaction. He already received 690-grand from Vivid and then, oh, my God, he had to send it right back to them. That's what happened here.

BY MR. ROWLETT:

Q Okay.

A And the evidence here, it proves it.

But, again, I'm not trying to -- this was not tried to defame or anything, I just needed to see the extent of what he was doing.

Q Got it.

A That's why I did what I did. I did nothing with it. I didn't share this thing. Nothing with this thing. There was no intent other than to just, say, okay, I need to understand the totality of what this individual potentially did or didn't do with our brokers.

Q But getting back to -- thank you for that, Mr. Ferrara.

Getting back to my question -- well, let

me take it a different way.

Is it common in the businesses in which you've worked, where a salesperson goes out and negotiates a price transaction, and then takes that price to their supervisor. Has that price -- even after some healthy debate, agreed to, and then the entity enters into that transaction on those terms. Is that a fairly standard process or your experience?

**A I think so. I think that's fairly standard.**

Q And is that the process that happened here, as it relates to this 591,055 purchase of tickets by Vivid Seats?

**A Well, no, I just told you --**

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: And the answer is no. What happened there was in the middle he took a $690,000 check right after this. So he sold it for 591 and took a $690,000 check that then turned around and had to give it back to them because he knew he was about to get caught.**

BY MR. ROWLETT:

Q And then so your -- your testimony is that -- well, let's look at the dates here 'cause

this -- this was presented to you in January of 2017, is that right, this first document?

**A Correct.**

Q That's the date that you have identified on the top, 1/26/2017; correct?

**A Yes.**

Q And then the check, there's a check in Dave -- or Cohen Consulting's check. How do we know this is Cohen Consulting's checkbook, sir? Is there anything on this page that shows this is Cohen Consulting's checkbook?

**A I can't see it on that page. But the checks itself, Christopher, my recollection was that they said Cohen Consulting on them.**

Q But there's nothing on this document, including in your handwriting, that says this is a Cohen Consulting checkbook; correct?

**A No, it is not. On that picture, no, it is not. If the picture was extended on the right, you see what I'm saying, you would see it's a Cohen Consulting checkbook if it was extended on the right-hand side.**

Q I understand what you're saying.

**A Yes.**

Q And then this shows -- this -- the

handwriting here, whose handwriting is this?

A Mr. Cohen.

Q And you testified to that based on your familiarity with his handwriting?

A That is correct.

Q A $690,000 check, added to a balance of $432.82, for a total of $69,432.82. Am I reading that correctly?

A You are, yes.

Q Why is there then a balance at the bottom that says $432.82. What does that mean?

A Well, he's got -- that check to the right of it was $690,000 going back to Vivid.

Q So in February --

A Oh, I'm sorry, I'm sorry, strike that please.

It was a check going from Cohen Consulting to his Edward Jones account. I'm sorry. It says Edward Jones there. So he was depositing in his investment account, I apologize.

Q So your testimony is that -- withdraw it.

Is there anything on this document that shows $690,000 check coming from Vivid to Cohen Consulting?

A The deposit where it says Vivid.

Q Right here? This is where my hand --
**A Right.**
Q Okay. But you didn't see a copy of that check?
**A No, I did not see a copy. What I saw was the 690,000 going into the Edward Jones account.**
Q And this is that page ABOR Cohen2018?
**A Correct.**
Q And then this next page, this photograph with your hand on it?
**A Let me see, hold on.**
Q 2-0-1-9. Remind me what this page shows?
**A Check received from Cohen Consulting. So that was that very same check that you saw in the previous -- the previous one that --**
Q Check number --
**A -- you saw in the checkbook?**
Q That appears to be --
**A -- that's going from Cohen Consulting.**
**I'm sorry, Chris, you speak.**
Q No, we're doing not a good job of cross-talking, and my apologies to the court reporter.
Maybe this says 1-1-5-4 --
**A Yes.**
Q -- this check number? And if we go back

we can see --
A I think it says 1-1-5-4, yes. And that just shows -- that just shows the check going in from Cohen Consulting to his Edward Jones account which, I guess, is where he keeps his investment -- his investment accounts.
Q And then in November of 2017, there's a withdrawal from the Cohen's personal Edward Jones account of $690,000, is that correct, is that what this document reflects to you?
A No, that's in the annual accounts. So sometimes that year, not necessarily in that time frame.
Q Okay.
A So you notice it doesn't -- Christopher, notice it doesn't say in that period.
Q I do, I do. That's helpful.
A It's some time in that calendar year.
Q We don't know when?
A We don't know when.
Q Based on this document?
A Based on this document, we do not know when, correct.
Q And then what's this document here?
A The last one -- are you referring to the Vivid check at the bottom of the last document?

Q Um-hmm.

**A I believe that's when Vivid finally paid after the transaction cleared with the 690 that he said, all right, listen. You guys got a hundred-thousand dollar break, we're going to sell it to you for 591.**

**And I need you to understand it was in the middle of this transaction that he got caught when the other ticket investigation was going on and then he had to unravel it before things got worse.**

Q Okay. A couple of things. You just said you got a hundred-thousand dollar break, I'll sell it to you for 591. Who were you doing an impression of there?

**A I'm sorry, Dave Cohen. I should not do that for the court reporter.**

**But this is when -- this is months later now if you notice that instead of Vivid paying 690 to Dave Cohen, they now paid 591 to Arizona State.**

Q And do you have -- did Mr. Cohen say that -- did Mr. Cohen tell you he went to Vivid and said I'll give you a hundred-thousand dollar break and you pay --

**A No, no, he never said that. That was my -- again, I should not do that in this setting. Sorry.**

Q So that's your -- that's your assumption

as to some conversation that may or may not have happened between Mr. Cohen and Mr. --

**A Exactly right and, yeah, I shouldn't -- yes.**

Q And this handwriting at the top, this is your handwriting?

**A That is my handwriting.**

Q What's the significance of May 14th, 2019?

**A Because it was months after. I want to make sure the time line, it was months after the original price was, I think, it was back in January I think we just saw. So four months after the price was agreed to, Vivid wound up paying Arizona State. But in the middle of this time frame, Christopher, there was a large transaction between Vivid and Dave Cohen that had to be unravelled. They paid him 690 -- roughly a hundred-thousand dollars more than that.**

Q Well, this 5/14/19 date at the top is two years and four months after; correct?

You're talking about 2017 time frame. Your handwritten note at the top is 5/14/2019. So I'm asking what the significance of May 14, 2019 is.

**A I'm sorry. Can I -- it's blurry. What is the date of this check? Can you see? Can you blow**

**that up for me, Christopher?**

Q I can try. It appears to be 2017.

**A Then the note is wrong. Sorry. My handwritten note is wrong. It should be 5/14/17.**

Q Okay.

**A The notes --**

**THE WITNESS: To be clear, court reporter, the handwriting on the top of this, that's my handwriting, is incorrect. It should say 5/14/17.**

BY MR. ROWLETT:

Q Okay. And I see the date on the check, best of my ability, the top half it says 5/10/2017. And then there's a second line down here on the top that appears to maybe say 5/14/2017. Is that the date that you understand that Arizona State maybe received or processed the check?

**A Probably, yes. That would be, again, this copy, unfortunately, is blurry but that would be a good assumption I would think.**

Q And while I can't read it, can you read what that number is there on that check -- oh, wait. We can read the words, 500 --

**A Yeah, I think it's the exact same as the first thing, I believe. If you blow it up, we could figure that out for sure. But I believe it's the 591.**

Q I can't read it but let's just say it's $591,055.

Okay. So did you ever ask Dave Cohen about this particular Vivid Seats transaction?

**A No. Dave and I never spoke, other than minor things we bumped into each other. We never spoke after he left Arizona State.**

**We had a one chance meeting after that on a golf course where we had a very cordial conversation maybe a few years later, but Dave and I never spoke after this.**

Q So let's talk about this other context you talked about historical context for your -- actually withdrawn.

Was this document a copy from Dave Cohen's office, this page 2-0-2-1?

**A No, it was not. That was -- I'm going off recollection here, but I believe I asked either one of my people, you know, my main lieutenant in the Sun Devil Athletic Finance or perhaps someone in the ticket office to, you know, show me how Vivid paid for these tickets, and I got this check from them. This check was not found in his office, this item right here.**

Q Did someone ask you to --

**A No, that part I did on my own.**

Q Okay. And you sent these documents -- or you handed these documents to Ms. Love in the context of her investigation of -- in the fall of 2019; is that correct?

**A Yes.**

Q Now, let's go back and talk about the historical context that you were referencing earlier. What other investigation were you referencing regarding Mr. Cohen's conduct of ticketing?

**A There was an investigation that took place in the spring of 2017 about certain things that he had done with ticketing. Similar to what we did here, albeit on a smaller scale specific with respect to bowl tickets -- sorry, football bowl tickets.**

Q What's your recollection of that investigation?

**A To be more specific, it was large. Can you be more specific?**

Q How did it start?

**A It was complex. I got a call from our chief operating officer, I believe, in Marchish of 2017. He said, hey, heads up, there's an investigation going on on bowl tickets, and it appears, you know, Dave is involved. Have you heard anything about this? I says I have not, you know.**

And he said, well, just to be clear because it's something, you know, you don't want to be where, you know, Dave is doing something, and it looks like maybe one of his other colleagues -- Greg McElroy's involved, and this is happening under your nose and asleep at the wheel.

And I said, well, when did it happen. And he says it was the -- the bowl game for -- or bowl game of the Rocky -- his name is Rocky Harris. We were not in the bowl game last year. So are you talking about the year prior? And he said that we were. I said, well, I was not the CFO then, right, it was my predecessor back then.

But can you be more specific? Is there something that I should be looking for? And he said -- he would not be. He just said, look, they are investigating that he's doing something really strange with bowl tickets, that's all I'm going to let you know, and the OGC is aware of it is what he told me.

So I called my two lieutenants at the time. Their names are Chris Tudor and Dan Wakely. And I told them everything with the exception of anybody's name. I did not say Dave's name. I said, if you wouldn't mind, take a look at the bowl -- and to be clear, this would have been bowl season late 2015, and

see if you see anything odd. I do remember Chris saying can you describe odd. I said anything big that looks strange to you; please look at the tickets.

And then he -- it was -- Christopher, it was about a day or two later, Chris and Dan came to me and -- they actually they called me. I was on -- I was at home at the time. I might have been on vacation actually. They called me and they said that they found something strange. And it was a $32,000 check from Cohen Consulting that was really big for a bowl thing. And then I said, well, does that name ring a bell to you guys. He goes, this is not Dave Cohen, is it, I said, oh, yeah, it is. Yes, it is. So Dave was purchasing a large volume of bowl tickets and giving them to a broker.

So I didn't do anything at the time other -- like in terms of my own investigation. Nothing.

I did speak to Morgan Olson, our university CFO. I set up an in-person meeting with him. I told him what had happened that he had -- it looks like he was securing large amounts of tickets and then sending them to a broker. And then Morgan said, got it. I'm going to take it from here. I have people on my staff that have audit background, and we got it, okay.

You are to do nothing, all right, so -- and then they took it from there, and they had an investigation.

As part of that, they did see that there was large amounts of questionable transactions between him. And at the time it was not Vivid Seats, it was actually a company called Prime Sport where he was taking large amounts of tickets. At the time we could -- we had -- maybe I should back up.

Each school gets a quantity of tickets to bowl games, even if they're not competing in it, that they can order. Dave was, for lack of a better term, hoarding them and then turning around and selling them to Prime Sport.

And it appears that there was also something where he sold it for one price. It was somewhere along the lines of $32,000 or so, I think, was the amount. But then he got what I call, in the industry, getting in the middle of the transaction where he actually -- he bought the tickets himself and then had the broker pay him directly. And it appears he made somewhere along the lines of $14,000 or so on that transaction.

And then as part of the -- you know, sorry for the long-winded answer, but let's get this all on the table now. And as part of their investigation, I

guess, whatever they went about to do that, they uncovered that he was also a paid -- he was receiving money from Vivid Seats and another broker in the amount, I believe, it was $20,000, and signed a consulting agreement with them to be on their board, I believe it was their board of directors, where he got $20,000.

And I think the issue that Arizona State had was, you know, Vivid had, I think, a two-year deal it was, Christopher, from 2015 to 2017. And then Dave was overseeing the RFP or Request for Proposal process of determining who are next ticketing provider would have been for the 2017 through '19 season, and then Dave selected Vivid Seats -- well, the committee sought that Dave chaired wound up selecting Vivid Seats. And then there was record of Arizona State had uncovered somehow that he received the $20,000 check.

When confronted with the evidence, Dave admitted it. He admitted wrongdoing to me directly, and, I believe, to others. And Dave made a $20,000 check back -- a donation to Sun Devil Club.

I'll stop there. I don't know. You may have questions, I'm assuming.

Q Yeah, I'm just taking some notes.

A Sure.

Q You said David admitted wrongdoing to

you. What did he tell you?

A He told me, he said, Frank, I need you to believe me, you know. No matter what I did, it did not skew my -- I don't know if you want to say decision or whatever -- my view to select Vivid Seats, whatever. He said the right things, and I told him I said, look, Dave, you know, he was confiding into me. And, remember, if you haven't figured it out by now, Dave and I we have a complex relationship, but it was very close, right, and he did -- he did say, look, I didn't do anything that would have askewed my professional opinion about whether or not they were the best partner for us.

And then he said, to make up for it, you know, is there anything I can do, and I was like I believe it was my suggestion to him and said why don't you take that money and if you can't give it, but maybe donate it to Sun Devil Club and see if that, you know, carries any weight, and he did. He did make that turnaround, and made a donation to the Sun Devil Club for $20,000.

Q So it was a suggestion for Dave Cohen to donate the Board C compensation to the Sun Devil Club?

A Yeah, it was well after the fact. We had a discussion. What's not clear to me is when we were having our discussion, we were at home at the time, it

**was not in person, whether that was something that Dave suggested or I suggested, but it was something that we were, you know, something that we had come up with on that call and he did walk in the next day -- at least the next workday, my recollection was, and he made a $20,000 donation. It was only between, myself, him and, I believe, Ray and, obviously, people in the investigation may have known this, as well. We did not share with anyone at Sun Devil Club the reasons why he was doing it. It was just seen as a donation.**

Q And then there were two components to your story, right. One component was this Vivid Seats board seat. And the other was bowl ticket compensation?

**A Yes.**

Q And what happened -- how did the investigation conclude regarding bowl tickets?

**A I think that they said -- again, I was not part of that.**

Q Okay.

**A The investigation, but I think that they concluded that it was whether he -- it was something that was inconclusive, I think, was what they finally, on that aspect of it. That it looks like he did, but it's not something that we would say that it's conclusive.**

Q And this happened in 2017?

**A Correct. It was in, again, my best recollection was that it started some time in March of 2017. And then it may have finalized a few months later. I don't know when it was final.**

Q And that that investigation was conducted by whom. Do you know?

**A I believe there was two investigations that started. One with OGC separately and then one with Morgan Olson CFO group.**

Q Okay.

**A I believe there was two. The one that I brought forth I believe was the second one. So somebody else had -- again, how it started was it was a call from Rocky Harris, our university -- I'm sorry, Sun Devil Athletics chief operating officer. So, you know, the thought -- are we allowed to speculate or not?**

Q No, I don't want you to guess. I just want what you know. I want your personal knowledge. I don't want your guesses.

**A Okay. Then, yes, I can tell you what I know. Rocky called me and said there was some investigation going on with OGC. And his words, these were his words, I recollect this very clearly, I'm just telling you as a friend 'cause I don't want it to be**

where, you know, you get caught up in this 'cause they think this is happening under your nose.

I said, well, Rocky, it was a different bowl. I wasn't the CFO, so I'm not concerned about that. But, yes, I will have my guys take a look without giving them any -- and, again, I want to be clear about this. I did not tell my guys, hey, look and see if Dave and Greg McElroy did something. I said, look, I can't give you more than I'm looking now. Look for large transactions, look if something that looks shady or whatever, but I need you guys to go through this as best you can. My recollection was I was on vacation at that week and that's why I didn't show them when they were looking.

Q And you said earlier that, in your view, Dave Cohen was hoarding tickets.

A Yes.

Q What do you mean by that?

A So he sent out an E-mail and, again, this is not -- this was part of the investigation, as I recall, that they found when they were going through his E-mails, as part of their investigation, that he was saying, hey, look, Ray has ordained me to be, now that I'm in charge of tickets, all ticket requests for bowl games have to go through me. So we had an interim

**rule that the most an employee can ask for is ten. There's no way you can ask for more than ten.**

**So what he did was he got, and this is what the evidence show, that there were E-mail exchanges between the two of them. He had Greg McElroy say that he needed ten tickets for every bowl game, which he did not, apparently, you can tell by the E-mails that were, at least, shown to me. I do not have copies of these but was shown to me as part of the investigation at the time. And then Dave also said that Ray Anderson himself was requesting ten tickets to every bowl game, which the investigation subsequently found out to be not true.**

**Dave was packaging all of these. So now you have 30 tickets: Ten, ten and ten for every single bowl game that we were allowed to get to: The college football playoffs, the Cotton Bowl, the Rose Bowl, and Sugar Bowl, on and on, and he packaged them, and he gave, maybe not every single one, there was a couple where he had to make room for certain donors that needed them, but almost all of those 30 tickets per game were given to Prime Sport.**

Q Okay. And was there a policy at Arizona State University that precluded him from doing this?

**A Was there -- I'm sorry.**

Q Was there a policy in Arizona State University or Sun Devil Athletics that precluded Dave from doing this?

**A No, there wasn't a specific policy that I can name, if that's giving the impression. But it's like one of those things, well, you know, you're not -- I don't want to be gleap here, but it's not -- there's not a policy that says don't steal either, you know.**

**It's one of those things where he took assets of the State of Arizona and then profited off of them without any profit to Arizona State.**

Q You say he took assets. He purchased -- did he purchase those tickets?

**A He did.**

Q And your beef is that he purchased --

**A Oh, I don't have a beef.**

Q -- those tickets and that he sold them.

**A Hold on. Christopher, I don't have a beef.**

Q Okay.

**A It's not my beef.**

Q Okay.

**A 'Cause I -- yeah, you got to strike that. It's not a beef, and it's a concern as a chief financial officer. You know, my concern is, and first of all, I**

**apologize for cutting you off. But my concern is that we know, you know, especially in the sport of football when you're dealing with NFL high playoff tickets or college football, these tickets have face value are significantly below what they go for on the market, the fair market value. So you have a big spread there. He inserted himself in the middle and took advantage of that spread.**

Q And that's your concern. I used beef and concern interchangeably and that's my mistake; loose language. But your concern --

**A That's a fair -- yes, sir.**

Q Your concern is that he purchased the tickets and then resold them at a profit?

**A Yes, sir. Can I say why?**

Q Sure.

**A The issue is, the issue at hand, the concern was that he was also cutting off donor requests. We had donors requesting tickets. And since we didn't have an allotment of certain tickets left, that we couldn't accommodate those.**

Q And your concern is the CFO was that there were ones who didn't -- weren't able to go to games because Dave Cohen had bought the tickets himself?

**A That would be my concern, yes.**

MS. LEE-COTA: Form.

**THE WITNESS: So you want to make sure -- look, and there were certain big donors that he had to. Remember, I said a few moments earlier we did acquiesce and I specifically remembered him giving a few of those tickets out of that Prime Sport allotment, let's call it that, to give to a particular football donor who, at the last minute, wanted to go to one of the bowl games, so Dave cut the allotment short. But there were other donors who just simply got cut off that year. That was my concern.**

**The reason why you do this is for things like this. You know, you have a donor or -- or -- or an -- or an important partner who, Hey, I'm going to be in the Rose Bowl this weekend, you know, is a great way -- Can I -- can I get some tickets? And then -- you know, they're used typically for that purpose.**

**They're not used for the purpose of -- of -- of a ticketing guy or any -- any person. I shouldn't say just a ticketing guy, but any executive taking them and then, you know, conglo- -- you know, aggregating together and selling them for personal property.**

BY MR. ROWLETT:

Q How did you learn that Dave Cohen made

$14,000 on these transactions?

**A I think I saw that the -- the same way in the checkbook. I think I saw, like, one of the things where it said "deposit" and said "tickets," and it was amounts higher than the 32,000 that he paid.**

Q So that information was not disclosed to you pursuant to the investigation by Arizona State University. That was information you gleaned after August of 2019, when you were reviewing the personal effects left over in Dave Cohen's office?

MS. LEE-COTA: Object to form.

**THE WITNESS: Incorrect, Chris.**

**Did someone say something? Did someone object?**

MS. LEE-COTA: I just made an objection, Frank, but you can answer the question.

**THE WITNESS: Okay. Yes. So Dave showed me his checkbook. He had his checkbook -- the same checkbook. This is now two years earlier, Chris.**

BY MR. ROWLETT:

Q Um-hmm.

**A He turned it around at his desk, when we were talking, and -- and he showed me (indicating). And I was like, "Well, Dave you have a deposit there for more money, you know."**

**And he said, "No. I need that for my daughter's car."**

**I said, "No, Dave. You have your own handwriting. It says a deposit there."**

**You know, so he -- that's how I saw it. He showed me the book.**

BY MR. ROWLETT:

Q Okay. He showed you the book, and did he -- you said he admitted to wrongdoing earlier. The admission of wrongdoing, was that only related to the Vivid Seats board --

**A Yes.**

Q -- computation?

**A Yes.**

Q Okay. Did Dave Cohen --

**A He did not admit wrongdoing to the -- to the ticketing thing. He did not -- at least not to me. I don't know what he did with the investigators, but he never did with me.**

**He -- he knows that -- and I made it clear that I had -- you know, I -- I was like, "Why would you -- what would possess you to get in the middle of it?" This conversation happened. This is not my conjecture.**

**I said, "Dave, I don't understand. Help**

me understand. Why would you get in the middle of a $32,000 transaction? Why? Why not just have Prime Sport pay for it, you know."

And then I -- I -- I was saying, "Look -- I mean, listen, you know, I -- I've been around the block a long time. I was 20 years at the NFL, and I worked in the ticket office there -- there, too. You -- you got in the middle of a transaction to make a profit, you know." And that's what it says here.

So, you know, I -- I'll stop -- I guess I accused him, you know, but I was doing it so -- I -- I do care about him, and I also did, you know. I -- I just -- I just -- I -- I wanted him -- I know we're a stronger team with him, and -- and I -- I just -- I -- I -- I just felt that, look, if -- if we could just get him doing the right things, you know, he could be an asset.

But my problem was always one -- I mean, I'm sure we'll get into this later, Christopher. My problem with Dave was always one of trust, you know, and this is -- this is my one thing that I always had with him. And, obviously, it's a big one.

THE REPORTER: Counsel, when you get a chance, can we take a break soon?

MR. ROWLETT: Absolutely. We can take a

break right now, Madam Court Reporter.
MS. LEE-COTA: Ten minutes?
THE REPORTER: Thank you.
(Off the record.)
MR. ROWLETT: Back on the record at 9:35.
BY MR. ROWLETT:
Q Mr. Ferrara, going back to Exhibit 91 briefly. These are the documents that -- from Dave Cohen's office, at least five of which from Dave Cohen's office that you copied. How did you decide to copy -- oh, withdrawn.
Let's look at, for example, the second page of that document, ABOR Cohen2017. This is a photo copy of a portion of a checkbook; correct?
**A Yes.**
Q And you made this copy?
MS. LEE-COTA: Do you mind screen sharing?
MR. ROWLETT: Oh, I'm sorry.
MS. LEE-COTA: I don't have the -- I don't have it up.
MR. ROWLETT: I don't at all.
Is my screen up there, Jenny?
MS. LEE-COTA: Yes. Thank you.
MR. ROWLETT: Okay. Yeah. No problem.

BY MR. ROWLETT:

Q You made this photocopy; correct?

**A I did.**

Q And this was from a much larger checkbook; correct?

**A Much larger in terms of the -- the -- the physical size, Christopher?**

Q Oh, withdraw.

Obviously, there's more to this page than what we see here; correct? We're seeing a portion of one page of the checkbook; correct?

**A Well, the checkbook was in a binder, like an executive binder. It's like -- I'm going to say maybe 12, 14 inches long and -- and three or four checks high. Like one of those big, old-style ring binders (indicating). It's a big book.**

Q How many pages were in that book?

**A I don't recall. More than this, if that's what you're asking. Yeah.**

Q How did you decide to copy this portion of this page?

**A Well, I saw the $690,000 deposit where it says "Vivid."**

Q And before that, you'd identified this as Dave Cohen's personal property; correct?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes. I -- I -- I knew it was not Arizona State property, Christopher.**

BY MR. ROWLETT:

Q How did you decide to thumb through that book?

**A Think I decided to thumb through it. I -- I -- I was curious about this one transaction. As I said earlier on record, Mike Chismar alerted me to the fact there was a book in there.**

**My recollection was that Mike didn't honestly -- when he came to me and I was in the hallway, he did not say, Hey, this is -- I found Dave Cohen's checkbook. I don't believe he said that. I think he said, I -- I found a checkbook -- checkbook, and I -- and maybe it's the ticket office's, or something like that. And so he wanted me -- the reason why he came to me as CFO 'cause he thought maybe it was something in our property.**

**I went in there with Dave -- I'm sorry -- with Mike Chismar, and there was someone else in there of Mike's staff who I don't recall. There was a third person in the room. And I opened it.**

**I said, "No, Mike, this is not ours. This is his." And I looked at it.**

Q And --
**A And so, you know, I -- I don't know that I went -- I don't believe I actually went at that point. I said, "No, this is his."**
**It might have been at the late- -- when I was copying it, when I was looking, and I -- I -- but I was specifically looking for this -- this transaction.**
**Does that help? Is that what you were asking, or I --**
Q It does.
At what point in time did you start, specifically, looking for this transaction?
**A It was at -- it -- it was during when I was looking at -- when I was making the copies. I -- I wanted to see if there was something in there, like if there was a -- a Vivid transaction of a large amount.**
Q Did you copy every page of that checkbook?
**A No. No. The -- it was a big checkbook, Christopher. Yeah.**
Q Is this the only copy of that checkbook you made?
**A I -- there was other -- there was other copies in -- well, there was other pages in there that I may have copied, realized they weren't relevant, and**

**then discarded. That's possible, I guess. But the -- the only time --**

Q Relevant to what?

**A Sorry?**

Q I'm sorry. I thought you were done. Please, go ahead.

**A No, no. And so the only copies that I have are -- are the ones that you have before you, if that's what you're asking.**

Q You said you realized -- you may have made other copies. You realized they weren't relevant, so you discarded them, I believe, is your testimony; is that correct?

**A That's right. That -- I said I may have, 'cause I'm --**

Q Yeah.

**A I'm trying to think if I went through things and if they're the only things I ever -- ever copied. I -- I don't recall if these are the only ones, you know, that I copied. I will -- I will testify that I did not copy that whole checkbook. All right?**

**I -- I recall it -- it was large. All right? It -- it -- there was a lot of documents in there.**

Q And you said it wasn't relevant.

Relevant to what?

**A Well, relevant to the -- to -- to something -- the -- the transactions that we were talking about earlier; right? I don't necessarily need to know what he was doing to buy a car. I didn't care about that.**

**I wasn't looking to -- to -- I was -- I was concerned about this -- the -- the -- the transactions as it -- as it related to tickets.**

Q When did you decide to look for transactions related to tickets?

MS. LEE-COTA: Hold on, Frank. I'm going to instruct you not to answer. We're getting into attorney-client privilege.

Well, sorry. Actually, Chris, sorry. Did you say when?

MR. ROWLETT: Yeah.

MS. LEE-COTA: Yeah.

Okay. You can --

**THE WITNESS: Yeah. Christopher, I -- I don't recall. I -- I -- I -- it was sometime -- and I -- like I -- like I keep mentioning, I think there like a -- a two-weekish period -- a ten-dayish period when he was escorted out of the office, which I believe was mid August, and when he finally picked up his items.**

**It was some time in between there. I don't recall the date. I don't.**
BY MR. ROWLETT:
Q And so I'm trying to understand. Did you see this checkbook and see these statements from his personal Edward Jones account and decide to conduct your own investigation as to the check issue, or did someone ask you to look into the check issue?
MS. LEE-COTA: Well, hold on a second.
BY MR. ROWLETT:
Q If you can't answer it because it's attorney-client privilege, I just want to know --
MS. LEE-COTA: Yeah.
BY MR. ROWLETT:
Q Because at some point, you saw things that were clearly personal property. You identified them. You testified that this isn't an Arizona State issue. This is Dave Cohen property.
Obviously, this -- the Edward Jones statement couldn't be Arizona State property. At some point, you said --
**A Why did --**
MS. LEE-COTA: Okay. Sorry, Chris. Go ahead.

BY MR. ROWLETT:

Q And, Mr. Ferrara, you told me that you didn't really look at them that time. You just looked at them enough to see that they weren't Arizona State, they were Cohen property; correct?

MS. LEE-COTA: So I'm going to object to form --

MR. ROWLETT: Okay.

MS. LEE-COTA: -- to that question.

Frank, you can -- you can -- you can -- you can answer that specific question that Chris just asked.

**THE WITNESS: I do -- and I do want to answer it, but -- but would you mind repeating it, Christopher?**

BY MR. ROWLETT:

Q Sure, sure.

I believe your testimony, as I understand it is, Mr. Chismar calls you into the office 'cause he has questions about what may be -- did -- Cohen's personal property versus what is Arizona State's property, because he was tasked with removing Dave Cohen's personal property; correct?

**A More or less, yes. And let me -- let me respond this way, too, just to clarify what you just**

**said. If there was no checkbook in there, I doubt -- I -- I doubt Mike Chismar would have called me in, period.**

**Like, he wouldn't have called me in necessarily to make a -- a -- a determination whether the -- the refrigerator was his or not. You know, that -- that wasn't what he -- he called me in because he saw a checkbook in there as part -- that was left over.**

Q At that point, when you were brought in, did you also -- did he also point out to you these personal Edward Jones account statements?

MS. LEE-COTA: Object to form.

**THE WITNESS: I believe that they -- I'm sorry.**

MS. LEE-COTA: Go ahead, Frank. You can answer.

**THE WITNESS: Yeah. I -- I believe they were all -- not necessarily together, 'cause it wasn't in the same loose -- what I -- I'll call a big, executive, loose-leaf checkbook. It -- it was right underneath it. There was also financial documents.**

BY MR. ROWLETT:

Q But did you --

**A But, yes, Mike did find those, as well.**

Q And did he give those to you?

**A Did he give them to me? I don't recall if he physically picked them up and gave them to me or if he pointed at them in the drawer.**

Q And did you take those somewhere after Mr. --

**A No, not at that time. No.**

Q At that time they remained in the office?

**A (Nodding in the affirmative.)**

Q Were they placed in a box for Mr. Cohen to collect when he came to collect his personal effects?

**A I don't recall -- or if they were just locked up where they were, I don't recall.**

Q Did you --

**A That would -- I didn't -- I didn't lock them up. I didn't put them in anywhere. I left them where I found them.**

Q Thank you.

When was the next time you laid hands on that checkbook and these personal Edward Jones account statements?

**A When, as in a date? I don't -- I don't recall the date. It -- it was not the next day.**

**I believe -- it would be helpful if I knew when he picked up the documents. I believe it was**

**shortly before that. I don't recall, Christopher.**

**I don't know the exact date. I didn't write that down.**

Q And did it -- I'm sorry. I understand, and I -- and I'm not looking for a specific date. I guess I'll handle -- we can probably figure out when Dave Cohen went back to collect his personal effects?

**A Right.**

Q And best of your recollection is a couple of days before that you -- was the next time you laid eyes or hands on these documents; is that correct?

**A That is correct.**

Q And without divulging attorney-client privileged communication, are you able to tell me if you decided to go in and look at those documents of your own volition, or you were asked to do so? Can you answer that question without divulging attorney-client privileged communication?

**A Gosh, can I?**

MS. LEE-COTA: Yeah. So, Chris, did a good job of framing that for you, Frank. So if you cannot answer that question without revealing any sort of attorney-client communication that you may have had, you should not answer this question.

**THE WITNESS: I can't answer it.**

BY MR. ROWLETT:

Q If we look at page 5 of Exhibit 91, which is Bates-labeled ABOR Cohen2020, you see at the top right corner it says page 1 of 4. Do you see that?

**A I do.**

Q Why did you only copy the first page and not all four pages?

**A I don't recall what was on pages 2, 3, and 4. But I guess at the time, I didn't think it was relevant, it didn't have anything. I do not have -- I -- I do not have those copies, Christopher, if there were other pages.**

Q I understand.

Well, let me ask this, Mr. Ferrara, do you have any documents in your possession related to Dave Cohen in any way, shape, or form?

**A No, not at this time. At this time I don't. If -- if we did at some point five years ago, they -- they are gone. All right?**

**I don't have anything else. All right?**

Q Understood. Thank you.

No. And that's my understanding? I don't --

**A Yes.**

Q I don't mean to imply by any of these

questions --

A Right.

Q -- that you are still in possession of any documents. I am -- I am simply trying to understand how we got from cleaning out Dave Cohen's office to, in the, you know, days leading him up to him collecting those personal effects, you going through those documents and copying what you believed to be evidence of wrongdoing. That's all -- you know, that's all I'm trying to understand.

It seems like, you know, counsel told -- this isn't a question. I'm just saying, based on your testimony, it seems like the Office of General Counsel said when and figure out what's in those and make copies of anything that shows wrongdoing. That's my guess. I'm not asking you to respond to that, but that seems -- that seems like what's happened here.

So the investigation regarding bowl tickets --

A Yes.

Q -- is it correct that the Office of General Counsel determined that there was no wrong by Dave Cohen vis à vis those bowl tickets?

MS. LEE-COTA: Hold on. I'm going to object, Frank. To the extent that this is something

that you've heard from OGC, you should not answer this question.

THE WITNESS: **What about the office of -- of the chief financial officer? Is that the same; or --**

BY MR. ROWLETT:

Q No. I'll ask that question.

Earlier you testified that there were two investigations, one by the CFO and one by the OGC. Did you --

**A That started diff- -- you -- continue, please.**

Q No.

**A Okay.**

Q Are you aware if the office of the chief financial officer at Arizona State University made a determination as to Dave Cohen's wrongdoing vis à vis bowl ticket sales?

**A They said it was inconclusive.**

Q And are you aware if the Office of General Counsel reached any conclusion regarding Dave Cohen's liability as to ticket sales vis à vis bowl tickets?

MS. LEE-COTA: Frank, just don't get into the substance of any communication that you may or may not be aware of, but I don't think Chris's question

asked for that, if I'm understanding Chris correctly.

BY MR. ROWLETT:

Q Just are you aware if a determination was made?

**A If this helps, the two -- they -- although they started differently from two different places, the -- the -- they shortly -- at some point the investigations merged together, as one would expect; so it did- -- it wasn't like they were just two completely different investigations. They started from different places, again, one that was brought by me with the CFO office after hearing about something else. I raised it to -- to see if they -- someone could look, you know, outside to -- to be completely independent and I'll stand back.**

**And then they merged together, and the -- they had a -- a -- a -- a finding that I am told believed that it was inconclusive.**

Q Thank you.

Other than counsel for Arizona State University, did you speak to anyone else in preparation for your deposition today?

**A No.**

Q When was the last time you talked to Ray Anderson?

A Wow. It was either Christmas or New Year's when we -- when we reached out just to say happ- -- you know, Merry Christmas or -- or -- or New Year's -- oh, no, no. There was one other time.
He -- he reached out about a month ago. This is a crazy coincidence. I -- obviously, am working in Alpharetta now. Ray's residence is about three miles away from my work now.
He asked if I can get together for dinner, and -- and I said I could not. I was busy, so that was the last time we spoke.
Q And is Alpharetta -- pardon my ignorance -- is Alpharetta a city in Arizona?
A No. Alpharetta is a city, and it is a suburb of Atlanta.
Q That's where you are currently working?
A That's where I'm currently working, yes. I'm -- I'm in Georgia. I happened to be back here.
I came back. I was not expected to be here today, but I came back 'cause of a health issue for one of my parents.
Q Okay. Sorry to hear that.
A Thank you.
Q So you're currently residing in Georgia?
A Correct.

Q And what's your current position?

**A I'm the senior project executive of a company called Krause Sports and Entertainment. That is a company that is looking to build a mixed use -- a hundred-acre, mixed-use development in the northern suburbs of Atlanta, specifically in Forsyth County, with an 18,500 arena anchor tenant with the hopes of bringing an expansion NHL team back to Georgia.**

Q Again, pardon my ignorance. There used to be an NHL team, the Atlanta Thrashers?

**A Correct. And prior to that, the Atlanta Flames, going back many, many years.**

Q And so at some point, the Atlanta Thrashers left Atlanta; is that correct?

**A They -- they relocated to Winnipeg in 2011.**

Q Wow. I'm really out of the loop there.

**A You are.**

Q How do you spell -- is it -- is it Krause Sports and Entertainment?

**A Krause Sports and Entertainment, K-R-A-U-S-E.**

Q Thank you.

Before Krause Sports and Entertainment, what was your employer?

A Arizona State University.

Q When did you leave Arizona State University?

A August 23, 2023.

Q Why did you leave ASU?

A For the opportunity to -- to do something that I thought was a once-in-a-lifetime thing, a project that I believed in. I -- Mr. Krause reached out to me after I -- I had worked on Mullett Arena, which is where the Arizona Coyotes play now as a tenant, where Sun Devil Hockey is -- obviously it's their building.

And he reached out to me and said, "Look, I'm trying to" -- what I just said -- "I'm trying to build an arena in a -- in a mixed-use development to be the next home of the -- of the 33rd NHL franchise, and your name keeps coming up. So if this is something that interests you -- I understand you have a great thing going at Arizona State -- I'll stop talking now. But if it's something that interests you, I'll -- I'd like to -- to talk to you about -- about this opportunity."

And Mr. Krause flew out to talk -- flew out to Phoenix to talk to me and sold me on his vision. I'm very happy -- as -- as incredibly difficult as it was to leave ASU, I took the position and took the -- a chance of a lifetime to bring NHL hockey back to

**Georgia.**

Q And you referenced an arena. In my head it sounded like Mullett Arena, but I'm sure that's not right. What is the --

**A Mullett Arena is the arena that -- that was built at Arizona State, yes.**

Q Can you spell that for me?

**A M-U-L-L-E-T-T.**

Q That's a great name for a hockey arena, particularly given the flow the hockey players like to have. That's really, really good stuff.

Is that -- is that a donor's name or is that --

**A Correct, that is a donor's name for -- for Don Mullett.**

Q That's a fortuitous name for a hockey arena.

**A It sure is.**

Q And I understand, again, from prior witness testimony, that hockey was a -- Arizona state hockey, in that arena, was something of a passion project of yours; is that correct?

**A That is correct.**

Q And when did you join Arizona State University?

**A October 26 --**

Q Ballpark.

**A Well, October 26, 2015.**

Q So you were with ASU for just under eight years; is that correct?

**A Yes. From two -- from October of 2015 to August of 2023.**

Q And were you the chief financial officer for that whole time?

**A No. I was the chief financial officer starting on March 1, 2016.**

Q What was your title before you became the chief financial officer in March 2016?

**A Oh, wow. I know what I did -- I -- it was very brief obviously. It was only for -- for four or five months, but I -- I was -- I was working in the sponsorship group under Greg McElroy as his lieutenant, if you will, until a need arose from my predecessor at Arizona State leaving or -- or requesting a more -- less time-consuming role. She wanted a part-time role. She was raising a family.**

**And then the need came. And then Ray had asked me to step up and become chief financial officer.**

Q Got it.

In addition to being the CFO, did you

have the title of senior associate athletic director?
A I did.
Q When was your first -- oh, withdraw it.
Did you know Dave Cohen before you joined Arizona State University?
A I did.
Q How did you know Dave Cohen?
A Dave worked for the Atlanta Falcons -- well, I worked for the National Football League. I was the NFL's finance director, and I worked at the NFL for 20 years. So at -- there were certain times when my path crossed with Dave's. Dave was work- -- when he was working for the Falcons in particular.
Q Okay. When you joined Arizona State, was Dave Cohen already an Arizona State employee?
A Yes.
Q Did you know Dave Cohen was an Arizona State employee when you accepted the position at Arizona State?
A No. No, I didn't. I -- it was when I first got there that I saw that he was there, so we were not -- if that's what you're getting at.
We were not close by any stretch, but we -- I -- I did have a couple of contact points with him.

Q Had you formed any opinion about Dave Cohen as an employee, based on your experience while you were with the NFL and he was with the Atlanta Falcons?

**A Yes.**

Q What was your opinion of Dave Cohen as an employee?

**A It was not good. It was not good. He -- Dave had a -- a bad reputation as someone who took shortcuts when it came to ticketing.**

Q What do you mean "shortcuts"? I'm sorry. I thought you were done.

**A Well -- no, no. There were two instances. There was one in 2010 at Super Bowl 45 that -- that occurred, and I should also state that during Super Bowls I was the -- the NFL's financial representative in the ticketing area when it came to -- to bowl ticketing.**

**There was an unfortunate incident that occurred on game day where Dave came into the -- we have -- we have a trailer outside, and -- and I'm -- I -- I man it with other head of ticketings, both from the National Football League but also the senior ticketing people from a select -- say three or four teams that are not in the playoffs, you know, that --**

that would help us work out. And -- so this would have been -- I'm trying to -- it was sup- -- it was definitely Super Bowl 45 in Dallas. That I recall.

I don't recall the date. It may have been January of 2010ish or 11ish, whenever that Super Bowl was. But it was the Dallas Super Bowl. And, unfortunately, Dave came in right before the game time, and players -- certain teams leave their tickets for their players to pick up.

Players who are -- are -- are on the active roster have, via -- through their collective bargaining agreement, have the -- the right to two Super Bowl tickets. And certain teams -- the Falcons being one of them -- have -- decide that if the players want the tickets, they have to come to will call and pick them up.

There were three player -- three players who did not pick up their tickets. This would have been shortly before the game started. Dave came into the office, and it -- which is common.

And it -- it would have been, you know, common for them to take the tickets. Hey, I'm going to give them to my players. What we saw Dave do on the camera, he took the play- -- he asked for his three player tickets, and he swapped them out.

So he didn't realize he was on camera, but, you know -- but the head of ticket -- Fred Otto is -- was his name at the National Football League -- said, "He's stealing his own player's tickets." So I looked over at the camera, and I decided to approach Dave about it. And I said, "Dave, hey, what do you want me to tell your players when they come and the -- and that their own ticket guy is stealing their tickets?"

And he said --

And forgive me, Court Reporter.

He said, "You know what, Frank. Tell them to fuck them because they should have picked them up sooner."

I said, "Okay. Put your name down on the -- put your phone number on the ticket so I can tell Roddy White what you said." And it was a -- it was a tense conversation.

And then he took -- so what he did -- what we saw him do, he took -- he took the players' tickets out. He put really poor tickets in, and then he -- we presumably thought he was selling them on the outside, so I ordered the bar tickets killed -- the bar codes that are on the tickets killed, and -- so that those six tickets could not get into the stadium.

I said, "I'd love to see those people

come back here." They never showed up. But those -- those six tickets did not get in the stadium.

So we had a tense conversation. And ironically, if you're wondering, Dave did not remember that that was me when I started at Arizona State. But he had a bad reputation.

Q Okay. That was one incident. And we can -- we may -- you said there was two incidents?

A There was. When the Falcons made the playoffs -- I'm going to say in the 2005 or 2006 time frame -- Dave called up to -- to my office at the NFL and was very upset with the playoff pricing that the league had set. And it was something that put us on a rate -- that is unheard of; right?

The league sets the pricing. And if anything, it would be -- even if an NFL owner would call and complain about the ticket pricing. But called my boss at the time, whose name is Mike Smith. I was in the office, and Dave was really upset with the -- with the ticketing prices.

And the NFL was -- it -- it was on alert that we thought that he was taking a large group of -- of -- of wild card prices for the Falcons and then selling them on the open market.

Q I'm sorry. That story's -- I don't

understand it. So he called upset at how much the NFL was charging for team playoff tickets?

**A Setting, setting. So NFL sets the pricing for the playoff tickets, not the team when the -- when a team's in the playoffs.**

**Dave was very upset, which is unheard of. It doesn't make -- it doesn't affect it. But he was -- he was upset that the price was -- was set too high.**

**So that alerted everyone that, okay, he's -- he cares about it because he's already got a price that he's selling on the secondary market to some broker, and he wants to have the -- the face value lower so he can make a bigger profit; so that was -- everyone was on alert for that.**

Q And Dave told you that he already had a price to sell to a broker, and he was concerned about his profit margin?

**A He did not say that. No, he didn't say that. So we called -- we called his bo- -- we called the CFO afterwards to complain. Said, "Listen, he's overstepping his line. You better watch him."**

**All right. So that was one of the things that -- that was concerning. And I know we alerted and called security at the time to be on the lookout, and they -- they were -- there was serious concerns starting**

**at that point swirling around him and his dealings with ticket brokers.**

**So I don't know exactly what happened, but I -- I -- I know -- in terms what NFL security did. All of them are FBI agents or former FBI agents, but they were on the lookout for what he did -- what he was doing.**

Q I'm trying to understand. You testified that Dave Cohen called because he was upset that he wasn't going to make enough money off these ticket sales.

**A No, I didn't. I said -- no. We set the prices too high, he thought. He thought we set the prices too high.**

Q But you attributed to him a reason why that call. Couldn't the reason also have been he wanted to be able to sell them for less as season ticket-holders?

**A No.**

MS. LEE-COTA: Object to form, foundation.

BY MR. ROWLETT:

Q No, that's not possible?

**A No.**

Q The only possible explanation in your

understanding is that he previously negotiated a deal with a broker, and he was upset about the profit margin?

A Yeah. That was -- that was what everyone was already on the -- on the radar for, that he was doing business with -- with -- with a broker. That would be the only explanation why a ticket guy would call the league office.

Those -- I want to -- Christopher, let me under- -- let me -- a call like that would come from the owner himself, not the ticket guy. And I -- I've been there for 20 years. It's unheard of, and -- and it alerted everyone to -- to -- to be on the lookout that he was doing something.

Q And so when did you talk to Mr. Cohen about this?

A I never did.

Q Did anyone ever talk to your knowledge to Mr. Cohen about this?

A We -- we -- we alerted his -- it was a -- the CFO of the Atlanta Falcons at the time.

Q And were you on that call with the CFO?

A I was.

Q And what did the CFO say?

A He said, "That's -- that's absolutely crazy." He said, "Was he directed to do this, or

**where -- where -- where is this coming from, the pricing?" And the CFO did not know.**

**And so we would go -- wondering if we should go to offer about it. But he said, "No, he's acting alone, so we got it. We're sorry, don't worry about it, and whatever." So the -- the -- he -- he affirmed that it was not coming from the organization.**

Q So the two incidents that formed your negative opinion of Dave Cohen prior to your employment at Arizona State were the picking up tickets for players --

**A That was --**

Q -- and swapping them out?

**A Yeah. Far more that one than the other one.**

MS. LEE-COTA: Object to form.

**THE WITNESS: Yeah.**

BY MR. ROWLETT:

Q And the second one is he called to complain about ticket pricing prior to this playoffs in which the Atlanta Falcons were about to compete? Do I have that right?

MS. LEE-COTA: Object to form.

You can answer, Frank.

**THE WITNESS: Yeah. The first is --**

**is -- it's mainly the second one for sure. All right? That was a direct confrontation with myself and -- and -- and Dave.**

**The first one I wouldn't call it a confrontation. He did not even call me. He called Mike Smith; so --**

**And I was in the room. I was Mike's lieutenant. Mike was our senior vice president of finance, and I was the finance director.**

BY MR. ROWLETT:

Q And you overheard that conversation?

**A Mike called me in the office. I -- my office was next door.**

Q During that conversation, you were called into it?

**A That's correct.**

Q So you did, in fact, hear Dave Cohen say, I'm upset about the playoff ticket pricing?

**A Yes.**

Q But the other incident, it sounds like, was more concerning to you. And that was swapping out the --

**A Far more.**

Q -- picking up players' tickets and then swapping them out?

**A You're correct, Christopher. And it was far more concerning to me.**

Q Other than the confrontation you had with Dave Cohen on the day of the Super Bowl in Dallas, did you have any further conversations with Dave Cohen about that particular incident?

**A No -- oh, wait, wait. I -- I -- I want to be clear. Are you talking about at the Super Bowl? Did we talk then? No.**

Q Or any other time? At any other time?

**A Oh, we did. We talked about it at Arizona State. We talked about it many years later at Arizona State.**

Q Oh, great.

What did -- what did Mr. Cohen say?

**A I brought it up to him. I was like, "Do you remember" -- well, it -- it started out there was something about -- oh, I know what it was.**

**I -- I believe it was -- it was something where he had called Fred Otto about something. He -- and he had complained to me that "Fred Otto doesn't call me back."**

**I was like, "Well, Dave, you know, you -- you do -- did you ever have any run-ins with Fred and his group?" And he did remember.**

And I said, "I don't know if you recall. Did you have an issue with him at the Super Bowl at one point?"

And he said, "I do. One of -- and one of his guys, too, was -- was getting in my face."

I was like, "Well, that guy was me." And then his eyes lit up. And then he -- and then I told him -- I said, you know, "You got -- you're lucky. No one came to steal -- to -- to pick up those tickets that day -- none of the players, but you stole those tickets."

And he was shocked. He was shocked that it was me, that he didn't remember it was me. It was the first time I was telling him my recollection was this was maybe -- it was not right after I started. Maybe a year or two after, you know, that I brought it up to him.

You know, at the time Dave and I had forged a close friendship, you know. And -- and even besides the point, you know, it -- obviously it's crystal clear to everyone we have a complex relationship after all these issues of trust, but we'll get into that maybe -- perhaps later with your questioning.

He came to me the following day and said -- the following day, after I alerted him, and

said, "I want to talk to you about that incident." And he said, "I want to be clear that it was Arthur Blank himself that directed me to do that." That's what he told me.

Q Um-hmm.

A And I said, you know, "That's Dave." I -- I don't know who -- I've been doing that for 20 years. If Arthur Blank needed tickets -- or any owner for that matter, they could just call us up, the NA. I have someone very important to my organization and my -- my team that needs to get in the building. I -- I -- whatever it is.

And we handle that. We have extra tickets. We have ways of getting people in. We would never take them from a player.

So I -- I told him. I said, you know, "That's nothing but a bunch of bunk. You know, save it."

And he didn't really push back much, you know. I -- I just said, "Look, it's -- I know what you did, you know, so -- so I -- I don't -- don't make it worse by saying that -- that the owner of the team was behind it, because he wasn't," you know; so that's where it ended.

Q Understood. Thank you.

And your position, that the owner of the team absolutely wasn't behind it, does that come from any conversations you had with Mr. Blank?

A No. I never -- I never spoke to Mr. Blank about it. I -- it comes from just years of -- 20 years of -- of experience, that if -- and it happens from time to time. It may not be common.

But if -- if an owner does -- like I said. And it doesn't have to be an owner that's in a stadium or partici- -- any -- all 32 owners, generally speaking, go to the Super Bowl. Generally speaking.

They all have a suite. And if they needed help to -- to Hey, listen, I forgot anybody, they would just call down to the -- even if it is on game day. And -- and of course we would do to -- whatever we could to accommodate an NFL owner.

He -- he was not directed. Again, I -- I told Dave -- this is me talking to Dave again. "Dave, come on. Save it. You weren't directed by Arthur to do this. All right? It's -- it happened back in 2010, Dave. Let's leave it back there."

And we -- we -- you know, again, it was the one thing about him -- the -- the trust issue was always something I felt I had to watch, Christopher; right? It was the -- the one thing that I had to watch

**about him. Let's just leave it at that.**
Q And have we now covered all of the issues that caused you to not trust Dave Cohen?
**A I believe we have.**
Q Okay.
**A At least to my recollection. I can't recall trust issues that have happened certainly with tickets or anything like that. I -- I -- I don't recall as I -- as I -- as I sit here before you.**
Q Okay. And so far I think we've gone over maybe five issues. Let's see if I can remember them. One, calling the NFL to complain about playoff ticket pricing?
**A Yes.**
Q Two, the Dallas Super Bowl player ticket swap?
**A Yes.**
Q Three, the Vivid seats board seat?
**A Yes. I didn't -- that -- that was told to me. I did not -- I did not investigate that. That was a product of the other investigation. But that's not what you're saying; right?**
Q I'm saying did that factor into your -- you told us that you don't really trust Dave Cohen?
**A Oh, well, yes, it factored into it.**

**You know, I -- I -- again, that -- it -- it bothered me, you know. I was disappointed in him.**

Q For the bowl ticket purchasing through Cohen Consulting?

**A In 2015, yes.**

Q 2015.

And then the January 2017 Vivid seats pricing and payment to Cohen Consulting?

**A Yes.**

Q Are those now the five issues that caused you to not trust Dave Cohen?

**A That I can recall as I'm seating here today, yes.**

Q Is there anything I could show you that would refresh your recollection to recall any other such incidents that caused you --

**A Oh.**

Q -- not to trust Dave Cohen?

**A How could I answer no to that? I -- I don't -- yeah. As I'm sitting here, I'm -- if you're going to show me something, perhaps so. Yeah.**

Q I don't know. I don't -- I don't have anything up my sleeve (indicating.) I just --

**A Right.**

Q I don't know if there's something else --

this is my chance to ask you questions.

A No.

Q So I'm trying to understand. Is there more out there? You say you don't trust Dave.

I want to know. Is there anything other than these events that happened in the 2010 to 2017 time frame that led you not to trust Dave Cohen?

A Not that I recall.

Q From your understanding, who made the decision to terminate Dave Cohen?

A Ray Anderson. To -- to -- to my knowledge.

Q Did he --

A I don't know if it -- I don't know if it was President Crow. I -- I don't -- but to my knowledge, it was Ray Anderson.

Q How did you come to this understanding?

A How did I come to this understanding? I mean, at the end of the day, no -- no one's going to fire anyone without Ray knowing, you know, so -- or -- or Ray making the decision at any level; right? So as athletic director, in the -- my -- I guess my -- through my eight years there, yeah.

My recollection, Christopher, is that every -- every firing that I -- that I saw was -- was,

**at the end of the day, a Ray Anderson decision, whether it's a coach or --**

Q Did --

**A -- even -- even -- even a junior staffer actually.**

Q Understood.

And did Ray Cohen tell you that he fired Dave Cohen?

**A Ray Anderson?**

MS. LEE-COTA: Objection to form.

MR. ROWLETT: Withdrawn.

BY MR. ROWLETT:

Q Did Ray Anderson tell you he fired Dave Cohen?

**A It was either him or Jean Boyd who came to me and told me. I don't recall exactly who told me. I was not in the room when he was fired.**

Q When were you told that Dave Cohen was fired?

**A Shortly aft- -- when did I find out that he was fired?**

Q Yeah.

**A Shortly after he left the building.**

Q In August of 2019?

**A Yes. I think it was August 15th. I**

**think it was a Thursday.**

Q Around that time there was a -- discussions around a reorganization of the Sun Devil Athletics department; correct?

**A Yes.**

Q Had those changes taken effect as of August 15th of 2019, when Dave Cohen was terminated by Ray Anderson?

**A Yes. They were announced earlier that week.**

Q And so at the time Dave Cohen was terminated, did he report directly to you?

**A At the time he was terminated, he reported directly to me. Starting that -- you know, it was that Monday, I believe. I -- I think it was the same exact week, so not even a full week.**

Q There were discussions regarding that Arizona State -- withdrawn.

There were discussions regarding the Sun Devil Athletics department reorganization in the months leading up to August of 2019; correct?

**A That is correct.**

Q And in those discussions -- withdrawn.

When was it first discussed that Dave Cohen would be reporting directly to you?

A I found out very late July -- very late July. It was just before -- I -- I had a 15-day trip to China with my hockey team, and it was right before we left -- the day before we left. Ray -- it was -- Ray had told me.
Q Do you recall telling Dave Cohen that if he reported to you, the first thing you would do was terminate his employment?
A Never.
MS. LEE-COTA: Object to form.
THE WITNESS: Never.
BY MR. ROWLETT:
Q You never told him that?
A Never. It was part of a joke. And it's the only thing I could think of. But it was a joke, if -- if someone overheard this, 'cause Dave knew it was a joke. He was laughing.
Way earlier than that -- so back in July -- July 5th. It was the same day that we were both -- we were both working in the office. He came into my office midway through, and there's a lot happened on that day, which I'm sure you're aware of.
At the very end, he said, "So I understand I report to you now?" And I had not heard any of that at this time. Again, this was -- this was

significantly before any org thing was -- was brought to my attention.

And I joked to him. We were both upset, Christopher, that we were working on a holiday, which we were. And so I joked to him.

I said, "Okay. Tell you what. First thing I'm going to do is fire you, and then I'm going to quit so we can get the hell out of here and not work on holidays anymore."

And he laughed his ass off. He thought it was really funny. That's the only thing that I could possibly think of that would even approach that statement, but it was a joke.

And -- and at that time, I had no inkling whatsoever to think that that man would ever report to me or Ray would even want that at that point. That's the only thing I could think of, because that's been asked of me before. And I never would have said that to him, never.

Q I thought that you said on that day, July 5th, that David said, I guess I report to you now?

A Yes. He literally walked into my office, stood in my doorway, and said those words.

Q So when he said that to you, you're not -- you're saying it's a joke. But your response

was, If you reported to me, I would fire you. And then you said, I would quit?

**A I said, "Tell you what, how" -- yeah. "How about I fire you and then I quit so we can get the hell out of here and not work holidays anymore?"**

Q Okay.

**A And I started laughing and he started laughing. He says, "How the hell are you so funny?" you know, and whatever. And he started laughing his butt off, whatever.**

**Said, "Yeah. We got to -- we got to get out of here, man. It's -- it's -- we -- we should be with our families." It's that sort of thing.**

Q And then five or six weeks later, in mid August of 2019, that reporting structure comes into effect and Dave Cohen does report to you; correct?

**A Yes.**

Q And later that week, he was fired?

**A Yes.**

Q After Dave Cohen was fired, do you have -- were -- do you have any other direct reports until you left? What I'm trying to get at -- that was a bad question.

What I'm trying to get at is Dave was going to report directly to you -- well, withdrawn.

Before he reported to you, do you know who Dave reported to?
A Ray. Ray Anderson.
Q So when --
A And he still -- I want to be clear. This -- I want -- this is a nuance I think you need to understand, Christopher.
Q Yes.
A Even with the reporting structure, he reported to me only with ticketing. He also had a dual role. He was the senior associate athletic director in charge of our men's basketball program.
That he continued to report to Ray on. All right? In that part. So that was never take- -- ever taken away from him. It was only on the ticketing piece.
Q Got it.
And in your view, was -- you used the phrase "taken away from him." Was changing his reporting structure from directly to Ray Anderson to you on the -- on the ticketing and sports administration aspect, was that a --
A On just ticketing. On ticketing.
Q Was that a -- was that a demotion?
MS. LEE-COTA: Object to form.

BY MR. ROWLETT:

Q In your view?

**A In my view he did not receive any less compensation. He was still receiving his bonuses, so I wouldn't call it a -- a -- a demotion. I -- I wouldn't refer to it as that.**

**He never received any lower pay. There was no title change, so I don't receive it as a -- I -- I didn't perceive it as a demotion for him.**

Q So in your view, it was not a demotion, going from reporting to Ray Anderson --

**A No.**

Q -- to reporting to you?

MS. LEE-COTA: Object to form.

BY MR. ROWLETT:

Q I'm going to mark --

**A Christopher -- Christopher --**

Q Yes, sir.

**A -- I didn't think one bit less of him because of it, and I would hope that others didn't either.**

Q You still at that point thought Sun Devil Athletics was a stronger team with Dave than without Dave?

MS. LEE-COTA: Object to form.

THE WITNESS: I -- yeah. And -- and I -- I do want to say that -- that there's -- there's different degrees, and -- and everybody has -- has -- has incredible skills and -- and things that they have to work on. As human beings, we all have that.

I was able to -- to -- to -- to work with -- even after all the -- you know, we -- we spoke about a lot of things here today, but there was a lot of things that Dave and I worked on very, very well together. And -- and he does have skills, and he does have value. And -- and those are the things that I -- I also had the -- the -- you know, the experience of working with him on.

And so, yes, in that regard, I -- I do believe we were a stronger team with Dave. And -- and when I say that, I just really wish that -- that we could have figured out a way to solve some of these things we talked about earlier and -- and -- and put them behind us. And then whether that meant me watching him more or talking -- you know, whatever it was, and then focus on the things that Dave does bring to -- to the table -- oh, and there are a lot of things, by the way, you know, that we would have been a better team.

That's what I meant. I meant that then and I -- and I mean that now.

BY MR. ROWLETT:

Q What are some of the things that Dave brings to the table?

A Dave has executive presence. He does. He's -- he's got a -- a -- I'll talk about, you know, his skills first on -- on the business side, and then we could talk about the personality.

But I -- I think he has tremendous executive presence. He also has the ability to -- I'll -- listen, I don't want this to be a -- Bobby Hurley is a little bit difficult to manage; right? He's -- he's -- he's a very strong personality.

I thought Dave did a great job of that. I thought Dave did an -- an exceptional job. I thought Dave also, in my view, did a -- a fantastic program of managing the men's basketball program.

There are certain things that we -- that we were able to accomplish with -- with -- that Dave spearheaded. The scheduling and -- and getting the home and home series with Kansas, that's Dave. That's Dave.

That's not Bobby, that's not Frank, that's not Ray. That was Dave Cohen's relationships that got that incredible home and home series, which we won both games. We beat a number one team twice, right, and -- and really cemented things. And that's --

that's -- that was -- that was Dave, you know.

And -- and also, you know, we talked about the Mullett Arena experience, that the thing that I was trying to -- you -- you said -- you -- you said it pretty well, that that was a -- a passion project. It's how I define myself, at least the last four years of my career. While Dave was there in the beginning, you know, it was he and I working side by side on this. You know, we complimented each other very well.

It was Dave who made the introduction to Othfi (phonetic) group with me. It was Dave who -- I -- I -- you know, we -- he and I got on the plane to talk to Othfi group when we first started thinking about this deal that -- that eventually, through a myriad of changes went to become -- you know, yes, three or four years after Dave left -- Mullett Arena; right? But Dave -- Dave did have skills; right?

And on the personal side, I -- you know, he -- he's incredibly funny. He -- he's -- he's a guy that is incredibly engaging. You know, you work together a lot. We -- we don't work 40-hour weeks. We -- we work more than that.

And Dave and I had -- you know, had a -- a -- a great relationship through -- mainly based in humour. We had a lot of things in common. You know,

yes, I guess we may not -- we -- we came from professional football backgrounds, and -- and we have -- we share like -- we had common things, you know, with our kids and our families.

And we both are -- are passionate about dogs and things like that. There -- so there were a lot of things that we -- that we worked on. We had fun playing golf together.

We spent a lot of time outside of work talking. The biggest thing I would ta- -- say that we had in common was our -- our incredibly strong, or whatever, sense of humor that we would deal with things, but -- yeah.

So the -- there -- the -- there -- there were things about David that -- that in -- in my view was -- was admirable. There were things in there, and -- and he did -- and he -- and he did have an executive presence. And he did hold people accountable.

And he did -- sometimes it could be construed as -- as -- as whatever, but -- destructive or critici- -- it's fine, but, you know, he did hold people accountable. So nothing's black and -- nothing's just black and white. Sometimes there are shades of gray.

Q Absolutely.

As CFO even before you were his direct

supervisor for three or four days, you certainly would have had awareness and knowledge of his performance as head of ticketing; correct?

MS. LEE-COTA: Object to form.

**THE WITNESS: I did, yes.**

BY MR. ROWLETT:

Q Yeah.

In your view as the chief financial officer during the relevant period, how was Dave Cohen's performance vis à vis ticketing?

**A It was mixed, so I -- I -- and I kind of alluded to it earlier. You know, he -- he did -- let's start with the good first. You know, he -- he did a great job with basketball, I thought.**

**You know, we -- it was -- it was -- again, he was -- he was very instrumental in helping Sun Devil basketball schedule. And that is a big factor, especially with the nonconference games. Obviously the conference games -- for those who don't know, those -- those are scheduled for you by the Pac-12 Conference.**

**So what the true make or break is, is when you get into the nonconference games, and I -- and I really did. I -- I think Dave did -- did a -- did a -- a -- a great job of -- of -- of making sure that we**

were scheduling games competitively and games that -- that our -- our fans would be interested in and games that the -- that our broadcasters would be interested in, and -- and -- and he did; so he did a -- a -- a good job. And -- and I was always happy with that, right, as CFO.

Football was a different story. Football we struggled mightily. You know, the last year that he had, we had a -- we missed budget by a couple of million -- million dollars.

And, listen, there are a lot of reasons why. He's not -- he's not playing quarterback either, you know; so there's not -- it's not all -- you -- you -- you don't just go out and sell tickets. And if -- and if you -- and if -- and -- as tickets are selling poorly, it's -- it's a factor of -- of -- of the -- the -- the ticketing team is not selling; so there's a variety of factors.

Is that part of it? Sure, it is. And that's why a lot of his compensation was what I call "at risk," or someone would say he gets a large bonus to get to pay the -- the big buck to help out with that.

We didn't do a good job with -- with football sales that last year. Like I said, we were down two million bucks for his budget; so, you know, it

**was a little bit of a -- of a mixed bag at how -- how I -- I -- I felt we were doing.**

**Remember, it's not just putting butts in seats, as you said earlier. It's also pricing; right? You als- -- also have to price things as well to get -- putting butts in seats at $5 tickets doesn't really help much on the revenue side; right?**

**So it is a -- it -- it is a strategy. It's -- it's an art. It's a science that Dave had to manifest.**

**And, again, towards the end there, Christopher, I thought it was a -- a split decision. I thought he did remarkably well with basketball. And football, it was a little bit of a struggle.**

Q You said "the last season." Would that have been the season that would have ended in, let's say, December of 2018?

A **That's correct.**

Q What was the football team's record that year? Do you know?

A **Seven and 6.**

Q Did they goal a game?

A **They did. We lost that bowl game to -- we made the Vegas bowl, and we -- we played at Sam Boyd Stadium. We lost to Fresno State.**

Q You referenced earlier a -- a -- or maybe I just read this in one of your notes. But there was a -- a stadium renovation of the football stadium?

**A Yes.**

Q I think you testified to that.

When was that complete?

**A It was complete, I believe, that same year. And it was completed over a time period of four seasons. We never closed -- I'm not saying we never closed.**

**We never -- we never lost a single home game. We -- we did all the work over the course of four off seasons -- three or four. It started before I arrived, so I'm not exactly sure when it started.**

**But they completed different sections of the stadium in different off season.**

Q During the seasons leading up to his final season in charge of ticketing, is it fair to say the stadium was under renovation?

**A It was complete. It was the last year that it was complete.**

Q So the 2018 --

**A His last year --**

Q I'm sorry. I didn't mean to cut you off.

So the 2018 season or the season that

ended in December of 2018 --

A Was the first season it was fully complete.

Q Fully complete?

A Yes.

Q Okay. And that season the team -- how many home games did they win?

A I don't recall. I'd have to look it up. I don't -- I don't have that. I'd have to look that up.

Without -- I remember we won Michigan State. We won the first game. We lost -- we lost to Stanford that year.

I don't recall -- I -- I remember the loss to Stanford at home. I don't recall any -- I -- I -- I -- we'd have to look. I don't know.

Q Yeah. It's tough. You always remember getting beat by the nerds.

A You do. We lost to Stanford --

Q Just feels -- feels worse.

A -- at home. Yeah.

Q Okay. Let's look at a document I've marked as -- well, no. Let's be fair.

You said that there's two sides to the coin. Other than the trust issues that you identified earlier, you listed a number of things that you thought

Dave Cohen did well?
A Yes.
Q You said it was a mixed bag as to football ticketing?
A Yes.
Q What else would you say --
A As to -- as to tick- -- mixed bag as to ticketing in general, meaning I -- I -- I -- I really thought he did well with basketball ticketing. I -- I did. I thought he was -- he -- he did a -- a -- a very -- an admirable job with that in the time -- at least the time that I was there.
Maybe a couple of hiccups here and there that I'm not recalling, but my -- my recollection of him is that he did a -- a -- a really good job with the basketball ticketing. And football is -- is where I said he had the flip side of the coin where we -- we struggled.
Q And what did you -- what else did Dave struggle with as an employee in your view?
A Well, I -- I -- I think it might be with -- let me try to think how he -- you know, he wore his emotions on his sleeve, and some of us do. He -- he -- he was quick to -- sometimes quick to temper, you know, with Ray at certain things, which I -- I

**really wish he would -- if I could go back and coach him a little bit. Say, Jesus, you know, Dave. You know, that's -- a little restraint would -- would -- would go a long way sometimes.**

**But also, you know, when dealing with -- you know, we had some staff members that if Dave felt that they were poor performers, Dave would -- you know, he could be rough on them. He could be critical with them. He would -- you know, again, hold them accountable is a -- is a nice term to do that, and he certainly would do that.**

**But the problem is sometimes it was perceived as -- as bullying, right, because he is a -- a -- a strong personality. And, you know, it just wasn't received well by -- by the people on the other side of the -- on the receiving end of -- of his criticism; so it made it at times difficult if you're trying to exist as a cohesive team. You know, sometimes his approach was -- was -- was a little rough.**

Q Do you believe Dave Cohen to be a racist?

**A Sorry. Say that again.**

Q Do you believe Dave Cohen to be racist?

**A No, absolutely not.**

Q I'm going to -- I'm sorry. Before we go off this, is there anything else that you can recall, as

you sit here, that in your view Dave Cohen was -- presented problems in the workplace in Sun Devil Athletics.

**A Well, we talked about -- I said my issues of trust, which I tried my best to keep to us. You know, I didn't want that out there poisoning his ability to -- to -- to lead, you know. So I didn't tell necessarily the staff about those things. I had that in the back of my mind.**

**I actually could take Dave's critici- - you know, and there was -- you know, from time to time. I never took exception to it ever, and I don't think he really took mine at the end of the day bad. I -- I think that there was issues, again, with his -- sometimes with his -- his -- and I think I'm being repetitive here.**

**But he could be abrasive at -- at -- at times. And it's funny. There are times when I think others even would feel the same way that, Hey -- I use me as an ex- -- Hey, you know, Frank's a poor performer, and -- and -- and they would manage it maybe a little bit differently than Dave would.**

**Dave could also come -- come -- at times come off as -- as bullying at times.**

Q Did you see him bullying anyone in

your -- in your view?
A Yeah. No. So, again, I'm a little bit different.
Like I -- I -- it's maybe perhaps my upbringing -- well, both personally but also in the National Football League where things tend to get -- at least my boss, who's the CFO. And he was -- he's still the CFO to this day. He's going to be retiring soon.
He was very tough on me. But I love him; right? It's one of those things where you -- you -- you know, I -- wherever I go in this -- in this career, his fingerprints are going to be all over it, and that's just how it is; so I'm a little bit different than -- than most.
So would I -- I -- I would perceive him being incredibly tough on people. And like, jeez, I may not have -- I personally may not have phrased things that way. But as to cross the line to bullying, no.
It's -- and let me draw the distinction to make -- be clear. I -- I -- think he was -- what always would set him off would be something that was a -- a poor performance type of thing if someone messed up, he would, for lack of a better term, lose it.
Q I want to show you --
MR. ROWLETT: Sorry.

Yeah, Jenny?
MS. LEE-COTA: Yeah, yeah. When you're ready for a break.
MR. ROWLETT: We could take a break right now.
MS. LEE-COTA: Okay.
MR. ROWLETT: Off the record at 10:37.
(Off the record.)
MR. ROWLETT: Hearing no objections, we'll go back on the record at 10:48.
BY MR. ROWLETT:
Q Mr. Ferrara, I'm going to show you what will be marked as Exhibit 92.
(Deposition Exhibit 92 marked.)
BY MR. ROWLETT:
Q I'll share my screen. It is a series of documents Bates-labeled ABOR Cohen317. Oh, they're not sequential, so I'm going to -- I'm going to -- I'm going to number them specifically for the record.
ABOR317, 318, 315, 314, 999, 1000, 311, and 312. I'll share my screen so you can see these. Again, this will be Exhibit 92.
I know this is going to be very blurry on your screen for now, but can you just see my screen share?

A Yes.
Q Okay. What has this first document to do -- what's this first document look like to you?
A It's an org chart for Sun Devil Athletics.
Q And there's a date in the bottom left-hand corner here. Do you see it?
A Yes.
Q And what date is that?
A January 2019.
Q And in this org chart as of January 2019, you are here. Do you see that?
A Yes.
Q And it says "senior associate AD and CFO Frank Ferrara"; correct?
A Yes.
Q And it identifies your -- I think these are duties, responsibilities: "finance, travel, and sports administration." Do you see that?
A Yes.
Q And then it's got this dotted line down here to someone named Kate jan- --
A Janczewski.
Q Janczewski. Thank you.
What does that dotted line mean?

A She -- she reported to me at the time.

MR. ROWLETT: And for the record, Madam Court Reporter, Kate, K-A-T-E. Janczewski is J-A-N-C-Z-E-W-S-K-I. I -- I -- I grew up with -- there's a -- there's a very strong Polish community in the Detroit area where I grew up.

But when I -- when I'm -- I haven't lived there for a while now, and I've lost my edge. I -- I can't -- I used to be able to read those numbers -- read those names with some dexterity.

But now I get jan- and I'm like, Oh, I'm lost.

BY MR. ROWLETT:

Q But at the time, Kate reported to you?

A Correct.

Q In January 2019 did anyone else report to you?

A I'd have to go back to that time period. I -- well, it says "sport administration," so the whole hockey area. I guess that's what that means, the whole hockey -- yeah. So I -- I think that's it.

Q Thank you. That's helpful, because I do want to show you now -- well, before we move on. And this org chart reflects kind of a little up -- vertical line here, horizontal line, and the vertical line to

Ray Anderson showing that you reported directly to Ray Anderson?

A Right.

Q Is that what this shows?

A Yes.

Q And that was your understanding in January 2019, that you reported directly to Ray Anderson?

A Yes.

Q And then over here on the same -- we're still back on a document Bates-labeled ABOR Cohen317. This shows Dave Cohen -- do you see where I'm pointing here --

A Yes.

Q -- as the senior associate AD?

And his responsibilities, at least January 2019, appear to be band/spirit squad joint, ticketing, and then sports administration; correct?

A Correct.

Q You referenced that this sports administration in your responsibilities you understood to refer to hockey. The next document in this exhibit is Bates-labeled ABOR Cohen318.

A Yes.

Q Is this another org chart, Mr. Ferrara?

**A I -- yeah, we could call it an org chart. But I guess this is one layer down of detail, just describing what the sport administration responsibility of the people from the -- the -- the chart above that you first showed and then specifically what sports that they're -- they're responsible for.**

Q Okay. So it is your understanding that this sports administration -- I'm now referring back to the first Page of Exhibit 92 -- the kind of -- if we zoomed in. And the detail of that is on the second page showing that the sport that you're responsible for is ice hockey, men's; is that correct?

**A Correct. That's correct.**

Q And this still shows you reporting directly to Ray Anderson; correct?

**A Yes.**

Q And then Dave Cohen is also reporting directly to Ray Anderson here, and it shows his responsibility as basketball, M -- I'm assuming that means men's?

**A Correct.**

Q -- diving MW -- men's and women's diving and men's and women's swimming; is that correct?

**A That's correct.**

Q And in January of 2019, that was your

understanding of Mr. Cohen's responsibilities; correct?

A Yes. Correct.

Q The next page in this exhibit is Bates-labeled ABOR Cohen315, and it has a date in the lower-left corner. Do you see that date?

A Yes.

Q What is that date?

A February 2019.

Q And this would be the sports administration organizational chart; correct?

A That's what it says, correct.

Q And in this one, it still identifies you as being responsible for men's ice hockey; correct?

A Correct.

Q And it still shows Dave Cohen as being responsible for basketball -- men's basketball, men's and women's diving, and men's and women's swimming; correct?

A Yes.

Q And is that your understanding of your responsibilities and Dave Cohen's responsibilities in February of 2019?

A To the best of my recollection at that time, yes.

Q The next one, page 4 of the exhibit, is

Bates-labeled ABOR Cohen314. And this is -- there's a date in the bottom left-hand corner. Is that February 2019?

A **February 2019.**

Q Okay. So this appears to be the administration version of the February 2019 organizational chart for Sun Devil's athletics; correct?

A **Yes.**

Q And in this it shows the same as in January; right? You're responsible for finance, travel, and sports administration; correct?

A **Correct.**

Q Kate still reports to you --

A **That's correct.**

Q -- with this dotted line?

And then Dave Cohen's responsible for ticketing and sports administration; correct?

A **Yes.**

Q So it looks like, from January to February of 2019, Mr. Cohen is no longer responsible on a joint basis for band and spirit squad?

A **Yes. And I don't recall the particulars of why that happened. I don't recall Dave being even -- I was surprised to me that I even saw him as -- as the joint.**

**I always thought that Bill Kennedy was the -- the head of -- of -- or dean perhaps maybe was the head of the band and spirit squad. I don't recall if it -- if -- if there were -- why that change happened, Chris.**

Q Thank you. I understand that. I'll ask someone else that question.

And this is going back to the January 2019 organizational chart, and it shows Deana Garner-Smith --

**A Oh, yes. It says -- got it. Yeah.**

Q -- band and spirit squad. So that's consistent with your recollection, that she was --

**A Yeah.**

Q -- at least, you know, if not primarily, jointly responsible for that --

**A Yes.**

Q -- in January of 2019?

And then in February of 2019, it appears -- see if we can find Ms. Garner-Smith --

**A Yeah.**

Q -- band spirit squad joint. I don't know who her counterpart is on that.

You said Bill Kennedy?

**A Bill Kennedy. And I don't know if**

**Bill -- Bill is a -- a little bit junior. He's not a senior associate AD.**

Q Okay.

**A I don't -- he may not be on this chart.**

Q Okay.

**A But Bill was the one who had -- my reco- -- at least the last few years that I was at Sun Devil Athletics in Arizona State University, Bill was the -- the one who was responsible for the -- the -- the day-to-day administration of the band and spirit squad; so my guess is that at some point it transferred over from Dave to Bill.**

Q Got it.

We talked about this dotted line down here to Kate. I also see a SID line that seems to connect to the main artery going back to Ray Anderson for -- for Kate and -- and Mark Brand. Do you see that?

**A Yes.**

Q What does that mean?

**A Well, Mark -- Mark reported to him for sure. Kate and -- and Mark were on the same level, you know. They were both part of communications.**

**Kate more on the digital side and the social media aspect, and Mark on the stand- -- on the -- let's call it the traditional sport -- sport information**

director. It's known as SID in the industry.
And I think they were grooming Kate to take Mark's spot. Mark was getting near retirement. He has subsequently -- he has retirement. Kate actually also left as well.
But this actually is not -- this is not reflective of my understanding. I don't recall Kate actually reporting to Ray. I did her ratings. I determined her bonuses and all that other stuff and -- and did her reviews and whatever; so my recollection was that in -- in those -- in 2019 Kate reported directly to me and only me.
Q Okay. So your recollection, if we were going to convert it to this org chart --
A You would remove that line.
Q -- this would be a solid line -- this would be a solid line?
A Right.
Q And then we would remove this line here?
A Correct. That would -- that was my -- my best recollection --
Q Okay.
A -- at this time.
Q But at least in February of 2019, Dave Cohen is still reporting directly to Ray Anderson?

A He is.
Q And everyone on this level, from Dave Cohen across to Steve Webb, is reporting directly to Ray Anderson?
A Yes.
Q Oh, let me -- that's for Steve Webb. Steve Webb is a little bit wonky, right, because he's --
A That's right. He's a little bit wonky.
And the only one I would add after that is Jean Boyd above. He reports to Ray as well.
Q Yes. Okay.
Next document in this line is Bates-labeled ABOR Cohen999.
A Um-hmm.
Q And there's a date in the lower left corner here. Can you read that date for me, please, Mr. Ferrara?
A It says "July 2019."
Q Great.
And is this around the time we -- withdrawn.
You testified before the break that in July -- on or about July 5th of 2019 is when you and Dave Cohen, it sounds like, learned or at least spoke about Dave reporting directly to you?

MS. LEE-COTA: Object to form.

**THE WITNESS: He made a joke about it. We didn't talk about it, and I certainly at the time did not know anything that he would be reporting to me. I -- I testified earlier -- Christopher, you may remember.**

BY MR. ROWLETT:

Q Um-hmm.

**A I found -- Ray first brought it to my attention right before I was leaving for China, which is at the very end. I think it was July 29th or July 30th of -- of 2019 when the team left for -- for China. Maybe 28. Something like that.**

**It was at the very end, and it was right before that trip that Dave -- I'm sorry. I'm sorry -- that Ray alerted me that he had made a decision that Dave was going to report to me.**

Q And so I guess this is consistent with that testimony, that in July 2019, a decision was made that Dave Cohen was going to report directly to -- to you; correct?

**A Yes.**

Q And this is for ticketing and sports administration?

**A No, that -- this is incorrect also. It**

**was just for ticketing. The sport administration he reported directly to Ray, and I'm absolutely certain.**

**So, in other words, when you say "sport administration" -- and I don't know -- at the time -- I know he -- he kept on to men's basketball. I believe they may have removed swimming and diving away from him at the -- sometime around this point.**

**Is there another piece of this --**

Q Yeah.

**A -- document that we can take a look at?**

Q Yeah, yeah, yeah. Yeah, we can take a look at that.

Before we go there, I do want to say it appears that from the February of 2019, Gabe Cagwin (phonetic) reported directly to Ray? And Dave Cohen reported directly to Ray?

**A Yes.**

Q And then in July of 2019, Gabe Cagwin began reporting to Scott Nelson and Dave Cohen began reporting to -- to you; correct?

**A Yes.**

Q And everyone else is still reporting directly to Ray Anderson?

**A I -- I -- well, what I don't recall is Jean may have picked up some direct reports that were**

**previously reporting to Ray. I don't know, and the -- I'm thinking about Tesh and Scotty. I noticed they're not reporting to Ray anymore. Maybe that changed as well.**

Q So maybe I'm -- maybe I'm misreading this. I see -- you referred to "Tesh." I think this is Natesh Rao here; correct?

**A Correct.**

Q And this line connects over to Ray Anderson, right, or are -- do I understand this to be that they're reporting to both Jean Boyd and Ray Anderson?

**A My -- my recollection, I -- I -- again, I don't recall that dotted line in practice even being here. I thought, from this moment on, they reported to Jean, period.**

Q And then this is the sports administration in July of 2019?

**A Yes.**

Q And this represents your ice hockey for men's?

**A Yes.**

Q Dave Cohen, basketball. And directly to Ray Anderson for purposes of men's basketball.

**A Correct. So it looks like they removed**

**the swimming and diving from Dave at this point.**

Q And so maybe I -- it's your understanding, though, that this sports administration refers to the teams or the specific sports that they were responsible for; is that correct?

**A That is correct.**

Q Okay. All right.

**A And then my -- go ahead. Continue.**

Q Yeah. I'm sorry. And that was not a good question -- not clear for the record.

The sports administration in the general administrative org chart identified as Bates label ABOR Cohen999, your understanding is that refers to this specific sport that certain Sun Devil athletic employees were responsible for certain sports?

**A That is correct. Usually there's a primary and a secondary administrator of a sport. In case someone's traveling or someone's on vacation, they go to a secondary. But the primary -- in this specific case, the primary administrator for men's ice hockey was me and the primary administrator for men's basketball was Dave.**

Q And so the last -- there's two more pages in this document to show you. This is Bates-labeled ABOR Cohen311. Do you see that?

A **Yes.**
Q Bottom right corner.
This is another org chart for the administrative structure of Sun Devil Athletics; correct?
A **Yes.**
Q There's no date on this document. You can look at it as long as you like. I've looked at it. I don't see any date on this particular document.
A **Yes.**
Q But I note that absent from this document is any reference to Dave Cohen.
A **Okay. So it must have -- okay. Yes, I don't see it either.**
Q Yeah.
So do you think that this document is probably the organizational chapter Dave Cohen was terminated?
A **It -- it must have been the -- the one that was done after he was terminated. I -- I -- I haven't had a chance to review this. I don't know if there are any other changes to it other than Dave.**
Q Yeah.
A **Dave is clearly missing, so it's clearly after that. I -- I don't know if there's anybody else**

missing.

Q Sure.

And then it says that ticketing then became your responsibility?

A Yes.

Q Is that consistent with your recollection?

A Correct. And until I left in August of 2023, ticketing -- Dave successor's name is Mike Meitin. He was his main lieutenant who took over his role.

Ticketing still continued to report directly to me until I left.

Q And then it appears that in -- on the last page of Exhibit 92, Bates-labeled ABOR Cohen312, this is the sport administration org chart that is, again, undated. Do you see that?

A I do.

Q But it shows here under Ken Landphere -- that's L-A-N-D-P-H-E-R-E -- that he is now responsible for men's basketball. Do you see that?

A I do. Ken was the second on Dave's -- remember I said there was two?

Q You did.

A Ken was always Dave's second -- well, not always -- but for years. For the years prior to Dave's

**departure, Ken was the backup. So it appears that now he's the primary.**

Q Do you recall, after Dave Cohen was terminated, that this organizational chart that we just looked at in the last two pages of Exhibit 92 was published to the Sun Devil Athletics department or at least the senior management team?

**A You know, you would -- you would think it would be. And I -- I don't recall that -- if that was given out at a management meeting at -- at all. It wasn't posted on the wall, per se.**

**I don't recall ever, like, getting a copy in -- in -- in an E-mail, although I may have.**

Q Earlier, one last time you spoke to Ray Anderson was you mentioned that he maybe asked to connect with you in Atlanta or in the suburbs of Atlanta when he was there. Do you still text with Mr. Anderson at all?

**A No, that was the last time we texted. I mean, we do. I mean, that was -- I know what your question is.**

**I mean, I -- he lives -- we haven't got connected yet, but he lives literally two to three miles away from where I live. His -- his primary residence is -- and always has been for the last 30 years -- in**

**the suburbs of Atlanta near -- near where I live, coincidentally. Although to this date, we have not connected.**

Q It's crazy how that can happen.

**A It's crazy. It is.**

Q It is.

**A But he's in Arizona for the most part, even after he -- you know, he -- he resigned in -- I guess, Novemberish; so we didn't really get a chance much to -- to connect. At some point I assume we will. At least I'd like to.**

Q I want to go back to July of 2019. You said that, you know, a lot of things happened in July of 2019. What were you referring to?

**A I was referring to a specific date, on July 5th of 2019.**

Q And what happened on that date that was memorable to you?

**A It was -- it was a date that was -- again, the office was closed that date. It was a holiday. It was the continuation of the July 4th holiday.**

**I was in the office un- -- I say unfortunately. None of us like to be on when we should be with our families. But I was in the office preparing**

for a big meeting that I had, and -- and -- with Ray and with President Crow later.

Sorry. The early part of the following week to go through certain things financially and what not. Dave was in for whatever reasons he was. But we -- I -- my recollection was that we were two of the very few, if not the only two people that were in the -- well, people on my team were in the finance team.

We were working on the same presentation. But as far as the senior staff, Christopher, I -- I think that Dave and I were the only ones that were present. That was my best recollection.

Dave came in first thing in the morning. It was very early. We -- we both had a habit of getting in extremely early. I was usually in by 7:00, as was Dave, and so we always had, you know, that -- that we would usually get there first or second.

And Dave came in and shared with me details about what was happening with -- with -- with him and -- and the incident that happened in Las Vegas.

Q Are you referring to the bar where -- sexual harassment allegations?

A That is correct.

Q And what did Dave share with you at that time?

A Dave came in. And he started off by saying, "Frank, I -- I want to thank you. My bonus just cleared -- my bonus for the year. My annual bonus just cleared. I had a discussion with Kathy last night about filling you in on certain things that have been going on the last few months, specifically since March, as it relates to something that happened in -- in Vegas."

And he proceeded to share with me the details of what happened.

Q Do you remember any specifics of what he told you on July 5th?

A I do.

Q What did he tell you?

A He told me -- he said, "Look, they -- you may" -- I recall he said, "You may be confused as to some of my -- the last few months. You may have picked up on that Ray and I have been at each other" or something.

And I said, "Well" -- I said, "Kind of sort of. I didn't know exactly know why, but I assume you're about to tell me."

And then he told me about how his wife was inappropriately touched. I -- I forget the wording that he used. I'm trying to think what he said.

But he -- he mentioned that during the --

the -- the Pac-12 tournament at T-Mobile Arena in Las Vegas that, you know, she was touched. And he -- as he's tell me the story, he became increasingly angry, just like -- again, and not in a -- as -- as he's -- I guess as he's reliving it about what had happened.

And he started going, "Listen, let me tell you something. He's nothing but a hypocrite. Ray is a complete hypocrite, and all of the things that he said" -- and -- and I -- and I said, "I'm losing you Dave. What -- what are you referring to?"

And he reminded me. "Oh, so you remember how Ray talked about the incident that happened at University of Washington?" I believe it was a coach or an assistance coach somehow had inappropriate sexual contact -- relations with an athlete or a gymnast -- a female gymnast. And Ray was very critical about how the University of Washington handled that incident and -- to all of us, and he brought it up at a senior staff meeting.

And Dave was really getting angry. Goes, "He's a hypocrite, and -- and -- you know, and the fact that he would do this to my wife." And -- and I stopped him.

I said, "Okay. Stop." I said, "So he touched your wife? Are you kidding me?"

And he said, "No. Bart Wear touched my wife."

I said, "Dave, you're losing me. I'm -- I'm -- I'm lost here. I -- I don't know what happened, so tell me what happened."

And he told me that it was Bart Wear who -- which he did start to say to me -- but he was so angry with -- with Ray. And he told me the story.

I said, "Well, what -- what did he do?"

And he said he walked behind her, and he reached behind her. And Dave motioned with his hands. And he cupped her breasts and said -- made something along the lines of, You know, you're way too pretty for Dave, or something along those lines.

And, you know, I -- I was a little stunned. I said, Okay. Why are you so mad at Ray and not Bart? That -- that's where you're losing me. Seems like you're far more angry with Ray than you are with Bart. I'm lost."

And he continued to say, like, you know, how Ray is doing nothing to stop this. And he really started making this about Ray. And, you know, it became an unfortunate conversation.

I -- I -- I didn't understood how he -- how he tied it to the bonus. I -- I -- I called him out

on that. I said, "Dave, what does this have to -- why would you be telling me this now? Who knows about this?"

And he -- and he said that Scott Nelson knows. My recollection, Christopher, was that he said Rick Shangraw knows. Clearly Ray knows.

He said -- I -- he said he told Scott first is my recollection, and then they told Rick Shangraw shortly thereafter. And then they collectively -- I believe collectively had a conversation with Ray. He also indicated that Jean Boyd knew as well.

And I was a little surprised at, you know, he didn't tell me at all -- at that time. And so I had -- I said something along the lines of, I -- I don't understand if -- if -- if -- you know, Why -- why didn't you do something then? I don't understand.

And he -- and he said, "I didn't want to be a distraction to Bobby."

I said, "Well, what do you think you're doing now? You know, I don't understand that. If a crime was committed, the first thing you should have done is call the police or -- did you call Deana? Did you alert Deana about this?"

And he said he didn't. I said, "Well,

why not? And he said it was above her head.

And so, you know, I -- I -- I told him. I said, "Dave" -- I -- I -- I -- I made unfortunate comments, because I think it was misconstrued the wrong way. I -- I -- I did say, "Look, if there was -- let me tell you something. If someone would -- if a hockey donor had touched my wife in March, we wouldn't be talking about it here in July. As a matter of fact, if a hockey donor had touched your wife in March, we wouldn't be talking about it in July."

And he took that in the wrong way, Christopher. He took that in the way that I was implying that I would defend his wife more than he was. I wasn't.

I was trying to imply that I would -- if I -- had I been there, I -- I would have done something to protect her. That's all I was trying to imply.

He got pissed. He got really upset. And we started -- and I just said, "Look, man. It just seems like you're trying your best to attach this to Ray as opposed to -- to -- to going after Bart."

I didn't even know -- "And why the hell you would tie this to your bonus is -- is beyond me."

He said, "I'm not."

"Well, you just said, now that your bonus

is cleared, you feel like you can talk to me about this, you know. So, listen, I -- I don't know where this stands. I -- I -- I would encourage you to -- to, you know, follow the proper things and make sure you -- you're instructed, when things like this happens, to -- to talk to Deana."

Deana is -- is our -- is our representative here. And, you know, for whatever reason, he chose not to -- to do that. And that's really all -- all I remember about the -- the -- the conversation until he came back later that day.

And I told you this is what -- I'm going to reiterate what I did later that day. I was stunned by the whole thing. I was surprised that he had held this to himself all these months without telling me.

I had not heard anything about it, not even rumored, nothing. But, you know, again, I -- I -- I thought that -- I thought -- and maybe I am. You know, I thought, Of all the people on staff, I thought I was his closest friend.

And I thought that he would have at some point told me, and I could have, you know, done something to help him. I mean, I was -- I was pretty pissed off at Bart, you know. I -- I sensed that, you know, if something like this happened, it may not

have happened the way that he implied it happened.

But Bart had, you know, a -- a reputa- -- I didn't know Bart well. Let's just leave it at that. You know, he -- he was a guy that seemed to tend to like to party. But to see him do something like this, I wouldn't know that he was capable of.

But I wasn't there, so I don't know exactly what happened. But I just was a little disappointed at the way he handled it. It would have been -- he should not have waited.

Something this serious happened, to me he should have reported it immediately whether it was serious enough to report to the police or certainly reported it to Deana so that we -- the -- the proper course should be taken.

Him waiting for the Pac-12 -- I'm sorry. Yes, the Pac-12 and then subsequently the NCAA tournament, I thought was really disappointing out of respect for his wife. And so that was the conversation we had.

Q Is that all you recall about the conversations you had on July 5th of 20- --

A There was that one more when he said he walked into the office late in the day. And he said, "So I guess I report to you now." And I told you the

rest of that.
Q Okay.
A And he asked, "Why did you say that?" And it was something along the lines of, Well, I -- I texted Ray thank you. I wanted to thank Ray, too. I'm trying to do -- he said, "I want to try to see if now we can put this behind us."
Again, Christopher, he was tieing it to the bonus, and that's what I -- I didn't quite -- it just didn't jive right with me how this had anything to do with his bonus clearing whatever. But he just said, "I want -- I want to try to turn over a new leaf with Ray. I -- I -- I sent him a new text thanking him."
And then Ray responded with something, and I did not see the text. I was not copied on the test, but I'm getting this from David that -- something along the lines of, You're welcome, and we're going to make -- changes are forthcoming to make us better or something like that. And somehow some way, the way it was said alert- -- concerned Dave that there might have been some more changes coming.
Q Got it.
Do you know when Dave Cohen first reported -- oh, withdrawn.
In March of 2019, Ray Anderson was

Dave Cohen's supervisor; correct?

A Yes.

Q Do you know when Dave Cohen first reported this sexual harassment to his supervisor?

A I only know when he told me, so I don't know of any -- I -- I'm not privy to any of the details of the investigation. I'm not. I've never seen it.

He told me at some point after the Sun Devil's men's basketball team was eliminated from the NCAA -- so now you're one week further. You know, we -- we had made a -- well, we had a playing game which we won, and then we went to the round of -- the first round, which we played in Tulsa and we lost. Then we lost to Buffalo and we flew home.

He said -- he told me that it was after we were eliminated that he decided to talk to Scott Nelson.

Q Do you know --

A I don't know the date, so that would have been sometime in late March, I guess, you know. Early April maybe.

Q So it sounds like the -- you're talking about a -- a two-week window from the --

A Potentially.

Q -- Pac-12 tournament to the -- to the --

well, I'm sorry. That wasn't a good question.
It was a two-week window from when the Pac-12 tournament happens in this week and the following week the first round of the NCAA tournament happens; correct?
**A Yes.**
Q So --
**A So the Pac-12 game would have been the first round -- the first game. He said it happened during the first game. I don't know who we were playing, but that would have been sometime mid March.**
Q So at the outside, it's -- that's a two-week window. Could be 7 to 14 days from the first round of the Pac-12 tournament to being eliminate in the first round of the NCAA tournament; right?
**A Yeah. A week to -- a week to ten days. And then what I don't know is how soon after that game ended.**
**He told me -- he said, "I did not want to bring this up to anybody before we were eliminated." And -- and, again, I -- I be- -- I do -- I recall vividly me criticizing that. I'd say, "How did -- how do you tie something this serious to winning or losing this basketball game?"**
Q Do you --

A I said, "Do you think Bobby Hurley would have waited if -- if -- if something happened to his wife?" There was an incident down in Tucson that I -- I brought up when Bobby -- when a fan unfortunately in Arizona said something really nasty to Bobby's wife, Leslie. And I thought Bobby was going to kill the guy and had to be retrained from -- by security.
I said, "Do you think he stops, right, you know, in the middle? So, you know, I -- I don't -- I don't understand why you would tie this."
Q Yeah.
A "I -- I -- it makes no sense to me why you would -- you would think this would be a distraction to Bobby."
Q Do you know if there were other women sexually harassed on that same day by Bart Wear?
A I -- I know -- I -- I -- I -- first of all, I -- I don't know any first-hand knowledge of any of this. I -- I was told by Dave that he also touched, I -- I believe, our director of ops' wife. Dave told me.
Q And did Dave also tell you that the victims specifically asked him not to raise the issue until after the season concluded?
A He did not tell me that.

Q Okay.
**A Well, you know, hold on. I don't recall him telling me that. All right?**
Q Okay.
**A It's five years.**
Q Okay.
**A I don't recall that being a -- a discussion. I -- I -- it was one of those things -- it was -- the way it was positioned to me, Christopher, was that it -- this was important to Dave and Bobby that this -- that this post season run and he didn't want it to be a distraction.**
Q Okay. If the -- if the victims had specifically asked him not to report it until the season concluded -- if that were true, does it change your view of the propriety of waiting until after the season -- the season completed?
MS. LEE-COTA: Form.
**THE WITNESS: Yeah. Absolutely not. I -- I -- absolutely not.**
**I -- I -- I -- listen, it's probably not my job. If you said it another way -- if -- again, if this happened in hockey, I'd be like, "Yeah, no dice. We're -- we're -- this is serious. We're doing this right here right now, and I don't care about the**

**frozen four now."**
BY MR. ROWLETT:
Q And that's regard- --
**A That would have been my approach.**
Q And that's regardless --
**A And I know that's not what you're asking me.**
Q No.
**A But I'm trying to give you the -- I'm trying to give you --**
Q I appreciate that. And I -- and I asked you the question, and I'm -- and I'm -- and that's regardless of if the victim said, No, Frank, don't say anything, I want this to be -- I want you to wait until after the season's over? You'd say, Sorry, sorry, I'm going to do it right now?
**A I have to -- I would -- I would have alerted -- you know, we're all instructed -- all of us -- David included, myself, everyone from Sun Devil Athletics, not just senior staff. We're alerted on our protocols of what we do. The first call we make is to Deana to -- to do this, and that -- that would have been my first call of action.**
Q Um-hmm.
**A The only thing that would have stopped**

**that would have -- of course I always would have called her -- but if I thought it was serious enough to -- to -- to call the police.**

Q And were you also in your training told that you could report it to your supervisor?

**A I was told the first person you're supposed to talk to is Deana.**

Q Were you told you could also report it to your supervisor?

**A No.**

Q No -- no mention of that at all?

**A No. No. It's got to go through the right channels, you know, to be investigated the right way, and -- and the -- and the right way -- the approach is -- again, Deana is a signed-off person, but that was the channels that we were -- we were instructed to go through.**

Q When you found out --

**A Or the -- or the police.**

Q Okay. Thank you.

When you found out in July of 2019, were you under an obligation to alert Deana?

MS. LEE-COTA: Object to form.

BY MR. ROWLETT:

Q In your mind?
A I had -- I had -- I -- I believe I was actually. I told -- I told Dave that I -- that he should tell her. I asked him -- I said, "You have told Deana this?"
And he said, "No. This is way over her head." I said, "Well, I'm going to encourage you, you know, to do this." I don't know if I called -- if I called Deana or not.
I don't recall if I said, Look -- I don't -- I know very little details, but there is something going on -- or by that time she already knew. He told me that Deana did not know on -- on the 5th of July, Christopher.
Q Um-hmm.
A He definitely told me that Scott Nelson -- I'm -- I'm -- I'm incredibly vivid on that thing, that Scott Nelson knew. He told me that Rick Shangraw knew. And less certain, but I believe he also told me that Jean Boyd was aware of things as well.
Q And Ray Anderson.
A I'm sorry about that one.
Q Did he tell you that Ray -- and he told you that Ray knew?
A Oh, yes. Sorry. And then he -- he told

**me that -- that after telling Scott and telling Rick that Ray was alerted. I don't know when that was -- or I don't recall if I -- if he told me.**

Q And you testified a few minutes ago that the start of that conversation in which Dave disclosed to you the sexual harassment --

**A Yes.**

Q -- said, You may have been wondering why things have been difficult between Ray and I. Those aren't the exact words but something to that effect?

**A But that's the exact -- that's the spirit, yes.**

Q Had you noticed that things had gotten tense between Dave and Ray --

**A Yeah.**

Q -- in the proceedings months?

**A I did. I -- I -- I did. I -- I -- I would love to point out a specific example.**

**I could think of one, and it happened at -- at a -- at a ball game at -- at a game in Phoenix where I was sitting in my family seats. And I noticed that Dave was sitting with -- I don't recall if Kathy was there or not. I can't recall.**

**But Dave was sitting with -- with Ray. And then Ray didn't stay long. It was weird.**

**And then just Dave was staying there, and then Dave was aggravated about something about a conversation he add with Ray. It was noticeable. And I noticed that the -- there was some sort of thing going on.**

**Their seats might have been 75 feet from my family's, you know. I -- I -- I did notice something. I noticed Ray leaving.**

Q Is this --

**A And so -- this was at Phoenix community stadium. One of our baseball games.**

Q And you said "our baseball games." You mean Sun Devil Athletics baseball games?

**A That's correct.**

Q And this is about in May of 2019?

**A Probably. April or May, yeah. We would -- we -- we play baseball from February to May.**

Q But Dave did tell you in, at least July of 2019, that he was frustrated that Ray hadn't taken action pursuant to this sexual harassment report; is that correct?

**A That is correct.**

MS. LEE-COTA: Object to form.

**THE WITNESS: Oh, I'm sorry, guys.**

**I -- can I answer the question when you**

**say that?**

MS. LEE-COTA: Yeah. I'll try to be really good about making you --

**THE WITNESS: And I'll be better at pausing.**

MS. LEE-COTA: -- making you stop, but that was fine to answer.

**THE WITNESS: Yes.**

**Christopher, one more time. I'm sorry.**

BY MR. ROWLETT:

Q No. You answered the question.

**A I did?**

Q No need.

At some point in 2019 -- this would have had to have been prior to July of 2019 -- were you involved in the annual performance review for Dave Cohen?

**A Yes.**

Q Prior to -- withdrawn.

When abouts did that happen? Can you narrow it down to a month, or --

**A Oh, for sure. It happened, because Ray was present -- physically present, and Ray -- so my guess it would have been week the first coup- -- either week one or week two of Juneish, somewhere around there,**

**because it was -- it was -- the reason I say that was because Ray was physically present. He wasn't on the phone or -- I don't even know if we used Zoom back then, But he wasn't on the phone. And was a review that took place in his office.**

**And Ray usually goes away sometime in mid -- mid June to, say, late July every year to go back to Atlanta, so it would have been that time frame.**

Q And was this the first time you'd participated in Dave Cohen's performance review?

**A I believe it was, yes.**

Q How many other employees' performance reviews, did you participate in, in -- in 2019?

**A All of the senior staff. Every single one of them.**

Q And does any stand out to you about Dave Cohen's performance review from that year?

**A Yes, it does stand out.**

Q How so?

**A I believe it was one of the first ones we had -- either the first or -- or second review that we -- that we were doing. We did go through some of the points that we had talked about earlier. There was some -- we -- we talked about the -- the -- let's call it a -- you know, the split decision on the ticketing**

thing.

Obviously football -- you know, for those of you who don't know, football probably makes about 85 percent of our ticketing revenue. Men's basketball makes -- and ice hockey probably makes the rest of it with the other -- all the other ticketing sports make -- make -- literally being rounding errors on that. And we had a -- you know, the issue with -- with football ticketing that we went through. We also talked about the -- the -- the basketball revenues.

And then there was also -- and Ray had brought this up. Ray had talked about his inability to -- to work with some of the staff and -- and -- and being abrasive with other folks. And that came up.

I believe he also -- Christopher, I think he also brought up at that point -- or -- or it may have been at this meeting or sometime closer when he decided that he was going to take him off of swimming and diving so that he could focus on ticketing. I think that also occurred at that time.

But Dave was upset. Dave was very upset. A lot of the -- the focus in -- in -- in Dave's mind swirled around his -- his bonus.

And Dave was different than most. Dave had a -- a -- listen, for lack of a better term, bonus.

I also refer to it as compensation at stake or at risk, because he does have a revenue-generating capacity to it -- to his job.

And so I think Dave was overly concerned about the -- these negative things impacting his -- his bonus. That was my -- my recollection on -- on the stuff leading up to it.

Jean Boyd was also in the room. He was the only other one in the room other than Dave and -- and -- and Ray. Then the conversation towards the end of it circulated around his bonus.

And Dave ment- -- I'm sorry -- and Ray mentioned that I'm going to give you -- you know, Look, we've got to get some of these things addressed, mainly your ability to, for lack of a better -- I don't know what words he used -- but you've got to play nicer in the sandbox with some of your colleagues. And also you -- we've got to do better with football ticketing revenue. And I'm going to take swimming and diving away from you so that you can focus on these types of things and improve.

And I'm going to give you a bonus. Instead of the $100,000 max, I'm going to give you 75,000. And Dave got extremely upset.

And it got -- it got to the point where

**it -- it seemed like a minute. May have even been less. But Jean Boyd had said, "Look, do you guys need a minute? Would you prefer to have this conversation without Frank and I?"**

**Both Dave and Ray said, "Yeah, that might be best." And Jean and I left the room.**

Q How long were you out of the room?

**A My recollec- -- my best recollection was five minutes, ten minutes. Five minutes maybe and we were called back in.**

Q I was just going to ask. How did you know when to come back in?

**A We were called back in. I -- I went in -- Jean's office is right next door to Ray's. Mine is a little bit further down the hall on the other end on the other corner.**

**But we were sitting in -- in -- in Jean's office. And then the door opened, and we were called back in.**

Q And what happened when you got back into the office?

**A The mood was considerably less tense. They seemed to have, you know, come to some agreement. And -- and Ray agreed to increase his bonus from 75,000 to 95,000.**

Q Did Ray tell you why the bonus was increased from 75 to 95K?

A In very vague terms. He didn't really say much. He said, "Look, we did have a" -- the way I -- I recall it, Christopher, that there was a lett- -- and I'll stop short of calling it a contract.

It was more of a letter agreement that Dave had when he first came on board in, I believe, 2014ish, whenever he started working, that said that he was entitled to up to $100,000 bonus based on mutually agreed upon goals, which I -- I don't recall whatever stipulated anywhere, if they were, between Dave and Ray. I -- I didn't see them.

Dave's contention was, "No, that's not true. We had a -- a -- a handshake agreement that it was going to be $100,000, and that's what you told me when I came onboard."

Ray said, "Look, I kind of sort of remember that. We're going to memorialize this in a -- in a new letter agreement, but I did agree to give him $95,000." And that was -- that was really it.

I'll be honest with you. I was somewhat please. Forget about the amount.

The main thing that pleased me was -- I mean, it -- it was a tense ten minutes, you know. And I

was concerned that, A, this is not going to end well for -- you know, for -- for -- for -- for Dave -- especially Dave, and -- and it seemed like he was a completely different person when I went back in there.

So I was a little relieved -- relieved for him. He seemed to be in a very good place, and -- and -- and I -- I -- I guess the 20 -- the extra $20,000 did that for him.

Q Did you have any -- did you have any other further conversations with Ray Anderson about what was discussed in that room when you were out of it when you and Jean Boyd left the room?

A No. I -- I -- I don't recall other than what I just told you. It -- it was brief. It was about -- listen, he -- he recalls this differently than I do.

We're all going to memorialize this and make sure that something is -- is clearer going forward, and we're going to present it with him just so that we know that this is completely at my discretion, whatever. And -- and that's how we're going to be going forward, and -- and that's all he said to me.

Oh, sorry. He did ask me. He said, "Would you mind, you know, dra-" -- and -- and he gave me some key points. Might have been bullet points.

**"Would you mind drafting another letter for me?"**

**Which I did. It's -- it was brief. It's a one-pager, half-a-pager-type of a letter.**

**And I gave it to him. He may have had an edit or two, and then -- then he -- that was going to be the new letter that he presented to Dave when Dave returned.**

Q And it was your understanding that after that letter that you drafted was presented to Dave and signed by Dave, it would mean that his bonus going forward was fully discretionary at Ray Anderson's discretion?

MS. LEE-COTA: Object to form.

**THE WITNESS: That's correct.**

**Sorry.**

MS. LEE-COTA: You can answer.

**THE WITNESS: That -- that -- that was my -- my understanding was that it was a fully discretionary bonus that was based on -- on -- on Ray's discretion.**

BY MR. ROWLETT:

Q My office, the walls aren't particularly thick, and I can hear if people are having a heated conversation next door. When you were in Jean Boyd's office, could you hear through the wall or through the

door conversation that -- that Dave and Ray were having?

A Yes. I couldn't hear the words, but I could hear it was -- it was heated. And, you know, you could hear the -- the -- the cadence of it, you know, and the volume.

I -- I -- I don't necessarily know that we -- we heard the -- the actual words that were -- that were spoken. And Jean and I were talking also at the time too.

Q But at least as of June of 2019, you were unaware that Dave Cohen had reported Bart Wear's sexual harassment to Ray Anderson; is that correct?

A That is -- that is a hundred -- and I didn't even sense it. I mean, it -- it wasn't -- like, you know, sometimes rumors get out, Christopher.

Q Okay.

A I -- I didn't -- I didn't even sense or -- or it wasn't even on my -- my -- my spider senses. I didn't even know about it at this -- at this moment. I found out about it, like I -- like I testified earlier, on July 5th.

Q Is there anything that sticks out in your mind about -- oh, withdrawn.

After July 5th, when you had this conversation with Dave Cohen about Bart Wear's

sexual harassment, did you notice anything different about the relationship between Dave Cohen and Ray Anderson between July 5th and August 15th, when he was terminated by Ray Anderson?

**A What's difficult there is even before I went to China, I -- I took greater than a week off to be on vacation. I was -- I was out of town for at least a week or ten days. We went to Palm Desert, my family.**

**So I don't -- there's nothing that's jumping out at me as you're asking, at least nothing that I can recall at this point.**

Q Palm Desert in July is a gluten for punishment?

**A Yeah. You -- you know you're tough when you go there, man.**

Q You're a gluten for punishment.

**A You're going from 115-degree heat to 117-degree heat.**

Q We went for a -- like one day in, I want to say, August or something last year for one of my wife's friend's birthday. And the wind blows like a blow dryer in your face.

**A It's like a hair dryer, I know.**

Q It is the most -- does that happen to you in Phoenix, too? Do you get that hot wind?

**A Yes, you do. And it's -- it's -- when it's windy, it's -- it -- it's -- the word I use, it's impressive.**

Q It's oppressive, I would say.

**A Yeah, it's impressive. You don't wear metal glasses 'cause if they touch -- like the titanium glasses. If they touch the sides of your face, they will burn; so that's --**

Q Humans are not meant to live in southern climates.

**A No.**

Q So it sounds like from July 5th until August 15th, there were -- there was maybe three weeks or so of that six-week stretch in which you were out of the office either on vacation or a work trip to China; is that fair?

**A That -- that's correct, three weeks -- three weeks plus, actually.**

Q Okay. And so you're just not in a position to t offer any testimony as to the relationship -- your perception of the relationship between Dave Cohen and Ray Anderson from July 5th to --

**A Yeah. Nothing that jumps out at me that I can recall, you know; so --**

Q Is there anything that jumps out at you

around the -- Dave Cohen's termination on August 15th? Did you -- I believe there was a meeting around that time at which some of these organizational changes were announced. Were you at that meeting?

MS. LEE-COTA: Object to form.

**THE WITNESS: They were -- yes. They were announced at -- at a senior staff meeting on that Monday, the Monday prior. So what -- what would that have been? The 12th? Yeah.**

BY MR. ROWLETT:

Q And you were present at that meeting?

**A I was.**

Q Was Dave Cohen present at that meeting?

**A He was.**

Q Does anything jump out at you about Dave Cohen's conduct during that meeting?

**A He was very upset. He was red-faced.**

Q Did he say anything?

**A You know, I don't recall him saying anything during the meeting himself. He -- he was definitely upset about it. He was very upset.**

Q And you could tell that from the --

**A But, no, I don't recall him saying anything in the meeting. In the meeting itself, I don't recall him saying anything. He may have. I -- I just**

**don't recall what it was.**

Q And I don't mean this to sound glib. I'm afraid it will. But you could tell he was upset based on, like, the skin tone and his -- his body language? How could you tell he was upset?

**A It was so red it was noticeable. We all were looking at him. He was -- he was flush.**

**He was -- he was -- my recollection was that he was staring kind of like straight at his -- at the -- at the center of the table. I recall they also announced the other org changes that we talked about earlier that -- well, that we saw earlier. There were some changes that were -- that were also made with respect to Gabe and some of the others that were reporting to Jean.**

**I think Ray gave a preamble that these are all designed to -- he said, "Dr. Crow wants me to have a more pyramidical -- there's too many people reporting to him. It's too flat." One of those things.**

**He said probably the right things, if you will, that this is not meant to be -- you know, to any of the people that are affected here. We're just trying to -- to be more streamlined and whatever. But Dave was incredibly upset.**

Q Did you have any conversations with Dave

after that meeting?

A Yes, I did.

Q And what do you recall from those conversations?

A He walked out first and I was following. His -- our offices are in the same direction. And I -- I tried to walk into his. He was in there.

He was angry, and then he turned his anger unfortunately at me. And I said, "Hey, Dave. Look, you know, I -- I know you -- you're -- you're stunned by this." And I said, "We should talk."

And he just yelled multiple times. He said, "Hey, save it, save it." pointing at me. And, you know, you got to give people space, you know.

It's -- it's -- it's -- in my view, it's difficult to judge people at that time, you know, in my view. So to judge him at that time in my view would have been unfair, you know. So I actually stayed there, and I tried to talk to him.

I let him, you know, yell for a little bit. I said, "Look, we can work through this. All right? This is -- I -- you know, I didn't want this, Bud. You know, I didn't want this, but we can solve this. We've got to" --

And he just said, "Save it," you know.

**"I'm not in the mood. Save it (indicating.)"**

**And I can't wait for the first time, Frank, that Dr. Crow calls when the -- and the numbers aren't -- meaning the -- the -- that the attendance numbers aren't good, Dr. Crow. And -- and I'm going to give him your phone number; right? He was saying things like that very loudly, very angrily.**

**But like I just said, I -- I -- I -- I stood there and took it at that moment. I thought that was the right thing to do. And I -- I just -- sometimes you -- you just -- it's unfair to judge people at that point. He was very angry, so I -- eventually I -- I stopped and walked out into my office.**

**I did hear Jean Boyd. Again, you -- as you mentioned, the walls are paper thin. And I -- I -- I clearly heard that Jean Boyd had gone in there after, and there was some altercation between them two. I don't recall what was said.**

**But eventually Dave decided to walk out -- storm out, whatever the words are. He left. I don't recall if he came back that day, Christopher, or maybe he decided to just take a breather and come back the next day. But that's what had happened.**

Q It sounds like you and Dave had the kind of relationship where you -- you could have direct

conversations with the other. You both sound like you are direct communicators; is that fair?

**A Absolutely.**

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes. Okay. Sorry. Absolutely.**

BY MR. ROWLETT:

Q You overheard not the substance necessa- -- well, did you -- let me ask this way. Did you overhear the substance of the conversation that Dave Cohen had with Jean Boyd after that senior staff meeting?

**A No, I -- I didn't overhear the substance. I could tell there were -- it was more along the lines -- my recollection was, Yeah. You know what? Now I see where you stand, pal.**

**It was one of those things where Dave was -- was -- was approaching him in that regard. And Jean saying something -- Hey, man. Don't you be pointing your finger at me.**

**It was that type of stuff. I'm in here because I give a shit, you know, whatever. And it was -- it was -- it was things like that.**

Q Okay.

**A I had no idea that Dave was going to walk**

out. My -- my intention was I -- I've got to give this guy --

Q Um-hmm.

A -- a half hour, hour, whatever. And I guess what I got to do is wait for him to come and talk to me now; right?

Q Yeah.

A But, unfortunately, it didn't happen that day.

Q Did you have any conversations with Dave Cohen after that August -- we said August 12th. That could be the right date. I have no -- this doesn't mean to be a pop quiz.

But the day of that senior staff meeting in which the changes were announced --

A Yeah.

Q -- did you have any meetings with him after that day?

A We did. We -- we -- there was a couple also. He was not ready. He was really angry.

So like I said, my recollection was that he was terminated early morning on that Thursday, which would have been the 15th. There was also -- in the middle there, there was a -- a -- a retreat, which I couldn't make. I was -- I was working on -- on the

arena. I had -- I had consultants in.

But it was an off-site retreat. I believe Dave did attend that. I believe he did.

My point being that we had no contact that day.

Q Okay.

A I was -- I was home -- home. I was at the office in -- in Tempe with some of the -- the arena consultants working on the preliminary stages of what would become Mullett Arena, and Dave was at the retreat; so there was one day where we didn't come in.

There was another day when he was just not welcoming at all. And then that Thursday morning, the last day, I got a -- either a phone call or a text -- I don't recall -- very early in the morning from him stating, "Listen, I'd like to talk to you."

And we -- we met. He wanted to meet in my office first thing. Again, like I mentioned, we both come in early.

I had called our arena consultant who was also supposed to meet with me. I said, "Listen, I -- I have a more important meet- -- I have to meet with someone. Would you mind pushing our 7:00 o'clock back to 8:00" -- or whatever it was. But I have to talk to someone, which he did. He stayed in his hotel.

Dave came in, and -- and he -- he -- he started out by apologizing. He was upset. He wanted to make sure that -- that I knew that it was not necessarily directed at me.

He was directed at frustration. He made it a point to tell me that he believed it was done in retaliation that all these things were -- were done. But he wanted to say, "Frank, listen. Let's just face it. If it has to be that I have to report to someone, I'm glad it's you" is what he said. "I -- I just -- I -- I -- I just don't think I could handle with someone else, and I'm sorry."

My recollection was that he also brought out his strategic plan that he had gone over with his staff. When I was in China, he had a -- he prepared a strategic -- strategic plan for the upcoming year that he reviewed with -- with certain senior staff, if not the entire senior staff. Again, I was in China.

He walked me through that document, and -- and that took a while, you know. We -- we -- we went through it page by page about what he was thinking about for the -- for the upcoming year and how he was going to attack things both in football, basketball, and other things. It seemed to be a well-prepared document. I don't believe I have it anymore, but I -- I -- I do

recall being impressed with it.

And then I told him -- my recollection was that I told him what I tried to tell him two or three days earlier that, "Look, you know, I didn't want this. This is not something I -- I -- I seeked. This is not something -- Dave, I'm not getting one more cent of compensation. I -- I -- I just think that Ray feels that you and I are the best team to work this through."

Success to me -- I told him these words, Christopher, that success to me would be at some point in the future if Ray would have come to me or you both would have come to me -- call me into Ray's office and say, Look, we've got this thing and -- and -- and Dave goes right back to reporting to me, meaning Ray. So that's -- you know, would be success.

But I can't be inserted as a blame point. What you said the other day about me -- anytime something goes wrong, you -- you're just going to tell Dr. Crow to call me. That's not what I'm here for.

I -- I -- I don't -- you'll forget more than I know about the ticketing business, at least on the sales side. Maybe not on the upside. But he -- you know, so we have to work together with things.

I -- I can't have it where you're -- you're just looking to insert me as a blame point. And

**he assured me that wouldn't happen. So I thought it was a positive conversation we had that last day.**

THE REPORTER: Can we take a break, Counsel.

MR. ROWLETT: Absolutely.

MS. LEE-COTA: Ten minutes?

MR. ROWLETT: Ten minutes is good by me. Yep.

Off the record at 11:51.

(A recess was taken.)

MR. ROWLETT: All right. We'll go back on the record at 12:02 p.m.

BY MR. ROWLETT:

Q Mr. Ferrara, I don't think I have more than an -- I think I have less than an hour left of questions for you, so I don't think we need to take a lunch break. But if you'd like to, we can.

**A No, that's fine.**

Q Okay.

**A I think we -- maybe we ought to -- we -- we finish for everyone and then we go about our days.**

Q That sounds good to me.

All right. So we left off, I -- I believe, in -- regarding a meeting that you had with -- with Mr. Cohen. You felt it was a positive meeting

about how you might move forward together as employee and supervisor; is that fair?

A Yes. Yes.

Q And did that meeting happen the same day that Dave Cohen was terminated, to your recollection?

A It -- it happened -- it absolutely happened the same day.

Q Had you had any meetings with anyone before that day in which the topic of Dave Cohen's termination had come up?

A No. I -- I know they were thinking about it. I -- I -- I believe I had a conversation with Jean. I bel- -- my recollection, Christopher, was there was phone calls maybe the -- the night before. I -- my recollection wasn't with Ray, it was with Jean, that this was not going in a good place.

Dave had -- you know, again, like I said, he was upset with the -- with the -- with the change and whatnot. I don't recall a conversation that I -- that I directly had with Ray.

Q Do you know the name Kevin Salcido?

A I do.

Q Who's Kevin Salcido?

A I -- he -- was, I guess, is the right term. He was the head of H- -- I don't believe he's the

**head of HR anymore. He was the head of HR.**

**I think he retired maybe a year or two ago at the -- for the university, not for -- not for Sun Devil Athletics but for Arizona State University.**

Q And that would have been in the August of 2019 time frame when Dave Cohen was terminated and Mr. Salcido was the head of HR for Arizona State University?

**A That's my recollection.**

Q Did you ever have any conversations in which Mr. Salcido participated regarding Dave Cohen's employment and subsequent termination?

**A I -- I don't recall. I -- I may have been invited to one. I don't know if I was able to be present or not. I -- I don't recall the conversation at all.**

Q Okay. Did anyone ever ask you your opinion of whether or not Dave Cohen should be terminated?

**A No.**

Q And --

**A No.**

Q Thank you.

To the best of your recollection, you didn't participate in any conversations with

Ray Anderson about Dave Cohen's termination prior to Dave Cohen's termination?

**A No, that's incorrect. I spoke to him after our conversation in the morning. I did talk to Ray.**

Q Thank you. That's great.

What did you talk to Ray about?

**A About what just happened. I -- I told him that I had a good conversation with him. I said, "It was unfortunate, you know, what happened a couple of days ago." But we -- we did have what I thought was -- was a -- a -- a -- a step in the right direction.**

Q And what was Mr. Anderson's response?

**A He had told me that -- that it was too late and that -- that -- that he felt that Dave -- that he was going to terminate him. That's when I found out for sure that he was going to be terminated later that morning.**

**Almost like -- and I'm trying to remember the word, but -- 'cause he didn't say it this way. But it was like a too-little-too-late thing, you know.**

Q That was your -- that was your understanding of the conversation, too little too late?

**A Yes. Yes.**

Q Were you disappointed to hear that from

Mr. Anderson?
A I was.
Q Why?
A Because I don't understand how all this got to this point, you know. I -- I told you there's faults with -- believe me. There's a lot of faults with me. There's faults with Dave, there's faults with everyone, there's faults with Ray. And I was upset that the -- that everything got to this point.
So I have disappointments with Dave about the things that I had that I mentioned with trust issues. And I respect his talents, I respect his friendship, I respect his -- what he brings to -- what he brings to the table. He makes the days go sooner -- go faster. He's an engaging guy.
And I was just disappointed that it all got to this. So the word is -- there was -- there was no -- there was no celebration in my mind that day. Not in my mind.
Q And --
A So I understand it. I understand Ray's decision. It was his decision to make, and I understand he made it -- what he thought was in the best interest of Arizona State and Sun Devil Athletics.
But -- so I understand it. And maybe if

I'm in his shoes, I would have made the same decision. But, no, I was -- I was -- I was not happy.

Q Did you voice those concerns to Mr. Anderson?

A Not in that way, Christopher. I did say, "If you're doing this because of me because you think he was disrespectful to me, please don't, because I can take it. All right? It's not fair to judge him in that moment, and I -- and I -- and I -- I just want to let you know that if -- if -- if you feel a need to -- to -- to -- if you need an out to keep him, I'm -- I know you guys are great friends -- or at least were great friends" -- meaning Dave and Ray -- "I would understand, Ray. I -- I think I could figure this out."

But he was really adamant. He was really upset about the culture thing, and I get it. I know there was a culture thing.

There was people that, I guess, had made mention -- several folks made mention about their -- their -- you know, not liking to work with Dave. He can be aggressive and abrasive and all these other things. And culturally he was a bad fit, and all these other -- other things; so I understand.

But, no, I -- I -- I though from ticketing -- and you've got to understand something.

**You know, we're about to embark on a trans- -- transformational transaction and trying to build an arena. And not just an arena for hockey but a special, special place where we can do other things in there and make -- have concerts and all these others things.**

**And who knows? Maybe -- you know, whatever. The way -- whatever it became.**

**And, remember, I -- I chose to -- to work with Dave on that project; right? It was -- it was -- it was he and I working together at the very start of it, and now he wasn't -- and now he was gone.**

Q Did Ray -- withdrawn.

After Ray's termination on August 15 --

**A Dave's termination.**

Q Sorry. Thank you.

**A Yeah.**

Q Sorry. Jeez.

After Mr. Cohen's termination on August 15th, did you have any further conversations with anyone about that decision to terminate Dave Cohen?

**A I spoke to -- yes. Only one other -- I spoke to -- before Ray, I -- here's my recollection.**

**I went to Ray's office. His office door was closed. And, again, it was early in the morning, so I don't want if he wasn't in yet or if he was meeting**

**with someone else.**

**So I went around to speak to Amy Schramm, who was our head of HR. I informed her of -- of our conversation.**

Q That's the conversation you had with Dave Cohen that you thought was a positive conversation?

**A Correct.**

Q And you went and informed Ms. Schramm about the conversation?

**A I went to inform Ray first. His door was closed. I don't know if he was in yet.**

**So I decided to go to -- to -- to Amy. And Amy said, "Look, you may want to talk to Ray 'cause" -- you know, I -- I -- I -- I guess -- my guess is Amy knew damn well what was about to happen in a couple hours later.**

**And so I did go to Ray. And then when I did go to Ray, he was -- he was just getting into the office.**

Q After -- oh, withdrawn.

I think you testified earlier that you were out of the office when Dave was terminated and escorted out of the office; is that correct?

**A No. I -- I was down the hall.**

Q Okay.

A It happened -- yeah. I -- I -- I was -- I was present. I -- I was down the hall.

I asked, "So -- so you're going to -- so what" -- I was told that I was not going to be in the room, that a decision was made, which I didn't understand. I said, "He reported to me."

But, you know, I -- I -- I don't know. I -- still to this day, I don't understand that. I was not in the room.

I believe -- I know Jean was. I know Amy was. Perhaps Mike Chismar was at the time, but I -- I -- I was not in the room.

Q Was Mr. Anderson in the room as well?

A Oh, he was, yes. Yeah.

Q Did you overhear that conversation?

A Did I overhear it?

Q Yeah.

A No.

Q It wasn't one of those loud conversations that you overheard in the past?

A No. No. Remember my office is -- I -- if you could look at it, there was probably seven offices between myself and Ray.

He's on one corner and I'm on the other. Yeah. I would --

Q And the termination happened in Ray's office?

**A That's my understanding, yes.**

Q Was the termination announced to the senior management team in any way?

**A I'm sure it must have been. I don't recall if it was via an e-mail or did we have a staff meeting. I -- I -- I don't recall. But obviously it had to have been announced somehow, some way.**

Q You made reference a moment ago that you were not celebrating on the day that Dave Cohen was terminated on August 15th.

**A Right.**

Q Was anyone celebrating, to your recollection?

**A No. At least not openly. At least not that I witnessed. You know, I didn't see anybody celebrating.**

Q You talked a couple times about the trust issues you had with Dave Cohen. A couple's not fair. You talked a number of times about those trust issues you had with David Cohen?

**A Yes.**

Q Did you share any of those concerns you had with anyone at Sun Devil Athletics?

A I concern- -- I shared some of these concerns at Sun Devil Athletics certainly with Ray. You know, I never told Ray about any of these ticketing issues until the first ticketing thing. I never did.

I never shared any of that stuff that I -- at the NFL. I -- I had reasons for doing it. I thought the right thing to do was, Hey, listen, we're at a new place. And he's clearly a trusted member of Ray's staff, as am I; so I -- I did not share with anything.

Of course, the first rays out of -- first words out of Ray's mouth were, "Why the hell didn't you tell me until now," you know.

But I thought, in the best interest of -- of our team and going forward as an organization, it was best just to try to keep my eye on him as best I could. And -- and hopefully nothing ever -- nothing -- nothing happened.

Q And --

A So, no, I didn't share anything with -- I don't recall any discussions that I had with anyone else.

Q So it sounds like you shared your concerns about the NFL ticketing issues with Ray Anderson in the May 2017 time frame?

A Did you say 2017?

Q Yes.
**A That is correct, yes.**
Q Okay.
**A Not prior. And not even at the NFL. There would have been no reason in Ray's role at the NFL for me to talk to him. He was not privy to those conversations in his former role at the National Football League.**
Q Other than members of the office of the general counsel of Arizona State University, after the -- after August of 2019, did anyone ask you about those ticketing issues that you had with the NFL?
**A Other than the Office of General Counsel?**
Q Yes, sir.
**A No one.**
Q When you sat down to talk with Carrie Love, did she ask you about those ticketing issues from the NFL?
**A I believe I brought them up. I -- and it might have been in the same way, like, Hey, what was your relation -- did you know him at the NFL? And it kind of went that direction.**
**I don't recall her asking me initially. I thought it was -- you know, this is also almost five years ago. My -- my recollection was that I**

brought it up to her. I could be wrong, but that's what I thought.

Q After Dave's termination on August 15, 2019, did you have a conversation with anyone about why Dave Cohen was terminated?

A Well, certainly with Ray at some point, and -- and the -- the -- the facts that were -- well, mainly the culture fit and his -- the way he was acting after the meeting. You know, he stormed out and his -- you know, I -- I -- I -- you know, Ray was saying, "Look, he's completely rejecting what we're trying to do here, and it's" -- you know, we have this culture and -- and his cultural fit.

And that was the -- the reasonings that I recall being given, both from Ray to me and then -- again, at some point -- I don't recall the exact meeting, Christopher, when we had this -- if this was at a subsequent staff meeting or a specially called staff meeting or maybe an e-mail that went out from -- from either Ray or Jean. But those were the -- the -- the reasons that were -- that were given to me.

Q Cultural fit, rejecting the organizational structure changes. Anything else given reasons?

A Yeah. If you -- and maybe this is part

**of cultural fit. But, again, his -- his inability to pay -- to play with certain folks in -- in -- in the -- the sand box.**

Q Other than the relationship between Dave and Ray, which to your recollection had been strained in the months leading up to his termination --

**A Correct.**

Q -- had there been any other -- had you noticed any other changes with any other relationships that Dave had with people in that time period?

**A Not that I recall. He was polarizing. He had his friends and he had his foes.**

**But I don't recall those -- those changes necessarily in -- in -- in that time period -- in that time period that you're -- you're -- you're asking about.**

Q Other than the relationship with Ray Anderson, which you do recall being particularly strained --

**A I do recall being -- that being strained. Like noticeable. Like he's not happy with Ray.**

**Just -- it's -- it's clear. It was clear to me that there was something wrong going on.**

Q Um-hmm.

**A I do recall -- I -- I told you. I'm sure**

**there were multiple examples in my head that I sensed. But the one in particular -- I did notice something go -- didn't look right when I watched them together in their box at -- at Phoenix muni.**

Q That was the baseball game we talked about earlier?

**A That was the baseball game. That's our -- that's our stadium -- our home stadium for Sun Devil baseball.**

Q When Mr. Anderson told you that Dave was being terminated in part because he was rejecting the changes to the organizational structure, did you remind him of the positive meeting you had with Dave in which that was not -- that did not seem to be the case to you, at least the morning of his termination?

**A Yeah. I don't recall ever having a conversation with Ray about the meeting that he and I had that very last meeting after this one particular time. I do recall having the conversation directly with Amy Schramm about it first.**

**It wasn't designed to be first. I went to Ray first, but Ray was --**

Q Um-hmm.

**A -- office was closed, like I -- door was closed, like I said. And then I went to Ray and -- and**

I did talk to him.

You know, Ray -- I -- I think Ray might have suggested, Frank, he's manipulating you. He knows the end is near, and this -- and this kind of, sort of, whatever is why, you know, I don't want you in the room at this point. You're too close to him.

I wasn't too close to him to bring up an investigation against him; right? But I -- you know. But that was my -- my fear on -- on this.

I -- like I said, I -- I -- I understand Ray's decision. It was a difficult decision for him. I know -- at least at one point, I know he loved Dave Cohen.

I know that. All right? I don't know how things were at the end. I also know that Dave Cohen loved him.

And, you know, again, my disappointment in walking away from that, when I -- when I finally got in my car that day, wasn't seeing how -- how did this all happen? It just seemed so avoidable to me, and that was, I guess, what -- what -- what was the emotion that was running through my head.

I said, "If I could get past what we got past two years earlier and -- and -- and figure things out and just watch him" -- all right. I've got to keep

**him close, but still it just seemed unfortunate how this whole thing happened. That was my feeling.**

Q And did you have conversations -- oh, withdrawn.

Were you a party to any conversations in which other alternatives to terminating Dave Cohen were discussed?

**A Well, other than the one that I had off- -- I had offered to work with him. I -- I -- I -- that's -- I guess would be the only one that I -- that jumps out at me. So after he and I spoke, I was like, Look, you know, I -- I think I could handle this. All right? I know it's going to be rough, but he's -- but I -- I -- I think we could find a way to find -- you know, hey, what I bring to the table, what Dave brings to the table. I may have had that sort of conversation.**

**I don't recall any other conversation about me trying to, hey -- it just wasn't -- it just wasn't time, you know. Like I said, this whole thing -- this whole thing went from -- from -- at least my recollection was from, you know, Monday, August 12 to -- to Thursday morning, August 15th, with a day in the middle when everyone was away for a -- a -- a retreat.**

Q Were there any reports that came back

from the retreat about Dave Cohen's conduct at the retreat? Did you receive any reports from that?

**A I -- I didn't receive anything positive or negative about it. I know he attended, but I -- I did not hear anything negative about it, that he was, you know, in a bad mood. I didn't hear anything that he was in a good mood. I didn't -- I didn't hear anything about that.**

Q When was the first time you heard mention of retaliation either from -- withdrawn.

When was the first time you heard the mention of the word retaliation in the context of Dave Cohen's employment or termination?

**A The first time he said it to me -- that I heard it come out of Dave's mouth was when we were sitting in the office. Ray -- not "the office" -- Ray's office, when Ray broke the news to him that he was going to be reporting to me. I was present when he said that. That would have been on Monday, August 12th.**

Q Or was that -- I'm sorry and I don't mean to be difficult. All right. Maybe I misunderstood.

There was a meeting in which that news was delivered to Dave Cohen before the senior staff meeting in which it was publicly disseminated?

**A That -- that is correct.**

Q So there was a meeting you had with Ray Anderson, Dave Cohen. Anyone else?

**A Myself and, I believe, Jean Boyd was present also.**

Q Okay. There was four --

**A I believe Jean Boyd. I'm -- I'm certain about me, Ray, and Dave. I'm probably 75 percent certain that -- that -- that Jean was in there as well.**

Q And that meeting happened on the morning of August 12th, to the best of your recollection -- that Monday?

**A It absolutely happened on that morning.**

Q And when Dave Cohen -- how did Dave Cohen mention retaliation?

**A It was brought in, and he -- and he said, "Hey, listen, this sounds like retaliation to me." He was very upset, like I said.**

**And then he went, This is retaliation for what happened. Now I'm reporting to -- you know, I'm reporting to -- to -- to Frank now. Ray, I got to tell you, this sounds like retal- -- so it was a tough meeting.**

**It was very -- it was -- my recollection was it was relatively quick. Maybe five or ten minutes. And then we went from that right into the staff meeting.**

Q And this is a staff meeting in which Dave Cohen was visibly upset?

**A Correct.**

Q And did Ray Anderson have a response to Dave Cohen's mention of retaliation in that morning meeting?

**A Yeah. I -- I -- my -- to the best of my recollection, obviously he said, "It's not retaliation." And he -- and he talked about issues that -- that -- that had -- had -- others had brought up during their reviews about him being abusive and a culture thing. And there's, you know, aspects of -- of a -- I think he might have brought up the -- the -- the football ticketing issue, whatever and -- and all these other things that had -- that had come up out on -- on his review.**

**It has -- one has nothing to do with the other, that sort of thing. So -- so Ray did not yield one bit. He was not accepting of that.**

Q Um-hmm.

**A I -- I -- I guess they agreed to disagree. That would be the best way to decide. But my recollection was that we went right from that meeting and then we walked into the senior -- we call it a senior staff meeting or senior man- -- also know as**

**senior management team meeting. And we walked from Ray's office five feet into that big conference room where everyone was, and then he announced it.**

Q Okay. And to the best of your recollection, these -- the issues about how Dave Cohen interacted with fellow staff, the issues about, you know, ticketing, were these new issues or were these issues that had been there for quite some time?

**A It may have been -- and they definitely were -- were -- were coming to a head, so it was definitely getting bigger. But I -- I don't -- I -- I think it might have been a -- a -- a progression. The football ticketing thing -- there were some issues in the past.**

**It wasn't all bad, you know, for sure. We -- we didn't -- we didn't finish below budget 2 million dollars every year.**

**You know, and in Dave's defense, I want to say something. We -- we do not -- Dave had no ability -- zero ability to -- to -- to impact football scheduling. None.**

**So that was not some- -- that's also in my view a difference between men's, basketball, where he did have the ability to say, Hey, I just did a deal with Kansas. We're going to do a ho- -- what's known as a**

"home and home." We're going -- they're going to play us and we're going to play us next year.

So Dave did have the ability -- as -- as -- same with me with hockey; right?

Q Um-hmm.

A I had the ability to make our schedule or at least help our coach make our schedule. The -- the football schedule was -- was predetermined by the conference and many, many, many years advanced by -- by people way before Dave; so Dave had no impact on that.

So I always in my mind felt that that was also -- you know, he -- he was basically playing, you know, the -- the eight -- the eight and the three that he got dealt on the table sometimes, you know.

Q Yeah.

A So in all fairness; right? So there is a difference between the two. But he's also paid the big bucks to -- sometimes probably an eight and a three in his profession -- the profession he chose.

So to say -- to get back to your question, I -- I -- I don't believe that it was something that just happened all at once. It might have been, you know, a -- a progression, especially as it relates to -- to the way that he was handling or dealing with -- or his inability to get along with certain

**people on the staff.**

Q You mentioned earlier that Dave said in his, you know, anger regarding the reorganization --

**A Um-hmm.**

Q -- that when President Crow called him about ticket sales, he was going to lay the blame at your feet?

**A He -- yeah. He was going to say, I'm going to give him your cell number, buddy, you know.**

Q Yeah.

**A It was -- and he was yelling it pretty loud that everyone heard it. I mean, he was yelling. He was bellowing.**

**But that's what he said. "He's getting your cell phone, pal. You deal with it on Saturday night. Have fun, pal, you know." So it was along those lines.**

Q Was President Crow pretty involved in ticketing issues?

**A Yeah. So at times -- only -- only when things went bad. I'll be honest with you, you know.**

**If you -- the attendance last night was atrocious. And of course it is. Those -- those calls came -- when we lost, they would -- they would -- they would be more frequent then.**

**He -- I'm -- I'm -- if we won a big game, I don't know that he cared much whether attendance -- I could be wrong there. But, yes, Dave would be the brunt of -- of some of those late night Saturday night texts where, Hey, you know -- you know, the -- the attendance was -- was -- was absolutely abysmal today, you know.**

**So -- and all the reasons why we should be the -- we should be selling out. And President Crow would send those things, and Dave would bear the brunt of those types of E-mails.**

Q Got it.

So it sounds like it wasn't uncommon for President Crow to have direct interactions with Dave Cohen about various aspects of Dave Cohen's job performance; is that fair?

**A That's correct. Yeah.**

MS. LEE-COTA: Object to form.

**THE WITNESS: Okay. Sure. But that is correct.**

BY MR. ROWLETT:

Q Did you ever have a conversation with President Crow about Dave Cohen?

**A No, nothing.**

Q I think you answered this already. I'm going to apologize.

Did you ever have a conversation with Kevin Salcido about Dave Cohen?

**A No. I -- I don't recall any con- -- direct conversations with Kevin. And there's a meeting that -- again, I -- if there was a meeting that I parti- -- I -- I don't recall being in it. It just doesn't -- doesn't flag anything in my memory.**

Q That's totally fine.

You mentioned a conversation you had with Amy Schramm --

**A Yes.**

Q -- the morning Dave Cohen was terminated?

**A Yes.**

Q Other than that conversation, do you recall any conversations with Ms. Schramm about Dave Cohen's employment termination?

**A I may have talked to -- I don't recall this -- I hate -- I may have told her, you know, Hey, look, he was -- when he stormed out, I -- I -- I may have told -- we had a conversation about that.**

**Look, he's gone. He's -- he's very angry with me. Seems like he's very angry with Jean. He stormed out. I don't know if he's coming back or not. I have no idea, but he's -- he's gone. All right?**

**He -- he literally left the building.**

**I -- I -- I believe I told her that -- that. I don't recall discussions beyond that.**

Q Was it uncommon for Dave Cohen to be absent from the building for a day?

**A Yes -- well, hold on. Of course he travels with basketball. That's not what you mean; right? You mean --**

Q I just meant --

**A Yeah.**

Q -- if -- if you're in the office, there are many times when Dave Cohen wasn't in the office for a day?

**A Yes, yes. For -- for -- and by the nature of his job. For instance, if there was a -- Dave, to my recollection, traveled every single away series that men's basketball had. All right?**

**Now, there was nothing going on this particular day. But, no, I wouldn't say it's uncommon. Dave also traveled away to most -- because he was the head of ticketing -- most football games -- away football games; so -- so, no, it would not be uncommon for him to be out of the office for -- because of the -- 'cause of the nature of his job duties.**

**What is uncommon would be the fact that he stormed out. We never saw him again. That I never**

**saw happen before with him.**

Q Yeah.

You mentioned that he was -- he was very upset that day. And your read on the situation, given your relationship with Dave, was that he needed a little space to vent and process?

**A Yeah. And I decided --**

MS. LEE-COTA: Object to form.

**THE WITNESS: Oh, sorry.**

BY MR. ROWLETT:

Q No. Go ahead.

MS. LEE-COTA: Go ahead.

**THE WITNESS: Oh. Yes, that is correct. I -- I -- I made a decision in my head that -- that I needed to give him time to come back and talk to me, that I'm just -- it is not being helpful if I try to talk to him at this point.**

**So I've just got to just wait. And if he's going to talk to me, he's going to talk to me. If he's not, I guess he's not.**

BY MR. ROWLETT:

Q You testified a few moments ago that the morning of Dave Cohen's termination, when you talked to Ray Anderson about the positive meeting you had that morning, Ray Anderson's view on it was that Dave Cohen

was manipulating you.

A Yes.

Q Did I -- did I recall that correctly?

A Yes.

Q Did you feel like you were being manipulated by Dave Cohen on the morning of his termination?

A If I felt that way, I wouldn't have gone for Ray; so I didn't feel like that. Is it possible? I guess it's possible, you know, that he -- maybe he -- he -- he -- somebody tipped him. I -- I don't know.

But I -- I -- no, I didn't feel it that way at the time. If I did, I wouldn't -- I wouldn't have went to Ray and told everybody that it was a positive conversation, because clearly it wouldn't have been a positive conversation. It would have been manipulative.

I didn't feel it was manipulative. At the time, Christopher, I did not feel he was manipulating me.

Q You mentioned a strategic plan that you and Dave stepped through on the morning of his termination. Do you recall that testimony?

A I do.

Q And I believe you testified that you

thought it was a good piece of work product?

A It -- it was.

Q A comprehensive plan?

A It was -- whoever -- yes. It was just the two of us in the office. But, no, I -- I -- I did -- I did like the -- well, the way it was professionally put together. I liked the content. I liked -- you know, it was setting the strategy.

We -- we had some work to do. You know, we had some thought that we had to apply. Remember, it's not just -- it's twofold. You want to have butts in seats, as you say.

But you also want to, if you can, to the extent possible to thread the needle between butts in seats and maximizing revenue. It's so much -- it's so more complex than people think. Like, how do I get people in this section (indicating)?

Well, if this section next to it is 94 percent sold, maybe you need to increase this section literally to get people to stop buying the next section. Sometimes you've got to increase price to -- to get more people in. It's -- it's very strange to people. You think that, Oh, just lower the tickets to get more people.

It's not. We -- we -- we had a -- and

Dave understood that. I mean, Dave -- Dave's a seasoned professional when it comes to that.

So we had some -- some discussions about what we do to -- to -- to maximize revenue and maximize -- again, the word we use in the industry is "affinity," which you can call butts in seats. And then also fan engagement and whatever, so we had a good conversation, I thought.

Q Did Sun Devil Athletics implement the strategic plan that you went over that morning with Dave Cohen?

A I'm sure certain aspects of it, we did. I don't think we -- they started from -- from scratch. I don't know if I anyone ever -- if I ever saw the -- the -- the -- you know, the -- the plan itself being presented.

I'm sure Mike Meitin, who was -- who was Dave's lieuten- -- lieutenant at the time -- and then we named pretty quickly that he was going to be his successor. He had the plan himself, right, at some point. And then Mike had the ability to -- to -- to make changes to it.

And Dave had the ability to make changes to it; right? He stayed. It was just a draft of what -- so it -- to say that not -- not -- that we

didn't implement any aspects of it I'm sure would be incorrect. But was it implemented perfectly, I doubt it.

Q Would you say that by the time you -- oh, withdrawn.

Would you say that by the time Dave Cohen was terminated, in August of 2019, that you knew Dave fairly well?

A Very well.

Q Would it surprise you to learn that when you print off your text messages from September of 2017 to the present, it's about 142 pages of text messages between the two of you?

A No, not at all. It doesn't surprise me. I -- I think it should be more. I -- I -- that sounds -- 'cause we texted all the time.

It was -- it was not a -- listen, it -- it wasn't a work -- just a work relationship; right? We -- we -- we also -- we had a personal relationship, too, that sadly, you know, ended that day. I say sadly. I don't know how Dave feels, but -- but the way it ended on that day.

But, no, we -- we -- we -- we texted a lot about a lot of things that weren't related to work. Funny things. Humor was a big part of our --

our -- our lives.
We texted a lot about family. We texted a lot about -- again, I -- I told you I -- I -- I recuse dogs. I've got three rescues behind me that are behaving remarkably well during this.
Q Remarkably well. They are.
A I know.
And -- and Dave was a -- was a huge dog lover, so we had that in common. And I'm sure there's a myriad of other things. Obviously big sports fans, you know, roughly around the same age; so, yeah, we -- we did have a good relationship.
Q You traveled with three rescue dogs from Atlanta to Arizona.
A No. They -- they are -- they are here in my -- yes. I did once, when I -- when I drove them here. They can't fly.
Q Okay.
A You need one person per dog, so that's -- that's very rare.
Q Okay.
A So when I had to bring them back, I actually had to drive back. But they're with me now, yeah.
Q Okay.

**A They're being -- being very good.**

Q You referenced earlier that at some point, Dave Cohen -- you understood that though he was terminated in August, he was then placed on administrative leave. Do you -- do you recall that testimony?

**A I do recall.**

Q Yeah.

How did you learn that Dave Cohen was no longer terminated, was, in fact, now on administrative leave?

**A No longer terminated? You mean no longer actively employed and placed on administrative leave?**

Q Yeah.

So you were told in August of 2015 that he was terminated -- I'm sorry. Withdrawn.

You were told in August of 2019 that he was terminated; correct?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes. I -- I -- I was told that -- shortly after he -- he -- I don't know who walked into my office and told me. Somebody walked into my office shortly after he was terminated and told me he was terminated.**

BY MR. ROWLETT:

Q Yeah.
And then some point after that, you learned that rather than being terminated, he's on administrative leave?
**A Yes.**
Q How did you learn that?
**A Amy had told me. So that -- that wouldn't come through the CFO. Amy was our head of HR, and I assume that she was dealing with OGC, but he was -- they -- OGC would -- Office of General Counsel would not allow him to be removed from payroll.**
Q And what did Amy tell you about that?
**A Said that he would be on -- on payroll -- on administrative leave on -- on -- on payroll until further notice.**
Q What was the next thing you heard about that?
**A Nothing until -- boy, I think it was Christmas time or Decemberish when he was removed from administrative leave and -- and no longer paid. I was not part of any conversations as to when that would happen, if it would happen. I literally found out, Hey, he's no longer on payroll. I believe Amy told me.**
Q How did the conver- -- the first conversation in which Ms. Schramm told you that Dave was

going to remain on payroll for a specific period of time? How did that come about?

A I don't recall. She may have just told me on her own volition for budgetary purposes. I mean, I got a salary, what we have to do -- that may have -- may have been the case.

But I -- I -- I don't recall whether I asked her or -- or -- and it could have been also my lieutenant who was responsible for budgeting the payroll. His name is Dan Wakely. He's the current CFO of Sun Devil Athletics.

He may have asked Amy, Hey, what's going on? I need to keep my -- my forecasting up. Is -- is -- is Dave terminated? I still see he's on a payroll record. It might have come from that.

And then Dan came to me and said, "Hey, just so you know, Dave's on administrative leave indefinitely, just so you know, Frank."

Q You're not clear? At some point you learned about it?

A I'm not clear.

Q You're not exactly sure how it happened?

A No.

Q Okay. And --

A I do know -- the only thing I can

**testify, Christopher, is that I was not part of those discussions at all -- at all.**

Q And then you had a meeting in or around October of 2019 with Carrie Love regarding an investigation; correct?

**A Yes.**

Q And then at some point -- oh, withdrawn.

How did you find out you were going to be meeting with Ms. Love?

**A I -- I'm assuming I got an E-mail from somebody. Maybe an OGC that said, Hey, listen. You know, we -- you need to show up at OGC's office on such and such a date and such and such a time.**

Q Is that where the meeting took place, in the office of the Office of General Counsel? I'm sorry. That's funny. In the office of the Office of the General Counsel.

**A In the office of the Office of the General Counsel. Mine's -- I don't know if everyone's did, but mine did.**

Q Were any members of the Office of General Counsel present at that meeting?

**A They were sporadic -- sporadic in there. They may have been there at the very beginning and then came in, in the middle and then at the end. But for the**

**most -- my recollection for the most part, I was in there with Carrie Love and maybe someone else from her firm.**

Q And then at some point, mid December you learned that Dave Cohen's officially off the payroll?

**A That is correct.**

Q Correct?

At some point did you learn that -- well, withdrawn.

At some point you learned that Dave Cohen had filed a lawsuit against Arizona State University; correct?

**A That is correct.**

Q How did you come to learn that?

**A Through the media.**

Q Did you reach out to Dave to discuss his lawsuit?

**A No, no.**

MR. ROWLETT: I think I'm about done. Let me take a five-minute break to go over my notes to make sure there's nothing else I need to ask Mr. Ferrara. And otherwise I think we can shut it down --

**THE WITNESS: Okay.**

MR. ROWLETT: -- unless, of course, you

have questions, Jenny.
MS. LEE-COTA: Off the record?
MR. ROWLETT: Off the record. Off the record at 12:41.
(A recess was taken.)
MR. ROWLETT: Back on the record at 12:50 p.m.
BY MR. ROWLETT:
Q Mr. Ferrara, I want to just make sure I have a very clear picture of Exhibit 91. This was the documents we started out our day with.
**A Okay.**
Q You have a copy in front of you; correct?
**A Yes.**
Q And I want to make sure I understand the order of operations of how these copies were made.
**A Yes.**
Q Were you -- withdrawn.
Are you able to tell me -- or withdrawn.
Did you make the decision to copy these on your own, or were you asked to make copies of them? And can you answer that question without divulging attorney-client privileged communication?
**A I don't think I can.**
Q Can you answer me this, did you make the

decision to copy these on your own?

MS. LEE-COTA: Chris, I don't understand the distinction between your prior question and this question.

MR. ROWLETT: The prior question involves direction. This is just on his own, did he make the decision to copy these documents?

MS. LEE-COTA: Frank, you can answer this question just specifically as Chris -- if you -- I would -- so --

MR. ROWLETT: If you can.

MS. LEE-COTA: Yeah, if you can.

**THE WITNESS: I can't.**

BY MR. ROWLETT:

Q You don't remember if you made the decision to copy these on your own?

**A And that's what I should say. I don't recall if I was told to do it or if I did it on my own. I don't recall.**

Q Look at page 5 of Exhibit 91, Bates-labeled ABOR Cohen2020.

MR. ROWLETT: Jenny, do you have a copy or do you need me to screen share?

MS. LEE-COTA: If you can screen share. I don't -- 2020, you said.

MR. ROWLETT: Yeah. No problem. I got it right here. Oh, shoot. I almost left the meeting. Buttons are very close.

So this is page 5 of Exhibit 91.

**THE WITNESS: Yes.**

BY MR. ROWLETT:

Q When you copied this document, was there any question in your mind that this was the personal property of Dave Cohen?

MS. LEE-COTA: Object to form.

**THE WITNESS: No. There was -- there was no -- there was no question in my mind that this was the property of Dave and Kathy Cohen. The -- the -- the issue that I had was -- was that money, whether that was Arizona State's money or not.**

BY MR. ROWLETT:

Q Got it.

And page 2 of the exhibit labeled, ABOR Cohen2017, this is a copy of a portion of a register for Cohen Consulting; correct?

**A It's a cop- -- yes. It's a copy of their checkbook for -- of the checkbook for Cohen Consulting -- the check stub.**

Q Was there any question in your mind as to whether this was Arizona State University property, the

check stub that you copied?

MS. LEE-COTA: Object to form.

THE WITNESS: I had an histor- -- sorry. I had historical basis to be concerned about what was in this account, and as CFO, Christopher, my job is to safeguard the assets of this athletic department. And I wanted to know the extent of what he was doing.

And I found that out. And I think we all found that out by looking at these documents what he did. So that was the basis, and that was the -- that was the -- the -- the reasoning why I wanted to do it.

I did not intend to hurt him nor Kathy Cohen. I was looking to see -- to make sure that I understood the extent at which -- and the pervasiveness of what he was doing based on the historical basis that I had for concern both at the National Football League and here at Arizona State.

That's why I did it. Nothing less. You didn't see this on social media. You didn't see any of this stuff -- I never shared it with anybody.

I would never want to do anything to hurt this man from getting a future job or anything. All right? But that's why I did this.

BY MR. ROWLETT:

Q I understand.
My question was limited to the -- the actual document that you copied, is there any question in your mind that that document was not Arizona State University property at the time you copy?
MS. LEE-COTA: Object to form.
**THE WITNESS: And -- and -- and we -- this question was answered previously. No, I -- I had no ques- -- there was no question in my mind that this was Dave's property.**
BY MR. ROWLETT:
Q The same goes -- oh, sorry.
**A The actual -- the actual piece of paper itself was -- was his property. My issue was the num- -- the amounts that are represented therein, whether they were Dave Cohen's property or whether they were Arizona State University's.**
Q The same goes for the third page, ABOR Cohen2018.
**A Yes.**
Q Was there any question in your mind when you photocopied this image that this was Dave's personal property?
MS. LEE-COTA: Object to form.
**THE WITNESS: The image itself?**

BY MR. ROWLETT:
Q Yes.
**A The image itself was -- was the property of Dave Cohen. The amounts therein I have -- I have concerns that they are not Dave Cohen's.**
Q Okay. The same goes for page 4, ABOR Cohen2019. Was there any question in your mind when you photocopied this document that it was the -- the document was the personal property of Dave Cohen?
MS. LEE-COTA: Object to form.
You can answer, Frank.
**THE WITNESS: Yes. No. There was no -- there was no doubt in any mind that this was his -- his -- his property. I do want to add, I have no idea why he left it in the office. At the time when he left, he didn't include it in the items that he took with him.**
**But at the time, no. When I looked at this, I knew this was not -- I knew that this was -- was Dave's personal property, yes.**
BY MR. ROWLETT:
Q Do you know what personal items Dave left with on the day of his termination on August 15th?
**A I wasn't present. I mean, it was a lot of things. I mean, obviously the office was -- the office was a lot of -- empty -- emptier than it normally**

**is, so obviously he took a lot of things.**

**I'm sure he took his -- his cell phones, his -- his chargers, and all those other items that you would normally see -- maybe his laptop. His jackets. His stuff like that, so he -- he definitely took items with him. There were certain items to whatever reason he did not take.**

**I can understand why a refrigerator which we thought was ours, he thought was his. And we -- we originally -- I understand, and a -- and eventually he did take that. That was a -- he was allowed to take that refrigerator. It's a small refrigerator (indicating), and -- and a few other things.**

**But, no, I don't know why he took things and why he didn't.**

MR. ROWLETT: I have no further questions of this witness.

MS. LEE-COTA: No questions for me.

MR. ROWLETT: All right. Thank you so much for your time, Mr. Ferrara.

MS. LEE-COTA: Dalia, we'll read and sign.

MR. ROWLETT: Read and sign. Thank you so much.

(The deposition concluded at 12:58 p.m.)

SIGNATURE PAGE

I, FRANK FERRARA, the deponent in the above deposition, do acknowledge that I have read the foregoing transcript of my testimony, and state under oath that it, together with any attached Amendment Sheet pages, constitutes my sworn statement.

____ I have made changes to my deposition

____ I have NOT made any changes to my deposition

______________________________
FRANK FERRARA

CERTIFICATE OF DEPOSITION OFFICER

I, Dalia Ambriz, RPR, CSR, (IL, AZ), commissioned to administer oaths, do hereby certify that previous to the commencement of the examination, the deponent was duly sworn by me to testify the truth in relation to matters in controversy between the said parties; that the said deposition was taken in stenotype by me at the time and place aforesaid and was thereafter reduced to typewritten form by me; and that the foregoing is a true and correct transcript of my stenotype notes thereof.

That I am not an attorney nor counsel nor in any way connected with any attorney or counsel for any of the parties to said action nor otherwise interested in the outcome of this action.

__X__ Reading and Signing was requested.
_____ Reading and Signing was not requested.
_____ Reading and Signing was waived.
_____ Reading and Signing is not required.

__ /s/ Dalia Ambriz_________
Dalia Ambriz, RPR, CSR (IL, AZ)

GRIFFIN GROUP INTERNATIONAL -ERRATA SHEET - CHANGES IN TESTIMONY

3200 East Camelback Road Suite 177 Phoenix, Arizona 85018

Frank-Ferrara-April 10, 2024

Errata & Signature due no later than July 19, 2024.

| PAGE | LINE | CORRECTIONS/CHANGES | REASON |
| --- | --- | --- | --- |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |

_________________________ ________

SIGNATURE OF WITNESS DATE

## $

**$100,000**
171:23 173:10,16
**$14,000**
61:21 71:1
**$20,000**
62:4,6,16,19 63:20 64:6 174:7
**$32,000**
60:9 61:16 73:2
**$432.82**
51:7,11
**$5**
124:6
**$590,000**
45:1,3
**$591,000**
9:19
**$591,055**
45:16,22 46:5,12, 19 47:9 57:2
**$69,432.82**
51:7
**$690,000**
19:2,5 23:6,7 44:21 46:2 49:18, 20 51:6,13,23 53:9 75:22
**$95,000**
173:21

## 1

**1**
85:4 93:11
**1-1-5-4**
52:23 53:2
**1/26/2017**
50:5
**1000**
131:20
**10:37**
131:7
**10:48**
131:10
**115-degree**
177:17
**1154**
19:3 24:23
**117-degree**
177:18
**11:51**
188:9
**11ish**
96:5
**12**
75:14 204:22
**12:02**
188:12
**12:41**
225:4
**12:50**
225:7
**12:58**
231:25
**12th**
179:9 184:11 205:19 206:10
**14**
55:23 75:14 160:13
**142**
218:12
**14th**
55:8
**15**
194:13 200:3
**15-day**
113:2
**15th**
111:25 112:7 177:3 178:13 179:1 184:23 194:19 197:12 204:23 230:22
**18,500**
90:7
**19**
62:12

## 2

**2**
18:17,18,19 85:8 208:17 227:18
**2-0-1-9**
52:12
**2-0-2-1**
57:16
**20**
73:6 94:11 101:11 106:8 107:6 174:7
**20-**
157:22
**2005**
98:10
**2006**
98:10
**2010**
95:14 107:20 110:6
**2010ish**
96:5
**2011**
90:16
**2014ish**
173:9
**2015**
59:25 62:9 93:3,6 109:5,6 220:15
**2016**
21:12 93:11,13
**2017**
9:14,24 10:4 12:13,14,18 18:13, 15 23:5 24:21 44:4,20 45:8 50:1 53:7 55:21 56:2 58:11,21 62:9,12 65:1,4 109:7 110:6 198:24,25 218:11
**2018**
124:17 125:22,25 126:1
**2019**
11:5,6,7,20 16:18 20:14 21:16 34:8 55:9,23 58:3 71:9 111:24 112:7,21 115:15 132:10,11 133:16 134:7,17 135:25 136:8,22 137:3,4,6,20 138:9,18,19 140:11,24 141:18, 23 142:12,19 143:14,18 144:18 149:12,14,16 158:25 164:21 167:15,19 168:14, 15 169:13 176:10 190:6 199:11 200:4 218:7 220:17 223:4
**2020**
226:25
**2023**
91:4 93:7 147:9
**21st**
24:23
**23**
91:4
**25th**
44:4
**26**
93:1,3
**28**
142:13
**29th**
142:11

## 3

**3**
85:8
**30**
67:14,20 148:25
**30th**
142:11
**31**
44:4
**311**
131:20
**312**
131:21
**314**
131:20
**315**
131:20
**318**
131:20
**32**
107:10
**32,000**
71:5
**33rd**
91:15

## 4

**4**
85:4,9 136:25 230:6
**40-hour**
120:21
**45**
95:14 96:3
**4th**
149:21

## 5

**5**
85:2 226:20 227:4
**5/10/2017**
56:12
**5/14/17**
56:4,9
**5/14/19**
55:19
**5/14/2017**
56:14
**5/14/2019**
55:22
**50**
8:3 9:15 14:5
**500**
56:22
**59055**
45:9
**591**
49:19 54:5,12,17

56:25
**591,055** 49:12
**595,000** 45:4
**5th** 113:19 114:21 141:23 149:16 151:11 157:22 165:13 176:21,24 177:3 178:12,22

**6**

**6** 124:21
**690** 54:3,16 55:17
**690,000** 52:6
**690-grand** 48:7

**7**

**7** 160:13
**75** 167:6 173:2 206:7
**75,000** 171:24 172:24
**7:00** 150:15 185:23

**8**

**85** 170:4
**8:00** 185:24
**8:02** 4:8

**9**

**90** 8:9
**91** 8:12,16,19 22:4 74:7 85:2 225:10 226:20 227:4
**92** 131:13,14,22 135:9 147:14 148:5
**94** 216:19
**95,000** 172:25
**95K** 173:2
**999** 131:20
**9:35** 74:5

**A**

**a.m.** 4:8
**ability** 56:12 119:9 129:7 171:15 208:20,24 209:3,6 217:21,23
**ABOR** 8:17,18 24:20 43:11 45:7 52:7 74:13 85:3 131:17 134:11,23 136:4 137:1 141:13 145:13,25 147:14 226:21 227:19 229:18 230:6
**Abor.cohen2016.** 8:25
**ABOR. COHEN2018** 22:18
**Abor.cohen2018.** 23:3
**ABOR317** 131:20
**abouts** 168:20
**abrasive** 129:17 170:14 193:21
**absent** 146:11 213:4
**absolutely** 73:25 101:24 107:2 121:24 128:23 143:2 162:19,20 183:3,6 188:5 189:6 206:12 211:6
**abusive** 207:11
**abysmal** 211:6
**accepted** 94:18
**accepting** 207:19
**accommodate** 69:21 107:16
**accomplish** 119:18
**account** 12:3 19:3 24:7,8 44:22 51:18,20 52:6 53:4,9 80:6 82:12 83:20 228:5
**accountable** 121:18,22 128:10
**accounts** 24:13 53:6,11
**accurate** 25:3
**accused** 73:11
**acquiesce** 70:4
**acting** 30:15,16 102:5 200:8
**action** 32:19 163:23 167:20
**active** 96:11
**actively** 220:13
**actual** 176:7 229:3,13
**AD** 132:14 134:15 139:2
**adamant** 193:15
**add** 141:9 167:3 230:14
**added** 51:6
**addition** 23:6 93:25
**addressed** 171:14
**Adidas** 35:7
**administration** 116:21 132:19 133:19 134:18,21 135:3,8 136:10 137:6,11,17 139:10 142:24 143:1,4 144:18 145:3,11 147:15
**administrative** 34:14 145:12 146:4 220:5,10,13 221:4,14,20 222:17
**administrator** 145:17,20,21
**admirable** 121:16 127:11
**admission** 72:10
**admit** 72:16
**admitted** 62:18,25 72:9
**advance** 42:21
**advanced** 209:9
**advantage** 69:7
**affect** 99:7
**affected** 180:22
**affinity** 17:19 217:6
**affirmative** 83:9
**affirmed** 102:7
**afraid** 180:3
**aft-** 111:20
**age** 219:11
**agents** 100:5
**aggravated** 167:2
**aggregating** 70:22
**aggressive** 193:21
**agree** 6:3 173:20
**agreed** 17:15 46:4,8,11, 14,18 47:2,8,21 49:6 55:14 172:24 173:11 207:21
**agreement** 62:5 96:12 172:23 173:7,15,20
**ahead** 6:17,19 25:19 29:4 33:11 78:6 80:24 82:16 145:8 214:11,12
**albeit** 14:16 58:13
**alert** 98:21 99:14 154:24 164:22

**alert-**
158:20
**alerted**
76:9 99:9,23 101:12,19 105:25 142:16 163:18,20 166:2
**allegations**
150:22
**allotment**
69:20 70:6,9
**allowed**
65:17 67:15 231:11
**alluded**
122:12
**Alpharetta**
89:7,12,13,14
**als-**
124:5
**altercation**
182:17
**alternatives**
204:6
**amount**
15:1 45:9,13 47:18 61:17 62:3 77:16 173:23
**amounts**
60:22 61:4,7 71:5 229:15 230:4
**Amy**
195:2,12,13,15 196:10 202:20 212:10 221:7,8,12, 23 222:12
**anchor**
90:7
**Anderson**
18:3,13 40:18,22, 25 47:1,8 67:10 88:25 110:11,16 111:1,9,13 112:8 116:3,20 117:11 134:1,2,8 135:15, 18 139:16 140:25 141:4 143:23 144:10,12,24 148:15,17 158:25 165:21 174:10 176:12 177:3,4 178:22 191:1 192:1 193:4 196:13 198:24 201:18 202:10 206:2 207:4 214:24
**Anderson's**
47:6 175:11 191:13 214:25
**anger**
181:9 210:3
**angrily**
182:7
**angry**
152:3,20 153:8,18 181:8 182:12 184:20 212:21,22
**announced**
112:9 179:4,7 180:11 184:15 197:4,9 208:3
**annual**
44:21 53:11 151:3 168:16
**answers**
36:1,2 47:17
**anybody's**
59:22
**anymore**
114:9 115:5 144:3 186:25 190:1
**anytime**
187:17
**apologies**
39:3 52:22
**apologize**
51:20 69:1 211:25
**apologizing**
186:2
**apparently**
67:7
**appears**
12:6 43:13 52:18 56:2,14 58:23 61:14,20 137:5 138:20 143:14 147:13 148:1
**apply**
216:10
**approach**
97:5 114:12 128:19 163:4 164:14
**approaching**
183:18
**approval**
18:10
**approved**
18:12
**April**
159:21 167:16
**area**
95:17 133:6,20
**arena**
90:7 91:9,14 92:2, 3,5,9,17,21 120:3, 16 152:1 185:1,8, 10,20 194:3
**Arizona**
5:5,13 15:16 21:3 22:12 26:25 27:17 32:23 35:11 36:5 39:15 40:13 44:1 45:14,15,21 46:4, 7,10,18,23 54:17 55:14 56:15 57:7 62:7,15 67:23 68:1,10,11 71:7 76:3 80:17,20 81:4,21 87:15 88:20 89:13 91:1, 2,10,18 92:6,20,24 93:19 94:5,14,15, 17,19 98:5 102:10 104:12,13 112:18 139:8 149:7 161:5 190:4,7 192:24 199:10 219:14 224:11 227:15,25 228:17 229:4,17
**arose**
93:18
**arrived**
125:14
**art**
124:9
**artery**
139:16
**Arthur**
106:2,8 107:19
**askewed**
63:11
**asleep**
59:6
**aspect**
64:23 116:22 139:24
**aspects**
207:12 211:14 217:12 218:1
**ass**
114:10
**asset**
73:17
**assets**
30:7 68:10,12 228:6
**assistance**
152:14
**associate**
94:1 116:11 132:14 134:15 139:2
**assume**
149:10 151:20 221:9
**assuming**
62:22 135:19 223:10
**assumption**
54:25 56:19
**assured**
188:1
**ASU**
5:8 27:13 31:20,22 91:5,24 93:4
**ASU's**
42:3
**athlete**
152:15
**athletic**
17:8 57:20 94:1 110:22 116:11 145:14 228:6
**athletics**
15:16 30:5 65:16 68:2 112:4,20 117:23 129:3 132:5 137:7 139:8 146:4 148:6 163:20 167:13 190:4 192:24 197:25 198:2 217:9 222:11
**Atlanta**
89:15 90:6,10,11, 13,14 94:8 95:4 101:20 102:21 148:16 149:1 169:8 219:14
**atrocious**
210:23
**attach**
155:20
**attack**
186:23
**attend**
185:3
**attendance**
182:4 210:22 211:2,5
**attended**
205:4
**attention**
114:2 142:10
**attorney**
20:25 21:2 31:3 41:9
**attorney-client**
6:1 19:23 20:4 25:18,22 29:18 31:10 37:18,23 44:10 79:14 80:12 84:13,17,23 225:23
**attorneys**
4:23 5:9 24:4 40:15

**attributed**
100:15
**audit**
60:25
**August**
10:22,23 11:6,23 16:18 20:14 21:10, 15 34:8 71:9 79:25 91:4 93:7 111:24, 25 112:7,21 115:15 147:8 177:3,20 178:13 179:1 184:11 190:5 194:13,19 197:12 199:11 200:3 204:22,23 205:19 206:10 218:7 220:4,15,17 230:22
**avoidable**
203:20
**aware**
16:18 18:3 59:19 87:14,19,25 88:3 113:22 165:20
**awareness**
122:2

**B**

**back**
9:14,22 12:13,14 13:20 22:14 24:19 33:12 39:1,24 45:8 47:3 48:8,23,25 49:21 51:13 52:25 55:12 58:6 59:13 61:8 62:20 74:5,7 84:7 88:15 89:18, 19,20 90:8,12 91:25 98:1 104:22 106:19 107:20,21 113:18 128:1 129:9 131:10 133:18 134:11 135:8 138:8 139:16 149:12 156:11 169:3,7 172:10,12,13,19, 20 174:4 182:21, 22 185:23 187:14 188:11 204:25 209:20 212:23 214:15 219:22,23 225:6
**background**
60:25
**backgrounds**
121:2
**backup**
148:1
**bad**
95:9 98:6 115:23 129:13 193:22 205:6 208:15 210:21
**badly**
38:4
**bag**
124:1 127:3,7
**balance**
51:6,10
**ball**
166:20
**Ballpark**
93:2
**band**
137:21 138:3,12, 22 139:10
**band/spirit**
134:17
**bar**
97:22 150:21
**bargaining**
96:12
**Bart**
153:1,6,17,19 155:21 156:24 157:2,3 161:16 176:11,25
**baseball**
167:11,12,13,17 202:5,7,9
**based**
51:3 53:20,21 86:12 95:2 120:24 173:10 175:19 180:3 228:15
**basically**
209:12
**basis**
137:21 228:4,10, 16
**basketball**
116:12 119:16 122:14,17 124:13 127:9,16 135:19 136:16 143:5 144:23,24 145:21 147:20 159:9 160:24 170:4,10 186:23 208:23 213:6,16
**Bates**
145:12
**Bates-labeled**
8:17,25 21:12 22:18 23:3 24:19 43:11 85:3 131:17 134:11,23 136:4 137:1 141:13 145:24 147:14 226:21
**be-**
160:21
**bear**
211:9
**beat**
119:24 126:17
**beef**
68:15,16,19,21,24 69:9
**began**
143:19
**beginning**
120:7 223:24
**behaving**
219:5
**beings**
118:5
**bel-**
189:13
**believed**
38:17,22 46:20 86:8 88:18 91:8 186:6
**bell**
60:11
**bellowing**
210:13
**belong**
27:12,13
**belonged**
35:10,11
**Belt**
30:5
**big**
14:17 32:11 60:2, 10 69:6 70:3 73:22 75:15,16 77:19 82:20 122:17 123:22 150:1 208:2 209:17 211:1 218:25 219:10
**bigger**
99:13 208:11
**biggest**
121:10
**Bill**
138:1,24,25 139:1, 6,8,12
**binder**
75:12,13
**binders**
75:15
**birthday**
177:21
**bit**
117:19 119:11 124:1,14 128:2 129:22 130:2,13 139:1 141:7,8 172:15 181:21 207:19
**black**
31:11 121:22,23
**blame**
187:16,25 210:6
**Blank**
106:2,8 107:3,5
**blessed**
47:18
**block**
46:5,11,19 47:9 73:6
**blow**
55:25 56:24 177:22
**blows**
177:21
**blurry**
55:24 56:18 131:23
**bo-**
99:19
**board**
62:5,6 63:22 64:13 72:11 108:18 173:8
**Bob**
5:11 37:24
**Bobby**
119:11,21 154:19 161:1,4,6,14 162:10
**Bobby's**
161:5
**body**
180:4
**bonus**
123:21 151:2,3 153:25 155:23,25 158:9,11 170:23, 25 171:6,11,22 172:24 173:1,10 175:10,19
**bonuses**
117:4 140:9
**book**
72:6,8 75:16,17 76:6,10
**boss**
98:18 130:7
**bothered**
109:1
**bottom**
11:25 15:7 22:19

24:17 51:10 53:25 132:6 137:2 146:2
**bought**
61:19 69:24
**bowl**
58:14,23 59:8,10, 18,24,25 60:10,14 61:10 64:13,16 66:4,25 67:6,11, 15,16,17 70:8,15 86:18,23 87:17,21 95:14,18 96:3,6,13 104:4,8 105:2 107:11 108:15 109:3 124:23,24
**Bowls**
95:16
**box**
83:10 201:3 202:4
**boxes**
35:7
**boy**
221:18
**Boyd**
111:15 124:24 141:10 144:11 154:11 165:20 171:8 172:2 174:12 182:14,16 183:11 206:3,6
**Boyd's**
175:24
**brand**
35:7 139:17
**branded**
38:21
**break**
54:5,11,20 73:24 74:1 122:22 131:3, 4 141:22 188:3,17 224:20
**breasts**
153:12
**breather**
182:22
**briefly**
74:8
**bring**
32:13 34:3,5 91:25 118:21 160:20 203:7 204:15 219:22
**bringing**
13:25 90:7
**brings**
34:21 119:3 192:13,14 204:16
**broadcasters**
123:3
**broke**
205:17
**broker**
13:14,24 15:4 16:5 18:6 60:15,23 61:20 62:3 99:12, 16 101:2,5
**brokers**
36:20 48:22 100:2
**brought**
65:13 82:10 88:11 104:16 105:16 114:1 142:9 152:18 161:4 170:12,16 186:13 199:19 200:1 206:15 207:10,13
**brunt**
211:3,9
**buck**
123:22
**bucks**
123:25 209:18
**Bud**
181:23
**buddy**
210:9
**budget**
123:9,25 208:16
**budgetary**
222:4
**budgeting**
222:9
**Buffalo**
159:14
**build**
90:4 91:14 194:2
**building**
14:22 17:23 91:11 106:11 111:23 212:25 213:4
**built**
92:6
**bullet**
174:25
**bullying**
128:13 129:24,25 130:18
**bumped**
57:6
**bunch**
106:17
**bunk**
106:17
**bunson**
18:1,2
**burn**
178:8
**business**
101:5 119:6 187:21
**businesses**
49:2
**busy**
89:10
**butt**
115:10
**Buttons**
227:3
**butts**
124:3,6 216:11,14 217:6
**buy**
79:5
**buying**
216:20

**C**

**C-H-I-S-M-A-R**
33:21
**cadence**
176:4
**Cagwin**
143:15,18
**calendar**
53:17
**call**
5:8,10,15 12:19 28:21,22,23,24 32:3 34:3 58:20 61:17 64:4 65:14 70:6 82:20 96:15 98:16 100:16 101:7,9,21 103:4,5 104:21 106:9 107:14 117:5 123:20 135:1 139:25 154:23 163:21,23 164:3 169:24 185:14 187:12,19 207:24 217:6
**called**
27:7 34:6 59:20 60:6,8 61:6 65:22 82:2,4,7 90:3 98:11,17 99:1,19, 24 100:9 102:19 103:5,12,14 104:20 153:25 164:1 165:8,9 172:10,13,18 185:20 200:18 210:5
**calling**
108:12 173:6
**calls**
39:18 81:19 182:3 189:14 210:23
**camera**
96:24 97:1,5
**campus**
14:20 17:24
**capable**
157:6
**capacity**
171:2
**car**
72:2 79:5 203:19
**card**
98:23
**care**
73:12 79:5 162:25
**cared**
211:2
**career**
120:7 130:11
**cares**
99:10
**Carrie**
41:9 199:17 223:4 224:2
**carries**
63:18
**case**
6:8 145:18,20 202:14 222:6
**caught**
30:3,19 48:5,6 49:22 54:7 66:1
**caused**
108:3 109:10,16
**caution**
19:24
**celebrating**
197:11,14,18
**celebration**
192:18
**cell**
210:9,15 231:2
**cemented**
119:25
**cent**
187:6
**center**
180:10
**CFO**
13:25 30:15,16 59:12 60:20 65:10 66:4 69:22 76:18 87:8 88:11 93:25 99:20 101:20,21, 23 102:2 121:25 123:6 130:7,8 132:14 221:8

222:10 228:5
**chain**
31:14
**chaired**
62:14
**chance**
57:8 73:24 91:25 110:1 146:21 149:9
**change**
45:5 117:8 138:4 162:15 189:18
**changed**
144:3
**changing**
116:19
**channels**
164:13,16
**chapter**
146:17
**characterization**
32:19
**charge**
17:2 66:24 116:12 125:18
**chargers**
231:3
**charging**
99:2
**chart**
132:4,11 133:24 134:25 135:1,4 136:10 137:7 138:9 139:4 140:14 145:12 146:3 147:15 148:4
**chasten**
10:5
**check**
19:3 24:22 45:16, 22 49:19,20 50:7,8 51:6,12,17,23 52:4,13,14,16,25 53:3,25 55:25 56:11,16,21 57:22, 23 60:9 62:16,20 80:7,8 227:23

228:1
**checkbook**
18:20 19:7,13,16, 19 27:9,14 38:18 50:9,11,17,21 52:17 71:3,18,19 74:14 75:5,11,12 76:14,15 77:18,19, 21 78:21 80:5 82:1,8,21 83:20 227:22
**checkbooks**
34:25
**checks**
7:11,12 50:13 75:14
**chief**
12:23 30:5 36:22 58:21 65:16 68:24 87:4,14 93:8,10, 13,23 122:8
**China**
113:3 142:10,12 177:6 178:15 186:15,18
**Chismar**
25:8,9,25 26:7,9 27:3,6,7 33:17,19, 20,23 34:3,7,21 38:14 39:14 76:9, 21 81:19 82:2 196:11
**chose**
156:9 194:8 209:19
**Chris**
4:13 5:20 7:19 19:25 20:17 29:4 33:7 52:20 59:21 60:1,5 71:12,19 79:15 80:23 81:11 84:20 88:1 138:5 226:2,9
**Chris's**
87:25
**Christmas**
89:1,3 221:19
**Christopher**

4:15 5:1 7:6 9:4 10:14,25 11:16 12:22 14:3,12 15:6 16:3 18:25 22:8,16 27:2 28:7 30:2 34:19 35:25 37:20 38:8 40:9 41:3,15 42:19 43:9,20 44:15 45:4 47:18 50:13 53:14 55:15 56:1 60:4 62:9 68:18 73:19 75:7 76:3 77:20 79:20 81:15 84:1 85:11 101:8 104:1 107:24 110:24 114:4 116:7 117:17 124:12 142:5 150:10 154:5 155:12 158:8 162:9 165:14 168:9 170:15 173:5 176:15 182:21 187:10 189:13 193:5 200:17 215:19 223:1 228:5
**circle**
44:17
**circled**
45:9
**circulated**
171:11
**city**
89:13,14
**clarifies**
38:10
**clarify**
5:20 81:25
**clean**
33:24 39:5,14
**cleaned**
33:17
**cleaning**
31:20 32:8,12 86:5
**clear**
13:15 20:13 26:1,

11 36:24 56:7 59:1,25 63:24 66:6 72:21 104:8 105:21 106:2 116:5 130:20 145:10 201:22 222:19,21 225:10
**cleared**
54:3 151:3,4 156:1
**clearer**
174:18
**clearing**
158:11
**client-privilege**
31:3
**climates**
178:10
**close**
14:24 37:18 63:9 94:23 105:19 203:6,7 204:1 227:3
**closed**
125:9,10 149:20 194:24 195:11 202:24,25
**closer**
170:17
**closest**
156:20
**Club**
8:4 62:20 63:17, 19,22 64:9
**coach**
14:13 111:2 128:1 152:13,14 209:7
**Code**
12:2
**codes**
97:23
**Cohen**
4:13 7:12 9:14,20 12:7 13:8 14:8 16:21 18:20 19:10, 12,15 24:7,12,23 32:6,10 33:2 34:17 37:1 43:13,21,22 45:8 46:2,6,7,10,

13,21,23 50:8,9, 11,14,17,21 51:2, 18,24 52:13,19 53:4 54:13,17,18, 19 55:2,16 57:3 60:10,12 63:21 66:16 69:24 70:25 72:15 80:18 81:5 83:10 84:7 85:16 86:23 94:4,7,15,17 95:2,6 100:9 101:14,18 102:9 103:17 104:4,5,15 108:3,24 109:4,8, 11,18 110:7,10 111:7,8,14,18 112:7,11,25 113:6 115:16,20 127:1 128:20,22 129:1 134:12 135:17 136:15 137:20 140:25 141:3,24 142:20 143:16,19 144:23 146:12,17 148:3 158:23 159:3 168:17 176:11,25 177:2 178:22 179:13 183:11 184:11 188:25 189:5 190:6,18 194:20 195:6 197:11,20, 22 200:5 203:13, 15 204:6 205:23 206:2,13 207:2 208:5 211:14,22 212:2,12 213:3,11 214:25 215:6 217:11 218:6 220:3,9 224:10 227:9,13,20,22 228:13 230:4,9
**Cohen's**
6:22 7:5 9:2 16:19 21:6,15 23:13 24:6,25 25:10 26:10 27:17 28:1, 11,20 29:1 31:12, 20 33:24 34:4,8 39:15,24 43:14

44:1 53:8 57:16 58:9 71:10 74:9,10 75:25 76:13 81:20, 23 86:5 87:16,21 119:22 122:9 136:1,21 137:16 159:1 169:10,17 179:1,16 189:9 190:11 191:1,2 194:18 205:1,13 207:5 211:14 212:16 214:23 224:5 229:16 230:5

**Cohen2016** 8:17 45:7

**Cohen2017** 74:13 227:19

**Cohen2018** 52:7 229:19

**Cohen2019** 24:20 230:7

**Cohen2020** 43:11 85:3 226:21

**Cohen2021** 8:18

**Cohen311** 145:25

**Cohen312** 147:14

**Cohen314** 137:1

**Cohen315** 136:4

**Cohen317** 131:17 134:11

**Cohen318** 134:23

**Cohen999** 141:13 145:13

**cohesive** 128:18

**coin** 126:24 127:17

**coincidence** 89:6

**coincidentally** 149:2

**Coke** 35:8 38:20,21,22

**colleagues** 59:4 171:17

**collect** 26:7,10 83:11 84:7

**collected** 31:19

**collecting** 86:6

**collective** 96:11

**collectively** 154:10

**collects** 39:25

**college** 67:15 69:4

**colloquialling** 31:10

**column** 44:21 45:12

**comments** 155:4

**committed** 154:22

**committee** 62:13

**common** 49:2 96:20,22 107:7 120:25 121:3,11 219:9

**communication** 6:1 20:5 44:11 84:14,18,23 87:24 225:23

**communications** 25:19,22 37:23 139:22

**communicators** 183:2

**community** 133:5 167:10

**company** 61:6 90:3,4

**compensation** 63:22 64:13 117:4 123:20 171:1 187:7

**compete** 102:21

**competing** 61:10

**competitively** 123:1

**complain** 98:17 99:20 102:20 108:12

**complained** 104:21

**complete** 17:22 125:6,7,20, 21 126:3,4 152:8

**completed** 125:8,15 162:17

**completely** 88:9,14 174:4,20 200:11

**complex** 58:20 63:9 105:21 216:16

**complimented** 120:9

**component** 64:12

**components** 64:11

**comprehensive** 216:3

**computation** 72:13

**con-** 212:3

**concern** 31:7 35:14 39:19 44:23 68:24,25 69:1,9,10,11,13, 18,22,25 70:11 228:16

**concern-** 198:1

**concerned** 17:16,17 32:23 33:2 46:15 66:4 79:8 99:16 158:20 171:4 174:1 228:4

**concerns** 14:2,7 15:14 16:8 99:25 193:3 197:24 198:2,23 230:5

**concerts** 194:5

**conclude** 64:16

**concluded** 64:21 161:24 162:15 231:25

**conclusion** 87:20

**conclusive** 64:25

**conduct** 58:9 80:6 179:16 205:1

**conducted** 65:6

**conference** 9:17 122:19,21 208:2 209:9

**confiding** 63:7

**confrontation** 103:2,5 104:3

**confrontational** 17:13 47:20

**confronted** 62:17

**confused** 20:13 151:15

**conglo-** 70:21

**conjecture** 72:24

**connect** 139:16 148:16 149:10

**connected** 148:23 149:3

**connects** 144:9

**considerable** 47:3

**considerably** 172:22

**consistent** 138:13 142:18 147:6

**construed** 121:20

**consultant** 185:20

**consultants** 185:1,9

**consulting** 7:12 19:10 24:23 50:14,17,21 51:18, 24 52:13,19 53:4 60:10 62:4 109:4,8 227:20,23

**Consulting's** 18:20 24:7 50:8,9, 11

**contact** 94:24 152:15 185:4

**content** 216:7

**contention** 173:14

**context** 19:25 29:20 30:2 33:5 36:18 57:12, 13 58:2,7 205:12

**continuation** 149:21

**continue** 87:10 145:8

**continued** 116:13 147:11 153:20

**contract** 173:6

**conver-**
221:24
**conversation**
28:17 33:25 37:24 55:1 57:9 72:23 97:17 98:3 103:11, 14 153:23 154:11 156:11 157:19 166:5 167:3 171:10 172:3 175:24 176:1,25 183:10 188:2 189:12,19 190:15 191:4,9,23 195:4, 5,6,9 196:15 200:4 202:17,19 204:17, 18 211:21 212:1,9, 14,20 215:15,16 217:8 221:25
**conversations**
104:5 107:3 157:22 174:10 180:25 181:4 183:1 184:10 190:10,25 194:19 196:19 199:7 204:3,5 212:4,15 221:21
**convert**
140:14
**cop-**
227:21
**copied**
24:25 32:25 35:16, 18,24,25 36:4 74:10 77:25 78:19, 20 158:15 227:7 228:1 229:3
**copies**
6:21 7:11 20:15,23 21:7 22:17 23:17 24:13 27:25 28:12, 21 29:1,11,13 30:20 31:11 32:4 37:8,9,11,12 38:3, 6,7 39:20,22 40:13,17 41:21,23, 25 42:1,3 67:8 77:14,24 78:7,11 85:11 86:14 225:16,21
**copy**
10:6 18:19,21 19:13,16,18 21:12, 14 22:16 23:4,11 26:25 27:1 30:10 36:6,15,18 42:6 43:13 44:12 45:7 52:3,5 56:18 57:15 74:11,14,16 75:20 77:17,21 78:21 85:6 148:12 225:13,20 226:1,7, 16,22 227:19,21 229:5
**copying**
77:6 86:8
**cordial**
57:9
**corner**
22:19 43:21 85:4 132:7 136:5 137:2 141:16 146:2 172:16 196:24
**Corp**
12:3 15:8
**correct**
9:9,25 10:7,10 12:6,9 15:5,9 16:19,20,25 18:14 22:3 27:18,20,23, 24 33:22,24 34:8, 11 37:12 43:6,15 44:5,9 45:10 46:5, 12,20 47:2,6,7,9 50:3,5,17 51:5 52:8 53:9,22 55:20 58:4 65:2 74:14 75:2,5,10,11,25 78:13 81:5,23 84:11,12 86:21 89:25 90:11,14 92:14,22,23 93:5 103:16 104:1 112:4,21,22 115:16 122:3 124:18 132:15 133:15 134:18,19 135:12,13,15,21, 23,24 136:1,2,10, 11,13,14,18 137:7, 11,12,14,17 140:20 142:21 143:20 144:7,8,25 145:5,6,16 146:5 147:8 150:23 159:1 160:5 167:14,21,22 175:14 176:12 178:17 195:7,23 199:2 201:7 205:25 207:3 211:16,19 214:13 220:18 223:5 224:6,7,12,13 225:13 227:20
**correctly**
12:4 51:8 88:1 215:3
**Cotton**
67:16
**counsel**
11:15 23:12 25:5 28:17,21,23 29:11, 13,25 31:22 32:10 33:9 36:5 41:16 73:23 86:11,13,22 87:20 88:20 188:4 199:10,13 221:10 223:15,17,19,22
**counsel's**
21:3 25:1
**counterpart**
138:23
**County**
90:6
**coup-**
168:24
**couple**
26:5 54:10 67:18 84:9 94:24 123:9 127:13 184:19 191:10 195:16 197:19
**couple's**
197:20
**court**
4:8 52:22 54:14 56:7 74:1 97:10 133:3
**covered**
108:2
**Coyotes**
91:10
**crazy**
89:6 101:25 149:4, 5
**create**
11:13
**created**
9:13,20 10:1
**creating**
11:17
**crime**
154:22
**critical**
128:8 152:16
**critici-**
121:21 129:10
**criticism**
128:17
**criticizing**
160:22
**cross**
130:18
**cross-talking**
52:22
**crossed**
94:12
**Crow**
17:24 110:15 150:2 180:17 182:3,5 187:19 210:5,18 211:8,13, 22
**crystal**
105:21
**cultural**
200:13,22 201:1
**culturally**
193:22
**culture**
193:16,17 200:8, 12 207:11
**cupped**
153:12
**curious**
76:8
**current**
7:16 90:1 222:10
**custody**
31:14
**cut**
12:15 39:2 70:9,10 125:24
**cute**
35:21
**cutoff**
31:9
**cutting**
69:1,18

**D**

**Dalia**
231:21
**Dallas**
96:3,6 104:4 108:15
**damn**
195:15
**Dan**
59:21 60:5 222:10, 16
**data**
12:1
**date**
11:1,20 31:8 44:3 50:4 55:19,25 56:11,14 80:2 83:22,23 84:2,5 96:4 132:6,9 136:4,5,7 137:2 141:15,16 146:7,9 149:2,15,17,19,20 159:19 184:12 223:13
**dates**
49:25
**daughter's**

72:2
**Dave**
13:8 14:11 16:19, 21 17:4,9,16 19:12,15 21:6,15 23:13 24:12 25:10 26:3 27:12,17 28:1,11,20 29:1 31:12,20 32:6,10, 23 33:24 34:4,8,17 35:11 37:1,3 38:16,22,25 39:5, 15,24 43:13 44:1 45:8 46:2,6,7,10, 13,21,23 48:5 50:8 54:13,17 55:16 57:3,5,10,16 58:23 59:3 60:12,13 61:11 62:9,12,14, 17,19 63:7,8,21 64:1 66:7,16 67:10,13 68:2 69:24 70:9,25 71:10,17,24 72:3, 15,25 73:20 74:9, 10 75:25 76:13,20 80:18 81:23 84:7 85:16 86:5,23 87:16,21 94:4,7,8, 12,15,17 95:2,6,9, 20 96:7,19,23 97:6 98:4,11,19 99:6,15 100:9 102:9 103:3, 17 104:4,5,23 105:18 106:6 107:18,21 108:3, 24 109:11,18 110:4,7,10 111:8, 14,18 112:7,11,25 113:6,16 115:16, 20,24 116:2 117:23,24 118:9, 15,21 119:2,4,13, 14,15,18,20,22 120:1,7,10,11,16, 17,23 122:9,24 124:9 127:1,19 128:2,6,7,20,22 129:1,22,23 134:12 135:17 136:15,21 137:16, 23 139:12 140:25 141:3,24,25 142:15,17,20 143:16,19 144:23 145:1,22 146:12, 17,22,24 147:9 148:3 150:5,11,13, 16,18,24 151:1 152:10,20 153:3, 11,14 154:1 155:3 158:20,23 159:1,3 161:19,20,22 162:10 165:3 166:5,14,22,24 167:1,2,18 168:17 169:10,17 170:21, 24 171:4,9,12,24 172:5 173:8,12 174:2,3 175:6,9,10 176:1,11,25 177:2 178:22 179:1,13, 16 180:23,25 181:9 182:19,24 183:11,17,25 184:11 185:3,10 186:1 187:6,13 189:5,9,17 190:6, 11,18 191:1,2,15 192:7,10 193:13, 20 194:9,20 195:6, 22 197:11,20 200:5 201:4,10 202:10,13 203:13, 15 204:6,15 205:1, 13,23 206:2,7,13 207:2,5 208:5,19 209:3,10 210:2 211:3,9,14,22 212:2,12,16 213:3, 11,15,19 214:5,23, 25 215:6,22 217:1, 11,23 218:6,7,21 219:8 220:3,9 221:25 222:14 224:5,10,16 227:9, 13 229:16 230:4,5, 9,21
**Dave's**
18:19 20:23 35:5 39:17 59:23 94:12 129:10 147:21,24, 25 170:22 173:14 194:14 200:3 205:15 208:18 217:1,18 222:17 229:10,22 230:19
**David**
4:13 13:11 43:21 62:25 114:21 121:15 158:16 163:19 197:22
**David's**
10:17
**day**
30:4 48:3 60:5 64:4 83:23 95:20 104:4 105:10,24, 25 107:15 110:19 111:1 113:4,19,22 114:20 129:13 130:8 156:11,13 157:24 161:16 177:19 182:21,23 184:9,14,18 185:5, 11,12,14 187:17 188:2 189:4,7,9 192:18 196:8 197:11 203:19 204:23 213:4,12, 18 214:4 218:20, 22 225:11 230:22
**day-to-day**
139:10
**days**
5:9 84:10 86:6 122:1 160:13,16 177:8 187:4 188:21 191:11 192:14
**deal**
62:8 101:1 120:14 121:12 208:24 210:15
**dealing**
69:3 128:5 209:24 221:9
**dealings**
100:1
**dealt**
209:14
**dean**
138:2
**Deana**
138:10 154:23,24 156:6,7 157:14 163:22 164:7,15, 22 165:5,9,13
**debate**
17:11 49:6
**December**
44:4,20 124:17 126:1 224:4
**Decemberish**
221:19
**decide**
74:10 75:20 76:5 79:10 80:6 96:14 207:22
**decided**
27:25 28:12 76:7 84:15 97:5 159:16 170:17 182:19,22 195:12 214:7
**decision**
17:5 18:8 30:9,20 47:6 63:4 110:10, 21 111:1 124:12 142:16,19 169:25 192:22 193:1 194:20 196:5 203:11 214:14 225:20 226:1,7,16
**deep**
9:14 16:9
**defame**
48:14
**defend**
155:13
**defense**
208:18
**define**
120:6
**degrees**
118:3
**delivered**
205:23
**demotion**
116:24 117:5,9,10
**departed**
6:23
**department**
112:4,20 148:6 228:6
**departure**
148:1
**deposed**
47:13
**deposit**
19:2 51:25 71:4,24 72:4 75:22
**depositing**
51:20
**deposition**
4:21,23 5:7 7:21, 23 8:7,19 88:22 131:14 231:25
**depth**
15:15
**describe**
6:18 60:2
**describing**
135:3
**description**
6:20
**Desert**
177:8,12
**designed**
180:17 202:21
**desk**
71:22
**destructive**
121:20
**detail**
135:2,10
**detailed**
24:22
**details**
150:19 151:9 159:6 165:11
**determination**
35:10 82:5 87:16 88:3

**determined**
28:20 86:22 140:9

**determining**
62:11

**Detroit**
133:6

**development**
90:5 91:14

**Devil**
57:20 62:20 63:17, 19,22 64:9 65:15 68:2 91:11 112:3, 20 117:22 122:17 129:2 132:4 139:8 145:14 146:4 148:6 163:19 167:13 190:4 192:24 197:25 198:2 202:9 217:9 222:11

**Devil's**
137:7 159:9

**dexterity**
133:10

**dice**
162:23

**did-**
88:9

**diff-**
87:10

**difference**
16:24 18:5 32:11 208:23 209:17

**differently**
88:6 129:22 174:15

**difficult**
91:23 119:11 128:17 166:9 177:5 181:16 203:11 205:21

**digital**
139:23

**dinner**
89:10

**direct**
103:2 115:21 121:25 143:25 182:25 183:2 211:13 212:4

**directed**
101:25 106:3 107:17,19 186:4,5

**direction**
181:6 191:12 199:22 226:6

**directly**
61:20 62:18 112:12,14,25 115:25 116:20 134:1,7 135:15,18 140:11,25 141:3, 25 142:20 143:2, 15,16,23 144:23 147:12 189:20 202:19

**director**
17:8 94:1,10 103:9 110:22 116:11 140:1 161:20

**directors**
62:6

**dirt**
32:5

**disagree**
14:25 207:22

**disagreed**
14:25

**disappointed**
109:2 157:9 191:25 192:16

**disappointing**
157:18

**disappointment**
203:17

**disappointments**
192:10

**discarded**
78:1,12

**disclosed**
20:1 71:6 166:5

**discount**
9:15 15:2,3,15 16:5 18:5,11

**discretion**
174:20 175:12,20

**discretionary**
175:11,19

**discuss**
31:5 224:16

**discussed**
6:18 15:17,18 20:2 112:24 174:11 204:7

**discussion**
13:19,20 33:8 47:20 63:24,25 151:4 162:8

**discussions**
29:24 112:3,17,19, 23 198:20 213:2 217:3 223:2

**disrespectful**
193:7

**disseminated**
205:24

**distinction**
130:19 226:3

**distraction**
154:19 161:13 162:12

**distribute**
13:15

**diving**
135:22 136:17 143:6 145:1 170:18 171:19

**divulge**
19:23

**divulging**
84:13,17 225:22

**doc-**
21:20

**document**
8:17,25 9:12,13,21 10:20 11:3,9,12,22 12:13 13:2,7,23 16:17 19:4 21:11 22:14,15,23 23:2, 3,25 24:19,20 43:7,10,11,23,25 44:12,23 50:2,15 51:22 53:10,20,21, 23,25 57:15 74:13 126:21 132:2,3 134:11,22 141:12 143:10 145:24 146:7,9,11,16 186:19,24 227:7 229:3,4 230:8,9

**documents**
5:14,16,17,21,24, 25 6:6,10,13,15, 18,20 9:1,5,10 11:2 20:15,23 21:22,25 22:1,6,13 24:24 27:4,5,9 30:10 31:8,15,19, 23 32:24 33:1 34:4,5,22 35:13, 14,18 38:2,11 39:4,19,24 40:17, 23 41:18,21 43:4 44:15 58:1,2 74:8 78:23 82:22 83:25 84:11,15 85:15 86:4,8 131:17 225:11 226:7 228:9

**dog**
219:8,19

**dogs**
121:6 219:4,13

**dollar**
54:5,11,20

**dollars**
44:25 55:18 123:10 208:17

**Don**
92:15

**donate**
63:17,22

**donation**
62:20 63:19 64:6, 10

**donor**
69:18 70:7,13 155:7,9

**donor's**
92:12,14

**donors**
67:19 69:19 70:3, 10

**door**
103:13 172:14,18 175:24 176:1 194:23 195:10 202:24

**doorway**
114:23

**dotted**
132:21,25 137:15 139:14 144:14

**doubt**
82:1,2 218:2 230:13

**dra-**
174:24

**draft**
217:24

**drafted**
175:9

**drafting**
175:1

**draw**
130:19

**drawer**
83:4

**drive**
219:23

**drove**
219:16

**dryer**
177:22,23

**dual**
116:10

**duly**
4:5

**duties**
132:18 213:23

**E**

**e-mail**
42:9 66:19 67:4 148:13 197:7 200:19 223:10

**E-MAILS**
66:22 67:7 211:10
**earlier**
9:8 24:4 30:3 47:1,5 58:7 66:15 70:4 71:19 72:9 76:9 79:4 87:7 112:9 113:18 118:18 122:12 124:4 125:1 126:25 142:5 148:14 169:23 176:21 180:12 187:4 195:21 202:6 203:24 210:2 220:2
**early**
9:14 150:3,14,15 159:20 184:22 185:15,19 194:24
**edge**
133:8
**edit**
175:5
**Edward**
19:3 23:5 24:7,8,13,21 43:14 44:20 51:18,19 52:6 53:4,8 80:6,19 82:12 83:20
**effect**
112:6 115:16 166:10
**effects**
26:10 39:5,18,25 71:10 83:11 84:7 86:7
**eliminate**
160:14
**eliminated**
159:9,16 160:20
**embark**
194:1
**emotion**
203:21
**emotions**
127:23
**employed**
220:13
**employee**
5:5 26:1 30:17 38:24,25 39:16 67:1 94:15,18 95:2,7 127:20 189:1
**employee's**
29:9 32:12,18
**employees**
31:21 145:14
**employees'**
169:12
**employer**
32:14 90:25
**employment**
102:9 113:8 190:12 205:13 212:16
**emptier**
230:25
**empty**
230:25
**encourage**
156:3 165:7
**end**
30:4 110:19 111:1 113:23 124:11 128:16 129:13 142:11,14 171:10 172:15 174:1 203:4,15 223:25
**ended**
106:24 124:16 126:1 160:18 218:20,21
**engagement**
217:7
**engaging**
120:20 192:15
**enters**
49:7
**Entertainment**
90:3,20,21,24
**entire**
186:18
**entitled**
5:24 173:10
**entity**
49:6
**errors**
170:7
**escorted**
34:17 79:24 195:23
**events**
110:6
**eventually**
18:10 46:8,14 47:18,21 120:14 182:12,19 231:10
**everyone's**
223:19
**evidence**
48:12 62:17 67:4 86:8
**ex-**
129:20
**exact**
22:24 30:4 35:24 56:23 84:2 112:16 166:10,11 200:16
**EXAMINATION**
4:10
**examined**
4:5
**examples**
202:1
**Excellent**
18:17
**exception**
59:22 129:12
**exceptional**
119:14
**exchanges**
67:4
**Excuse**
8:8
**executive**
70:20 75:13 82:21 90:2 119:4,9 121:18
**exhibit**
7:17 8:11,16,19 22:4 74:7 85:2 131:13,14,22 134:22 135:9 136:3,25 147:14 148:5 225:10 226:20 227:4,18
**exist**
128:18
**existence**
16:18
**expansion**
90:8
**expect**
88:8
**expectation**
32:18
**expected**
89:19
**experience**
49:8 95:2 107:6 118:12 120:3
**explained**
31:2,19 33:4
**explanation**
100:25 101:6
**extended**
50:19,21
**extent**
19:22 31:3 33:10 48:15 86:25 216:14 228:7,14
**extra**
106:13 174:7
**extremely**
150:15 171:24
**eye**
37:7 198:15
**eyes**
84:11 105:7

**F**

**face**
69:4 99:12 105:5 177:22 178:7
186:8
**fact**
16:21 63:23 76:10 103:17 152:21 155:8 213:24 220:10
**factor**
108:23 122:18 123:16
**factored**
108:25
**factors**
123:18
**facts**
6:7 29:21 200:7
**fair**
26:9 30:10 69:6,12 125:18 126:22 178:16 183:2 189:2 193:8 197:20 211:15
**fairly**
49:8,9 218:8
**fairness**
209:16
**Falcons**
94:8,13 95:4 96:13 98:9,23 101:20 102:21
**fall**
58:3
**familiarity**
51:4
**families**
115:13 121:4 149:25
**family**
93:21 166:21 177:8 219:2
**family's**
167:7
**fan**
161:4 217:7
**fans**
123:2 219:10
**fantastic**
119:15

**faster**
192:15
**fault**
36:14
**faults**
192:6,7,8
**FBI**
100:5
**fear**
203:9
**February**
23:5 24:21,23 51:14 136:8,22 137:3,4,6,20 138:19 140:24 143:14 167:17
**feel**
36:9 129:19 156:1 193:10 215:5,9,12, 18,19
**feeling**
204:2
**feels**
126:19 187:7 218:21
**feet**
167:6 208:2 210:7
**fellow**
208:6
**felt**
14:11,13,19 17:16 18:9 37:6 73:15 107:24 124:2 128:6 188:25 191:15 209:11 215:8
**female**
152:16
**Ferrara**
4:4,12 5:7 6:6 8:21 11:4 22:11 24:20 30:15 32:22 33:1, 2,16 40:5 43:19 48:24 74:7 81:2 85:14 131:12 132:15 134:25 141:17 188:14 224:22 225:9
231:20
**figure**
56:25 84:6 86:14 193:14 203:24
**figured**
63:8 118:17
**filed**
224:11
**fill**
16:12 17:21
**filled**
16:14,16
**filling**
151:5
**final**
65:5 125:18
**finalized**
65:4
**finally**
54:2 64:22 79:25 203:18
**finance**
57:20 94:10 103:9 132:18 137:10 150:8
**financial**
12:23 30:5 36:23 42:22 68:24 82:22 87:4,15 93:8,10, 13,23 95:16 122:8
**financially**
150:4
**find**
7:20 13:24 36:20 82:25 111:20 138:20 204:14 223:8
**finding**
88:17
**fine**
8:10 121:21 168:7 188:18 212:8
**finger**
183:20
**fingerprints**
130:12
**finish**
29:4 188:21 208:16
**finished**
8:3
**fire**
110:20 114:7 115:1,4
**fired**
111:7,13,17,19,21 115:18,20
**firing**
110:25
**firm**
224:3
**first-hand**
161:18
**fit**
193:22 200:8,13, 22 201:1
**five-minute**
224:20
**flag**
212:7
**Flames**
90:12
**flat**
180:19
**flew**
91:21 159:14
**flip**
127:17
**flow**
92:10
**flush**
180:7
**fly**
219:17
**focus**
118:21 170:19,22 171:20
**Focussing**
35:12
**foes**
201:12
**folks**
170:14 193:19
201:2
**follow**
156:4
**football**
58:14 67:16 69:2,4 70:7 94:9 95:23 97:3 121:2 123:7, 24 124:14,19 125:3 127:4,16 130:6 170:2,3,8 171:18 186:23 199:8 207:13 208:13,20 209:8 213:20,21 228:17
**forecasting**
222:13
**forged**
105:19
**forget**
151:23 173:23 187:20
**forgive**
97:10
**forgot**
107:13
**form**
10:8 19:20 23:14 25:12 27:19 28:2, 13 30:11,21 34:12 35:19 36:8 37:13 40:2,3,19 42:5 43:16 47:10 49:15 70:1 71:11 76:1 81:7 82:13 85:16 100:20 102:16,23 111:10 113:10 116:25 117:14,25 122:4 142:1 162:18 164:23 167:23 175:13 179:5 183:4 211:17 214:8 220:19 227:10 228:2 229:6,24 230:10
**formed**
95:1 102:8
**Forsyth**
90:6
**forthcoming**
158:18
**fortuitous**
92:16
**forward**
174:18,21 175:11 189:1 198:14
**found**
6:22 7:5 10:6 11:2, 18 16:19 20:15 25:4,7,8 26:2 27:8 39:23 40:23 43:23, 25 57:23 60:8 66:21 67:12 76:13, 15 83:17 113:1 142:9 164:18,21 176:20 191:16 221:22 228:8,9
**foundation**
24:10 25:13 26:12 39:7 43:17 45:18 47:11 49:16 100:21
**frame**
18:13,15 53:12 55:15,21 98:11 110:7 169:8 190:6 198:24
**framing**
84:21
**franchise**
91:15
**Frank**
4:4 5:19 6:17 17:17 19:22 20:3, 22 23:15 25:15,17 28:5 29:16,17 30:25 31:4 32:22, 24 33:1,6 40:6 47:15 63:2 71:16 79:12 81:10 82:16 84:21 86:25 87:23 97:11 102:24 119:21 132:15 151:2 163:13 172:4 182:3 186:8 203:3 206:20 222:18 226:8

230:11
**Frank's**
129:20
**Fred**
97:2 104:20,21,24
**frequent**
210:25
**Fresno**
124:25
**friend**
65:25 156:20
**friend's**
177:21
**friends**
193:12,13 201:12
**friendship**
105:19 192:13
**front**
21:22 22:6 225:13
**frozen**
163:1
**frustrated**
167:19
**frustration**
186:5
**fuck**
97:12
**full**
112:16
**fully**
126:2,4 175:11,18
**fun**
121:7 210:16
**funny**
114:11 115:8 120:19 129:18 218:25 223:16
**future**
38:24 43:4 187:11 228:22

**G**

**Gabe**
143:15,18 180:14
**game**
9:17 12:3 14:16 59:8,9,10 67:6,11, 15,20 95:20 96:7, 19 107:14 124:22, 23 125:12 126:11 159:11 160:8,9,10, 17,24 166:20 202:5,7 211:1
**games**
9:18 12:3 17:25 61:10 66:25 69:24 70:8 119:24 122:18,19,23 123:1,2 126:7 167:11,12,13 213:20,21
**gap**
32:8
**Garner-smith**
138:10,20
**gates**
14:15
**gave**
9:22,24 18:10 41:18,21,23 42:1,6 67:18 83:3 174:24 175:4 180:16
**general**
21:2 23:12 32:10 33:9 42:3 86:13,22 87:20 127:8 145:11 199:10,13 221:10 223:15,17, 19,21
**generally**
107:10,11
**Georgia**
89:18,24 90:8 92:1
**get along**
209:25
**give**
29:19 38:22 42:1 49:20 54:20 63:16 66:8 70:7 83:1,2 96:23 163:9,10 171:13,22,23 173:20 181:14 182:6 183:22 184:1 210:9 214:15
**giving**
42:24 60:14 66:5 68:5 70:5
**glad**
186:10
**glasses**
178:6,7
**gleaned**
71:8
**gleap**
68:7
**glib**
180:2
**gluten**
177:12,16
**goal**
17:17,18 124:22
**goals**
173:11
**God**
48:8
**golf**
57:9 121:8
**good**
4:12,15 13:13 17:9 52:21 56:19 84:21 92:11 95:8 122:13 123:4,23 127:15 145:10 160:1 168:3 174:6 182:5 188:7,22 189:16 191:9 205:7 216:1 217:7 219:12 220:1
**Gosh**
84:19
**gray**
121:23
**great**
7:18 70:15 91:17 92:9 104:14 119:13 120:24 122:14,25 141:19 191:6 193:12
**greater**
177:6
**Greg**
59:4 66:8 67:5 93:17
**grew**
133:4,6
**grooming**
140:2
**group**
65:10 93:17 98:22 104:25 120:11,13
**guess**
11:17 26:24 34:2 41:3 53:5 62:1 65:18 73:10 78:1 84:6 85:9 86:15 110:22 114:21 121:1 133:20 135:2 139:11 142:18 149:9 152:5 157:25 159:20 168:24 174:7 184:5 189:24 193:18 195:14 203:21 204:10 207:21 214:20 215:10
**guesses**
65:20
**guessing**
34:1
**gun**
32:4
**guy**
33:16 70:19,20 97:8 101:6,10 105:6 120:19 157:4 161:6 184:2 192:15
**guys**
29:2 32:4 54:4 60:12 66:5,7,11 105:5 167:24 172:2 193:12
**gymnast**
152:15,16

**H**

**H-**
189:25
**habit**
150:14
**hair**
177:23
**half**
14:6 56:12 184:4
**half-a-pager-type**
175:3
**hall**
172:15 195:24 196:2
**hallway**
27:2 76:12
**hand**
10:13 26:18,19 42:10 52:1,10 69:17
**handed**
42:11,12 58:2
**handle**
84:6 106:13 186:11 204:12
**handled**
152:17 157:9
**handling**
209:24
**hands**
83:19 84:11 153:11
**handshake**
173:15
**handwriting**
10:12,13,16,17,18, 19 11:7,8,11,21,25 12:11 18:23,24 23:8,10,21,22 24:17,18 42:13,14, 16,21 43:2 44:16, 17,18 50:16 51:1,4 55:5,6,7 56:8,9 72:4
**handwritten**
23:25 32:9 39:23

55:22 56:4
**happ-**
89:3
**happen**
59:7 149:4 168:20 177:24 184:8 188:1 189:4 195:15 203:20 214:1 221:22
**happened**
14:10 28:19 29:8 32:15 40:10 48:1,9 49:11,18 55:2 60:21 64:15 65:1 72:23 86:17 89:18 100:3 107:20 108:7 110:6 113:22 137:23 138:5 149:13,17 150:20 151:7,9 152:5,12 153:4,5 156:25 157:1,8,11 160:9 161:2 162:23 166:19 168:22 172:20 182:23 189:6,7 191:8,10 196:1 197:1 198:17 204:2 206:9,12,19 209:22 222:22
**happening**
14:14 59:5 66:2 150:19
**happy**
91:23 123:5 193:2 201:21
**harassed**
161:16
**harassment**
150:22 159:4 166:6 167:20 176:12 177:1
**Harris**
59:9 65:15
**hate**
212:18
**Hatfield**
8:4
**head**
36:13 92:2 95:22 97:2 122:3 138:2,3 155:1 165:7 189:25 190:1,7 195:3 202:1 203:22 208:10 213:20 214:14 221:8
**heads**
58:22
**health**
89:20
**healthy**
13:20 17:13 18:4 47:19 49:6
**hear**
89:22 103:17 175:23,25 176:2,3, 4 182:14 191:25 205:5,6,7
**heard**
18:9 30:15 58:24 87:1 113:24 156:16 176:7 182:16 205:9,11, 15 210:12 221:16
**hearing**
88:12 131:9
**heat**
177:17,18
**heated**
175:23 176:3
**Heather**
7:19 8:2 37:24
**held**
156:14
**hell**
114:8 115:5,8 155:22 198:11
**helmets**
35:8
**helpful**
15:10 53:16 83:24 133:22 214:16
**helping**
122:16
**helps**
88:5
**hey**
32:5 58:22 66:7,23 70:14 76:13 96:22 97:6 107:13 129:19,20 181:9, 13 183:19 198:7 199:20 204:15,19 206:16 208:24 211:5 212:18 221:22 222:12,16 223:11
**hiccups**
127:13
**high**
69:3 75:15 99:8 100:13,14
**higher**
71:5
**hired**
16:7
**histor-**
228:3
**historical**
29:19 30:2 33:5 36:18 57:13 58:7 228:4,16
**history**
13:1
**ho-**
208:25
**hoarding**
61:12 66:16
**hockey**
91:11,25 92:9,10, 16,20,21 113:3 133:20,21 134:22 135:12 136:13 144:20 145:20 155:6,9 162:23 170:5 194:3 209:4
**hold**
5:18 6:16 19:21 25:15 52:11 68:18 79:12 80:9 86:24 121:18,21 128:9 162:2 213:5
**holiday**
114:4 149:21,22
**holidays**
114:9 115:5
**home**
12:3 14:16 60:7 63:25 91:15 119:19,20,23 125:11 126:7,14, 20 159:14 185:7 202:8 209:1
**honest**
47:24 173:22 210:21
**honestly**
76:12
**hope**
117:20
**hopes**
90:7
**horizontal**
133:25
**hot**
177:25
**hotel**
185:25
**hour**
184:4 188:15
**hours**
195:16
**house**
17:21
**HR**
190:1,7 195:3 221:8
**huge**
219:8
**human**
118:5
**Humans**
178:9
**humor**
121:12 218:25
**humour**
120:25
**hundred**
176:13
**hundred-acre**
90:5
**hundred-thousand**
44:25 54:4,11,20 55:18
**Hurley**
119:11 161:1
**hurt**
36:25 37:4 228:12, 21
**hypocrite**
152:7,8,21

**I**

**ice**
135:12 136:13 144:20 145:20 170:5
**idea**
13:13 183:25 212:24 230:14
**identified**
27:16 28:10 35:14 50:4 75:24 80:16 126:24 145:12
**identifies**
132:17 136:12
**identify**
29:9
**identifying**
28:25 29:12
**ignorance**
89:13 90:9
**image**
229:22,25 230:3
**immediately**
157:12
**impact**
208:20 209:10
**impacting**
171:5
**implement**
217:9 218:1
**implemented**
218:2

**implied**
157:1
**imply**
85:25 155:15,17
**implying**
155:13
**important**
5:23 13:4 14:20 70:14 106:10 162:10 185:22
**impressed**
187:1
**impression**
54:12 68:5
**impressive**
178:3,5
**improve**
171:21
**in-person**
60:20
**inability**
170:12 201:1 209:25
**inappropriate**
152:14
**inappropriately**
151:23
**inches**
75:14
**incident**
95:19 98:7 103:20 104:6 106:1 150:20 152:12,17 161:3
**incidents**
98:8 102:8 109:16
**include**
230:16
**included**
163:19
**including**
39:19 50:16
**inconclusive**
64:22 87:18 88:18
**incorrect**
32:20 56:9 71:12 142:25 191:3 218:2
**increase**
172:24 216:19,21
**increased**
173:2
**increasingly**
152:3
**incredible**
118:4 119:23
**incredibly**
91:23 120:19,20 121:11 130:16 165:17 180:24
**indefinitely**
222:18
**independent**
88:14
**indicating**
71:23 75:16 109:23 182:1 216:17 231:13
**individual**
12:3 48:21
**industry**
61:18 140:1 217:5
**inform**
195:10
**information**
19:23 25:21 71:6,8 139:25
**informed**
195:3,8
**initially**
199:23
**inkling**
114:14
**insert**
187:25
**inserted**
69:7 187:16
**instance**
213:14
**instances**
95:14
**instruct**
20:9 25:20 79:13
**instructed**
32:5 33:23 38:13 156:5 163:18 164:16
**instructing**
33:9
**instructions**
20:18 25:1,4 31:4, 22 32:1,3
**instrumental**
122:16
**intend**
228:12
**intent**
36:25 48:19
**intention**
184:1
**interacted**
208:6
**interactions**
211:13
**interchangeably**
69:10
**interest**
192:23 198:13
**interested**
123:2,3
**interests**
91:17,19
**interim**
66:25
**interruption**
8:8
**interviewed**
41:15,16,17
**introduction**
120:10
**investigate**
108:20
**investigated**
164:13
**investigating**
59:17
**investigation**
24:5 41:5,8,12 48:4 54:8 58:3,8, 10,16,22 60:17 61:2,25 64:8,16,20 65:6,23 66:20,22 67:9,12 71:7 80:7 86:18 108:21 159:7 203:8 223:5
**investigations**
20:1 65:8 87:8 88:8,10
**investigators**
72:18
**investment**
51:20 53:5,6
**invited**
190:14
**involve**
29:22
**involved**
37:5 58:24 59:5 168:16 210:18
**involves**
226:5
**ironically**
98:4
**issue**
62:7 69:17 80:7,8, 18 89:20 105:2 107:23 161:23 170:8 207:14 227:14 229:14
**issues**
105:22 108:2,7,11 109:10 126:24 129:4,14 192:12 197:20,21 198:4, 23 199:12,18 207:9 208:5,6,7,8, 13 210:19
**item**
57:23
**items**
6:21 7:4,7,8,10,12, 13 25:11 26:2 27:11 28:11,12 35:4,6 79:25 230:16,21 231:3,5, 6

**J**

**J-A-N-C-Z-E-W-S-K-I**
133:4
**jackets**
231:4
**jan-**
132:22 133:11
**Janczewski**
132:23,24 133:3
**January**
9:22,24 10:4 15:18,19,25 50:1 55:12 96:5 109:7 132:10,11 133:16 134:7,17 135:25 137:10,19 138:8, 18
**Jean**
111:15 141:10 143:25 144:11,16 154:11 165:20 171:8 172:2,6 174:12 175:24 176:8 180:15 182:14,16 183:11, 19 189:12,15 196:10 200:20 206:3,6,8 212:22
**Jean's**
172:14,17
**jeez**
17:17 130:16 194:17
**Jenny**
5:12 7:16 31:6 37:23 74:23 131:1 225:1 226:22
**Jesus**
128:2
**jive**
158:10
**job**
17:20 37:3 52:21 84:21 119:13,14 122:14,25 123:5,

23 127:11,15 162:22 171:3 211:14 213:14,23 228:5,22

**join**
92:24

**joined**
94:4,14

**joint**
134:17 137:21,25 138:22

**jointly**
138:16

**joke**
113:14,15,17 114:13,25 142:2

**joked**
114:3,5

**Jones**
19:3 24:8,21 43:14 44:20 51:18,19 52:6 53:4,8 80:6, 19 82:12 83:20

**Jones'**
23:5 24:7,13

**judge**
181:16,17 182:11 193:8

**July**
113:1,2,19 114:21 141:18,23 142:11, 19 143:18 144:18 149:12,13,16,21 151:11 155:8,10 157:22 164:21 165:14 167:18 168:15 169:7 176:21,24 177:3, 12 178:12,22

**jump**
179:15

**jumping**
177:10

**jumps**
178:23,25 204:11

**June**
169:7 176:10

**Juneish**
168:25

**junior**
111:4 139:1

**K**

**K-A-T-E**
133:3

**K-R-A-U-S-E**
90:22

**Kansas**
119:20 208:25

**Kate**
132:22 133:3,14 137:13 139:15,17, 21,23 140:2,4,7,11

**Kathy**
43:14,22 151:4 166:22 227:13 228:13

**Ken**
147:18,21,24 148:1

**Kennedy**
138:1,24,25

**Kevin**
7:23 189:21,23 212:2,4

**key**
174:25

**kidding**
152:25

**kids**
121:4

**kill**
161:6

**killed**
97:22,23

**kind**
44:7 122:11 133:24 135:9 151:19 173:18 180:9 182:24 199:22 203:4

**knew**
12:17 14:12 49:21 76:2 83:25 113:16 154:12 165:12,18, 19,24 186:3 195:15 218:7 230:18

**knowing**
16:15 110:20

**knowledge**
39:9,10 65:19 101:17 110:12,16 122:2 161:18

**Krause**
90:3,19,21,24 91:8,21

**Kwan**
5:12,13

**L**

**L-A-N-D-P-H-E-R-E**
147:19

**label**
145:12

**labeled**
227:18

**lack**
61:11 130:23 170:25 171:15

**laid**
83:19 84:10

**Landphere**
147:18

**language**
69:11 180:4

**laptop**
231:4

**large**
55:16 58:17 60:14, 22 61:4,7 66:9 77:16 78:22 98:22 123:21

**larger**
75:4,6

**Las**
150:20 152:2

**late**
59:25 113:1 157:24 159:20 169:7 191:15,23 211:4

**late-**
77:5

**laughed**
114:10

**laughing**
113:17 115:7,8,9

**lawsuit**
224:11,17

**lay**
210:6

**layer**
135:2

**lead**
129:7

**leadership**
14:20

**leading**
86:6 112:21 125:17 171:7 201:6

**leaf**
158:12

**league**
94:9 95:23 97:3 98:13,15 101:7 130:6 199:8 228:17

**learn**
70:25 218:10 220:9 221:6 224:8, 14

**learned**
141:24 221:3 222:20 224:5,10

**leave**
34:14 91:2,5,24 96:8 107:21 108:1 157:3 220:5,11,13 221:4,14,20 222:17

**leaving**
93:19 142:10 167:8

**led**
110:7

**Lee-cota**
5:12,18 6:2,16 7:18,22,25 8:2,6 10:8 19:20 20:8,17 23:14 24:10,11 25:12,15 26:12 27:19 28:2,5,13 29:3,15,21,24 30:11,21,24 31:17, 25 32:17 33:4,14 34:12 35:19 36:8 37:13 39:7 40:2,6, 19 42:5 43:16 45:18 47:10,14 49:15 70:1 71:11, 15 74:2,17,20,24 76:1 79:12,18 80:9,13,23 81:6,9 82:13,16 84:20 86:24 87:23 100:20 102:16,23 111:10 113:10 116:25 117:14,25 122:4 131:2,6 142:1 162:18 164:23 167:23 168:2,6 175:13,16 179:5 183:4 188:6 211:17 214:8,12 220:19 225:2 226:2,8,12,24 227:10 228:2 229:6,24 230:10 231:18,21

**left**
9:2 10:16 12:1 15:8 21:8 25:11 26:3 34:14 43:21 57:7 69:20 71:10 82:9 83:16 90:14 111:23 113:4 115:22 120:16 140:5 141:15 142:12 147:8,12 172:6 174:12 182:20 188:15,23 212:25 227:2 230:15,21

**left-hand**
132:7 137:2
**Leslie**
161:6
**lett-**
173:5
**letter**
173:7,20 175:1,3, 6,9
**level**
110:21 139:21 141:2
**liability**
87:21
**lieuten-**
217:18
**lieutenant**
57:19 93:17 103:8 147:10 217:18 222:9
**lieutenants**
59:20
**lifetime**
91:25
**liking**
193:20
**limited**
229:2
**lines**
61:16,21 153:13, 14 154:15 158:4, 17 183:15 210:17
**listed**
126:25
**listen**
13:10 14:13 16:8 27:7 32:5 54:4 73:5 99:20 107:13 119:10 123:11 152:6 156:2 162:21 170:25 174:15 185:16,21 186:8 198:7 206:16 218:17 223:11
**lit**
105:7
**literally**
114:22 148:23 170:7 212:25 216:20 221:22
**live**
148:24 149:1 178:9
**lived**
133:7
**lives**
148:22,23 219:1
**located**
22:10
**lock**
39:21 83:15
**locked**
83:13
**locking**
38:15
**long**
73:6 75:14 128:4 146:8 166:25 172:7
**long-winded**
61:24
**longer**
137:20 220:10,12 221:20,23
**looked**
21:11 35:1 76:25 81:3 97:5 146:8 148:5 230:17
**lookout**
99:24 100:6 101:12
**loop**
90:17
**loose**
69:10 82:20
**loose-leaf**
82:21
**lose**
130:23
**losing**
152:9 153:3,17 160:23
**loss**
126:14
**lost**
124:23,25 125:11 126:11,12,18 133:8,12 153:4,19 159:13,14 210:24
**lot**
78:23 113:21 118:8,22 120:21, 25 121:6,9 123:11, 20 149:13 170:22 192:6 218:24 219:2,3 230:23,25 231:1
**loud**
196:19 210:12
**loudly**
182:7
**love**
41:9,22,24 42:1,7, 15,16 58:2 97:25 130:9 166:18 199:17 223:4,9 224:2
**loved**
203:12,16
**lover**
219:9
**low**
13:21 14:4,15 37:6 46:14,15,20 47:21
**lower**
10:16,18 99:12 117:7 141:15 216:23
**lower-left**
136:5
**lucky**
105:8
**lunch**
188:17

**M**

**M-U-L-L-E-T-T**
92:8
**machine**
27:1,2 38:20,21
**mad**
153:16
**madam**
4:7 74:1 133:3
**made**
18:21 19:16 20:15 23:18 28:21 30:9, 19 37:8,9,12 44:24 61:20 62:19 63:19 64:5 70:25 71:15 72:20 74:16 75:2 77:22 78:11 87:15 88:4 98:9 110:9 120:10 124:24 128:17 142:2,16, 19 153:12 155:3 159:11 180:13 186:5 192:23 193:1,18,19 196:5 197:10 214:14 225:16 226:15
**main**
57:19 139:16 147:10 173:24
**make**
17:20 19:12,18 20:23 21:7 23:24 27:25 28:12 29:11 30:17,20 37:11 38:3,6,7 39:20,22 43:3 55:11 63:13, 18 67:19 70:2 73:8 82:5 86:14 99:7,13 100:10 106:21 122:22 130:20 156:4 158:18 163:21 170:6,7 174:18 184:25 186:3 192:22 194:5 209:6,7 217:22,23 224:21 225:9,15,20,21,25 226:6 228:13
**makes**
161:12 170:3,5 192:14
**making**
24:13 29:1 32:9 77:14 110:21 122:25 153:22 168:3,6
**man**
95:22 114:15 115:12 155:19 177:15 183:19 228:22
**man-**
207:25
**manage**
119:11 129:21
**management**
148:7,10 197:5 208:1
**managing**
119:16
**manifest**
124:10
**manipulated**
215:6
**manipulating**
203:3 215:1,20
**manipulative**
215:17,18
**March**
65:3 93:11,13 151:6 155:7,9 158:25 159:20 160:11
**Marchish**
58:21
**margin**
99:17 101:2
**mark**
8:15 25:25 26:7 117:16 139:17,20, 21,24 140:3
**Mark's**
140:3
**marked**
8:16,19 22:4 126:22 131:13,14
**market**
69:5,6 98:24 99:11

**match-up**
14:15
**Mateen**
15:23
**matter**
4:20 63:3 106:9 155:8
**max**
171:23
**maximize**
217:4,5
**maximizing**
216:15
**Mcelroy**
66:8 67:5 93:17
**Mcelroy's**
59:4
**meaning**
17:19 127:8 182:4 187:14 193:13
**means**
133:20 135:20
**meant**
118:19,24 178:9 180:21 213:8
**media**
37:1 139:24 224:15 228:19
**meet**
41:9 185:17,21,22
**meet-**
185:22
**meeting**
5:25 6:14 11:14 13:5 42:22 57:8 60:20 148:10 150:1 152:19 170:17 179:2,4,7, 11,13,16,20,24 181:1 183:12 184:14 188:24,25 189:4 194:25 197:8 200:9,17,18, 19 202:13,17,18 205:22,24 206:1,9, 22,25 207:1,6,23, 25 208:1 212:4,5 214:24 223:3,9,14, 22 227:2
**meetings**
184:17 189:8
**Meitin**
147:9 217:17
**member**
19:9 198:8
**members**
15:21,22 128:6 199:9 223:21
**memorable**
149:18
**memorialize**
173:19 174:17
**memory**
212:7
**men's**
116:12 119:16 135:12,20,22,23 136:13,16,17 143:5 144:21,24 145:20,21 147:20 159:9 170:4 208:23 213:16
**ment-**
171:12
**mention**
164:11 193:19 205:9,12 206:14 207:5
**mentioned**
148:15 151:25 171:13 182:15 185:18 192:11 210:2 212:9 214:3 215:21
**mentioning**
79:22
**merged**
88:8,16
**Merry**
89:3
**messages**
218:11,12
**messed**
130:22
**met**
4:17 42:23 185:17
**metal**
178:6
**Michigan**
14:16 126:11
**mid**
79:25 115:15 160:11 169:7 224:4
**middle**
46:1 47:25 48:6 49:18 54:7 55:15 61:18 69:7 72:22 73:1,8 161:9 184:24 204:24 223:25
**midst**
11:5
**midway**
113:21
**mightily**
123:8
**Mike**
15:23,24 16:6,7 25:8,9 33:17 38:14 39:14 76:9,11,21, 24 82:2,25 98:18 103:6,8,12 147:9 196:11 217:17,21
**Mike's**
15:25 76:22 103:7
**miles**
89:7 148:23
**million**
123:10,25 208:17
**mind**
13:22 14:4 28:8 59:24 74:17 81:14 129:9 165:1 170:22 174:24 175:1 176:23 185:23 192:18,19 209:11 227:8,12, 24 229:4,9,21 230:7,13
**mine**
129:13 172:14 223:20
**Mine's**
223:19
**minor**
57:6
**minute**
70:8 172:1,3
**minutes**
74:2 166:4 172:9 173:25 188:6,7 206:24
**misconstrued**
155:4
**misreading**
144:5
**missed**
123:9
**missing**
146:24 147:1
**mistake**
69:10
**misunderstood**
36:12 205:21
**mixed**
90:4 122:11 124:1 127:3,7
**mixed-use**
90:5 91:14
**moment**
16:3 144:15 176:19 182:9 193:9 197:10
**moments**
70:4 214:22
**Monday**
112:15 179:8 204:22 205:19 206:11
**money**
62:3 63:16 71:25 100:10 227:14,15
**month**
89:5 168:21
**months**
45:17,24 54:15 55:10,11,13,20 65:4 93:16 112:21 151:6,16 156:15 166:16 201:6
**mood**
172:22 182:1 205:6,7
**Morgan**
60:19,23 65:10
**morning**
4:12 150:13 184:22 185:13,15 191:4,18 194:24 202:15 204:23 206:9,12 207:5 212:12 214:23,25 215:6,22 217:10
**motioned**
153:11
**mouth**
198:11 205:15
**move**
133:23 189:1
**Mullett**
91:9 92:3,5,15 120:3,16 185:10
**multiple**
7:7 35:7 181:12 202:1
**muni**
202:4
**mutually**
173:10
**MW**
135:22
**myriad**
120:14 219:10

N

**NA**
106:10
**named**
33:16 41:9 132:22 217:19
**names**
59:21 133:10
**narrow**
168:21
**nasty**

161:5
**Nate**
16:2
**Natesh**
144:7
**National**
94:9 95:23 97:3 130:6 199:8 228:17
**nature**
213:14,23
**NCAA**
157:17 159:10 160:4,15
**necessa-**
183:9
**necessarily**
41:1 53:12 79:4 82:5,19 129:8 176:6 186:4 201:14
**needed**
17:19 18:1,2 36:20 37:4 48:14 67:6,19 106:8 107:13 214:5,15
**needle**
216:14
**negative**
102:9 171:5 205:4,5
**negotiated**
101:1
**negotiates**
49:4
**Nelson**
143:19 154:4 159:17 165:17,18
**nerds**
126:17
**news**
205:17,22
**NFL**
69:3 73:6 94:10 95:3 98:12,16,21 99:1,3 100:4 107:16 108:12 198:6,23 199:4,5,12,18,21
**NFL's**
94:10 95:16
**NHL**
90:8,10 91:15,25
**nice**
128:10
**nicer**
171:16
**night**
151:4 189:14 210:16,22 211:4
**nodding**
83:9
**nonconference**
122:18,23
**northern**
90:5
**nose**
59:5 66:2
**note**
23:6 55:22 56:3,4 146:11
**notes**
7:20 22:21,22 23:25 32:9 39:23 56:6 62:23 125:2 224:20
**nothing's**
121:22
**notice**
53:14,15 54:16 167:7 177:1 202:2 221:15
**noticeable**
167:3 180:6 201:21
**noticed**
144:2 166:13,21 167:4,8 201:9
**November**
44:4 53:7
**Novemberish**
149:9
**nuance**
116:6
**num-**
229:15
**number**
7:17 19:3 22:15 24:23 44:16 52:16,25 56:21 97:15 119:24 126:25 131:19 182:6 197:21 210:9
**numbers**
133:9 182:3,5

**O**

**object**
10:8 19:20 23:14 24:10 25:12 26:12 27:19 28:2,13 30:11,21 34:12 35:19 36:8 37:13 39:7 40:2,3,19 42:5 43:16 45:18 47:10 49:15 71:11,14 76:1 81:6 82:13 86:25 100:20 102:16,23 113:10 116:25 117:14,25 122:4 142:1 164:23 167:23 175:13 179:5 183:4 211:17 214:8 220:19 227:10 228:2 229:6,24 230:10
**objection**
5:18 19:21 71:15 111:10
**objections**
131:9
**obligation**
164:22
**occupy**
38:25 39:16
**occurred**
95:15,20 170:20
**October**
11:16,20,24 93:1,3,6 223:4
**October-ish**
41:6
**odd**
60:1,2
**off-**
204:9
**off-site**
185:2
**offer**
16:5 17:6 18:10 102:4 178:20
**offered**
9:18 15:12 18:12 204:9
**offering**
12:19 15:2
**offhand**
7:25
**office**
6:22 7:5,9,13 9:2 10:5 16:19 20:14,23 21:3,6,15 23:13 24:25 25:5,6,7,10,25 26:1,11,22,23 27:1,8 31:20 32:9,12,19 33:8,18,24 34:4,8,9,10,15,18,22 35:23 38:15,25 39:1,4,15,21,25 42:4 44:1 57:16,21,23 71:10 73:7 74:9,10 79:24 81:19 83:8 86:5,13,21 87:3,14,19 88:12 96:20 98:11,19 101:7 103:12,13 113:20,21 114:22 149:20,23,25 157:24 169:5 172:14,18,21 175:22,25 178:15 182:13 185:8,18 187:12 194:23 195:19,22,23 196:21 197:2 199:9,13 202:24 205:16,17 208:2 213:10,11,22 216:5 220:22,23 221:10 223:12,15,16,18,21 230:15,24,25
**office's**
76:16
**officer**
12:23 30:5 36:23 58:21 65:16 68:25 87:4,15 93:8,10,13,23 122:9
**offices**
26:24 181:6 196:23
**officially**
224:5
**OGC**
59:19 65:9,23 87:1,8 221:9,10 223:11
**OGC's**
223:12
**old-style**
75:15
**Olson**
60:19 65:10
**onboard**
173:17
**once-in-a-lifetime**
91:7
**one's**
110:19
**one-pager**
175:3
**open**
98:24
**opened**
27:13 76:23 172:18
**openly**
197:16
**operating**
58:21 65:16
**operation**
38:1
**operations**
39:14 225:16

**opinion**
16:24 18:5 63:11 95:1,6 102:9 190:18

**opportunity**
38:16 91:6,20

**opposed**
155:21

**oppressive**
178:4

**ops'**
161:20

**ordained**
66:23

**order**
37:25 39:13 61:11 225:16

**ordered**
97:22

**org**
114:1 132:4,11 133:24 134:25 135:1 140:14 145:12 146:3 147:15 180:11

**organization**
102:7 106:10 198:14

**organizational**
136:10 137:7 138:9 146:17 148:4 179:3 200:23 202:12

**origin**
31:11,14,18,25

**original**
55:12

**originally**
231:10

**originals**
39:24

**Othfi**
120:11,13

**Otto**
97:2 104:20,21

**overhear**
183:10,13 196:15, 16

**overheard**
103:11 113:16 183:8 196:20

**overly**
171:4

**overseeing**
62:10

**overstepping**
99:21

**owner**
19:9 98:16 101:10 106:9,22 107:1,8, 9,16

**owners**
107:10

**P**

**p.m.**
188:12 225:7 231:25

**Pac-12**
122:21 152:1 157:16,17 159:25 160:3,8,14

**packaged**
67:17

**packages**
9:16

**packaging**
67:13

**pages**
23:11 31:12 32:13 75:17 77:24 85:7, 8,12 145:23 148:5 218:12

**paid**
46:2 54:2,17 55:17 57:21 62:2 71:5 209:17 221:20

**pal**
183:16 210:15,16

**Palm**
177:8,12

**paper**
182:15 229:13

**pardon**
89:12 90:9

**parents**
89:21

**part**
24:5 33:8,25 44:14 57:25 61:3,23,25 64:18 66:20,22 67:9 82:8 113:14 116:14 123:19 139:22 149:7 150:3 200:25 202:11 218:25 221:21 223:1 224:1

**part-time**
93:20

**parti-**
212:6

**partici-**
107:10

**participate**
169:13 190:25

**participated**
169:10 190:11

**particulars**
137:22

**partner**
63:12 70:14

**partners**
17:6

**partnership**
13:9 16:22

**party**
157:5 204:5

**passion**
92:21 120:5

**passionate**
121:5

**past**
8:5,6 196:20 203:23,24 208:14

**path**
94:12

**pausing**
168:5

**pay**
54:21 61:20 73:3 117:7 123:22 201:2

**paying**
54:16 55:14

**payment**
19:5 109:8

**payroll**
221:11,13,14,23 222:1,10,14 224:5

**people**
57:19 60:24 64:7 95:24 97:25 106:14 121:18,21 128:15 130:16 135:4 150:7,8 156:19 175:23 180:18,22 181:14, 16 182:11 193:18 201:10 209:10 210:1 216:16,17, 20,22,24

**perceive**
117:9 130:15

**perceived**
128:13

**percent**
9:15 14:5 170:4 206:7 216:19

**perception**
178:21

**perfectly**
218:2

**performance**
122:2,10 130:22 168:16 169:10,12, 17 211:15

**performer**
129:20

**performers**
128:7

**period**
44:3 53:15 79:23 82:3 122:9 125:8 133:18 144:16 201:10,14,15 222:1

**person**
64:1 70:19 76:23 164:6,15 174:4 219:19

**personal**
24:6 26:10 27:17 28:1,11,20 29:1, 10,13 30:6 31:12 32:25 39:5,17 43:14 53:8 65:19 70:22 71:9 75:25 80:6,16 81:21,23 82:12 83:11,20 84:7 86:7 120:18 218:19 227:8 229:22 230:9,19, 21

**personality**
119:7,12 128:14

**personally**
4:25 44:25 130:5, 17

**pervasiveness**
228:15

**Phoenix**
91:22 166:20 167:10 177:25 202:4

**phone**
97:15 169:3,4 182:6 185:14 189:14 210:15

**phones**
231:2

**phonetic**
8:4 15:23 18:1 25:8 120:11 143:15

**photo**
74:13

**photocopied**
229:22 230:8

**photocopy**
75:2

**photograph**
52:9

**phrase**
116:19

**phrased** 130:17
**physical** 75:7
**physically** 22:10 42:10,11 83:3 168:23 169:2
**pick** 38:16 96:9,16,18 105:9
**picked** 26:4 39:11 79:25 83:3,25 97:12 143:25 151:16
**picking** 21:9 102:10 103:24
**picture** 26:17,21 50:18,19 225:10
**piece** 116:16 143:8 216:1 229:13
**Piensook** 5:13 8:8,11,13
**pissed** 155:18 156:24
**pitch** 13:8
**pitched** 13:10
**place** 58:11 169:5 174:6 189:16 194:4 198:8 223:14
**places** 88:7,11
**plaintiff** 4:13
**plaintiff's** 8:7
**plan** 186:14,16 215:21 216:3 217:10,15, 20
**plane** 120:12
**play** 91:10 167:17 171:16 201:2 209:1,2
**play-** 96:24
**played** 124:24 159:13
**player** 96:17,25 106:15 108:15
**player's** 97:4
**players** 92:10 96:8,9,10, 14,17,23 97:7 102:11 105:10
**players'** 97:19 103:24
**playing** 121:8 123:12 159:11 160:11 209:12
**playoff** 69:3 98:12 99:2,4 103:18 108:12
**playoffs** 67:16 95:25 98:10 99:5 102:20
**pleased** 173:24
**point** 15:12 17:3 27:16 28:12 29:10 34:11 37:22 38:12 39:11, 22 41:9 45:20 77:3,11 80:15,21 82:10,11 85:18 88:7 90:13 100:1 105:3,20 114:16 117:22 139:11 143:7 145:1 149:10 156:22 159:8 166:18 168:14 170:16 171:25 177:11 182:12 185:4 186:6 187:10,16, 25 192:5,9 200:6, 16 203:6,12 214:17 217:21 220:3 221:2 222:19 223:7 224:4,8,10
**pointed** 83:4
**pointing** 134:12 181:13 183:20
**points** 94:24 169:23 174:25
**poisoning** 129:6
**polarizing** 201:11
**police** 154:23 157:13 164:3,19
**policy** 67:22 68:1,4,8
**Polish** 133:5
**poor** 97:20 128:7 129:20 130:22
**poorly** 123:16
**pop** 184:13
**portion** 74:14 75:10,20 227:19
**portions** 31:12
**position** 90:1 91:24 94:18 107:1 178:20
**positioned** 162:9
**positive** 188:2,25 195:6 202:13 205:3 214:24 215:15,16
**possess** 72:22
**possession** 85:15 86:3
**possibly** 114:12
**post** 162:11
**posted** 148:11
**potential** 13:9 16:22
**potentially** 48:21 159:24
**practice** 144:14
**preamble** 180:16
**precluded** 67:23 68:2
**predecessor** 16:1 59:13 93:18
**predetermined** 209:8
**prefer** 172:3
**preliminary** 185:9
**premise** 17:15
**prep** 5:8
**preparation** 88:21
**prepare** 5:6
**prepared** 186:15
**preparing** 149:25
**presence** 119:4,9 121:18
**present** 150:12 168:23 169:2 174:19 179:11,13 190:15 196:2 205:18 206:4 218:12 223:22 230:23
**presentation** 150:9
**presented** 16:21 50:1 129:2 175:6,9 217:16
**president** 17:24 103:8 110:15 150:2 210:5,18 211:8,13, 22
**pressures** 17:23
**pretty** 120:5 153:13 156:23 210:11,18 217:19
**prevent** 37:2
**previous** 52:15
**previously** 101:1 144:1 229:8
**price** 12:20 13:18,20 14:2,4,6 15:12 17:6,16 46:7,9,13, 19 47:2 49:4,5 55:12,13 61:15 99:8,11,16 124:5 216:21
**prices** 98:20,23 100:13, 14
**pricing** 16:25 98:12,15,17 99:4 102:2,20 103:18 108:13 109:8 124:4
**primarily** 138:15
**primary** 145:17,19,20,21 148:2,24
**Prime** 61:6,13 67:21 70:6 73:3

**print**
218:11
**prior**
7:21 21:8,9 41:4,7 59:11 90:11 92:19 102:9,20 147:25 168:15,19 179:8 191:1 199:4 226:3, 5
**privacy**
32:18
**privilege**
6:1 25:19 29:18 31:10 37:18 79:14 80:12
**privileged**
37:23 44:11 84:14, 18 225:23
**privy**
159:6 199:6
**problem**
14:17 73:18,20 74:25 128:12 227:1
**problems**
129:2
**proceeded**
151:8
**proceedings**
166:16
**process**
32:8 49:8,11 62:10 214:6
**processed**
56:16
**product**
108:21 216:1
**profession**
209:19
**professional**
63:11 121:2 217:2
**professionally**
216:7
**profit**
68:11 69:14 73:8 99:13,17 101:2
**profited**
68:10
**profiting**
36:20
**program**
116:12 119:15,16
**progression**
208:12 209:23
**project**
90:2 91:7 92:22 120:5 194:9
**proper**
34:14 41:15 156:4 157:14
**property**
27:17,18 28:1,11, 20 29:1,10,13 30:6 31:12 32:25 70:23 75:25 76:3,19 80:16,18,20 81:5, 21,22,23 227:9,13, 25 229:5,10,14,16, 23 230:3,9,14,19
**Proposal**
62:10
**propriety**
162:16
**prorated**
12:3
**protect**
155:17
**protocols**
163:21
**proves**
48:12
**provide**
24:4 27:4
**provided**
20:18
**provider**
12:20 13:14 62:11
**publicly**
205:24
**published**
148:6
**punishment**
177:13,16
**purchase**
49:12 68:13
**purchased**
68:12,15 69:13
**purchasing**
60:13 109:3
**purpose**
12:24 70:17,18
**purposes**
4:21,23 144:24 222:4
**pursuant**
24:25 71:7 167:20
**push**
106:19
**pushing**
185:23
**put**
10:19 11:7,8,11,21 18:1,2 39:1,24 42:16 43:2 83:16 97:14,15,20 98:13 118:18 158:7 216:7
**putting**
124:3,6
**pyramidical**
180:18

**Q**

**quantity**
61:9
**quarterback**
123:12
**ques-**
229:9
**question**
7:18 25:18 27:12 28:8 29:5 33:11 41:20 47:17 48:25 71:16 81:9,11 84:17,22,24 86:12 87:2,6,25 115:23 138:7 145:10 148:21 160:1 163:12 167:25 168:11 209:21 225:22 226:3,4,5,9 227:8,12,24 229:2, 3,8,9,21 230:7
**questionable**
61:4
**questioning**
105:23
**questions**
31:9,14 36:2 39:17 62:22 81:20 86:1 110:1 188:16 225:1 231:16,18
**quick**
7:3 127:24 206:24
**quickly**
217:19
**quit**
114:8 115:2,4
**quiz**
184:13

**R**

**racist**
128:20,22
**radar**
101:4
**rails**
14:17
**raise**
39:19 161:23
**raised**
88:12
**raising**
93:21
**Rao**
144:7
**rare**
219:20
**rate**
98:14
**ratings**
140:8
**Ray**
18:13 41:7 47:1,6, 8,18 64:7 66:23 67:10 88:25 93:22 110:11,16,20,21 111:1,7,9,13 112:8 113:4 114:16 116:3,13,20 117:11 119:22 127:25 134:1,2,8 135:15,18 139:16 140:8,25 141:4,10 142:9,16 143:2,15, 16,23 144:1,3,10, 12,24 148:15 150:1 151:17 152:7,12,16 153:8, 16,18,21,22 154:6, 11 155:20 158:5, 13,14,25 165:21, 23,24 166:2,9,14, 24,25 167:3,8,19 168:22,23 169:2,6 170:11,12 171:10, 12 172:5,24 173:1, 12,18 174:10 175:11 176:1,12 177:3,4 178:22 180:16 187:7,11, 14 189:15,20 191:1,5,7 192:8 193:13,14 194:12, 22 195:10,13,17, 18 196:23 198:2,3, 24 200:6,10,15,20 201:5,18,21 202:17,22,25 203:2 205:16,17 206:2,7,20 207:4, 18 214:24,25 215:9,14
**Ray's**
17:7 89:7 172:14 175:19 187:12 192:21 194:13,23 197:1 198:8,11 199:5 203:11 205:16 208:2
**rays**
198:10
**reach**
224:16
**reached**
87:20 89:2,5 91:8,

12 153:11
**read**
12:4 24:18 56:20, 22 57:1 125:2 133:9 141:16 214:4 231:21,23
**reading**
51:7
**ready**
131:3 184:20
**real**
7:2
**realize**
97:1
**realized**
77:25 78:10,11
**reason**
17:9 24:3 36:4,16, 17 70:12 76:17 100:15,16 156:9 169:1 199:5 231:6
**reasoning**
228:11
**reasonings**
200:14
**reasons**
38:4 64:9 123:11 150:5 198:6 200:21,24 211:7
**recall**
10:25 11:15 16:3,4 21:17 23:17 35:20, 22,24 41:2 66:21 75:18 76:22 78:19, 22 79:21 80:2 83:2,12,13,23 84:1 85:8 96:3,4 105:1 108:7,8 109:12,15 110:8 111:16 113:6 126:8,13,14 128:25 137:22,23 138:3 140:7 143:24 144:14 148:3,9,12 151:15 157:21 160:21 162:2,7 165:10 166:3,22,23 173:5, 11 174:13 177:11 178:24 179:19,23, 25 180:1,10 181:3 182:18,21 185:15 187:1 189:19 190:13,15 197:7,8 198:20 199:23 200:15,16 201:11, 13,18,20,25 202:16,19 204:18 212:3,6,15,17 213:2 215:3,23 220:5,7 222:3,7 226:18,19
**recalling**
127:14
**recalls**
174:15
**receive**
117:3,8 205:2,3
**received**
19:2,5 24:22 45:14,22 48:7 52:13 56:15 62:16 117:7 128:15
**receiving**
62:2 117:4 128:16
**recently**
13:3,4
**recess**
188:10 225:5
**reco-**
139:7
**recognize**
12:12
**recognized**
9:23
**recollec-**
172:8
**recollect**
65:24
**recollection**
5:22 6:3,7 11:20 14:12 17:14 40:9 41:3,6 50:13 57:18 58:15 64:5 65:3 66:12 76:11 84:9 105:14 108:6 109:15 110:24 127:14 136:23 138:13 140:10,13, 21 144:13 147:7 150:6,12 154:5,8 171:6 172:8 180:8 183:15 184:21 186:13 187:2 189:5,13,15 190:9, 24 194:22 197:15 199:25 201:5 204:22 206:10,23 207:8,23 208:5 213:15 224:1
**record**
4:8 11:13 24:4 62:15 74:4,5 76:9 124:19 131:7,8,10, 19 133:2 145:10 188:9,12 222:15 225:2,3,4,6
**recuse**
219:3
**red**
180:6
**red-faced**
179:17
**refer**
117:6 134:22 171:1
**reference**
146:12 197:10
**referenced**
33:16 92:2 125:1 134:20 220:2
**referencing**
58:7,8
**referred**
9:17 144:6
**referring**
7:7 9:1 10:14 33:3 41:13 53:24 135:8 149:14,15 150:21 152:10
**refers**
145:4,13
**reflecting**
45:9
**reflective**
140:7
**reflects**
19:7 53:10 133:24
**refresh**
5:21 6:2,7 11:20 109:15
**refrigerator**
35:8 38:21 82:6 231:8,12
**regard**
118:14 183:18
**regard-**
163:3
**register**
227:20
**reiterate**
156:13
**rejecting**
200:11,22 202:11
**related**
6:7 20:2 31:22 33:8 72:10 79:9,11 85:15 218:24
**relates**
49:12 151:7 209:24
**relation**
199:21
**relations**
152:15
**relationship**
63:9 105:21 120:24 177:2 178:20,21 182:25 201:4,17 214:5 218:18,19 219:12
**relationships**
119:22 201:9
**relevant**
77:25 78:3,11,25 79:1,2 85:10 122:9
**relieved**
174:5
**reliving**
152:5
**relocated**
90:15
**remain**
222:1
**remained**
83:8
**remarkably**
124:13 219:5,6
**remember**
6:13 7:4 16:1 38:20 41:4 60:1 63:8 70:4 98:4 104:17,25 105:13 108:11 124:3 126:10,13,16 142:6 147:22 151:10 152:11 156:10 173:19 191:19 194:8 196:21 216:10 226:15
**remembered**
70:5
**remind**
52:12 202:12
**reminded**
152:11
**remove**
140:15,19
**removed**
143:6 144:25 221:11,19
**removing**
81:22
**renovated**
14:22
**renovation**
125:3,19
**reorganization**
112:3,20 210:3
**repeating**
28:8 81:14
**repetitive**
129:16
**replace**
46:6
**report**

17:9 112:12 113:24 114:15,21 115:16,25 116:13 133:16 142:17,20 147:11 157:13,25 162:14 164:5,8 167:20 186:9

**reported** 112:14 113:7 115:1 116:1,2,10 133:1,14 134:1,7 139:20 140:11 143:2,15,16 144:15 157:12,14 158:24 159:4 176:11 196:6

**reporter** 4:8 52:22 54:14 56:8 73:23 74:1,3 97:10 133:3 188:3

**reporting** 112:25 115:15 116:9,20 117:11, 13 135:14,17 140:8,25 141:3,25 142:4 143:19,20, 22 144:1,3,11 180:15,19 187:14 205:18 206:19,20

**reports** 115:21 137:13 141:10 143:25 204:25 205:2

**represent** 4:13

**representation** 5:3,4

**representative** 95:17 156:8

**represented** 4:20,22,25 229:15

**representing** 46:23

**represents** 144:20

**reputa-** 157:2

**reputation** 95:9 98:6

**Request** 62:10

**requesting** 67:11 69:19 93:19

**requests** 66:24 69:18

**requires** 19:22

**rescue** 219:13

**rescues** 219:4

**residence** 89:7 148:24

**residing** 89:24

**resigned** 149:8

**resold** 69:14

**respect** 58:13 157:19 180:14 192:12,13

**respond** 81:25 86:16

**responded** 158:14

**response** 114:25 191:13 207:4

**responsibilities** 132:18 134:16,21 136:1,21

**responsibility** 135:3,19 147:4

**responsible** 135:6,11 136:13, 16 137:10,16,20 138:16 139:9 145:5,15 147:19 222:9

**rest** 158:1 170:5

**restraint** 128:3

**result** 31:20

**retal-** 206:21

**retaliation** 186:7 205:10,12 206:14,16,18 207:5,8

**retired** 190:2

**retirement** 140:3,4

**retiring** 130:8

**retrained** 161:7

**retreat** 184:24 185:2,10 204:24 205:1,2

**returned** 175:7

**revealing** 84:22

**revenue** 17:18 124:7 170:4 171:19 216:15 217:4

**revenue-generating** 171:2

**revenues** 170:10

**review** 5:17 9:7 146:21 168:16 169:4,10, 17,21 207:16

**reviewed** 5:25 7:8,10 9:6 13:4 186:17

**reviewing** 71:9

**reviews** 140:10 169:13 207:11

**RFP** 62:10

**Rick** 154:6,9 165:19

166:1

**right-hand** 50:22

**ring** 60:11 75:15

**risk** 123:21 171:1

**Rocky** 59:9 65:15,22 66:3

**Roddy** 97:16

**role** 93:20 116:11 147:10 199:5,7

**room** 67:19 76:23 103:7 111:17 171:8,9 172:6,7 174:11,12 196:5,9,12,13 203:5 208:2

**Rose** 67:16 70:15

**roster** 96:11

**rotate** 24:16 43:8

**rough** 128:8,19 204:13

**roughly** 55:17 219:11

**round** 159:12,13 160:4,9, 14,15

**rounding** 170:7

**Rowlett** 4:7,11,13 5:23 6:4, 5,24 7:16,20,24 8:1,3,10,13,14,20 10:9 20:11,12,19, 21 23:20 26:6,14 27:21 28:9,15 29:6,7 30:8,13,22 31:6,24 32:1,21 33:12,15 34:16 36:3,11 37:15 39:8 40:4,11,21 42:8 43:18 45:19 48:10

49:23 56:10 70:24 71:20 72:7 73:25 74:5,6,19,22,25 75:1 76:4 79:17 80:3,10,14 81:1,8, 16 82:23 85:1 87:5 88:2 100:22 102:18 103:10 111:11,12 113:12 117:1,15 119:1 122:6 130:25 131:4,7,9,11,15 133:2,13 142:7 163:2 164:25 168:10 175:21 179:10 183:7 188:5,7,11,13 211:20 214:10,21 220:25 224:19,25 225:3,6,8 226:5, 11,14,22 227:1,6, 16 228:25 229:11 230:1,20 231:16, 19,23

**rule** 67:1

**rumored** 156:17

**rumors** 176:15

**run** 162:11

**run-ins** 104:24

**running** 203:22

## S

**sadly** 218:20

**safeguard** 30:6 228:6

**salary** 222:5

**Salcido** 189:21,23 190:7, 11 212:2

**sales**
87:17,21 100:11 123:24 187:22 210:6
**salesperson**
49:3
**Sam**
124:24
**sand**
201:3
**sandbox**
171:17
**sat**
199:16
**Saturday**
210:15 211:4
**Saucedo**
7:23
**save**
106:17 107:19 181:13,25 182:1
**savvy**
42:23
**scale**
58:13
**schedule**
122:17 209:6,7,8
**scheduled**
122:20
**scheduling**
119:19 123:1 208:21
**school**
61:9
**Schramm**
195:2,8 202:20 212:10,15 221:25
**science**
124:9
**Scott**
143:19 154:4,7 159:17 165:17,18 166:1
**Scotty**
144:2
**scratch**
217:13
**screen**
8:16 22:25 45:6 74:17,23 131:16, 21,24,25 226:23, 24
**screenshare**
8:22
**search**
23:12 25:10
**season**
9:16 12:2 59:25 62:12 100:17 124:15,16 125:16, 18,25 126:2,6 161:24 162:11,14, 16,17
**season's**
163:15
**seasoned**
217:1
**seasons**
125:9,13,17
**seat**
64:13 108:18
**seating**
109:12
**seats**
9:18 13:12 14:1 15:4 16:11,12,13 18:1,2,12 19:6 45:15,21 46:5,11, 19 47:9 49:13 57:4 61:5 62:3,13,14 63:5 64:12 72:11 108:18 109:7 124:4,6 166:21 167:6 216:12,15 217:6
**secondary**
12:20 13:14 99:11 145:17,19
**section**
216:17,18,19,20
**sections**
13:12 125:15
**securing**
60:22
**security**
99:24 100:4 161:7
**seeked**
187:5
**select**
63:5 95:24
**selected**
62:13
**selecting**
62:14
**sell**
13:25 14:23 46:4, 11,18 47:8 54:5,11 99:16 100:17 123:14
**selling**
13:12,19 14:1,18, 24 61:12 70:22 97:21 98:24 99:11 123:16,17 211:8
**send**
29:13 40:12,17 42:9 48:8 211:9
**sending**
60:23
**senior**
90:2 94:1 95:23 103:8 116:11 132:14 134:15 139:2 148:7 150:10 152:18 163:20 169:14 179:7 183:11 184:14 186:17,18 197:5 205:23 207:24,25 208:1
**sense**
121:12 161:12 176:14,17
**sensed**
156:24 202:1
**senses**
176:18
**separately**
65:9
**September**
218:11
**sequential**
131:18
**series**
119:20,23 131:16 213:16
**set**
46:7,8,13,21 60:20 98:13 99:8 100:12, 13 130:21
**sets**
98:15 99:3
**setting**
54:23 99:3 216:8
**sexual**
150:22 152:14 159:4 166:6 167:20 176:11 177:1
**sexually**
161:16
**shades**
121:23
**shady**
66:10
**Shangraw**
154:6,9 165:19
**shape**
85:16
**share**
8:16 48:18 64:9 121:3 131:16,21, 25 150:24 151:8 197:24 198:9,19 226:23,24
**shared**
150:18 198:1,5,22 228:20
**sharing**
74:18
**ship**
12:2
**shit**
183:22
**shocked**
105:12
**shoes**
193:1
**shoot**
227:2
**short**
70:9 173:6
**shortcuts**
95:10,11
**shortly**
6:22 84:1 88:7 96:19 111:20,23 154:9 220:21,23
**show**
8:15 12:14 14:20, 23 57:21 66:13 67:4 109:14,21 130:24 131:12 133:23 145:24 223:12
**showed**
9:14 12:12,13,17 35:4 41:2 45:8 71:17,23 72:6,8 98:1 135:5
**showing**
23:5 134:1 135:11
**shown**
67:8,9
**shows**
44:21,24 50:10,25 51:23 52:12 53:3 86:15 134:4,12 135:14,18 136:15 137:9 138:9 147:18
**shut**
224:22
**SID**
139:15 140:1
**side**
50:22 119:6 120:8, 18 124:7 127:17 128:16 139:23 187:22
**sides**
126:23 178:7
**sign**
231:22,23
**signed**
62:4 175:10

**signed-off**
164:15
**significance**
19:4 55:8,23
**significant**
45:25
**significantly**
8:7 69:5 114:1
**Similar**
58:12
**simply**
70:10 86:4
**single**
9:17 67:14,18 125:11 169:14 213:15
**sir**
21:23 22:7 30:23 44:19 50:9 69:12, 15 117:18 199:14
**sit**
15:20 108:9 129:1
**sitting**
109:20 166:21,22, 24 172:17 205:16
**situation**
214:4
**six-page**
8:17
**six-week**
178:14
**size**
75:7
**skew**
63:4
**skills**
118:4,10 119:6 120:17
**skin**
180:4
**sleeve**
109:23 127:23
**small**
39:25 231:12
**smaller**
48:5 58:13
**smell**
16:9
**Smith**
98:18 103:6
**smoking**
32:4
**sneakers**
35:7
**social**
37:1 139:24 228:19
**sold**
16:10,11 17:25 49:19 61:15 68:17 91:22 216:19
**solid**
140:16,17
**solve**
118:17 181:24
**some-**
208:22
**someone's**
145:18
**sooner**
97:13 192:14
**sort**
84:22 115:13 151:20 167:4 173:18 203:4 204:16 207:18
**sorts**
35:9
**sought**
62:13
**sound**
180:2 183:1
**sounded**
92:3
**sounds**
16:22 29:10 30:9 35:13 37:9 103:20 141:24 159:22 178:12 182:24 188:22 198:22 206:16,21 211:12 218:16
**southern**
178:10
**space**
181:14 214:6
**speak**
36:1 52:20 60:19 88:21 195:2
**speaking**
107:11
**spearheaded**
119:19
**special**
194:3,4
**specially**
200:18
**specific**
58:13,17,18 59:14 68:4 81:11 84:5 145:4,14,19 149:15 166:18 222:1
**specifically**
35:12 70:5 77:7,12 90:6 131:19 135:5 151:6 161:23 162:14 226:9
**specifics**
151:10
**speculate**
65:17
**spell**
90:19 92:7
**spent**
121:9
**spider**
176:18
**spirit**
137:21 138:3,12, 22 139:10 166:12
**split**
124:12 169:25
**spoke**
57:5,6,10 89:11 107:4 118:7 141:24 148:14 191:3 194:21,22 204:11
**spoken**
176:8
**sponsorship**
93:17
**sporadic**
223:23
**sport**
61:6,13 67:21 69:2 70:6 73:3 133:19 135:3,11 139:25 143:1,4 145:14,17 147:15
**sports**
90:3,20,21,24 116:21 132:19 134:18,20 135:5,8 136:9 137:11,17 142:23 144:17 145:3,4,11,15 170:6 219:10
**spot**
140:3
**spread**
69:6,8
**spreadsheet**
45:8
**spring**
58:11
**squad**
134:17 137:21 138:3,12,22 139:11
**stadium**
97:24 98:2 107:10 124:25 125:3,16, 19 167:11 202:8
**staff**
15:21 60:25 76:22 128:6 129:8 150:10 152:18 156:19 163:20 169:14 170:13 179:7 183:11 184:14 186:15,17, 18 197:7 198:9 200:18 205:23 206:25 207:1,25 208:6 210:1
**staffer**
111:4
**stages**
185:9
**stake**
171:1
**stand**
88:15 169:16,18 183:16
**stand-**
139:24
**standard**
49:8,10
**stands**
15:6 156:3
**Stanford**
126:12,14,18
**staring**
180:9
**start**
13:2 58:19 77:11 122:13 153:7 166:5 194:10
**started**
15:25 48:4 65:3,9, 14 87:10 88:6,10 96:19 98:5 104:17 105:15 115:7,9 120:13 125:13,14 151:1 152:6 153:22 155:19 173:9 186:2 217:13 225:11
**starting**
93:11 99:25 112:14
**state**
5:5,13 14:16 15:16 21:3 26:25 27:17 32:23 35:11 36:5 39:15 40:13 44:1 45:14,15,21 46:4, 7,10,18,24 54:17 55:14 56:15 57:7 62:7,15 67:23 68:1,10,11 71:7 76:3 80:17,20 81:4 87:15 88:20 91:1,

2,18 92:6,20,24 93:19 94:5,14,15, 18,19 95:15 98:5 102:10 104:12,13 112:18 124:25 126:11 139:8 190:4,7 192:24 199:10 224:11 227:25 228:17 229:4,17

**State's**
81:21 227:15

**stated**
24:4

**statement**
24:8,21 43:14 44:3,21 80:20 114:13

**statements**
23:5 24:13 80:5 82:12 83:21

**stating**
185:16

**stay**
166:25

**stayed**
181:18 185:25 217:24

**staying**
167:1

**steal**
68:8 105:9

**stealing**
30:7,18 32:23 33:3 48:5 97:4,8

**step**
93:23 191:12

**stepped**
215:22

**steps**
35:24

**Steve**
141:3,6,7

**sticks**
176:22

**stipulated**
173:12

**stole**
32:24 33:1 105:10

**stood**
114:23 182:9

**stop**
48:2 62:21 73:10 91:18 152:24 153:21 168:6 173:6 216:20

**stopped**
152:22 163:25 182:13

**stops**
161:8

**storm**
182:20

**stormed**
200:9 212:19,23 213:25

**story**
64:12 123:7 152:3 153:8

**story's**
98:25

**straight**
180:9

**strained**
201:5,19,20

**strange**
59:17 60:3,9 216:22

**strategic**
186:14,16 215:21 217:10

**strategy**
124:8 216:8

**streamlined**
180:23

**stretch**
94:23 178:14

**strike**
51:15 68:23

**strong**
119:12 121:11 128:14 133:5

**stronger**
73:14 117:23

118:15

**strongly**
14:19

**structure**
115:15 116:9,20 146:4 200:23 202:12

**struggle**
124:14 127:20

**struggled**
123:8 127:18

**stub**
227:23 228:1

**stuff**
7:8 92:11 140:9 171:7 183:21 198:5 228:20 231:5

**stunned**
153:16 156:13 181:11

**subsequent**
190:12 200:18

**subsequently**
26:4 67:12 140:4 157:17

**substance**
87:24 183:8,10,13

**suburb**
89:15

**suburbs**
90:6 148:16 149:1

**success**
187:9,10,15

**successor**
217:20

**successor's**
147:9

**Sugar**
67:17

**suggested**
64:2 203:3

**suggestion**
63:15,21

**suite**
107:12

**Sun**
30:5 57:20 62:20 63:17,19,22 64:9 65:15 68:2 91:11 112:3,20 117:22 122:17 129:2 132:4 137:7 139:8 145:14 146:4 148:6 159:9 163:19 167:13 190:4 192:24 197:25 198:2 202:9 217:9 222:11

**sup-**
96:2

**Super**
95:14,16 96:3,6,13 104:4,8 105:2 107:11 108:15

**supervisor**
49:5 122:1 159:1,4 164:5,9 189:2

**supposed**
164:7 185:21

**surprise**
218:10,14

**surprised**
137:24 154:13 156:14

**surreptitious**
13:23,24

**suspicious**
47:23,25

**swap**
108:16

**swapped**
96:25

**swapping**
102:13 103:21,25

**swimming**
135:23 136:17 143:6 145:1 170:18 171:19

**swirled**
170:23

**swirling**
100:1

**sworn**
4:5

**T**

**T-MOBILE**
152:1

**ta-**
121:10

**table**
61:25 118:22 119:3 180:10 192:14 204:15,16 209:14

**take-**
116:14

**takes**
49:4

**taking**
61:7 62:23 70:21 98:22

**talents**
192:12

**talk**
12:25 13:5 35:25 40:22,25 57:12 58:6 91:20,21,22 101:14,17 104:9 106:1 119:5,7 120:12 142:3 156:1,6 159:16 164:7 181:11,19 184:5 185:16,24 191:4,7 195:13 199:6,16 203:1 214:15,17,19

**talked**
57:13 88:24 104:11,12 118:18 120:2 129:4 139:14 152:12 169:23,24 170:9, 12 180:11 197:19, 21 202:5 207:9 212:17 214:23

**talking**
21:21 55:21 59:10 71:23 79:4 91:18 104:8 107:18

118:20 121:10 155:8,10 159:22 176:8

**tasked**
81:22

**team**
73:14 90:8,10 99:2,4 106:11,22 107:2 113:3 117:23 118:15,23 119:24 123:17 126:6 128:18 142:12 148:7 150:8 159:9 187:8 197:5 198:14 208:1

**team's**
99:5 124:19

**teams**
95:25 96:8,13 145:4

**telling**
65:25 105:14 113:6 154:2 156:15 162:3 166:1

**Tempe**
185:8

**temper**
127:24

**ten**
67:1,2,6,11,14 74:2 160:16 172:9 173:25 177:8 188:6,7 206:24

**ten-dayish**
79:23

**tenant**
90:7 91:10

**tend**
130:6 157:4

**tense**
97:17 98:3 166:14 172:22 173:25

**term**
34:14 41:15 61:11 128:10 130:23 170:25 189:25

**terminate**
110:10 113:8 191:16 194:20

**terminated**
34:11 112:7,12,13 146:18,20 148:4 177:4 184:22 189:5 190:6,19 191:17 195:22 197:12 200:5 202:11 212:12 218:7 220:4,10,12, 16,18,23,24 221:3 222:14

**terminating**
204:6

**termination**
9:3 179:1 189:10 190:12 191:1,2 194:13,14,18 197:1,4 200:3 201:6 202:15 205:13 212:16 214:23 215:7,23 230:22

**terms**
17:6 49:7 60:17 75:6 100:4 173:3

**Tesh**
144:2,6

**test**
158:16

**testified**
4:5 51:3 80:17 87:7 100:8 125:5 141:22 142:5 166:4 176:20 195:21 214:22 215:25

**testify**
78:20 223:1

**testimony**
12:7 49:24 51:21 78:12 81:18 86:13 92:20 142:19 178:20 215:23 220:6

**text**
148:17 158:13,15 185:15 218:11,12

**texted**
148:19 158:5 218:16,23 219:2

**texts**
211:4

**thanking**
158:13

**theft**
32:14,19 33:3

**thick**
175:23

**thin**
182:15

**thing**
30:4 43:10 48:18, 19 56:24 60:10 72:17 73:21 91:7, 17 107:23,25 113:7,15 114:1,7, 11,17 115:13 120:3 121:10 130:22 150:13 154:22 156:14 163:25 165:18 167:4 170:1 173:24 182:10 185:18 187:13 191:21 193:16,17 198:4,7 204:2,20, 21 207:11,18 208:13 221:16 222:25

**things**
11:18 14:17 27:8 32:9 35:6,9 38:16, 17,19,23 39:1,16, 18 42:25 54:9,10 57:6 58:11 63:6 68:6,9 70:12 71:3 73:16 78:18 80:15 99:22 118:4,8,9, 11,18,21,22 119:2, 17,25 120:25 121:3,6,7,12,15,16 124:5 126:25 127:25 129:8 130:6,10,17 149:13 150:4 151:5 152:8 156:4, 5 162:8 165:20 166:9,13 171:5,14, 20 180:19,20 182:6 183:17,23 186:7,23,24 187:23 192:11 193:21,23 194:4,5 203:15,24 207:15 210:21 211:9 218:24,25 219:10 230:24 231:1,13, 14

**thinking**
120:13 144:2 186:21 189:11

**thought**
13:13,20 15:1 20:14 21:21 34:24 38:1 39:3 45:24 65:17 76:18 78:5 91:7 95:12 97:21 98:22 100:13 114:10,20 117:22 119:13,14 122:14 124:12,13 126:25 127:9,10 138:1 144:15 156:18,19, 20,21 157:18 161:6 164:2 182:9 188:1 191:11 192:23 195:6 198:7,13 199:24 200:2 216:1,10 217:8 231:9

**Thrashers**
90:10,14

**thread**
216:14

**throw**
37:1

**thumb**
76:5,7

**Thursday**
112:1 184:22 185:13 204:23

**tick-**
127:7

**ticket**
12:20 16:5,22 17:6 18:6 54:8 57:21 64:13 66:24 73:7 76:16 87:17,21 97:2,8,15 98:17 100:2,10 101:6,10 102:20 103:18 108:12,15 109:3 210:6

**ticket-holders**
100:18

**ticket-office**
34:25

**ticketing**
9:16 15:21 17:2 58:9,12 62:11 70:19,20 72:17 95:10,17,18,24 98:20 116:10,15, 21,23 122:3,10 123:17 125:18 127:4,8,9,16 134:18 137:17 142:23 143:1 147:3,9,11 169:25 170:4,6,9,19 171:18 187:21 193:25 198:3,4,23 199:12,17 207:14 208:7,13 210:19 213:20

**ticketings**
95:22

**tickets**
9:16,17 12:2 13:16 14:18 15:11 16:10 20:2 45:14 46:5, 11,19 47:9 48:6 49:12 57:22 58:14, 23 59:18 60:3,14, 22 61:7,9,19 64:16 66:16,24 67:6,11, 14,20 68:13,17 69:3,4,14,19,20,24 70:6,16 71:4 79:9, 11 86:19,23 87:22 96:8,13,15,18,22, 25 97:4,8,20,22,

23,24 98:2 99:2,4 102:10 103:24 105:9,11 106:8,14 108:8 123:14,15 124:6 216:23

**tie**
155:23 160:23 161:10

**tied**
153:25

**tieing**
158:8

**time**
10:1,21 11:17,23 12:23 16:7 17:5 18:13,15 21:9 26:4 33:9 35:20 36:13 38:7,8 39:20 41:16 42:24 44:14 45:20 47:24 48:2 53:12, 17 55:11,15,21 59:21 60:7,16 61:5,7 63:25 65:3 67:10 73:6 77:11 78:2 80:1 81:3 83:7,8,19 84:10 85:9,17 88:24 89:4,11 93:9 96:7 98:11,18 99:24 101:20 104:10 105:14,18 107:7 110:7 112:2,11,13 113:25 114:14 121:9 125:8 127:11,12 129:11 133:1,14,18 136:24 140:23 141:20 142:3 143:5 148:14,19 150:25 154:14 165:12 168:9 169:8,9 170:20 176:9 179:3 181:16,17 182:2 190:6 196:11 198:24 201:10,14, 15 202:19 204:20 205:9,11,14 208:8 214:15 215:13,19 217:18 218:4,6,16 221:19 222:2 223:13 229:5 230:15,17 231:20

**time-consuming**
93:20

**times**
94:11 128:17 129:18,23,24 181:12 197:19,21 210:20 213:11

**timing**
45:25

**tipped**
215:11

**titanium**
178:6

**title**
93:12 94:1 117:8

**today**
4:14,17 5:7 9:6,7 22:10,12 88:22 89:20 109:13 118:8 211:6

**told**
10:1 25:5 35:23 37:17 38:1,13 39:22 41:7 47:1,5 49:14 59:19,22 60:21 63:2,6 81:2 86:11 88:17 99:15 105:7 106:4,16 107:18 108:19,24 111:16,18 113:5, 13 151:11,14,22 153:6,8 154:7,8 155:2 156:12,22 157:25 159:5,8,15 160:19 161:19,20 164:4,6,8 165:3,4, 13,16,18,20,23,25 166:3 173:16 174:14 187:2,3,9 191:8,14 192:5 196:4 198:3 201:25 202:10 212:18,20 213:1 215:14 219:3 220:15,17,20,22, 23 221:7,23,25 222:3 226:18

**tone**
180:4

**too-little-too-late**
191:21

**top**
10:17,20 23:9,21 43:21 44:7 50:5 55:5,19,22 56:8, 12,13 85:3

**topic**
189:9

**total**
9:18 45:9,12,13 51:7

**totality**
48:20

**totally**
212:8

**touch**
178:6,7

**touched**
151:23 152:2,25 153:1 155:7,9 161:19

**tough**
14:15 126:16 130:9,16 177:14 206:21

**tournament**
152:1 157:18 159:25 160:3,4,14, 15

**town**
177:7

**traditional**
139:25

**trailer**
95:21

**training**
164:4

**trans-**
194:1

**transaction**
37:5 45:1,3 46:2 48:1,5,7 49:4,7 54:3,7 55:16 57:4 61:18,22 73:2,8 76:8 77:7,12,16 194:2

**transactions**
36:19 61:4 66:10 71:1 79:3,9,11

**transferred**
139:11

**transformational**
194:2

**travel**
132:18 137:10

**traveled**
213:15,19 219:13

**traveling**
145:18

**travels**
213:6

**tremendous**
119:8

**trial**
31:8

**trip**
113:2 142:15 178:15

**trouble**
13:11,12 14:1,12

**true**
67:12 122:22 162:15 173:15

**trust**
73:20 105:22 107:23 108:3,7,24 109:11,18 110:4,7 126:24 129:5 192:11 197:19,21

**trusted**
198:8

**Tucson**
161:3

**Tudor**
59:21

**Tulsa**
159:13

**turn**
158:12

**turnaround**
63:19

**turned**
49:20 71:22 181:8

**turning**
61:12

**two-hour**
5:8

**two-week**
159:23 160:2,13

**two-weekish**
79:23

**two-year**
62:8

**twofold**
216:11

**type**
130:22 183:21

**types**
7:7 171:20 211:10

**typically**
70:17

**U**

**ultimately**
15:3,11 16:10 17:7 18:12 47:5

**Um-hmm**
54:1 71:21 106:5 141:14 142:8 163:24 165:15 184:3 201:24 202:23 207:20 209:5 210:4

**un-**
149:23

**unaware**
176:11

**uncommon**
211:12 213:3,18, 21,24

**uncovered**
62:2,15

**undated**
147:16

**under-**
101:9
**underneath**
82:22
**understand**
5:24 13:6 29:8,12 32:2,7,15 37:25 42:25 43:4 46:16 47:16 48:20 50:23 54:6 56:15 72:25 73:1 80:4 81:18 84:4 85:13 86:4,10 91:17 92:19 99:1 100:8 110:3 113:24 116:7 138:6 144:10 154:16,17,21 161:10 192:4,21, 22,25 193:13,23, 25 196:6,8 203:10 225:15 226:2 229:1 231:8,10
**understanding**
5:2 12:5 30:18 39:13 43:19 85:22 88:1 101:1 110:9, 17,18 134:6 135:7 136:1,20 140:7 145:3,13 175:8,18 191:23 197:3
**understood**
15:7 43:5 85:21 106:25 111:6 134:21 153:24 217:1 220:3 228:14
**unfair**
181:18 182:11
**unfortunate**
95:19 153:23 155:3 191:10 204:1
**unheard**
98:14 99:6 101:11
**university**
5:5 15:16 21:3,4 26:25 32:18 40:13 44:1 45:16 46:11, 18,24 60:20 65:15 67:23 68:2 71:8 87:15 88:21 91:1,3 92:25 94:5 139:8 152:13,17 190:3,4, 8 199:10 224:11 227:25 229:5
**University's**
229:17
**unravel**
54:9
**unravelled**
55:17
**upbringing**
130:5
**upcoming**
186:16,22
**upset**
98:12,19 99:1,6,8 100:9 101:2 103:18 114:3 155:18 170:21 171:24 179:17,21 180:3,5,24 186:2 189:18 192:8 193:16 206:17 207:2 214:4
**upside**
43:8 187:22

**V**

**vacation**
60:7 66:12 145:18 177:7 178:15
**vague**
173:3
**variety**
123:18
**Vegas**
124:24 150:20 151:7 152:2
**vent**
214:6
**version**
137:6
**versus**
81:21
**vertical**
133:24,25
**vice**
103:8
**victim**
163:13
**victims**
161:23 162:13
**view**
17:13 32:13 63:5 66:15 116:18 117:2,3,10 119:15 121:15 122:8 127:20 129:1 130:1 162:15 181:15,17 208:23 214:25
**viewer**
24:16
**views**
16:4
**vis**
86:23 87:16,21 122:10
**visibly**
207:2
**vision**
91:22
**vivid**
9:18 15:4 16:11,12 18:12 19:2,6 20:2 45:15,21 46:5,11, 19 47:9 48:7 49:13 51:13,23,25 53:25 54:2,16,19 55:14, 16 57:4,21 61:5 62:3,8,13,14 63:5 64:12 72:11 75:23 77:16 108:18 109:7 165:17
**vividly**
160:22
**voice**
14:7 15:14 193:3
**voiced**
15:20
**volition**
84:16 222:4
**volume**
60:14 176:5

**W**

**wait**
56:21 104:7 163:14 182:2 184:5 214:18
**waited**
157:10 161:2
**waiting**
157:16 162:16
**Wakely**
59:21 222:10
**walk**
64:4 181:7 182:19 183:25
**walked**
27:9 114:22 153:10 157:24 181:5 182:13 186:19 207:24 208:1 220:22
**walking**
203:18
**wall**
148:11 175:25
**walls**
175:22 182:15
**wanted**
11:13 17:15 25:3 36:17,22 37:17 38:4,6 70:8 73:13 76:17 77:15 93:20 100:16 158:5 185:17 186:2,8 228:7,11
**Washington**
152:13,17
**watch**
99:21 107:24,25 203:25
**watched**
202:3
**watching**
118:19
**ways**
106:14
**wear**
153:1,6 161:16 178:5
**Wear's**
176:11,25
**Webb**
141:3,6,7
**week**
9:8 66:13 112:10, 16 115:18 150:4 159:10 160:3,4,16 168:24,25 177:6,8
**weekend**
70:15
**weeks**
26:5 115:14 120:21 178:13,17, 18
**weighed**
18:4
**weight**
63:18
**weird**
166:25
**welcoming**
185:13
**well-prepared**
186:24
**whatnot**
189:19
**whatsoever**
114:15
**wheel**
59:6
**white**
31:11 97:16 121:23
**whoever's**
42:23
**wife**
151:22 152:22,25 153:2 155:7,9,13 157:19 161:3,5,20
**wife's**
177:21

**wild**
98:23
**win**
126:7
**wind**
177:21,25
**window**
159:23 160:2,13
**windy**
178:2
**winning**
160:23
**Winnipeg**
90:15
**withdraw**
7:15 51:21 75:8 94:3
**withdrawal**
23:6 53:8
**withdrawn**
4:21 21:13 26:8 27:4 37:10 43:24 46:3,24 57:14 74:11 111:11 112:18,23 115:25 141:21 158:24 168:19 176:23 194:12 195:20 204:4 205:10 218:5 220:16 223:7 224:9 225:18,19
**witnessed**
197:17
**women**
161:15
**women's**
135:22,23 136:17
**won**
119:24 126:10,11 159:12 211:1
**wondering**
35:5 48:1 98:4 102:3 166:8
**wonky**
141:7,8
**word**
178:2 191:20 192:17 205:12 217:5
**wording**
151:23
**words**
17:18 56:22 65:23,24 114:23 143:3 166:10 171:16 176:2,7 182:20 187:9 198:11
**wore**
127:22
**work**
13:1 89:8 96:1 114:8 115:5 118:5,6 120:20,21,22 121:9 125:12 170:13 178:15 181:21 187:8,23 193:20 194:8 204:9 216:1,9 218:18,25
**work-**
94:12
**workday**
64:5
**worked**
49:3 73:7 91:9 94:8,9,10 118:9 121:7
**working**
89:6,16,17 93:16 94:13 113:20 114:4 118:13 120:8 150:9 173:9 184:25 185:9 194:10
**workplace**
129:2
**worry**
102:5
**worse**
54:9 106:22 126:19
**wound**
55:14 62:14
**wow**
89:1 90:17 93:14
**write**
45:15 84:3
**written**
19:3
**wrong**
21:20 32:10 36:13 56:3,4 86:22 155:4,11 187:18 200:1 201:23 211:3
**wrongdoing**
62:18,25 72:9,10,16 86:9,15 87:16
**wrote**
12:8 45:21

**Y**

**year**
11:17 13:13 14:22 17:22 41:7 53:12,17 59:10,11 70:10 105:16 123:8,24 124:20 125:8,20,23 126:12 151:3 169:7,17 177:20 186:16,22 190:2 208:17 209:2
**Year's**
89:2,4
**years**
30:3,19 55:20 57:10 71:19 73:6 85:18 90:12 93:5 94:11 101:11 104:12 106:8 107:5,6 110:23 120:6,16 139:7 147:25 148:25 162:5 199:25 203:24 209:9
**yell**
181:20
**yelled**
181:12
**yelling**
210:11,12
**yield**
207:18

**Z**

**Zoom**
169:3
**zoomed**
135:10

# EXHIBIT 4

# In the Matter of:

*Cohen*

*vs*

***Arizona Board of Regents, and Anderson***

---

*James Jay Heiler*

*December 5, 2023*

---

GRIFFIN GROUP
INTERNATIONAL
3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

DAVID COHEN,
Plaintiff,
vs.
ARIZONA BOARD OF REGENTS AND RAYMOND ANDERSON,
Defendants.

No. 2:21-CV-01778-GMS

DEPOSITION OF JAMES JAY HEILER

Phoenix, Arizona
December 5, 2023
3:09 p.m.

REPORTED BY:
CINDY BACHMAN, CR
Certified Reporter
Certificate No. 50763

PREPARED FOR:
ASCII/CONDENSED
(Certified Copy)

I N D E X

WITNESS Page

JAMES JAY HEILER

EXAMINATION BY MR. ROWLETT....................4

EXAMINATION BY MR. McKIRGAN.................60

* * * * * *

E X H I B I T S

| Deposition Exhibits: | Description | Page |
|---|---|---|
| | (No exhibits were marked.) | |

DEPOSITION OF JAMES JAY HEILER,

was taken on December 5, 2023, commencing at 3:09 p.m., at the law offices of MILLER, PITT, FELDMAN & McANALLY, P.C., 2800 North Central Avenue, Suite 840, Phoenix, Arizona, before CINDY BACHMAN, a Certified Reporter, Certificate No. 50763, for the State of Arizona.

COUNSEL APPEARING:

For the Plaintiff:

PEREZ VAUGH & FEASBY
BY: Christopher W. Rowlett, Esq.
600 B Street
Suite 2100
San Diego, California 92101

For the Defendants:

PAPETTI SAMUELS WEISS McKIRGAN
BY: Robert H. McKirgan, Esq.
Jennifer Lee-Cota, Esq.
16430 North Scottsdale Road
Suite 290
Scottsdale, Arizona 85254

ALSO PRESENT:

David Cohen, Plaintiff
Kwan Piensook, Esq., Assistant General Counsel for Arizona State University

JAMES JAY HEILER,

a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. ROWLETT:

Q. Mr. Heiler, good afternoon. How are you?

**A. I'm fine. How are you?**

Q. I'm well. Thank you.

My name is Chris Rowlett. I'm an attorney for Mr. Cohen. We just met for the first time a few moments ago. Is that correct?

**A. Yes, sir.**

Q. I'm going to ask you some questions today about some events that happened about two to three years ago, involving Mr. Cohen and the termination of his employment from Arizona State University. Do you understand that?

**A. Yes.**

Q. What did you do to prepare for today's deposition?

**A. I spoke with counsel for the University for a little while yesterday afternoon.**

Q. About how long did you talk to counsel?

A. **Oh, about 45 minutes.**
Q. Did you look at any documents in preparation for today's deposition?
A. **No.**
Q. Did you go back through your cell phone and look at any communications you had with Mr. Cohen over the years in preparation for today's deposition?
A. **I tried to do that. And then I tried to do the same thing with regard to President Crow at the University, but I think it must have been too remote in time so there was nothing there that I could find.**
Q. You were unable to find any communications with either Mr. Cohen or Dr. Crow. Is that correct?
A. **No, not in my text messages.**
Q. Okay. Did you ever have any email exchanges --
A. **I did find some with Dave. Excuse me. I want to be clear, but they weren't about this. They were more recent in time. Other things that we had texted about.**
Q. Things like maybe golf, for example?
A. **Yeah.**
Q. Important things.
A. **I can actually look at it, if you want me to.**
Q. No, not now.
A. **I can't remember what they were, but...**

Q. It's all right. We can get to that later.
Mr. Heiler, have you been deposed before?
**A. I don't believe I have.**
Q. Okay. Have you ever testified in any legal proceeding of any kind?
**A. A legal proceeding of any kind. That's a broad definition.**
Q. So have you ever participated in --
**A. I testified in front of many legislative committees. I've conducted a deposition or two. But I don't believe I've ever testified in a legal proceeding. Well, actually, I remember I did testify in a legal proceeding once. It was a personal matter involving a piece of property.**
Q. A real estate dispute?
**A. No. It was a horse, actually.**
Q. Oh, when was that?
**A. Decades ago. It was a stallion that my father owned that was brought out here to Arizona. I grew up on a horse farm. And it led to a dispute with the family. He had entered into an agreement to stand the horse it stud with. And so it was a writ of replevin proceeding to recover the horse. So that's the only one that comes to mind right now.**
Q. Okay. And that was 30 years ago?

**A. Yeah. That was back when I was in law school, I think. More than 30 years ago.**

Q. You graduated law school in 1986?

**A. Correct.**

Q. And you graduated from what university?

**A. From what?**

Q. What university?

**A. Oh, from Arizona State.**

Q. And is that where you got your undergraduate degree as well?

**A. Yes.**

Q. Okay. What about an arbitration -- well, did that go to trial, your writ of --

**A. Writ of replevin. It's a writ used to recover property, which I learned back at the time. And I think it was -- I don't think it was a trial. I think it was just a hearing before a court as to whether to issue the writ.**

Q. Well, it's been a while since you've testified, so I'm going to go over a couple of the ground rules.

**A. Okay.**

Q. Again, I know that you were -- you were a practicing attorney for a while, correct?

**A. Yes.**

Q. And so you may have even taken some depositions

in your time. Is that correct?

**A. Yes. In my early stretch as an assistant attorney general, I recall taking a deposition or two in criminal matters, not civil. But I don't believe I ever took any in civil matters.**

**I practiced more recently at Beus Gilbert, which is a firm here in town, for a couple of years from -- actually, when these events were unfolding, from 2018 to 2020.**

Q. Okay. You were a practicing attorney at the time?

**A. I was.**

Q. Were you a litigator?

**A. Yes, in some respects. Although, in those two years, I did not end up actually carrying on a litigation. Some preliminary steps and some motion practice. So litigation at that level, but nothing in the courthouse.**

**There was one hearing I participated in over Zoom during COVID.**

Q. So you are familiar, generally, with the process, but let me go over a couple of the ground rules just so we're on the same page.

You understand that the oath that you were just administered is the same oath that you would take

if you were in a court of law. Is that correct?

**A. Yes.**

Q. And you understand that the court reporter is recording everything that we say, everything that's said in this room. Do you understand that?

**A. Yes.**

Q. At the end of this process, after a few weeks, you'll be given a copy of the transcript of today's proceedings. Do you understand that?

**A. Yes.**

Q. At the time, you'll be given an opportunity to review and make any necessary corrections to that transcript. Do you understand that?

**A. Yes.**

Q. Now, if you make corrections like, oh, that was the wrong date or actually that person's name is spelled this way, not that way, that's totally fine. That happens.

If you change answers from "yes" to "no" or make more substantive changes, that can be used to comment on your credibility at the time at trial. Do you understand that?

**A. Yes.**

Q. Okay. You're doing an excellent job of this so far, but we've got to make sure we don't talk over each

other so that we can get a clean record of today's proceedings. Do you understand that?

**A. Yes.**

Q. You're also doing a great job giving audible responses. Please continue with that. The "uh-huhs" or "huh-uhs" work well for us, but they don't work so well for the court reporter. Do you understand that?

**A. Understood.**

Q. Is there anything -- I'll withdraw.

Are you under the influence of any medication that would affect your ability to give your best testimony today?

**A. No. I may take a cough drop somewhere along the way.**

Q. And I do have some mints here, if that helps you as well.

**A. Yeah. I apologize for my raspy voice. I'm getting over a cold.**

Q. Thank you. No apology necessary.

Although I don't believe this will take us very long, this is not meant to be some kind of torture session. If you'd like a break, please ask for one and we'll take a break. You can use the restroom, talk to your attorney, do whatever you need to do. Do you understand that?

**A. Yes.**
Q. The only thing I ask though is that if there's a question pending, answer the question, then you can take your break and talk about it. But if there's not a question pending, you let me know when you want to take a break, and we'll take a break. All right?
**A. I don't think I'll need a break.**
Q. I don't think so either. I don't think it's going to take that long.
And if you don't understand me or if I ask a bad question, which will happen probably within the next three minutes, ask me to repeat it or ask me to rephrase it. I'm happy to do so.
But if you answer it, I won't know that you didn't understand it. Does that make sense?
**A. Yes.**
Q. Okay. What did you study as an undergrad at Arizona State University?
**A. Journalism.**
Q. And you graduated what year?
**A. Undergrad?**
Q. Yeah.
**A. 1983.**
Q. And then you went back and graduated law school in 1986?

A. Correct.

Q. What positions -- I don't want to go through your work history because it's not entirely relevant. But I do want to know, thumbnail sketch, what have you done since graduating law school that led you to be a regent for the Arizona Board of Regency?

A. Yeah. I moved from various theaters of law and journalism and public policy and business preceding my appointment to the board, which I think was in 2012.

And so when I finished law school, I became an assistant attorney general in the organized crime and racketeering division of that office, in the Arizona Attorney General's Office.

And then a few years after that, I went back into journalism and accepted a position as the assistant editor of the editorial pages of the Richmond Times-Dispatch in Richmond, Virginia.

Then I went into business for a year up inside the beltway in Northern Virginia with some friends in a technology company in the environmental testing field.

And then a year later, I came back to Arizona and took a position in the office of the governor as a special assistant for policy development. And my responsibility, my billet, there was to direct

policy for the executive branch in Arizona.

Q. What time frame were you with --

A. That was in 1992, when I went to work in the governor's office, May of '92. And I worked there until that governor left office in the fall of 1997. At which point, I had become the chief of staff to the governor.

I then opened a lone wolf consulting practice that I supported my family through really up until going to work at Buis Gilbert in 2018. And I brought some of that practice into the law firm there with me, some of those clients.

And then in 2020, along the way there, back around 2001, 2002, I co-founded a charter school organization called Great Hearts Academies and began to replicate a classical liberal arts educational model in the Phoenix metro area.

And then about a decade later, also exported that model to the state of Texas and began to replicate those schools there.

And so I'm now doing that full time. In 2020, I went inside, in-house, full time at Great Hearts and became the chief executive instead of the board chair, which is what I had been since founding the organization in 2002.

Q. And that brings us up to today's date.

**A. As of today, I am the chief executive at Great Hearts. Yes, sir.**

Q. Thank you, Mr. Heiler.

So highlights. Before '92, you were at a newspaper and the attorney general's office doing some business work. '92 to '97, you're at the governor's office for the state of Arizona.

**A. Correct.**

Q. Then you have your consulting practice that you run from '97 through 2018.

**A. Yeah. There was one stretch where I brought that inside a firm based in D.C. for, I think, about three years, and then I exited that firm and went back on my own again.**

Q. Okay. And then in the 2011-2012 time frame, you were appointed by the governor to be a regent for the Arizona Board of Regency.

**A. By Governor Brewer, yes.**

Q. And I believe -- correct me if I'm wrong, but I believe you were appointed in 2011 and your tenure began in 2012. Is that correct?

**A. Yeah. After Senate confirmation is when you officially become a regent.**

Q. What were your duties and responsibilities as a

regent of the Arizona Board of Regents?

**A. Governance over the --**

Q. Let me rephrase there. I think I'm using the wrong phrase. You're not a regent of the Arizona Board of Regents. You may be a member of the Arizona Board of Regents. What's the right terminology?

**A. Well, you're a regent. And as a regent, you're a member of that board, yes. Which in Arizona oversees all three of the state universities, as opposed to the model in many states where a board just oversees a single university.**

**And so our responsibilities on the Board of Regents, we're to act as the governors of all three state universities and exercise oversight of their presidents hire/fire, compensate their presidents, all the usual fiduciary responsibilities of a board pertaining to all three state schools.**

Q. Okay. Other than hiring, firing, overseeing presidents, what other duties and responsibilities does the Arizona Board of Regents have in terms of managing the day-to-day function of the three public universities in Arizona?

**A. It has governance responsibilities and fiduciary responsibilities to oversee the operations within universities in a way to keep them solvent, to**

keep them running within State statute, to audit them, see to it that their audits are performed and come back unqualified or corrected, if necessary, and so forth.

So the normal governance responsibilities of a not-for-profit or the universities' not-for-profit organizations. And so it's all those things that are normally thought to be encompassed by governance and fiduciary responsibility.

Q. Does that include compensation packages for certain employees of those universities?

A. Large contract employees, such as coaches of significant sports, yeah. There's a set of policies pertaining to that, Chris. I'm not sure -- I can't remember exactly what they are. But the practice was that the contracts, large contracts, for highly paid employees, such as coaches of major sports and athletic directors, would come before the board for approval.

Q. Okay.

A. And I believe that's grounded in some policy that the board has established as to what employment engagements require its approval.

Q. Okay. And what about the termination of those contracts, does that come before the Board of Regents as well?

A. Yes, I believe it does.

Q. You're aware that from, let's say, roughly 2014 through the end of 2019, Mr. Dave Cohen, who's seated here next to me, was an employee of Arizona State University, correct?

**A. Correct.**

Q. As a regent or a member of the Board of Regents, would you have had any involvement in the hiring of Mr. Dave Cohen?

**A. No.**

Q. That was beneath the level of the contracts that rose to the regents. Is that correct?

**A. That's correct.**

Q. Okay. What about the termination of Dave Cohen? Dave Cohen's employment was terminated, let's say, in December of 2019. Would the Arizona Board of Regents have any involvement in the decision to terminate Dave Cohen in December of 2019?

**A. No.**

Q. Okay. Did any of the work -- withdrawn.

During your time as a member of the Board of Regents, did any of those highly paid coach contracts or other contracts bubble up to the Arizona Board of Regents? Did they come to your attention in that time period?

**A. In every case, yes.**

Q. For example, the basketball --
**A. Basketball coaches, football coaches, and athletic directors. And then I believe the women's basketball coach would also come up. I think it would have something to do with both the amount of the compensation and the multi-year contracts that were typically involved with hiring those personnel, which is probably what would implicate the regent policy of what would have to be approved by the board.**
Q. Okay. Do you recall the hiring of Bobby Hurley during --
**A. Yes.**
Q. -- your time at the Arizona Board of Regents?
**A. Yes. Sorry. I spoke over you there. I didn't know you weren't finished.**
Q. Yeah, I should have been.
Do you remember what year Mr. Hurley was hired?
**A. Not right off the top of my head, but I think I could figure it out. I think it was probably around 2014, I'm thinking, because it was a couple of years after I joined the board.**
Q. That's not germane. I'm not trying to --
**A. It would have been '14 or '15, somewhere in there.**

Q. Okay. And what was your involvement with the hiring of Bobby Hurley as the men's basketball coach for Arizona State University?

**A. I was not directly involved with the hiring. I guess I would say I was involved in the lead-up to the hiring in some respects with regard to the basketball program prior to that time and activities around the preceding coach's contract and contract renewal.**

**And so I was involved indirectly in that regard, in the circumstances leading up to Coach Hurley's hiring, but I was not involved in the hiring process itself that resulted in Coach Hurley being named the new basketball coach.**

Q. Can you give me some more detail about your involvement in the lead-up to the hiring of the preceding coach? I don't know what you mean by that.

**A. The administration at the university came to the Board of Regents in what I considered to be an unorthodox time frame, seeking the renewal of Coach Hurley's predecessor, seeking an extension of his contract in very close proximity to the beginning of the new basketball season.**

**Typically, those extensions are brought to the board in the spring, immediately following the**

conclusion of the preceding basketball season.

I was the regent that was sort of unofficially expected by the other regents to be paying closer attention to athletic matters, and so this was not an untypical thing. So I objected to that. At the point at which the university brought forward that contract extension, I did not think it was in the best interests of the university.

And so in my fiduciary obligation as a regent, I made that view known. And so there ensued a discussion between myself and the university administration about how that process was going to proceed.

It ultimately culminated in a revised proposal for an extension of that coach that was significantly different from their original proposal, which I nevertheless voted against, but I did not seek to persuade other regents to join me in voting against it. And so they were able to extend that coach for one year, as I recall, if I'm recalling that correctly, as opposed to another three or four years. And then the following season, the coach was fired.

And that's actually the context in which I first became aware of Dave, because he had joined the athletic program at some point and was given an

**assignment to analyze the basketball program and make recommendations around it. And so I had not met Dave, but I was informed that that was going on and later came to find out that that was Dave who was doing that.**

Q. Did Mr. Cohen produce some kind of work product or some kind of draft analysis that you were able to review?

**A. He did.**

Q. And was that analysis helpful to you?

**A. It was informative, and it reflected some of my own observations that I had made about the basketball program from a much greater distance. And it was provided to me in confidence to review.**

Q. And was the recommendation of Dave's analysis that the prior basketball coach -- withdrawn.

Was it Dave's recommendation, based on his analysis, that the basketball program, the men's basketball program, at Arizona State needed to move on from the prior coach?

**A. Yeah. I recall it as a balanced and incisive analysis, concluding that there were a number of positive things to be credited to the coach and some bright spots, but that the coach was not likely to be able to significantly elevate the program beyond its level of performance theretofore. And that was sort of**

**my view at the time as well.**

Q. And then, obviously, when that coach is terminated, a search is conducted for the new men's basketball coach. Is that correct?

**A. There was a search conducted, I believe. As I say, I wasn't part of that. But I think I recall that there was some sort of search conducted. I don't know if it involved a search firm or who was leading it, but I know there was a search of some definition.**

Q. Do you know how many candidates were considered or looked at before they ultimately arrived at Bobby Hurley?

**A. I do not.**

Q. Was Mr. Hurley's contract one of those contracts that is brought before the Arizona Board of Regents for approval?

**A. Yes.**

Q. Okay. Did you have any conversations -- withdrawn.

When was the first time you remember meeting Dave? It would have been in and around this time frame, but when was that?

**A. I met Dave, I believe, for the first time at a charitable event that was held annually at the time in Phoenix. I don't know if it still is or not. If I'm**

recalling correctly what the event was, it was called Fight Night.

I was introduced to him by someone and I recognized his name, and he recognized my name at that point, I think, as well. And so that was, I think, our first meeting.

Q. Okay. What was your assessment of Dave? What was your opinion of Dave on that first meeting?

A. Very high. I was very pleased to meet him, and I felt he had given the university very good advice. And we became fast friends.

Q. How did your relationship with Dave develop from that first time to when you considered him fast friends? How did that develop?

A. We just had a lot of common interests. Obviously, ASU sports and basketball, in particular.

Golf, we played a lot of golf together. A lot. I mean, for me, it was a lot, given the time constraints always bearing down.

But we just enjoyed each other's company, played golf, shared views about things going on mostly in the sporting world. And just became friends.

Which was -- I guess I should say that's not -- I had much more contact with Dave than I normally would with an employee of the university,

**because we became friends. So the nature of our relationship was not as a regent engaging with an employee. It was more of just two people who became friends, who also happened to have that connection around the university with Dave's employment there and my position as a regent.**

Q. That's helpful. Thank you.

So in March of 2019, the men's basketball team participated in the Pac 12 tournament in Las Vegas, Nevada. Is that correct?

**A. That's correct.**

Q. And at that event -- well, let me withdraw.

Before March of 2019, had you ever heard of a gentleman named Bart Wear?

**A. I had, and I had met him on several occasions at basketball events. And I believe I first met him at a reception at his home that he hosted after Coach Hurley was hired. And so I was at his home on that occasion and, I believe, met him there and then ran into him various times at sporting events.**

Q. From your perspective as a regent and member of the Board of Regents at the time, who was Bart Wear and what was his relationship to the Arizona State University?

**A. He was a supporter of the athletic program.**

**So I believe my recollection was that I was told he had a background in the financial services industry and that he was a financial supporter at some level of ASU athletics.**

Q. If I use the word "booster," is that, in your mind, synonymous with a financial supporter of an athletic department?

**A. It's commonly used to connotate that, yes.**

Q. So Mr. Wear, at least when you became aware of him at the time, was an Arizona State athletics booster. Is that fair?

**A. Yes, you could use that word, if you wanted to.**

Q. Was he a fairly significant financial supporter/booster/donor of the department?

**A. I was unaware.**

MR. McKIRGAN: Form.

So I may make an objection, but still answer the question, unless I tell you not to.

So I'm just going to object to form.

BY MR. ROWLETT:

Q. Go ahead.

**A. I was not aware at what level he was a donor to the university. I didn't have that information.**

Q. Did you form any opinions or views of Mr. Wear in those occasions that you met him --

A. I did.
Q. -- before March of 2019?
A. I did.
Q. Where those views and opinions?
A. He struck me as a very boisterous personality and more so when alcohol was involved in the social setting. And, you know, very friendly, very garrulous, and engaging. But boisterous and better off avoided if it seemed like he had been having a cocktail or two.
Q. Did you have any conversations with anyone at the time about Mr. Wear and your views of him?
A. No, not that I recall until Dave informed me of the events involving Mr. Wear. That was the first time I recall discussing him with anybody.
Q. Okay. Let's get to those events. What did Dave tell you about Mr. Wear's conduct in March of 2019?
A. Well, I can't remember timelines as to exactly when, because we had many conversations around some stretch of time, and it all kind of runs together in my head at this point.
But Dave shared with me that Mr. Wear had inappropriately encroached on his wife's space and inappropriately touched her. And then informed me that he believed he had done it with several others as well

**in some fashion, inappropriately touched or touched at least in an unwanted way, I guess I should say.**

**And so that was the first I learned of anything about that, pertaining to Mr. Wear.**

Q. Did it surprise you to hear that Mr. Wear had acted in this way?

**A. Yeah, I guess it surprised me a bit. You know, I hadn't taken him for a bad person. As I said, I just took him for a very boisterous, garrulous person who was not above having maybe one too many now and then in certain social settings.**

**So I didn't really read him much beyond that one way or the other. So I guess I would be surprised about that, learning about anyone that I hadn't already suspected it of or had reason to suspect it.**

Q. Did Dave tell you what he did in response to learning of the inappropriate conduct?

**A. He did. He told me that he had reported it to his supervisor, Ray Anderson, and requested that something be done about it.**

Q. Did he convey any specifics or any more details about the reporting to his supervisor?

**A. Yeah, I'm sure he did. I can't recall a lot of details about that. But we spoke about it, you know,**

in some amount of detail. And so I think what he relayed to me was that he had asked that something be done about Mr. Wear, and as I recall, he was awaiting for some time period in there an outcome about that.

And then Dave, as I recall, became increasingly disappointed, increasingly irritated as time went on. And as he was reporting to me, nothing was happening.

Q. Okay. And he was conveying his increased frustration to you at the lack of -- or at least his perceived lack of action by Arizona State?

A. Yes.

Q. Did you do anything with his information when you received it?

A. I did.

Q. What did you do with that information?

A. In some sequence of time, I can't remember exactly which, I spoke to Michael Crow, the president of the university, about it. That may have come later, in more of the early proximity to events.

I spoke with Rick Shangraw, who was then the -- I guess, at that point, he was the head of a foundation. But he was somebody that I understood to have full access to Michael, to talk with Michael about anything going on at the university. He and Michael,

you know, had been very close for a long time.

And so I had conversations with him about it as well. And both of us believed it was something that the university needed to take action around in order to show a responsible response when a complaint of that nature was made.

Sensitivities around that kind of thing were especially heightened at that point in time. Tolerance levels had been appropriately diminished for any sort of behavior that people found unwelcome or harassing in nature. And so the conversations that Rick and I had at that time were to that effect, that the university has to respond to this. And so my understanding was that that was being relayed to the university.

I can't recall whether I spoke to Michael about it in that time frame. I know I spoke to him about it in some time frame, but I don't remember exactly when. That's why I checked my text messages. But I don't know that I ever texted him about it in that time frame anyway. If I had communicated with him about it, it just would have been via telephone. I do know that I spoke with him about it later on at some point, and we shared some viewpoints about it.

Q. What viewpoints did you share with -- I know

you talked about the viewpoints you shared with Mr. Shangraw.

A. Yep.

Q. What viewpoints did you share with Mr. Crow?

A. It was similar. He shared his viewpoint that Dave had been terminated because of issues totally unrelated to this regarding his performance.

I shared in response to that, that I felt there were things significantly positive about Dave's performance that I could point to at the university and value that had been added.

I shared with him Dave's point that he had made to me in our conversations, which was that he had been given a substantial bonus. And I believe he told me it was the largest bonus that anyone had been given in the athletic department and that that sort of didn't really square with the idea that his performance was substandard.

So I recall discussing that with Michael, and then Michael discussed with me that no, that's not the reason he was -- that that's not completely true. There were significant performance issues, and they dated back quite a while. And things had never quite gotten to the level they wanted them.

And he also mentioned that David had

reacted badly to a reorganization in the department. I was aware of that issue because Dave had shared that with me too. And Dave's perception of that reorganization was that that was itself, you know, if not retaliatory -- I don't know if he ever said that to me, but that it was personality driven and that it was not sound. It was not based on any real, reliable metrics of performance. And it felt to Dave like his responsibilities were being significantly diminished inside the department.

And so those were the conversations we had had. I relayed those to Michael. Michael relayed the university's position that there were performance issues with Dave. And that's what led to his termination.

Q. So it sounds like Dr. Crow had some thoughts on Dave's performance dating back for some time?

A. He did.

MR. McKIRGAN: Object to form.

Go ahead.

THE WITNESS: He did.

BY MR. ROWLETT:

Q. Okay. Was anyone else involved in that conversation between you and Dr. Crow?

A. No.

Q. Did you ever have any conversations -- withdrawn.

At least in 2019, the director of athletics for Arizona State University was Ray Anderson, correct?

**A. Correct.**

Q. Did you have any conversations with Mr. Anderson about David Cohen?

**A. I did not. I did not think that would be appropriate. I felt that my responsibilities were to deal with his superiors. Because if I, as a regent, had gone directly to Ray Anderson about this, at that point as a member of the Board of Governors, I'm sort of engaging in operational direction and leadership. And that gets to be very dicey very quickly when regents do that sort of thing. And so I tried never to do that.**

**When any issue involving any operating difficulty was brought to my attention as a member of the board, and that would happen from time to time, my response to that was to take it to the university and to the university leadership. Not to go engage at the level of the university where the operational problem, or the alleged operational problem, was occurring.**

Q. Going back to your conversations with Dr. Crow

for a moment. Do you recall when those conversations took place?

And I'll tell you if this helps refresh your recollection, that in August of 2019, Dave was placed on administrative leave, and then his employment was finally terminated in December of 2019.

**A. Yeah.**

Q. So do you recall when in there that you spoke to -- I assume it was somewhere in there that you spoke to Dr. Crow.

**A. I think that's correct. So here's what I can tell you. Again, my memory as to the timelines is no longer very clear.**

**But my understanding, or what I recall my understanding being, was not that Dave was placed on administrative leave in the first instance, but that he was terminated. And my recollection is that the administrative leave came around the time I was talking to Michael. Because I believe I recall Michael telling me, no, he's not terminated. He's on administrative leave.**

**And so y'all would know more about those facts than I do. I can't really recall them that clearly anymore. But my recollection was, when the event first occurred, as Dave reported it to me at that**

time, it was that he was terminated, not that he was put on administrative leave. That he had been terminated by Ray.

And so I believe what happened at that point is that's when I ended up speaking to Michael. And either in that conversation or a subsequent conversation not long after that, he informed me, no, he's not terminated. He's on administrative leave.

Which then caused me to think, okay, this is going to be investigated now and maybe Dave's not going to lose his job and maybe this is all going to turn out differently. At that point, I didn't know how it was all going to turn out. And I took it as good news that he was not terminated, even if it wasn't good news that he was on administrative leave.

Q. Because in your view, at least at that time, there was no reason to terminate Dave Cohen?

A. I didn't -- I couldn't say that. You know, President Crow had given me his assurances that there were reasons.

And I guess it's fair to say, there was no reason that I would have taken as adequate to terminate Dave Cohen. But it was clear to me that President Crow believed that there was.

Q. Are you aware that Arizona State University

conducted an investigation into Bart Wear's conduct, including his conduct at the PAC 12 men's basketball tournament, and the subsequent termination of Dave Cohen in or around the fourth quarter of 2019?

**A. Yes, I'm aware of that.**

Q. Were you interviewed in the context of that investigation?

**A. I don't think I was. I can't recall now. I have to think about that for a minute. I remember when it was going on, it was being carried on by a lawyer. I'm embarrassed to say this, but I honestly can't remember right now whether I was interviewed or not. I may have been; I may not have been.**

Q. I don't think that you were.

**A. Okay.**

Q. And that wasn't intended as a trick question. I was just wondering, because I've seen a report --

**A. Okay.**

Q. -- of that investigation. The attorney who conducted it, I believe, was a woman named Carrie Love.

**A. With a law firm back East somewhere, right?**

Q. Armstrong Teasdale --

**A. Okay.**

Q. -- I believe back East.

**A. Yeah.**

Q. Does that refresh your recollection as to whether or not you were asked to participate in providing information about that investigation?

**A. I have no recollection of an actual interview. So I'm guessing I wasn't, but, I mean, I may have spoken to her and forgotten about it. I just -- I don't recall.**

Q. Okay. You testified a little earlier that you and Mr. Shangraw shared the view that the university should take action regarding the sexual harassment by Bart Wear. Do you recall that testimony?

**A. Yes.**

Q. What action did you and Mr. Shangraw believe should be taken?

**A. We believed that it should be investigated and that the university needed to accept responsibility to do so. And so that was pretty much it.**

**You know, we didn't -- I think we speculated that there could be more and more of it now. The way that these stories often unfolded at the time was in serial revelations and so forth. And so if you were seen not reacting in any kind of reasonable time, you were courting worse and worse outcomes in terms of how well you would be said to have exercised your responsibilities around the events. And so that was**

the nature of the discussions we had about it.

Both of us were also -- you know, I believe Rick knew Dave very well, as I did. So we had that in common as well. Rick and I were also -- I was friends with everybody in this scenario. You know, I was professional colleagues with everybody as well. So I wasn't -- you know, but there was something like friendship for me with both Dave and Ray, with Michael Crow, with Rick.

You know, Bart was an acquaintance, not a friend. I had never really spent any time with him except accidentally at sporting events.

And then Bobby Hurley, I considered more of an acquaintance than a friend, but we communicated every once in a while. We had played golf together a couple of times.

And so I had friendships with all of the people involved in this. And my interest was just in seeing people carry out their responsibilities in the right way. And I also had an interest in not seeing Dave get hurt.

Q. Let's assume for purposes of this deposition that Dave Cohen first reported Bart Wear's sexual harassment to Ray Anderson in March of 2019.

As a member of the Arizona Board of

Regents at the time, when would you expect an investigation into that conduct and those allegations to begin?

MR. McKIRGAN: Object to form. Foundation.

Go ahead.

**THE WITNESS: Repeat the question.**

BY MR. ROWLETT:

Q. Absolutely.

Let's assume for purposes of this deposition that Dave Cohen first reported Bart Wear's sexual harassment to Ray Anderson in March of 2019. As a member of the Arizona Board of Regents at the time, when would you have expected an investigation into those allegations to begin?

MR. McKIRGAN: Same objections.

**THE WITNESS: I don't know that I even had an expectation about that. I suppose, I would say, as soon as enough of a preliminary inquiry could be made to determine that the investigation was warranted.**

**You know, if I were in that position, I would also feel it was my responsibility to -- until I knew better, to also worry about the effect on the accused. And so you would need to go gather enough information as a preliminary matter before deciding**

whether to launch an investigation. And so, you know, however long that would take. I wouldn't think that would take very long, however.

BY MR. ROWLETT:

Q. What would, in your view, a preliminary investigation -- I'm sorry, you used "inquiry." A preliminary inquiry, what would that look like under these circumstances?

MR. McKIRGAN: Objection. Form and foundation.

THE WITNESS: Okay to answer?

MR. McKIRGAN: Yes.

THE WITNESS: I would imagine it would be to speak to the principals involved. So speak directly with any of the women involved. And it would include maybe some aspects of what would go on in an actual investigation.

But before you call something an investigation, I think in situations like this, you do some amount of preliminary inquiry to make certain that that is, in fact, your responsibility. So that's all I'm -- I think it would just be a little bit more rounding out of your information.

BY MR. ROWLETT:

Q. In this preliminary inquiry, you mentioned

speak to the women. Would you also speak to the accused?

**A. It would depend on the facts as first reported to you by the different people making the accusations, but it's possible. And, you know, it's hard to say without really being there and having all those things in front of you.**

Q. Okay.

**A. I'm thinking about this myself right now as the leader of an organization with over 3,000 employees, and there's no end of things that come up in the human event. And so you really have to -- it's hard to say these things in the abstract. You kind of just have to be in the thing itself before you can make those judgments.**

Q. In this instance, Arizona State University's counsel in preferring -- sorry, withdrawn.

In this instance, Arizona State University's counsel that conducted the investigation and prepared the report determined that there was enough evidence to determine that Bart Wear sexually harassed at least three women at the PAC 12 tournament in March of 2019. That investigation was not conducted until between August and December of 2019.

In your mind, as a member of the Arizona

Board of Regents at the time, is that a reasonable response to receive a credible allegation of sexual harassment in March and not conduct any sort of investigation until August of 2019?

MR. McKIRGAN: Object to form.

**THE WITNESS: Well, I'd have to restate my prior answer. That would depend upon exactly what information was in front of them and what they were doing during that time, leading up to the announcement of an investigation.**

**And I don't know the answers to that. I don't know what was happening. So I don't know whether it was reasonable or not.**

BY MR. ROWLETT:

Q. Okay. That's fair.

During your tenure as a member of the Arizona Board of Regents, did the Arizona Board of Regents take allegations of sexual harassment within the university communities they oversaw seriously?

**A. I'm trying to recall other events that occurred along the way. There's only one that comes to mind. It was at a different university. And what the board would typically do, I think, was simply try to draw a conclusion about whether the university was acting and engaging as it should. The board would not be**

**conducting that engagement or that investigation.**

**And so, yes, I think the board took these kinds of things seriously when they came up, as they would any other of the countless types of allegations that could surface from time to time about any kind of impropriety.**

Q. Did the investigation that resulted from Bart Wear's conduct and Dave Cohen's reporting of that contact, did that rise to your attention at the Arizona Board of Regents outside of your communications with Dave?

**A. Only once it broke into the press, which it did do, again, at some point along the time sequence. And so at that point, you know, the board was also obviously then made aware of it. And I think that began to happen right around the time that the investigation was initiated, but I don't really recall.**

**I don't recall what the timeline was in terms of when it broke out in the media in that August time frame that you stated as to when the investigation was initiated and Dave was put on leave.**

Q. The other instance of sexual harassment that you referenced during your time as a member of the Arizona Board of Regents, do you remember what university that was at?

A. I do.

Q. Which university was that?

A. It was at the University of Arizona. And I'm not sure if it was sexual harassment or if it was something even more serious than that. I think it was more serious than that.

Yeah, I think it was in the nature of an alleged drugging and sexual assault. I could recall that coming up.

Q. How did that University of Arizona sexual misconduct issue come to the board's attention?

A. I think it was just -- I think the board was just informed of it at some point. And then the board would receive at each meeting, each quarterly regular scheduled meeting -- or they were more than quarterly. I think they were six times a year, and then maybe we changed them to five.

But at each regular meeting, the board would receive a blue folder with all newly initiated legal claims against the university system, as a pro forma matter.

I got the feeling that I was a little odd among the board members because I actually would look at that. I just found it interesting to find out who was suing the university system for what types of

claims, and so I would usually spend at least a few minutes flipping through that.

And so I must have seen some more of those types of claims over time, but the only one that sticks out in my head is the one I'm talking about. It was a relatively high-ranking person at the university who had come under accusation. And I don't remember how it turned out or whether it had turned out by the time I left the board. It just popped back into my head when you brought it up.

Q. Yeah, once an attorney, always an attorney. You see that list of people suing, and you're like, oh, what's going on here?

A. Yeah. I mean, it was just interesting. And some of them were just really amusing. And others were shocking.

Of course, many of them involved medical malpractice issues that came up at the University of Medical operation in Tucson. And I was also reading it to see those because I was concerned about that operation, and I was trying to discern if there was a pattern of malpractice claims across time. So I would look for that. So yeah, it was that sort of thing.

Q. When Dave talked to you about what Kathy Cohen experienced and Bart Wear's conduct, did your views of

that -- or were your views of that affected by the fact that she was a wife of an employee and not an employee or a student of her own?

As a member of the Arizona Board of Regents, do you view that differently?

**A. No.**

MR. McKIRGAN: Object to form.

Go ahead.

**THE WITNESS: No, I did not view it differently. I put it in the category of an individual who was a guest of the university interacting in whatever way with other guests, which I guess is what Dave's wife would have also been categorized as, as a wife of a senior athletics official.**

**And so it was just -- it was in the category of the university and its responsibilities to superintend environments like that, NCAA athletics events, where its guests were in proximity.**

BY MR. ROWLETT:

Q. Is the Arizona Board -- withdrawn.

During your time as a member of the Arizona Board of Regents, were they involved in the making of antiharassment policies at the university level?

**A. I don't recall the making of the policy in that**

field while I was on the board. I can't say that it didn't happen, but I don't recall it. I have no independent recollection of it.

You know, you're there for eight years, and you go to six meetings a year and special meetings in between, and you get this big fat binder at every regular meeting, and there's many, many, many things. It's run a bit like a governance machine in order to process three different state universities' ongoing run of things that have to be processed.

And so I don't recall the making of any policies about it, but it's possible that it happened.

Q. And are the universities empowered to make their own policies, or is that a fiat that comes down from the Board of Regents, specifically in, let's say, the antidiscrimination/antiharassment context?

A. You know, I should know the answer to that, but I don't. It sounds like something that the board might want to have a systemwide body of policy around. But I honestly don't know whether that's policy also just at the institutional level.

A lot of it is policy that's going to be driven by evolving law, I would assume. So I don't know the answer, sir, which level that policy was primarily promulgated at.

Q. And I don't either. So I'm not trying to be cute.

You mentioned that from March of 2019 until his termination from Arizona State University, you had had a number of conversations with Dave about the sexual harassment his wife experienced. And I believe you also testified that he was becoming increasingly frustrated with the lack of action by the Arizona State. Do you recall that testimony?

**A. Yes.**

Q. How was he conveying that frustration to you?

**A. He was just -- he was making it clear that his -- I felt that his feelings were hurt. He felt, as any person would, the kind of emotion that would go along with feeling your wife had been mistreated and that that mistreatment was ongoing through the lack of response.**

**And I think there was also a rising level of frustration with Ray, generally, that Dave was feeling that he shared with me, and maybe vice versa. Although, again, I never spoke with Ray about Dave at any point, and have not since.**

**And so we spoke about issues that were going on in the athletic department. And Dave shared with me some of his feelings about those issues in**

**areas that he thought were not being handled the right way.**

**And so there was some more context, I would say, leading up to all of these events that might have affected the way Ray responded, or did not respond, to Dave when these events unfolded. It wasn't happening in a vacuum. It was happening in the context of the other ongoing events inside the athletic department with regard to Ray and Dave and other personnel in the department. That was my perception at the time.**

Q. And that's helpful.

Can you expand on that? What other sort of events were you and Dave talking about that were happening within the athletic department at the time?

**A. All kinds of things. Just the football program, things going on there. The baseball program. We would just talk about different things going on with the athletic department. The swimming program, which was also Dave's responsibility and made it a big splash hire. No pun intended.**

(Cross-talk, multiple speakers.)

I really did not intend that. That was completely accidental. I realized it a couple seconds after I said it.

So yeah, we would talk about different things. I think at that time -- and this may be when the new hockey program and a big donor had come along, so we would talk about that. We talked about all kinds of things.

Q. What specifically was Dave frustrated with with respect to Ray Anderson's handling of the athletic department, other than the handling of the sexual harassment complaint?

**A. Dave conveyed to me that he felt that a lot of Ray's decision-making was ego-driven rather than grounded in sound analysis. He said things at that time regarding Ray, you know, having too much confidence in certain people that he didn't think could really be trusted, professionally speaking, to succeed.**

**You know, just the kind of workplace stuff that friends talk about. You know, it was just kind of, we both cared about it. We both knew the individuals involved, to some degree or another.**

**There would be rumors that would fly around from time to time. I recall there was a rumor going on about recruiting in California for football. We discussed that. Frankly, more serious types of things involved in those rumors than what the university is currently under investigation for. I**

**recall discussing things like that as those would come up.**

**We talked about the basketball team. And Dave relayed to me at the time that Coach Hurley and Dave both felt like Ray did not really put enough support behind the basketball program as an athletic director, that he was a little too focused on football, and maybe even other things, and that he really wasn't invested in the basketball team's success. That kind of stuff.**

Q. Okay. Did you have any conversations with Bobby Hurley about that?

**A. I don't believe I did, no.**

Q. In your time around the university and specifically the athletic department, did you form any opinions about how Dave Cohen was performing his job?

MR. McKIRGAN: Objection. Foundation. Form.

**THE WITNESS: Say it again.**

BY MR. ROWLETT:

Q. Yeah. During your time -- withdrawn.

It sounds like you were the member of the Board of Regents that was, at least informally, given the responsibility, or the expectation, of being aware of the comings and goings in the athletic department.

Is that fair?

MR. McKIRGAN: Form.

THE WITNESS: I guess what I would say is, you know, on a board, you have different people who come from different backgrounds, have different interests, different bodies of experience. And typically what happens in boards is people will become trusted around a given theater that they might know a little more about and follow a little more closely and have a little more background than their colleagues on the board.

The same kind of thing that if you have an accountant on the board, you know, they would be trusted to speak about audits and analyze those things. And if they bring something to the attention of the board, the board would be inclined to pay attention. So it's that sort of thing.

And so, yeah, I pay a little more attention to athletics. And I was just a little more aware of things in this sector, such as the normal cycles for hiring and extending coaches. Whereas, the typical regent might never have made a note of that. And so it was that kind of thing.

And, you know, most of the regents would attend most football games. They would not attend

**basketball games. I don't know if I recall any regents hardly ever attending ASU basketball games, other than myself. Very occasionally, at best, Regent Christian would attend a game now and then.**

**But basketball was not of great interest to most of the board members, and they didn't have a lot of background in it.**

BY MR. ROWLETT:

Q. But you did take an interest in Arizona State men's basketball, correct?

**A. I did. I had been a season ticket holder since before joining the board. And the long years I spent at the university, I went to most of the basketball games. I've been paying close attention to ASU basketball since 1978.**

Q. And in the 45 years that you've been paying close attention to Arizona State basketball, how did the performance during Mr. Cohen's tenure as the athletics employee responsible for managing that program, how did that compare to some of the prior phases of Arizona basketball?

MR. McKIRGAN: Objection. Form.

Go ahead.

**THE WITNESS: It was better. It was more informed. It was dedicated to the success of the**

program. It was dedicated to making the coach feel supported, which is an important part of a basketball program that's trying to become something.

You know, if you go over to Kansas, Bill Self doesn't really need to be made to feel supported, because he's the king of the town in Lawrence. But, you know, when you've never really been a successful basketball program, those kinds of things are important. There has to be a lot of strategic engagement in order to move the program forward. And a coach is not capable of doing those things on his own; he needs help. And so that was something I did try to communicate to the university about basketball.

I also tried to communicate to them that basketball was far more important to the university and its athletic program than they seem to have any idea that it could be. And that, frankly, it might be a lot easier to establish a very successful basketball program at Arizona State.

They had a successful football program because it was a completely different strategic framework in which you had to advance and excel and climb the hill. And in my mind, it was less complicated than doing that in football, but only if you had the dedication to getting it done.

BY MR. ROWLETT:

Q. And how did you perceive Dave Cohen's role in what you just described, about making the coach feel supported? Was that something that he brought to the men's basketball program?

**A. Yes.**

Q. Is it fair to say that, in your view, Dave Cohen did a good job as the administrator of the men's basketball program?

**A. Yes.**

Q. Did you have any -- withdrawn.

One of Dave Cohen's other responsibilities was ticketing. Is that correct?

**A. Yes.**

Q. Did you have any interactions with Dave Cohen about his role and responsibility in the context of ticketing?

**A. Yes, he did discuss that with me from time to time as another one of those topics that I was listing out previously. That was certainly one of them as well. And there was more success there than there had been as well. Significantly more based on the metrics that Dave shared with me.**

**He seemed to feel at the time though that that success was not adequately appreciated, and it was**

viewed as not having been enough, even though it was significantly more. I seem to recall him expressing something like that at different times.

I recall when the barriers up at the top of the basketball arena that had walled off the upper 10 rows all the way around the arena were actually removed at one point because there was enough momentum going that those seats were actually going to end up being sold. And unfortunately, a number of things kind of slowed that momentum. But to even have gotten the program to that level of excitement.

And the metrics on this are clear. The basketball program, but for COVID, would have gone to the NCAA tournament three consecutive years, which had not happened since like 1962, as I recall, something like that. And so that's a very clear, understandable thing.

If you're running a successful basketball program in a Power 5 conference, it's going to the NCAA tournament almost every year. If you're running a highly successful one, it's going every year and it's occasionally moving deep into the tournament. That's pretty much how it's measured in basketball. It's real simple.

And I still believe that that is

**attainable at ASU if there were enough dedication put behind it to do all those programmatic things that build into that.**

Q. Thank you.

I'll represent to you that after Bart Wear's sexual harassment was first reported to Ray Anderson, Ray Anderson and some other Arizona State University employees took a golf trip with Bart Wear on Bart Wear's private plane. Are you aware of this?

**A. I was aware of the trip. I was not aware that it was on his plane. If I ever was aware, then I had forgotten that part. But I was aware of the trip. Dave made me aware of the trip at the time.**

Q. And as a member of the Board of Regents at the time, do you feel like that was appropriate conduct by Ray Anderson and other Arizona State University employees?

MR. McKIRGAN: Object to form.

**THE WITNESS: Are you asking appropriateness in light of the events surrounding Mr. Wear --**

BY MR. ROWLETT:

Q. Absolutely.

**A. -- of the alleged events?**

Q. Yes. Let me clarify.

If we take the sexual harassment out of the equation, let me ask it this way, do you think it's inappropriate for Arizona State University employees to go on golf trips with athletic boosters?

**A. No.**

Q. Okay.

**A. It's a part of raising money.**

Q. Agreed.

After receiving the allegations -- withdrawn.

After learning of the sexual harassment by Bart Wear, do you think it's appropriate for those same Arizona State employees to go on golfing trips on the harasser's private plane?

MR. McKIRGAN: Object to form.

**THE WITNESS: I would say it's questionable judgment in that context to not postpone such trip or cancel it.**

BY MR. ROWLETT:

Q. Prior to Dave Cohen being -- withdrawn.

Since we have some uncertainty around termination administratively, let's just say prior to August of 2019, because that's when the termination administratively started.

Prior to August of 2019, did anyone from

Arizona State University say negative things to you about Dave Cohen's performance in the athletic department?

**A. I don't think so. It's possible that Michael may have said something to me somewhere along the way that, you know, where I might have said something positive about Dave and maybe he would have said something like, "Yeah, that's worked out. We're working on some other things with him," something like that. Nothing negative. He might have just mentioned something like that. Nobody ever said Dave was falling down on the job in any way to me.**

Q. And Michael in that sentence was Dr. Crow?

**A. Yes. I'm sorry. Mike Crow.**

Q. Okay. That's helpful.

Other than the conversations that we talked about regarding -- withdrawn.

Other than the conversations you've talked about with Dr. Crow, have you had any other conversations with anyone at the university about Dave Cohen?

**A. I don't believe so. Other than Rick Shangraw, again, back at the time this was going on. And I haven't had any conversations with him since.**

Q. Did you have any conversations with Dr. Crow

about Bart Wear?

A. Yes, in proximity to these events. He was aware of Bart Wear prior to these events and indicated that he had drawn some kind of negative opinion about him before any of this even happened.

I can't recall any detail around that, but I just remember him mentioning something. When I did discuss this with him, he brought that up, that "Yeah, I know who he is." And he might have mentioned some prior event that had gone on maybe with Bart shouting at somebody from the stands or just being boisterous in the stands. I don't know. But he was aware of him. He was aware of Wear.

Q. Going back to what we talked about a few moments ago with Mr. Cohen and his increasing frustration with the lack of action with respect to the sexual harassment allegations.

Do you feel like from your perspective at the time, David Cohen was acting unreasonably expecting some sort of action from the university?

MR. McKIRGAN: Object to form.

THE WITNESS: No. I empathize very much with Dave. I knew Kathy as well by then. And no, I agreed with Dave's basic position in the matter, that it was unacceptable, and it needed to be dealt with in

**some fashion.**

MR. ROWLETT: Let's take a break. I want to go over my notes and make sure I didn't miss anything. But I think we're just about done.

**THE WITNESS: Okay. Sure.**

(A recess was taken from 4:29 p.m. to 4:35 p.m.)

MR. ROWLETT: That's all the questions I have for you at this time, Mr. Heiler. Thank you for your patience --

**THE WITNESS: Sure.**

MR. ROWLETT: -- and your professionalism. And I believe that counsel for the Board of Regents has some questions for you.

**THE WITNESS: Sure.**

EXAMINATION

BY MR. McKIRGAN:

Q. Mr. Heiler, you were asked questions about Mr. Cohen's reporting to Ray Anderson about Bart Wear's conduct at this Pact 12 basketball game.

Did you ever speak to Ray Anderson about what exactly it was that Mr. Cohen reported?

**A. I did not speak with Ray.**

Q. Okay. You were asked a lot of questions about

your impressions of how the university was responding to what Mr. Cohen had raised. It's fair to say, isn't it, that your views and opinions are based almost entirely on what Mr. Cohen has told you?

**A. Yes.**

Q. In terms of Mr. Cohen's performance at the athletic department, do you feel that you're a better judge of that performance than Ray Anderson, who was running the department?

**A. Only in a couple of fairly narrow regards.**

Q. When relating to the administration of the basketball program?

**A. Yes.**

Q. And in terms of the criticisms of Mr. Anderson and the administration of the basketball program, is it really more of a matter of priorities, that not enough priority was being put on the basketball program?

**A. Yes. It was priority and then focus, you know, a related concept but not exactly the same. You know, how much importance and then how much insight around basketball programmatic advance. I think that was mainly the issue.**

**And that was what I always saw, frankly, at Arizona State University, long predating Dave's arrival or Ray's arrival. It was just more of the**

**same.**

Q. And if I understand what your role was as a regent, when it came to the day-to-day operations, you were really deferring to Dr. Crow and the folks that reported to him. Is that right?

**A. I wasn't deferring. I was simply understanding the division of labor. The work of a regent involves governance. The work of leading operations of the institution belongs to the President and his or her team.**

Q. Okay. And when Dr. Crow told you -- excuse me, I'm going to back up.

Your discussions with Dr. Crow, if I'm understanding your testimony correctly, occurred after Mr. Cohen had been put on administrative leave in August. Is that correct?

**A. Around that time. I think it might have been right at that time or right before that time. I seem to recall Michael informing me, and my not having known it when he informed me, Dave was not to be terminated; he was to be put on administrative leave.**

Q. So when you spoke with Dr. Crow about the administrative leave, did you reach out to him because of something Dave had told you or was Dr. Crow informing you of what happened? Do you remember?

A. I can't recall who reached out to who. Michael and I spoke not at all, infrequently during that time frame about any number of different things. So I can't recall who initiated it or whether it was even part of a larger conversation involving other topics.

I do recall it being a telephone conversation, I think. And chances are I reached out to him about it, but I really can't tell you.

Q. Okay. When Dr. Crow told you the reason behind Mr. Cohen's administrative leave was performance and not Bart Wear, when did that conversation happen?

A. I think it was that same time frame.

Q. Did you ever see the investigative report that was produced in December?

A. I may have. It may have been provided to the board. I may have seen it. I'd have to look at it, and then I'd know whether I saw it. I don't imagine there was much in it that I was not already aware of, at least in terms of the events surrounding the allegations.

A lot of that had already been aired in the media by that time, as I recall. People had begun writing stories about it and so forth. So somewhere along the...

Q. Did you understand the report concluded that Mr. Cohen had not been retaliated against?

**A. I can't recall whether I read the report or what I understood about it. I'd have to look at it again, which I'm happy to do if you have it with you.**

Q. No, I don't.

The increasing frustration that Mr. Cohen had, I want to talk a little bit about that.

Do you understand how university employees like Mr. Cohen, what they're taught -- or excuse me, trained in terms of the duty to report sexual harassment? Are you familiar with what their obligations are?

**A. Not with any degree of specificity or detail, no.**

Q. Did you understand that university employees have a duty to report it to the Title IX coordinator?

**A. Yeah, I know that Title IX is a dimension of the whole thing.**

Q. Did Mr. Cohen ever explain to you why he didn't go to the Title IX coordinator about Bart Wear?

**A. I don't think we ever discussed Title IX in regard to these events. It may be that he wasn't thinking that Title IX applied to these particular circumstances because he wasn't an employee. I don't**

**know.**

Q. Because Bart was not an employee?

**A. Yeah.**

Q. I think you testified that when you spoke to Dave, he was frustrated because something had not been done about Bart. Did he indicate to you what it was that he wanted done?

**A. I can't really recall that independently. I think he probably just wanted him to be disinvited from athletic events or something like that. But I can't really recall, independently, a discussion around that. He didn't want him around his wife.**

Q. Do you know who was in charge of the seating at the games when Mr. Cohen was there, in terms of the seating arrangements that -- for example, the PAC 12 tournament, how seat assignments were made?

**A. I never had the impression that there was that much detail to seat assignments. I always just sort of felt like there was an area that people were invited to sit in.**

**At that particular event, I believe we were playing Oregon that night in the final of that tournament, and I left that seating area and went up many rows higher and sat and watched the game from there after the early phases of the game.**

Q. I think you testified that it might have been questionable judgment, I think was the term you used, for Ray and others to go on the golf trip with Bart Wear in May of 2019.

That testimony, again, was based on what had been reported to you by Mr. Cohen?

**A. Of course, yeah. I have no idea of what set of considerations was in front of Ray at that point about that trip. I have no idea. So yeah, that's my statement based upon those shared facts surrounding those allegations.**

Q. And I think you testified that in terms of Dave's performance in the athletic department, you had not heard from others, besides Dr. Crow, about his performance being bad or negative?

**A. I don't believe so. No, I don't recall ever hearing anything like that.**

Q. But you would agree with me that the fact that you had not heard anything doesn't mean that performance issues did not exist?

**A. Of course. It's not something that necessarily would have been brought to my attention.**

Q. Right.

You also testified, I think, that Dr. Crow had a negative opinion of Bart Wear. Did that have

anything to do with -- did that prior negative opinion have anything to do with the sexual harassment by Mr. Wear?

**A. No, no. It had to do with, again, having noticed the boisterous presence. You know, you couldn't really put any more color around it than that.**

Q. Kind of the same impressions you had of Mr. Wear by observing him --

**A. Yeah.**

Q. -- at functions?

**A. Yeah.**

Q. Probably not pleasant to be around?

**A. I didn't find him unpleasant, particularly. A lot of people would just sort of notice him. So yeah, I mean, you just notice him when you're in his proximity. He's a loud and boisterous personality type, but I never had any kind of unpleasant interaction with him. And I never observed him inappropriately touching people. If I had, I would have said something about it.**

Q. Right.

**A. And probably to him.**

Q. Did Mr. Cohen ever tell you that he had directly confronted Mr. Wear about what he had done at the PAC 12 during the game?

**A. No. Dave's view, as we discussed, at the time was that he needed to handle it administratively and that if he didn't handle it that way, he could be considered in violation of rules or requirements or policies. I think I recall him expressing that he didn't feel that that was an avenue he could take.**

Q. You testified that you and Mr. Shangraw believe that the matter should have been investigated. Again, that's a view that you drew based on things that were being told to you by Dave?

**A. Yes.**

Q. I'm going to show you a text message. This is a text that's Bates No. COHEN 002655. This is a copy of a text message that Mr. Cohen has produced in this case with you. And he's texting "I have a friend in need of a good employment lawyer. Do you have a lawyer? Explain more in person."

Do you see that there?

**A. Okay.**

Q. And then the texting goes back and forth, and he tells you, quote, "Prefer in person. It is best for me to come to you or meet somewhere. I have a meeting at 9:30 that won't take that long."

**A. Okay.**

Q. Do you remember meeting with him about a good

employment lawyer?

**A. I don't. I'm not saying it didn't happen, but I don't remember. I didn't remember any of that.**

MR. ROWLETT: Are we going to mark that as an exhibit for the deposition?

MR. McKIRGAN: I didn't bring copies, so we can.

MR. ROWLETT: I'm okay to not mark that. I can find my own copy.

MR. McKIRGAN: I'll probably mark it at Dave's deposition. But it's Bates No. 002655.

MR. ROWLETT: Thanks.

BY MR. McKIRGAN:

Q. So I know you and Mr. Cohen are friends and you're kind of in this awkward position of being a regent and being his friend. But at some point, did he come to you seeking advice about finding a lawyer?

**A. It sounds like he did, based on that text you showed me. And I do vaguely recall that now, but I don't know if that was about this situation. It's the kind of thing, I think, he would have asked me about if he had come to a point where he...**

MR. ROWLETT: Is there a date on that text?

MR. McKIRGAN: June 19, 2019.

BY MR. McKIRGAN:

Q. Do you remember -- well, strike that.

MR. McKIRGAN: I think that's all I've got.

MR. ROWLETT: I have no follow-up.

(The deposition concluded at 4:53 p.m.)

* * * * * *

____________________________________

JAMES JAY HEILER

CERTIFICATE OF CERTIFIED REPORTER

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in voice dictation and thereafter reduced to print under my direction; that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 (J)(1)(g)(1) and (2).

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

[X] Review and signature was requested; any changes made by the witness will be attached to the original transcript.
[ ] Review and signature was waived/not requested.
[ ] Review and signature not required.

Dated in Phoenix, Arizona, this 19th day of December 2023.

______/s/ Cindy Bachman________
CINDY BACHMAN, CVR

Certified Reporter

Arizona CR No. 50763

*     *     *     *     *

I CERTIFY that GRIFFIN GROUP INTERNATIONAL, has complied with the ethical obligations set forth in ACJA 7-206(J)(1)(g)(1) through (6).

_____/s/Pamela A. Griffin____
GRIFFIN GROUP INTERNATIONAL
Registered Reporting Firm
Arizona RRF No. R1005

GRIFFIN GROUP INTERNATIONAL -ERRATA SHEET - CHANGES IN TESTIMONY

3200 East Camelback Road Suite 177 Phoenix, Arizona 85018

Cohen vs Arizona Board of Regents, and Anderson-James Jay-Heiler-December 05, 2023

Errata & Signature due no later than the January 26th, 2024.

| PAGE | LINE | CORRECTIONS/CHANGES | REASON |
|---|---|---|---|
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |

_________________________ ________

SIGNATURE OF WITNESS DATE

**0**

**002655**
68:13 69:11

**1**

**10**
55:6

**12**
24:9 35:2 40:22 60:21 65:15 67:25

**14**
18:24

**15**
18:24

**19**
69:25

**1962**
55:15

**1978**
52:15

**1983**
11:23

**1986**
7:3 11:25

**1992**
13:3

**1997**
13:5

**2**

**2001**
13:14

**2002**
13:14,25

**2011**
14:21

**2011-2012**
14:16

**2012**
12:9 14:22

**2014**
17:1 18:21

**2018**
8:9 13:10 14:11

**2019**
17:2,15,17 24:8,13 26:2,17 32:3 33:4, 6 35:4 37:24 38:12 40:23,24 41:4 47:3 57:23,25 66:4 69:25

**2020**
8:9 13:13,22

**3**

**3,000**
40:10

**30**
6:25 7:2

**4**

**45**
5:1 52:16

**4:29**
60:6

**4:35**
60:7

**4:53**
70:6

**5**

**5**
55:19

**9**

**92**
13:4 14:5,7

**97**
14:7,11

**9:30**
68:23

**A**

**ability**
10:11

**Absolutely**
38:9 56:23

**abstract**
40:13

**Academies**
13:15

**accept**
36:16

**accepted**
12:15

**access**
28:24

**accidental**
48:24

**accidentally**
37:12

**accountant**
51:13

**accusation**
44:7

**accusations**
40:4

**accused**
38:24 40:2

**acquaintance**
37:10,14

**act**
15:13

**acted**
27:6

**acting**
41:24 59:19

**action**
28:11 29:4 36:10, 13 47:8 59:16,20

**activities**
19:7

**actual**
36:4 39:16

**added**
30:11

**adequate**
34:22

**adequately**
54:25

**administered**
8:25

**administration**
19:18 20:12 61:11, 15

**administrative**
33:5,16,18,20 34:2,8,15 62:15, 21,23 63:11

**administratively**
57:22,24 68:2

**administrator**
54:8

**advance**
53:22 61:21

**advice**
23:11 69:17

**affect**
10:11

**affected**
45:1 48:5

**afternoon**
4:8,24

**agree**
66:18

**agreed**
57:8 59:24

**agreement**
6:21

**ahead**
25:21 31:20 38:6 45:8 52:23

**aired**
63:22

**alcohol**
26:6

**allegation**
41:2

**allegations**
38:2,15 41:18 42:4 57:9 59:17 63:21 66:11

**alleged**
32:24 43:8 56:24

**amount**
18:5 28:1 39:20

**amusing**
44:15

**analysis**
21:6,9,14,17,21 49:12

**analyze**
21:1 51:14

**Anderson**
27:20 32:5,8,12 37:24 38:12 56:7, 16 60:20,22 61:8, 14

**Anderson's**
49:7

**announcement**
41:9

**annually**
22:24

**answers**
9:19 41:11

**antidiscrimination/ antiharassment**
46:16

**antiharassment**
45:23

**anymore**
33:24

**apologize**
10:17

**apology**
10:19

**applied**
64:24

**appointed**
14:17,21

**appointment**
12:9

**appreciated**
54:25

**appropriately**
29:9

**appropriateness**
56:20

**approval**
16:17,21 22:16

**approved**
18:9

**arbitration**
7:12

**area**
13:17 65:19,23
**areas**
48:1
**arena**
55:5,6
**Arizona**
4:18 6:19 7:8 11:18 12:6,13,23 13:1 14:8,18 15:1, 4,5,8,20,22 17:3, 15,22 18:13 19:3 21:18 22:15 24:23 25:10 28:11 32:4 34:25 37:25 38:13 40:16,18,25 41:17 42:9,24 43:3,10 45:4,20,22 47:4,9 52:9,17,21 53:19 56:7,16 57:3,13 58:1 61:24
**Armstrong**
35:22
**arrangements**
65:15
**arrival**
61:25
**arrived**
22:11
**arts**
13:16
**aspects**
39:16
**assault**
43:8
**assessment**
23:7
**assignment**
21:1
**assignments**
65:16,18
**assistant**
8:2 12:11,16,24
**assume**
33:9 37:22 38:10 46:23
**assurances**
34:19
**ASU**
23:16 25:3 52:2,14 56:1
**athletic**
16:16 18:3 20:4,25 24:25 25:7 30:16 47:24 48:8,15,19 49:7 50:6,15,25 53:16 57:4 58:2 61:7 65:10 66:13
**athletics**
25:4,10 32:4 45:14,17 51:19 52:19
**attainable**
56:1
**attend**
51:25 52:4
**attending**
52:2
**attention**
17:23 20:4 32:19 42:9 43:11 51:15, 16,19 52:14,17 66:22
**attorney**
4:11 7:23 8:3,10 10:24 12:11,13 14:6 35:19 44:11
**audible**
10:4
**audit**
16:1
**audits**
16:2 51:14
**August**
33:4 40:24 41:4 42:19 57:23,25 62:16
**avenue**
68:6
**avoided**
26:8
**awaiting**
28:3
**aware**
17:1 20:24 25:9,22 31:2 34:25 35:5 42:15 50:24 51:20 56:9,10,11,12,13 59:3,12,13 63:19
**awkward**
69:15

**B**

**back**
5:5 7:1,15 11:24 12:15,22 13:14 14:14 16:2 30:23 31:17 32:25 35:21, 24 44:9 58:23 59:14 62:12 68:20
**background**
25:2 51:10 52:7
**backgrounds**
51:5
**bad**
11:11 27:8 66:15
**badly**
31:1
**balanced**
21:20
**barriers**
55:4
**Bart**
24:14,22 35:1 36:11 37:10,23 38:11 40:21 42:7 44:25 56:5,8,9 57:12 59:1,3,10 60:20 63:12 64:21 65:2,6 66:3,25
**baseball**
48:17
**based**
14:13 21:16 31:7 54:22 61:3 66:5,10 68:9 69:18
**basic**
59:24
**basketball**
18:1,2,4 19:2,7,14, 23 20:1 21:1,11, 15,17,18 22:4 23:16 24:8,16 35:2 50:3,6,9 52:1,2,5, 10,13,15,17,21 53:2,8,13,15,18 54:5,9 55:5,13,18, 23 60:21 61:12,15, 17,21
**Bates**
68:13 69:11
**bearing**
23:19
**began**
13:15,19 14:22 42:16
**begin**
38:3,15
**beginning**
19:22
**begun**
63:23
**behavior**
29:10
**believed**
26:25 29:3 34:24 36:15
**belongs**
62:9
**beltway**
12:19
**beneath**
17:10
**Beus**
8:6
**big**
46:6 48:20 49:3
**Bill**
53:4
**billet**
12:25
**binder**
46:6
**bit**
27:7 39:22 46:8 64:8
**blue**
43:19
**board**
12:6,9 13:24 14:18 15:1,4,5,8,10,12, 16,20 16:17,20,23 17:6,15,20,23 18:9,13,22 19:19, 25 22:15 24:22 32:13,20 37:25 38:13 41:1,17,22, 25 42:2,10,14,24 43:12,13,18,23 44:9 45:4,20,22 46:1,15,18 50:23 51:4,11,13,16 52:6,12 56:14 60:13 63:17
**board's**
43:11
**boards**
51:7
**Bobby**
18:10 19:2 22:11 37:13 50:12
**bodies**
51:6
**body**
46:19
**boisterous**
26:5,8 27:9 59:11 67:5,16
**bonus**
30:14,15
**booster**
25:5,11
**boosters**
57:4
**branch**
13:1
**break**
10:22,23 11:4,6,7 60:2
**Brewer**
14:19
**bright**
21:23
**bring**
51:15 69:6

**brings**
14:1
**broad**
6:6
**broke**
42:12,19
**brought**
6:19 13:11 14:12 19:24 20:6 22:15 32:19 44:10 54:4 59:8 66:22
**bubble**
17:22
**build**
56:3
**Buis**
13:10
**business**
12:8,18 14:7

**C**

**California**
49:22
**call**
39:18
**called**
13:15 23:1
**cancel**
57:18
**candidates**
22:10
**capable**
53:11
**cared**
49:18
**Carrie**
35:20
**carried**
35:10
**carry**
37:19
**carrying**
8:15
**case**
17:25 68:15
**categorized**
45:13
**category**
45:10,16
**caused**
34:9
**cell**
5:5
**Certified**
4:3
**chair**
13:24
**chances**
63:8
**change**
9:19
**changed**
43:17
**charge**
65:13
**charitable**
22:24
**charter**
13:14
**checked**
29:19
**chief**
13:6,23 14:2
**Chris**
4:11 16:13
**Christian**
52:3
**circumstances**
19:11 39:8 64:25
**civil**
8:4,5
**claims**
43:20 44:1,4,22
**clarify**
56:25
**classical**
13:16
**clean**
10:1
**clear**
5:17 33:13 34:23 47:12 55:12,16
**clients**
13:12
**climb**
53:23
**close**
19:22 29:1 52:14, 17
**closely**
51:9
**closer**
20:4
**co-founded**
13:14
**coach**
17:21 18:4 19:2, 11,13,14,17,20 20:15,19,22 21:15, 19,22,23 22:2,4 24:17 50:4 53:1,11 54:3
**coach's**
19:8
**coaches**
16:11,16 18:2 51:21
**cocktail**
26:9
**Cohen**
4:12,17 5:6,13 17:2,8,14,17 21:5 32:8 34:17,23 35:4 37:23 38:11 44:24 50:16 54:8,15 57:20 58:21 59:15, 19 60:23 61:2,4 62:15 64:2,7,10,20 65:14 66:6 67:23 68:13,14 69:14
**Cohen's**
17:14 42:8 52:18 54:2,12 58:2 60:20 61:6 63:11
**cold**
10:18
**colleagues**
37:6 51:10
**color**
67:6
**comings**
50:25
**comment**
9:21
**committees**
6:10
**common**
23:15 37:4
**commonly**
25:8
**communicate**
53:13,14
**communicated**
29:21 37:14
**communications**
5:6,12 42:10
**communities**
41:19
**company**
12:20 23:20
**compare**
52:20
**compensate**
15:15
**compensation**
16:9 18:6
**complaint**
29:5 49:9
**completely**
30:21 48:24 53:21
**complicated**
53:24
**concept**
61:19
**concerned**
44:20
**concluded**
64:1 70:6
**concluding**
21:21
**conclusion**
20:1 41:24
**conduct**
26:16 27:18 35:1,2 38:2 41:3 42:8 44:25 56:15 60:21
**conducted**
6:10 22:3,5,7 35:1, 20 40:19,23
**conducting**
42:1
**conference**
55:19
**confidence**
21:13 49:14
**confirmation**
14:23
**confronted**
67:24
**connection**
24:4
**connotate**
25:8
**consecutive**
55:14
**considerations**
66:8
**considered**
19:19 22:10 23:13 37:13 68:4
**constraints**
23:19
**consulting**
13:8 14:10
**contact**
23:24 42:9
**context**
20:23 35:6 46:16 48:3,7 54:16 57:17
**continue**
10:5
**contract**
16:11 19:8,22 20:7 22:14
**contracts**
16:15,23 17:10,22 18:6 22:15
**conversation**
31:24 34:6,7 63:5, 8,12

**conversations** 22:18 26:10,19 29:2,11 30:13 31:11 32:1,7,25 33:1 47:5 50:11 58:16,18,20,24,25
**convey** 27:22
**conveyed** 49:10
**conveying** 28:9 47:11
**coordinator** 64:17,21
**copies** 69:6
**copy** 9:8 68:13 69:9
**correct** 4:13 5:13 7:4,23 8:1 9:1 12:1 14:9, 20,22 17:4,5,11,12 22:4 24:10,11 32:5,6 33:11 52:10 54:13 62:16
**corrected** 16:3
**corrections** 9:12,15
**correctly** 20:20 23:1 62:14
**cough** 10:13
**counsel** 4:23,25 40:17,19 60:13
**countless** 42:4
**couple** 7:20 8:7,22 18:21 37:16 48:24 61:10
**court** 7:17 9:1,3 10:7
**courthouse** 8:18
**courting** 36:23
**COVID** 8:20 55:13
**credibility** 9:21
**credible** 41:2
**credited** 21:22
**crime** 12:12
**criminal** 8:4
**criticisms** 61:14
**cross-talk** 48:22
**Crow** 5:9,13 28:18 30:4 31:16,24 32:25 33:10 34:19,23 37:9 58:13,14,19, 25 62:4,11,13,22, 24 63:10 66:14,24
**culminated** 20:14
**cute** 47:2
**cycles** 51:21

**D**

**D.C.** 14:13
**date** 9:16 14:1 69:23
**dated** 30:23
**dating** 31:17
**Dave** 5:16 17:2,8,13,14, 17 20:24 21:2,4 22:21,23 23:7,8, 12,24 26:12,16,22 27:17 28:5 30:6 31:2,8,14 33:4,15, 25 34:17,23 35:3 37:3,8,21,23 38:11 42:8,11,21 44:24 47:5,19,21,24 48:6,9,14 49:6,10 50:4,5,16 54:2,7, 12,15,23 56:13 57:20 58:2,7,11,21 59:23 62:20,24 65:5 68:10
**Dave's** 21:14,16 24:5 30:9,12 31:3,17 34:10 45:13 48:20 59:24 61:24 66:13 68:1 69:11
**David** 30:25 32:8 59:19
**day-to-day** 15:21 62:3
**deal** 32:11
**dealt** 59:25
**decade** 13:18
**Decades** 6:18
**December** 17:15,17 33:6 40:24 63:15
**deciding** 38:25
**decision** 17:16
**decision-making** 49:11
**dedicated** 52:25 53:1
**dedication** 53:25 56:1
**deep** 55:22
**deferring** 62:4,6
**definition** 6:7 22:9
**degree** 7:10 49:19 64:14
**department** 25:7,14 30:16 31:1,10 47:24 48:9,10,15,19 49:8 50:15,25 58:3 61:7,9 66:13
**depend** 40:3 41:7
**deposed** 6:2
**deposition** 4:22 5:3,7 6:10 8:3 37:22 38:11 69:5, 11 70:6
**depositions** 7:25
**detail** 19:15 28:1 59:6 64:14 65:18
**details** 27:22,25
**determine** 38:20 40:21
**determined** 40:20
**develop** 23:12,14
**development** 12:24
**dicey** 32:15
**differently** 34:12 45:5,10
**difficulty** 32:19
**dimension** 64:18
**diminished** 29:9 31:9
**direct** 12:25
**direction** 32:14
**directly** 19:4 32:12 39:14 67:24
**director** 32:3 50:7
**directors** 16:17 18:3
**disappointed** 28:6
**discern** 44:21
**discuss** 54:18 59:8
**discussed** 30:20 49:23 64:22 68:1
**discussing** 26:14 30:19 50:1
**discussion** 20:11 65:11
**discussions** 37:1 62:13
**disinvited** 65:9
**dispute** 6:15,20
**distance** 21:12
**division** 12:12 62:7
**documents** 5:2
**donor** 25:22 49:3
**draft** 21:6
**draw** 41:23
**drawn** 59:4
**drew** 68:9
**driven** 31:6 46:23
**drop** 10:13
**drugging** 43:8

**duly**
4:2
**duties**
14:25 15:19
**duty**
64:11,17

E

**earlier**
36:8
**early**
8:2 28:20 65:25
**easier**
53:18
**East**
35:21,24
**editor**
12:16
**editorial**
12:16
**educational**
13:16
**effect**
29:12 38:23
**ego-driven**
49:11
**elevate**
21:24
**email**
5:15
**embarrassed**
35:11
**emotion**
47:14
**empathize**
59:22
**employee**
17:3 23:25 24:3 45:2 52:19 64:25 65:2
**employees**
16:10,11,16 40:10 56:8,17 57:3,13 64:9,16
**employment**
4:18 16:20 17:14 24:5 33:5 68:16 69:1
**empowered**
46:13
**encompassed**
16:7
**encroached**
26:23
**end**
8:15 9:7 17:2 40:11 55:8
**ended**
34:5
**engage**
32:22
**engagement**
42:1 53:10
**engagements**
16:21
**engaging**
24:2 26:8 32:14 41:25
**enjoyed**
23:20
**ensued**
20:10
**entered**
6:21
**environmental**
12:20
**environments**
45:17
**equation**
57:2
**establish**
53:18
**established**
16:20
**estate**
6:15
**event**
22:24 23:1 24:12 33:25 40:12 59:10 65:21
**events**
4:16 8:8 24:16,20 26:13,15 28:20 36:25 37:12 41:20 45:18 48:4,6,8,14 56:20,24 59:2,3 63:20 64:23 65:10
**evidence**
40:21
**evolving**
46:23
**EXAMINATION**
4:6 60:17
**examined**
4:4
**excel**
53:22
**excellent**
9:24
**exchanges**
5:15
**excitement**
55:11
**excuse**
5:16 62:11 64:10
**executive**
13:1,23 14:2
**exercise**
15:14
**exercised**
36:24
**exhibit**
69:5
**exist**
66:20
**exited**
14:14
**expand**
48:13
**expect**
38:1
**expectation**
38:18 50:24
**expected**
20:3 38:14
**expecting**
59:19
**experience**
51:6
**experienced**
44:25 47:6
**explain**
64:20 68:17
**exported**
13:19
**expressing**
55:2 68:5
**extend**
20:19
**extending**
51:21
**extension**
19:21 20:7,15
**extensions**
19:24

F

**fact**
39:21 45:1 66:18
**facts**
33:23 40:3 66:10
**fair**
25:11 34:21 41:15 51:1 54:7 61:2
**fairly**
25:13 61:10
**fall**
13:5
**falling**
58:11
**familiar**
8:21 64:12
**family**
6:21 13:9
**farm**
6:20
**fashion**
27:1 60:1
**fast**
23:11,13
**fat**
46:6
**father**
6:18
**feel**
38:22 53:1,5 54:3, 24 56:15 59:18 61:7 68:6
**feeling**
43:22 47:15,20
**feelings**
47:13,25
**felt**
23:10 30:8 31:8 32:10 47:13 49:10 50:5 65:19
**fiat**
46:14
**fiduciary**
15:16,24 16:8 20:9
**field**
12:21 46:1
**Fight**
23:2
**figure**
18:20
**final**
65:22
**finally**
33:6
**financial**
25:2,3,6,13
**find**
5:11,12,16 21:4 43:24 67:13 69:9
**finding**
69:17
**fine**
4:9 9:17
**finished**
12:10 18:15
**fired**
20:22
**firing**
15:18
**firm**
8:7 13:11 14:13,14 22:8 35:21
**flipping**
44:2

**fly**
49:20
**focus**
61:18
**focused**
50:7
**folder**
43:19
**folks**
62:4
**follow**
51:9
**follow-up**
70:5
**football**
18:2 48:16 49:22 50:7 51:25 53:20, 24
**forgotten**
36:6 56:12
**form**
25:16,19,24 31:19 38:4 39:9 41:5 45:7 50:15,18 51:2 52:22 56:18 57:15 59:21
**forma**
43:21
**forward**
20:6 53:10
**found**
29:10 43:24
**foundation**
28:23 38:5 39:10 50:17
**founding**
13:24
**fourth**
35:4
**frame**
13:2 14:16 19:20 22:22 29:17,18,21 42:20 63:3,13
**framework**
53:22
**frankly**
49:23 53:17 61:23
**friend**
37:11,14 68:15 69:16
**friendly**
26:7
**friends**
12:20 23:11,14,22 24:1,4 37:5 49:17 69:14
**friendship**
37:8
**friendships**
37:17
**front**
6:9 40:7 41:8 66:8
**frustrated**
47:8 49:6 65:5
**frustration**
28:10 47:11,19 59:16 64:7
**full**
13:21,22 28:24
**function**
15:21
**functions**
67:10

**G**

**game**
52:4 60:21 65:24, 25 67:25
**games**
51:25 52:1,2,14 65:14
**garrulous**
26:7 27:9
**gather**
38:24
**general**
8:3 12:11
**general's**
12:13 14:6
**generally**
8:21 47:19
**gentleman**
24:14
**germane**
18:23
**Gilbert**
8:6 13:10
**give**
10:11 19:15
**giving**
10:4
**goings**
50:25
**golf**
5:20 23:17,21 37:15 56:8 57:4 66:3
**golfing**
57:13
**good**
4:8 23:10 34:13,14 54:8 68:16,25
**governance**
15:2,23 16:4,7 46:8 62:8
**governor**
12:24 13:5,7 14:17,19
**governor's**
13:4 14:7
**governors**
15:13 32:13
**graduated**
7:3,5 11:20,24
**graduating**
12:5
**great**
10:4 13:15,22 14:2 52:5
**greater**
21:12
**grew**
6:19
**ground**
7:20 8:22
**grounded**
16:19 49:12
**guess**
19:5 23:23 27:2,7, 13 28:22 34:21 45:12 51:3
**guessing**
36:5
**guest**
45:11
**guests**
45:12,18

**H**

**handle**
68:2,3
**handled**
48:1
**handling**
49:7,8
**happen**
11:11 32:20 42:16 46:2 63:12 69:2
**happened**
4:16 24:4 34:4 46:12 55:15 59:5 62:25
**happening**
28:8 41:12 48:7,15
**happy**
11:13 64:5
**harassed**
40:22
**harasser's**
57:14
**harassing**
29:11
**harassment**
36:10 37:24 38:12 41:3,18 42:22 43:4 47:6 49:9 56:6 57:1,11 59:17 64:12 67:2
**hard**
40:5,12
**head**
18:19 26:21 28:22 44:5,9
**hear**
27:5
**heard**
24:13 66:14,19
**hearing**
7:17 8:19 66:17
**Hearts**
13:15,23 14:3
**heightened**
29:8
**Heiler**
4:1,8 6:2 14:4 60:9,19 70:14
**held**
22:24
**helpful**
21:9 24:7 48:12 58:15
**helps**
10:15 33:3
**high**
23:9
**high-ranking**
44:6
**higher**
65:24
**highlights**
14:5
**highly**
16:15 17:21 55:21
**hill**
53:23
**hire**
48:21
**hire/fire**
15:15
**hired**
18:18 24:18
**hiring**
15:18 17:8 18:7,10 19:2,4,6,12,16 51:21
**history**
12:3
**hockey**
49:3
**holder**
52:11

**home** 24:17,18
**honestly** 35:11 46:20
**horse** 6:16,20,22,23
**hosted** 24:17
**huh-uhs** 10:6
**human** 40:11
**Hurley** 18:10,17 19:2,13 22:12 24:18 37:13 50:4,12
**Hurley's** 19:12,21 22:14
**hurt** 37:21 47:13

**I**

**idea** 30:17 53:16 66:7,9
**imagine** 39:13 63:18
**immediately** 19:25
**implicate** 18:8
**importance** 61:20
**important** 5:22 53:2,9,15
**impression** 65:17
**impressions** 61:1 67:7
**impropriety** 42:6
**in-house** 13:22
**inappropriate** 27:18 57:3
**inappropriately** 26:23,24 27:1 67:19
**incisive** 21:20
**inclined** 51:16
**include** 16:9 39:15
**including** 35:2
**increased** 28:9
**increasing** 59:15 64:7
**increasingly** 28:6 47:8
**independent** 46:3
**independently** 65:8,11
**indirectly** 19:10
**individual** 45:10
**individuals** 49:19
**industry** 25:2
**influence** 10:10
**informally** 50:23
**information** 25:23 28:13,16 36:3 38:25 39:23 41:8
**informative** 21:10
**informed** 21:3 26:12,24 34:7 43:13 52:25 62:20
**informing** 62:19,25
**infrequently** 63:2
**initiated** 42:17,21 43:19 63:4
**inquiry** 38:19 39:6,7,20,25
**inside** 12:19 13:22 14:13 31:10 48:8
**insight** 61:20
**instance** 33:16 40:16,18 42:22
**institution** 62:9
**institutional** 46:21
**intend** 48:23
**intended** 35:16 48:21
**interacting** 45:11
**interaction** 67:18
**interactions** 54:15
**interest** 37:18,20 52:5,9
**interesting** 43:24 44:14
**interests** 20:8 23:15 51:6
**interview** 36:4
**interviewed** 35:6,12
**introduced** 23:3
**invested** 50:9
**investigated** 34:10 36:15 68:8
**investigation** 35:1,7,19 36:3 38:2,14,20 39:1,6,17,19 40:19,23 41:4,10 42:1,7,17,20 49:25
**investigative** 63:14
**invited** 65:19
**involved** 18:7 19:4,5,10,12 22:8 26:6 31:23 37:18 39:14,15 44:17 45:22 49:19,24
**involvement** 17:7,16 19:1,16
**involves** 62:7
**involving** 4:17 6:14 26:13 32:18 63:5
**irritated** 28:6
**issue** 7:18 31:2 32:18 43:11 61:22
**issues** 30:6,22 31:14 44:18 47:23,25 66:20
**IX** 64:17,18,21,22,24

**J**

**JAMES** 4:1 70:14
**JAY** 4:1 70:14
**job** 9:24 10:4 34:11 50:16 54:8 58:12
**join** 20:18
**joined** 18:22 20:24
**joining** 52:12
**journalism** 11:19 12:8,15
**judge** 61:8
**judgment** 57:17 66:2
**judgments** 40:15
**June** 69:25

**K**

**Kansas** 53:4
**Kathy** 44:24 59:23
**kind** 6:5,6 10:21 21:5,6 26:20 29:7 36:22 40:13 42:5 47:14 49:16,17 50:9 51:12,23 55:9 59:4 67:7,17 69:15,21
**kinds** 42:3 48:16 49:4 53:8
**king** 53:6
**knew** 37:3 38:23 49:18 59:23

**L**

**labor** 62:7
**lack** 28:10,11 47:8,16 59:16
**large** 16:11,15
**larger** 63:5
**largest** 30:15
**Las** 24:10
**launch** 39:1

**law**
7:1,3 9:1 11:24 12:5,7,10 13:11 35:21 46:23

**Lawrence**
53:6

**lawyer**
35:11 68:16,17 69:1,17

**lead-up**
19:5,16

**leader**
40:10

**leadership**
32:14,22

**leading**
19:11 22:8 41:9 48:4 62:8

**learned**
7:15 27:3

**learning**
27:14,18 57:11

**leave**
33:5,16,18,21 34:2,8,15 42:21 62:15,21,23 63:11

**led**
6:20 12:5 31:14

**left**
13:5 44:9 65:23

**legal**
6:4,6,11,13 43:20

**legislative**
6:9

**level**
8:17 17:10 21:25 25:3,22 30:24 32:23 45:24 46:21, 24 47:18 55:11

**levels**
29:9

**liberal**
13:16

**light**
56:20

**list**
44:12

**listing**
54:19

**litigation**
8:16,17

**litigator**
8:13

**lone**
13:8

**long**
4:25 10:21 11:9 29:1 34:7 39:2,3 52:12 61:24 68:23

**longer**
33:13

**looked**
22:11

**lose**
34:11

**lot**
23:15,17,18 27:24 46:22 49:10 52:7 53:9,17 60:25 63:22 67:14

**loud**
67:16

**Love**
35:20

**M**

**machine**
46:8

**made**
20:10 21:11 29:6 30:13 38:19 42:15 48:20 51:22 53:5 56:13 65:16

**major**
16:16

**make**
9:12,15,20,25 11:15 21:1 25:17 39:20 40:14 46:13 60:3

**making**
40:4 45:23,25 46:11 47:12 53:1 54:3

**malpractice**
44:18,22

**managing**
15:20 52:19

**March**
24:8,13 26:2,16 37:24 38:12 40:23 41:3 47:3

**mark**
69:4,8,10

**matter**
6:13 38:25 43:21 59:24 61:16 68:8

**matters**
8:4,5 20:4

**Mckirgan**
25:16 31:19 38:4, 16 39:9,12 41:5 45:7 50:17 51:2 52:22 56:18 57:15 59:21 60:18 69:6, 10,13,25 70:1,3

**meant**
10:21

**measured**
55:23

**media**
42:19 63:23

**medical**
44:17,19

**medication**
10:11

**meet**
23:9 68:22

**meeting**
22:21 23:6,8 43:14,15,18 46:7 68:22,25

**meetings**
46:5

**member**
15:5,8 17:6,20 24:21 32:13,19 37:25 38:13 40:25 41:16 42:23 45:4, 21 50:22 56:14

**members**
43:23 52:6

**memory**
33:12

**men's**
19:2 21:17 22:3 24:8 35:2 52:10 54:5,8

**mentioned**
30:25 39:25 47:3 58:10 59:9

**mentioning**
59:7

**message**
68:12,14

**messages**
5:14 29:19

**met**
4:12 21:2 22:23 24:15,16,19 25:25

**metrics**
31:8 54:22 55:12

**metro**
13:17

**Michael**
28:18,24,25 29:16 30:19,20 31:12 33:19 34:5 37:9 58:4,13 62:19 63:2

**Mike**
58:14

**mind**
6:24 25:6 40:25 41:21 53:23

**mints**
10:15

**minute**
35:9

**minutes**
5:1 11:12 44:2

**misconduct**
43:11

**mistreated**
47:15

**mistreatment**
47:16

**model**
13:16,19 15:10

**moment**
33:1

**moments**
4:13 59:15

**momentum**
55:7,10

**money**
57:7

**motion**
8:16

**move**
21:18 53:10

**moved**
12:7

**moving**
55:22

**multi-year**
18:6

**multiple**
48:22

**N**

**named**
19:14 24:14 35:20

**narrow**
61:10

**nature**
24:1 29:6,11 37:1 43:7

**NCAA**
45:17 55:14,19

**necessarily**
66:21

**needed**
21:18 29:4 36:16 59:25 68:2

**negative**
58:1,10 59:4 66:15,25 67:1

**Nevada**
24:10

**newly**
43:19

**news**
34:14,15

**newspaper**
14:6
**night**
23:2 65:22
**normal**
16:4 51:20
**Northern**
12:19
**not-for-profit**
16:5
**note**
51:22
**notes**
60:3
**notice**
67:14,15
**noticed**
67:5
**number**
21:21 47:5 55:9 63:3

**O**

**oath**
8:24,25
**object**
25:19 31:19 38:4 41:5 45:7 56:18 57:15 59:21
**objected**
20:5
**objection**
25:17 39:9 50:17 52:22
**objections**
38:16
**obligation**
20:9
**obligations**
64:13
**observations**
21:11
**observed**
67:18
**observing**
67:8
**occasion**
24:19
**occasionally**
52:3 55:22
**occasions**
24:15 25:25
**occurred**
33:25 41:20 62:14
**occurring**
32:24
**odd**
43:22
**office**
12:12,13,23 13:4,5 14:6,8
**official**
45:14
**officially**
14:24
**ongoing**
46:9 47:16 48:8
**opened**
13:8
**operating**
32:18
**operation**
44:19,21
**operational**
32:14,23,24
**operations**
15:24 62:3,8
**opinion**
23:8 59:4 66:25 67:1
**opinions**
25:24 26:4 50:16 61:3
**opportunity**
9:11
**opposed**
15:9 20:21
**order**
29:5 46:8 53:10
**Oregon**
65:22
**organization**
13:15,25 40:10
**organizations**
16:6
**organized**
12:11
**original**
20:16
**other's**
23:20
**outcome**
28:4
**outcomes**
36:23
**oversaw**
41:19
**oversee**
15:24
**overseeing**
15:18
**oversees**
15:8,10
**oversight**
15:14
**owned**
6:19

**P**

**p.m.**
60:6,7 70:6
**Pac**
24:9 35:2 40:22 65:15 67:25
**packages**
16:9
**Pact**
60:21
**pages**
12:16
**paid**
16:15 17:21
**part**
22:6 53:2 56:12 57:7 63:5
**participate**
36:2
**participated**
6:8 8:19 24:9
**patience**
60:10
**pattern**
44:22
**pay**
51:16,18
**paying**
20:3 52:14,16
**pending**
11:3,5
**people**
24:3 29:10 37:18,19 40:4 44:12 49:14 51:4,7 63:23 65:19 67:14,19
**perceive**
54:2
**perceived**
28:11
**perception**
31:3 48:10
**performance**
21:25 30:7,10,17,22 31:8,13,17 52:18 58:2 61:6,8 63:11 66:13,15,20
**performed**
16:2
**performing**
50:16
**period**
17:24 28:4
**person**
27:8,9 44:6 47:14 68:17,21
**person's**
9:16
**personal**
6:13
**personality**
26:5 31:6 67:16
**personnel**
18:7 48:10
**perspective**
24:21 59:18
**persuade**
20:18
**pertaining**
15:17 16:13 27:4
**phases**
52:21 65:25
**Phoenix**
13:17 22:25
**phone**
5:5
**phrase**
15:4
**piece**
6:14
**place**
33:2
**plane**
56:9,11 57:14
**played**
23:17,21 37:15
**playing**
65:22
**pleasant**
67:12
**pleased**
23:9
**point**
13:6 20:6,25 23:5 26:21 28:22 29:8,24 30:10,12 32:13 34:5,12 42:13,14 43:13 47:22 55:7 66:8 69:16,22
**policies**
16:12 45:23 46:12,14 68:5
**policy**
12:8,24 13:1 16:19 18:8 45:25 46:19,20,22,24
**popped**
44:9
**position**
12:15,23 24:6 31:13 38:21 59:24 69:15

**positions** 12:2
**positive** 21:22 30:9 58:7
**postpone** 57:17
**Power** 55:19
**practice** 8:17 13:9,11 14:10 16:14
**practiced** 8:6
**practicing** 7:23 8:10
**preceding** 12:8 19:8,17 20:1
**predating** 61:24
**predecessor** 19:21
**Prefer** 68:21
**preferring** 40:17
**preliminary** 8:16 38:19,25 39:5,7,20,25
**preparation** 5:2,7
**prepare** 4:21
**prepared** 40:20
**presence** 67:5
**president** 5:9 28:18 34:19,23 62:9
**presidents** 15:15,19
**press** 42:12
**pretty** 36:17 55:23
**previously** 54:20
**primarily** 46:25
**principals** 39:14
**prior** 19:7 21:15,19 41:7 52:20 57:20,22,25 59:3,10 67:1
**priorities** 61:16
**priority** 61:17,18
**private** 56:9 57:14
**pro** 43:20
**problem** 32:23,24
**proceed** 20:13
**proceeding** 6:5,6,12,13,23
**proceedings** 9:9 10:2
**process** 8:22 9:7 19:13 20:12 46:9
**processed** 46:10
**produce** 21:5
**produced** 63:15 68:14
**product** 21:5
**professional** 37:6
**professionalism** 60:12
**professionally** 49:15
**program** 19:7 20:25 21:1,12,17,18,24 24:25 48:17,19 49:3 50:6 52:20 53:1,3,8,10,16,19,20 54:5,9 55:11,13,19 61:12,15,17
**programmatic** 56:2 61:21
**promulgated** 46:25
**property** 6:14 7:15
**proposal** 20:15,16
**provided** 21:13 63:16
**providing** 36:3
**proximity** 19:22 28:20 45:18 59:2 67:16
**public** 12:8 15:21
**pun** 48:21
**purposes** 37:22 38:10
**put** 34:2 42:21 45:10 50:5 56:1 61:17 62:15,21 67:6

**Q**

**quarter** 35:4
**quarterly** 43:14,15
**question** 11:3,5,11 25:18 35:16 38:7
**questionable** 57:17 66:2
**questions** 4:15 60:8,14,19,25
**quickly** 32:15
**quote** 68:21

**R**

**racketeering** 12:12
**raised** 61:2
**raising** 57:7
**ran** 24:19
**raspy** 10:17
**Ray** 27:20 32:5,12 34:3 37:8,24 38:12 47:19,21 48:5,9 49:7,13 50:5 56:6,7,16 60:20,22,24 61:8 66:3,8
**Ray's** 49:11 61:25
**reach** 62:23
**reached** 63:1,8
**reacted** 31:1
**reacting** 36:22
**read** 27:12 64:3
**reading** 44:19
**real** 6:15 31:7 55:23
**realized** 48:24
**reason** 27:15 30:21 34:17,22 63:10
**reasonable** 36:22 41:1,13
**reasons** 34:20
**recall** 8:3 18:10 20:20 21:20 22:6 26:12,14 27:24 28:3,5 29:16 30:19 33:1,8,14,19,23 35:8 36:7,11 41:20 42:17,18 43:8 45:25 46:2,11 47:9 49:21 50:1 52:1 55:2,4,15 59:6 62:19 63:1,4,7,23 64:3 65:8,11 66:16 68:5 69:19
**recalling** 20:20 23:1
**receive** 41:2 43:14,19
**received** 28:14
**receiving** 57:9
**recent** 5:18
**recently** 8:6
**reception** 24:17
**recess** 60:6
**recognized** 23:4
**recollection** 25:1 33:4,17,24 36:1,4 46:3
**recommendation** 21:14,16
**recommendations** 21:2
**record** 10:1
**recording** 9:4
**recover** 6:23 7:14
**recruiting** 49:22
**referenced** 42:23

**reflected**
21:10
**refresh**
33:3 36:1
**regard**
5:9 19:6,11 48:9 64:23
**Regency**
12:6 14:18
**regent**
12:6 14:17,24 15:1,4,7 17:6 18:8 20:2,10 24:2,6,21 32:11 51:22 52:3 62:3,7 69:16
**regents**
15:1,5,6,13,20 16:23 17:7,11,16, 21,23 18:13 19:19 20:3,18 22:16 24:22 32:16 38:1, 13 41:1,17,18 42:10,24 45:5,22 46:15 50:23 51:24 52:1 56:14 60:13
**regular**
43:14,18 46:7
**related**
61:19
**relating**
61:11
**relationship**
23:12 24:2,23
**relayed**
28:2 29:14 31:12 50:4
**relevant**
12:3
**reliable**
31:7
**remember**
5:25 6:12 16:14 18:17 22:20 26:18 28:17 29:18 35:9, 12 42:24 44:7 59:7 62:25 68:25 69:3 70:2
**remote**
5:10
**removed**
55:7
**renewal**
19:9,20
**reorganization**
31:1,4
**repeat**
11:12 38:7
**rephase**
15:3
**rephrase**
11:13
**replevin**
6:22 7:14
**replicate**
13:16,20
**report**
35:17 40:20 63:14 64:1,3,11,17
**reported**
27:19 33:25 37:23 38:11 40:3 56:6 60:23 62:5 66:6
**reporter**
4:3 9:3 10:7
**reporting**
27:23 28:7 42:8 60:20
**represent**
56:5
**requested**
27:20
**require**
16:21
**requirements**
68:4
**respect**
49:7 59:16
**respects**
8:14 19:6
**respond**
29:13 48:6
**responded**
48:5
**responding**
61:1
**response**
27:17 29:5 30:8 32:21 41:2 47:17
**responses**
10:5
**responsibilities**
14:25 15:12,16,19, 23,24 16:4 31:9 32:10 36:25 37:19 45:16 54:12
**responsibility**
12:25 16:8 36:16 38:22 39:21 48:20 50:24 54:16
**responsible**
29:5 52:19
**restate**
41:6
**restroom**
10:23
**resulted**
19:13 42:7
**retaliated**
64:2
**retaliatory**
31:5
**revelations**
36:21
**review**
9:12 21:7,13
**revised**
20:14
**Richmond**
12:16,17
**Rick**
28:21 29:12 37:3, 4,9 58:22
**rise**
42:9
**rising**
47:18
**role**
54:2,16 62:2
**room**
9:5
**rose**
17:11
**roughly**
17:1
**rounding**
39:23
**Rowlett**
4:7,11 25:20 31:22 38:8 39:4,24 41:14 45:19 50:20 52:8 54:1 56:22 57:19 60:2,8,12 69:4,8, 12,23 70:5
**rows**
55:6 65:24
**rules**
7:20 8:23 68:4
**rumor**
49:21
**rumors**
49:20,24
**run**
14:11 46:8,9
**running**
16:1 55:18,20 61:9
**runs**
26:20

**S**

**sat**
65:24
**scenario**
37:5
**scheduled**
43:15
**school**
7:1,3 11:24 12:5, 10 13:14
**schools**
13:20 15:17
**search**
22:3,5,7,8,9
**season**
19:23 20:1,22 52:11
**seat**
65:16,18
**seated**
17:2
**seating**
65:13,15,23
**seats**
55:8
**seconds**
48:24
**sector**
51:20
**seek**
20:17
**seeking**
19:20,21 69:17
**Senate**
14:23
**senior**
45:14
**sense**
11:15
**Sensitivities**
29:7
**sentence**
58:13
**sequence**
28:17 42:13
**serial**
36:21
**services**
25:2
**session**
10:22
**set**
16:12 66:7
**setting**
26:7
**settings**
27:11
**sexual**
36:10 37:23 38:12 41:2,18 42:22 43:4,8,10 47:6 49:8 56:6 57:1,11 59:17 64:11 67:2

**sexually**
40:21
**Shangraw**
28:21 30:2 36:9,13 58:22 68:7
**share**
29:25 30:4
**shared**
23:21 26:22 29:24 30:1,5,8,12 31:2 36:9 47:20,24 54:23 66:10
**shocking**
44:16
**shouting**
59:10
**show**
29:5 68:12
**showed**
69:19
**significant**
16:12 25:13 30:22
**significantly**
20:16 21:24 30:9 31:9 54:22 55:2
**similar**
30:5
**simple**
55:24
**simply**
41:23 62:6
**single**
15:11
**sir**
4:14 14:3 46:24
**sit**
65:20
**situation**
69:20
**situations**
39:19
**sketch**
12:4
**slowed**
55:10
**social**
26:6 27:11
**sold**
55:9
**solvent**
15:25
**sort**
20:2 21:25 22:7 29:10 30:16 32:13,16 41:3 44:23 48:13 51:17 59:20 65:18 67:14
**sound**
31:7 49:12
**sounds**
31:16 46:18 50:22 69:18
**space**
26:23
**speak**
4:3 39:14 40:1 51:14 60:22,24
**speakers**
48:22
**speaking**
34:5 49:15
**special**
12:24 46:5
**specifically**
46:15 49:6 50:15
**specificity**
64:14
**specifics**
27:22
**speculated**
36:19
**spelled**
9:17
**spend**
44:1
**spent**
37:11 52:12
**splash**
48:20
**spoke**
4:23 18:14 27:25 28:18,21 29:16,17,23 33:8,9 47:21,23 62:22 63:2 65:4
**spoken**
36:6
**sporting**
23:22 24:20 37:12
**sports**
16:12,16 23:16
**spots**
21:23
**spring**
19:25
**square**
30:17
**staff**
13:6
**stallion**
6:18
**stand**
6:21
**stands**
59:11,12
**started**
57:24
**state**
4:18 7:8 11:18 13:19 14:8 15:9,14,17 16:1 17:3 19:3 21:18 24:23 25:10 28:11 32:4 34:25 40:16,18 46:9 47:4,9 52:9,17 53:19 56:7,16 57:3,13 58:1 61:24
**stated**
42:20
**statement**
66:10
**states**
15:10
**statute**
16:1
**steps**
8:16
**sticks**
44:4
**stories**
36:20 63:24
**strategic**
53:9,21
**stretch**
8:2 14:12 26:20
**strike**
70:2
**struck**
26:5
**stud**
6:22
**student**
45:3
**study**
11:17
**stuff**
49:16 50:10
**subsequent**
34:6 35:3
**substandard**
30:18
**substantial**
30:14
**substantive**
9:20
**succeed**
49:15
**success**
50:9 52:25 54:21,25
**successful**
53:7,18,20 55:18,21
**suing**
43:25 44:12
**superintend**
45:17
**superiors**
32:11
**supervisor**
27:20,23
**support**
50:6
**supported**
13:9 53:2,5 54:4
**supporter**
24:25 25:3,6
**supporter/booster/donor**
25:14
**suppose**
38:18
**surface**
42:5
**surprise**
27:5
**surprised**
27:7,14
**surrounding**
56:20 63:20 66:10
**suspect**
27:15
**suspected**
27:15
**swimming**
48:19
**sworn**
4:2
**synonymous**
25:6
**system**
43:20,25
**systemwide**
46:19

**T**

**taking**
8:3
**talk**
4:25 9:25 10:23 11:4 28:24 48:18 49:1,4,17 64:8
**talked**
30:1 44:24 49:4 50:3 58:17,18 59:14
**talking**
33:18 44:5 48:14
**taught**
64:10
**team**
24:9 50:3 62:10

**team's** 50:9
**Teasdale** 35:22
**technology** 12:20
**telephone** 29:22 63:7
**telling** 33:19
**tells** 68:21
**tenure** 14:21 41:16 52:18
**term** 66:2
**terminate** 17:17 34:17,22
**terminated** 17:14 22:3 30:6 33:6,17,20 34:1,3, 8,14 62:20
**termination** 4:17 16:22 17:13 31:15 35:3 47:4 57:22,23
**terminology** 15:6
**terms** 15:20 36:23 42:19 61:6,14 63:20 64:11 65:14 66:12
**testified** 4:4 6:4,9,11 7:19 36:8 47:7 65:4 66:1,12,24 68:7
**testify** 6:12
**testimony** 10:12 36:11 47:9 62:14 66:5
**testing** 12:21
**Texas** 13:19
**text** 5:14 29:19 68:12, 13,14 69:18,24
**texted** 5:18 29:20
**texting** 68:15,20
**theater** 51:8
**theaters** 12:7
**theretofore** 21:25
**thing** 5:9 11:2 20:5 29:7 32:16 40:14 44:23 51:12,17,23 55:17 64:19 69:21
**things** 5:18,20,22 16:6 21:22 23:21 30:9, 23 40:6,11,13 42:3 46:7,10 48:16,17, 18 49:2,5,12,24 50:1,8 51:14,20 53:8,11 55:9 56:2 58:1,9 63:3 68:9
**thinking** 18:21 40:9 64:24
**thought** 16:7 48:1
**thoughts** 31:16
**thumbnail** 12:4
**ticket** 52:11
**ticketing** 54:13,17
**time** 4:12 5:11,18 7:15 8:1,11 9:11,21 13:2,21,22 14:16 17:20,24 18:13 19:7,20 22:1,20, 22,23,24 23:13,18 24:22 25:10 26:11, 13,20 28:4,7,17 29:1,8,12,17,18,21 31:17 32:20 33:18 34:1,16 36:20,22 37:11 38:1,14 41:1,9 42:5,13,16, 20,23 44:4,8,22 45:21 48:11,15 49:2,13,21 50:4, 14,21 54:18,19,24 56:13,15 58:23 59:19 60:9 62:17, 18 63:3,13,23 68:1
**timeline** 42:18
**timelines** 26:18 33:12
**times** 24:20 37:16 43:16 55:3
**Times-dispatch** 12:17
**Title** 64:17,18,21,22,24
**today** 4:15 10:12 14:2
**today's** 4:21 5:3,7 9:8 10:1 14:1
**told** 25:1 27:19 30:14 61:4 62:11,24 63:10 68:10
**Tolerance** 29:9
**top** 18:19 55:4
**topics** 54:19 63:6
**torture** 10:21
**totally** 9:17 30:6
**touched** 26:24 27:1
**touching** 67:19
**tournament** 24:9 35:3 40:22 55:14,20,22 65:16, 23
**town** 8:7 53:6
**trained** 64:11
**transcript** 9:8,13
**trial** 7:13,16 9:21
**trick** 35:16
**trip** 56:8,10,12,13 57:18 66:3,9
**trips** 57:4,13
**true** 30:21
**trusted** 49:15 51:8,14
**truth** 4:3,4
**Tucson** 44:19
**turn** 34:12,13
**turned** 44:8
**type** 67:17
**types** 42:4 43:25 44:4 49:23
**typical** 51:22
**typically** 18:7 19:24 41:23 51:7

**U**

**uh-huhs** 10:5
**ultimately** 20:14 22:11
**unable** 5:12
**unacceptable** 59:25
**unaware** 25:15
**uncertainty** 57:21
**undergrad** 11:17,21
**undergraduate** 7:9
**understand** 4:19 8:24 9:3,5,9, 13,22 10:2,7,25 11:10,15 62:2 64:1,9,16
**understandable** 55:16
**understanding** 29:14 33:14,15 62:6,14
**understood** 10:8 28:23 64:4
**unfolded** 36:20 48:6
**unfolding** 8:8
**universities** 15:9,14,22,25 16:10 46:13
**universities'** 16:5 46:9
**university** 4:18,23 5:10 7:5,7 11:18 15:11 17:4 19:3,18 20:6,8,11 23:10,25 24:5,24 25:23 28:19,25 29:4,13,15 30:10 32:4,21,22,23 34:25 36:9,16 41:19,22,24 42:25 43:2,3,10,20,25 44:6,18 45:11,16, 23 47:4 49:25 50:14 52:13 53:13, 15 56:8,16 57:3 58:1,20 59:20 61:1,24 64:9,16

**university's**
31:13 40:16,19
**unofficially**
20:3
**unorthodox**
19:20
**unpleasant**
67:13,17
**unqualified**
16:3
**unreasonably**
59:19
**unrelated**
30:7
**untypical**
20:5
**unwanted**
27:2
**unwelcome**
29:10
**upper**
55:5
**usual**
15:16

**V**

**vacuum**
48:7
**vaguely**
69:19
**Vegas**
24:10
**versa**
47:20
**vice**
47:20
**view**
20:10 22:1 34:16 36:9 39:5 45:5,9 54:7 68:1,9
**viewed**
55:1
**viewpoint**
30:5
**viewpoints**
29:24,25 30:1,4
**views**
23:21 25:24 26:4, 11 44:25 45:1 61:3
**violation**
68:4
**Virginia**
12:17,19
**voice**
10:17
**voted**
20:17
**voting**
20:18

**W**

**walled**
55:5
**wanted**
25:12 30:24 65:7,9
**warranted**
38:20
**watched**
65:24
**Wear**
24:14,22 25:9,24 26:11,13,22 27:4,5 28:3 36:11 40:21 56:8,21 57:12 59:1,3,13 63:12 64:21 66:4,25 67:3,8,24
**Wear's**
26:16 35:1 37:23 38:11 42:8 44:25 56:6,9 60:20
**weeks**
9:7
**wife**
45:2,13,14 47:6,15 65:12
**wife's**
26:23
**withdraw**
10:9 24:12
**withdrawn**
17:19 21:15 22:19 32:2 40:17 45:20 50:21 54:11 57:10, 20 58:17
**wolf**
13:8
**woman**
35:20
**women**
39:15 40:1,22
**women's**
18:3
**wondering**
35:17
**word**
25:5,12
**work**
10:6 12:3 13:3,10 14:7 17:19 21:5 62:7,8
**worked**
13:4 58:8
**working**
58:9
**workplace**
49:16
**world**
23:22
**worry**
38:23
**worse**
36:23
**writ**
6:22 7:13,14,18
**writing**
63:24
**wrong**
9:16 14:20 15:4

**Y**

**y'all**
33:22
**year**
11:20 12:18,22 18:17 20:20 43:16 46:5 55:20,21
**years**
4:16 5:7 6:25 7:2 8:7,15 12:14 14:14 18:21 20:21 46:4 52:12,16 55:14
**yesterday**
4:24

**Z**

**Zoom**
8:20

# EXHIBIT 5

# In the Matter of:

*Cohen*

*vs*

***Arizona Board of Regents, and Anderson***

---

*Ralph Frederick Shangraw, Jr.*

*December 20, 2023*

---

GRIFFIN GROUP
INTERNATIONAL
3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

DAVID COHEN, Plaintiff,

vs.

ARIZONA BOARD OF REGENTS AND RAYMOND ANDERSON, Defendants.

No. 2:21-CV-01778-GMS

DEPOSITION OF RALPH FREDERICK SHANGRAW, JR.

Phoenix, Arizona
December 20, 2023
9:20 a.m.

REPORTED BY:
CINDY BACHMAN, CR
Certified Reporter
Certificate No. 50763

PREPARED FOR:
ASCII/CONDENSED
(Certified Copy)

I N D E X

WITNESS Page

RALPH FREDERICK SHANGRAW, JR.

EXAMINATION BY MR. PEREZ......................5

* * * * * *

E X H I B I T S


| Deposition Exhibits: | Description | Page |
|---|---|---|
| No. 19 | Amended Notice of Videotaped Deposition of R.F. "Rick" Shangraw, Jr. (4 pages) | 14 |
| No. 20 | Email Correspondence ABOR.COHEN000107-109 (3 pages) | 99 |
| No. 21 | Memorandum from Carrie Love to Kim Demarchi, November 5, 2019 (21 pages) | 103 |
| No. 22 | Notes of the meeting between Rick Shangraw and Marcel Valenta ABOR.COHEN002247-2250 (4 pages) | 103 |
| No. 23 | Text Messages COHEN_005612-005625 (14 pages) | 126 |

DEPOSITION OF RALPH FREDERICK SHANGRAW, JR., was taken on December 20, 2023, commencing at 9:20 a.m., at the law offices of MILLER, PITT, FELDMAN & McANALLY, P.C., 2800 North Central Avenue, Suite 840, Phoenix, Arizona, before CINDY BACHMAN, a Certified Reporter, Certificate No. 50763, for the State of Arizona.

COUNSEL APPEARING:

For the Plaintiff:

PEREZ VAUGH & FEASBY
BY: Michael J. Perez, Esq.
600 B Street
Suite 2100
San Diego, California 92101

MILLER, PITT, FELDMAN & McANALLY, P.C.
BY: Jose de Jesus Rivera, Esq.
2800 North Central Avenue
Suite 840
Phoenix, Arizona 85004

For the Defendants:

PAPETTI SAMUELS WEISS McKIRGAN
BY: Jennifer Lee-Cota, Esq.
Robert H. McKirgan, Esq.
Heather A. Robles, Esq.
16430 North Scottsdale Road
Suite 290
Scottsdale, Arizona 85254

ALSO PRESENT:

David Cohen, Plaintiff
Kathy Cohen
Hope Sharett, ASU Enterprise Partners
Marlina Rogers, ASU Enterprise Partners
Kwan Piensook, Esq., Assistant General Counsel for Arizona State University (Appearing telephonic)

RALPH FREDERICK SHANGRAW, JR.,

a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. PEREZ:

Q. Good morning.

**A. Good morning.**

Q. How are you?

**A. Great. Thank you.**

Q. Good.

My name is Mike Perez. I'm the attorney representing Dave Cohen in this matter. Okay? Good to meet you.

**A. Great. Should I call you Mike? Is that okay?**

Q. You can call me Mike, if you'd like.

**A. Great. Wonderful.**

Q. And then to my left is my client, Dave Cohen, and his wife. And you know both Dave and Kathy, correct?

**A. Yes.**

Q. Okay.

MR. PEREZ: Counsel, I'm going to ask if you'll introduce the other people in the room.

MS. LEE-COTA: Yes.

So Jennifer Lee-Cota, counsel for Arizona Board of Regents and Ray Anderson. And then next to me, I have Hope Sharett of ASU Enterprise Partners. And then I have Heather Robles of Papetti Samuels Weiss McKirgan and also Bob McKirgan of Papetti Samuels Weiss McKirgan. And Marlina Rogers of ASU Enterprise Partners. And also on the phone, we have Kwan Piensook, associate counsel for ASU.

MR. PEREZ: Thank you very much.

BY MR. PEREZ:

Q. Mr. Shangraw, could you please state your full name and spell your last name for the record.

**A. Sure. Ralph Frederick Shangraw, Jr. S-h-a-n-g-r-a-w.**

Q. Mr. Shangraw, have you ever been deposed before?

**A. I have.**

Q. Okay. I'm going to run through some basic admonitions. I'll go through them maybe more quickly since you've gone through this process before.

You understand you're testifying today under penalty of perjury, which is the same as if you were testifying in a court of law?

**A. I do.**

Q. And you understand that you are obligated to tell the truth today and that if you don't tell the truth, that's tantamount to perjury. Do you understand that?

**A. I do.**

Q. Okay. To your left is the court reporter. The court reporter will be making a transcript of today's proceedings and so it's important that we follow a certain set of ground rules. Okay?

**A. Okay.**

Q. So one of those ground rules is that we speak audibly. Okay?

**A. Yes.**

Q. And then another ground rule is that we don't talk over each other. So I'll talk, pause, give you an opportunity to speak, and give you the same courtesy. All right?

**A. Sounds good.**

Q. Okay. A transcript will be prepared, and you will have an opportunity to comment on that transcript. But it's important that we get your full and most accurate testimony today. Do you understand that?

**A. Yes, I do.**

Q. And to the extent that you make changes or have edits to your transcript down the road, we'll have an

opportunity to comment on that at trial. So whatever reason, it's important that we have your best and most accurate testimony today.

**A. I understand.**

Q. Great.

Is there any reason why you cannot give your best and most accurate testimony today?

**A. No reason.**

Q. Are you under any medications or anything we should know about?

**A. I am not.**

Q. All right. The process of a deposition is I'll ask a question and you'll answer, which means there is an assumption that if you answer the question, you understand the question. Does that make sense?

**A. It does.**

Q. So if you don't understand the question, will you please let me know?

**A. I will.**

Q. All right. During the course of today's deposition, your counsel may object from time to time, and you will still be required to answer the question unless your counsel instructs you not to answer the question. Does that make sense?

**A. It does.**

Q. So, for example, if I ask a question and she objects and she doesn't instruct you not to answer the question, then I'll still wait for an answer.

**A. Understood.**

Q. Okay. Again, we talked about not just audible responses but whether you're using your hands or gestures, the record can't pick that up. So I may from time to time ask you to walk us through audibly what it is that you're doing. I'm not sure if that will happen in this instance, but just so you know. Okay?

**A. Understood.**

Q. You look like you might talk with your hands, which is why I threw that in there.

**A. I'll put them down in my lap.**

Q. Okay. During the course of today's deposition, you'll have an opportunity to take breaks. I don't imagine we'll go more than three hours, so we'll probably only do one, maybe two, breaks during the course of this deposition.

But if, for whatever reason, you feel you need a break, then will you please let me know?

**A. I will.**

Q. And typically, the way this process will unfold is that we'll finish our question before we take a break. So we won't take a break in the middle of a

question, but we'll take the most reasonable and soon as break that we can take. Okay?

**A. Understood.**

Q. All right. During the course of today's deposition, I do not want you to guess. I do not want you to provide answers that you don't have some degree of certainty to. But you may be asked to speculate. And so I want to know if you know the difference between guessing and speculation?

**A. I do.**

Q. Okay. And then you understand that you're represented by counsel today on your right. And throughout the course of this deposition, I do not want any information that you've discussed with your counsel or they've discussed with you. Attorney-client privilege discussions or any type of attorney-client privilege communications, emails, interactions, we do not want that information.

And so if you feel like in order to answer the question, you have to divulge something, please hesitate and speak with your attorney. Okay?

**A. Will do.**

Q. All right. So you said you've been deposed before. On how many occasions?

**A. Four.**

Q. Can you recount for me those four instances?
So let's take the furthest in time. Do you recall what that deposition was about?

**A. That deposition was related to an HR matter related to a company that I was a CEO.**

Q. Were you a party to that lawsuit?

**A. No.**

Q. It sounds like it was a civil lawsuit?

**A. Yes.**

Q. Was your company a party to that lawsuit?

**A. Yes.**

Q. Okay. And it sounds like it was an HR issue with regard to a termination?

**A. Yes.**

Q. How long ago was that?

**A. 25 years.**

Q. Do you remember the name of that lawsuit?

**A. No.**

Q. All right. Let's go to the next one in time.

**A. It was a matter related to an intellectual property claim.**

Q. And were you a party to that lawsuit?

**A. No.**

Q. Can you tell me what that lawsuit was about?

**A. It was about a claim related to groundwater**

**technology that the company I was CEO had an interest in.**

Q. Was that the same company as the first one?

**A. Correct.**

Q. And what was the name of that company?

**A. Project Performance Corporation.**

Q. And do you remember the name of that lawsuit?

**A. I don't.**

Q. Was it civil litigation?

**A. Yes, it was.**

Q. And now the third lawsuit, if you can remember.

**A. The third lawsuit was a matter related to an intellectual property claim against Skysong Innovations.**

Q. And you weren't a party to that lawsuit. Is that correct?

**A. I was not a party.**

Q. Okay. And do you remember what that litigation was regarding?

**A. It was regarding a claim against a company that had improperly used a technology that had been developed at Arizona State University.**

Q. So at the time, you were at ASU?

**A. I was at ASU Enterprise Partners.**

Q. And I think I asked this. You were not a party

to that lawsuit, correct?
A. **Right.**
Q. Do you remember the name of that lawsuit?
A. **I don't.**
Q. Okay. Do you remember who the defendants were to that lawsuit?
A. **It was a company, and I can't remember the name.**
Q. And was ASU the plaintiff?
A. **I don't know.**
Q. Okay. And then I think you said four. Do you remember a fourth lawsuit?
A. **I do.**
Q. And what was that?
A. **That was a matter related to an improper employee of ASU claiming some claims against the University related to her employment contract.**
Q. And do you remember how long ago that lawsuit was?
A. **Four years ago. Five years ago.**
Q. Before COVID?
A. **Pre-COVID.**
Q. It sounds like you were not a party to that lawsuit?
A. **Correct.**

Q. And was ASU a party to the lawsuit?
**A. They were. The Board of Regents.**
Q. Do you remember the name of that lawsuit?
**A. I don't.**
Q. Let's talk about what you've done in preparation for your deposition. I'm going to begin by handing you a copy of Exhibit 19.
(Deposition Exhibit No. 19 was marked for identification by the court reporter.)
BY MR. PEREZ:
Q. Do you recall seeing this document before?
**A. I don't.**
Q. Do you recall seeing a prior iteration of this exhibit?
**A. No, I don't.**
Q. Did you bring any documents with you today?
**A. I did not.**
Q. Were you asked to bring any documents with you today?
**A. I was not.**
Q. I'm going to ask you to take a moment to review Attachment A, and you'll see there are three questions: Request for Production 1, 2, and 3.
**A. Yes.**
Q. I'm going to walk through those requests with

you.

Have you produced to counsel all communications between you and any person relating to Dave Cohen?

**A. Yes.**

Q. And that includes tax, emails, any other communication --

**A. Correct.**

Q. -- social media you might use?

**A. Correct.**

Q. Have you produced request No. 2, all communications between you and Dave Cohen?

**A. Yes.**

Q. And the third request, have you produced all communications between you and any person related to the sexual harassment by Bart Wear or any investigation related to the sexual harassment by Bart Wear?

**A. Yes.**

Q. And those are all produced to your counsel?

**A. Some time ago. That's correct.**

Q. And walk me through, please, when it was you received this request, I assume from counsel, for this information. Where did you look for that information?

**A. Let's see. That request came probably spring of 2020, I think, is when it came. And I looked on my**

**computer. I looked on my phone. I don't use social media, so...**

Q. Do you have a laptop?

**A. I do.**

Q. Do you work from just a laptop or a desktop as well?

**A. Both.**

Q. Did you search both devices?

**A. Didn't need to.**

Q. Because?

**A. It's all in one place, in the cloud.**

Q. Okay. So you don't have a separate line of communication, personal emails that you might use?

**A. No.**

Q. And do you have hard copy documents?

**A. Can you clarify that?**

Q. Sure.

Do you print out things and put them in files?

**A. No.**

Q. So you don't have any hard copy documents at your office or at home?

**A. No.**

Q. Please tell me what you did in preparation for today's deposition.

**A. I met with counsel twice.**
Q. And when did you meet with them?
**A. I had a short meeting, I want to say, two or three weeks ago. And then another short meeting at the beginning of this week.**
Q. When you say "short meeting," what does that mean to you?
**A. 30 minutes.**
Q. So each was approximately 30 minutes?
**A. Correct.**
Q. I would like to talk a little bit about your background. And I'd like to go through this relatively quickly.
Where did you attend undergrad?
**A. Dickinson College in Carlisle, Pennsylvania.**
Q. And what year did you graduate?
**A. 1981.**
Q. What was your degree in?
**A. Political science and environmental science.**
Q. Did you get another degree after that?
**A. I did.**
Q. And what was that degree in?
**A. A master's in public administration in 1982 from Syracuse University.**
Q. In upstate?

**A. In upstate.**
**And a Ph.D. from Syracuse University in 1986.**
Q. My sister was the general counsel in Syracuse, but not until the late '90s.
**A. I missed her.**
Q. Yeah.
So after your Ph.D., did you get any other degrees?
**A. I did not.**
Q. And I'm sorry. What was your Ph.D. in?
**A. Public administration.**
Q. Did you work between getting your undergraduate degree and your Ph.D.?
**A. Yes.**
Q. And so what was your first job after graduating from college?
**A. My first job was the summer of '83 at the RAND Corporation.**
Q. And what did you do at the RAND Corporation?
**A. I was an analyst.**
Q. And did you get your master's degree at the same time that you were working at RAND?
**A. I did not.**
Q. When did you start working at RAND?

A. **Summer of '83.**
Q. So that would have been after your --
A. **Between the master's and Ph.D.**
Q. And your Ph.D.
A. **Correct.**
Q. Did you work while you were getting your Ph.D.?
A. **Yes.**
Q. Was it at the RAND Corporation?
A. **No.**
Q. And where was that at?
A. **It was at Syracuse University.**
Q. And on-campus job?
A. **Graduate assistant.**
Q. And did you do that throughout your time at Syracuse University?
A. **I did.**
Q. Okay. When you graduated from Syracuse, what was your first job after receiving your Ph.D.?
A. **A faculty member.**
Q. At what university?
A. **At Syracuse University.**
Q. And how long were you at Syracuse University?
A. **As a faculty member, for three years.**
Q. And can you tell me what you taught at Syracuse University?

**A. I taught organizational theory. I taught research and development policy. I taught management information systems. I taught introduction to computing. I think that was it.**
Q. And was that all at the undergraduate level?
**A. All at the graduate level.**
Q. At the graduate level.
**A. Correct.**
Q. Was there a particular graduate school?
**A. Yes.**
Q. Which one?
**A. It's called the Maxwell School of Citizenship and Public Affairs.**
Q. After that job, what was your next job?
**A. My next job was with a company called Independent Project Analysis.**
Q. And approximately when did you start that job?
**A. I started that job in 1988.**
Q. And what did you do at that job?
**A. I was the vice president of the company.**
Q. What was the name of the company?
**A. Independent Project Analysis.**
Q. So it was this company that you were working at. How long were you at that job?
**A. Three years.**

Q. And then what was your next job after that?
**A. I was CEO of Project Performance Corporation.**
Q. And what year did that begin?
**A. 1991.**
Q. Approximately what age were you when you were the CEO in 1991?
**A. 31.**
Q. Describe that company for me.
**A. It had three areas of work. It worked in the environmental field, the energy field, and in the information technology field doing mainly strategy consulting.**
Q. And how long were you at that job?
**A. I was at that job for 14 years.**
Q. And where was that job?
**A. Northern Virginia.**
Q. Norfolk?
**A. No, no, no. Outside of Washington, D.C. Northern Virginia, yeah.**
Q. And after that job, then what was your next job?
**A. Arizona State University.**
Q. At the university itself?
**A. That's correct.**
Q. And what was that job?

A. **I was the director of a research center.**
Q. And what school did that fall under?
A. **I was appointed in the School of Public Affairs.**
Q. And what exactly were you doing there?
A. **I was running the research center and teaching.**
Q. What does that mean "running the research center"?
A. **I was the director.**
Q. So you had a staff? You were running staff?
A. **Yes.**
Q. How many people were under you?
A. **20 to 25.**
Q. Okay. And so how long did you do that job?
A. **Two and a half years.**
Q. And then what was your next position?
A. **I was associate vice president of research.**
Q. At Arizona State University?
A. **Yes.**
Q. In the same department?
A. **This was an executive level.**
Q. Who appointed you?
A. **President Crow.**
Q. Who appointed you to the position prior to that?

A. The director of the research center. That appointment was made by President Crow. The faculty appointment was made by the director of the department and dean of the college at that time.

Q. Did you know President Crow prior to coming to ASU?

A. I did.

Q. And where did you know him from?

A. I met him in 1982 at Syracuse University.

Q. And in what capacity did you meet him in?

A. We were graduate students together.

Q. While you were getting your Ph.D.?

A. Yes.

Q. Was he also getting a Ph.D.?

A. Yes.

Q. And did you maintain a relationship from 1982 until years later when you went to ASU?

A. Yes.

Q. How would you describe that relationship during that time?

A. Good.

Q. Were you friends?

A. Yes.

Q. All right. What was your next job after that?

A. I was vice president of research.

Q. And how long were you in that capacity?

**A. Four years.**

Q. So approximately when did that job end?

**A. 2011.**

Q. And where did you go to in 2011?

**A. I became CEO of the ASU Foundation.**

Q. Explain for me what ASU Foundation is.

**A. It's a private not-for-profit 501(c)(3).**

Q. Is it an entity separate and apart from ASU?

**A. It is.**

Q. So it's got no overlap with ASU or the Arizona Board of Regents?

MS. LEE-COTA: Object to form.

**THE WITNESS: What do you mean by "overlap"?**

BY MR. PEREZ:

Q. Is there any governance that's related between the Arizona Board of Regents, ASU, and the Foundation?

**A. No governance.**

Q. Are there finances that are intermingled between the Foundation, ASU, and/or the Board of Regents?

**A. Clarify "intermingled."**

Q. Does the Foundation send money to ASU, for example?

**A. It does.**
Q. Does ASU send money to the Foundation?
**A. It does.**
Q. Explain to me then that financial relationship. Is there a mechanism by which money is sent from one entity to the other to demonstrate the separate entities? Does that make sense?
MS. LEE-COTA: Object to form.
**THE WITNESS: No.**
BY MR. PEREZ:
Q. Okay. I guess I'm trying to understand the separate entity foundation relationship with ASU.
**A. ASU procures services from the Foundation, and the Foundation provides resources back to the university.**
Q. So they hire you?
MS. LEE-COTA: Object to form.
**THE WITNESS: That's correct.**
BY MR. PEREZ:
Q. And when they hire you, you then perform services. And as a result of that, you are paid for those services?
**A. That's correct.**
Q. And you said something about resources. What are the resources that are exchanged?

MS. LEE-COTA: Object to form.

**THE WITNESS: Resources in terms of funding that goes back to ASU.**

BY MR. PEREZ:

Q. And what type of funding would that be?

**A. For example, scholarships.**

Q. And what was your role again at the foundation at that time?

**A. CEO.**

Q. How long had the foundation been in existence at that point?

**A. 30-plus years.**

Q. Do you remember who you replaced?

**A. There was an interim that I replaced. And it was Craig Weatherup.**

Q. Do you remember who was before Craig Weatherum?

**A. Weatherup. I do not.**

Q. With regard to your position at the foundation, has that been the same position that you've held since that time?

**A. What do you mean "since that time"?**

Q. 2011 is when you became the CEO?

**A. That's correct.**

Q. Okay. And then is that the same position you were in, or did you transition to another position?

**A. Well, do you want to know my next job?**
Q. Yes, please.
**A. I was the CEO of ASU Enterprise Partners.**
Q. Okay. I'm getting confused with all the foundations.
So tell me about the Enterprise Partners entity.
**A. A separate 501(c)(3). And it had a number of 501(c)(3)s reporting to it.**
Q. So that is a separate 501(c)(3) from the foundation?
**A. That's correct.**
Q. I was under the impression it fell under it. So it's a separate 501(c)(3). And that separate 501(c)(3) has 501(c)(3)s underneath it?
**A. That's correct. Including the foundation.**
Q. And I'm sorry. What was your role or your title at the new position?
**A. CEO.**
Q. And is that the role you are still in?
**A. Still in when?**
Q. At the Enterprise Partners. Is that the role that you're in now?
**A. No.**
Q. What's your next position then?

**A. I'm president of Cintana Education.**
Q. So you've left the foundation entirely, and you've left ASU Enterprise Partners?
**A. I retired in January of 2020.**
Q. Who replaced you?
**A. Dan Dillon.**
Q. Did you pick your replacement?
**A. I did not.**
Q. Who picked your replacement?
**A. The board.**
Q. Which board?
**A. Board of Enterprise Partners.**
Q. And what is your new position?
**A. President.**
Q. Let's talk a little bit about your relationship with the Cohens. When did you first meet Dave Cohen?
**A. Soon after he joined ASU.**
Q. Approximately 2014?
**A. I guess if that's when he joined ASU.**
Q. Do you remember when you first met him?
**A. I do not.**
Q. You said "soon after he joined." Was there something that strikes your memory why you knew it was soon after he joined?
**A. No.**

Q. I mean, was there like a welcome thing for him that you attended?

**A. I have no idea.**

Q. Okay. And would it be fair to say that you had at first a professional relationship that ultimately developed into a social relationship as well?

**A. Yes.**

Q. And when did you meet Kathy Cohen?

**A. Soon after Dave joined ASU.**

Q. And would it also be fair to say that you had a social relationship with Kathy and Dave together?

**A. That's correct.**

Q. And is it also true that you had a relationship that included your wife; the four of you would go out for dinner from time to time?

**A. That's correct.**

Q. How would you describe your relationship with David Cohen?

**A. Good.**

Q. You were friends?

**A. Yes.**

Q. And how about your relationship with Kathy, were you friends?

**A. Yes.**

Q. And are you familiar with the facts of this

lawsuit?
**A. Not all of them, but some, yes.**
Q. We're going to walk through some of those, but I want to find out your relationship with some of the different people involved.
**A. Okay.**
Q. Do you know who Bart Wear is?
**A. Yes.**
Q. How do you know Bart Wear?
**A. Bart Wear was a donor to the university.**
Q. When did you first meet Bart Wear?
**A. I don't remember.**
Q. What was your relationship with Bart Wear?
**A. I would see him at events.**
Q. How would you describe Bart Wear as a person?
**A. I didn't know him that well to be descriptive.**
Q. Well, do you recall being interviewed by a law firm in connection with this case?
**A. Yes, I do.**
Q. And do you recall during that interview, there were discussions about Bart Wear drinking?
**A. There were questions regarding that. That's correct.**
Q. So in that interview, do you recall what you told the investigators or the attorneys about

Bart Wear's drinking?

**A. No, not the details of that.**

Q. Do you recall whether or not you had ever seen Bart Wear drunk?

**A. I believe I have seen him drunk, yes. Correct.**

Q. On how many occasions?

**A. I don't know.**

Q. On most occasions?

MS. LEE-COTA: Object to form.

**THE WITNESS: Define "occasions."**

BY MR. PEREZ:

Q. Well, where would you see him at?

**A. I saw him at events.**

Q. Okay. So those are the occasions. Do you recall him being intoxicated at those occasions?

**A. I remember seeing him at one of those occasions, yes.**

Q. In your interview, do you recall telling the investigators that he was often intoxicated at those occasions?

MS. LEE-COTA: Object to form.

**THE WITNESS: At the one event that I saw him, I believe he was intoxicated. That's correct.**

BY MR. PEREZ:

Q. Only the one event?

**A. It's the only one I remember.**

Q. Do you recall during the interview telling the attorneys that whenever you saw Bart, it was usually around alcohol?

MS. LEE-COTA: Object to form.

**THE WITNESS: No.**

BY MR. PEREZ:

Q. You don't recall that to be a fact about your seeing Bart Wear in the past?

MS. LEE-COTA: Object to form.

**THE WITNESS: I don't recall that to be a fact, but if that's what I said to the investigators at that time, which is the question.**

BY MR. PEREZ:

Q. But as you sit here today?

MS. LEE-COTA: Object to form.

**THE WITNESS: As I sit here today?**

BY MR. PEREZ:

Q. Yes.

**A. What was the question?**

Q. As you sit here today, do you recall Bart Wear being someone who was often around alcohol?

MS. LEE-COTA: Object to form.

**THE WITNESS: No. I can't say that. The one time that I did see him, that I saw him, I believe**

**he was intoxicated.**

BY MR. PEREZ:

Q. Were you aware of any incidents involving Bart Wear making inappropriate comments?

**A. Not that I remember.**

Q. Were you aware of any incidents where Bart Wear had been accused of doing or saying something inappropriate?

**A. Accused. In other words, secondhand comments?**

Q. Yes.

**A. Yes.**

Q. And which is that?

**A. Which is what?**

Q. Which is the incident that you recall?

**A. I remember a comment made by somebody on the athletic staff that he had made an inappropriate comment at an event.**

Q. Do you remember what that comment was?

**A. I do not.**

Q. Do you remember who told you that?

**A. I do not.**

Q. Do you remember when that was?

**A. No.**

Q. So you remember some vague incident where somebody told you that Bart Wear had made an

inappropriate comment?
MS. LEE-COTA: Object to form.
**THE WITNESS: I remember a comment made by a person that, yes, Bart Wear had made an inappropriate comment. Correct.**
BY MR. PEREZ:
Q. Do you remember Bart Wear being intoxicated at any ASU sporting events?
**A. I remember Bart Wear being intoxicated and seeing him intoxicated at one event. And that one event was a sporting event, correct.**
Q. Do you remember what that event was?
**A. Not specifically, no.**
Q. You don't remember if it was a basketball game or a football game?
MS. LEE-COTA: Object to form.
**THE WITNESS: It could have been either one.**
BY MR. PEREZ:
Q. Do you recall Bart Wear walking onto the basketball court intoxicated at an ASU basketball game?
**A. I remember Bart Wear walking onto an ASU basketball court where it appeared that he was intoxicated. I don't know if he was intoxicated.**
Q. So that was not the incident you were referring

to?
**A. That was the incident I was referring to, yes.**
Q. So now you do remember it was a basketball game?
**A. Yep, it was. Yes.**
Q. Do you recall Bart Wear being notified by the Pac 12 about his inappropriate conduct --
**A. No.**
Q. I'll finish my question.
The Pac 12 notifying him of his inappropriate conduct?
**A. No.**
Q. All right. Let me ask about Ray Anderson. You know Mr. Anderson?
**A. I do.**
Q. How long have you known Mr. Anderson?
**A. Since he was hired at ASU.**
Q. Do you remember when that was?
**A. No.**
Q. Can you describe your relationship with Mr. Anderson?
**A. Good.**
Q. Professional?
**A. Professional, correct.**
Q. Social as well?

**A. Yes.**
Q. Were you friends?
**A. Yes.**
Q. Were you friends with his wife as well?
**A. Yes.**
Q. Would it be fair to describe that relationship similar to the relationship you had with Dave and Kathy Cohen?
MS. LEE-COTA: Object to form.
**THE WITNESS: No.**
BY MR. PEREZ:
Q. And how was it different?
**A. Limited engagements.**
Q. With Mr. Anderson?
**A. Andersons, correct.**
Q. All right. Over time, did your relationship with Mr. Cohen develop such that he would come to you and seek your advice and counsel on various things?
MS. LEE-COTA: Object to form.
**THE WITNESS: Yes.**
BY MR. PEREZ:
Q. Would it be fair to say that it appeared that he looked to you for your counsel as something that he valued?
**A. I couldn't --**

MS. LEE-COTA: Object to form and foundation.

**THE WITNESS: I couldn't establish what he was thinking.**

BY MR. PEREZ:

Q. Well, did you turn to him for advice and counsel?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. And do you remember how long that type of relationship existed where the two of you would seek counsel from each other?

MS. LEE-COTA: Object to form.

**THE WITNESS: We would have conversations, you know, ever since he joined ASU.**

BY MR. PEREZ:

Q. All right. So for five or six years, that was the relationship the two of you had?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. Did you have the type of relationship where you could push back on him, disagree with him, give him counsel that he might not have wanted to hear?

MS. LEE-COTA: Object to form.
**THE WITNESS: Yes.**
BY MR. PEREZ:
Q. Did you interact with Mr. Cohen from a job performance standpoint?
**A. No.**
Q. Did you have an occasion to know or learn about his job performance at ASU in the athletic department?
**A. No.**
Q. Did anyone ever comment to you, for example, Mr. Anderson, about Dave Cohen's job performance at the athletic department?
**A. No.**
Q. So even though you had a friendly relationship with Mr. Anderson, your testimony is that he never made any comments good or bad about Dave Cohen's performance at ASU?
MS. LEE-COTA: Object to form.
**THE WITNESS: That's correct.**
BY MR. PEREZ:
Q. There came a time when Mr. Cohen approached you about an incident that occurred at an ASU basketball game regarding Kathy Cohen. Do you remember that interaction with Mr. Cohen?
**A. Yes.**

Q. Do you remember approximately when that was?

**A. No.**

Q. Do you remember what year?

**A. I would say it was pre-COVID. It must have been 2019.**

Q. And it was during basketball season, correct?

**A. It was sometime in the late spring, yes.**

**So correction. That would be after the basketball season.**

Q. So it was after, for example, March Madness?

**A. I can't remember specifically.**

Q. When Mr. Cohen approached you, where did that meeting occur?

**A. I don't remember.**

Q. Did he call you first?

**A. I don't remember.**

Q. Did you talk on the phone?

**A. I don't remember.**

Q. Was it in person?

**A. I don't remember.**

Q. Do you remember what he told you?

**A. Yes.**

Q. What did he tell you?

**A. He told me that there had been an incident with a donor who had inappropriately touched two women.**

Q. Did he tell you who those women were?
**A. He did.**
Q. And who were those two women?
**A. His wife and the wife of the basketball coach.**
Q. Mr. Hurley?
**A. That's correct.**
Q. And since you don't remember if it was in person, do you remember if there were any hand gestures or anything involved?
**A. I don't remember.**
Q. Do you remember why he sought your counsel on that?
**A. No.**
Q. Did he ask you to do anything?
**A. No.**
Q. What else do you remember about that conversation?
**A. Nothing else.**
Q. Where were you working at that time?
**A. I was CEO of ASU Enterprise Partners.**
Q. So through ASU Enterprise Partners, do you have an obligation to report incidents, or potential incidents, of sexual harassment?
**A. I do.**
Q. And who do you report that to?

**A. I report it to the general counsel.**

Q. Of?

**A. ASU Enterprise Partners.**

Q. And did you do that?

**A. I did.**

Q. Do you remember roughly when you did that?

**A. Spring of 2019.**

Q. I'm sorry. Let me restate that.

Was it immediately after the conversation, or was it a week after the conversation? Do you remember roughly in relation to when you learned of it?

**A. No.**

Q. Was it a month after the conversation?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yeah. I don't remember exactly when I reported it.**

BY MR. PEREZ:

Q. Well, what would your practice have been? If you learned of an incident like that, what would your practice have been?

MS. LEE-COTA: Object to form.

**THE WITNESS: My practice would have been to do it immediately.**

BY MR. PEREZ:

Q. And as you sit here today, you have no reason

to believe that you did anything different other than your regular practice?

MS. LEE-COTA: Object to form.

**THE WITNESS: That's correct.**

BY MR. PEREZ:

Q. And though you had a duty to report, that would have been something that you learned through ASU Enterprise Partners and not through training at ASU. Is that correct?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yeah. Can you ask that question again?**

BY MR. PEREZ:

Q. Sure.

So when you were at ASU, you probably had various forms of training on how you interact with employees and students and things of that nature, correct?

**A. Correct.**

Q. You may have received some type of training from HR, perhaps sexual harassment training and perhaps even Title IX training. Would that be fair to say?

**A. Correct.**

Q. I'm assuming, so correct me if I'm wrong, that when you left ASU and you went to the foundation, that

you no longer receive training from ASU. Is that fair?
**A. That is fair, yes.**
Q. And because it was a separate entity, at that point your training would have been through ASU Enterprise Partners?
**A. That's correct.**
Q. And likewise, to the extent that you had a reporting requirement, would it be fair to say that after you went to the foundation and then ASU Enterprise Partners, that your duty to report would have been up through ASU Enterprise Partners?
MS. LEE-COTA: Object to form.
**THE WITNESS: That's correct.**
BY MR. PEREZ:
Q. After the first interaction with Mr. Cohen, do you remember having a conversation with anybody else about what Dave had told you? Anybody else besides your general counsel at ASU Enterprise Partners.
**A. During what time frame?**
Q. Thereafter.
**A. Any time thereafter?**
Q. Any time thereafter.
**A. Yes.**
Q. And who was that?
**A. I had a conversation -- I'm sorry. Can you ask**

**me again what -- you want me to tell you what the conversation was about?**

Q. Well, first, I want to see who else you spoke to.

**A. About?**

Q. About the harassment that Mr. Cohen had told you with regard to Ms. Hurley and Ms. Cohen.

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes. I talked to Jay Heiler, and I talked to President Crow.**

BY MR. PEREZ:

Q. And was that immediately after you first learned of it from Dave Cohen?

**A. No.**

Q. How long after was it?

**A. At least a couple months.**

Q. So if this occurred in the spring, it would have been sometime during the summer?

**A. Correct.**

Q. And was that with both Mr. Heiler and Mr. Crow?

**A. At different times.**

Q. But during the summer for both?

**A. Late summer for Crow.**

Q. Do you also remember having a conversation with Mr. Nelson?

**A. Yes.**
Q. Do you remember when your conversation with Mr. Scott Nelson was?
**A. That was the first I learned of the situation, so late spring.**
Q. Do you mean you learned of the situation with Mr. Nelson before you learned it with Mr. Cohen?
**A. That's correct.**
Q. Then let me back up in time.
When did you first speak with Mr. Nelson about the incident involving Bart Wear and Ms. Cohen and Ms. Hurley?
**A. Again, late spring. April. I can't remember a date.**
Q. But it was before you spoke to Mr. Cohen?
**A. That's correct.**
Q. Do you remember if that was during basketball season?
**A. It was after basketball season.**
Q. So you remember it was after basketball season?
**A. Correct.**
Q. And --
**A. If you define basketball season as ASU's basketball season.**
Q. In other words, ASU was no longer in the

tournament or competing in 2019?
A. **I believe that's correct, yes.**
Q. I should say the early part of 2019 because they would have picked up again at the end of 2019.
A. **Right.**
Q. Okay. Describe for me that first conversation with Mr. Nelson.
A. **Mr. Nelson reported to me that there had been an incident with a donor and that he was alerting me to that incident.**
Q. Did he name the donor?
A. **He did.**
Q. Who was that donor?
A. **Bart Wear.**
Q. Can you tell me what Mr. Nelson told you?
A. **In general, he told me that there had been an incident with a donor and inappropriate touching. And he told me who was involved in the incident. And that's it.**
Q. He told you Ms. Cohen and Ms. Hurley had been involved in that incident with Bart Wear?
MS. LEE-COTA: Object to form.
**THE WITNESS: Yes.**
BY MR. PEREZ:
Q. Did he mention a third woman?

**A. Not that I remember.**

Q. As you sit here today, are you aware that there is a third woman involved?

**A. Only by reading the complaint.**

Q. But not before then?

**A. Correct.**

Q. Why did Mr. Nelson report that information to you or communicate that information to you?

MS. LEE-COTA: Object to foundation.

**THE WITNESS: I don't know exactly why he did, but as an employee of the foundation, he viewed that as his responsibility, professional responsibility to report that to me.**

BY MR. PEREZ:

Q. So Mr. Nelson is an employee of the foundation?

**A. That's correct.**

Q. Does he also have employment with ASU through the athletic department?

**A. That's a trick question.**

Q. Help me understand it.

**A. Well, there is a Sun Devil Club that's related to the ASU athletics, of which he is a leader of that activity, although it reports up through the athletic department. But his place of employment is with the foundation. His paycheck comes from the foundation.**

Q. So he does not draw a paycheck --

**A. That's correct.**

Q. Let me finish. Thank you.

He does not draw a paycheck from ASU, correct?

**A. That's correct.**

Q. His paychecks are, and have always been, through the foundation?

**A. I don't know if they always have been. At the time, that would be correct.**

Q. Has that changed, as far as you know, between, let's say, 2016 when you left and 2020, did Mr. Nelson always draw a paycheck from the foundation?

**A. I'm not sure.**

Q. Were you aware if he ever -- during that time period, let's say 2016 to 2020, if Mr. Nelson ever drew a paycheck from ASU?

MS. LEE-COTA: Object to form.

**THE WITNESS: I don't know.**

BY MR. PEREZ:

Q. Would there be any reason for him to draw a paycheck from both institutions?

MS. LEE-COTA: Object to form and foundation.

**THE WITNESS: I don't know of -- there**

**could be a model if that happens. I don't know if that happened or not.**

BY MR. PEREZ:

Q. Do you know if Mr. Nelson ever received any type of compensation of any kind from ASU or the Arizona Board of Regents?

MS. LEE-COTA: Object to form.

**THE WITNESS: I do not know.**

BY MR. PEREZ:

Q. Do you have any other employees through ASU Enterprise Partners that works in, what I'll call it, dual capacity?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. And who is that?

**A. So every -- so let's start with the use of the word "dual capacity." So what do you mean by "dual capacity"?**

Q. Where they work both with the foundation or with ASU Enterprise Partners, so the entity with which you are responsible for --

**A. Uh-huh.**

Q. -- but also has assignments and works directly with the University, for example, as you've described,

the Sun Devil Foundation.

**A. Yes.**

Q. And was that pretty typical?

MS. LEE-COTA: Object to form.

**THE WITNESS: ASU contracted for services with the ASU Foundation for fundraising and support. So they would provide fundraising and support to the various units at the university.**

BY MR. PEREZ:

Q. So with regards to support, would it be fair to say that Mr. Nelson had a more significant role at ASU than just providing support?

MS. LEE-COTA: Object to form.

**THE WITNESS: I -- I -- what do you mean by "a more significant role"?**

BY MR. PEREZ:

Q. Well, for example, at the athletics department, he showed up on their organizational chart. Was that something you were aware of?

**A. No.**

Q. Does that surprise you?

**A. No.**

Q. And why not?

**A. Because he had a role supporting the ASU athletics.**

Q. Let me ask you this. With regard to you mentioned other individuals that had, what I referred to as dual capacity, do you know if any of those other individuals drew paychecks from both ASU Enterprise Partners and the university?

**A. Another trick question. So oftentimes, there would be an ASU Foundation employee that would be directing fundraising for a unit. But other fundraisers in that unit would be paid directly by the unit.**

Q. And the unit might fall under ASU?

**A. These are ASU units. That's correct.**

Q. Maybe you can define for me what you mean by "units".

**A. School of Engineering, School of Liberal Arts and Sciences, Law School, Journalism School.**

Q. And so if they were being paid by a unit, would they also be being paid by Enterprise Partners?

**A. No.**

Q. So if I understand your testimony, to the best of your knowledge, an individual was either drawing their salary from ASU Enterprise Partners or the foundation, or they were drawing it from ASU, a unit or otherwise?

MS. LEE-COTA: Object to form.

**THE WITNESS: To the best of my knowledge, yes. Correct.**

BY MR. PEREZ:

Q. Okay. After you spoke to Mr. Nelson the first time, was that when you went and spoke to your general counsel?

**A. Correct.**

Q. So it was before you spoke to Mr. Cohen?

**A. I don't remember the exact sequence.**

Q. Do you know how Mr. Nelson learned about the incident?

**A. I do not.**

Q. All right. So we've established, to the best of your recollection, the first interactions about the incident with Bart Wear you learned about from Mr. Nelson roughly in the spring after ASU's basketball season is over. And then you also had a conversation with Mr. Cohen thereafter but also in the spring. That's correct?

**A. That is correct.**

Q. What was your next interaction with anybody about the incident involving Bart Wear?

**A. Other than -- are you asking me about other than Mr. Cohen and Mr. Nelson?**

Q. No. I'm asking what the next one is. So it

could have been with them the second time.

**A. Yeah, I don't remember if it was with them.**

Q. Well, what do you remember to be the next conversation you had with anybody about what occurred?

**A. The next one that I remember -- this was four years ago. The next one I remember is a conversation I had with Ray Anderson about the incident.**

Q. You said it was four years ago. Do you have notes or something that might refresh your recollection?

**A. No.**

Q. You don't keep a journal or anything, a calendar book?

**A. No.**

Q. All right. So the next one that you remember was with Mr. Anderson. Approximately what time frame is that?

**A. Late spring/early summer.**

Q. It would be fair to say it was before your conversation with Mr. Heiler and Mr. Crow?

**A. I believe so, yes.**

Q. What was your interaction with Mr. Anderson?

**A. We were at lunch.**

Q. So you were in person?

**A. Correct.**

Q. And who brought it up?

**A. I did.**

Q. And what did you say to Mr. Anderson?

**A. I asked Mr. Anderson if he had addressed the incident with Mr. Wear.**

Q. Did you describe for him what that incident was?

**A. Yes.**

Q. Essentially, you told him what Mr. Cohen had told you and what Mr. Nelson had told you?

MS. LEE-COTA: Object to form.

**THE WITNESS: No.**

BY MR. PEREZ:

Q. How did you describe the incident to him?

**A. There was no description of the incident since he was well-aware of the incident, and I was well-aware of the incident.**

Q. So he already knew?

**A. At that time, that's correct.**

Q. And did you learn how it was that he knew about the incident?

**A. I did not.**

Q. But you said he was well-aware of it?

**A. He was.**

Q. And what did you say to him about the incident?

**A. I asked him if he had addressed the incident with Mr. Wear.**

Q. And what did he say?

**A. He said he would take care of it.**

Q. Did you ask him what that meant?

**A. No.**

Q. Did you have any more detailed discussion about when or how he might take care of it?

**A. Not that I remember.**

Q. When he said to you words to the effect of "I'll take care of it," what was your response?

**A. "Good."**

Q. What did you understand him to mean when he said "I'll take care of it"?

MS. LEE-COTA: Object to foundation.

**THE WITNESS: I did not have, at that time, a specific understanding of what he meant by that.**

BY MR. PEREZ:

Q. But my question is, what did you understand that to mean?

**A. I would understand that to mean what it would mean to me. I don't know what it would mean to Ray.**

Q. So what would you understand that to mean?

**A. That he would have a conversation with Mr. Wear**

**about the incident and address it.**

Q. Would you also understand that to mean that he would report it through proper channels?

**A. Yes.**

Q. Assuming that it had not already been reported, you would understand that he would do what he was required to do or what you believed would be his obligations in his position?

MS. LEE-COTA: Object to form.

**THE WITNESS: I would assume that to be the case, yes.**

BY MR. PEREZ:

Q. Did he say how long he had been aware of the incident?

**A. No.**

Q. You said he was well-aware of the incident. What led you to believe he was well-aware of the incident?

**A. I knew that he had had a con- -- when Scott Nelson reported the incident to me, I knew that he immediately -- either before or after reporting it to me, that he had reported that incident to Mr. Anderson.**

Q. Would it be fair to say that it would have been before because then he would have told you that, Mr. Nelson, when he met with you?

MS. LEE-COTA: Object to form.
**THE WITNESS: I don't know.**
BY MR. PEREZ:
Q. Because if it would have been after, then that would have meant that Mr. Nelson would have to come back to you and said, "I reported it to Mr. Anderson."
MS. LEE-COTA: Object to form.
BY MR. PEREZ:
Q. Do you remember that?
**A. I do not.**
Q. But if this incident with Mr. -- that was reported by Mr. Nelson, which would have been, again, sometime in the spring of 2019, and then, as you've just testified, sometime around that time, Mr. Anderson had become aware of it, would it be fair to say at least a month, if not two or three, had passed before your conversation with Mr. Anderson in -- I think you said the early summer of 2019?
MS. LEE-COTA: Object to form and foundation.
**THE WITNESS: I would say that there had been some time that had passed. I don't know exactly the amount of time.**
BY MR. PEREZ:
Q. I guess what I'm getting at is, did you have a

conversation with Mr. Anderson wherein you said to him "It's already been a month or a few weeks. What have you done up to this point"?

MS. LEE-COTA: Object to form.

**THE WITNESS: No. My conversation that I remember was as I stated, which is "Have you addressed the incident?" And he said he had not. And he said, "I'll take care of it."**

BY MR. PEREZ:

Q. Did you have the type of relationship with Mr. Anderson where you might have been more candid or frank with him about how you felt if you disagreed with the way he was handling an incident?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. But as far as you recall, you did not tell him that during this particular incident -- this particular conversation?

**A. Tell him what?**

Q. That you were surprised or disappointed, curious, all of the above as to why he had not done anything up to that point?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yeah, that's a lot of**

**adjectives. Surprised. What were the ones? You went surprised.**

BY MR. PEREZ:

Q. Surprised, curious, disappointed.

**A. Curious, disappointed.**

**I believe I expressed disappointment that it hadn't been addressed by that time, correct.**

Q. Okay. So now let's move on to the next conversation. You've had a conversation with Mr. Anderson. He says, "I'll take care of it."

Do you remember your next conversation about the incident involving Bart Wear and Ms. Cohen and Ms. Hurley?

**A. The one that I remember next was with Mr. Heiler.**

Q. And you testified earlier that that was during the summer. So it was before a conversation with Mr. Crow?

**A. That's correct.**

Q. What was the conversation with Mr. Heiler?

**A. The conversation with Mr. Heiler was that the incident had occurred and that it hadn't been addressed.**

Q. Who initiated the conversation?

**A. I can't remember.**

Q. Where was the conversation?
**A. It was a phone call.**
Q. But you don't remember who dialed it?
**A. No.**
Q. Was the purpose of the call to discuss this or did it come up during the conversation?
MS. LEE-COTA: Object to form.
**THE WITNESS: I can't remember.**
BY MR. PEREZ:
Q. Okay. So tell me everything you remember about that conversation with Mr. Heiler.
**A. The conversation was that the incident had occurred, and Mr. Heiler had known about the incident by the time we had had that phone call. I think he expressed concern about the incident, and I expressed concern about the incident also.**
Q. Do you know how long after your conversation with Mr. Anderson this conversation with Mr. Heiler took place?
**A. No.**
Q. Generally, a month? Two months?
**A. I can't remember.**
Q. You just remember it was after your conversation with Mr. Anderson?
**A. That's correct.**

Q. And you said Mr. Heiler already knew. How did that become apparent?

**A. He told me.**

Q. Did he tell you how he knew?

**A. No.**

Q. What was Mr. Heiler's position at the time?

**A. He was chairman of the board of a set of charter schools in Arizona.**

Q. Was he on the Board of Regents?

**A. He was.**

Q. And the Board of Regents, to the best of your knowledge, has oversight over ASU. Is that fair to say?

**A. That's fair to say.**

Q. During that conversation where you both expressed -- well, strike that.

During that conversation with Mr. Heiler, was there discussion about what either of you should do to move the process along so that somebody at the university was managing it?

MS. LEE-COTA: Object to form.

**THE WITNESS: There was a conversation about what should be the next steps, yes.**

BY MR. PEREZ:

Q. And what was that conversation?

**A. The conversation was, you know, who should be alerted about the situation, given the facts that we knew at that time that hadn't been addressed yet by Mr. Anderson.**

Q. At that time in your conversation with Mr. Heiler, did you know or understand whether that had been reported to the proper Title IX authorities?

MS. LEE-COTA: Object to form.

**THE WITNESS: I don't know.**

BY MR. PEREZ:

Q. Do you know if it had been reported by Ray Anderson or anyone else up the chain, in other words, to his supervisors or bosses?

**A. I don't know.**

Q. Do you know if it had been reported to any HR departments or anyone responsible for these types of incidents at ASU?

MS. LEE-COTA: Object to form.

**THE WITNESS: I was told by Mr. Cohen at one point that he had a conversation with Mr. Salcido at HR at ASU.**

BY MR. PEREZ:

Q. But I'm speaking specifically as what Mr. Anderson did.

**A. No.**

Q. In other words, you said that your conversation with Mr. Heiler was what should be the appropriate next steps. And I think you said -- I don't want to put words in your mouth. But I think your testimony was given that nothing had been done or that it hadn't been acted on. Is that correct?

MS. LEE-COTA: Object to form.

**THE WITNESS: No, not exactly. What I said was that given our understanding at the time, that nothing had been addressed.**

BY MR. PEREZ:

Q. So when you say "that nothing had been addressed," what does that mean to you?

**A. That means to me that we did not believe at the time, neither Mr. Heiler or myself, that Ray Anderson had appropriately addressed the issue with the donor.**

Q. So you were thinking specifically of the donor, Mr. Wear?

**A. That's correct.**

Q. Were you also thinking about what Mr. Anderson had done at the university level to address it?

MS. LEE-COTA: Object to form.

**THE WITNESS: Our discussion was about Mr. Wear.**

BY MR. PEREZ:

Q. Was there a concern by you or Mr. Heiler that the university needed to be able to deal with this through its proper channels?

MS. LEE-COTA: Object to form.

**THE WITNESS: No, we did not have that discussion.**

BY MR. PEREZ:

Q. Did you learn from Mr. Heiler whether or not he had reported it through the proper channels?

MS. LEE-COTA: Object to form.

**THE WITNESS: I did not.**

BY MR. PEREZ:

Q. Did you ask him about that?

**A. I did not.**

Q. So what was your -- given your understanding of how it needed to be addressed, what did you and Mr. Heiler decide?

**A. I don't think there was any decision made.**

Q. So you had a conversation about what the appropriate next step should be?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. And what was that conversation?

**A. The conversation was back and forth about what should be done about this situation and who -- what should be those next steps.**

Q. And what should those next steps have been?

**A. I can't remember exactly the discussion at that point.**

Q. But was there a conversation that one of you should talk to Mr. Wear?

**A. No, I don't believe that was the conversation.**

Q. Was the conversation that one of you need to go back and speak to Mr. Anderson?

**A. I believe we had a conversation that one of us could do that, yes. Correct.**

Q. Do you remember if you said you were going to do it or Mr. Heiler was going to do it or maybe you both were going to talk to Mr. Anderson?

MS. LEE-COTA: Object to form.

**THE WITNESS: No. I think the conversation was, you know, should we, not who was going to.**

BY MR. PEREZ:

Q. And what was your assessment of should you?

**A. Can't remember.**

Q. So you just left that meeting with nobody knowing what they were going to do next?

MS. LEE-COTA: Object to form.

**THE WITNESS: Well, it was not a meeting. It was a phone conversation. And it was a conversation about the incident. And, yes, we left that meeting after having discussion, correct.**

BY MR. PEREZ:

Q. What did you do next as a result of that -- sorry.

What did you do next after your conversation with Mr. Heiler?

**A. With regards to?**

Q. Appropriate next steps.

MS. LEE-COTA: Object to form.

**THE WITNESS: Appropriate next steps related to the Bart Wear incident?**

BY MR. PEREZ:

Q. Yes.

**A. And do you mean who was my next conversation with?**

Q. No. I'm trying to figure out if you did anything, or did you just go on with your business?

MS. LEE-COTA: Object to form.

**THE WITNESS: I ultimately had a conversation with President Crow about the incident.**

BY MR. PEREZ:
Q. Was that also your next conversation that you remember having?
**A. No. I don't remember when my next conversation was.**
Q. All right. So you just had a conversation with Mr. Heiler. After that conversation, who was your next conversation about the incident with?
**A. I don't remember.**
Q. Do you remember having more than one conversation with Scott Nelson about the incident?
**A. Over what time period?**
Q. From when it occurred until Mr. Cohen was fired.
**A. Sure. Yes.**
Q. Do you remember having more than one conversation with Mr. Cohen between when it occurred and when he was fired?
**A. Yes.**
Q. Do you remember having more than one conversation with Mr. Anderson from when it occurred and when Mr. Cohen was fired?
**A. Yes.**
Q. So then your next conversation after your discussion with Mr. Heiler that you remember was with

Mr. Crow?

MS. LEE-COTA: Object to form.

**THE WITNESS: That I remember, yes, correct.**

BY MR. PEREZ:

Q. And I do want to make sure. When I refer to the incident, just so we're clear, I'm talking about Bart Wear's harassment of Mrs. Hurley and Mrs. Cohen. Do you understand that?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes, I do.**

BY MR. PEREZ:

Q. Okay. So you testified earlier that you had a conversation with Mr. Crow in late summer, correct?

**A. That's correct.**

Q. But you don't remember exactly when that was beyond that discussion?

**A. I do not.**

Q. Okay. So late summer you have a conversation with Mr. Crow. Please describe for me how that conversation was initiated.

**A. It was by phone.**

Q. Was it your calling Mr. Crow?

**A. Yes.**

Q. And when you called President Crow, was it

specifically to discuss the incident?
A. Yes.
Q. And so how did that conversation take place? What occurred?
A. I called President Crow and I wanted to alert him to the incident and the situation. And I wanted to make sure he was aware of it.
Q. Did you describe the incident?
A. I did.
Q. And did you describe it the same way that Mr. Cohen had described it to you?
MS. LEE-COTA: Object to form.
THE WITNESS: I described it the same way that originally Mr. Nelson had described it to me.
BY MR. PEREZ:
Q. Was that different than how Mr. Cohen had described it to you?
A. No.
Q. So as you described it to Mr. Crow, were you able to discern if that was the first he was hearing about it?
MS. LEE-COTA: Object to form.
THE WITNESS: He said he was aware of the incident.

BY MR. PEREZ:
Q. So at some point prior to that conversation, he had already been made aware of the incident?
MS. LEE-COTA: Object to form.
**THE WITNESS: I don't know if that's the case. He said he was aware of the incident.**
BY MR. PEREZ:
Q. And what was the rest of your conversation about?
**A. He said it's being addressed.**
Q. Did he explain what that meant?
**A. Nope.**
Q. At that point that you had the conversation with President Crow, do you know if anybody had addressed it with Mr. Wear?
**A. I do not know at that time if it had been addressed with Mr. Wear.**
Q. You had not addressed it with Mr. Wear?
**A. That's correct.**
Q. When you had the conversation with Mr. Crow, did you convey to him that you had had prior conversations with Mr. Anderson?
**A. I did not.**
Q. Did you convey to him that you had had prior conversations with Mr. Heiler?

**A. I don't remember.**
Q. Did you convey to him that you had had prior conversations with Mr. Nelson?
**A. No.**
Q. You seem pretty sure about that. Why is it that you remember that you did not convey to him that you had had a conversation with Mr. Nelson about the incident?
MS. LEE-COTA: Object to form.
**THE WITNESS: Why am I sure?**
BY MR. PEREZ:
Q. Yes.
**A. Because I would not have viewed that to be important to the conversation.**
Q. Did you ever have a conversation with anyone else about the incident, for example, Mr. Hurley?
MS. LEE-COTA: Object to form.
**THE WITNESS: No.**
BY MR. PEREZ:
Q. Did you have a conversation with your wife about the incident?
**A. Yes.**
MS. LEE-COTA: Object to form.
BY MR. PEREZ:
Q. When did you have a conversation with your wife

about the incident?

MS. LEE-COTA: Object to form.

**THE WITNESS: I would imagine it would be soon after I learned of the incident.**

BY MR. PEREZ:

Q. And what was the nature of that conversation?

**A. Factual.**

Q. Do you recall if your wife asked or if she, in fact, reached out to Kathy Cohen to have a conversation with her?

**A. I can't remember what she said with regards to that.**

Q. Did you have an ongoing conversation with your wife over the course of time as you subsequently spoke to Mr. Heiler, Mr. Crow, Mr. Anderson? Do you know if you had more than one conversation with your wife?

MS. LEE-COTA: Object to form.

**THE WITNESS: So I know I had more than one conversation with my wife. I don't remember when that occurred or what it was about.**

BY MR. PEREZ:

Q. Do you know if your wife conveyed to you a similar concern as to why people weren't addressing the incident and the cause of the incident?

MS. LEE-COTA: Object to form.

**THE WITNESS: If your question is, was my wife concerned about the incident not being addressed, the answer is yes.**

MR. PEREZ: This is a good place for a break.

(A recess was taken from 10:35 a.m. to 10:51 a.m.)

BY MR. PEREZ:

Q. When we finished our conversation before the break, we were talking about your interactions with your wife about the incident.

I'm curious, as you sit here today, do you still have an ongoing relationship wherein you receive compensation from ASU or the Board of Regents?

**A. No.**

Q. And you recall you're still under oath?

**A. Yes.**

Q. So our conversation was that you had spoken to President Crow in late summer and that you don't remember exactly when that was. Is that correct?

**A. That is correct.**

Q. Okay. And as you sit here today, you can't put a month or a date to that; you just know it somehow was late summer?

MS. LEE-COTA: Object to form.

**THE WITNESS: I believe it was in August.**
BY MR. PEREZ:
Q. Okay. Do you know whether or not it was before or after Mr. Cohen had been fired?
MS. LEE-COTA: Object to form.
**THE WITNESS: I can't remember.**
BY MR. PEREZ:
Q. Do you know if it was before or after Mr. Cohen met with you to tell you that --
**A. I'm sorry. Can we go back to that last question?**
Q. Yes.
**A. I apologize for interrupting you. You asked me if it was before or after Mr. Cohen was fired?**
Q. Yes.
**A. As I understand it, there were two actions there. There was a put on leave and then there was a final determination. Which one are you talking about?**
Q. Well, how do you come to that understanding?
**A. That's what I understood happened.**
Q. Okay. Who informed you that that's what happened?
MS. LEE-COTA: Object to form.
**THE WITNESS: I have no idea.**

BY MR. PEREZ:

Q. Okay. So Mr. Cohen was fired twice. He was fired in early August. So that's the first interaction. And the subsequent firing was in December.

So my question is, do you know where it was in relation to his termination?

MS. LEE-COTA: Object to form.

**THE WITNESS: Is that his first firing or his second firing, using your language?**

BY MR. PEREZ:

Q. I don't know what your memory is. Had he been fired?

MS. LEE-COTA: Object to form.

**THE WITNESS: I don't know what you mean by fired, no.**

BY MR. PEREZ:

Q. Had there been an adverse employment action taken against him?

MS. LEE-COTA: Object to form.

**THE WITNESS: I don't know.**

BY MR. PEREZ:

Q. So when you spoke to Crow, as you sit here today, you don't know whether or not Mr. Cohen had been fired, adverse interaction, administrative leave, any

of those things?

MS. LEE-COTA: Object to form.

**THE WITNESS: Correct.**

BY MR. PEREZ:

Q. That's a salient point, so I would expect that you would remember that, but you don't?

MS. LEE-COTA: Object to form.

**THE WITNESS: Four years ago.**

BY MR. PEREZ:

Q. And you didn't do anything to prepare for today's deposition that might help you remember the dates?

MS. LEE-COTA: Object to form.

**THE WITNESS: No.**

BY MR. PEREZ:

Q. You stated that you had had more than one conversation with Mr. Nelson and that you had more than one conversation with Mr. Anderson and that you had more than one conversation with Mr. Cohen about the incident.

So far you have described for me one interaction with each. Can you recall any other interactions you had with Mr. Scott Nelson about the incident and how that was being handled?

MS. LEE-COTA: Object to form.

**THE WITNESS: I know I had a discussion -- several discussions over that period of time. I can't remember the exact dates, nor the exact nature of the discussion. But it was related to the Bart Wear incident.**

BY MR. PEREZ:

Q. What was the nature of those discussions?

**A. It was related to the Bart Wear incident.**

Q. And what?

**A. I can't remember.**

Q. Were you talking about whether it was being addressed?

MS. LEE-COTA: Object to form.

**THE WITNESS: Again, I can't remember the specifics of the conversation. I know I had conversations; I just can't remember.**

BY MR. PEREZ:

Q. I mean, the fact that they were ongoing conversations would suggest that the incident had not been addressed. Do you remember that?

MS. LEE-COTA: Object to form.

**THE WITNESS: That's not what I said. I said I didn't know what the specific conversation was.**

BY MR. PEREZ:
Q. No, I understand. I'm asking you that. The fact that you continued to have ongoing conversations with Mr. Nelson would suggest that there was a reason that he would keep coming back to you with that, correct?
MS. LEE-COTA: Object to form.
**THE WITNESS: That's not -- no, not necessarily.**
BY MR. PEREZ:
Q. Why would he keep coming back to talk to you about it?
**A. I would see Mr. Nelson at every athletic event. I'd see Mr. Nelson at events related to the foundation. We would run into each other. I'm sure we had a conversation about it. I don't know what we specifically talked about.**
Q. Did you talk about whether or not it had been addressed with Mr. Wear himself?
MS. LEE-COTA: Object to form.
**THE WITNESS: I do not remember.**
BY MR. PEREZ:
Q. Did you talk about whether or not anybody had reported it up the chain of command on the ASU side?
MS. LEE-COTA: Object to form.

**THE WITNESS: I don't remember.**
BY MR. PEREZ:
Q. Did you talk about whether or not ASU had investigated the incident at all?
MS. LEE-COTA: Object to form.
**THE WITNESS: Don't remember.**
BY MR. PEREZ:
Q. You just remember having several conversations with Mr. Nelson?
MS. LEE-COTA: Object to form.
**THE WITNESS: Yes. Your question was, did I have any interactions with Mr. Nelson over that period about this Bart Wear incident. And the answer is I remember having some interactions.**
BY MR. PEREZ:
Q. All right. You also said that you had several interactions or more than one communication with Mr. Anderson, correct?
MS. LEE-COTA: Object to form.
**THE WITNESS: That's correct.**
BY MR. PEREZ:
Q. Do you remember how many interactions you had with Mr. Anderson?
**A. I do not.**
Q. Do you remember when those took place?

**A. I believe I talked to him once before we had that lunch that I talked about. And I may have talked to him about it one more time after that. So maybe three.**

Q. You said once before the lunch?

**A. Correct.**

Q. What was the conversation before the lunch?

**A. Don't remember.**

Q. Because that conversation before the lunch would have occurred in the spring, correct?

MS. LEE-COTA: Object to form.

**THE WITNESS: That's correct. Late spring.**

BY MR. PEREZ:

Q. So you had a conversation before then with Mr. Anderson?

**A. Before the lunch. That's correct.**

Q. What was that conversation?

**A. Very similar to the lunch conversation. He was aware of the incident. I asked him if he was addressing it, and he said yes, he was addressing it.**

Q. Do you know when that was in relation to the basketball season?

MS. LEE-COTA: Object to form.

**THE WITNESS: Well, it was after the**

**basketball season.**

BY MR. PEREZ:

Q. When you say "basketball season," are you referring to the ASU season or the NCAA season?

**A. I'm talking about somewhere between the conversation I had with Scott Nelson and the lunch that I had with Ray Anderson.**

Q. That you had another conversation with Ray Anderson?

**A. I had a conversation between -- from a timeline perspective, between when I had a conversation with Scott Nelson and when I had lunch with Ray Anderson.**

Q. And that would have been some time; you just don't remember if it was during the NCAA basketball season or not?

MS. LEE-COTA: Object to form.

**THE WITNESS: I do not remember.**

BY MR. PEREZ:

Q. And you believe that conversation was very similar to the conversation that you had when you had lunch?

MS. LEE-COTA: Object to form.

**THE WITNESS: That's correct.**

BY MR. PEREZ:

Q. And roughly the same things were discussed,

about knowledge of the incident and he was aware of it?
A. **That is correct.**
Q. And that he said he would address it?
A. **That's correct.**
Q. Okay. And then you said there was a third conversation with Mr. Anderson. What was that third conversation?
A. **Very similar.**
Q. When did that occur?
A. **Sometime after lunch.**
Q. But before any adverse employment actions against Mr. Cohen?
MS. LEE-COTA: Object to form.
**THE WITNESS: Yes. I believe it was before whatever adverse action took place, correct.**
BY MR. PEREZ:
Q. And what was the nature of that conversation?
A. **Similar.**
Q. All right. So "similar" meaning that he obviously was aware of it, correct?
A. **He had been aware of it at my first meeting, which would be before lunch. He was aware of it at the lunch. And he was still aware of it at the meeting I had afterwards.**
Q. Which is why I said he's obviously aware of it,

correct?

**A. Yes, correct.**

Q. But at the same time, you've now addressed it with him twice, correct?

**A. That's correct.**

Q. And both times you conveyed some sense, at least to me, that you were concerned about whether it was being addressed. So --

MS. LEE-COTA: Object to form.

**THE WITNESS: I did not use the word "concerned." I used the word "disappointment."**

BY MR. PEREZ:

Q. Okay. So now you're having your third meeting. Had it been addressed at that point?

**A. He said he was taking care of it.**

Q. Did you have the same sense of disappointment?

MS. LEE-COTA: Object to form.

**THE WITNESS: I didn't know if he had addressed it or not. We didn't get into the specifics, but I asked him if he had dealt with it, and he said he was addressing it.**

BY MR. PEREZ:

Q. Okay. You asked him if he had dealt with it, past tense.

**A. Yeah.**

Q. And did he tell you he had dealt with it?
**A. He said he was addressing it.**
Q. Did you ask him how he was addressing it?
**A. No.**
Q. Did you ask him if he had had a conversation with Bart Wear?
**A. No.**
Q. Did you ask him if he had had a conversation with Mr. Crow?
**A. No.**
Q. Did you ask him if there had been an investigation opened?
**A. No.**
Q. Did you ask him if he had reported it up through Title IX, HR, an ombudsperson?
**A. No.**
Q. So for the third time, you just accepted that when he said he was taking care of it, that meant something to you, but you don't know what it meant to him?
MS. LEE-COTA: Object to form.
**THE WITNESS: Yeah. It meant to me that as a professional, he was addressing it.**
BY MR. PEREZ:
Q. And the fact that you were having a third

conversation with him about it doesn't suggest that you weren't surprised that more hadn't happened; there was no sense on your side that not enough was being done?

MS. LEE-COTA: Object to form.

**THE WITNESS: I think when we went through the adjectives, you used surprised, concerned, and disappointed. I remained disappointed.**

BY MR. PEREZ:

Q. Do you remember having a conversation with your wife after that third meeting with Mr. Anderson?

MS. LEE-COTA: Object to form.

Mr. Perez, I just want to say that there's a spousal privilege that's recognized here, so...

MR. PEREZ: Yes. But you can ask a question.

MS. LEE-COTA: You can answer this question. It's a -- can you repeat your question?

MR. PEREZ: Can you repeat the question?

(The record was played back by the court reporter.)

**THE WITNESS: No, I don't remember.**

BY MR. PEREZ:

Q. All right. And then I think you said you had had more than one conversation with Mr. Cohen, correct?

**A. Correct.**

Q. Do you know how many conversations you had with Mr. Cohen?

**A. No.**

Q. More than one?

**A. Yes.**

Q. More than five?

**A. Yes.**

Q. Were those always in person?

**A. Not necessarily, no.**

Q. So sometimes by phone?

**A. Sometimes by phone, correct.**

Q. All right. So can you tell me when your next conversation was with Mr. Cohen about the incident?

**A. No.**

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. You don't remember one way or the other?

**A. I don't remember, correct.**

Q. Was it before or after your conversation with Mr. Heiler?

**A. I don't remember.**

Q. Tell me about your conversations with Mr. Crow (sic). Since you don't remember when they happen, can you tell me what those discussions were about?

MS. LEE-COTA: Object to form.

**THE WITNESS: I described those to you.**

BY MR. PEREZ:

Q. Okay. You described one.

**A. That was it. With Mr. Crow?**

Q. No. With Mr. Cohen.

**A. Oh, I apologize. I thought you said Mr. Crow.**

**With Mr. Cohen, they were always sort of an update on the situation from Mr. Cohen.**

Q. And what was the update?

**A. Whatever the update was at the time.**

Q. Do you remember what the update was?

**A. Whatever the time was. No, I don't. He would routinely call me and update me on the situation.**

Q. Okay. Well, since Mr. Cohen's position was that nothing was occurring, do you recall that the update was "They are still not doing anything"?

**A. That was generally the update. That's correct.**

Q. Okay. So the update was to advise you, or inform you, that as far as Mr. Cohen knew, Mr. Anderson was not doing anything with the information that he had about the incident?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes, correct.**

BY MR. PEREZ:

Q. Do you ever remember a conversation with Mr. Cohen where he told you, "Oh, they're finally doing something"?

**A. I do not remember having a conversation of that matter -- of that content.**

Q. I mean, isn't it accurate and fair to say that at no point during your conversations with Mr. Cohen did he ever say to you that the incident was being addressed?

MS. LEE-COTA: Object to form.

**THE WITNESS: I would say that almost all the conversations I had with Mr. Cohen were updates on the incident and concern expressed by Mr. Cohen that nothing had been addressed.**

BY MR. PEREZ:

Q. And when you say "almost all," that implies that you have a recollection of something different?

MS. LEE-COTA: Object to form.

**THE WITNESS: The reason I said "almost" is because I don't have a complete recollection from four years ago.**

BY MR. PEREZ:

Q. All right. Let me restate that then.

Would it be fair to say that to the best

of your knowledge, the conversations that you had with Mr. Cohen about the incident were that the incident was not being addressed by Mr. Anderson?

MS. LEE-COTA: Object to form.

**THE WITNESS: To the best of my knowledge, most of the conversations I had with Mr. Cohen were of that nature.**

BY MR. PEREZ:

Q. And so then what was the other discussions? You keep using "almost" or "most," which is a hedge. So I'm trying to figure out, what do you remember that was different than that?

MS. LEE-COTA: Object to form.

**THE WITNESS: The problem is, I don't remember all the conversations so I can't say they all were. If I remembered all of them, I could say they all were. But I don't remember all of them, so I can't say all of them were.**

BY MR. PEREZ:

Q. Well, maybe you didn't understand the question, because the question was to the best of your recollection, to the best of your knowledge. Like that's the ones you remember. Do you understand that?

When I ask you to give the best of your memory, you understand that I mean as you sit here

today knowing?

MS. LEE-COTA: Object to form.

**THE WITNESS: Again, to the best of my memory, I remember most of them being of that nature. Not all of them.**

BY MR. PEREZ:

Q. So do you remember something different?

**A. I remember having conversations with Mr. Cohen about getting together for dinner. I remember having a lot of conversations with Mr. Cohen. Not all of them were related to that topic.**

Q. You do understand we're talking about the incident, and that's why we're here today?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes, I do.**

BY MR. PEREZ:

Q. Okay. And you do understand I'm asking you questions about what you remember about conversations between Mr. Cohen and you about the incident?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. As you sit here today, to the best of your memory, do you have any recollection of Mr. Cohen ever saying to you that ASU was addressing the incident?

MS. LEE-COTA: Object to form.
**THE WITNESS: No.**
BY MR. PEREZ:
Q. Did you have any subsequent conversations with Mr. Heiler, other than the one you've talked about?
**A. Not that I remember.**
Q. Do you remember having a conversation with Mr. Cohen a day or two before he received the adverse employment action?
MS. LEE-COTA: Object to form.
**THE WITNESS: No, I don't remember.**
BY MR. PEREZ:
Q. Did you work with David on any fundraising efforts?
**A. Fundraising efforts? Indirectly.**
Q. In your interactions with Mr. Cohen, in whatever capacity but to support or assist you in the efforts of ASU Enterprise Partners, did you find him to be a good worker?
MS. LEE-COTA: Object to form.
**THE WITNESS: Mr. Cohen and I always had a good set of interactions.**
BY MR. PEREZ:
Q. Did he do the things that you asked him to do?
MS. LEE-COTA: Object to form.

**THE WITNESS: In general, I was not his supervisor, so I didn't ask him to do things.**

BY MR. PEREZ:

Q. He would just do them without you asking?

MS. LEE-COTA: Object to form.

**THE WITNESS: I wouldn't ask him to do things.**

BY MR. PEREZ:

Q. Again, to the extent that he's assisting or supporting your efforts --

**A. Correct.**

Q. -- at ASU Enterprise Partners, did you find him to do a good job?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. Whether or not you asked him?

MS. LEE-COTA: Object to form.

**THE WITNESS: Generally, we were in a collaborative relationship. I was not asking him to do things. He was not asking me to do things.**

BY MR. PEREZ:

Q. Who is Jack Furst?

**A. Jack Furst is a donor to ASU.**

Q. Did Mr. Cohen ever ask you -- or help you in

your relationship with Mr. Furst?
MS. LEE-COTA: Object to form.
**THE WITNESS: I don't remember.**
BY MR. PEREZ:
Q. Do you know if Mr. Furst and Mr. Cohen had a good relationship?
**A. I don't remember.**
Q. Do you know if Mr. Anderson and Mr. Furst had a good working relationship?
MS. LEE-COTA: Object to foundation.
**THE WITNESS: How do you define "working relationship"?**
BY MR. PEREZ:
Q. Did he get along with Mr. Anderson?
MS. LEE-COTA: Object to form.
**THE WITNESS: Again, in what context?**
BY MR. PEREZ:
Q. Did he like to interact with him? Was he somebody --
**A. I don't have any knowledge of his likeness of interacting with Ray or not.**
Q. Is he somebody that you recall asking Ray Anderson to assist with for donor relations?
**A. Who are you asking me about?**
Q. Mr. Furst.

**A. Can you restate the question?**

Q. Did you ever ask Mr. Anderson to assist you in donor relations with Mr. Furst?

**A. No.**

Q. To the best of your knowledge, did Mr. Cohen have a good working relationship with other senior members of your team at ASU Enterprise Partners?

MS. LEE-COTA: Object to form and foundation.

**THE WITNESS: To the best of my knowledge, Mr. Cohen had a good working relationship with other members of my team.**

BY MR. PEREZ:

Q. To the best of your knowledge, did Mr. Cohen have good relationships with other senior members of the ASU community that you interacted with?

MS. LEE-COTA: Object to form and foundation.

**THE WITNESS: What specific ASU community members are you speaking of?**

BY MR. PEREZ:

Q. It could be in Mr. Crow's office. It could be in the athletic department. It could be with regards to other fundraising efforts. For example, you mentioned the Sun Devils.

MS. LEE-COTA: Same objection.
**THE WITNESS: Can you be more specific when you say the ASU community? It's a broad term.**
BY MR. PEREZ:
Q. It is, and I'm trying to move this along. But if you want, I'll go through them one at a time.
I'm just trying to figure out if you're aware of anybody who had a bad relationship with Mr. Cohen with regards to his performance and your efforts for ASU Enterprise Partners?
MS. LEE-COTA: Object to form.
**THE WITNESS: Different question. No.**
BY MR. PEREZ:
Q. Were you aware that after the incident occurred, that there came a time when Mr. Anderson and Mr. Herm Edwards flew on a plane to California with Mr. Bart Wear?
MS. LEE-COTA: Object to form.
**THE WITNESS: Yes.**
BY MR. PEREZ:
Q. And what is it that you were aware of?
**A. Those facts as you stated them.**
Q. Do you remember why they went there, to California?
**A. No.**

Q. Was it to golf?
**A. I don't know.**
Q. How were you aware of it?
**A. I heard from somebody, who I don't remember, telling me that that was occurring.**
Q. And was that before, to the best of your knowledge, Ray Anderson had addressed the situation with Mr. Bart Wear?
MS. LEE-COTA: Object to form.
**THE WITNESS: It was before. To the best of my knowledge, it was before Mr. Anderson had addressed the incident with Bart Wear.**
BY MR. PEREZ:
Q. So do you recall if during one of your three conversations with Mr. Anderson, you expressed to him a feeling about that plane ride to California and that weekend in California?
MS. LEE-COTA: Object to form.
**THE WITNESS: Yes.**
BY MR. PEREZ:
Q. What did you say?
**A. As I remember it, I would have said to him, and I think this is what I would say to him, that that would be inappropriate unless he had already addressed the incident.**

Q. And do you remember what he said to you?
**A. I don't.**
Q. But your recollection, as you sit here today, is that he still had not addressed it?
MS. LEE-COTA: Object to form.
**THE WITNESS: That is correct.**
BY MR. PEREZ:
Q. And you don't remember how he would have responded, or did respond, when you brought that up to him?
**A. I do not exactly remember how he responded.**
Q. Well, did he provide you a response that you thought was satisfactory?
MS. LEE-COTA: Object to form.
**THE WITNESS: His response was consistent with the other responses, which was he was addressing it.**
BY MR. PEREZ:
Q. Are you aware of a subsequent trip which Bart Wear took with ASU's football team to Michigan as part of a team trip for a football game in Michigan?
**A. No.**
Q. There's been some interesting allegations in this case about Mr. Cohen having -- I'm not exactly sure how to phrase them -- racist tendencies.

In your relationship with Mr. Cohen, do you believe that he has any racist tendencies?

MS. LEE-COTA: Object to form.

**THE WITNESS: No.**

BY MR. PEREZ:

Q. In your interactions with Mr. Cohen, were you aware of him making comments that were inappropriate for the professional position he held?

MS. LEE-COTA: Object to form.

**THE WITNESS: I do not have any recollection of Mr. Cohen making any unprofessional comments.**

BY MR. PEREZ:

Q. Would you consider Mr. Cohen to be, with respect to ASU Enterprise Partners, a team player?

MS. LEE-COTA: Object to form.

**THE WITNESS: A team partner? Can you define "team partner" for me?**

BY MR. PEREZ:

Q. A team player. How would you define that?

**A. How would I define "team player"?**

Q. Yes.

**A. A good collaborator.**

Q. Would you consider, in your experience and interactions with Mr. Cohen, him to be a good

collaborative partner?

**A. Yes.**

Q. Who is Marcel Valenta?

**A. Marcel Valenta was general counsel for ASU Enterprise Partners.**

Q. There came a time when ASU began investigation of the incident, and you were contacted by Joan Wright from the law firm of Armstrong Teasdale. Do you remember that?

**A. I remember being contacted. I don't remember the specific name.**

Q. I'm going to give you what we're going to mark as Exhibit 20.

(Deposition Exhibit No. 20 was marked for identification by the court reporter.)

**THE WITNESS: Okay.**

MR. PEREZ: I'll wait until your counsel has a copy before I ask you about it.

BY MR. PEREZ:

Q. All right. Before you as Exhibit 20 is an email from Ms. Wright from Armstrong Tisdale. Do you see that?

**A. Yes.**

Q. Okay. Do you remember receiving this or having this interaction with their firm regarding the ASU

investigation?

**A. I don't remember receiving this specific email. I do remember having interaction with them.**

Q. You'll see on page 2 of Exhibit 20, the email is addressed specifically to you, Rick.Shangraw@asu.edu?

**A. Correct.**

Q. And do you have any reason to believe you didn't receive this email?

**A. No.**

Q. You just don't remember?

**A. Correct.**

Q. Do you recall when you received this email, when it was in connection with your conversations with Mr. Anderson?

MS. LEE-COTA: Object to form.

**THE WITNESS: No, I don't. I remember being contacted and being asked to participate in an investigation. That was what I knew.**

BY MR. PEREZ:

Q. Do you know what the impetus was for initiating this investigation?

**A. Not specifically, no.**

Q. Were you involved in the decision to initiate the investigation?

**A. No.**

Q. Was ASU Enterprise Partners in a legal relationship with Armstrong Teasdale with respect to this investigation?

MS. LEE-COTA: Object to form.

**THE WITNESS: I have no idea.**

BY MR. PEREZ:

Q. Were you paying them?

MS. LEE-COTA: Object to form and foundation.

**THE WITNESS: I don't know.**

BY MR. PEREZ:

Q. In other words, had ASU Enterprise Partners engaged Armstrong Teasdale or was that an engagement with some other entity?

MS. LEE-COTA: Object to form and foundation.

**THE WITNESS: I don't know.**

BY MR. PEREZ:

Q. Would you have sent this email to Mr. Valenta as counsel? Is that why he's involved in this interaction?

**A. I would have sent this to Mr. Valenta. That's correct.**

Q. Because if you notice through this chain, there

is not an email from you to Mr. Valenta.
Do you know how Ms. Wright began interacting with Mr. Valenta directly?
MS. LEE-COTA: Object to foundation.
**THE WITNESS: I do not know exactly how the two of them interacted.**
BY MR. PEREZ:
Q. Who is Mr. Collins?
**A. Collins?**
Q. Yes. C-o-l-l-i-n-s.
**A. Can you provide me some more background?**
Q. Take a look at the first page of Exhibit 20.
**A. All right.**
Q. "Similar emails to Scott Nelson and Tom Collins." Do you see that?
**A. Oh, Tom Collins. Yes, Tom Collins was on the development staff for Sun Devil Athletics.**
Q. He was not an employee of ASU Enterprise Partners?
**A. My recollection is he was at one point in time, but then he switched over and became an employee of ASU Athletics.**
Q. Well, at this time, which was August 27, 2019, was he an employee of ASU Enterprise Partners?
**A. I can't remember when that switchover occurred.**

Q. Did he participate in your interview with the Armstrong Teasdale firm?

**A. No.**

Q. I'm going to show you what I will mark as Exhibit 21.

(Deposition Exhibit No. 21 as marked for identification by the court reporter.)

BY MR. PEREZ:

Q. This is the November 5, 2019 report from Carrie Love, who is the attorney from Armstrong Teasdale. Do you recall ever seeing this document before?

**A. I do believe I saw this document, yes.**

Q. Do you recall when you received this document?

**A. No.**

Q. As a result of this investigation, there were notes created with respect to an interview with you and Armstrong Teasdale, which I will mark as Exhibit 22.

(Deposition Exhibit No. 22 was marked for identification by the court reporter.)

BY MR. PEREZ:

Q. Do you recall seeing the notes from this investigation?

**A. I have never seen these notes.**

Q. So you previously testified that you had seen

Exhibit 21, which is the confidential report, but you didn't see the summary of your interview. Is that correct?

MS. LEE-COTA: Object to form.

**THE WITNESS: I have not seen this summary of the interview.**

MR. PEREZ: Okay. Please take a moment to review them.

(The witness reviewed the document.)

BY MR. PEREZ:

Q. I'm going to refer you for a moment back to Exhibit 21, page 12. And you'll see at the top of page 12, "On June 7, Mr. Cohen had lunch with Mr. Shangraw." Do you see that?

**A. I do.**

Q. Does that refresh your recollection on when you met with Mr. Cohen about the incident?

**A. This is more contemporaneous, so I believe that would be accurate.**

Q. And then if you see down to the fourth full paragraph on that page, do you see there a reference to your having lunch with Mr. Anderson?

**A. Uh-huh.**

Q. Yes?

**A. Yes.**

Q. Okay. And it refers to it as a mid-June lunch. Do you see that?

**A. Yes.**

Q. Does that refresh your recollection of when you had lunch with Mr. Anderson?

**A. Yes.**

Q. And it would be mid-June?

**A. Yes.**

Q. Would it also be fair to say that this was the second time you spoke with Mr. Anderson, because this is the lunch you were talking about?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. So there would have been a conversation that you would have had with him before this mid-June event?

**A. That's correct.**

Q. As you've now had an opportunity to look at these dates, do you recall if your first conversation with Mr. Anderson was two weeks beforehand? A month beforehand?

MS. LEE-COTA: Object to form.

**THE WITNESS: I don't remember.**

BY MR. PEREZ:

Q. You don't remember one way or the other?

A. **That's correct.**

Q. On page 15 of this document, do you see a reference under heading F that says Administrative Leave? Do you see that heading?

A. **I do.**

Q. Is that where you received the impression that he was hired on August 15 but put on administrative leave?

MS. LEE-COTA: Object to form.

**THE WITNESS: What impression?**

BY MR. PEREZ:

Q. That it was not a firing, but administrative leave.

A. **At that time, I don't remember how it was communicated to me. And it was communicated to me by several different sources, so...**

Q. Do you remember Mr. Cohen telling you on October 15 that he had been told he was fired?

A. **Not specifically, no.**

Q. On page 16 of this document, the report states -- and I'm looking at the fourth paragraph down, the second sentence -- "Numerous witnesses, including but not limited to Mr. Nelson, the Woods, Ms. Hurley, Ms. Parke, and Mr. Shangraw, stated that Mr. Wear had a reputation for drinking too much and subsequently

engaging in inappropriate behavior."

Do you see that?

**A. Yes.**

Q. Does that refresh your recollection on what you knew of Mr. Wear's reputation?

**A. Not beyond what I've already talked about here.**

Q. Do you recall making the statement to the investigators about Mr. Wear?

**A. As I read this sentence, it says: "Numerous witnesses, including but not limited to." So this is the report from -- one, two, three, four, five -- six people. So my response is, given what I told you earlier, I had seen him once at an event that I thought he was intoxicated.**

Q. All right. So let's go to Exhibit 22.

**A. Okay.**

Q. And you previously testified that you had not seen these notes before.

**A. That's correct.**

Q. These were notes, as you can see from the bottom right-hand corner, that were provided by counsel, which are notes of the interview that you had with the investigators. And you'll see it starts with background information about you. Do you see that?

**A. Yes.**

Q. And then it goes into a paragraph called Bart. Do you see that?

**A. The first page?**

Q. First page.

**A. Yes. Yes, I do.**

Q. And in that document, there is a statement that says that Mr. Wear, quote, moved off because he was not compatible with others on the board.

That was a committee. What board was he moved off of?

**A. This would be the ASU Foundation board.**

Q. And do you know why he was moved off that board?

**A. Yes, I do.**

Q. And why is that?

**A. He was not collaborative. There is. It says right there. "He was not collaborative in decision-making."**

Q. And how would you describe that? Collaborative, what does that mean to you?

**A. As stated.**

Q. Just that he was not collaborative. His views he held closely?

MS. LEE-COTA: Object to form.

**THE WITNESS: No. I would say that he did**

**not collaborate and interact effectively with other board members.**

BY MR. PEREZ:

Q. Was he liked by other board members?

MS. LEE-COTA: Object to foundation.

**THE WITNESS: I have no idea of how other board members felt about him.**

BY MR. PEREZ:

Q. You have no idea if other board members didn't enjoy working with him?

**A. That's correct.**

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. So the decision to remove him from the board, whose decision was that?

**A. That was mine.**

Q. And so when you say he was not collaborative, was that an independent decision?

**A. That was my perspective on him. That's correct.**

Q. That paragraph two down says, quote, "I don't interact long enough to make observations. Having observed his behavior. Intoxicated at events," plural. Answer, yes.

Does that refresh your recollection on you

seeing Mr. Wear intoxicated at more than one event?
**A. As I said before, I saw him at one event where I believed he was intoxicated. That's correct.**
Q. But not more than one?
**A. I saw him at other events. I can't say that I knew that he was intoxicated at those events.**
Q. And then if you read the rest of that, it says: "Not speaking clearly. Acting and behaving as if he has had some alcohol."
And this is what I had asked you about earlier. "Most of the time I see him alcohol involved and he seems intoxicated." Do you see that?
**A. I do.**
Q. Do you recall making that statement to the investigator?
**A. I don't.**
Q. As you sit here today, do you believe that to be wrong that "Most of the time I see him alcohol involved and he seems intoxicated"?
MS. LEE-COTA: Object to form.
**THE WITNESS: As I said before, at one event, it was clear to me that I believed he was intoxicated at that event. I did observe him at other events. I did not know if he was intoxicated.**

BY MR. PEREZ:

Q. Do you think this is wrong, this statement in your interview notes?

MS. LEE-COTA: Object to form.

**THE WITNESS: No. Because it says "he seems intoxicated." I couldn't confirm that he was intoxicated.**

BY MR. PEREZ:

Q. And I'll quote the language again. "Most of the time I see him alcohol involved and he seems intoxicated." Do you see that?

**A. Right. But I can't confirm he is. That's correct.**

Q. But what I had also asked you is that most of the time involved -- alcohol was involved?

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. Most of the time you saw him, alcohol was involved?

**A. Most of the events that I attended with him, alcohol was involved. That's correct. Alcohol was served at all those events.**

Q. And he was drinking?

MS. LEE-COTA: Object to form.

**THE WITNESS: I did not say that.**

BY MR. PEREZ:

Q. So you believe this statement "Most of time I see him alcohol involved," that has nothing to do with whether or not he was drinking it?

MS. LEE-COTA: Object to form.

**THE WITNESS: As I've communicated to you, I was at events with him. There was alcohol being served at the events. And I can't confirm whether he was intoxicated or not.**

BY MR. PEREZ:

Q. Okay. In that same sentence, it says: "Most of time I see him alcohol involved and he seems intoxicated." Does that mean there were more than one incident where you saw him where he seemed intoxicated?

MS. LEE-COTA: Object to form.

**THE WITNESS: I saw him at a couple of events, not many, and there was always alcohol being served at those events. And at one event, I believed he was intoxicated, correct.**

BY MR. PEREZ:

Q. On page 2 when you referred to Mr. Cohen, there is a statement that said: "Thought he was a professionally oriented person. Thought he carried himself well, outgoing, engaged." Do you see that?

**A. What paragraph are you?**

Q. Second paragraph on the second page.

**A. Yeah. As I have testified here, yes, that's correct.**

Q. So you believe that to be accurate?

MS. LEE-COTA: Object to form.

**THE WITNESS: As I've stated before, yes.**

BY MR. PEREZ:

Q. On the fourth paragraph, do you see a reference to "In my office, in person"? If you would just read that paragraph entitled Wives.

(The witness complied.)

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. And so as you sit here today, do you still believe that that is consistent with your testimony today?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. Do you believe that to be an accurate --

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. -- memorialization of your conversation with the investigator?

MS. LEE-COTA: Object to form.
**THE WITNESS: I believe what's stated here is accurate, to the best of my knowledge.**
BY MR. PEREZ:
Q. You don't take issue with anything in that paragraph that begins with Wives on page 2?
MS. LEE-COTA: Object to form.
**THE WITNESS: I do not.**
BY MR. PEREZ:
Q. And the paragraph under that then talks about a lunch with Dave on June 7th. Do you see that?
**A. I do.**
Q. So would this have been the second time that you had this conversation with Dave Cohen about the incident?
MS. LEE-COTA: Object to form.
**THE WITNESS: I don't know if it was the second time or not.**
BY MR. PEREZ:
Q. As you sit here today, you don't recall?
**A. I don't recall.**
Q. About a paragraph down from that -- or sentences, I suppose, it says: "Between lunch with Dave and Ray, spoke with Scott. Confirmed no conversation with Bart occurred yet." Do you see that?

A. **Yes.**

Q. And again, is that consistent with what you've testified to today?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. And then from a timing standpoint, the next paragraph says: "After I met with Dave, I had lunch with Ray one week later." Do you see that?

**A. I do.**

Q. Actually, it says one week, hyphen, two weeks later.

**A. Yup.**

Q. And at that time, it says that when you met with Ray, you asked him and he said that he has not -- "I asked him," hyphen, "no, I haven't." Do you see that?

**A. Yes.**

Q. Do you know what that's referring to?

**A. No.**

Q. And then it says: "That's bad." Were those your words?

**A. I don't remember.**

Q. Do you remember Mr. Anderson telling you that he had not engaged with Bart Wear yet because he had

left for summer?

**A. Yes, I do.**

Q. And do you remember what your reaction to that was?

**A. I do not remember what my reaction was to that.**

Q. Did you feel like this was a conversation that had to occur with Mr. Wear in person?

MS. LEE-COTA: Object to form.

**THE WITNESS: My feelings?**

BY MR. PEREZ:

Q. Yes.

**A. My feelings are that this issue should have been addressed.**

Q. By that time?

**A. Yes.**

Q. And at this point, there's a reference to when you learned about incident, I went on a weekend golf trip. Do you see that?

**A. Yes.**

Q. Now, was that Mr. Anderson telling you that he went on a golf trip with Mr. Wear?

**A. I don't remember.**

Q. And then there's the statement that says: "We were having a good time and it wasn't appropriate."

Do you remember Mr. Anderson telling you

that?

**A. I -- no, I don't remember Mr. Anderson saying that.**

Q. Do you have any reason to believe that this paragraph is inaccurate?

MS. LEE-COTA: Object to form and foundation.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. What part do you think is inaccurate?

**A. I do not -- I'm having a hard time understanding these notes. They're not very explicit as to who they are referring to. And so I do have some concerns about this paragraph because it says I, me, we, they, he, she. I don't understand exactly what the reference is to.**

**And particularly, that sentence says "We were having a good time." Who's the "we"?**

**"And it wasn't appropriate." What's the "it"?**

**It's not explicit here, so I don't have any confidence in these notes.**

Q. Okay. Well, the sentence before that says: "No chance at all," question mark. Do you see that?

**A. No chance at all what?**

Q. Do you see that?

**A. I do, yes.**

Q. Okay. Well, what precedes that, did you have an opportunity to talk to Mr. Anderson? Response is "As soon as I could get to it, Bart left for summer. No chance at all?"

**A. I have no idea what that's referring to.**

Q. Well, then after it, it says: "When I learned about incident, I went on a weekend golf trip."

You didn't go on a weekend golf trip, correct?

**A. No. This is why this sentence is confusing.**

Q. Well, isn't it Ray Anderson that went on the weekend golf trip?

MS. LEE-COTA: Object to form and foundation.

**THE WITNESS: Yes, I know Ray went on a weekend golf trip. I don't know -- I just don't understand what this is referring to, to be honest with you.**

BY MR. PEREZ:

Q. Well, if you didn't go on a weekend golf trip --

**A. Correct.**

Q. -- doesn't that refer to Mr. Ray Anderson?

MS. LEE-COTA: Object to form.
**THE WITNESS: That would be a guess.**
BY MR. PEREZ:
Q. Okay. Down below, it says: "Ray says I'm going to take care of it." Do you see that?
**A. Yes.**
Q. And then you say: "Rick - if I was you, I would track him down and talk to him."
Do you remember saying that to the investigators?
MS. LEE-COTA: Object to form.
**THE WITNESS: I don't remember exactly saying that.**
BY MR. PEREZ:
Q. Do you remember saying that to Ray?
**A. I don't remember exactly saying that to Ray.**
Q. Do you remember Ray saying to you, "I'm going to wait until he returns at the end of the summer"?
**A. I do remember that, yes.**
Q. And what did you say in response to that?
**A. As I expressed before, my feelings at the time would have been to say that he needed to address it sooner.**
Q. Which is, in fact, what the last sentence says in that paragraph, correct?

**A. Correct.**

Q. "I would have addressed the issue when it happened."

**A. Correct.**

Q. And then the paragraph underneath it talks about "Mandated reporters - no one reported." Do you see that?

**A. I do.**

Q. Did you have that conversation with Mr. Anderson about whether he had reported the incident?

MS. LEE-COTA: Object to form.

**THE WITNESS: I don't remember.**

BY MR. PEREZ:

Q. Did you have a conversation with Mr. Anderson about him being a mandated reporter?

**A. I do not remember, no.**

Q. Do you see that last sentence that says that the tone you used during lunch, it says "not my casual conversation"?

**A. I don't know what that means because it says it's not my casual conversation. And then the next thing he says is "Not serious."**

Q. You don't know what that means?

**A. No, I have no idea what that means.**

Q. I'm referring to the fourth paragraph on page 3. "Next time it comes up - Scott in my office."

**A. Okay.**

Q. There it says: "The next time it comes up." What's the "it" that comes up?

**A. I have no idea.**

Q. And then this statement is: "Ray is going to make an organizational change." Do you see that?

**A. I do.**

Q. Were you aware of that organizational change before this conversation?

MS. LEE-COTA: Object to form.

**THE WITNESS: I don't remember any of the timing of that, no.**

BY MR. PEREZ:

Q. You say: "Dave called as soon as Ray announced the change." That's about three sentences later.

**A. Oh, yeah. Okay.**

Q. Do you remember that telephone call with Dave?

**A. I do not, no.**

Q. Do you remember Dave Cohen saying that this reorganization was in retaliation for his talking to Ray Anderson about the incident?

**A. I believe at some point in time, Dave -- and I don't remember if it was this conversation or another**

**conversation where Dave did claim that it was retaliation. That's correct.**

Q. Do you recall how you reacted to that discussion?

**A. I do not.**

Q. You don't recall agreeing with Dave that it was retaliation?

MS. LEE-COTA: Object to form.

**THE WITNESS: Can you ask the question again?**

BY MR. PEREZ:

Q. You don't recall agreeing with Dave Cohen that it was retaliation?

MS. LEE-COTA: Same objection.

**THE WITNESS: I don't remember agreeing with Dave Cohen that it was retaliation, no, I don't.**

BY MR. PEREZ:

Q. You don't remember saying to Mr. Cohen that you would deny it if asked, but that you felt it was retaliation?

MS. LEE-COTA: Object to form.

**THE WITNESS: Is that in the notes here?**

BY MR. PEREZ:

Q. I'm asking you.

**A. Can you ask that question again?**

Q. Sure.
You don't remember telling Dave Cohen that you would deny it if you were asked, but that you thought it was retaliation?
MS. LEE-COTA: Object to form.
**THE WITNESS: No, I never said that.**
BY MR. PEREZ:
Q. That you remember, that you never said that?
MS. LEE-COTA: Object to form.
**THE WITNESS: Yeah. There would be no way I would say something like that.**
BY MR. PEREZ:
Q. And then you see the next paragraph, it says: "Dave is calling me once a day. Ray, once a day." Do you see that?
**A. I do.**
Q. Do you remember what those calls were about?
**A. Not specifically, no.**
Q. Do you see "Call from Ray - letting Dave go"?
**A. Yes, I do.**
Q. So do you remember now that Mr. Anderson spoke to you before he took an adverse employment action against Mr. Cohen?
MS. LEE-COTA: Object to form and foundation.

THE WITNESS: I don't know if that's -- I don't know if you have the timing right on that. I don't know if I got that call from Ray before or after the event had already happened.

BY MR. PEREZ:

Q. Well, it says he's letting Dave go. You don't know if that was before or after?

MS. LEE-COTA: Object to form.

THE WITNESS: That's correct.

BY MR. PEREZ:

Q. Do you see it says: "Called me again to let me know he had let me go"?

A. Who called me again?

Q. Do you know who called you again?

A. Yeah.

Q. Who?

A. It says: "Called me again to let me know he had let me go." So that's Dave who had called me again to let me know that he had been let go.

Q. In other words, do you now remember having a conversation with Dave saying that he had been fired?

MS. LEE-COTA: Object to form.

THE WITNESS: I remember having a conversation with Dave saying that he had been let go, yes.

BY MR. PEREZ:
Q. Okay. So not put on administrative leave, but let go?
MS. LEE-COTA: Object to form.
**THE WITNESS: That is correct.**
BY MR. PEREZ:
Q. And then he said he was going to get a lawyer?
**A. I believe he said at some point in time that he was getting a lawyer. That's correct.**
Q. Do you see on the last page a reference to the standard protocol?
**A. Yes.**
Q. Do you know what that's referring to?
**A. No.**
Q. Was that your standard protocol?
**A. I don't know what the notetaker was referring to there, no.**
Q. Do you see the next paragraph says "Brought to Marcel's attention"?
**A. Yes.**
Q. What does that mean?
**A. I would be interpreting somebody else's notes that are very vague here. I don't know.**
Q. Well, do you remember because they're interpreting your interview?

**A. Do I remember what?**

Q. Do you remember what that referred to with regards to the standard protocol and bringing it to Marcel's attention?

MS. LEE-COTA: Object to form and foundation.

**THE WITNESS: No, I cannot make the connection between the two. I don't understand what the notetaker is writing here, to be honest with you. It's very vague.**

(Deposition Exhibit No. 23 was marked for identification by the court reporter.)

BY MR. PEREZ:

Q. I'm going to refer to 23.

MS. LEE-COTA: Can we take a quick break, just very short?

MR. PEREZ: Of course, yes.

(A recess was taken from 11:53 a.m. to 12:00 p.m.)

BY MR. PEREZ:

Q. I'm going to give you what I've marked as Exhibit 23.

And, Mr. Shangraw, as I stated before, I think we're close. I know you're concerned about leaving. I think we'll be done within 15 minutes.

**A. Great. Thank you.**
Q. You're welcome.
These text messages you see on Exhibit 23 are hard to follow, so I will do the best I can to walk you through. But why don't you just take a moment to just look at the texts.
**A. So can you just help me?**
Q. Sure.
**A. Who's on the left and who's on the right?**
Q. So where it says "Rick Shangraw" on the top, do you see that, and "Messages"?
**A. Yeah.**
Q. The darker color would be Mr. Cohen.
**A. Oh, okay.**
Q. So, for example, on that first page, it says "Reservation is Mary's name." I assume your wife is Mary?
**A. Yes.**
Q. Okay.
**A. So I'm on the left?**
Q. You're on the left on that --
**A. And Dave is on the right?**
Q. On that string, yes.
**A. Okay. I'm just trying to follow.**
Q. Yep.

**A. Oh, I see the dates too. Okay. Let's go.**
Q. Okay. So on page 2, it's marked 5613.
**A. Page 2...**
Q. Page 2 on the bottom right, there's 5613.
**A. Oh, yes. Sorry.**
Q. All right. And I'm sorry that some of this might be a little redundant.
You have just had a meal with the Cohens. And your text says: "Thanks for coming over. Good time. I greatly appreciate our friendship."
**A. Yes.**
Q. And Mr. Cohen writes: "I was just going to send you a note. You and Mary are special friends. I so enjoy spending time with you guys. Only downside was Kathy wasn't here tonight. Next time, for sure. Enjoy your Sunday."
**A. Yes.**
Q. So that is consistent with your testimony, that you and Mary were friends with Kathy and David Cohen?
**A. Yes.**
Q. And that you had a relationship that extended beyond your professional relationship?
**A. Yes.**
Q. Now I would like you to turn to the document marked 5616.

A. **Okay.**
Q. And in document 5616, you'll see the date of that text is May 16, 2019. And in your first text: "I'm on a plane back from LA." Do you see that?
A. **I do.**
Q. And that's in response to Dave sending you a text saying: "You have five minutes to catch up on something tonight?" Do you see that?
A. **Yes.**
Q. And then it says: "Can we meet for coffee in the morning? Better to do in person." Do you see that?
A. **Yes.**
Q. Does that refresh your recollection of one of the conversations that you had with Mr. Cohen about the incident?
MS. LEE-COTA: Object to form.
**THE WITNESS: No.**
BY MR. PEREZ:
Q. Mr. Cohen says we better do in person. Was that common for you two to meet in person as opposed to sending texts about things?
A. **I don't know.**
Q. You don't know one way or the other?
A. **I can't interpret Mr. Cohen's text there.**

Q. Well, I'm asking you.

**A. I don't know.**

Q. Was it common for you to do conversations in person as opposed to via text?

**A. For -- with regards to what and with who?**

Q. With Mr. Cohen with regards to serious or significant events.

MS. LEE-COTA: Object to form.

**THE WITNESS: I would talk to him in person. And you can see, I would text him. I did both.**

BY MR. PEREZ:

Q. All right. On page 5618, at the top, do you see that text from Dave Cohen saying: "Golf was good. He didn't mention one thing on the BW situation." Do you see that?

**A. I do.**

Q. And, in fact, in case you're curious about who the golf was with, if you go to the prior page on 6/8, "I decided to play golf with Ray tomorrow."

**A. Okay.**

Q. So that's 6/8. The next text is 6/9, where you text: "I will be in Beijing. Hope golf went well."

**A. Uh-huh.**

Q. And then Dave on that same day, 6/9, says:

"He didn't mention one thing on the BW situation."
Do you see that?

**A. I do.**

Q. Do you know that the BW situation was the Bart Wear situation?

**A. That would force me to interpret Dave's texts. I don't -- I'm not -- I don't know.**

Q. Well, you didn't write him back, correct, and say "What do you mean by BW"?

**A. Yes, I did not write him back.**

Q. So you obviously had an understanding of what the BW meant.

MS. LEE-COTA: Object to form.

**THE WITNESS: I would not say that's obvious, no.**

BY MR. PEREZ:

Q. You just wouldn't write him back?

MS. LEE-COTA: Object to form.

**THE WITNESS: I don't know.**

BY MR. PEREZ:

Q. And then Dave says on 6/19 that he has an update for you. Do you see that?

**A. Yes. "You in? I have an update." Yes.**

Q. And do you recall meeting with Dave around 6/19 on that update?

**A. No.**

Q. All right. On 8/12 -- so for your memory, Mr. Cohen was fired on 8/15.

MS. LEE-COTA: Object to form.

**THE WITNESS: Okay.**

BY MR. PEREZ:

Q. So on 8/12, he says: "Okay. We need to talk. I need to update you. I'm meeting with Salcido at 2:00 p.m." Do you see that?

**A. I do.**

Q. And then you say you got a very quick heads-up from Scott. What was it that Scott gave you a heads-up on?

**A. You know, I don't remember. But if you go to the document that you referred to, I think it's 21, it says that I had a conversation with Scott at that time about a reorganization occurring in the athletics department.**

Q. So your recollection is that the conversation with Scott was about the reorganization?

MS. LEE-COTA: Object to form.

**THE WITNESS: As documented in the November 5, 2019 report, yes, that's correct.**

BY MR. PEREZ:

Q. But who is Mr. Salcido?

**A. Salcido is the head of HR for Arizona State University.**

Q. All right. So would he have been talking to Dave Cohen about a reorganization?

MS. LEE-COTA: Object to form and foundation.

**THE WITNESS: I don't know what he was talking to Dave Cohen about.**

BY MR. PEREZ:

Q. Okay. Well, the next day you had dinner with Mr. Cohen, correct, for a meeting at Steak 44?

**A. Where are we? We're on 618?**

Q. At the very bottom of the page, 5618.

**A. Okay. Got it.**

Q. Do you see the reference to a meeting at 4:45 to 5:30 --

**A. I do.**

Q. -- at Steak 44?

**A. Yep, I do.**

Q. Okay. So that would have been the next day after Mr. Cohen met with Mr. Salcido. Do you remember that meeting?

**A. No, I don't.**

Q. Do you remember the conversation that occurred?

**A. No, I don't.**

Q. And then do you see on 8/14, you apparently did meet. Do you see that? Because Dave says on 8/14: "Thanks for listening last night."

**A. Yep. Yes.**

Q. Now, again, we know this to be the day before an adverse employment action took place against Mr. Cohen.

Is it your testimony that you don't recall that meeting the day before the employment action took place?

MS. LEE-COTA: Object to form.

**THE WITNESS: I do not recall that meeting, no. Let me just think. That's -- let's see. '19, '20, '21. That's four and a half years ago. Is that correct?**

BY MR. PEREZ:

Q. I don't know.

**A. Yeah, I don't remember.**

Q. Okay. And you have no notes or anything that could help you remember better, correct?

MS. LEE-COTA: Object to form.

**THE WITNESS: I did not take notes. If I had the meeting, I would have remembered because it's Steak 44.**

BY MR. PEREZ:

Q. But my question was, you have no notes that would help you remember any better, correct?

MS. LEE-COTA: Object to form.

**THE WITNESS: That's correct.**

BY MR. PEREZ:

Q. So when we go to trial, you're not going to have notes that you can turn to. Is that correct?

MS. LEE-COTA: Object to form.

**THE WITNESS: That's correct. I have no notes.**

BY MR. PEREZ:

Q. All right. So do you know what it was that Mr. Cohen was referring to about it being very uncomfortable today?

MS. LEE-COTA: Object to foundation.

**THE WITNESS: "Thanks for listening last night. Appreciate your time. Very uncomfortable today. Ray has now gone to Jean and Frank. Very, very noticeable."**

**It must have had something to do with the reorganization.**

BY MR. PEREZ:

Q. And then we now know that the adverse action

took place the following day, 8/15.

**A. Okay.**

Q. Did you have a conversation with Mr. Cohen the following day on 8/15?

MS. LEE-COTA: Object to form.

**THE WITNESS: I do not remember a specific conversation, no, on 8/15.**

BY MR. PEREZ:

Q. All right. I'm going to go to page 5622.

**A. Okay.**

Q. 5622 is dated February 23, 2020. And it appears that you and Mr. Cohen are getting together for dinner. Do you see that?

**A. Yes.**

Q. All right. And then Dave says: "Thanks for dinner tonight. Always good to see you and Mary. I apologize if I became irritable. I get tired of Jay educating me on how to deal with this when he apparently has never had the conversation with Crow." Do you see that?

**A. I do.**

Q. Was that Jay Heiler he's referring to?

**A. I would assume.**

Q. Okay. Do you know another Jay?

**A. I know lots of Jays.**

Q. In connection with Mr. Cohen?

**A. No.**

Q. And then Mr. Cohen says: "I realize me and my family are on an island, and we have an uphill fight with people that have all the resources. Maybe truth will prevail. I appreciate the support." Do you see that?

**A. I do.**

Q. Do you remember that meeting -- that dinner that you and Mary had, was Kathy at that meeting?

**A. I don't remember.**

Q. And then in response, you say: "It was great to see you. I too hope the truth will prevail." Do you see that?

**A. I do.**

Q. What did you mean when you said "I too hope the truth will prevail"?

**A. I don't know specifically, but I'm always hopeful that truth will prevail.**

Q. What were you referring to?

**A. In that particular instance?**

Q. Yes.

**A. I don't remember.**

Q. Well, do you know what Dave was referring to when he said "Maybe the truth will prevail"?

MS. LEE-COTA: Object to foundation.

**THE WITNESS: No. On February 23, 2020, in that text message? No.**

BY MR. PEREZ:

Q. So Dave says "Maybe the truth will prevail," and you agree with him. But as you sit here today, you don't remember why you were agreeing with him?

MS. LEE-COTA: Object to form.

**THE WITNESS: That's correct.**

BY MR. PEREZ:

Q. All right. Do you know if and when this situation was ever addressed with Mr. Wear by Ray Anderson?

**A. No, I do not.**

Q. To the best of your knowledge, isn't it fair to say that you don't believe Ray Anderson ever dealt with it with Mr. Wear?

MS. LEE-COTA: Object to form.

**THE WITNESS: That would not be a true statement.**

BY MR. PEREZ:

Q. Because you think he did?

**A. I don't know if he did.**

Q. So you just trust that maybe he did?

MS. LEE-COTA: Object to form.

**THE WITNESS: I didn't say that. I said I don't know if he did.**

BY MR. PEREZ:

Q. As you sit here today, do you have any information or knowledge that Mr. Ray Anderson ever met with Mr. Bart Wear to address the incident?

MS. LEE-COTA: Object to form.

**THE WITNESS: I do not know if Ray ever met with -- I do not know if he met with Bart Wear.**

BY MR. PEREZ:

Q. So the answer is yes, as you sit here today, you have no knowledge of that?

MS. LEE-COTA: Object to form.

**THE WITNESS: No knowledge again of?**

MR. PEREZ: Can you read it again?

(The record was played back by the court reporter.)

**THE WITNESS: I have no information.**

MR. PEREZ: Counsel, I have no further questions.

MS. LEE-COTA: All right. We'll read and sign.

(The deposition concluded at 12:00 p.m.)

__________________________________

RALPH FREDERICK SHANGRAW, JR.

CERTIFICATE OF CERTIFIED REPORTER

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in voice dictation and thereafter reduced to print under my direction; that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 (J)(1)(g)(1) and (2).

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

[X] Review and signature was requested; any changes made by the witness will be attached to the original transcript.
[ ] Review and signature was waived/not requested.
[ ] Review and signature not required.

Dated in Phoenix, Arizona, this 5th day of January 2024.

______/s/ Cindy Bachman________
CINDY BACHMAN, CVR

Certified Reporter

Arizona CR No. 50763

*     *     *     *     *

I CERTIFY that GRIFFIN GROUP INTERNATIONAL, has complied with the ethical obligations set forth in ACJA 7-206(J)(1)(g)(1) through (6).

_____/s/Pamela A. Griffin____
GRIFFIN GROUP INTERNATIONAL
Registered Reporting Firm
Arizona RRF No. R1005

GRIFFIN GROUP INTERNATIONAL -ERRATA SHEET - CHANGES IN TESTIMONY

3200 East Camelback Road Suite 177 Phoenix, Arizona 85018

Cohen vs Arizona Board of Regents, and Anderson-Ralph Frederick-Shangraw, Jr.-December 20, 2023

Errata & Signature due no later than the Februrary 9th, 2024.

| PAGE | LINE | CORRECTIONS/CHANGES | REASON |
| --- | --- | --- | --- |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |

_________________________ ________

SIGNATURE OF WITNESS DATE

**Exhibits**

**Shangraw 122023 Exh 19**
14:7,8
**Shangraw 122023 Exh 20**
99:13,14,20 100:4 102:12
**Shangraw 122023 Exh 21**
103:5,6 104:1,12
**Shangraw 122023 Exh 22**
103:18,19 107:15
**Shangraw 122023 Exh 23**
126:11,22 127:3

**1**

**1**
14:23
**10:35**
73:6
**10:51**
73:7
**11:53**
126:18
**12**
35:7,10 104:12,13
**12:00**
126:19 139:23
**14**
21:14
**15**
106:2,7,18 126:25
**16**
106:20 129:3
**19**
14:7,8 134:14
**1981**
17:17
**1982**
17:23 23:9,16
**1986**
18:3
**1988**
20:18
**1991**
21:4,6

**2**

**2**
14:23 15:11 100:4 112:21 114:6 128:2,3,4
**20**
22:13 99:13,14,20 100:4 102:12 134:14
**2011**
24:4,5 26:22
**2014**
28:18
**2016**
48:12,16
**2019**
39:5 41:7 46:1,3,4 57:13,18 102:23 103:9 129:3 132:23
**2020**
15:25 28:4 48:12, 16 136:11 138:2
**21**
103:5,6 104:1,12 132:15 134:14
**22**
103:18,19 107:15
**23**
126:11,14,22 127:3 136:11 138:2
**25**
11:16 22:13
**27**
102:23
**2:00**
132:9

**3**

**3**
14:23 121:2
**30**
17:8,9
**30-plus**
26:12
**31**
21:7

**4**

**44**
133:11,18 134:24
**4:45**
133:15

**5**

**5**
103:9 132:23
**501(c)(3)**
24:8 27:8,10,14,15
**501(c)(3)s**
27:9,15
**5613**
128:2,4
**5616**
128:25 129:2
**5618**
130:13 133:13
**5622**
136:9,11
**5:30**
133:16

**6**

**6/19**
131:21,24
**6/8**
130:19,22
**6/9**
130:22,25
**618**
133:12

**7**

**7**
104:13
**7th**
114:11

**8**

**8/12**
132:2,7
**8/14**
134:1,2
**8/15**
132:3 136:1,4,7
**83**
18:18 19:1

**9**

**90s**
18:5

**A**

**a.m.**
73:6,7 126:18
**accepted**
84:17
**accurate**
7:22 8:3,7 88:7 104:19 113:4,20 114:3
**accused**
33:7,9
**acted**
63:6
**Acting**
110:8
**action**
75:18 82:15 91:9 123:22 134:6,9 135:25
**actions**
74:16 82:11
**activity**
47:23
**address**
56:1 63:21 82:3 119:22 139:6
**addressed**
54:4 55:1 58:6 59:7,23 62:3 63:10,13,16 64:17 70:10,15,17,18 73:2 77:12,20 78:19 83:3,8,14,19 88:10,15 89:3 96:7,12,24 97:4 100:5 116:13 120:2 138:12
**addressing**
72:23 80:21 83:21 84:2,3,23 90:25 97:16
**adjectives**
59:1 85:6
**administration**
17:23 18:12
**administrative**
75:25 106:3,7,12 125:2
**admonitions**
6:20
**adverse**
75:18,25 82:11,15 91:8 123:22 134:6 135:25
**advice**
36:18 37:6
**advise**
87:19
**Affairs**
20:13 22:4
**age**
21:5
**agree**
138:6
**agreeing**
122:6,12,15 138:7
**alcohol**
32:4,22 110:9,11, 18 111:10,15,18,

21 112:3,7,12,17
**alert**
69:5
**alerted**
62:2
**alerting**
46:9
**allegations**
97:23
**amount**
57:23
**Analysis**
20:16,22
**analyst**
18:21
**and/or**
24:21
**Anderson**
6:3 35:13,14,16,21 36:14 38:11,15 53:7,16,22 54:3,4 56:22 57:6,14,17 58:1,11 59:10 60:18,24 62:4,12, 24 63:15,20 65:11, 16 67:21 70:22 72:15 76:18 79:18, 23 80:16 81:7,9,12 82:6 85:10 87:20 89:3 93:8,14,23 94:2 95:15 96:7, 11,15 100:15 104:22 105:5,10, 20 115:24 116:20, 25 117:2 118:4,13, 25 120:10,15 121:23 123:21 138:13,16 139:5
**Andersons**
36:15
**announced**
121:16
**answers**
10:6
**apologize**
74:13 87:7 136:17
**apparent**
61:2
**apparently**
134:1 136:19
**appeared**
34:23 36:22
**appears**
136:12
**appointed**
22:3,22,24
**appointment**
23:2,3
**approached**
38:21 39:12
**appropriately**
63:16
**approximately**
17:9 20:17 21:5 24:3 28:18 39:1 53:16
**April**
45:13
**areas**
21:9
**Arizona**
6:2 12:22 21:22 22:18 24:11,18 49:6 61:8 133:1
**Armstrong**
99:8,21 101:3,14 103:2,10,18
**Arts**
51:15
**assessment**
65:22
**assignments**
49:24
**assist**
91:17 93:23 94:2
**assistant**
19:13
**assisting**
92:9
**associate**
6:9 22:17
**assume**
15:22 56:10 127:16 136:23
**assuming**
42:24 56:5
**assumption**
8:14
**ASU**
6:4,7,9 12:23,24 13:9,16 14:1 23:6, 17 24:6,7,9,11,18, 21,24 25:2,12,13 26:3 27:3 28:3,17, 19 29:9 34:8,21,22 35:17 37:16 38:8, 17,22 40:20,21 41:3 42:7,8,15,25 43:1,4,9,11,18 45:25 47:17,22 48:4,17 49:5,10,21 50:5,6,11,24 51:4, 7,11,12,22,23 61:12 62:17,21 73:14 78:24 79:3 81:4 90:25 91:18 92:12,24 94:7,16, 19 95:3,10 98:15 99:4,6,25 101:2,13 102:18,21,24 108:11
**ASU's**
45:23 52:16 97:20
**athletic**
33:16 38:8,12 47:18,23 78:13 94:23
**athletics**
47:22 50:17,25 102:17,22 132:17
**Attachment**
14:22
**attend**
17:14
**attended**
29:2 111:20
**attention**
125:19 126:4
**attorney**
5:13 10:21 103:10
**attorney-client**
10:15,16
**attorneys**
30:25 32:3
**audible**
9:5
**audibly**
7:12 9:8
**August**
74:1 75:3 102:23 106:7
**authorities**
62:7
**aware**
33:3,6 47:2 48:15 50:19 56:13 57:15 69:7,23 70:3,6 80:20 82:1,20,21, 22,23,25 95:8,14, 21 96:3 97:19 98:7 121:10

**B**

**back**
25:14 26:3 37:24 45:9 57:6 65:1,11 74:10 78:5,11 85:19 104:11 129:4 131:8,10,17 139:16
**background**
17:12 102:11 107:24
**bad**
38:16 95:8 115:21
**Bart**
15:16,17 30:7,9, 10,11,13,15,21 31:1,4 32:3,9,21 33:4,6,25 34:4,7,9, 20,22 35:6 45:11 46:14,21 52:15,22 59:12 66:15 68:8 77:4,8 79:13 84:6 95:17 96:8,12 97:20 108:1 114:25 115:25 118:5 131:5 139:6, 9
**basic**
6:19
**basketball**
34:14,21,23 35:3 38:22 39:6,9 40:4 45:17,19,20,23,24 52:16 80:23 81:1, 3,14
**began**
99:6 102:2
**begin**
14:6 21:3
**beginning**
17:5
**begins**
114:6
**behaving**
110:8
**behavior**
107:1 109:23
**Beijing**
130:23
**believed**
56:7 110:3,22 112:18
**bit**
17:11 28:15
**board**
6:3 14:2 24:12,18, 21 28:10,11,12 49:6 61:7,9,11 73:14 108:8,9,11, 13 109:2,4,7,9,14
**Bob**
6:6
**book**
53:13
**bosses**
62:13
**bottom**
107:21 128:4 133:13
**break**
9:21,25 10:2 73:5, 10 126:15
**breaks**
9:16,18

**bring**
14:16,18
**bringing**
126:3
**broad**
95:3
**brought**
54:1 97:9 125:18
**business**
66:21
**BW**
130:15 131:1,4,9, 12

**C**

**C-O-L-L-I-N-S**
102:10
**calendar**
53:13
**California**
95:16,24 96:16,17
**call**
5:16,17 39:15 49:11 60:2,5,14 87:14 121:19 123:19 124:3
**called**
20:12,15 68:25 69:5 108:1 121:16 124:11,13,14,17, 18
**calling**
68:23 123:14
**calls**
123:17
**candid**
58:11
**capacity**
23:10 24:1 49:12, 18,19 51:3 91:17
**care**
55:4,8,11,14 58:8 59:10 83:15 84:18 119:5
**Carlisle**
17:15
**Carrie**
103:10
**carried**
112:23
**case**
30:18 56:11 70:6 97:24 130:18
**casual**
120:19,22
**catch**
129:7
**center**
22:1,6,8 23:1
**CEO**
11:5 12:1 21:2,6 24:6 26:9,22 27:3, 19 40:20
**certainty**
10:7
**Certified**
5:3
**chain**
62:12 78:24 101:25
**chairman**
61:7
**chance**
117:24,25 118:6
**change**
121:8,10,17
**changed**
48:11
**channels**
56:3 64:4,10
**chart**
50:18
**charter**
61:8
**Cintana**
28:1
**Citizenship**
20:12
**civil**
11:8 12:9
**claim**
11:21,25 12:13,20 122:1
**claiming**
13:16
**claims**
13:16
**clarify**
16:16 24:23
**clear**
68:7 110:22
**client**
5:19
**close**
126:24
**closely**
108:23
**cloud**
16:11
**Club**
47:21
**coach**
40:4
**coffee**
129:10
**Cohen**
5:14,19 15:4,12 28:16 29:8,18 36:8,17 38:4,21, 23,24 39:12 43:15 44:6,7,13 45:7,11, 15 46:20 52:8,18, 24 54:9 59:12 62:19 67:13,17,22 68:8 69:11,16 72:9 74:4,8,14 75:2,24 76:19 82:12 85:24 86:2,13 87:6,8,9, 20 88:3,8,13,14 89:2,6 90:8,10,19, 24 91:8,16,21 92:25 93:5 94:5, 11,14 95:9 97:24 98:1,6,11,14,25 104:13,17 106:17 112:21 114:14 121:21 122:12,16, 18 123:2,23 127:13 128:12,19 129:15,20 130:6, 14 132:3 133:4,8, 11,21 134:7 135:15 136:3,12 137:1,3
**Cohen's**
38:11,16 87:15 129:25
**Cohens**
28:16 128:8
**collaborate**
109:1
**collaborative**
92:20 99:1 108:16, 17,20,22 109:17
**collaborator**
98:23
**college**
17:15 18:17 23:4
**Collins**
102:8,9,15,16
**color**
127:13
**command**
78:24
**comment**
7:20 8:1 33:15,17, 18 34:1,3,5 38:10
**comments**
33:4,9 38:16 98:7, 12
**committee**
108:9
**common**
129:21 130:3
**communicate**
47:8
**communicated**
106:15 112:6
**communication**
15:7 16:13 79:17
**communications**
10:17 15:3,12,15
**community**
94:16,19 95:3
**company**
11:5,10 12:1,3,5, 20 13:7 20:15,20, 21,23 21:8
**compatible**
108:8
**compensation**
49:5 73:14
**competing**
46:1
**complaint**
47:4
**complete**
88:21
**complied**
113:11
**computer**
16:1
**computing**
20:4
**con-**
56:19
**concern**
60:15,16 64:2 72:23 88:14
**concerned**
73:2 83:7,11 85:6 126:24
**concerns**
117:14
**concluded**
139:23
**conduct**
35:7,11
**confidence**
117:22
**confidential**
104:1
**confirm**
111:6,12 112:8
**Confirmed**
114:24
**confused**
27:4
**confusing**
118:12
**connection**
30:18 100:14 126:8 137:1
**consistent**

97:15 113:15 115:2 128:18

**consulting**
21:12

**contacted**
99:7,10 100:18

**contemporaneous**
104:18

**content**
88:6

**context**
93:16

**continued**
78:3

**contract**
13:17

**contracted**
50:5

**conversation**
40:17 41:9,10,13 43:16,25 44:2,24 45:2 46:6 52:17 53:4,6,20 55:25 57:17 58:1,5,19 59:9,11,17,20,21, 24 60:1,6,11,12, 17,18,24 61:15,17, 22,25 62:1,5,20 63:1 64:20,25 65:1,7,9,10,12,19 66:3,10,18,24 67:2,4,6,7,8,11,17, 21,24 68:14,19,21 69:3 70:2,8,13,20 71:7,14,15,20,25 72:6,9,13,16,19 73:9,18 76:17,18, 19 77:15,23 78:16 80:7,9,15,18,19 81:6,8,10,11,19,20 82:6,7,17 84:5,8 85:1,9,24 86:13,19 88:2,5 91:7 105:15,19 113:24 114:14,24 116:6 120:9,15,20,22 121:11,25 122:1 124:21,24 132:16, 19 133:24 136:3,7, 19

**conversations**
37:15 70:22,25 71:3 77:16,19 78:4 79:8 86:1,22 88:8, 13 89:1,6,15 90:8, 10,18 91:4 96:15 100:14 129:15 130:3

**convey**
70:21,24 71:2,6

**conveyed**
72:22 83:6

**copy**
14:7 16:15,21 99:18

**corner**
107:21

**Corporation**
12:6 18:19,20 19:8 21:2

**correct**
5:21 12:4,16 13:1, 25 15:8,10,20 17:10 19:5 20:8 21:24 25:18,23 26:23 27:12,16 29:12,16 30:23 31:5,23 34:5,11 35:24 36:15 38:19 39:6 40:6 42:4,9, 18,19,23,24 43:6, 13 44:19 45:8,16, 21 46:2 47:6,16 48:2,5,6,10 51:12 52:2,7,19,20 53:25 54:19 59:7,19 60:25 63:6,19 65:13 66:5 68:4, 14,15 70:19 73:20, 21 76:3 78:6 79:18,20 80:6,10, 12,17 81:23 82:2, 4,15,20 83:1,2,4,5 85:24,25 86:11,18 87:18,24 92:11 97:6 100:7,12 101:24 104:3 105:17 106:1 107:19 109:11,20 110:3 111:13,21 112:19 113:3 118:11,24 119:25 120:1,4 122:2 124:9 125:5,9 131:8 132:23 133:11 134:15,20 135:3,5,9,11 138:9

**correction**
39:8

**counsel**
5:24 6:2,9 8:21,23 10:12,14 15:2,19, 22 17:1 18:4 36:18,23 37:7,13, 25 40:11 41:1 43:18 52:6 99:4,17 101:21 107:22 139:19

**couple**
44:16 112:16

**court**
6:24 7:6,7 14:9 34:21,23 85:19 99:15 103:7,20 126:12 139:16

**courtesy**
7:16

**COVID**
13:21

**Craig**
26:15,16

**created**
103:17

**Crow**
22:23 23:2,5 44:10,20,23 53:20 59:18 66:24 68:1, 14,20,23,25 69:5, 19 70:14,20 72:15 73:19 75:23 84:9 86:23 87:5,7 136:19

**Crow's**
94:22

**curious**
58:22 59:4,5 73:12 130:18

**D**

**D.C.**
21:18

**Dan**
28:6

**darker**
127:13

**date**
45:14 73:23 129:2

**dated**
136:11

**dates**
76:12 77:3 105:19 128:1

**Dave**
5:14,19,20 15:4,12 28:16 29:9,11 36:7 38:11,16 43:17 44:13 114:11,14, 23 115:8 121:16, 19,21,24 122:1,6, 12,16 123:2,14,19 124:6,18,21,24 127:22 129:6 130:14,25 131:21, 24 133:4,8 134:2 136:15 137:24 138:5

**Dave's**
131:6

**David**
29:18 91:13 128:19

**day**
91:8 123:14 130:25 133:10,20 134:5,9 136:1,4

**deal**
64:3 136:18

**dealt**
83:20,23 84:1 138:16

**dean**
23:4

**December**
75:5

**decide**
64:18

**decided**
130:20

**decision**
64:19 100:24 109:14,15,18

**decision-making**
108:18

**defendants**
13:5

**define**
31:10 45:23 51:13 93:11 98:18,20,21

**degree**
10:6 17:18,20,22 18:14,22

**degrees**
18:9

**demonstrate**
25:6

**deny**
122:19 123:3

**department**
22:20 23:3 38:8,12 47:18,24 50:17 94:23 132:18

**departments**
62:16

**deposed**
6:16 10:23

**deposition**
8:12,21 9:15,19 10:5,13 11:3,4 14:6,8 16:25 76:11 99:14 103:6,19 126:11 139:23

**describe**
21:8 23:19 29:17 30:15 35:20 36:6 46:6 54:6,14 68:20 69:8,10 108:19

**description**
54:15

**descriptive**

30:16
**desktop**
16:5
**detailed**
55:7
**details**
31:2
**determination**
74:18
**develop**
36:17
**developed**
12:22 29:6
**development**
20:2 102:17
**devices**
16:8
**Devil**
47:21 50:1 102:17
**Devils**
94:25
**dialed**
60:3
**Dickinson**
17:15
**difference**
10:8
**Dillon**
28:6
**dinner**
29:15 90:9 133:10 136:13,16 137:9
**directing**
51:8
**directly**
49:24 51:9 102:3
**director**
22:1,9 23:1,3
**disagree**
37:24
**disagreed**
58:12
**disappointed**
58:21 59:4,5 85:7
**disappointment**
59:6 83:11,16
**discern**
69:20
**discuss**
60:5 69:1
**discussed**
10:14,15 81:25
**discussion**
55:7 61:18 63:23 64:7 65:5 66:5 67:25 68:17 77:1,4 122:4
**discussions**
10:16 30:21 77:2,7 86:24 89:9
**divulge**
10:20
**document**
14:11 103:11,13, 14 104:9 106:2,20 108:6 128:24 129:2 132:15
**documented**
132:22
**documents**
14:16,18 16:15,21
**donor**
30:10 39:25 46:9, 11,13,17 63:16,17 92:24 93:23 94:3
**downside**
128:14
**draw**
48:1,4,13,21
**drawing**
51:21,23
**drew**
48:16 51:4
**drinking**
30:21 31:1 106:25 111:23 112:4
**drunk**
31:4,5
**dual**
49:12,18 51:3
**duly**
5:2
**duty**
42:6 43:10

**E**

**earlier**
59:16 68:13 107:13 110:11
**early**
46:3 57:18 75:3
**edits**
7:25
**educating**
136:18
**Education**
28:1
**Edwards**
95:16
**effect**
55:10
**effectively**
109:1
**efforts**
91:14,15,18 92:10 94:24 95:10
**else's**
125:22
**email**
99:21 100:2,4,9,13 101:20 102:1
**emails**
10:17 15:6 16:13 102:14
**employee**
13:16 47:11,15 51:7 102:18,21,24
**employees**
42:17 49:10
**employment**
13:17 47:17,24 75:18 82:11 91:9 123:22 134:6,9
**end**
24:3 46:4 119:18
**energy**
21:10
**engaged**
101:14 112:24 115:25
**engagement**
101:14
**engagements**
36:13
**engaging**
107:1
**Engineering**
51:15
**enjoy**
109:10 128:14,15
**Enterprise**
6:4,7 12:24 27:3,6, 22 28:3,12 40:20, 21 41:3 42:8 43:5, 10,11,18 49:11,21 51:4,18,22 91:18 92:12 94:7 95:10 98:15 99:5 101:2, 13 102:18,24
**entities**
25:7
**entitled**
113:10
**entity**
24:9 25:6,12 27:7 43:3 49:21 101:15
**environmental**
17:19 21:10
**Essentially**
54:9
**establish**
37:3
**established**
52:13
**event**
31:22,25 33:17 34:10,11,12 78:13 105:16 107:13 110:1,2,22,23 112:18 124:4
**events**
30:14 31:13 34:8 78:14 109:23 110:5,6,24 111:20, 22 112:7,8,17,18
130:7
**exact**
52:9 77:3
**EXAMINATION**
5:6
**examined**
5:4
**exchanged**
25:25
**executive**
22:21
**exhibit**
14:7,8,14 99:13, 14,20 100:4 102:12 103:5,6,18, 19 104:1,12 107:15 126:11,22 127:3
**existed**
37:12
**existence**
26:10
**expect**
76:5
**experience**
98:24
**explain**
24:7 25:4 70:11
**explicit**
117:12,21
**expressed**
59:6 60:15 61:16 88:14 96:15 119:21
**extended**
128:21
**extent**
7:24 43:7 92:9

**F**

**fact**
32:8,12 72:9 77:18 78:3 84:25 119:24 130:18
**facts**
29:25 62:2 95:22

**Factual**
72:7
**faculty**
19:19,23 23:2
**fair**
29:4,10 36:6,22 42:22 43:1,2,8 50:10 53:19 56:23 57:15 61:12,14 88:7,25 105:9 138:15
**fall**
22:2 51:11
**familiar**
29:25
**family**
137:4
**February**
136:11 138:2
**feel**
9:20 10:19 116:6
**feeling**
96:16
**feelings**
116:9,12 119:21
**fell**
27:13
**felt**
58:12 109:7 122:19
**field**
21:10,11
**fight**
137:4
**figure**
66:20 89:11 95:7
**files**
16:19
**final**
74:18
**finally**
88:3
**finances**
24:20
**financial**
25:4
**find**
30:4 91:18 92:12
**finish**
9:24 35:9 48:3
**finished**
73:9
**fired**
67:14,18,22 74:4, 14 75:2,3,13,16,25 106:18 124:21 132:3
**firing**
75:4,9,10 106:12
**firm**
30:18 99:8,25 103:2
**flew**
95:16
**follow**
7:9 127:4,24
**football**
34:15 97:20,21
**force**
131:6
**form**
24:13 25:8,17 26:1 31:9,21 32:5,10, 16,23 34:2,16 36:9,19 37:1,8,14, 20 38:1,18 41:14, 21 42:3,10 43:12 44:8 46:22 48:18, 23 49:7,13 50:4,13 51:25 54:11 56:9 57:1,7,19 58:4,14, 24 60:7 61:21 62:8,18 63:7,22 64:5,11,22 65:17 66:1,13,22 68:2,10 69:12,22 70:4 71:9,17,23 72:2, 17,25 73:25 74:5, 23 75:8,14,20 76:2,7,13,25 77:13,21 78:7,20, 25 79:5,10,19 80:11,24 81:16,22 82:13 83:9,17 84:21 85:4,11 86:15 87:1,23 88:11,19 89:4,13 90:2,14,20 91:1, 10,20,25 92:5,14, 18 93:2,15 94:8,17 95:11,18 96:9,18 97:5,14 98:3,9,16 100:16 101:5,9,16 104:4 105:12,22 106:9 108:24 109:12 110:20 111:4,16,24 112:5, 15 113:5,17,21 114:1,7,16 115:4 116:8 117:6 118:15 119:1,11 120:12 121:12 122:8,21 123:5,9, 24 124:8,22 125:4 126:5 129:17 130:8 131:13,18 132:4,21 133:5 134:11,21 135:4, 10 136:5 138:8,18, 25 139:7,13
**forms**
42:16
**foundation**
24:6,7,18,21,24 25:2,12,13,14 26:7,10,18 27:11, 16 28:2 37:2 42:25 43:9 47:9,11,15,25 48:8,13,24 49:20 50:1,6 51:7,23 55:15 57:20 78:14 93:10 94:9,18 101:10,17 102:4 108:11 109:5 117:7 118:16 123:25 126:6 133:6 135:17 138:1
**foundations**
27:5
**fourth**
13:12 104:20 106:21 113:8 121:1
**frame**
43:19 53:16
**frank**
58:12 135:20
**Frederick**
5:1 6:14 139:25
**friendly**
38:14
**friends**
23:22 29:20,23 36:2,4 128:13,19
**friendship**
128:10
**full**
6:12 7:21 104:20
**funding**
26:3,5
**fundraisers**
51:9
**fundraising**
50:6,7 51:8 91:13, 15 94:24
**Furst**
92:23,24 93:1,5,8, 25 94:3
**furthest**
11:2

**G**

**game**
34:14,15,21 35:4 38:23 97:21
**gave**
132:12
**general**
18:4 41:1 43:18 46:16 52:5 92:1 99:4
**generally**
60:21 87:18 92:19
**gestures**
9:7 40:8
**get along**
93:14
**give**
7:15,16 8:6 37:24 89:24 99:12 126:21
**golf**
96:1 116:17,21 118:9,10,14,18,22 130:14,19,20,23
**good**
5:8,9,12,14 7:18 23:21 29:19 35:22 38:16 55:12 73:4 91:19,22 92:13 93:6,9 94:6,11,15 98:23,25 116:24 117:18 128:9 130:14 136:16
**governance**
24:17,19
**graduate**
17:16 19:13 20:6, 7,9 23:11
**graduated**
19:17
**graduating**
18:16
**great**
5:11,16,18 8:5 127:1 137:12
**greatly**
128:10
**ground**
7:9,11,14
**groundwater**
11:25
**guess**
10:5 25:11 28:19 57:25 119:2
**guessing**
10:9
**guys**
128:14

**H**

**half**
22:15 134:14
**hand**
40:8

**handing** 14:7
**handled** 76:24
**handling** 58:13
**hands** 9:6,12
**happen** 9:9 86:24
**happened** 49:2 74:20,22 85:2 120:3 124:4
**harassment** 15:16,17 40:23 42:21 44:6 68:8
**hard** 16:15,21 117:11 127:4
**head** 133:1
**heading** 106:3,4
**heads-up** 132:11,12
**hear** 37:25
**heard** 96:4
**hearing** 69:20
**Heather** 6:5
**hedge** 89:10
**Heiler** 44:10,20 53:20 59:15,20,21 60:11, 13,18 61:1,17 62:6 63:2,15 64:2,9,18 65:15 66:10 67:7, 25 70:25 72:15 86:20 91:5 136:22
**Heiler's** 61:6
**held** 26:19 98:8 108:23
**Herm** 95:16
**hesitate** 10:21
**hire** 25:16,20
**hired** 35:17 106:7
**home** 16:22
**honest** 118:19 126:9
**hope** 6:4 130:23 137:13, 16
**hopeful** 137:19
**hours** 9:17
**HR** 11:4,12 42:21 62:15,21 84:15 133:1
**Hurley** 40:5 44:7 45:12 46:20 59:13 68:8 71:16 106:23
**hyphen** 115:11,16

**I**

**idea** 29:3 74:24 101:6 109:6,9 118:7 120:25 121:6
**identification** 14:9 99:15 103:7, 20 126:12
**imagine** 9:17 72:3
**immediately** 41:9,23 44:12 56:21
**impetus** 100:21
**implies** 88:17
**important** 7:8,21 8:2 71:14
**impression** 27:13 106:6,10
**improper** 13:15
**improperly** 12:21
**inaccurate** 117:5,10
**inappropriate** 33:4,8,16 34:1,4 35:7,11 46:17 96:24 98:7 107:1
**inappropriately** 39:25
**incident** 33:14,24 34:25 35:2 38:22 39:24 41:19 45:11 46:9, 10,17,18,21 52:11, 15,22 53:7 54:5,6, 14,15,16,17,21,25 55:1 56:1,14,16, 18,20,22 57:11 58:7,13,18 59:12, 22 60:12,13,15,16 66:4,15,24 67:8,11 68:7 69:1,6,8,24 70:3,6 71:8,16,21 72:1,4,24 73:2,11 76:20,24 77:5,8,19 79:4,13 80:20 82:1 86:13 87:22 88:9, 14 89:2 90:13,19, 25 95:14 96:12,25 99:7 104:17 112:14 114:15 116:17 118:9 120:11 121:23 129:16 139:6
**incidents** 33:3,6 40:22,23 62:17
**included** 29:14
**includes** 15:6
**including** 27:16 106:22 107:10
**independent** 20:16,22 109:18
**Indirectly** 91:15
**individual** 51:21
**individuals** 51:2,4
**inform** 87:20
**information** 10:14,18 15:23 20:3 21:11 47:7,8 87:21 107:24 139:5,18
**informed** 74:21
**initiate** 100:24
**initiated** 59:24 68:21
**initiating** 100:21
**Innovations** 12:14
**instance** 9:10 137:21
**instances** 11:1
**institutions** 48:22
**instruct** 9:2
**instructs** 8:23
**intellectual** 11:20 12:13
**interact** 38:4 42:16 93:18 109:1,22
**interacted** 94:16 102:6
**interacting** 93:21 102:3
**interaction** 38:24 43:15 52:21 53:22 75:4,25 76:22 99:25 100:3 101:22
**interactions** 10:17 52:14 73:10 76:23 79:12,14,17, 22 91:16,22 98:6, 25
**interest** 12:1
**interesting** 97:23
**interim** 26:14
**intermingled** 24:20,23
**interpret** 129:25 131:6
**interpreting** 125:22,25
**interrupting** 74:13
**interview** 30:20,24 31:18 32:2 103:1,17 104:2,6 107:22 111:3 125:25
**interviewed** 30:17
**intoxicated** 31:15,19,23 33:1 34:7,9,10,21,24 107:14 109:23 110:1,3,6,12,19, 23,24 111:6,7,11 112:9,13,14,19
**introduce** 5:25
**introduction** 20:3
**investigated** 79:4
**investigation**

15:16 84:12 99:6 100:1,19,22,25 101:4 103:16,23

**investigator** 110:15 113:25

**investigators** 30:25 31:19 32:12 107:8,23 119:10

**involved** 30:5 40:9 46:18,21 47:3 100:24 101:21 110:11,19 111:10,15,19,21 112:3,12

**involving** 33:3 45:11 52:22 59:12

**irritable** 136:17

**island** 137:4

**issue** 11:12 63:16 114:5 116:12 120:2

**iteration** 14:13

**IX** 42:22 62:7 84:15

**J**

**Jack** 92:23,24

**January** 28:4

**Jay** 44:10 136:17,22, 24

**Jays** 136:25

**Jean** 135:20

**Jennifer** 6:2

**Joan** 99:7

**job** 18:16,18 19:12,18 20:14,15,17,18,19, 24 21:1,13,14,15, 20,21,25 22:14 23:24 24:3 27:1 38:4,8,11 92:13

**joined** 28:17,19,22,24 29:9 37:16

**journal** 53:12

**Journalism** 51:16

**Jr** 5:1 6:14 139:25

**June** 104:13 114:11

**K**

**Kathy** 5:20 29:8,11,22 36:8 38:23 72:9 128:15,19 137:10

**kind** 49:5

**knew** 28:23 54:18,20 56:19,20 61:1,4 62:3 87:20 100:19 107:5 110:6

**knowing** 65:25 90:1

**knowledge** 51:21 52:1 61:12 82:1 89:1,5,22 93:20 94:5,10,14 96:7,11 114:3 138:15 139:5,12, 14

**Kwan** 6:8

**L**

**LA** 129:4

**language** 75:10 111:9

**lap** 9:14

**laptop** 16:3,5

**late** 18:5 39:7 44:23 45:5,13 53:18 68:14,19 73:19,24 80:12

**law** 6:24 30:17 51:16 99:8

**lawsuit** 11:6,8,10,17,22,24 12:7,11,12,15 13:1,3,6,12,18,24 14:1,3 30:1

**lawyer** 125:7,9

**leader** 47:22

**learn** 38:7 54:20 64:9

**learned** 41:11,19 42:7 44:13 45:4,6,7 52:10,15 72:4 116:17 118:8

**leave** 74:17 75:25 106:4, 8,13 125:2

**leaving** 126:25

**led** 56:17

**Lee-cota** 6:1,2 24:13 25:8, 17 26:1 31:9,21 32:5,10,16,23 34:2,16 36:9,19 37:1,8,14,20 38:1, 18 41:14,21 42:3, 10 43:12 44:8 46:22 47:9 48:18, 23 49:7,13 50:4,13 51:25 54:11 55:15 56:9 57:1,7,19 58:4,14,24 60:7 61:21 62:8,18 63:7,22 64:5,11,22 65:17 66:1,13,22 68:2,10 69:12,22 70:4 71:9,17,23 72:2,17,25 73:25 74:5,23 75:8,14,20 76:2,7,13,25 77:13,21 78:7,20, 25 79:5,10,19 80:11,24 81:16,22 82:13 83:9,17 84:21 85:4,11,16 86:15 87:1,23 88:11,19 89:4,13 90:2,14,20 91:1, 10,20,25 92:5,14, 18 93:2,10,15 94:8,17 95:1,11,18 96:9,18 97:5,14 98:3,9,16 100:16 101:5,9,16 102:4 104:4 105:12,22 106:9 108:24 109:5,12 110:20 111:4,16,24 112:5, 15 113:5,17,21 114:1,7,16 115:4 116:8 117:6 118:15 119:1,11 120:12 121:12 122:8,14,21 123:5, 9,24 124:8,22 125:4 126:5,15 129:17 130:8 131:13,18 132:4, 21 133:5 134:11, 21 135:4,10,17 136:5 138:1,8,18, 25 139:7,13,21

**left** 5:19 7:6 28:2,3 42:25 48:12 65:24 66:4 116:1 118:5 127:9,20,21

**legal** 101:2

**letting** 123:19 124:6

**level** 20:5,6,7 22:21 63:21

**Liberal** 51:15

**likeness** 93:20

**likewise** 43:7

**limited** 36:13 106:23 107:10

**listening** 134:3 135:18

**litigation** 12:9,18

**long** 11:15 13:18 19:22 20:24 21:13 22:14 24:1 26:10 35:16 37:11 44:15 56:13 60:17 109:22

**longer** 43:1 45:25

**looked** 15:25 16:1 36:23

**lot** 58:25 90:10

**lots** 136:25

**Love** 103:10

**lunch** 53:23 80:2,5,7,9, 17,19 81:6,12,21 82:10,22,23 104:13,22 105:1,5, 11 114:11,23 115:8 120:19

**M**

**made** 23:2,3 33:15,16,25 34:3,4 38:15 64:19 70:3

**Madness**
39:10
**maintain**
23:16
**make**
7:24 8:15,24 25:7 68:6 69:7 109:22 121:8 126:7
**making**
7:7 33:4 98:7,11 107:7 110:14
**management**
20:2
**managing**
61:20
**mandated**
120:6,16
**Marcel**
99:3,4
**Marcel's**
125:19 126:4
**March**
39:10
**mark**
99:12 103:4,18 117:24
**marked**
14:8 99:14 103:6, 19 126:11,21 128:2,25
**Marlina**
6:7
**Mary**
127:17 128:13,19 136:16 137:10
**Mary's**
127:16
**master's**
17:23 18:22 19:3
**matter**
5:14 11:4,20 12:12 13:15 88:6
**Maxwell**
20:12
**Mckirgan**
6:6,7
**meal**
128:8
**meaning**
82:19
**means**
8:13 63:14 120:21, 24,25
**meant**
55:5,17 57:5 70:11 84:18,19,22 131:12
**mechanism**
25:5
**media**
15:9 16:2
**medications**
8:9
**meet**
5:15 17:2 23:10 28:16 29:8 30:11 129:10,21 134:2
**meeting**
17:3,4,6 39:13 65:24 66:2,4 82:21,23 83:13 85:10 131:24 132:8 133:11,15, 22 134:9,13,23 137:9,10
**member**
19:19,23
**members**
94:7,12,15,20 109:2,4,7,9
**memorialization**
113:24
**memory**
28:23 75:12 89:25 90:4,24 132:2
**mention**
46:25 130:15 131:1
**mentioned**
51:2 94:25
**message**
138:3
**messages**
127:3,11
**met**
17:1 23:9 28:20 56:25 74:9 104:17 115:8,14 133:21 139:5,9
**Michigan**
97:20,21
**mid-june**
105:1,7,16
**middle**
9:25
**Mike**
5:13,16,17
**mine**
109:16
**minutes**
17:8,9 126:25 129:7
**missed**
18:6
**model**
49:1
**moment**
14:21 104:7,11 127:5
**money**
24:24 25:2,5
**month**
41:13 57:16 58:2 60:21 73:23 105:20
**months**
44:16 60:21
**morning**
5:8,9 129:11
**mouth**
63:4
**move**
59:8 61:19 95:5
**moved**
108:7,10,12

**N**

**nature**
42:17 72:6 77:3,7 82:17 89:7 90:4
**NCAA**
81:4,14
**necessarily**
78:9 86:9
**needed**
64:3,17 119:22
**Nelson**
44:25 45:3,7,10 46:7,8,15 47:7,15 48:12,16 49:4 50:11 52:4,10,16, 24 54:10 56:20,25 57:5,12 67:11 69:14 71:3,7 76:17,23 78:4,13, 14 79:9,12 81:6,12 102:14 106:23
**night**
134:3 135:19
**Norfolk**
21:17
**Northern**
21:16,19
**not-for-profit**
24:8
**note**
128:13
**notes**
53:9 103:17,22,24 107:18,20,22 111:3 117:12,22 122:22 125:22 134:19,22 135:2,9, 12
**notetaker**
125:16 126:9
**notice**
101:25
**noticeable**
135:21
**notified**
35:6
**notifying**
35:10
**November**
103:9 132:23
**number**
27:8
**Numerous**
106:22 107:9

**O**

**oath**
73:16
**object**
8:21 24:13 25:8,17 26:1 31:9,21 32:5, 10,16,23 34:2,16 36:9,19 37:1,8,14, 20 38:1,18 41:14, 21 42:3,10 43:12 44:8 46:22 47:9 48:18,23 49:7,13 50:4,13 51:25 54:11 55:15 56:9 57:1,7,19 58:4,14, 24 60:7 61:21 62:8,18 63:7,22 64:5,11,22 65:17 66:1,13,22 68:2,10 69:12,22 70:4 71:9,17,23 72:2, 17,25 73:25 74:5, 23 75:8,14,20 76:2,7,13,25 77:13,21 78:7,20, 25 79:5,10,19 80:11,24 81:16,22 82:13 83:9,17 84:21 85:4,11 86:15 87:1,23 88:11,19 89:4,13 90:2,14,20 91:1, 10,20,25 92:5,14, 18 93:2,10,15 94:8,17 95:11,18 96:9,18 97:5,14 98:3,9,16 100:16 101:5,9,16 102:4 104:4 105:12,22 106:9 108:24 109:5,12 110:20 111:4,16,24 112:5, 15 113:5,17,21 114:1,7,16 115:4

116:8 117:6 118:15 119:1,11 120:12 121:12 122:8,21 123:5,9, 24 124:8,22 125:4 126:5 129:17 130:8 131:13,18 132:4,21 133:5 134:11,21 135:4, 10,17 136:5 138:1, 8,18,25 139:7,13

**objection**
95:1 122:14

**objects**
9:2

**obligated**
7:1

**obligation**
40:22

**obligations**
56:8

**observations**
109:22

**observe**
110:23

**observed**
109:23

**obvious**
131:15

**occasion**
38:7

**occasions**
10:24 31:6,8,10, 14,15,17,20

**occur**
39:13 82:9 116:7

**occurred**
38:22 44:17 53:4 59:22 60:13 67:13, 17,21 69:4 72:20 80:10 95:15 102:25 114:25 133:24

**occurring**
87:16 96:5 132:17

**October**
106:18

**office**
16:22 94:22 113:9 121:2

**oftentimes**
51:6

**ombudsperson**
84:15

**on-campus**
19:12

**ongoing**
72:13 73:13 77:18 78:3

**opened**
84:12

**opportunity**
7:16,20 8:1 9:16 105:18 118:4

**opposed**
129:22 130:4

**order**
10:19

**organizational**
20:1 50:18 121:8, 10

**oriented**
112:23

**originally**
69:14

**outgoing**
112:24

**overlap**
24:11,15

**oversight**
61:12

**P**

**p.m.**
126:19 132:9 139:23

**Pac**
35:7,10

**paid**
25:21 51:9,17,18

**Papetti**
6:5,6

**paragraph**
104:21 106:21 108:1 109:21 112:25 113:1,8,10 114:6,10,22 115:8 117:5,14 119:25 120:5 121:1 123:13 125:18

**Parke**
106:24

**part**
46:3 97:21 117:10

**participate**
100:18 103:1

**partner**
98:17,18 99:1

**Partners**
6:4,8 12:24 27:3,6, 22 28:3,12 40:20, 21 41:3 42:8 43:5, 10,11,18 49:11,21 51:5,18,22 91:18 92:12 94:7 95:10 98:15 99:5 101:2, 13 102:19,24

**party**
11:6,10,22 12:15, 17,25 13:23 14:1

**passed**
57:16,22

**past**
32:9 83:24

**pause**
7:15

**paycheck**
47:25 48:1,4,13, 17,22

**paychecks**
48:7 51:4

**paying**
101:8

**penalty**
6:23

**Pennsylvania**
17:15

**people**
5:25 22:12 30:5 72:23 107:12

137:5

**Perez**
5:7,13,24 6:10,11 14:10 24:16 25:10, 19 26:4 31:11,24 32:7,14,18 33:2 34:6,19 36:11,21 37:5,10,17,22 38:3,20 41:17,24 42:5,13 43:14 44:11 46:24 47:14 48:20 49:3,9,15 50:9,16 52:3 54:13 55:19 56:12 57:3, 8,24 58:9,16 59:3 60:9 61:24 62:10, 22 63:11 64:1,8, 13,24 65:21 66:6, 16 67:1 68:5,12 69:15 70:1,7 71:11,19,24 72:5, 21 73:4,8 74:2,7 75:1,11,17,22 76:4,9,15 77:6,17 78:1,10,22 79:2,7, 15,21 80:14 81:2, 18,24 82:16 83:12, 22 84:24 85:8,12, 14,18,22 86:16 87:3 88:1,16,23 89:8,19 90:6,16,22 91:3,12,23 92:3,8, 16,22 93:4,13,17 94:13,21 95:4,13, 20 96:13,20 97:7, 18 98:5,13,19 99:17,19 100:20 101:7,12,19 102:7 103:8,21 104:7,10 105:14,24 106:11 109:3,8,13 111:1, 8,17 112:1,10,20 113:7,13,19,23 114:4,9,19 115:6 116:10 117:9 118:21 119:3,14 120:14 121:15 122:11,17,23 123:7,12 124:5,10 125:1,6 126:13,17,

20 129:19 130:12 131:16,20 132:6, 24 133:9 134:16 135:1,7,13,24 136:8 138:4,10,21 139:3,10,15,19

**perform**
25:20

**performance**
12:6 21:2 38:5,8, 11,16 95:9

**period**
48:16 67:12 77:2 79:13

**perjury**
6:23 7:3

**person**
15:3,15 30:15 34:4 39:19 40:8 53:24 86:8 112:23 113:9 116:7 129:11,20, 21 130:4,10

**personal**
16:13

**perspective**
81:11 109:19

**Ph.d.**
18:2,8,11,14 19:3, 4,6,18 23:12,14

**phone**
6:8 16:1 39:17 60:2,14 66:3 68:22 86:10,11

**phrase**
97:25

**pick**
9:7 28:7

**picked**
28:9 46:4

**Piensook**
6:9

**place**
16:11 47:24 60:19 69:3 73:4 79:25 82:15 134:6,10 136:1

**plaintiff**
13:9

**plane**
95:16 96:16 129:4
**play**
130:20
**played**
85:19 139:16
**player**
98:15,20,21
**plural**
109:23
**point**
26:11 43:4 58:3,23 62:20 65:6 70:2,13 76:5 83:14 88:8 102:20 116:16 121:24 125:8
**policy**
20:2
**Political**
17:19
**position**
22:16,24 26:18,19, 24,25 27:18,25 28:13 56:8 61:6 87:15 98:8
**potential**
40:22
**practice**
41:18,20,22 42:2
**pre-covid**
13:22 39:4
**precedes**
118:3
**preparation**
14:6 16:24
**prepare**
76:10
**prepared**
7:19
**president**
20:20 22:17,23 23:2,5,25 28:1,14 44:10 66:24 68:25 69:5 70:14 73:19
**pretty**
50:3 71:5
**prevail**
137:6,13,17,19,25 138:5
**previously**
103:25 107:17
**print**
16:18
**prior**
14:13 22:24 23:5 70:2,21,24 71:2 130:19
**private**
24:8
**privilege**
10:16,17 85:13
**problem**
89:14
**proceedings**
7:8
**process**
6:21 8:12 9:23 61:19
**procures**
25:13
**produced**
15:2,11,14,19
**Production**
14:23
**professional**
29:5 35:23,24 47:12 84:23 98:8 128:22
**professionally**
112:23
**Project**
12:6 20:16,22 21:2
**proper**
56:3 62:7 64:4,10
**property**
11:21 12:13
**protocol**
125:11,15 126:3
**provide**
10:6 50:7 97:12 102:11
**provided**
107:21
**providing**
50:12
**public**
17:23 18:12 20:13 22:3
**purpose**
60:5
**push**
37:24
**put**
9:14 16:18 63:3 73:22 74:17 106:7 125:2

**Q**

**question**
8:13,14,15,17,22, 24 9:1,3,24 10:1, 20 32:13,20 35:9 42:12 47:19 51:6 55:20 73:1 74:11 75:6 79:11 85:15, 17,18 89:20,21 94:1 95:12 117:24 122:9,25 135:2
**questions**
14:22 30:22 90:18 139:20
**quick**
126:15 132:11
**quickly**
6:20 17:13
**quote**
108:7 109:21 111:9

**R**

**racist**
97:25 98:2
**Ralph**
5:1 6:14 139:25
**RAND**
18:18,20,23,25 19:8
**Ray**
6:3 35:13 53:7 55:23 62:12 63:15 81:7,9,12 93:21,22 96:7 114:24 115:9, 15 118:13,17,25 119:4,15,16,17 121:7,16,23 123:14,19 124:3 130:20 135:20 138:13,16 139:5,8
**reached**
72:9
**reacted**
122:3
**reaction**
116:3,5
**read**
107:9 110:7 113:9 139:15,21
**reading**
47:4
**realize**
137:3
**reason**
8:2,6,8 9:20 41:25 48:21 78:5 88:20 100:8 117:4
**reasonable**
10:1
**recall**
11:3 14:11,13 30:17,20,24 31:3, 15,18 32:2,8,11,21 33:14 34:20 35:6 58:17 72:8 73:16 76:22 87:16 93:22 96:14 100:13 103:11,14,22 105:19 107:7 110:14 114:20,21 122:3,6,12 131:24 134:8,12
**receive**
43:1 73:13 100:9
**received**
15:22 42:20 49:4 91:8 100:13 103:14 106:6
**receiving**
19:18 99:24 100:2
**recess**
73:6 126:18
**recognized**
85:13
**recollection**
52:14 53:10 88:18, 21 89:22 90:24 97:3 98:11 102:20 104:16 105:4 107:4 109:25 129:14 132:19
**record**
6:13 9:7 85:19 139:16
**recount**
11:1
**redundant**
128:7
**refer**
68:6 104:11 118:25 126:14
**reference**
104:21 106:3 113:8 116:16 117:16 125:10 133:15
**referred**
51:2 112:21 126:2 132:15
**referring**
34:25 35:2 81:4 115:19 117:13 118:7,19 121:1 125:13,16 135:15 136:22 137:20,24
**refers**
105:1
**refresh**
53:9 104:16 105:4 107:4 109:25 129:14
**regard**
11:13 26:18 44:7 51:1
**Regents**
6:3 14:2 24:12,18,

22 49:6 61:9,11 73:14
**regular** 42:2
**related** 11:4,5,20,25 12:12 13:15,17 15:15,17 24:17 47:21 66:15 77:4,8 78:14 90:11
**relating** 15:3
**relation** 41:11 75:7 80:22
**relations** 93:23 94:3
**relationship** 23:16,19 25:4,12 28:15 29:5,6,11, 13,17,22 30:4,13 35:20 36:6,7,16 37:12,19,23 38:14 58:10 73:13 92:20 93:1,6,9,12 94:6, 11 95:8 98:1 101:3 128:21,22
**relationships** 94:15
**remained** 85:7
**remember** 11:17 12:7,11,18 13:3,5,7,12,18 14:3 26:13,16 28:20 30:12 31:16 32:1 33:5,15,18, 20,22,24 34:3,7,9, 12,14,22 35:3,18 37:11 38:23 39:1, 3,11,14,16,18,20, 21 40:7,8,10,11,16 41:6,11,15 43:16 44:24 45:2,13,17, 20 47:1 52:9 53:2, 3,5,6,15 55:9 57:9 58:6 59:11,14,25 60:3,8,10,22,23 65:5,14,23 67:3,4, 9,10,16,20,25 68:3,16 71:1,6 72:11,19 73:20 74:6 76:6,11 77:3, 10,14,16,20 78:21 79:1,6,8,14,22,25 80:8 81:14,17 85:9,21 86:17,18, 21,23 87:12 88:2,5 89:11,15,17,23 90:4,7,8,9,18 91:6, 7,11 93:3,7 95:23 96:4,22 97:1,8,11 99:9,10,24 100:2, 3,11,17 102:25 105:23,25 106:14, 17 115:23,24 116:3,5,22,25 117:2 119:9,12,15, 16,17,19 120:13, 17 121:13,19,21, 25 122:15,18 123:2,8,17,21 124:20,23 125:24 126:1,2 132:14 133:21,24 134:18, 20 135:3 136:6 137:9,11,23 138:7
**remembered** 89:16 134:23
**remove** 109:14
**reorganization** 121:22 132:17,20 133:4 135:23
**repeat** 85:17,18
**replaced** 26:13,14 28:5
**replacement** 28:7,9
**report** 40:22,25 41:1 42:6 43:10 47:7,13 56:3 103:9 104:1 106:20 107:11 132:23
**reported** 41:16 46:8 56:5, 20,22 57:6,12 62:7,11,15 64:10 78:24 84:14 120:6, 10
**reporter** 5:3 7:6,7 14:9 85:20 99:15 103:7, 20 120:16 126:12 139:17
**reporters** 120:6
**reporting** 27:9 43:8 56:21
**reports** 47:23
**represented** 10:12
**representing** 5:14
**reputation** 106:25 107:5
**request** 14:23 15:11,14,22, 24
**requests** 14:25
**required** 8:22 56:7
**requirement** 43:8
**research** 20:2 22:1,6,7,17 23:1,25
**Reservation** 127:16
**resources** 25:14,24,25 26:2 137:5
**respect** 98:15 101:3 103:17
**respond** 97:9
**responded** 97:9,11
**response** 55:11 97:12,15 107:12 118:4 119:20 129:6 137:12
**responses** 9:6 97:16
**responsibility** 47:12
**responsible** 49:22 62:16
**rest** 70:8 110:7
**restate** 41:8 88:24 94:1
**result** 25:21 66:7 103:16
**retaliation** 121:22 122:2,7,13, 16,20 123:4
**retired** 28:4
**returns** 119:18
**review** 14:21 104:8
**reviewed** 104:9
**Rick** 119:7 127:10
**Rick.shangraw@ asu.edu** 100:6
**ride** 96:16
**right-hand** 107:21
**road** 7:25
**Robles** 6:5
**Rogers** 6:7
**role** 26:7 27:17,20,22 50:11,15,24
**room** 5:25
**roughly** 41:6,11 52:16 81:25
**routinely** 87:14
**rule** 7:14
**rules** 7:9,11
**run** 6:19 78:15
**running** 22:6,7,10

**S**

**S-H-A-N-G-R-A-W** 6:15
**salary** 51:22
**Salcido** 62:20 132:8,25 133:1,21
**salient** 76:5
**Samuels** 6:5,6
**satisfactory** 97:13
**scholarships** 26:6
**school** 20:9,12 22:2,3 51:15,16
**schools** 61:8
**science** 17:19
**Sciences** 51:16
**Scott** 45:3 56:19 67:11 76:23 81:6,12 102:14 114:24 121:2 132:12,16, 20
**search** 16:8

**season** 39:6,9 45:18,19, 20,23,24 52:17 80:23 81:1,3,4,15
**secondhand** 33:9
**seek** 36:18 37:12
**send** 24:24 25:2 128:12
**sending** 129:6,22
**senior** 94:6,15
**sense** 8:15,24 25:7 83:6, 16 85:3
**sentence** 106:22 107:9 112:11 117:17,23 118:12 119:24 120:18
**sentences** 114:23 121:17
**separate** 16:12 24:9 25:6,12 27:8,10,14 43:3
**sequence** 52:9
**served** 111:22 112:8,18
**services** 25:13,21,22 50:5
**set** 7:9 61:7 91:22
**sexual** 15:16,17 40:23 42:21
**Shangraw** 5:1 6:12,14,16 104:13 106:24 126:23 127:10 139:25
**Sharett** 6:4
**short** 17:3,4,6 126:16
**show** 103:4
**showed** 50:18
**sic** 86:23
**side** 78:24 85:3
**sign** 139:22
**significant** 50:11,15 130:7
**similar** 36:7 72:23 80:19 81:20 82:8,18,19 102:14
**sister** 18:4
**sit** 32:15,17,21 41:25 47:2 73:12,22 75:23 89:25 90:23 97:3 110:17 113:14 114:20 138:6 139:4,11
**situation** 45:4,6 62:2 65:2 69:6 87:9,14 96:7 130:15 131:1,4,5 138:12
**Skysong** 12:13
**social** 15:9 16:1 29:6,11 35:25
**sooner** 119:23
**sort** 87:8
**sought** 40:11
**sounds** 7:18 11:8,12 13:23
**sources** 106:16
**speak** 5:3 7:11,16 10:21 45:10 65:11
**speaking** 62:23 94:20 110:8
**special** 128:13
**specific** 55:17 77:23 94:19 95:2 99:11 100:2 136:6
**specifically** 34:13 39:11 62:23 63:17 69:1 78:17 100:5,23 106:19 123:18 137:18
**specifics** 77:15 83:19
**speculate** 10:7
**speculation** 10:9
**spell** 6:13
**spending** 128:14
**spoke** 44:3 45:15 52:4,5, 8 72:14 75:23 105:10 114:24 123:21
**spoken** 73:18
**sporting** 34:8,11
**spousal** 85:13
**spring** 15:24 39:7 41:7 44:17 45:5,13 52:16,18 57:13 80:10,13
**spring/early** 53:18
**staff** 22:10 33:16 102:17
**standard** 125:11,15 126:3
**standpoint** 38:5 115:7
**start** 18:25 20:17 49:17
**started** 20:18
**starts** 107:23
**state** 6:12 12:22 21:22 22:18 133:1
**stated** 58:6 76:16 95:22 106:24 108:21 113:6 114:2 126:23
**statement** 107:7 108:6 110:14 111:2 112:2,22 116:23 121:7 138:20
**states** 106:21
**Steak** 133:11,18 134:24
**step** 64:21
**steps** 61:23 63:3 65:3,4 66:12,14
**strategy** 21:11
**strike** 61:16
**strikes** 28:23
**string** 127:23
**students** 23:11 42:17
**subsequent** 75:4 91:4 97:19
**subsequently** 72:14 106:25
**suggest** 77:19 78:4 85:1
**summary** 104:2,5
**summer** 18:18 19:1 44:18, 22,23 53:18 57:18 59:17 68:14,19 73:19,24 116:1 118:5 119:18
**Sun** 47:21 50:1 94:25 102:17
**Sunday** 128:16
**supervisor** 92:2
**supervisors** 62:13
**support** 50:6,7,10,12 91:17 137:6
**supporting** 50:24 92:10
**suppose** 114:23
**surprise** 50:21
**surprised** 58:21 59:1,2,4 85:2,6
**switched** 102:21
**switchover** 102:25
**sworn** 5:2
**Syracuse** 17:24 18:2,4 19:11,15,17,21,22, 24 23:9
**systems** 20:3

**T**

**taking** 83:15 84:18
**talk**

7:15 9:12 14:5 17:11 28:15 39:17 65:8,16 78:11,18, 23 79:3 118:4 119:8 130:9 132:7

**talked**
9:5 44:9,10 78:17 80:1,2 91:5 107:6

**talking**
68:7 73:10 74:18 77:11 81:5 90:12 105:11 121:22 133:3,8

**talks**
114:10 120:5

**tantamount**
7:3

**taught**
19:24 20:1,2,3

**tax**
15:6

**teaching**
22:6

**team**
94:7,12 97:20,21 98:15,17,18,20,21

**Teasdale**
99:8 101:3,14 103:2,11,18

**technology**
12:1,21 21:11

**telephone**
121:19

**telling**
31:18 32:2 96:5 106:17 115:24 116:20,25 123:2

**tendencies**
97:25 98:2

**tense**
83:24

**term**
95:3

**termination**
11:13 75:7

**terms**
26:2

**testified**
5:4 57:14 59:16 68:13 103:25 107:17 113:2 115:3

**testifying**
6:22,24

**testimony**
7:22 8:3,7 38:15 51:20 63:4 113:15 128:18 134:8

**text**
127:3 128:9 129:3, 7,25 130:4,10,14, 22,23 138:3

**texts**
127:6 129:22 131:6

**theory**
20:1

**thing**
29:1 120:23 130:15 131:1

**things**
16:18 36:18 42:17 76:1 81:25 91:24 92:2,7,21 129:22

**thinking**
37:4 63:17,20

**thought**
87:7 97:13 107:13 112:22,23 123:4

**threw**
9:13

**time**
8:21 9:8 11:2,19 12:23 15:20 18:23 19:14 23:4,20 26:8,20,21 29:15 32:13,25 36:16 38:21 40:19 43:19, 21,22 45:9 48:10, 15 52:5 53:1,16 54:19 55:17 57:14, 22,23 59:7 60:14 61:6 62:3,5 63:9, 15 67:12 70:16 72:14 77:2 80:3 81:13 83:3 84:17 87:11,13 95:6,15 99:6 102:20,23 105:10 106:14 110:11,18 111:10, 15,18 112:2,12 114:13,18 115:14 116:14,24 117:11, 18 119:21 121:2,4, 24 125:8 128:10, 14,15 132:16 135:19

**timeline**
81:10

**times**
44:21 83:6

**timing**
115:7 121:14 124:2

**tired**
136:17

**Tisdale**
99:21

**title**
27:18 42:22 62:7 84:15

**today**
6:22 7:2,22 8:3,7 10:12 14:16,19 32:15,17,21 41:25 47:2 73:12,22 75:24 90:1,13,23 97:3 110:17 113:14,16 114:20 115:3 135:16,20 138:6 139:4,11

**today's**
7:8 8:20 9:15 10:4 16:25 76:11

**told**
30:25 33:20,25 39:21,24 43:17 44:6 46:15,16,18, 20 54:9,10 56:24 61:3 62:19 88:3 106:18 107:12

**Tom**
102:15,16

**tomorrow**
130:20

**tone**
120:19

**tonight**
128:15 129:8 136:16

**top**
104:12 127:10 130:13

**topic**
90:11

**touched**
39:25

**touching**
46:17

**tournament**
46:1

**track**
119:8

**training**
42:8,16,20,21,22 43:1,4

**transcript**
7:7,19,20,25

**transition**
26:25

**trial**
8:1 135:8

**trick**
47:19 51:6

**trip**
97:19,21 116:18, 21 118:9,10,14,18, 23

**true**
29:13 138:19

**trust**
138:24

**truth**
5:3,4 7:2,3 137:5, 13,17,19,25 138:5

**turn**
37:6 128:24 135:9

**type**
10:16 26:5 37:11, 23 42:20 49:5 58:10

**types**
62:16

**typical**
50:3

**typically**
9:23

U

**Uh-huh**
49:23 104:23 130:24

**ultimately**
29:5 66:23

**uncomfortable**
135:16,19

**undergrad**
17:14

**undergraduate**
18:13 20:5

**underneath**
27:15 120:5

**understand**
6:22 7:1,3,22 8:4, 15,17 10:11 25:11 47:20 51:20 55:13, 20,22,24 56:2,6 62:6 68:9 74:16 78:2 89:20,23,25 90:12,17 117:15 118:19 126:8

**understanding**
55:17 63:9 64:16 74:19 117:12 131:11

**understood**
9:4,11 10:3 74:20

**unfold**
9:23

**unit**
51:8,9,10,11,17,23

**units**
50:8 51:12,14

**university**
12:22 13:17 17:24 18:2 19:11,15,20,

21,22,25 21:22,23 22:18 23:9 25:15 30:10 49:25 50:8 51:5 61:20 63:21 64:3 133:2

**unprofessional**
98:11

**update**
87:9,10,11,12,14, 17,18,19 131:22, 23,25 132:8

**updates**
88:13

**uphill**
137:4

**upstate**
17:25 18:1

**V**

**vague**
33:24 125:23 126:10

**Valenta**
99:3,4 101:20,23 102:1,3

**valued**
36:24

**vice**
20:20 22:17 23:25

**viewed**
47:11 71:13

**views**
108:22

**Virginia**
21:16,19

**W**

**wait**
9:3 99:17 119:18

**walk**
9:8 14:25 15:21 30:3 127:4

**walking**
34:20,22

**wanted**
37:25 69:5,6

**Washington**
21:18

**Wear**
15:16,17 30:7,9, 10,11,13,15,21 31:4 32:9,21 33:4, 6,25 34:4,7,9,20, 22 35:6 45:11 46:14,21 52:15,22 54:5 55:2,25 59:12 63:18,24 65:8 66:15 70:15,17,18 77:4,8 78:19 79:13 84:6 95:17 96:8,12 97:20 106:24 107:8 108:7 110:1 115:25 116:7,21 131:5 138:12,17 139:6,9

**Wear's**
31:1 68:8 107:5

**Weatherum**
26:16

**Weatherup**
26:15,17

**week**
17:5 41:10 115:9, 11

**weekend**
96:17 116:17 118:9,10,14,18,22

**weeks**
17:4 58:2 105:20 115:11

**Weiss**
6:5,6

**well-aware**
54:16,23 56:16,17

**wife**
5:20 29:14 36:4 40:4 71:20,25 72:8,14,16,19,22 73:2,11 85:10 127:16

**witnesses**
106:22 107:10

**Wives**
113:10 114:6

**woman**
46:25 47:3

**women**
39:25 40:1,3

**Wonderful**
5:18

**Woods**
106:23

**word**
49:18 83:10,11

**words**
33:9 45:25 55:10 62:13 63:1,4 101:13 115:22 124:20

**work**
16:5 18:13 19:6 21:9 49:20 91:13

**worked**
21:9

**worker**
91:19

**working**
18:23,25 20:23 40:19 93:9,11 94:6,11 109:10

**works**
49:11,24

**Wright**
99:7,21 102:2

**write**
131:8,10,17

**writes**
128:12

**writing**
126:9

**wrong**
42:24 110:18 111:2

**Y**

**year**
17:16 21:3 39:3

**years**
11:16 13:20 19:23 20:25 21:14 22:15 23:17 24:2 26:12 37:18 53:6,8 76:8 88:22 134:14

**Yup**
115:13

# EXHIBIT 6

# Fall 2019 Academic Calendar

ASU

University Registrar Services
Updated 9/10/2019

| **Session A: Thursday 8/22/2019 – Friday 10/11/2019**<br>**Session B: Wednesday 10/16/2019 – Friday 12/6/2019**<br>**Session C: Thursday 8/22/2019 – Friday 12/6/2019 (Final exams 12/9/2019 – 12/14/2019)** | | | |
|---|---|---|---|
| Schedule of Classes Available | February 18, 2019 | | |
| Registration and Tuition Guide Available | February 18, 2019 | | |
| Registration Dates Begin | February 21, 2019 | | |
| $50.00 Late Registration Fee Begins (does not apply to ASU Online students) | Session A<br>August 14, 2019 | Session B<br>October 8, 2019 | Session C<br>August 14, 2019 |
| **Tuition Fee Payment Deadline** – For registration through 8/18/19. For more information see Tuition and Deadlines | August 25, 2019 | | |
| Classes Begin | Session A<br>August 22, 2019 | Session B<br>October 16, 2019 | Session C<br>August 22, 2019 |
| Academic Status Reports – Faculty have the opportunity to provide weekly feedback during each session. Students can view ASRs in MyASU within 24 hours after each weekly reporting period closes on Sunday. | Session A<br>Aug 22 – Sept 29, 2019 | Session B<br>Oct 16 – Nov 24, 2019 | Session C<br>Aug 22 – Nov 24, 2019 |
| Extended Hours (Registration Sites Only) | August 21-22, 2019 | | |
| Last day to register or drop/add without college approval | Session A<br>August 23, 2019 | Session B<br>October 17, 2019 | Session C<br>August 28, 2019 |
| Residency Classification Petition Deadline | August 28, 2019 | | |
| Labor Day Observed<br>***Classes excused/University closed*** | September 2, 2019 | | |
| **Tuition & Fees 100% Refund Deadline** – For more information see Tuition and Deadlines | Session A<br>August 28, 2019 | Session B<br>October 22, 2019 | Session C<br>September 4, 2019 |
| University 21st Day | Session A<br>September 11, 2019 | Session B<br>November 5, 2019 | Session C<br>September 11, 2019 |
| **Tuition Fee Payment Deadline** – For registration from 8/19/19 through 9/18/19. For more information see Tuition and Deadlines | September 25, 2019 | | |
| Deadline to Apply for Graduation | October 4, 2019 | | |
| University 45th Day | October 5, 2019 | | |
| Fall Break<br>***Classes excused/University open*** | October 12–15, 2019 | | |
| **Tuition Fee Payment Deadline** – For registration from 9/19/19 through 10/25/19. For more information see Tuition and Deadlines | October 25, 2019 | | |

University Registrar Services contact information can be found at http://students.asu.edu/contact/office-university-registrar.

**All dates are subject to change without notice.** Dates in yellow indicate changes or updates since the last published date of the semester calendar. This document is updated and published on the web at http://students.asu.edu/registrar-semester-calendar.

# Fall 2019 Academic Calendar

University Registrar Services
Updated 9/10/2019

| | | | |
|---|---|---|---|
| Course Withdrawal Deadline | Session A<br>September 11, 2019 | Session B<br>November 5, 2019 | Session C<br>November 6, 2019 |
| Veterans Day Observed<br>***Classes excused/University closed*** | November 11, 2019 | | |
| Sun Devil Gratitude Day | November 15, 2019 | | |
| Thanksgiving Holiday Observed<br>***Classes excused/University closed*** | November 28-29, 2019 | | |
| **Complete Session Withdrawal Deadline**<br>As part of a complete session withdrawal a student must withdraw from all classes in a session. Beginning the first day of classes, undergraduate students are required to contact their college/school to facilitate the withdrawal process. For more information click here. | Session A<br>October 11, 2019 | Session B<br>December 6, 2019 | Session C<br>December 6, 2019 |
| **Classes End/<br>Last Day to Process Transactions** | Session A<br>October 11, 2019 | Session B<br>December 6, 2019 | Session C<br>December 6, 2019 |
| Study Days | Session A<br>N/A | Session B<br>N/A | Session C<br>December 7-8, 2019 |
| **Final Exams** | Session A<br>Last Day of Classes | Session B<br>Last Day of Classes | Session C<br>December 9-14, 2019 |
| **Final Grades Due** | Session A<br>October 14, 2019 | Session B<br>December 9-16, 2019 | Session C<br>December 9-16, 2019 |
| Commencement Ceremony (Graduate and Undergraduate) http://graduation.asu.edu | December 16, 2019 | | |
| Degree Conferral Date | December 16, 2019 | | |
| Grade Replacement/Academic Standing Processing | December 17-18, 2019 | | |
| Holiday Break<br>***Classes excused/University closed*** | December 24-25, 2019 | | |

University Registrar Services contact information can be found at http://students.asu.edu/contact/office-university-registrar.

**All dates are subject to change without notice.** Dates in yellow indicate changes or updates since the last published date of the semester calendar. This document is updated and published on the web at http://students.asu.edu/registrar-semester-calendar.

# EXHIBIT 7

# In the Matter of:

*Cohen*

*vs*

***Arizona Board of Regents, and Anderson***

---

*Kevin John Salcido*

*April 4, 2024*

---

GRIFFIN GROUP
INTERNATIONAL
3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

```
DAVID COHEN,                    )
                                )
               Plaintiff,       )
                                )
        vs.                     )  No. 2:21-CV-01778-GMS
                                )
ARIZONA BOARD OF REGENTS AND    )
RAYMOND ANDERSON,               )
                                )
               Defendants.      )
________________________________)
```

DEPOSITION OF KEVIN JOHN SALCIDO

Phoenix, Arizona
April 4, 2024
9:03 a.m.

REPORTED BY:
CINDY BACHMAN, CR
Certified Reporter
Certificate No. 50763

PREPARED FOR:
ASCII/CONDENSED
(Certified Copy)

I N D E X

WITNESS Page

KEVIN JOHN SALCIDO

EXAMINATION BY MR. PEREZ......................5

EXAMINATION BY MR. McKIRGAN.................120

FURTHER EXAMINATION BY MR PEREZ.............123

* * * * * *

E X H I B I T S

| Deposition Exhibits: | Description | Page |
|---|---|---|
| Exh. 84 | SDA Notes - CONFIDENTIAL ABOR.COHEN001359-1360 | 12 |
| Exh. 85 | Texts from August 11 and 12, 2019 | 48 |
| Exh. 86 | Text between Mr. Cohen and Mr. Salcido, August 13, 2019 | 49 |
| Exh. 87 | Mr. Salcido's Notes | 53 |
| Exh. 88 | Text Messages from Amy Schramm COHEN_000357 | 54 |
| Exh. 89 | Text Messages between Mr. Cohen and Mr. Salcido, August 2019 | 72 |
| Exh. 90 | Text Messages between Mr. Cohen and Mr. Salcido, August 20, 2019 | 90 |

DEPOSITION OF KEVIN JOHN SALCIDO,

was taken on April 4, 2024, commencing at 9:03 a.m., at the law offices of PAPETTI SAMUELS WEISS McKIRGAN, 16430 North Scottsdale Road, Suite 290, Scottsdale, Arizona, before CINDY BACHMAN, a Certified Reporter, Certificate No. 50763, for the State of Arizona.

COUNSEL APPEARING:

For the Plaintiff:

PEREZ VAUGH & FEASBY
BY: Michael J. Perez, Esq.
600 B Street
Suite 2100
San Diego, California 92101

For the Defendants:

PAPETTI SAMUELS WEISS McKIRGAN
BY: Robert H. McKirgan, Esq.
Heather Robles, Esq.
16430 North Scottsdale Road
Suite 290
Scottsdale, Arizona 85254

ALSO PRESENT:

David Cohen, Plaintiff
Kwan Piensook, Esq., Assistant General Counsel for Arizona State University

KEVIN JOHN SALCIDO,

a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. PEREZ:

Q. Good morning.

**A. Good morning.**

Q. How are you?

**A. Doing well. How are you?**

Q. Can you please state your name and spell your last name for the record.

**A. Kevin John Salcido, S-a-l-c-i-d-o.**

MR. PEREZ: Counsel, do you want to introduce yourself?

MR. McKIRGAN: Yeah. Bob McKirgan and Heather Robles on behalf of the defendants, and Kwan Piensook is from ASU's General Counsel's Office.

MR. PEREZ: And I'm Mike Perez. I'm representing the plaintiff, Mr. David Cohen, who's also here in the room.

BY MR. PEREZ:

Q. Thanks for coming, Mr. Salcido.

**A. You're welcome.**

Q. I appreciate that.

When we first initiated this deposition procedure, you were at ASU and now you are not. We issued a subpoena recently and asked that you bring all documents related to this case.

Did you get a chance to see that subpoena?

**A. I did.**

Q. Okay. And did you bring any documents with you today?

**A. The only document I brought was this summary that I had submitted to a prior investigator.**

MR. PEREZ: Okay. Counsel, do you have a copy of that document?

MR. McKIRGAN: It's been produced.

MR. PEREZ: Okay. Do you have a copy of that document? Could you please make me a copy?

MR. McKIRGAN: Sure.

MR. PEREZ: Thank you.

BY MR. PEREZ:

Q. Have you ever been deposed before?

**A. Yes.**

Q. Okay. How many times?

**A. I would say three to four times.**

Q. Do you remember the -- those three to four times, were you ever a party to any of those cases?

**A. I was a witness to those cases.**

Q. Okay. And can you tell me just briefly what those cases were about and who was involved?

**A. It generally had to do with former employees alleging some kind of a discrimination or an unlawful termination.**

Q. And you were a witness as in you were in the HR capacity?

**A. Correct.**

Q. In all of those cases?

**A. Correct.**

Q. Did any of those cases involve ASU?

**A. Yes.**

Q. Did all of those cases involve ASU?

**A. No.**

Q. When were those cases?

**A. I'd say my most recent deposition would have been probably about four years ago. And the other cases would have been sprinkled throughout the '90s, early 2000s.**

Q. And it was the most recent case that involved ASU?

**A. Yes.**

Q. And again, approximately when was that?

**A. I would say I was deposed probably about four**

**years ago.**
Q. Okay. And do you remember who was the plaintiff in that case?
**A. I don't remember the -- I don't remember the name.**
Q. Do you remember what department the person would be in?
**A. I believe, if I recall -- I do not recall.**
Q. Well, let me ask you this. In your capacity, in your HR capacity, did you work with the entire university or only the athletic department?
**A. I did not work in the athletic department. I worked for the entire university.**
Q. Great.
MR. PEREZ: Sorry. Let's pause for a second.
(A discussion was held off the record.)
BY MR. PEREZ:
Q. Okay. Thank you very much for that background information. That helps me to maybe move forward a little bit quicker through this process.
I just want to make sure you understand the ground rules. Obviously, one of them you know is that we don't talk over each other, correct?
**A. Correct.**

Q. And that's the other one is to make sure that you give audible responses. Does that make sense?

**A. Correct. It does.**

Q. Perfect.

There's an implication here that when I ask a question and you answer it, you understand my question. Does that make sense?

**A. Yes.**

Q. So if you don't understand the question, can you please let me know?

**A. Yes.**

Q. All right. To your left is Mr. McKirgan. Is Bob representing you today?

MR. McKIRGAN: So let me just interject. Mr. Salcido is a former employee of ASU, so I am representing him for purposes of the deposition.

MR. PEREZ: Thank you.

BY MR. PEREZ:

Q. Have you ever been convicted of a felony?

**A. Nope.**

Q. Do you understand today's testimony is under oath as if you were testifying in trial?

**A. I understand.**

Q. Anything you say is being taken down to your right, and there will be a transcript. So do you

understand that we're entitled to your best and most accurate testimony today?

**A. I understand that.**

Q. Is there any reason you cannot give your best and most accurate testimony today?

**A. Nope.**

Q. No medications, nothing to worry about?

**A. No.**

Q. All right. During the course of today's deposition, we will ask you questions that you may or may not hear an objection from counsel. Unless counsel instructs you not to answer the question, then we'll just wait for you to answer the question. Does that make sense?

**A. It does.**

Q. We don't want to get into any attorney-client privilege information. So if there's an answer that requires you to do that, please pause and talk to your counsel.

**A. I will.**

MR. PEREZ: Counsel, with that point, you had mentioned you wanted to put something on the record maybe about attorney-client privilege.

MR. McKIRGAN: Yes. So there was a meeting that Kevin had that I'm sure you're going to

cover. It included the lawyer from the OGC's office. So we want to make sure when we get to that topic, that we do that slowly and carefully.

Because as I told you before, you're certainly entitled to the date, who was there, general subject matter. But the specific communications is where I'm going to draw the line.

But I want you to get as much information as you can without waiving the privilege. But I would ask that, to the extent that he is testifying on this, we would agree that it's not going to be a waiver of privilege. I think it would just be easier to do it that way. Otherwise, I may be drawing the line much more than is necessary.

MR. PEREZ: Do you recall the date of this meeting?

MR. McKIRGAN: August.

MR. PEREZ: The termination was August 15th.

MR. McKIRGAN: Yeah. I believe, if I recall, August 15th.

MR. PEREZ: Okay. So two weeks.

MR. McKIRGAN: But I'd want to confirm that I'm accurate on that.

MR. PEREZ: Thank you.

BY MR. PEREZ:
Q. Mr. Salcido, what did you do in preparation for today's deposition?
**A. We conducted a preparation session last Friday.**
Q. And when you say "we," who was present?
**A. The folks in this room were present and one other person who is currently absent.**
Q. Okay. With your counsel?
**A. Yes. ASU's counsel.**
Q. How long did that meeting last?
**A. I believe about 60 minutes.**
Q. Was that in person?
**A. Yes.**
Q. Did you review any documents at that time?
**A. I did.**
Q. What documents did you review?
**A. I reviewed this document. And I believe there was another picture of a text string, which I don't currently possess.**
Q. So when you say "this document," you're referring to the document which we will mark as Exhibit 1.
MR. McKIRGAN: We were marking exhibits consecutively.
MR. PEREZ: Okay.

MR. McKIRGAN: And I think the next number is...

MS. ROBLES: We're at 84.

MR. PEREZ: Okay. So we'll mark this as Exhibit 84.

(Deposition Exhibit No. 84 was marked for identification by the court reporter.)

MR. PEREZ: And so do you have other copies of this also?

MS. ROBLES: It's missing the Bates number.

MR. McKIRGAN: Why don't you copy some with the Bates numbers.

MR. PEREZ: But I need one now too. I'll just use this one for now.

BY MR. PEREZ:

Q. All right. So Exhibit 84 is a list of things that you met with and discussed in your preparation meeting?

**A. That's correct.**

Q. Is this a list that you put together?

**A. That's correct.**

Q. So you created this -- it says "SDA notes." Do you see that?

**A. Yes, I do.**

Q. And what does that mean, if you know?
**A. Sun Devil Athletics notes.**
Q. So these are notes that you created in real time? Is that fair to say that you created the notes from 8/12 on 8/12?
**A. No.**
Q. Okay. When did you create this list?
**A. I would have created this list likely several weeks after this occurrence.**
Q. You don't recall?
**A. I don't recall specifically.**
Q. But it was, let's say, two months after Mr. Cohen was terminated?
**A. I would say it would be within two months.**
Q. Okay. And you said there was a text string as well?
**A. Yes, there was a text string. And I do recall also an email, a copy of an email string.**
Q. That you reviewed?
**A. Yes.**
Q. Do you remember what the email string was regarding?
**A. It was pertaining to this case.**
Q. Of course. With regards to what?
**A. I believe it was an exchange between me and**

**Kimberly Demarchi and Amy Schramm.**
Q. Is it regarding scheduling?
**A. I believe it had to do something with logistics.**
Q. Okay. And then at the end of this deposition, I'm going to ask you, or if you can refer to it when we get to it, if we covered the text string that you were referring to.
**A. Okay.**
Q. All right. And those are all the documents you reviewed in preparation for --
**A. That's all I'm recall reviewing.**
Q. Have you discussed this case with anyone prior to today, besides the people you mentioned?
**A. No.**
Q. All right. Let's go over your background just a little bit. And I want to run through these pretty quickly. Please tell me about your job history.
**A. I spent 33 to 34 years in the human resources field. My first job was as the personnel director at a grocery store chain that's now defunct. After that I went --**
Q. What's the name of that chain?
**A. It was called Smitty's. It's no longer around.**
**After that, I moved on to a labor**

**relations, employee relations role at Arizona Public Service. I worked at the Palo Verde nuclear power station.**

Q. Okay. So let's go through each one a little bit more carefully.

**A. Sure.**

Q. So your first job at Smitty's, how long were you at Smitty's?

**A. I was in that role for about three or four years.**

Q. So during what time period?

**A. This would have been in the late '80s or early '90s.**

Q. Right out of college?

**A. No.**

Q. Where did you go to college?

**A. I went to college at Arizona State University.**

Q. So what did you do immediately after college?

**A. I was working in a store, in one of the stores.**

Q. And then there became a point in time when you were elevated or transitioned to a position in personnel?

**A. Yes.**

Q. And you said that was about four years in the late '80s?

**A. I would say 1988.**
Q. All right. And then your next position?
**A. I was at Arizona Public Service, I believe, from 1992, thereabouts, to about 1996, thereabouts.**
Q. And what was your title at Arizona Public Service?
**A. I had a variety of titles. I started as an employee relations representative.**
Q. For the union?
**A. For the company.**
**And then I transitioned to a role that was called legal coordinator. I do not have a legal background, but I was tasked with working with the legal department. I was actually embedded in the legal department to help the plant clear a variety of employee relations cases. There was a backlog.**
Q. When you say "clear," what does that mean?
**A. There was a backlog of cases: labor cases, employee relation cases, whistleblower cases. And I believe that the company felt that they needed somebody who could coordinate the response to those cases.**
Q. From a legal perspective?
**A. Well, again, I don't have any legal training. But just from a logistic standpoint, making sure that investigations were being opened and investigated and**

**closed in a timely manner.**
Q. Was this your first foray into investigations?
**A. Yes, I would say.**
Q. And approximately what time period was that?
I know you said '92 to '96. But when you moved into this legal coordinator position, what time period was that?
**A. I would say it was about '94.**
Q. To '96?
**A. Yes.**
Q. And that was the position you were in until you left?
**A. I spent about six months as a staffing manager before I left.**
Q. And what did that entail?
**A. Typical oversight over the recruitment processes and procedures for the company.**
Q. And then what did you do after that?
**A. I left APS.**
Q. And went to?
**A. I went to the Pepsi-Cola Company.**
Q. And what was your title at Pepsi-Cola?
**A. I was the HR manager for the Southwest region, which included Phoenix, New Mexico, and West Texas.**
Q. For how long?

**A. I did that for a combined three years, I believe.**

Q. So roughly '96 to '99?

**A. Thereabouts.**

Q. You said you went to ASU. What was your degree in?

**A. My undergraduate degree was criminal justice.**

Q. Did you get a graduate degree?

**A. I did go back for a master's in business administration.**

Q. And when did you get that?

**A. I graduated with my MBA in 1993.**

Q. From?

**A. Arizona State University.**

Q. You're full-on ASU?

**A. Absolutely.**

Q. Okay. And then did you also get a certificate, an HR certificate?

**A. I never got a certificate.**

Q. Are there any degrees or certificates that you've received?

**A. None that pertain to my professional life. I have a Series 7 and Series 66 license, and I have a pilot's license.**

Q. Now, are those both still in good standing?

A. **Yes, as far as I know.**
Q. It doesn't sound like someone I want to fly with.
All right. '99, you leave --
A. **Excuse me. I think we're a little bit askew on the timeline.**
Q. Okay.
A. **'92 through '96 was my first time at APS.**
Q. '92 through '96?
A. **Yes. That was my first time at APS.**
Q. And then '96 to '99?
A. **'96 through 2000.**
Q. Oh, 2000. Okay.
A. **I was --**
Q. PepsiCo?
A. **No. Let me back up. I'm going to get my mind squared away here. I'm sorry. I should have brought my resume.**
Q. Here's what I have. I have you at Smitty's from '88 to '92.
A. **Yeah.**
Q. And then I have you at APS, Arizona Public Service, from '92 to '96.
A. **Yeah, I may be two years ahead. I think maybe it was Smitty's from like '87 to 2000 -- excuse me, '87**

**to '90.**

Q. Okay.

**A. APS from '90 to '94. Pepsi from '94 to '96. I apologize for the confusion.**

Q. That's okay. So Pepsi, '94 to '96. Gotcha.

Now, previously you said you were an investigator, you said, '94 to '96. For the last two years?

**A. Yeah, I was incorrect. It would be more precise to say that it was the last two years on my first term with Arizona Public Service.**

Q. But that's more like '92 to '94.

**A. Correct.**

Q. All right. So we're at Pepsi. You leave Pepsi in '96?

**A. Yes.**

Q. And where do you go?

**A. I went to a company called Central Newspapers. It was a newspaper holding company. We owned seven newspapers, including the Arizona Republic and the Indianapolis Star News.**

Q. And what was your job there?

**A. I was the vice president of human resources.**

Q. How big was that company?

**A. Their company was about 5,000 employees.**

**About a billion dollars in revenue.**

Q. And how long were you at Central Newspapers?

**A. I was there for four years.**

Q. So from '96 to 2000?

**A. That's correct.**

Q. Where did you go in 2000?

**A. After the company sold to Gannett, which is a major media company, I took some time off. And then I went to work at Northern Trust Bank for two years.**

Q. So what was the time period for Northern Trust?

**A. That would have been 2000 to 2002/2003.**

Q. What was your title there?

**A. I was a vice president.**

Q. Of HR or just vice president?

**A. No. That was vice president. I worked in business development.**

Q. So not in the HR --

**A. Not in HR.**

Q. -- world at all? Sorry.

Not in the HR world at all?

**A. I'm sorry about that.**

**No. I was a spectacular failure as a salesperson.**

Q. Okay. As would I be.

Okay. From 2003, where did you go?

A. **I went back to Arizona Public Service.**
Q. And how long were you there?
A. **I was there for another three and a half years.**
Q. So 2003 to roughly 2006?
A. **'7.**
Q. 2007.
And what was your title there?
A. **I was the senior director of employee relations in the leadership and workforce development.**
Q. And during that time there, was that your title the entire time you were there?
A. **Yes, to the best of my recollection.**
Q. And then where did you go in 2007?
A. **In 2007, I was recruited to go work at Arizona State University.**
Q. With regard to these prior jobs -- so your first stint at APS, then PepsiCo, then Central Newspapers, then Northern Trust Bank, and then back to APS.
A. **That's correct.**
Q. -- can I assume that you left all those positions voluntarily?
A. **You can.**
Q. You were not fired from any of those positions?
A. **No.**

Q. That's correct?

**A. That's correct.**

Q. So let's go to ASU 2007. What were you hired in, what capacity?

**A. I was hired as a senior director of human resources.**

Q. In any particular group or department?

**A. I was in the central HR office.**

Q. Who did you report to?

**A. I reported to a vice president of human resources.**

Q. Do you remember that person's name?

**A. His name was Matthew McElrath.**

Q. And can you spell that?

**A. M-c-E-l-r-a-t-h.**

Q. And how long did you serve in that role as a senior director?

**A. I was in that role for two years. And my vice president left the organization. And I was placed as the interim vice president of human resources for a period of eight months, at which point the University granted me the full-time job as a -- the full-time title as associate vice president of human resources.**

Q. So roughly in 2009, you did this?

**A. Thereabouts.**

Q. And then how long did you serve in that role?
**A. Up until the time I retired.**
Q. So no change to title, position for duties from 2009 to 2024?
**A. I had a change. I went from associate vice president to a full vice president. That would have been around 2012.**
Q. Other than that, any changes?
**A. (Nonverbal response.)**
Q. No?
**A. Nope. Sorry.**
Q. That's okay.
So tell me what your job duties entailed in your role as vice president of human relations.
**A. I provided general oversight to the central HR office. The functions of which included a compensation of benefits, recruitment, employee relations, employee assistance, the leadership and workforce development, and benefits.**
Q. And I am not an ASU person; I'll confess. So where were you housed?
**A. I was housed in an administrative building not right on campus. It was about a quarter of a mile east of campus.**
Q. So not in the athletic department?

A. **Not in the athletic department.**
Q. Did you know Dave Cohen, and when did you first meet him?
A. **I did know Dave Cohen. I don't precisely recall when I met him. It would have been in the late teens, 2016, 2017, 2018 time frame, but I cannot give you a specific date.**
Q. Do you remember how you came to know Mr. Cohen?
A. **Dave and I were on a committee together.**
Q. What was the committee?
A. **The committee was tasked with driving employee and student engagement with the athletic department.**
Q. I presume that in your job as HR you were familiar with the HR Handbook?
A. **Yes.**
Q. In your nearly 17 years, were you involved at any point in helping to draft or revise that handbook?
A. **Yes.**
Q. Do you remember how many times that occurred?
A. **Well, there wasn't one handbook. It was more of a collection of policies.**
**So during the course of my tenure in my role, we revised most, if not all, of the most impactful HR policies.**
Q. So you supervised all those revisions?

A. **Correct.**
Q. Did you also give HR training?
A. **Yes.**
Q. Was that pretty common?
A. **Fairly common.**
Q. Did you ever give sexual harassment training?
A. **Yes.**
Q. Did you ever give sexual harassment training to the athletic department?
A. **No.**
Q. So to the best of your knowledge, you don't recall being in any training sessions involving either Mr. David Cohen or Ray Anderson?
A. **I do not recall a session like that.**
Q. Let's talk a little bit about your interactions with Mr. Cohen as it relates to his duties and performance at the athletic department.
Were you aware of his work in the athletic department?
A. **I wasn't aware to any great degree.**
Q. To the extent there were complaints about anybody in the athletic department, would you have been made aware of those?
A. **If they were important enough.**
Q. And by "important enough," how do you define

"important enough"?

A. **I would say a standard employee relations issue would not have come my way.**

Q. So does "important" relate to something that might lead to termination?

A. **Likely.**

Q. How about something related to breaches of policy?

A. **Likely.**

Q. Something related to potential lawsuits?

A. **Likely.**

Q. Would you be notified of something as it relates to probation or some type of warning to an employee?

A. **Unlikely.**

Q. Because that would be department specific?

A. **Yes.**

Q. And you would not be consulted?

A. **I would not be consulted.**

Q. How about when the decision came to terminate somebody, would that be something you would normally be involved with?

A. **More often than not.**

Q. And how soon would you normally be brought into that conversation?

MR. McKIRGAN: Object to form.
Go ahead. If I make an objection, you still answer the question unless I tell you not to.
**THE WITNESS: That would be case specific. Sometimes I would be involved early on in the process, and sometimes it would be like through the fax. "Kevin, can I get you to sign off on this termination?"**
**So there was no formal process through which I would either be engaged or not be engaged in a termination.**
BY MR. PEREZ:
Q. Would that process relate, at least in part, to how senior that person was?
**A. Likely.**
Q. So a less senior person, you would be less likely to be involved in those termination decisions?
**A. That's a fair characterization.**
Q. And then it might be brought to you to sign off on, but the decision itself would come to you relatively late in the game?
**A. Likely.**
Q. And that's fair?
**A. Fair.**
Q. Were you aware of any issues related to what we just covered, probation, problems, potential

termination with regards to David Cohen prior to July of 2019?

**A. I was not aware.**

Q. So nobody had come to you and complained about him or things that he may have done?

**A. Not to the best of my recollection.**

Q. Well, you'd probably have notes of that?

**A. I would not have had notes of that.**

Q. So if somebody came to you and talked to you about issues, you wouldn't take notes of those things?

**A. Rarely.**

Q. But as you sit here today, you have no knowledge of ever having those conversations?

**A. I do not recall such a conversation.**

**I do recall hearing that he had an executive coach at one time, but I didn't draw any positive or negative inference.**

Q. You had no interaction with him, correct?

**A. Nope.**

Q. That's correct?

**A. That's correct.**

Q. And you had no knowledge of whether or not that executive coach related to career advancements or grooming or training? You had no knowledge?

**A. I had no knowledge of the nature of the**

**coaching relationship.**

Q. Okay. With regard to Mr. Cohen's termination, I see from your notes that you start them on August 12 --

**A. Yes.**

Q. -- of 2019, correct?

**A. That's correct.**

Q. Would it be fair to say that prior to August 12 of 2019, you had no indication from anyone that Mr. Cohen was going to be terminated?

**A. I had no indication.**

Q. And on August 12, 2019, that was the day that you had met with Mr. Cohen, correct?

**A. That's correct.**

Q. All right. So to the extent that there is a conversation that was initiated, that was Mr. Cohen initiating it with you?

**A. That's correct.**

Q. So I'll come back to that.

**A. Sure.**

Q. We need to talk a little bit about what occurred leading up to that.

On August 12, when Mr. Cohen met with you, he explained to you about the sexual harassment that occurred between Bart Wear and at least three women

associated with ASU. Is that correct?
     **A. He did raise that in our conversation. That was not the sole focus of our conversation, but he did raise it.**
     Q. And so referring to that, referring to Mr. Bart Wear and the sexual harassment that occurred between Ms. Hurley, Ms. Woods, and Mrs. Cohen, was that the first you had heard of those incidents?
     **A. Yes.**
     Q. And at that time that you met with Mr. Cohen, would it be fair to say that he explained to you that he had been raising that issue since March 25th of 2019?
     **A. That's fair.**
     Q. Did he also explain to you at that time that not only had he raised it with Mr. Anderson, but he had raised it with a number of people, including Mr. Jay Heiler from the Board of Regents, Rick Shangraw, Jean Boyd, and Scott Nelson? Did he walk you through all of that?
     **A. I do recall he told me that he had discussed it with Rick Shangraw, but I don't recall him telling me that he discussed it with anybody else.**
     Q. And he discussed it with Mr. Anderson, correct?
     **A. Yes, that's correct.**

Q. And he told you that?

**A. Yes, correct.**

Q. He also told you that he discussed that many times with Mr. Anderson?

**A. I wouldn't say many times. He said several times.**

Q. Okay. Several times over the course of those months between March 25th and when you were meeting with him on August 12th?

**A. That's what I recall.**

Q. Now, in your mind, did you form an opinion as to how that matter would have been handled had it been brought to you?

**A. Yes.**

Q. And what is that?

**A. My opinion would have been that the allegation should have been investigated.**

Q. And how would you have initiated that investigation?

**A. I would have referred the case. I would have clearly called the Office of General Counsel. And we probably would have worked together to refer the case to the Office of University Rights and Responsibilities.**

Q. And you've done that before?

**A. Yes.**

Q. And upon making -- is it a phone call? Is it a form that you fill out?

**A. No form.**

Q. It's a phone call?

**A. Phone call or an email.**

Q. Or maybe even a face-to-face meeting?

**A. Likely.**

Q. But with that kind of initiation, then those departments that you mentioned, they would then take that and run with it, correct?

**A. That's correct.**

Q. So with a phone call, with an email, or perhaps some situations of a face-to-face meeting, you have those contacts and the initiation of the investigation would occur?

**A. That's correct.**

Q. And in your experience as the vice president of HR, was it your understanding, in that handbook policies, that when an employee learned of a sexual harassment allegation, that that employee was responsible and had a duty to report it to his supervisor?

**A. That's correct.**

Q. And in this case, were you aware that

Ray Anderson was Mr. Cohen's supervisor?
**A. I was aware.**
Q. So by Mr. Cohen taking it to Ray Anderson or putting it to Ray Anderson, that is what he was supposed to do?
**A. That's correct.**
Q. And was Mr. Cohen responsible once he turned it over to Mr. Anderson to then continue to prod or be involved in the investigation?
**A. Can you clarify the term "responsible," please?**
Q. Sure.
Did he have a role to play independently to initiate contact, follow up, any kind of interactions with that investigation?
**A. I would not say it was a formal role, but it was clearly something that would happen in the course of the day-to-day work-life, like "Hey, are you following up on this?"**
Q. And I'm guess what I'm getting at is, once Mr. Cohen referred it to Ray Anderson, who was the person that he should have followed up with?
**A. It would have been Ray Anderson.**
Q. Okay. He shouldn't have called those offices and independently said, "What are you doing? Tell me how I can help." That was not his role?

A. **That would have been outside the course of our normal informal process.**
Q. And then of course --
A. **There would be no burden on him to make a call like that.**
Q. And then of course to the extent that somebody from one of those offices called him, he would then be involved in that investigation. But that is, as it was initiated, back to him?
A. **That's correct.**
Q. At what level would Dr. Crow be involved in any questions with regard -- strike that. Let me do it this way.
What level would you classify Mr. Cohen? Was he considered a senior employee? How would you frame him?
As you were talking about employees and lower-level employees not necessarily coming to your attention, would you consider him a lower-level employee?
A. **Now.**
Q. A mid-level?
A. **More senior.**
Q. So as a senior member of the ASU personnel, would you have expected to have heard about his

potential termination sooner than when he met with you on August 12th?

MR. McKIRGAN: Object to form. Incomplete facts.

But go ahead.

**THE WITNESS: Yes, I think it would have been likely.**

BY MR. PEREZ:

Q. And who would you have heard that from?

**A. Likely from either the department HR person, who I believe at the time was Amy Schramm, or one of my consultants who were tasked with working with field HR. So it could have come in these two ways.**

**I can help clarify our management team.**

Q. Sure. That would be helpful.

**A. Okay. There were basically four tiers of management at ASU. There was an executive committee, which is comprised of the most senior leaders in the organization. Typically about 12 to 14 people. Dave was not on that.**

**And then there was a university council, which was basically comprised of vice presidents and vice provosts, the deans, people at that level. Dave was not part of that group, to the best of my recollection.**

**And then there was the university management team, which was pretty much anybody in a director level and above. And that group numbered in the 6- to 700 range. So we had different tiers of leadership.**

Q. And Dave was in that group?

**A. I believe so, to the best of my recollection.**

Q. Okay. In your experience, would Ray Anderson be involved in kind of communicating with you or with other members of your HR team on a decision to terminate someone at Mr. Cohen's level?

**A. Yes.**

Q. And would you have had a conversation with him directly?

**A. About this specific matter?**

Q. Generally.

**A. Generally, more often than not.**

Q. And so you --

**A. If it was a senior person.**

Q. As Mr. Cohen?

**A. Right.**

Q. And so you mentioned Amy Schramm. How do you spell that?

**A. Schramm.**

Q. S-c-h-r?

**A. I believe, yeah.**
MR. McKIRGAN: S-c-h-r-a-m-m.
BY MR. PEREZ:
Q. With regards to Mrs. Schramm, you said that you would have expected to hear from her?
**A. Likely, yes.**
Q. But you would have also heard from Mr. Anderson?
**A. Not necessarily.**
Q. Okay. So that would have come through Mr. Anderson to Ms. Schramm and then Ms. Schramm to you?
**A. That's a very likely process under which that would have unfolded.**
Q. Okay. Was it common for -- strike that.
Would you have expected President Crow to be involved in any of those conversations?
**A. No.**
Q. And that would be atypical, fair enough?
**A. That would be atypical. In my experience, that would have been atypical.**
Q. But not that it never happened; just that it would be atypical?
**A. It would be atypical.**
Q. So Mr. Cohen meets with you on August 12.

And when he meets with you on August 12, do you remember what occurred at that meeting?

**A. I do.**

Q. Okay. Please tell me.

**A. I recall I was returning to my office. I can't remember if it was after lunch or maybe I was outside of my office. I came back to my office to find Dave in the lobby of my office -- of my building.**

Q. And what happened?

**A. We asked exchange pleasantries. "Hey, Dave, how ya doing?" Dave and I had a very positive relationship. "How you doing? How's life?"**

**He seemed a bit upset, a bit agitated. He asked if I had time to visit with him.**

Q. Let me ask you this. Before August 12, did you form an opinion as to Mr. Cohen's performance at ASU prior to that conversation on August 12?

**A. I cannot speak --**

MR. McKIRGAN: Object to form. Lack of foundation.

Go ahead.

**THE WITNESS: I cannot speak to his job performance day-to-day. But Dave struck me as being a positive force for ASU. I was impressed by Dave's energy, by his intellect, and by his drive.**

**He was a kind of get-it-done guy. And I was kind of a get-it-done guy. And I think that's why I had an affinity for Dave. That's why we had a relationship, because we kind of saw things the same way.**

BY MR. PEREZ:

Q. So overall positive. Maybe not work performance-related, but a positive impression of Dave?

**A. I had a positive impression of Dave.**

Q. And would it be fair to say that during your years there that overlapped with Mr. Cohen, you never heard any negative comments about him?

**A. No.**

Q. That's correct?

**A. That's correct.**

Q. And would it also be fair to say that you never heard allegations about Mr. Cohen, for example, that he had racist tendencies?

**A. I never heard that allegation.**

Q. Is that the kind of thing you would have expected to hear?

**A. It's hard to say.**

MR. McKIRGAN: Object to form. Vague.

**THE WITNESS: I would not have expected to hear that.**

BY MR. PEREZ:
Q. Well, let me put it this way. If there was somebody on your ASU senior staff that was a racist, wouldn't that likely lead to termination?
MR. McKIRGAN: Object to form. Incomplete hypothetical.
Go ahead.
**THE WITNESS: Well, you can be a racist in this world, as long as you don't let that racist impact your decisions at work.**
BY MR. PEREZ:
Q. Fair enough.
But if it was something that had created problems on the job, then that would have impacted your work?
MR. McKIRGAN: Same objections.
Go ahead.
**THE WITNESS: Had I become aware that David was acting in a way that was discriminatory or if he was demonstrating racist behavior, it likely would have led to his termination after a due process and a formal investigation.**
BY MR. PEREZ:
Q. Okay. And you had never heard any such allegations?

**A. I had never heard such an allegation.**

Q. Also, did you ever hear any such allegation with regard to his being poor for the culture or not being a team player or somehow being obstructive to the athletic department?

**A. I've never heard such an allegation.**

Q. All right. And you said you had a positive impression of Dave. It sounds like, if I can move this along, that your impression was positive so that when you saw him on August 12, you were able to discern pretty quickly that something was off?

**A. That's correct.**

Q. And what happened as a result of that interaction?

**A. I invited him into my office, and I asked him to sit down and basically said, "Dave, what brings you here today?"**

Q. Now, was that a scheduled meeting or --

**A. Nope.**

Q. And so what did he tell you?

**A. He told me that he had recently left a meeting with Ray Anderson, I believe Jean Boyd, and I believe Frank Ferrara. I may not be right on the last name of Frank.**

**And I don't recall him telling me if he**

**had just left the meeting that morning or if the meeting had occurred the day before, but he had just recently left the meeting.**

**During the meeting, they were letting Dave know that he was having a change in reporting responsibilities. And I believe some sports were being either taken away from his portfolio or added to his portfolio. I just recall that he described a general reorganization.**

Q. Did he at that time tell you -- he was obviously upset, correct?

**A. He was upset.**

Q. Did he raise his voice?

**A. I don't recall him raising his voice, but I recall him acting in an agitated manner.**

Q. He was upset because he thought he was being treated unfairly?

**A. I can't answer that.**

Q. Did he tell you he thought he was being treated unfairly?

**A. He did not use those terms.**

Q. Okay. What did he tell you about how he was being treated?

**A. He told me -- well, he described the meeting. And that's when he brought up the fact that he felt**

**that this may have had something to do with an issue that he had raised through Ray Anderson.**

Q. And that's when he told you about what had happened to the three women?

**A. That's correct.**

Q. All right. And he told you that he had reported that to Ray several times?

**A. That's correct.**

Q. And what was your role during this? Were you just a sounding board? Were you just listening?

**A. Just listening, being a sounding board. I didn't know if Dave was coming at me as a friend or as a professional, more of a professional -- you know, more of a, quote, professional visit to HR or just "Hey, Kevin, you know, I know you. This is what's happening."**

Q. So he didn't raise his voice.

Did he ever threaten a lawsuit against ASU?

**A. He did.**

Q. Okay. What did he say?

**A. He told me that he was thinking about his options outside the organization, including filing charges or retaining an attorney.**

Q. Did he talk about what those charges might be?

**A. No.**

Q. Because at this point, he hasn't been terminated, correct?

**A. That's correct.**

Q. So his discussions about an attorney, were they specific about what he was going to do?

**A. No.**

Q. At that point, did he mention to you that he felt that he was being retaliated against?

**A. He did say that.**

Q. So he used the word "retaliation"?

**A. He did, to the best of my recollection.**

Q. And do you recall saying to him that you thought that it sounded like retaliation?

**A. I would not have said that.**

Q. Okay. Do you recall weighing in on what you thought about how he was being treated?

**A. I don't recall that.**

Q. At all?

**A. At all.**

Q. Do you recall Dave telling you that the meeting that occurred was atypical?

**A. I would not use the word "atypical." I would use the word "unexpected."**

Q. So you don't recall him telling you that there

was a meeting that occurred that had a number of people in that meeting and that that was something that didn't commonly take place?

**A. I don't recall that piece of the conversation.**

Q. What else happened during the meeting?

**A. Well, again, I mentioned I liked David. I considered Dave to be maybe not a friend, but somebody who I had an infinity for. And I gave him the same kind of counsel that I had given countless other executives in his position.**

Q. Do you remember at that time telling Dave about options that he should consider?

**A. I did.**

Q. And what were those options?

**A. I said, "Dave, people in your situation have a variety of different options. One is you can just accept the decision, move on, make the best of it."**

**I mentioned the fact that we are at-will employees, that we were not under any kind of contract and that our job duties could change on a moment's notice. And we could essentially be asked to perform any service for the organization as long as it wasn't unethical or illegal. So I said you can basically accept the decision.**

**Another option I gave him was he could ask**

**Ray to reconsider. I sensed a lot of emotion around this matter, and I recall telling Dave maybe let this thing soak for a couple days and go back to Ray and ask him to reconsider.**

**I mentioned to him that he could negotiate an exit strategy, and that I would be happy to help him with that.**

**And I recall making comments along the line that "You can make a charge, Dave, or you can retain an attorney." But in my experience, litigation is time consuming, stressful, expensive, unpredictable.**

**And also from a practical standpoint, having a charge filed with an agency or a court could come up in a Google search and could impact his future employment opportunities.**

**And this is the same talk I have given to many other executives in this situation.**

Q. And are you sure that at the time that it was Dave that said he was going to get an attorney, or did it come out of a discussion about the options?

**A. I recall him saying he was looking at his external options.**

Q. Because, again, at that point, he had not been fired, so I'm curious of what those external options were.

And I believe your testimony is that he didn't walk you through that?

MR. McKIRGAN: Object to form.

Go ahead.

**THE WITNESS: I don't recall. I recall him saying something along the lines of "I can look at my options outside the organization." We didn't talk about anything specifically.**

BY MR. PEREZ:

Q. And his options outside of the organization you took to mean a lawyer?

**A. Yes. Or a charge or some kind of a formal charge with an external agency.**

Q. Okay. Do you remember if he actually used the word "a lawyer"?

**A. I don't recall.**

Q. I'm going to show you a -- I have a series of texts. And let me mark this one first, which will be Exhibit 85.

Actually, why don't I mark this one as Exhibit 85. Here we go. Why don't you take that one. And give that one to your counsel.

(Deposition Exhibit No. 85 was marked for identification by the court reporter.)

BY MR. PEREZ:
Q. Do you remember this text exchange with Mr. Cohen?
**A. No.**
Q. And in this text exchange, the date of that is August 13, 2019, correct?
**A. No.**
Q. Do you see the August 13 day?
**A. I see an August 11 date and then an August 12 date.**
Q. I think I gave you the wrong one. I'm sorry.
**A. I believe you did, because I don't recall this.**
Q. That's all right. You can hold on to that.
MR. PEREZ: Let's mark this as Exhibit 86.
(Deposition Exhibit No. 86 was marked for identification by the court reporter.)
**THE WITNESS: I recall this text.**
BY MR. PEREZ:
Q. Okay. And so this one is dated August 13, 2019, correct?
**A. This is August 13, 2019.**
Q. Okay. And this is in a text, it looks like, from you?
**A. Yes.**
Q. And the text from you is at 10:49, it appears?

**A. That's correct.**
Q. All right. And the text from you also looks like it was initiated by you?
**A. Yes.**
Q. And in that text, you're checking in with him?
**A. That's correct.**
Q. And do you remember why it was that you were checking in with him?
**A. I would say in view of the options I presented to him the day prior, I was just kind of seeing where his thinking was.**
Q. And do you see his response?
**A. I do.**
Q. Okay. So in his response to you, he specifically refers to he spoke to Rick. Do you see that?
**A. I do.**
Q. Did you know Rick was?
**A. Yes.**
Q. Who was that?
**A. Rick Shangraw.**
Q. And during your conversation, did he talk about possibly checking in with Rick?
**A. It's possible.**
Q. And did you know Rick Shangraw?

A. I did.
Q. And so did you know that Rick and Dave had a relationship?
A. I was --
Q. They knew each other.
A. Yes. I mean, they're colleagues.
Q. Did you know if they had a friendly relationship?
A. I did not know.
Q. Okay. Did you have a positive opinion that Rick Shangraw would be a good person for Dave to talk to?
A. Yes.
Q. He would give good advice?
A. Yes.
Q. And so although you don't remember specifically whether or not Dave mentioned that he was going to talk to Rick, you weren't surprised by this text --
A. No.
Q. -- that he talked to Rick?
A. Sorry. No.
Q. And then he said he thought about going directly to President Crow. Do you see that?
A. Yes, I do.
Q. Do you remember him mentioning that to you when

you met with him on the 12th?

A. **Well, I need to correct something here.**

Q. Yes.

A. **Dave is not saying in this text that he is going directly to Crow. It appears to me that Rick is saying he's going directly to Crow.**

Q. Fair enough.

But do you remember a conversation about President Crow when you met with Dave on August 12?

A. **I do not recall that Dr. Crow's name was brought up in that initial meeting.**

Q. Was it brought up at some later time?

A. **I don't recall.**

Q. And also in his text, he says he's not happy that Ray didn't follow his instructions on talking to the donor. Do you see that?

A. **I do see that.**

Q. And you understood what that meant?

A. **Yes.**

Q. And, in fact, there had been an incident that occurred prior regarding a person named Eddie Sandridge. Were you familiar with a prior donor?

A. **No.**

MR. McKIRGAN: Object to form.

**THE WITNESS: That's the first time I've**

**heard that name.**

BY MR. PEREZ:

Q. Okay. He was often referred to as Fast Eddie.

**A. Not aware.**

Q. Okay.

(Deposition Exhibit No. 87 was marked for identification by the court reporter.)

BY MR. PEREZ:

Q. I'm going to show you what I've marked as Exhibit 87.

There came a time when you met with investigators after Mr. Cohen's termination, correct?

**A. That's correct.**

Q. And so what I've just handed you are the notes that were given to us from the people who conducted those investigations. So the notes might be a little cryptic, but I'm going to ask you to take a few minutes to just look at those, please.

(The witness reviewed the document.)

**THE WITNESS: Okay.**

BY MR. PEREZ:

Q. Have you ever seen those notes before?

**A. No.**

Q. And in these notes, you see that there's reference to the meeting that took place that morning,

correct?
A. **Which morning?**
Q. The morning of August 12th.
A. **Yes.**
Q. And it says who was -- to the best of your recollection, who was at that meeting?
A. **At the meeting at Sun Devil Athletics or the meeting with me?**
Q. The meeting at Sun Devil Athletics.
A. **Yes.**
Q. And also, I'm going to show you now what I'm going to mark as Exhibit 88.
(Deposition Exhibit No. 88 was marked for identification by the court reporter.)
BY MR. PEREZ:
Q. So Exhibit 88 is a text string that was provided from Amy Schramm.
MR. McKIRGAN: So what number is this? 88?
MR. PEREZ: 88.
MR. McKIRGAN: Thank you.
BY MR. PEREZ:
Q. And 88 shows that -- if you could go down towards the bottom where he is referencing to Amy that he had a conversation with Kevin.

**A. Yes.**

Q. And he says in that email to Amy that he had this review, that Ray had Frank and Jean in there. He said that was not protocol and very strange. Do you see that?

**A. I do.**

Q. Okay. Does that help you or remind you that that was something that was discussed when you met with Dave?

**A. I just don't recall. I don't recall him saying a meeting was strange.**

Q. Well, not the meeting was strange, but the people that were in the room were strange.

**A. Yeah, I don't recall that.**

Q. And do you recall anything else that you haven't testified to about that meeting that took place on August 12?

**A. No.**

Q. So do you recall having a conversation with Dave on August 12 that everything was going to be fine, that he was not going to be fired?

**A. I don't recall saying that.**

Q. But it would be fair to say that on August 12, you had no indication that he was going to be fired?

**A. That's correct.**

Q. And this was the first you were hearing that there was a problem?

**A. Somebody threw a hand grenade in my lap.**

Q. Okay. So Mr. Cohen leaves the room. And what do you do?

**A. To the best of my recollection, I likely called OGC.**

MR. McKIRGAN: So here's where I'm going to counsel you to be careful with what you say about your communication with OGC. You don't need to testify to the specific communications. But if you want to say what the subject matter was...

**THE WITNESS: It likely would have been pretty much a perfunctory phone call to inform OGC as to what I just became aware of.**

BY MR. PEREZ:

Q. And do you remember who you spoke to at OGC?

**A. It likely would have been Kimberly Demarchi, but I can't swear to that.**

Q. You have no notes of that?

**A. No.**

Q. And do you remember how long that conversation took place?

**A. It likely would have been five to ten minutes.**

MR. PEREZ: So, Counsel, here's where I'm

trying to dance around this.
BY MR. PEREZ:
Q. When you called to speak with Ms. Demarchi about the subject matter, the subject matter being David Cohen, would it be fair to say that she was not at that time aware of any David Cohen issue?
MR. McKIRGAN: So hold on. I think you're invading the privilege there.
So I'll instruct you not to answer.
BY MR. PEREZ:
Q. Would it be fair to say at that time that the conversation caught Mr. Demarchi off guard?
MR. McKIRGAN: Same objection. Same instruction. I think you're invading the privilege when you get into the substance of what's going on.
MR. PEREZ: And that's fine, Counsel. I certainly understand your position.
One of the issues that you know that's going to be addressed is with regards to whether or not Mr. Crow and other people knew and when they knew. And if all those are within the realm of a privilege that I can't pierce, which I certainly understand, then it just leads me back to...
MR. McKIRGAN: You can ask if Dr. Crow was on the phone call.

MR. PEREZ: He's already said he wasn't on the phone call.

MR. McKIRGAN: Okay.

MR. PEREZ: But that's not what I'm asking. That's not what I'm trying to get at, as you know.

BY MR. PEREZ:

Q. Okay. So you had this conversation with Ms. Demarchi. And then what did you do next?

**A. I believe I recall calling Ray Anderson.**

Q. And what was your conversation with Ray Anderson?

**A. I basically summarized the meeting that I recently had with Dave that morning. I told him I was a little bit concerned about the amount of emotion in this situation, that Dave seemed a little bit -- not a little bit, but somewhat agitated about the conversation.**

**And at that point, I brought up the fact that Dave had reported to me that he had reported to Ray the groping -- the alleged groping incidents at the -- I believe it was the Pac 12 tournament in Las Vegas.**

Q. Certainly that was part of it, yes.

**A. Yes.**

Q. And what did Mr. Anderson say?

**A. Mr. Anderson pretty much explained to me that it was a business-related move, that he was restructuring parts of his department.**

Q. Okay. You lost me with that part.

So you reported to Mr. Anderson -- sorry. You had a conversation with Mr. Anderson.

**A. I did.**

Q. In your conversation with Mr. Anderson, you tell him that there were these sexual harassment allegations that Dave had informed you of that had dated back to the Pac 12 tournament in March of 2019. Is that correct?

**A. That's correct.**

MR. McKIRGAN: Object to form.

Go ahead.

**THE WITNESS: Sorry.**

BY MR. PEREZ:

Q. And did Mr. Anderson answer what he had done about those allegations?

**A. He did.**

Q. What did he say?

**A. Well, he responded to a question that I asked him. I asked him if a formal investigation had been opened into this matter.**

Q. And what did he say?
**A. He said no.**
Q. Did you ask him why he had not opened an investigation?
**A. I did.**
Q. And what did he say?
**A. At that point, he told me that he had spoken to a few different people about the matter. He wasn't specific about it. But that he had not made a formal referral to any kind of investigation department.**
Q. Did you convey to him at that time that you believed an investigation should have been opened?
**A. Yes, I did.**
Q. Did you explain to him at that time what you recommended that he should do at that point?
**A. I mentioned to him that, number one, we need to investigate this, Ray. We can't just leave this laying out there.**
**And as it pertained to David, I let him know that -- I asked some general questions. "Do you think this relationship is salvageable? Do you think David can be successful in this role going forward?"**
**There was a lot of emotions surrounding this. And I believe at that meeting, I may have planted the seed with Ray that we should discuss maybe**

**a severance offer to David.**

Q. Sticking for a moment with the incident involving the three women.

Now, I think you probably know that the result of the investigation that ultimately began was that at the end, there was a finding that these three women had been sexually harassed. Are you familiar with that?

**A. I don't have specific knowledge of that.**

Q. Okay.

**A. The report findings from the investigator that, I believe, they brought in from Philadelphia, I never was privy to the results of that investigation.**

Q. Okay. So you didn't know that their findings was that those things --

**A. I did not know that.**

Q. -- had occurred?

MR. PEREZ: Did you get that?

THE COURT REPORTER: Yes.

MR. PEREZ: Sorry. We're talking over each other.

**THE WITNESS: I apologize.**

BY MR. PEREZ:

Q. But to be clear, in your opinion, when you had that conversation with Mr. Anderson on August 12,

you didn't need a finding. Based on what you had heard, you believed that an investigation should have been issued?

**A. That's correct.**

Q. Did you at that time mention to Mr. Anderson that part of Dave's frustration was that he had continually prodded and discussed this with Ray, and Mr. Anderson had not done anything?

**A. I don't recall that specifically -- well, let me walk that back a little.**

**I told Ray that one of the sources of Dave's discontentment was, in Dave's mind, he had brought the matter to Ray and Ray had not acted.**

Q. And would you say it's fair that that was a reasonable source of discontentment?

MR. McKIRGAN: Object to form. Lack of foundation.

Go ahead.

**THE WITNESS: I could see why Dave would be upset.**

BY MR. PEREZ:

Q. Knowing the players, Mr. Anderson and Mr. Cohen, would you have counseled Dave to go around Mr. Anderson's back and try to initiate an investigation in another manner?

**A. I did not give him that counsel.**

Q. But as you sit here today, would you have given him that counsel?

**A. I likely would have said something that if Ray doesn't launch an investigation, I will lodge an investigation.**

**I would not have put the onus onto Dave to go and launch an investigation. Because as a member of senior management and as a chief HR officer, I was duty-bound to report what I knew to the appropriate investigative body at the University. I would not have put the onus on David to do that.**

MR. COHEN: That's fair.

BY MR. PEREZ:

Q. And on August 12, when Mr. Anderson said that he had not initiated an investigation, did you feel that at that point now you had been duty-bound to do something?

**A. Absolutely.**

Q. So was it your intent at that point to both confirm that Mr. Anderson initiate an investigation, and if not, to initiate one yourself?

**A. Well, the Office of University Rights and Responsibilities reported to the Office of General Counsel.**

Q. So that's what you would have reported?

**A. That would have been part of my conversation with Kimberly Demarchi, was to make her aware of this allegation.**

Q. Thank you.

Do you remember doing anything else on August 12?

**A. I do not remember doing anything else on August 12.**

Q. Okay. And I cut you off earlier. You said that at that point you planted a seed, perhaps, of a severance for Mr. Cohen?

**A. That's correct.**

Q. But would it be fair to say you didn't counsel Ray Anderson to terminate Mr. Cohen?

**A. I would not have given him that counsel.**

Q. Did you convey to Mr. Anderson you were surprised that you hadn't heard about this sooner?

**A. I don't recall that. Excuse me, let me be more precise in your question.**

**Heard about what, the allegation?**

Q. About the possibility of terminating Mr. Cohen.

**A. When I talked to Ray Anderson on the 12th, the plan, concept, whatever of terminating Dave Cohen did not come up.**

Q. Okay. So it wasn't even on the table?
**A. Not in --**
MR. McKIRGAN: Object to form. Lack of foundation.
Go ahead.
**THE WITNESS: Not in that conversation.**
BY MR. PEREZ:
Q. With regards to the options that you set forth for Mr. Anderson, you said that there was a lot of emotion?
**A. Yes.**
Q. You've, obviously, already testified that Mr. Cohen had emotion, correct?
**A. That's correct.**
Q. Did Mr. Anderson have emotion?
**A. I believe there was an elevated level of emotion on Ray Anderson's part.**
Q. Do you know the source of that emotion?
**A. It would be supposition on my part.**
Q. Was he mad that Dave came and talked to you?
**A. He didn't say that specifically.**
Q. Okay. You said Mr. Anderson said it was a business decision?
**A. The reorganization was a business decision.**
Q. And so you talked about the reorganization?

**A. Briefly.**
Q. Did you talk about the fact that Mr. Cohen was concerned about who he was going to be reporting to?
**A. I don't recall that.**
Q. Did Mr. Cohen tell you when you met with him that he was now going to be reporting to somebody who had said he would fire Dave if Dave ever worked with him, and that's --
**A. I don't --**
MR. McKIRGAN: Object to form.
BY MR. PEREZ:
Q. And that is Frank Ferrara?
MR. McKIRGAN: Object to form. Assumes facts not in evidence.
**THE WITNESS: I don't recall Dave telling me that.**
BY MR. PEREZ:
Q. Okay. And I'm just trying to figure out if Dave told you because then maybe you would have had it with Ray. And it sounds like you didn't have the conversation, or remember having that conversation, with Dave. So you definitely didn't have the conversation with Ray?
**A. You took about four left turns on me there.**
MR. McKIRGAN: Object to form. Vague.

Compound.
BY MR. PEREZ:
     Q.  Well, as we talk about the reporting requirement, do you remember Dave talking about how the reorganization was not just a frustration with the way his responsibilities might change but who he was reporting to?
     **A.  There may have been some discomfort on his part.  I don't recall specifically.**
     Q.  So you don't recall if he specifically said Frank Ferrara or not?
     **A.  I don't recall if he specifically mentioned that he did not want to report to Frank or that he had an issue with Frank.  I do remember him telling me he was going to report to Frank.**
     Q.  Okay.  So then when you speak to Ray Anderson, do you recall that being a part of your conversation?
     **A.  I do.**
     Q.  And what was that?
     **A.  I do recall saying that Dave was upset that his reporting relationship was being changed, not necessarily that he was reporting to Frank.**
     Q.  Understood.  Thank you.  That clarifies things.
          And prior to that, you understood that Dave was reporting directly to Ray?

**A. That was to the best of my recollection.**

Q. And so did you have a conversation with Ray about why was that reporting shift being made?

**A. We touched briefly on that.**

Q. And what did he say?

**A. That's when we got into the conversation of business reasons, efficiencies. My right as an executive is to, you know, put my people where I think they can be most effective, things along those lines.**

Q. Okay. So I want to be very clear. In your conversation with Mr. Anderson on August 12, he never said Dave's a bad employee?

**A. He did not say that.**

Q. He never said Dave's a bad cultural fit?

**A. He never said that.**

Q. He never said that Dave wasn't a team player?

**A. I do not recall that.**

Q. He simply said he was making an organizational change that was a good business decision?

**A. That was to the best of my recollection.**

Q. And as you left that meeting/phone call, there was no indication at that time, in your mind, that Dave Cohen was going to be terminated?

**A. I had no reason to believe when I concluded my call with Ray Anderson that Dave was going to be**

**terminated.**

Q. And when you laid out those four options for Dave, it was your assumption that he was going to go and think on it, fair?

**A. Exactly.**

Q. And would it be fair to say that you had the same assumption with Mr. Anderson?

**A. That's correct. Because I recalled specifically telling Ray that I had given Dave those options.**

Q. All right.

**A. And that's when we approached the subject of a severance.**

Q. Which he didn't seem interested in? "He" being Ray Anderson.

**A. He did.**

Q. Oh, because you said you didn't think termination was on the table?

**A. Not in that initial phone call.**

Q. Okay. So when you gave him the four options and you talked about severance, doesn't that imply termination?

**A. No.**

Q. What does that imply?

**A. To me, a severance offer would be a mutual**

**agreement to sever the employer relationship.**

Q. Okay. To part ways?

**A. To part ways.**

Q. All right. And so Mr. Anderson did have an interest in what that might look like?

**A. Yes.**

Q. But at that time when you hung up the phone, he didn't say "I'm going to pursue the severance option"?

**A. I believe we agreed to keep all the options open. And I recall telling Ray that I would be happy to help on the severance piece, because I had a relationship with Dave.**

Q. You didn't think it made sense for you to help on the termination decision because you had a personal relationship?

**A. No, I would not say that.**

Q. What would you say?

**A. I would say that the termination piece never came up in that conversation.**

Q. Okay. So when you check in with Dave -- so I'm going back to the prior exhibit where you ask on August 13, the next day, you know, "Kevin here. How are things today," what was your intention?

**A. I wanted to take his temperature, to use a**

**colloquialism. I just wanted to see where his head was, to see if the emotion had subsided a bit so we could have maybe a more objective decision of what a most effective next step would be.**

Q. And did you have a call with him on August 13?

**A. Let me see.**

Q. So you're referring now to Exhibit 84?

**A. Yes. I don't recall that -- I said here I texted him, so I would default to my -- I could have called him, but I recall it being a text.**

Q. Okay. But I do want to make sure for the record you're looking at Exhibit 84?

MR. McKIRGAN: That's Exhibit 84.

**THE WITNESS: Yes, I am.**

BY MR. PEREZ:

Q. And I just want to make sure this is helpful for you to refresh your recollection?

**A. Yes, it is.**

Q. And so looking now at Exhibit 84 -- sorry, I'm referring to it and it's the one with the sticker on it.

MR. McKIRGAN: Okay. I was just making sure that's what he's looking at.

MR. PEREZ: Yep. Thank you, sir.

BY MR. PEREZ:

Q. So it says on August 13: "Texted to see if had come to any conclusions."

**A. Yes.**

Q. And that's on August 13?

**A. That's correct.**

Q. And you're referring in your text to "he." And "he" is David Cohen?

**A. That's correct.**

Q. And it says: "He told me he wanted to stay." Do you see that?

**A. I do.**

Q. But you don't remember if that was in a phone call or how that occurred?

**A. I don't remember.**

Q. All right. Do you remember anything about him telling you that he wanted to stay?

**A. Well, I recall he either told me via text or by a phone call, which I don't recall, that he wanted to stay. He did tell me he wanted to stay.**

Q. I'm going to try to do it this way.

MR. PEREZ: So this will be Exhibit 89.

(Deposition Exhibit No. 89 was marked for identification by the court reporter.)

BY MR. PEREZ:
Q. Maybe the best way to do this is, if you look at your exhibit that has the prior text.
**A. Yes.**
Q. And then now you look at Exhibit 89.
**A. Uh-huh.**
Q. You'll see that there was no interaction with Dave where you talked about he wanted to stay or Jim Rund or anything along those lines?
**A. I don't see anything on this document.**
Q. Okay. And these are texts that were provided by you, I believe?
**A. Possible.**
Q. Okay. And so we can maybe assume that your conversation with Dave on the 13th was a telephone call?
**A. No.**
Q. Okay. What else could it have been if it wasn't a text?
**A. Well, I mean, it's evident there was a text exchange. I don't understand your question.**
Q. Right. What I'm saying is that in the text exchanges that you have -- and you have both of them. Please take a look at them.
MR. McKIRGAN: Exhibit 86.

**THE WITNESS: Yeah.**

MR. McKIRGAN: There you go.

BY MR. PEREZ:

Q. So if you look at 86 and if you look at 89, you'll see that in neither of those texts, and those texts kind of fall one to the next, that there's no discussion about Dave saying that he wants to stay.

MR. McKIRGAN: Object to form.

**THE WITNESS: Yeah, I don't see that in the text.**

BY MR. PEREZ:

Q. Okay. So that's why I said it would be fair to say that that must have been a phone call?

**A. Possible.**

Q. Okay.

**A. Oh, excuse me. Yeah.**

MR. PEREZ: Counsel, I think you --

MR. McKIRGAN: Well, you're misstating the text, so I'm going to point him to the text.

MR. PEREZ: Well, no, you don't get to do that.

MR. McKIRGAN: Because you're not --

MR. PEREZ: Counsel --

MR. McKIRGAN: You're --

MR. PEREZ: Counsel --

MR. McKIRGAN: -- mischaracterizing the record.
MR. PEREZ: Counsel, you don't get to point something out to him and ask him --
MR. McKIRGAN: Well, I'm asking the witness to review Exhibit 86.
MR. PEREZ: Counsel, do you think that's appropriate for you to point?
MR. McKIRGAN: I do because you're mischaracterizing the record.
MR. PEREZ: Counsel, do you think it's appropriate for you to coach the witness in the middle of his testimony?
MR. McKIRGAN: I'm not coaching him. I'm asking him to review the exhibit.
MR. PEREZ: If you're pointing him directly to something to testify?
MR. McKIRGAN: I asked him to review the exhibit.
MR. PEREZ: All right. I'll remember that as we go forward.
MR. McKIRGAN: Okay. Go ahead.
Review the exhibit and then answer the question.
**THE WITNESS: Yeah. I apologize for not**

**being more thorough before I answered the question.**

**But in this text with Dave, he did tell me that he's not leaving.**

BY MR. PEREZ:

Q. But you don't recall a phone call?

**A. No.**

Q. And you don't recall Dave saying that it was his desire for him and Ray to make it work?

**A. I don't recall that.**

Q. Do you recall Dave saying that he was going to embrace the challenge?

**A. I don't recall him saying that.**

Q. At any point?

**A. At any time.**

Q. Do you recall Dave saying at any point that, although he wasn't happy with the reorganization, that it was his choice or his decision to make the best of the situation?

**A. I don't recall that outside of this text.**

Q. Do you recall the conversation with Mr. Cohen wherein he said that he loved his job?

**A. I don't recall that.**

Q. At any point?

**A. I don't recall that.**

Q. And I'm not talking just within the context of

these three or four days.

At any point, did you have conversations with Dave where he talked about how much he loved his job?

**A. It's possible it occurred. I just don't recall it.**

Q. Do you recall any conversations with Mr. Cohen wherein he said that, in his view, leaving was not really an option because he wanted to stay at ASU?

**A. I do recall that.**

Q. And that related to the fact that he liked his job?

**A. That seems to strike something in my mind. I don't recall the context or the form of that conversation, but I do recall him saying that he wanted to make a go of it.**

Q. Do you recall Mr. Cohen saying that he felt he was good at his job?

**A. I don't recall that.**

Q. All right. So August 13 ends. And then on August 14, you then have another exchange -- oh, I'm sorry, it's Exhibit 89.

**A. I've got it.**

Q. So Exhibit 89, which you have in front of you, you see that there's a text above that: "Okay. Let me

know if I can help. I'll sit tight."

**A. Yes.**

Q. And then in response on August 14, Mr. Cohen says: "Call when you are free, please."

**A. Yes.**

Q. And then you get that text. And do you remember having a phone conversation with him on the 14th?

**A. I don't remember having a phone conversation, which is not to say that we did not have a phone conversation.**

Q. Okay. So now I'm going to refer back to Exhibit 84.

On August 14, you say: "Note from Amy asking for a meeting." Do you see that?

**A. I do.**

Q. Do you remember what that note said?

**A. There was some generic "Can I get it put together? What does the calendar look like? Are you available?" But nothing of substance was discussed in the note.**

Q. And she said: "Took a call with Ray, Jean, Kim, Amy, and Frank."

**A. I said that, yes.**

Q. Yes. You were a part of that call?

A. **Yes.**
Q. Was that the call that Amy was trying to set up?
A. **Yes.**
Q. All right. Do you remember when that call occurred?
A. **I believe it would have been that day or the next day.**
Q. So it's possible it occurred on the 15th?
A. **It's possible. But again, I just don't recall.**
Q. Okay. And in that conversation on August 14, it says: "They told me that they wanted to let him go."
A. **That's correct.**
Q. And the "they" is who?
A. **That would have been Ray Anderson.**
Q. So Ray said that he wanted to let Dave go?
A. **That's what I recall.**
Q. Okay. So when Ray Anderson tells you that he wants to let Dave Cohen go, what is your response?
A. **I told Ray I thought that would be a very bad idea.**
Q. And why did you tell him that?
A. **Well, just a variety of reasons. It's an issue that's been active for a couple days. We haven't even had a chance to dig into the issues.**

**I may not have articulated this to Ray Anderson, but in my mind, if a person goes to HR and raises a pretty significant issue and gets fired the next day, that doesn't pass the smell test. So I felt very uncomfortable even entertaining the option of terminating Dave on that day.**

Q. Did you mention the sexual harassment issue that was outstanding?

**A. Well, that was part of a conversation that Kimberly Demarchi was available for.**

MR. McKIRGAN: And stop there. You can say that you had a conversation with Kim about that, but don't go any further.

BY MR. PEREZ:

Q. Is that what you're saying, what Counsel just said, that you had a conversation with Ms. Demarchi about that?

**A. Well, you asked me specifically, and I don't want to put words in your mouth, whether we talked about the sexual harassment complaint on this call.**

Q. Yes.

**THE WITNESS: And is that an area I can answer?**

MR. McKIRGAN: You can say that that topic was discussed.

**THE WITNESS: I would say that in the context of this call, it's very likely that topic was discussed.**

BY MR. PEREZ:

Q. To the best of your recollection?

**A. To the best of my recollection.**

Q. Now, during that conversation, did Jean, Amy, or Frank take a position on whether or not they agreed with Ray?

**A. I do not recall that.**

Q. Do you recall -- you don't recall Frank saying, "I don't think you should fire Dave"?

**A. I don't recall Frank saying that.**

Q. You don't recall Amy saying, "I don't think you should fire Dave"?

**A. I don't recall Amy saying that.**

Q. And you don't recall Jean saying, "I don't think you should fire Dave"?

**A. I don't recall Jean saying that.**

Q. Do you recall any of them saying, "I agree with you; we should fire Dave"?

MR. McKIRGAN: Object to form.

And when you say "any of them," you're including Ms. Demarchi, so don't answer that question.

BY MR. PEREZ:
Q. The "them" is Jean, Amy, and Frank.
**A. I do not recall them either agreeing or disagreeing with Ray's comments.**
Q. Your notes also say that you thought it was moving -- I was surprised that it -- I'm sorry. This note says: "I was surprised that it had moved that fast."
**A. That's correct.**
Q. So what you're saying is you were surprised how quickly they were moving to termination?
**A. That's correct. Or suggesting termination.**
Q. And would it be fair to say part of your surprise was you had spoken to Ray just two days earlier and that wasn't really on the table?
**A. That's correct. We had talked about a potential severance agreement, but not a termination.**
Q. Did you ask Ray why things were moving so fast?
**A. I don't recall that.**
Q. You had previously testified that you had given Ray options?
**A. That's correct.**
Q. Did you, in this conversation, say to Ray, "What about those options you were going to think about"?

A. **I would have said that.**
Q. Okay. And do you recall what he said?
A. **I don't recall his specific answer.**
Q. When you gave Ray those copies --
A. **If I may.**
Q. Yes.
A. **I'm refreshing myself on the second page. I did suggest making -- I did submit a suggestion again to make a severance offer. At the very top.**
Q. So one of the options, but not a termination option?
A. **Yes.**
Q. One of the options for a mutual -- what did we say? -- split?
A. **Parting of the ways.**
Q. Yes. But not a termination?
A. **Not a termination.**
Q. And is it fair to say that when you had that conversation with Ray on the 12th, I think you testified to this, that as you laid out options for him, termination was not one of those options?
A. **Not in that initial conversation. That's why I expressed my surprise in that phone call.**
Q. Now I'm going back to Exhibit 89.
So on Exhibit 89, you say to Dave --

because Dave has reached out to you and he wants to have a call on August 14th.

**A. Yes.**

Q. The next day you text him in the morning at 7:38 a.m.

**A. Yes.**

Q. And you say: "I have this spirit captain thing. Then I have the rest of the day open"?

**A. Yes.**

Q. So at this time you're sending this text, you already know that Ray has made the decision, or at least conveyed that it is his intention, to terminate Dave?

**A. That's not correct.**

Q. No, it's not correct?

**A. No.**

Q. Okay. Where am I wrong?

**A. At that point, I was not aware that Ray had made a decision to terminate him.**

Q. Only that he wanted to let him go?

**A. That's correct.**

Q. But he hadn't made that final decision?

**A. He had not made that. Honestly, after that call, I thought that we were still on the path that we were on.**

Q. Which is what? Which is a mutual departure or --

**A. Yes.**

Q. -- one of those options?

**A. I continued to advocate for the severance.**

Q. So let me rephrase that.

So on August 15, when you have the text at 7:38, you're at least familiar with the idea that Ray is considering termination?

**A. Yes.**

Q. And Dave replies back to you, and he says: "I'll see you there"?

**A. At the spirit captain.**

Q. Yes. Did that surprise you?

**A. No.**

Q. Okay. So you knew you were going to see him there?

**A. Yeah, we're on the same committee together.**

Q. Okay. And so as a result of this, you're -- what, are you hopeful that there's going to be a change of heart and that that's not something that's going to occur? Because that's August 15, and at least at that point, you're still hoping that there can be a friendly solution?

**A. Yes. That is correct.**

MR. PEREZ: All right. We're just going to go off the record for a second.

(A recess was taken from 10:34 a.m. to 10:42 a.m.)

BY MR. PEREZ:

Q. All right. Let's go to August 15. Look to your notes.

So on August 15th, in the morning, do you remember seeing Dave at that captain's thing that you referred to?

**A. I don't remember.**

Q. So it's fair to say that -- let me ask it.

You didn't call Dave and have a conversation with him on August -- the evening of August 14th or the morning of August 15th to say, "Hey, just so you know, there's a chance you might get fired"?

**A. I did not do that.**

Q. Right. That's not something you would do?

**A. I would not have done that.**

Q. And so you have this exchange with him that, you know, "See you there." But then to the extent that you see him there, and it sounds like you don't recall if you did or not, you didn't discuss his termination or any other potential changes to the options?

**A. Nope. I would not have raised the specter of termination.**

Q. Do you remember having a conversation with Dave at or around that time, being either the morning of the 15th, that "Have you thought more about those options I set out for you"?

**A. It's possible. Or maybe to be more specific, "Have you thought more about this severance option?"**

Q. Okay. Because you kind of had some other thoughts in the back in your mind, correct?

**A. Correct.**

Q. All right. But I don't see in your notes that that conversation occurred. So because they're not in your notes, are you pretty sure you did not have that conversation at the captain's thing?

**A. I do not recall.**

Q. Not quite my question. My question is, if you would have had that conversation, would you have expected to see those on your notes?

**A. Yes.**

Q. Okay. So August 15, you say -- and I'm now referring again to Exhibit 84 -- that "Dave came to see me. Told me that he had been fired. And they told him I had approved. Not the case."

**A. That's correct.**

Q. So let's see how this unfolds.
So Dave is fired on August 15. Did you get a call after the one that you had on the evening of the 14th, that they say we've made the decision. We are going to fire Dave?
**A. No.**
Q. And so consistent with your text, I can fairly say you did not approve the firing of Dave?
**A. That's correct.**
Q. And as you previously testified, it sounds like you would not have approved of that?
**A. I would not have approved it.**
Q. Not that they would have asked you, but if they would have asked you?
**A. If they would have asked me, I would not have approved it.**
Q. Okay. So when Dave comes to see you, as you said on August 15, and told you that he had been fired, was that the first you were learning of it?
**A. That's correct.**
Q. Okay. Were you surprised to learn that?
**A. I was surprised.**
Q. Were you surprised when Dave told you that they said you had approved it?
**A. I was surprised.**

MR. McKIRGAN: Object to form.
Go ahead.
BY MR. PEREZ:
Q. So before we get to the kind of -- the rehash of the prior advice, which is what your notes say, tell me what you remember about that conversation on August 15.
**A. I recall that Dave said "I've been fired."**
**And I said, "Well, that's news to me."**
**And along those lines, he likely would have said -- he likely said something along the lines "Well, they told me you approved it."**
**And I would have said, "That's not true. I would not have approved the termination."**
Q. How long did that meeting last?
**A. I don't recall that it lasted very long.**
Q. Was anyone else at that meeting?
**A. No.**
Q. Was Dave coming to you as a friend or as part of the personnel role that you had?
**A. Likely both.**
MR. McKIRGAN: Object to form and foundation.
**THE WITNESS: Likely both.**

BY MR. PEREZ:
Q. Because I think I guess I've covered this, which is you didn't get a call from someone in the athletic department saying "We've sent Dave over to you. We've terminated him"?
**A. No.**
Q. Because the first you're hearing of it is when Dave walks in your office?
**A. That's correct.**
Q. So was Dave yelling, screaming, raising his voice at that time?
**A. No.**
Q. Did he threaten to file a lawsuit at that time?
**A. I don't recall.**
Q. It's not in your notes, correct?
**A. It's not in my notes.**
Q. You say "I rehashed prior advice."
**A. Correct. Likely pertaining to the severance.**
Q. Okay. So you're still trying to find an amicable solution?
**A. Yes.**
Q. You say you asked him to try to stay objective. What does that mean?
**A. I don't recall. I may have asked him to just -- if I use the word "objective," I would have**

**meant take a step out of the situation and look at it from different viewpoints. In other words, remove their emotion and try to be strategic and tactical about how you make your decisions.**

**People are usually under a high degree of stress when they find themselves in a situation that Dave was in. And I always remind people that we don't make our very best decisions when we're under stress.**

Q. You say at the end of your notes, you say you offered six months. Was that a conversation you had with someone?

**A. Yes. I would not have offered had I not been given the approval. Because that money would not have come out of my budget. It would have come out of the athletics department.**

Q. So when you say "six months," that was a conversation you would have had with Ray at some point. Do you remember when that six-month approval occurred?

**A. It could have been in that larger meeting that we've previously discussed.**

Q. Okay.

**A. And again, that's likely why I expressed surprise because I thought we were going down the severance track.**

Q. You say you asked Dave to think about it over

the weekend?
     **A. Yes.**
     Q. And so when you say "think about it," again, in your mind, the "it" is severance?
     **A. Severance.**
     Q. And then you have a call that says reconvened call with group on August 15?
     **A. Yes.**
     Q. And that is a call that -- who initiated it?
     **A. I don't recall.**
     Q. What occurred during that -- let's start with this. Who was at that call?
     **A. I don't recall specifically. I would surmise that they were the same participants that were in the prior call.**
     Q. But you don't know that?
     **A. I don't recall specifically.**
     Q. Okay. Do you remember if general counsel was in that call?
     **A. I believe she was.**
     Q. Do you remember if Frank Ferrara was in that call?
     **A. I don't recall specifically.**
     Q. Do you remember if Amy Schramm was in that call?

A. **She would have been in that call.**
Q. Do you remember if Jean Boyd was in that call?
A. **I don't recall.**
Q. Do you remember if Ray Anderson was in --
A. **Ray Anderson would have been in that call.**
Q. Let me ask you, at any point prior to this 8/15 call, did you reach out to Amy Schramm and say "What's going on over there? I didn't see this coming"?
A. **I don't recall.**
Q. Because you said earlier that normally this might come to you through Amy to you, correct?
A. **Uh-huh.**
Q. Yes?
A. **Yes. I'm sorry.**
Q. But that didn't occur in this case, correct?
A. **I don't recall us having a conversation, a one-on-one conversation with Amy.**
Q. At any point?
A. **At any point.**
Q. Even after the fact?
A. **I don't recall.**
Q. All right. Because the other option you said is sometimes it would come through the specific -- I think you said department, HR person.
A. **Right.**

Q. But then you said it might come through one of your consultants?

**A. Right.**

Q. It didn't come that way?

**A. It did not come that way.**

Q. So at this point, are you thinking, what could I have done or what could my team have done to keep me in the loop?

**A. I don't recall having that conversation with myself. I don't recall.**

Q. Do you recall having a different conversation with yourself about this process?

**A. I just recall wondering why there was so much emotion around this and why people had to move so fast.**

Q. Why it went from 0 to 60 from August 12 to August 15?

**A. That's correct.**

Q. And as you sit here today, have you formed an opinion about that?

**A. I do not know why. I do not know why it moved as quickly as it did.**

Q. And would it be fair to say that it was your position in your calls with all the parties "Let's slow things down. Let's take the emotion out of it"?

**A. That's correct.**

Q. And you felt that that was coming from all sides, the emotion?

**A. Yes.**

Q. So was there anyone else in that call on August 15 besides the people we mentioned?

**A. I don't recall.**

Q. Dr. Crow was not in that call?

**A. No. I can tell you he was not in that call.**

Q. In your notes, you said "I told him that Dave was angry."

**A. Yes.**

Q. "But that offer had been made," meaning the six-month offer?

**A. That's correct.**

Q. So you conveyed to them what you had been saying all along, the severance, amicable solution, I've offered the six months that we agreed to?

**A. That's correct.**

Q. You say "Also called Shangraw" and then you put "before the larger meeting." Do you see that?

**A. Yes.**

Q. So that means before you had the call with the group, you had a conversation with Rick Shangraw?

**A. Yes.**

Q. And what was that call?

**A. I just wanted a different point of view again. Because I wanted somebody who was not in the direct transaction line to see what another respected executive's position would have been on this.**

Q. And what occurred during that call?

**A. I don't recall the specifics. I do recall that we talked about the matter generally. I do recall asking him about the matter pertaining to the sexual harassment issue, and he was aware of it.**

**I do recall telling Rick that I was still trying to negotiate a soft landing for everybody involved. And I recall Rick agreeing that that was a good strategy.**

Q. Do you recall Rick telling you that he had had a call with Dr. Crow surrounding this incident?

**A. I don't recall that.**

Q. You don't recall one way or the other?

**A. I do not recall that. I do not recall that Dr. Crow was involved.**

**Excuse me, let me be more precise. I do not recall being aware that Dr. Crow was involved.**

Q. In either the sexual harassment incident or the termination incident?

**A. Yes. I was not aware of Dr. Crow's involvement.**

Q. What came out of that meeting on August 15?

**A. Which meeting?**

Q. The meeting you had with the larger group.

**A. I believe that we just -- I agreed to continue to work this severance angle. There was no decision made at that meeting to terminate him.**

Q. Well, they had already terminated him.

MR. McKIRGAN: Object to form.

Go ahead.

**THE WITNESS: I think that's a matter of semantics. I don't think they had terminated him.**

BY MR. PEREZ:

Q. When Dave came to you on August 15 and said he had been fired, do you think that's a matter of semantics?

**A. Well, I think people have very selective hearing when they're stressed. And I believe it was possible that he interpreted this severance offer as a termination. That was my thinking at the time.**

Q. So you think what they conveyed to him on August 15 was an offer of severance?

**A. Something along those lines.**

Q. Were you aware that they walked him out of the building?

**A. I was not aware of that.**

MR. McKIRGAN: Object to form. Vague.
If you would just allow me to make my objections.
BY MR. PEREZ:
Q. Were you aware that they told him that he could not come back into the building to get his stuff until that had been approved?
**A. I was not aware of that.**
Q. Does that sound like a severance mutual agreement?
**A. Not to me.**
Q. It sounds like a termination?
**A. It sounds like a termination to me.**
Q. Let's say, for the sake of argument, that it was an administrative leave circumstance. Would you normally escort someone out of the building for administrative leave?
**A. No.**
MR. McKIRGAN: Object to form. Mischaracterizes.
Go ahead.
**THE WITNESS: No.**
BY MR. PEREZ:
Q. I believe when Mr. Cohen was escorted out of the building, that Amy Schramm was part of that escort

team.

MR. McKIRGAN: Object to form. Mischaracterizes the evidence.

Go ahead.

MR. PEREZ: If you'd hold your objections until after my question.

BY MR. PEREZ:

Q. Did you ever have a conversation with Amy Schramm about her involvement in how Dave Cohen was informed of his termination?

MR. McKIRGAN: Same objections.

**THE WITNESS: No.**

BY MR. PEREZ:

Q. Were you surprised that Amy Schramm would participate in that process of walking Mr. Cohen out of the building?

MR. McKIRGAN: Object to form.

**THE WITNESS: I'm not sure I understand what you're getting at with your question. Can you be -- again, can you rephrase or ask me the same question?**

BY MR. PEREZ:

Q. Of course.

Would you normally expect the HR person, in this case, Amy Schramm, to be involved with

escorting someone out of the building?

**A. That would be dependent on the circumstances of any particular situation.**

Q. So it's not atypical; it happens from time to time?

**A. It happens from time to time.**

Q. Would it be fair to say that one of the reasons why you might have someone like Amy involved is because you would expect that the person would go quietly?

**A. Again, situation dependent. I think it would depend on a variety of factors. If you thought somebody was a risk to the organization or to the systems or something along those lines, then I would expect somebody to be physically escorted out of the building.**

Q. And you would expect, probably, security to be involved, correct?

**A. In some cases.**

Q. I mean, if you thought there was going to be some type of destruction or lack of cooperation, would it be fair to say you would get security involved?

**A. Yes. That's happened on rare occasions.**

Q. But as you sit here today, you do not recall why it was that Amy was involved in that escort process?

**A. I do not recall.**

Q. Do you remember anything else about what you did?

So you told us about the call that you had with the group on August 15. You told us about your conversation with Rick Shangraw before that meeting. Do you remember anything else that occurred with regards to David Cohen on August 15?

**A. No.**

Q. It was those two calls?

**A. Yep.**

Q. And again, would it be fair to say that if something had occurred, you would probably have a notation in Exhibit 84?

**A. That's correct.**

Q. In your notes -- I'm referring to Exhibit 87 -- when you talk about that first meeting with Mr. Cohen, you say that he showed you how Mr. Wear had groped his wife, or he told you how he groped his wife?

**A. Yes.**

Q. Did he show you that? Did he physically show you that?

**A. He made this kind of a motion, like in other words, this person's hands going around the perimeter of these women's bodies.**

Q. Okay. You also note that Shangraw was antsy. And again, I don't know whose words these are. These are the notes taken --

**A. Right.**

Q. -- from somebody else.

That Shangraw was antsy that Ray hadn't addressed him. Do you see that?

**A. Yes.**

Q. Tell me about that. What was Shangraw's take on it? And again, this would have been dated back to August 12.

**A. I think he would have had the same opinion about the matter that I did, that it's a pretty serious allegation and it should have been acted upon.**

Q. Are you still working at ASU?

**A. No.**

Q. When did you leave?

**A. I retired in July of 2022.**

Q. And was there any reason for the cut?

**A. Time to retire. So I can go golfing at 1:00 on a Friday afternoon.**

Q. Oh, I'm sorry. That's the last thing I want to do.

**A. No, it was just time to go. I left on a very good note. My mom was dying of Alzheimer's, and I had**

**other things to do. My wife and I are travelers. It was just time to move on.**

Q. Well, congratulations.

**A. Yep.**

Q. Your next note refers to an August 19th interaction. And let's look at Exhibit 89.

Do you see there's an exchange: "Hi, Dave. Have you given thought to how you want to proceed? Let me know how I can help"?

**A. That's correct.**

Q. And I believe as your notes reflect, Dave did not answer that question?

**A. Yeah. At this point, Dave stopped responding to my texts.**

Q. Well, with regards to the severance, he did.

**A. With regards to anything. Dave didn't text me. I sent him several texts, and I never heard back.**

Q. Okay. Well, let me refresh your recollection. So I'm going to show you Exhibit 90, which actually is another text with Dave.

(Deposition Exhibit No. 90 was marked for identification by the court reporter.)

BY MR. PEREZ:

Q. And just so I'm clear, earlier you said you had reviewed documents in preparation for today's

testimony --

**A. Yes.**

Q. -- and you talked about texts. Were these the texts that you had reviewed?

**A. Some of them, not all of them.**

Q. But this is the document you were talking about?

**A. Let me read the text to make sure I can refresh myself.**

**I don't recall reviewing this text in our prior meeting.**

Q. Let me ask it differently. Was there a document that you reviewed that is not before you?

**A. No.**

Q. So now let's look at Exhibit 90. So you see that Dave actually did reply to you.

**A. Yes. Yes, I guess he did.**

Q. And that was specifically with regards to the OGC, Office of General Counsel, investigation, correct?

MR. McKIRGAN: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. And at this point now, it is fair to say that an investigation has been initiated, correct?

**A. I do not know specifically when they launched**

**their investigation.**

Q. Well, you knew that when you met with Ray on August 12, it had not been launched?

**A. That's correct.**

Q. And so some point between the 12th and the 20th, an investigation had been launched, correct?

**A. I believe so, but I can't say specifically that I had specific knowledge of that.**

Q. Okay. So when you're talking about Dave cooperating with the investigation, are you saying it's possible that it hasn't been launched yet?

**A. Well, I used the term "OGC will be investigating," which, to me, implies that they had not yet investigated.**

Q. Fair enough.

Was that the first conversation you had with Mr. Cohen about cooperating with any investigation?

**A. Yes.**

Q. I'm just curious because Dave's reply is "Of course we will cooperate." So had he ever given you an indication that he would not cooperate?

**A. Huh-uh.**

THE COURT REPORTER: What was your answer?

**THE WITNESS: No.**

BY MR. PEREZ:
Q. And as he says in his response: "We're glad that the university is finally taking these allegations seriously." Do you see that?
**A. I do.**
Q. And was that something that he had conveyed to you in your prior conversations, that he wanted somebody to take this seriously?
**A. Yes.**
Q. And you see at that point on August 20th, he says to you: "I plan to respond before the end of the week about the severance"?
**A. That's correct.**
Q. So as far as you know, that solution was not yet off the table. Is that right?
**A. Yes. That's correct.**
**Again, we went from offering severance, to Dave saying he had been fired, to me saying "I don't think that's the case." And then as these indicate, we were still having conversations about severance.**
Q. Did you know that Ray Anderson called a meeting shortly after he fired David on August 15, informing the people in the athletic department that he had just fired Dave?
**A. I am not aware of that meeting.**

MR. McKIRGAN: Object to form. Mischaracterizes the record.

Go ahead.

**THE WITNESS: I am not aware of that meeting.**

BY MR. PEREZ:

Q. Is that something that you would expect to happen?

**A. No.**

MR. McKIRGAN: Object to form. The same objection.

BY MR. PEREZ:

Q. In your position as an HR director, would it be fair to say that you believed that there's a certain sanctity to termination decisions?

**A. Yes.**

MR. McKIRGAN: Object to form. Vague.

Go ahead.

BY MR. PEREZ:

Q. And to the extent that there are reasons that are conveyed to an employee as to why or if or how or when that person is terminated, that is not something for public dissemination?

**A. I agree with that wholeheartedly.**

Q. You certainly wouldn't recommend calling a

meeting to advise everyone?
**A. No.**
Q. There's been some suggestions here that Mr. Cohen should have gone to a Title IX coordinator.
Is that something that you would have recommended him doing with the allegations involving these three women, nonemployees, nonstudents? Would you have suggested he go to a Title IX coordinator?
**A. I would not have made that suggestion.**
Q. Meaning what? Meaning that's not what you would have done?
**A. I would have recommended that he would have gone to the Office of University Rights and Responsibilities, which is responsible for investigating Title IX complaints, but other types of complaints as well: Title VII, Title IX, ADA complaints.**
**I would not have said go to a Title IX coordinator, because it was not within the purview of a Title IX coordinator to launch an investigation.**
Q. And, in fact, when you said -- let me rephrase that.
And, in fact, your testimony is Dave did what he should have done; he went to Ray Anderson?
**A. That's correct.**

Q. And so it would have been Mr. Anderson who would have gone to one of the offices that you suggested?

**A. That's correct.**

Q. But not Mr. Cohen?

**A. Our advice and our training is, if you feel there's a legitimate reason not to work an issue through your supervisor, then take it to the case yourself. But don't let the matter just sit there.**

**But if you can articulate a reason, maybe your supervisor is part of the investigation, then it's totally appropriate to go outside that chain.**

Q. Well, what if your supervisor tells you he's handling it?

**A. If my supervisor told me he was handling something and I had no reason to doubt that he wasn't, then I would likely not go on my own.**

Q. In other words, you had fulfilled your duty --

**A. Pretty much.**

Q. -- by going to your supervisor?

**A. Yes, correct. And once I handed him or her the matter, it was up to them to proceed.**

Q. Did you become aware at any point that Mr. Anderson was still interacting with Bart Wear as a donor without addressing the issue of the sexual

harassment?

**A. I would have no knowledge of that.**

Q. Did you become aware that Mr. Anderson went on a golf weekend with Mr. Bart Wear in a private jet, and Mr. Edwards, to -- I believe it was Pebble Beach for a golf weekend?

MR. McKIRGAN: Object to form.

**THE WITNESS: I would have no knowledge of that.**

BY MR. PEREZ:

Q. Were you aware that, again, while these allegations of sexual harassment are hanging, in other words, there's been no investigation, initiation, reporting, that Mr. Wear was still allowed to participate in ASU team events, like traveling with the team to a Michigan State football game?

MR. McKIRGAN: Object to form.

**THE WITNESS: I would have no knowledge of that.**

BY MR. PEREZ:

Q. As the VP and someone in HR, would you recommend that those interactions should still occur?

MR. McKIRGAN: Object to form.

Go ahead.

**THE WITNESS: After receiving an**

**allegation like that?**

BY MR. PEREZ:

Q. Yes.

MR. McKIRGAN: Object to form. Mischaracterizes.

Go ahead.

**THE WITNESS: I would advise against it.**

BY MR. PEREZ:

Q. You would not recommend it?

**A. I would advise against it. I would not recommend it.**

Q. There became a point in time during the summer when Mr. Anderson told Mr. Cohen that he hadn't gotten around to talking to Bart Wear, and he said, "I'll take it up after the summer."

Would you recommend that type of delay with the allegations that occurred?

**A. Absolutely not.**

MR. McKIRGAN: Object to form.

**THE WITNESS: Nope, I would not recommend that.**

BY MR. PEREZ:

Q. Would you recommend that the two things be connected, meaning talking to the person who was accused of sexual harassment and reporting to initiate

an investigation?
MR. McKIRGAN: Object to form.
**THE WITNESS: That would be a practice I would discourage.**
BY MR. PEREZ:
Q. In other words, would it be fair to say that independently, if you received the sexual harassment allegations, you would report that? The conversations that you had with the other person would be a separate matter?
**A. The person who is making the allegations or the subject of the complaint?**
Q. The subject of the complaint.
MR. McKIRGAN: Object to form. Incomplete hypothetical.
But go ahead.
**THE WITNESS: Yeah, I just don't know how to answer that. I'm not sure I understand enough of your question.**
BY MR. PEREZ:
Q. It's a tough question.
**A. Yeah.**
Q. It's a tough question to ask because when Ray Anderson tells Mr. Cohen that he's taking care of it but he needs to talk to Bart Wear, I'm trying to

understand why he needs to talk Bart Wear before he takes care of it.

So my question to you is, would you link those things together, "I've got to talk to Bart Wear before I initiate the investigation"?

MR. McKIRGAN: Object to form. Lack of foundation. Incomplete hypothetical.

**THE WITNESS: Yeah, I just can't answer that question. I'm sorry. It's just not registering with me for some reason.**

BY MR. PEREZ:

Q. Well, let me try to give you a hypothetical.

**A. Okay.**

Q. If somebody comes to you and reports an allegation of three women being harassed, and the subject of that allegation is a donor of ASU, would you think you need to have a conversation with that subject before you can initiate the investigation?

**A. No.**

MR. McKIRGAN: Object to form. Incomplete hypothetical.

**THE WITNESS: No.**

BY MR. PEREZ:

Q. Because your duty to report is your duty to report?

**A. Yeah, that's an internal matter.**

Q. And the ASU's policies -- and I'm referring to a couple of the policies in the Academic Affairs Manual, Policy 401, that says: "Unless a person is restricted by law from doing so, any employee who is informed or has a reasonable basis to believe that sexual harassment has occurred, shall immediately report all information regarding the occurrence to the Office of University Rights and Responsibilities."

Is that your understanding of the policy?

**A. That's correct.**

Q. And that's when you talk about the duty to report?

**A. That's correct.**

Q. Section 401 goes on to say: "Failure to report and/or inaction may be cause for disciplinary action."

**A. That's correct.**

Q. In other words, if Dave did not report those things, that's cause for disciplinary action?

**A. It potentially could be.**

Q. And so is it fair to say that Ray Anderson's failure to report is cause for disciplinary action?

**A. It's possible.**

MR. McKIRGAN: You're reading from which policy again?

MR. PEREZ: 401.
BY MR. PEREZ:
Q. As you sit here today, are you aware whether or not any disciplinary action was ever taken against Mr. Ray Anderson?
**A. I'm not aware of such action.**
Q. In this August 12 time frame, did you have any interactions with Mr. Jim Rund regarding the conversations he was having with Dave Cohen?
**A. I don't recall.**
Q. I know at one point, and I think your notes reflect this, that Dave told you that he was going to talk to Jim, that he did talk to Jim. In one of the texts that he sent, you said he had a 90-minute conversation with Jim. Do you remember those?
**A. I do.**
Q. Okay. But do you recall ever having a conversation with Jim about what was being discussed?
**A. I don't recall. I recall only talking to Rick Shangraw.**
Q. Did Mr. Rund or Mr. Cohen ever tell you that during those conversations, it was Mr. Cohen's desire to maintain his relationship with ASU and to do everything he could to be a good employee?
**A. I recall him saying that he -- I think we**

**covered this ground about an hour ago, that he did want to stay.**

Q. But also, that he was willing to do whatever he needed to to make it reparable?

**A. I don't remember that.**

Q. So you've testified a few times, sir, or you've hinted at, that you did not believe that Mr. Cohen was terminated, that he might have heard that wrong?

**A. It's possible. I mean, that was what I thought when he told me because I was clearly working the severance track.**

Q. But do you have any independent information that he was not terminated on August 15?

**A. No.**

Q. So you're saying that based on your understanding, that nobody had talked to you about him being terminated?

**A. That's correct. I was surprised.**

Q. Have you had any conversations with Ray Anderson or anybody else posttermination?

**A. Nope.**

Q. You note that there was an investigation and that you weren't aware of the outcome of that investigation?

**A. I never asked about the outcome, and it was**

**never provided to me.**

Q. And so it would be fair to say that you don't know what recommendations came out of that?

**A. That's fair.**

Q. And it would also be fair to say that you don't know whether or not there was a decision to terminate Mr. Cohen after that investigation?

**A. I was not aware of that decision.**

Q. On December 15, Mr. Cohen received a letter saying that he was terminated. Were you aware of that letter that went out?

**A. I was not.**

Q. Are you familiar with Sandy Hatfield Clubb?

**A. No.**

Q. Ms. Clubb had an opportunity to engage ASU's athletic department as part of the teambuilding cultural improvement effort. Were you involved in that?

**A. I was not.**

Q. Is that something you'd normally be involved in?

**A. A dean or somebody might call me asking for a referral for someone to come do teambuilding. But it's not just said and true.**

Q. But in this case, you didn't get that call?

**A. I was not aware.**

Q. And in this case, do you even know who Sandy Hatfield Clubb is?

**A. I do not.**

MR. PEREZ: Good news. We are very close. Thank you for moving your time for us.

**THE WITNESS: No problem. I'd like to have everything wrapped up too so we can all move on.**

MR. PEREZ: Great.

Counsel, maybe you can help me short-circuit this. I'm trying to find the name of the person -- the other person that met with David Cohen. Kevin Hellman?

MR. McKIRGAN: Yes. Kent --

**THE WITNESS: Kent Hellman.**

MR. McKIRGAN: -- Hellman.

**THE WITNESS: Kent Hellman, yes.**

MR. PEREZ: Kent Hellman. Okay.

BY MR. PEREZ:

Q. So are you familiar with Kent Hellman?

**A. I do know Kent. He's a friend of mine.**

Q. Okay. And he was the one who was doing the executive coaching for Mr. Cohen. Were you aware of that?

**A. I became aware of it. I can't remember if I**

**became aware of it through David or through Kent.**

**It's not likely Kent would have told me because most executive coaches have a code of ethics. They don't tell you who they're coaching.**

Q. Is he a name that you would refer to departments?

**A. Absolutely. Kent's a good guy.**

Q. And when Kent came in to assist people in his executive coaching capacity, would it be fair to say that there's no implication of a negative or a positive that you take from that?

**A. I don't take any inference.**

Q. Okay. Because he helps people, right?

**A. Absolutely.**

Q. He does positive things too?

**A. Absolutely. We all have our strengths and weaknesses. Our goal is to maximize our strengths and mitigate our weaknesses.**

MR. PEREZ: Counsel, I will pass the witness.

MR. McKIRGAN: I just got a few quick questions.

EXAMINATION

BY MR. McKIRGAN:

Q. So first I want to go to Policy 4.01, which provides, in part, the part that Counsel pointed to.

It says: "Unless a person is restricted by law from doing so, any employee who's informed or has a reasonable basis to believe that sexual harassment, including Title IX sexual harassment, shall immediately report all information regarding any occurrences to the Office of University Rights and Responsibilities or the Title IX coordinator or the Dean of Students Office."

So that mandatory duty applies to all employees?

**A. Yes.**

Q. And if you receive information, you are to go to one of three places: the ORR, Title IX coordinator, or the Dean of Students Office?

**A. That's correct. But in this case, to be precise, the Dean of Students would not have played a role.**

Q. What?

**A. The Dean of Students would not have played a role in this matter. That speaks to the student side.**

Q. So is it true that Mr. Cohen, as an employee, had a duty to go to the ORR or the Title IX

coordinator?
**A. Well, I believe the way we trained on this was first stop is always your supervisor, unless your supervisor is compromised or can't be trusted.**
Q. Okay. Or unless your supervisor -- you've come to the conclusion that your supervisor's not taking action?
**A. Responsive, yes.**
Q. In all your dealings with this situation, the Bart Wear situation, the David Cohen situation, any indication or information that Dr. Crow was involved in the decision to launch the investigation, the decision involving how to deal with David Cohen? Any reason to believe Dr. Crow was ever involved?
**A. I was not aware that Dr. Crow was involved. And had he been involved, I would have remembered it.**
Q. Okay. If you'd go to Exhibit 87 really quickly.
If you go to the first page, that last paragraph. This is from your interview with the investigator. There's a notation: "Allegations about Ray. Look into Ray."
Do you recall on August 12, Mr. Cohen saying words to you that somebody should look into Ray?
**A. Yes.**

Q. And Ray does things his own way?
**A. I recall that.**
Q. Do you recall Mr. Cohen telling you that Ray was sleeping with an administrative person?
**A. I do not recall that.**
Q. Do you recall telling the investigator about that?
**A. I'm looking in these notes. It looks like I did, but that's just -- I don't recall that now. But I would rely on my answer to this question back in 2019.**
Q. Okay. Do you recall Mr. Cohen raising issues about Ray spending too much money?
**A. Yes.**
Q. And Ray likes to hire friends?
**A. I don't recall him saying hiring friends, but I do recall Dave intimating or implying that Ray likes to hire African-American employees.**
Q. Did Dave use the term "All about blacks"?
**A. That's what he said.**
Q. And if you would go to Exhibit 84, you note that in your note, you have that quote?
**A. Yes.**
Q. Is that because that's the words Mr. Cohen used?
**A. Yes.**

Q. Do you recall whether any of this stuff that Mr. Cohen was conveying to you on August 12, did you convey any of that back to Ray Anderson?

**A. I did not. I do not recall specifically talking about the comments about the way Ray was running the department. I think I was more focused on the allegation itself.**

MR. McKIRGAN: Okay. That's all I have.

MR. PEREZ: All right. Let me come back to those two issues.

FURTHER EXAMINATION

BY MR. PEREZ:

Q. You stated in your notes, and I believe testified, that Mr. Cohen was upset when you met with him on August 12, correct?

**A. That's correct.**

Q. And I believe your notes said that -- or maybe it's in the notes that you gave to the investigation group, that "Dave was blowing off steam." I think that was the phrase that was used. Is that fair to say?

**A. Likely. I have a tendency to speak in metaphors and colloquialisms and whatnot.**

Q. He was venting?

**A. He was venting.**

Q. He was frustrated?

**A. Yeah, it was like a -- I always characterize somebody whose balloon is full and they're just letting the air out.**

Q. Which is probably not uncommon when people have been terminated or about to be terminated?

**A. It's very common.**

MR. McKIRGAN: Object to form. Foundation. Mischaracterizes the record.

Go ahead.

**THE WITNESS: It's common.**

BY MR. PEREZ:

Q. And in addition, I believe as Counsel just asked, when people blow off steam and talk to you in those situations, that's not something that you would report back, for example, this instance to Ray Anderson?

**A. Not necessarily.**

Q. And in this instance, did you?

**A. I do not recall that. I just recall talking to Ray about the sexual harassment allegation.**

Q. You also, I believe, testified earlier that you didn't know anything about this situation until August 12th. Is that correct?

**A. That's correct.**

Q. And so to the extent Mr. -- and then you didn't know anything about this situation after Mr. Cohen was terminated. For example, you didn't know about the investigation being launched, correct?

**A. I knew that an investigation was going to be launched, but at that point, I was not aware that it had been launched.**

Q. And you also didn't know about the letter that went to Mr. Cohen terminating him on the letter that said on December 15th?

**A. I was not aware of that letter.**

Q. So it's fair to say that there's a fair amount of things that occurred. Your involvement was relatively limited?

**A. This is how I would characterize it. Once I became aware that Dave had retained counsel, I left it with our OGC to manage the issue the rest of the way.**

Q. So to the extent that Dr. Crow may have been involved prior to August 12, you would have no way of knowing?

**A. I would have no way of knowing that.**

Q. And to the extent that something involving Dr. Crow occurred after your initial involvement and Mr. Cohen retained counsel, you have no way of knowing that?

A. I would have no way of knowing that.

MR. PEREZ: Thank you.

We're off the record.

(The deposition concluded at 11:30 a.m.)

* * * * * *

__________________________________

KEVIN JOHN SALCIDO

CERTIFICATE OF CERTIFIED REPORTER

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in voice dictation and thereafter reduced to print under my direction; that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 (J)(1)(g)(1) and (2).

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

[X] Review and signature was requested; any changes made by the witness will be attached to the original transcript.
[ ] Review and signature was waived/not requested.
[ ] Review and signature not required.

Dated in Phoenix, Arizona, this 19th day of April 2024.

______/s/ Cindy Bachman________
CINDY BACHMAN, CVR

Certified Reporter

Arizona CR No. 50763

*     *     *     *     *

I CERTIFY that GRIFFIN GROUP INTERNATIONAL, has complied with the ethical obligations set forth in ACJA 7-206(J)(1)(g)(1) through (6).

_____/s/Pamela A. Griffin____
GRIFFIN GROUP INTERNATIONAL
Registered Reporting Firm
Arizona RRF No. R1005

GRIFFIN GROUP INTERNATIONAL -ERRATA SHEET - CHANGES IN TESTIMONY

3200 East Camelback Road Suite 177 Phoenix, Arizona 85018

Cohen vs Arizona Board of Regents, and Anderson-Kevin John-Salcido-April 04, 2024

Errata & Signature due no later than May 24, 2024.

| PAGE | LINE | CORRECTIONS/CHANGES | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

_____________________________ __________

SIGNATURE OF WITNESS DATE

Exhibits

**Salcido 040424 Exh 84**
12:5,6,17 71:7,12, 13,19 78:13 87:22 101:14 122:20

**Salcido 040424 Exh 85**
48:19,21,23

**Salcido 040424 Exh 86**
49:14,15 73:25 75:6

**Salcido 040424 Exh 87**
53:6,10 101:16 121:17

**Salcido 040424 Exh 88**
54:12,13,16

**Salcido 040424 Exh 89**
72:22,23 73:5 77:22,24 83:24,25 103:6

**Salcido 040424 Exh 90**
103:19,21 104:15

0

**0**
94:15

1

**1**
11:22

**10:34**
86:3

**10:42**
86:4

**10:49**
49:25

**11**
49:9

**11:30**
126:4

**12**
30:4,8,12,23 36:19 38:25 39:1,15,17 42:10 49:9 52:9 55:17,20,23 58:22 59:12 61:25 63:15 64:7,9 68:11 94:15 102:11 105:3 115:7 121:23 123:2,16 125:19

**12th**
32:9 36:2 52:1 54:3 64:23 83:19 105:5 124:24

**13**
49:6,8,19,21 70:23 71:5 72:2,5 77:20

**13th**
73:15

**14**
36:19 77:21 78:3, 14 79:11

**14th**
78:8 84:2 86:15 88:4

**15**
85:7,22 86:6 87:21 88:2,18 89:7 92:7 94:16 95:5 97:1, 13,21 101:5,8 106:22 116:13 117:9

**15th**
10:19,21 79:9 86:8,15 87:5 125:10

**17**
25:16

**1988**
16:1

**1992**
16:4

**1993**
18:12

**1996**
16:4

**19th**
103:5

**1:00**
102:20

2

**2000**
19:12,13,25 21:4, 6,11

**2000s**
6:20

**2002/2003**
21:11

**2003**
21:25 22:4

**2006**
22:4

**2007**
22:6,13,14 23:3

**2009**
23:24 24:4

**2012**
24:7

**2016**
25:6

**2017**
25:6

**2018**
25:6

**2019**
29:2 30:6,9,12 31:13 49:6,20,21 59:12 122:10

**2022**
102:18

**2024**
24:4

**20th**
105:6 106:10

**25th**
31:12 32:8

3

**33**
14:19

**34**
14:19

4

**4.01**
120:3

**401**
114:4,15 115:1

5

**5,000**
20:25

6

**6-**
37:4

**60**
11:11 94:15

**66**
18:23

7

**7**
18:23 22:5

**700**
37:4

**7:38**
84:5 85:8

8

**8/12**
13:5

**8/15**
93:6

**80s**
15:12,25

**84**
12:3,5,6,17 71:7, 12,13,19 78:13 87:22 101:14 122:20

**85**
48:19,21,23

**86**
49:14,15 73:25 74:4 75:6

**87**
19:25 53:6,10 101:16 121:17

**88**
19:20 54:12,13,16, 19,20,23

**89**
72:22,23 73:5 74:4 77:22,24 83:24,25 103:6

9

**90**
20:1,3 103:19,21 104:15

**90-minute**
115:14

**90s**
6:19 15:13

**92**
17:5 19:8,9,20,23 20:12

**94**
17:8 20:3,5,7,12

**96**
17:5,9 18:3 19:8,9, 11,12,23 20:3,5,7, 15 21:4

**99**
18:3 19:4,11

A

**a.m.**
84:5 86:3,4 126:4

**absent**
11:7

**Absolutely**
18:16 63:19 111:18 119:7,14, 16

**Academic**
114:3

**accept**
46:17,24
**accurate**
9:2,5 10:24
**accused**
111:25
**acted**
62:13 102:14
**acting**
41:19 43:15
**action**
114:16,19,22 115:4,6 121:7
**active**
79:24
**ADA**
108:16
**added**
43:7
**addition**
124:13
**addressed**
57:19 102:7
**addressing**
109:25
**administration**
18:10
**administrative**
24:22 98:15,17 122:4
**advancements**
29:23
**advice**
51:14 89:5 90:17 109:6
**advise**
108:1 111:7,10
**advocate**
85:5
**Affairs**
114:3
**affinity**
40:3
**African-american**
122:17
**afternoon**
102:21
**agency**
47:13 48:13
**agitated**
39:13 43:15 58:17
**agree**
10:11 81:20 107:24
**agreed**
70:10 81:8 95:17 97:4
**agreeing**
82:3 96:12
**agreement**
70:1 82:17 98:10
**ahead**
19:24 28:2 36:5 39:21 41:7,17 48:4 59:16 62:18 65:5 75:22 89:2 97:9 98:21 99:4 107:3, 18 110:24 111:6 112:16 124:10
**air**
124:4
**allegation**
32:16 33:21 40:19 42:1,2,6 64:4,21 102:14 111:1 113:15,16 123:7 124:21
**allegations**
40:17 41:25 59:11, 20 106:3 108:6 110:12 111:17 112:8,11 121:21
**alleged**
58:21
**alleging**
6:5
**allowed**
110:14
**Alzheimer's**
102:25
**amicable**
90:20 95:16
**amount**
58:15 125:12
**Amy**
14:1 36:11 37:22 54:17,24 55:2 78:14,23 79:2 81:7,14,16 82:2 92:24 93:7,11,17 98:25 99:8,14,25 100:8,24
**and/or**
114:16
**Anderson**
26:13 31:16,24 32:4 34:1,3,4,8,20, 22 37:8 38:8,11 42:22 44:2 58:10, 12 59:1,2,6,7,9,19 61:25 62:5,8,22 63:15,21 64:15,17, 23 65:9,15,22 67:16 68:11,25 69:7,15 70:4 79:15,18 80:2 93:4,5 106:21 108:24 109:1,24 110:3 111:13 112:24 115:5 116:20 123:3 124:17
**Anderson's**
62:24 65:17 114:21
**angle**
97:5
**angry**
95:10
**antsy**
102:1,6
**apologize**
20:4 61:22 75:25
**appears**
49:25 52:5
**applies**
120:12
**approached**
69:12
**approval**
91:13,18
**approve**
88:8
**approved**
87:24 88:11,12,16, 24 89:12,14 98:7
**approximately**
6:24 17:4
**APS**
17:19 19:8,10,22 20:3 22:17,19
**area**
80:22
**argument**
98:14
**Arizona**
15:1,17 16:3,5 18:14 19:22 20:11, 20 22:1,14
**articulate**
109:10
**articulated**
80:1
**askew**
19:5
**assist**
119:8
**assistance**
24:18
**associate**
23:23 24:5
**assume**
22:21 73:14
**Assumes**
66:13
**assumption**
69:3,7
**ASU**
5:3 6:12,14,22 8:15 18:5,15 23:3 24:20 31:1 35:24 36:17 39:16,24 41:3 44:19 77:9 102:15 110:15 113:16 115:23
**ASU's**
4:19 11:9 114:2 117:15
**at-will**
46:18
**athletic**
7:11,12 24:25 25:1,12 26:9,17, 18,22 42:5 90:4 106:23 117:16
**athletics**
13:2 54:7,9 91:15
**attention**
35:19
**attorney**
44:24 45:5 47:10, 19
**attorney-client**
9:16,23
**atypical**
38:19,20,21,23,24 45:22,23 100:4
**audible**
8:2
**August**
10:17,19,21 30:4, 8,12,23 32:9 36:2 38:25 39:1,15,17 42:10 49:6,8,9,19, 21 52:9 54:3 55:17,20,23 61:25 63:15 64:7,9 68:11 70:23 71:5 72:2,5 77:20,21 78:3,14 79:11 84:2 85:7,22 86:6,8,14,15 87:21 88:2,18 89:7 92:7 94:15,16 95:5 97:1,13,21 101:5,8 102:11 103:5 105:3 106:10,22 115:7 116:13 121:23 123:2,16 124:24 125:19
**aware**
26:18,20,23 28:24 29:3 33:25 34:2 41:18 53:4 56:15 57:6 64:3 84:18 96:9,21,24 97:23, 25 98:5,8 106:25 107:4 109:23

110:3,11 115:3,6 116:23 117:8,10 118:1,23,25 119:1 121:15 125:6,11, 16

**B**

**back**
18:9 19:16 22:1,18 30:19 35:9 39:7 47:3 57:23 59:12 62:10,24 70:22 78:12 83:24 85:11 87:10 98:6 102:10 103:17 122:10 123:3,9 124:16

**background**
7:19 14:16 16:13

**backlog**
16:16,18

**bad**
68:12,14 79:20

**balloon**
124:3

**Bank**
21:9 22:18

**Bart**
30:25 31:6 109:24 110:4 111:14 112:25 113:1,4 121:10

**based**
62:1 116:15

**basically**
36:16,22 42:16 46:23 58:13

**basis**
114:6 120:7

**Bates**
12:10,13

**Beach**
110:5

**began**
61:5

**behalf**
4:18

**behavior**
41:20

**believed**
60:12 62:2 107:14

**benefits**
24:17,19

**big**
20:24

**billion**
21:1

**bit**
7:21 14:17 15:5 19:5 26:15 30:21 39:13 58:15,16,17 71:2

**blacks**
122:18

**blow**
124:14

**blowing**
123:20

**board**
31:18 44:10,11

**Bob**
4:17 8:13

**bodies**
101:25

**body**
63:11

**bottom**
54:24

**Boyd**
31:19 42:22 93:2

**breaches**
27:7

**briefly**
6:2 66:1 68:4

**bring**
5:4,8

**brings**
42:16

**brought**
5:10 19:17 27:24 28:18 32:13 43:25 52:11,12 58:19 61:12 62:13

**budget**
91:14

**building**
24:22 39:8 97:24 98:6,16,25 99:16 100:1,15

**burden**
35:4

**business**
18:9 21:16 65:23, 24 68:7,19

**business-related**
59:3

**C**

**calendar**
78:19

**call**
33:2,5,6,13 35:4 56:14 57:25 58:2 68:21,25 69:19 71:5 72:14,19 73:16 74:13 76:5 78:4,22,25 79:2,5 80:20 81:2 83:23 84:2,24 86:13 88:3 90:3 92:6,7,9,12, 15,19,22,25 93:1, 2,5,7 95:4,7,8,22, 25 96:5,15 101:4 117:22,25

**called**
14:24 16:12 20:18 32:21 34:23 35:7 56:6 57:3 71:10 95:19 106:21

**calling**
58:10 107:25

**calls**
94:23 101:10

**campus**
24:23,24

**capacity**
6:8 7:9,10 23:4 119:9

**captain**
84:7 85:13

**captain's**
86:9 87:15

**care**
112:24 113:2

**career**
29:23

**careful**
56:9

**carefully**
10:3 15:5

**case**
5:5 6:21 7:3 13:23 14:13 28:4 32:20, 22 33:25 87:24 93:15 99:25 106:19 109:8 117:25 118:2 120:18

**cases**
5:25 6:1,3,10,12, 14,16,19 16:16,18, 19,21 100:18

**caught**
57:12

**central**
20:18 21:2 22:17 23:8 24:15

**certificate**
18:17,18,19

**certificates**
18:20

**Certified**
4:3

**chain**
14:21,23 109:12

**challenge**
76:11

**chance**
5:6 79:25 86:16

**change**
24:3,5 43:5 46:20 67:6 68:19 85:20

**changed**
67:21

**characterization**
28:17

**characterize**
124:2 125:15

**charge**
47:9,13 48:12,13

**charges**
44:24,25

**check**
70:21

**checking**
50:5,8,23

**chief**
63:9

**choice**
76:17

**circumstance**
98:15

**circumstances**
100:2

**clarifies**
67:23

**clarify**
34:10 36:14

**classify**
35:14

**clear**
16:15,17 61:24 68:10 103:24

**close**
118:5

**closed**
17:1

**Clubb**
117:13,15 118:3

**coach**
29:16,23 75:12

**coaches**
119:3

**coaching**
30:1 75:14 118:23 119:4,9

**code**
119:3

**Cohen**
4:21 13:13 25:2,4, 8 26:13,16 29:1 30:10,13,16,23 31:7,10 34:3,7,20

35:14 37:20 38:25 40:11,17 49:3 56:4 57:5,6 62:23 63:13 64:12,15,22,24 65:13 66:2,5 68:23 72:8 76:20 77:7,17 78:3 79:19 98:24 99:9,15 101:8,17 105:17 108:4 109:5 111:13 112:24 115:9,21 116:7 117:7,9 118:12,23 120:24 121:10,13,23 122:3,11,23 123:2,15 125:2,9,24

**Cohen's** 30:2 34:1 37:11 39:16 53:12 115:22

**colleagues** 51:6

**collection** 25:21

**college** 15:14,16,17,18

**colloquialism** 71:1

**colloquialisms** 123:23

**combined** 18:1

**comments** 40:12 47:8 82:4 123:5

**committee** 25:9,10,11 36:17 85:18

**common** 26:4,5 38:15 124:7,11

**commonly** 46:3

**communicating** 37:9

**communication** 56:10

**communications** 10:6 56:11

**company** 16:10,20 17:17,21 20:18,19,24,25 21:7,8

**compensation** 24:16

**complained** 29:4

**complaint** 80:20 112:12,13

**complaints** 26:21 108:15,16,17

**Compound** 67:1

**comprised** 36:18,22

**compromised** 121:4

**concept** 64:24

**concerned** 58:15 66:3

**concluded** 68:24 126:4

**conclusion** 121:6

**conclusions** 72:3

**conducted** 11:4 53:15

**confess** 24:20

**confirm** 10:23 63:21

**confusion** 20:4

**congratulations** 103:3

**connected** 111:24

**consecutively** 11:24

**considered** 35:15 46:7

**consistent** 88:7

**consultants** 36:12 94:2

**consulted** 27:18,19

**consuming** 47:11

**contact** 34:13

**contacts** 33:15

**context** 76:25 77:14 81:2

**continually** 62:7

**continue** 34:8 97:4

**continued** 85:5

**contract** 46:19

**conversation** 27:25 29:14 30:16 31:2,3 37:13 39:17 46:4 50:22 52:8 54:25 55:19 56:22 57:12 58:8,11,18 59:7,9 61:25 64:2 65:6 66:21,23 67:17 68:2,6,11 70:20 73:15 76:20 77:15 78:7,9,11 79:11 80:9,12,16 81:7 82:23 83:19,22 86:14 87:3,13,15,18 89:6 91:10,17 93:16,17 94:9,11 95:23 99:8 101:6 105:16 113:17 115:15,18

**conversations** 29:13 38:17 77:2,7 106:7,20 112:8 115:9,22 116:19

**convey** 60:11 64:17 123:3

**conveyed** 84:12 95:15 97:20 106:6 107:21

**conveying** 123:2

**convicted** 8:19

**cooperate** 105:21,22

**cooperating** 105:10,17

**cooperation** 100:20

**coordinate** 16:21

**coordinator** 16:12 17:6 108:4,8,19,20 120:11,16 121:1

**copies** 12:9 83:4

**copy** 5:13,15,16 12:12 13:18

**correct** 6:9,11 7:24,25 8:3 12:20,22 20:13 21:5 22:20 23:1,2 26:1 29:18,20,21 30:6,7,13,14,18 31:1,24,25 32:2 33:11,12,17,24 34:6 35:10 40:14,15 42:12 43:11 44:5,8 45:3,4 49:6,20 50:1,6 52:2 53:12,13 54:1 55:25 59:13,14 62:4 64:13 65:13,14 69:8 72:6,9 79:13 82:9,12,16,22 84:14,15,21 85:25 87:10,11,25 88:9,20 90:9,15,18 93:11,15 94:17,25 95:14,18 100:17 101:15 103:10 104:19,24 105:4,6 106:13,16 108:25 109:4,21 114:11,14,17 116:18 120:18 123:16,17 124:24,25 125:4

**council** 36:21

**counsel** 4:15 5:12 9:11,19,21 11:8,9 32:21 46:9 48:22 56:9,25 57:16 63:1,3,25 64:14,16 74:17,23,25 75:3,7,11 80:15 92:18 104:19 118:10 119:19 120:4 124:13 125:16,24

**Counsel's** 4:19

**counseled** 62:23

**countless** 46:9

**couple** 47:3 79:24 114:3

**court** 12:7 47:13 48:24 49:16 53:7 54:14 61:19 72:24 103:22 105:24

**cover** 10:1

**covered** 14:7 28:25 90:2 116:1

**create** 13:7

**created** 12:23 13:3,4,8 41:13

**criminal** 18:7

**Crow** 35:11 38:16 51:23 52:5,6,9 57:20,24 95:7 96:15,19,21 121:11,14,15

125:18,23
**Crow's**
52:10 96:24
**cryptic**
53:17
**cultural**
68:14 117:17
**culture**
42:3
**curious**
47:24 105:20
**cut**
64:10 102:19

**D**

**dance**
57:1
**date**
10:5,15 25:7 49:5, 9,10
**dated**
49:19 59:12 102:10
**Dave**
25:2,4,9 36:20,24 37:6 39:7,10,11,23 40:3,8,9 42:8,16 43:4 44:12 45:21 46:7,11,15 47:2,9, 19 51:2,11,17 52:4,9 55:9,20 58:14,16,20 59:11 62:19,23 63:7 64:24 65:20 66:7, 15,19,22 67:4,20, 25 68:16,23,25 69:3,9 70:13,21 73:8,15 74:7 76:2, 7,10,15 77:3 79:16,19 80:6 81:12,15,18,21 83:25 84:1,13 85:11 86:9,13 87:3,22 88:2,5,8, 17,23 89:8,19 90:4,8,10 91:7,25 95:9 97:13 99:9 103:7,11,13,16,20 104:16 105:9 106:18,24 108:23 114:18 115:9,12 122:16,18 123:20 125:16
**Dave's**
39:24 62:6,12 68:12,14 105:20
**David**
4:21 26:13 29:1 41:19 46:6 57:5,6 60:19,22 61:1 63:12 72:8 101:8 106:22 118:12 119:1 121:10,13
**day**
30:12 43:2 49:8 50:10 70:23 79:7,8 80:4,6 84:4,8
**day-to-day**
34:17 39:23
**days**
47:3 77:1 79:24 82:14
**deal**
121:13
**dealings**
121:9
**dean**
117:22 120:11,17, 19,22
**deans**
36:23
**December**
117:9 125:10
**decision**
27:20 28:19 37:10 46:17,24 65:23,24 68:19 70:15 71:3 76:17 84:11,19,22 88:4 97:5 117:6,8 121:12
**decisions**
28:16 41:10 91:4,8 107:15
**default**
71:9
**defendants**
4:18
**define**
26:25
**defunct**
14:21
**degree**
18:5,7,8 26:20 91:5
**degrees**
18:20
**delay**
111:16
**Demarchi**
14:1 56:18 57:3,12 58:9 64:3 80:10,16 81:24
**demonstrating**
41:20
**department**
7:6,11,12 16:14,15 23:7 24:25 25:1,12 26:9,17,19,22 27:16 36:10 42:5 59:4 60:10 90:4 91:15 93:24 106:23 117:16 123:6
**departments**
33:10 119:6
**departure**
85:1
**depend**
100:11
**dependent**
100:2,10
**deposed**
5:20 6:25
**deposition**
5:2 6:17 8:16 9:10 11:3 12:6 14:5 48:23 49:15 53:6 54:13 72:23 103:21 126:4
**desire**
76:8 115:22
**destruction**
100:20
**development**
21:16 22:9 24:18
**Devil**
13:2 54:7,9
**differently**
104:12
**dig**
79:25
**direct**
96:2
**directly**
37:14 51:23 52:5,6 67:25 75:17
**director**
14:20 22:8 23:5,17 37:3 107:13
**disagreeing**
82:4
**discern**
42:10
**disciplinary**
114:16,19,22 115:4
**discomfort**
67:8
**discontentment**
62:12,15
**discourage**
112:4
**discrimination**
6:5
**discriminatory**
41:19
**discuss**
60:25 86:24
**discussed**
12:18 14:13 31:21, 23,24 32:3 55:8 62:7 78:20 80:25 81:3 91:20 115:18
**discussion**
7:17 47:20 74:7
**discussions**
45:5
**dissemination**
107:23
**document**
5:10,13,16 11:17, 20,21 53:19 73:10 104:6,13
**documents**
5:5,8 11:14,16 14:10 103:25
**dollars**
21:1
**donor**
52:16,22 109:25 113:16
**doubt**
109:16
**draft**
25:17
**draw**
10:7 29:16
**drawing**
10:13
**drive**
39:25
**driving**
25:11
**due**
41:21
**duly**
4:2
**duties**
24:3,13 26:16 46:20
**duty**
33:22 109:18 113:24 114:12 120:12,25
**duty-bound**
63:10,17
**dying**
102:25

**E**

**earlier**
64:10 82:15 93:10 103:24 124:22
**early**
6:20 15:12 28:5

**easier**
10:12
**east**
24:23
**Eddie**
52:21 53:3
**Edwards**
110:5
**effective**
68:9 71:4
**efficiencies**
68:7
**effort**
117:17
**elevated**
15:21 65:16
**email**
13:18,21 33:6,13 55:2
**embedded**
16:14
**embrace**
76:11
**emotion**
47:1 58:15 65:10, 13,15,17,18 71:2 91:3 94:14,24 95:2
**emotions**
60:23
**employee**
8:15 15:1 16:8,16, 19 22:8 24:17 25:11 27:2,14 33:20,21 35:15,20 68:12 107:21 114:5 115:24 120:6,24
**employees**
6:4 20:25 35:17,18 46:19 120:13 122:17
**employer**
70:1
**employment**
47:15
**end**
14:5 61:6 91:9 106:11
**ends**
77:20
**energy**
39:25
**engage**
117:15
**engaged**
28:9
**engagement**
25:12
**entail**
17:15
**entailed**
24:13
**entertaining**
80:5
**entire**
7:10,13 22:11
**entitled**
9:1 10:5
**escort**
98:16,25 100:24
**escorted**
98:24 100:14
**escorting**
100:1
**essentially**
46:21
**ethics**
119:3
**evening**
86:14 88:3
**events**
110:15
**evidence**
66:14 99:3
**evident**
73:20
**EXAMINATION**
4:6 120:1 123:12
**examined**
4:4
**exchange**
13:25 39:10 49:2,5 73:21 77:21 86:21 103:7
**exchanges**
73:23
**excuse**
19:5,25 64:19 74:16 96:20
**executive**
29:16,23 36:17 68:8 118:23 119:3, 9
**executive's**
96:4
**executives**
46:10 47:17
**exhibit**
11:22 12:5,6,17 48:19,21,23 49:14, 15 53:6,10 54:12, 13,16 70:22 71:7, 12,13,19 72:22,23 73:3,5,25 75:6,15, 19,23 77:22,24 78:13 83:24,25 87:22 101:14,16 103:6,19,21 104:15 121:17 122:20
**exhibits**
11:23
**exit**
47:6
**expect**
99:24 100:9,14,16 107:7
**expected**
35:25 38:5,16 40:21,24 87:19
**expensive**
47:11
**experience**
33:18 37:8 38:20 47:10
**explain**
31:15 60:14
**explained**
30:24 31:11 59:2
**expressed**
83:23 91:22
**extent**
10:10 26:21 30:15 35:6 86:22 107:20 125:1,18,22
**external**
47:22,24 48:13

**F**

**face-to-face**
33:7,14
**fact**
43:25 46:18 52:20 58:19 66:2 77:11 93:20 108:21,23
**factors**
100:11
**facts**
36:4 66:14
**failure**
21:22 114:15,22
**fair**
13:4 28:17,22,23 30:8 31:11,14 38:19 40:10,16 41:12 52:7 55:23 57:5,11 62:14 63:13 64:14 69:4,6 74:12 82:13 83:18 86:12 94:22 100:7, 21 101:12 104:23 105:15 107:14 112:6 114:21 117:2,4,5 119:9 123:21 125:12
**fairly**
26:5 88:7
**fall**
74:6
**familiar**
25:14 52:22 61:7 85:8 117:13 118:20
**fast**
53:3 82:8,18 94:14
**fax**
28:6
**feel**
63:16 109:6
**felony**
8:19
**felt**
16:20 43:25 45:9 77:17 80:5 95:1
**Ferrara**
42:23 66:12 67:11 92:21
**field**
14:20 36:12
**figure**
66:18
**file**
90:13
**filed**
47:13
**filing**
44:23
**fill**
33:3
**final**
84:22
**finally**
106:3
**find**
39:7 90:19 91:6 118:11
**finding**
61:6 62:1
**findings**
61:11,14
**fine**
55:20 57:16
**fire**
66:7 81:12,15,18, 21 88:5
**fired**
22:24 47:24 55:21, 24 80:3 86:17 87:23 88:2,18 89:8 97:14 106:18,22, 24
**firing**
88:8

**fit**
68:14
**fly**
19:2
**focus**
31:3
**focused**
123:6
**folks**
11:6
**follow**
34:13 52:15
**football**
110:16
**foray**
17:2
**force**
39:24
**form**
28:1 32:11 33:3,4 36:3 39:16,19 40:23 41:5 48:3 52:24 59:15 62:16 65:3 66:10,13,25 74:8 77:14 81:22 89:1,22 97:8 98:1, 19 99:2,17 104:20 107:1,10,17 110:7, 17,23 111:4,19 112:2,14 113:6,20 124:8
**formal**
28:8 34:15 41:22 48:12 59:24 60:9
**formed**
94:18
**forward**
7:20 60:22 75:21
**foundation**
39:20 62:17 65:4 89:23 113:7 124:9
**frame**
25:6 35:16 115:7
**Frank**
42:23,24 55:3 66:12 67:11,13,14, 15,22 78:23 81:8, 11,13 82:2 92:21
**free**
78:4
**Friday**
11:4 102:21
**friend**
44:12 46:7 89:19 118:21
**friendly**
51:7 85:23
**friends**
122:14,15
**front**
77:24
**frustrated**
124:1
**frustration**
62:6 67:5
**fulfilled**
109:18
**full**
24:6 124:3
**full-on**
18:15
**full-time**
23:22
**functions**
24:16
**future**
47:14

**G**

**game**
28:20 110:16
**Gannett**
21:7
**gave**
46:8,25 49:11 69:20 83:4 123:19
**general**
4:19 10:5 24:15 32:21 43:8 60:20 63:24 92:18 104:19
**generally**
6:4 37:16,17 96:7
**generic**
78:18
**get-it-done**
40:1,2
**give**
8:2 9:4 25:6 26:2, 6,8 48:22 51:14 63:1 113:12
**glad**
106:2
**goal**
119:17
**golf**
110:4,6
**golfing**
102:20
**good**
4:8,9 18:25 51:11, 14 68:19 77:18 96:13 102:25 115:24 118:5 119:7
**Google**
47:14
**Gotcha**
20:5
**graduate**
18:8
**graduated**
18:12
**granted**
23:22
**great**
7:14 26:20 118:9
**grenade**
56:3
**grocery**
14:21
**grooming**
29:24
**groped**
101:18,19
**groping**
58:21
**ground**
7:23 116:1
**group**
23:7 36:24 37:3,6 92:7 95:23 97:3 101:5 123:20
**guard**
57:12
**guess**
34:19 90:2 104:17
**guy**
40:1,2 119:7

**H**

**half**
22:3
**hand**
56:3
**handbook**
25:14,17,20 33:19
**handed**
53:14 109:21
**handled**
32:12
**handling**
109:14,15
**hands**
101:24
**hanging**
110:12
**happen**
34:16 107:8
**happened**
38:22 39:9 42:13 44:4 46:5 100:22
**happening**
44:16
**happy**
47:6 52:14 70:11 76:16
**harassed**
61:7 113:15
**harassment**
26:6,8 30:24 31:6 33:21 59:10 80:7, 20 96:9,22 110:1, 12 111:25 112:7 114:7 120:7,8
124:21
**hard**
40:22
**Hatfield**
117:13 118:3
**head**
71:1
**hear**
9:11 38:5 40:21,25 42:2
**heard**
31:8 35:25 36:9 38:7 40:12,17,19 41:24 42:1,6 53:1 62:2 64:18,21 103:17 116:8
**hearing**
29:15 56:1 90:7 97:17
**heart**
85:21
**Heather**
4:18
**Heiler**
31:18
**held**
7:17
**Hellman**
118:13,15,16,17, 18,20
**helpful**
36:15 71:16
**helping**
25:17
**helps**
7:20 119:13
**Hey**
34:17 39:10 44:15 86:15
**high**
91:5
**hinted**
116:7
**hire**
122:14,17
**hired**
23:3,5

**hiring**
122:15
**history**
14:18
**hold**
49:13 57:7 99:5
**holding**
20:19
**Honestly**
84:23
**hopeful**
85:20
**hoping**
85:23
**hour**
116:1
**housed**
24:21,22
**How's**
39:12
**HR**
6:7 7:10 17:23 18:18 21:14,17,18, 20 23:8 24:15 25:13,14,24 26:2 33:19 36:10,12 37:10 44:14 63:9 80:2 93:24 99:24 107:13 110:21
**Huh-uh**
105:23
**human**
14:19 20:23 23:5, 10,20,23 24:14
**hung**
70:7
**Hurley**
31:7
**hypothetical**
41:6 112:15 113:7, 12,21

**I**

**idea**
79:21 85:8
**identification**
12:7 48:24 49:16 53:7 54:14 72:24 103:22
**illegal**
46:23
**immediately**
15:18 114:7 120:8
**impact**
41:9 47:14
**impacted**
41:14
**impactful**
25:24
**implication**
8:5 119:10
**implies**
105:13
**imply**
69:21,24
**implying**
122:16
**important**
26:24,25 27:1,4
**impressed**
39:24
**impression**
40:8,9 42:8,9
**improvement**
117:17
**inaction**
114:16
**incident**
52:20 61:2 96:15, 22,23
**incidents**
31:8 58:21
**included**
10:1 17:24 24:16
**including**
20:20 31:17 44:23 81:24 120:8
**Incomplete**
36:3 41:5 112:14 113:7,20
**incorrect**
20:9
**independent**
116:12
**independently**
34:12,24 112:7
**Indianapolis**
20:21
**indication**
30:9,11 55:24 68:22 105:22 121:11
**inference**
29:17 119:12
**infinity**
46:8
**inform**
56:14
**informal**
35:2
**information**
7:20 9:17 10:8 114:8 116:12 120:9,15 121:11
**informed**
59:11 99:10 114:6 120:6
**informing**
106:22
**initial**
52:11 69:19 83:22 125:23
**initiate**
34:13 62:24 63:21, 22 111:25 113:5, 18
**initiated**
5:2 30:16 32:18 35:9 50:3 63:16 92:9 104:24
**initiating**
30:17
**initiation**
33:9,15 110:13
**instance**
124:16,19
**instruct**
57:9
**instruction**
57:14
**instructions**
52:15
**instructs**
9:12
**intellect**
39:25
**intent**
63:20
**intention**
70:24 84:12
**interacting**
109:24
**interaction**
29:18 42:14 73:7 103:6
**interactions**
26:15 34:14 110:22 115:8
**interest**
70:5
**interested**
69:14
**interim**
23:20
**interject**
8:14
**internal**
114:1
**interpreted**
97:18
**interview**
121:20
**intimating**
122:16
**introduce**
4:16
**invading**
57:8,14
**investigate**
60:17
**investigated**
16:25 32:17 105:14
**investigating**
105:13 108:15
**investigation**
32:19 33:15 34:9, 14 35:8 41:22 59:24 60:4,10,12 61:5,13 62:2,25 63:5,6,8,16,21 104:19,24 105:1,6, 10,18 108:20 109:11 110:13 112:1 113:5,18 116:22,24 117:7 121:12 123:19 125:4,5
**investigations**
16:25 17:2 53:16
**investigative**
63:11
**investigator**
5:11 20:7 61:11 121:21 122:6
**investigators**
53:12
**invited**
42:15
**involve**
6:12,14
**involved**
6:3,21 25:16 27:22 28:5,16 34:9 35:8, 11 37:9 38:17 96:12,19,21 99:25 100:8,17,21,24 117:17,20 121:11, 14,15,16 125:19
**involvement**
96:25 99:9 125:13, 23
**involving**
26:12 61:3 108:6 121:13 125:22
**issue**
27:2 31:12 44:1 57:6 67:14 79:23 80:3,7 96:9 109:7, 25 125:17
**issued**
5:4 62:3

**issues**
28:24 29:10 57:18 79:25 122:11 123:10
**IX**
108:4,8,15,16,18, 20 120:8,11,16,25

**J**

**Jay**
31:17
**Jean**
31:19 42:22 55:3 78:22 81:7,17,19 82:2 93:2
**jet**
110:4
**Jim**
73:9 115:8,13,15, 18
**job**
14:18,20 15:7 20:22 23:22 24:13 25:13 39:22 41:14 46:20 76:21 77:4, 12,18
**jobs**
22:16
**John**
4:1,14 126:12
**July**
29:1 102:18
**justice**
18:7

**K**

**Kent**
118:14,15,17,18, 20,21 119:1,2,8
**Kent's**
119:7
**Kevin**
4:1,14 9:25 28:7 44:15 54:25 70:23 118:13 126:12
**Kim**
78:22 80:12
**Kimberly**
14:1 56:18 64:3 80:10
**kind**
6:5 33:9 34:13 37:9 40:1,2,4,20 46:9,19 48:12 50:10 60:10 74:6 87:9 89:4 101:23
**knew**
51:5 57:20 63:10 85:16 105:2 125:5
**knowing**
62:22 125:20,21, 24 126:1
**knowledge**
26:11 29:13,22,24, 25 61:9 105:8 110:2,8,18
**Kwan**
4:19

**L**

**labor**
14:25 16:18
**lack**
39:19 62:16 65:3 100:20 113:6
**laid**
69:2 83:20
**landing**
96:11
**lap**
56:3
**larger**
91:19 95:20 97:3
**Las**
58:23
**lasted**
89:16
**late**
15:12,25 25:5 28:20
**launch**
63:5,8 108:20 121:12
**launched**
104:25 105:3,6,11 125:4,6,7
**law**
114:5 120:6
**lawsuit**
44:18 90:13
**lawsuits**
27:10
**lawyer**
10:1 48:11,15
**laying**
60:17
**lead**
27:5 41:4
**leaders**
36:18
**leadership**
22:9 24:18 37:5
**leading**
30:22
**leads**
57:23
**learn**
88:21
**learned**
33:20
**learning**
88:19
**leave**
19:4 20:14 60:17 98:15,17 102:17
**leaves**
56:4
**leaving**
76:3 77:8
**led**
41:21
**left**
8:12 17:12,14,19 22:21 23:19 42:21 43:1,3 66:24 68:21 102:24 125:16
**legal**
16:12,14,22,23 17:6
**legitimate**
109:7
**letter**
117:9,11 125:8,9, 11
**letting**
43:4 124:3
**level**
35:11,14 36:23 37:3,11 65:16
**license**
18:23,24
**life**
18:22 39:12
**likes**
122:14,16
**limited**
125:14
**lines**
48:6 68:9 73:9 89:10,11 97:22 100:13
**link**
113:3
**list**
12:17,21 13:7,8
**listening**
44:10,11
**litigation**
47:10
**lobby**
39:8
**lodge**
63:5
**logistic**
16:24
**logistics**
14:4
**long**
11:10 15:7 17:25 21:2 22:2 23:16 24:1 41:9 46:22 56:22 89:15,16
**longer**
14:24
**loop**
94:8
**lost**
59:5
**lot**
47:1 60:23 65:9
**loved**
76:21 77:3
**lower-level**
35:18,19
**lunch**
39:6

**M**

**M-C-E-L-R-A-T-H**
23:15
**mad**
65:20
**made**
26:23 60:9 68:3 70:14 84:11,19,22, 23 88:4 95:12 97:6 101:23 108:9
**maintain**
115:23
**major**
21:8
**make**
5:16 7:22 8:1,2,7 9:14 10:2 28:2 35:4 46:17 47:9 64:3 71:11,16 76:8,17 77:16 83:9 91:4,8 98:2 104:8 116:4
**making**
16:24 33:2 47:8 68:18 71:22 83:8 112:11
**manage**
125:17
**management**
36:14,17 37:2 63:9
**manager**
17:13,23
**mandatory**

120:12
**manner**
17:1 43:15 62:25
**Manual**
114:4
**March**
31:12 32:8 59:12
**mark**
11:21 12:4 48:18, 20 49:14 54:12
**marked**
12:6 48:23 49:15 53:6,9 54:13 72:23 103:21
**marking**
11:23
**master's**
18:9
**matter**
10:6 32:12 37:15 47:2 56:12 57:4 59:25 60:8 62:13 96:7,8 97:10,14 102:13 109:9,22 112:10 114:1 120:23
**Matthew**
23:13
**maximize**
119:17
**MBA**
18:12
**Mcelrath**
23:13
**Mckirgan**
4:17 5:14,17 8:12, 14 9:24 10:17,20, 23 11:23 12:1,12 28:1 36:3 38:2 39:19 40:23 41:5, 16 48:3 52:24 54:18,21 56:8 57:7,13,24 58:3 59:15 62:16 65:3 66:10,13,25 71:13, 22 73:25 74:2,8, 18,22,24 75:1,5,9, 14,18,22 80:11,24 81:22 89:1,22 97:8 98:1,19 99:2,11,17 104:20 107:1,10, 17 110:7,17,23 111:4,19 112:2,14 113:6,20 114:24 118:14,16 119:21 120:2 123:8 124:8
**meaning**
95:12 108:10 111:24
**means**
95:22
**meant**
52:18 91:1
**media**
21:8
**medications**
9:7
**meet**
25:3
**meeting**
9:25 10:16 11:10 12:19 32:8 33:7,14 39:2 42:18,21 43:1,2,3,4,24 45:21 46:1,2,5 52:11 53:25 54:6, 7,8,9 55:11,12,16 58:13 60:24 78:15 89:15,17 91:19 95:20 97:1,2,3,6 101:6,17 104:11 106:21,25 107:5 108:1
**meeting/phone**
68:21
**meets**
38:25 39:1
**member**
35:24 63:8
**members**
37:10
**mention**
45:8 62:5 80:7
**mentioned**
9:22 14:14 33:10 37:22 46:6,18 47:5 51:17 60:16 67:12 95:5
**mentioning**
51:25
**met**
12:18 25:5 30:13, 23 31:10 36:1 52:1,9 53:11 55:8 66:5 105:2 118:12 123:15
**metaphors**
123:23
**Mexico**
17:24
**Michigan**
110:16
**mid-level**
35:22
**middle**
75:12
**Mike**
4:20
**mile**
24:23
**mind**
19:16 32:11 62:12 68:22 77:13 80:2 87:10 92:4
**mine**
118:21
**minutes**
11:11 53:17 56:24
**Mischaracterizes**
98:20 99:3 107:2 111:5 124:9
**mischaracterizing**
75:1,10
**missing**
12:10
**misstating**
74:18
**mitigate**
119:18
**mom**
102:25
**moment**
61:2
**moment's**
46:20
**money**
91:13 122:12
**months**
13:12,14 17:13 23:21 32:8 91:10, 16 95:17
**morning**
4:8,9 43:1 53:25 54:2,3 58:14 84:4 86:8,15 87:4
**motion**
101:23
**mouth**
80:19
**move**
7:20 42:8 46:17 59:3 94:14 103:2 118:8
**moved**
14:25 17:6 82:7 94:20
**moving**
82:6,11,18 118:6
**mutual**
69:25 83:13 85:1 98:9

**N**

**named**
52:21
**nature**
29:25
**necessarily**
35:18 38:9 67:22 124:18
**needed**
16:20 116:4
**negative**
29:17 40:12 119:10
**negotiate**
47:5 96:11
**Nelson**
31:19
**news**
20:21 89:9 118:5
**newspaper**
20:19
**newspapers**
20:18,20 21:2 22:18
**nonemployees**
108:7
**nonstudents**
108:7
**nonverbal**
24:9
**normal**
35:2
**Northern**
21:9,10 22:18
**notation**
101:14 121:21
**note**
78:14,17,21 82:7 102:1,25 103:5 116:22 122:20,21
**notes**
12:23 13:2,3,4 29:7,8,10 30:3 53:14,16,22,24 56:20 82:5 86:7 87:12,14,19 89:5 90:15,16 91:9 95:9 101:16 102:3 103:11 115:11 122:8 123:14,18, 19
**notice**
46:21
**notified**
27:12
**nuclear**
15:2
**number**
12:1,11 31:17 46:1 54:18 60:16
**numbered**
37:3
**numbers**
12:13

**O**

**oath**
8:22
**Object**
28:1 36:3 39:19 40:23 41:5 48:3 52:24 59:15 62:16 65:3 66:10,13,25 74:8 81:22 89:1,22 97:8 98:1,19 99:2, 17 104:20 107:1, 10,17 110:7,17,23 111:4,19 112:2,14 113:6,20 124:8
**objection**
9:11 28:2 57:13 107:11
**objections**
41:16 98:3 99:5,11
**objective**
71:3 90:22,25
**obstructive**
42:4
**occasions**
100:22
**occur**
33:16 85:22 93:15 110:22
**occurred**
25:19 30:22,25 31:6 39:2 43:2 45:22 46:1 52:21 61:17 72:14 77:5 79:6,9 87:13 91:18 92:11 96:5 101:7, 13 111:17 114:7 125:13,23
**occurrence**
13:9 114:8
**occurrences**
120:9
**offer**
61:1 69:25 83:9 95:12,13 97:18,21
**offered**
91:10,12 95:17
**offering**
106:17
**office**
4:19 10:1 23:8 24:16 32:21,23 39:5,7,8 42:15 63:23,24 90:8 104:19 108:13 114:9 120:10,11, 17
**officer**
63:9
**offices**
34:23 35:7 109:2
**OGC**
56:7,10,14,17 104:19 105:12 125:17
**OGC's**
10:1
**one-on-one**
93:17
**onus**
63:7,12
**open**
70:11 84:8
**opened**
16:25 59:25 60:3, 12
**opinion**
32:11,16 39:16 51:10 61:24 94:19 102:12
**opportunities**
47:15
**opportunity**
117:15
**option**
46:25 70:9 77:9 80:5 83:11 87:8 93:22
**options**
44:23 46:12,14,16 47:20,22,24 48:7, 10 50:9 65:8 69:2, 10,20 70:10 82:21, 24 83:10,13,20,21 85:4 86:25 87:5
**organization**
23:19 36:19 44:23 46:22 48:7,10 100:12
**organizational**
68:18
**ORR**
120:16,25
**outcome**
116:23,25
**outstanding**
80:8
**overlapped**
40:11
**oversight**
17:16 24:15
**owned**
20:19

**P**

**Pac**
58:22 59:12
**Palo**
15:2
**paragraph**
121:20
**part**
28:12 36:24 58:24 59:5 62:6 64:2 65:17,19 67:9,17 70:2,3 78:25 80:9 82:13 89:19 98:25 109:11 117:16 120:4
**participants**
92:14
**participate**
99:15 110:15
**parties**
94:23
**Parting**
83:15
**parts**
59:4
**party**
5:25
**pass**
80:4 119:19
**path**
84:24
**pause**
7:15 9:18
**Pebble**
110:5
**people**
14:14 31:17 36:19, 23 46:1,15 53:15 55:13 57:20 60:8 68:8 91:5,7 94:14 95:5 97:16 106:23 119:8,13 124:5,14
**Pepsi**
20:3,5,14
**Pepsi-cola**
17:21,22
**Pepsico**
19:15 22:17
**Perez**
4:7,15,20,23 5:12, 15,18,19 7:15,18 8:17,18 9:21 10:15,18,22,25 11:1,25 12:4,8,14, 16 28:11 36:8 38:3 40:6 41:1,11,23 48:9 49:1,14,18 53:2,8,21 54:15, 20,22 56:16,25 57:2,10,16 58:1,4, 7 59:18 61:18,20, 23 62:21 63:14 65:7 66:11,17 67:2 71:15,24 72:1,22 73:1 74:3,11,17, 20,23,25 75:3,7, 11,16,20 76:4 80:14 81:4 82:1 86:1,5 89:3 90:1 97:12 98:4,23 99:5,7,13,22 103:23 104:22 106:1 107:6,12,19 110:10,20 111:2,8, 22 112:5,20 113:11,23 115:1,2 118:5,9,18,19 119:19 123:9,13 124:12 126:2
**Perfect**
8:4
**perform**
46:21
**performance**
26:17 39:16,23
**performance-related**
40:8
**perfunctory**
56:14
**perimeter**
101:24
**period**
15:11 17:4,7 21:10 23:21
**person**
7:6 11:7,12 24:20 28:13,15 34:21 36:10 37:19 51:11 52:21 80:2 93:24 99:24 100:9 107:22 111:24 112:9,11 114:4 118:12 120:5 122:4
**person's**
23:12 101:24
**personal**
70:15
**personnel**
14:20 15:22 35:24 89:20
**perspective**
16:22
**pertain**
18:22
**pertained**
60:19
**pertaining**
13:23 90:18 96:8
**Philadelphia**
61:12
**Phoenix**

17:24
**phone**
33:2,5,6,13 56:14 57:25 58:2 69:19 70:7 72:13,19 74:13 76:5 78:7,9, 10 83:23
**phrase**
123:21
**physically**
100:14 101:21
**picture**
11:18
**piece**
46:4 70:12,19
**Piensook**
4:19
**pierce**
57:22
**pilot's**
18:24
**place**
46:3 53:25 55:16 56:23
**places**
120:16
**plaintiff**
4:21 7:3
**plan**
64:24 106:11
**plant**
16:15
**planted**
60:25 64:11
**play**
34:12
**played**
120:19,22
**player**
42:4 68:16
**players**
62:22
**pleasantries**
39:10
**point**
9:21 15:20 23:21 25:17 45:2,8 47:23 58:19 60:7,15 63:17,20 64:11 74:19 75:4,8 76:13,15,23 77:2 84:18 85:23 91:17 93:6,18,19 94:6 96:1 103:13 104:23 105:5 106:10 109:23 111:12 115:11 125:6
**pointed**
120:4
**pointing**
75:16
**policies**
25:21,24 33:20 114:2,3
**policy**
27:8 114:4,10,25 120:3
**poor**
42:3
**portfolio**
43:7,8
**position**
15:21 16:2 17:6,11 24:3 46:10 57:17 81:8 94:23 96:4 107:13
**positions**
22:22,24
**positive**
29:17 39:11,24 40:7,8,9 42:7,9 51:10 119:10,15
**possess**
11:19
**possibility**
64:22
**possibly**
50:23
**posttermination**
116:20
**potential**
27:10 28:25 36:1 82:17 86:25
**potentially**
114:20
**power**
15:2
**practical**
47:12
**practice**
112:3
**precise**
20:10 64:20 96:20 120:19
**precisely**
25:4
**preparation**
11:2,4 12:18 14:11 103:25
**present**
11:5,6
**presented**
50:9
**president**
20:23 21:13,14,15 23:10,19,20,23 24:6,14 33:18 38:16 51:23 52:9
**presidents**
36:22
**presume**
25:13
**pretty**
14:17 26:4 37:2 42:11 56:14 59:2 80:3 87:14 102:13 109:19
**previously**
20:6 82:20 88:10 91:20
**prior**
5:11 14:13 22:16 29:1 30:8 39:17 50:10 52:21,22 67:24 70:22 73:3 89:5 90:17 92:15 93:6 104:11 106:7 125:19
**private**
110:4
**privilege**
9:17,23 10:9,12 57:8,14,21
**privy**
61:13
**probation**
27:13 28:25
**problem**
56:2 118:7
**problems**
28:25 41:14
**procedure**
5:3
**procedures**
17:17
**proceed**
103:8 109:22
**process**
7:21 28:5,8,12 35:2 38:13 41:21 94:12 99:15 100:25
**processes**
17:17
**prod**
34:8
**prodded**
62:7
**produced**
5:14
**professional**
18:22 44:13,14
**protocol**
55:4
**provided**
24:15 54:17 73:11 117:1
**provosts**
36:23
**public**
15:1 16:3,5 19:22 20:11 22:1 107:23
**purposes**
8:16
**pursue**
70:8
**purview**
108:19
**put**
9:22 12:21 41:2 63:7,12 68:8 78:18 80:19 95:19
**putting**
34:4

**Q**

**quarter**
24:23
**question**
8:6,7,9 9:12,13 28:3 59:23 64:20 73:21 75:24 76:1 81:24 87:17 99:6, 19,21 103:12 112:19,21,23 113:3,9 122:10
**questions**
9:10 35:12 60:20 119:22
**quick**
119:21
**quicker**
7:21
**quickly**
14:18 42:11 82:11 94:21 121:18
**quietly**
100:9
**quote**
44:14 122:21

**R**

**racist**
40:18 41:3,8,9,20
**raise**
31:2,4 43:13 44:17
**raised**
31:16,17 44:2 87:1
**raises**
80:3
**raising**
31:12 43:14 90:10

122:11
**range**
37:4
**rare**
100:22
**Rarely**
29:11
**Ray**
26:13 34:1,3,4,20, 22 37:8 42:22 44:2,7 47:1,3 52:15 55:3 58:10, 12,21 60:17,25 62:7,11,13 63:4 64:15,23 65:17 66:20,23 67:16,25 68:2,25 69:9,15 70:11 76:8 78:22 79:15,16,18,20 80:2 81:9 82:14, 18,21,23 83:4,19 84:11,18 85:8 91:17 93:4,5 102:6 105:2 106:21 108:24 112:24 114:21 115:5 116:20 121:22,24 122:1,3,12,14,16 123:3,5 124:16,21
**Ray's**
82:4
**reach**
93:7
**reached**
84:1
**read**
104:8
**reading**
114:24
**real**
13:3
**realm**
57:21
**reason**
9:4 68:24 102:19 109:7,10,16 113:10 121:13
**reasonable**
62:15 114:6 120:7
**reasons**
68:7 79:23 100:7 107:20
**recall**
7:8 10:15,21 13:10,11,17 14:12 25:5 26:12,14 29:14,15 31:21,22 32:10 39:5 42:25 43:8,14,15 45:13, 16,18,21,25 46:4 47:2,8,21 48:5,16 49:12,17 52:10,13 55:10,14,15,19,22 58:10 62:9 64:19 66:4,15 67:9,10, 12,17,20 68:17 70:11 71:8,10 72:18,19 76:5,7,9, 10,12,15,19,20,22, 24 77:5,7,10,14, 15,17,19 79:10,17 81:10,11,13,14,16, 17,19,20 82:3,19 83:2,3 86:23 87:16 89:8,16 90:14,24 92:10,13,17,23 93:3,9,16,21 94:9, 10,11,13 95:6 96:6,7,10,12,14, 16,17,18,21 100:23 101:1 104:10 115:10,17, 19,25 121:23 122:2,3,5,6,9,11, 15,16 123:1,4 124:20
**recalled**
69:8
**receive**
120:15
**received**
18:21 112:7 117:9
**receiving**
110:25
**recent**
6:17,21
**recently**
5:4 42:21 43:3 58:14
**recess**
86:3
**recollection**
22:12 29:6 36:25 37:7 45:12 54:6 56:6 68:1,20 71:17 81:5,6 103:18
**recommend**
107:25 110:22 111:9,11,16,20,23
**recommendations**
117:3
**recommended**
60:15 108:6,12
**reconsider**
47:1,4
**reconvened**
92:6
**record**
4:13 7:17 9:22 71:12 75:2,10 86:2 107:2 124:9 126:3
**recruited**
22:14
**recruitment**
17:16 24:17
**refer**
14:6 32:22 78:12 119:5
**reference**
53:25
**referencing**
54:24
**referral**
60:10 117:23
**referred**
32:20 34:20 53:3 86:10
**referring**
11:21 14:8 31:5 71:7,20 72:7 87:22 101:16 114:2
**refers**
50:15 103:5
**reflect**
103:11 115:12
**refresh**
71:17 103:18 104:8
**refreshing**
83:7
**regard**
22:16 30:2 35:12 42:3
**Regents**
31:18
**region**
17:23
**registering**
113:9
**rehash**
89:4
**rehashed**
90:17
**relate**
27:4 28:12
**related**
5:5 27:7,10 28:24 29:23 77:11
**relates**
26:16 27:13
**relation**
16:19
**relations**
15:1 16:8,16 22:8 24:14,17 27:2
**relationship**
30:1 39:12 40:4 51:3,8 60:21 67:21 70:1,13,16 115:23
**rely**
122:10
**remember**
5:24 7:2,4,6 13:21 23:12 25:8,19 39:2,6 46:11 48:14 49:2 50:7 51:16,25 52:8 56:17,22 64:6,8 66:21 67:4, 14 72:13,15,16 75:20 78:7,9,17
79:5 86:9,11 87:3 89:6 91:18 92:18, 21,24 93:2,4 101:2,7 115:15 116:5 118:25
**remembered**
121:16
**remind**
55:7 91:7
**remove**
91:2
**reorganization**
43:9 65:24,25 67:5 76:16
**reparable**
116:4
**rephrase**
85:6 99:20 108:21
**replies**
85:11
**reply**
104:16 105:20
**report**
23:9 33:22 61:11 63:10 67:13,15 112:8 113:24,25 114:8,13,15,18,22 120:9 124:16
**reported**
23:10 44:7 58:20 59:6 63:24 64:1
**reporter**
4:3 12:7 48:24 49:16 53:7 54:14 61:19 72:24 103:22 105:24
**reporting**
43:5 66:3,6 67:3,7, 21,22,25 68:3 110:14 111:25
**reports**
113:14
**representative**
16:8
**representing**
4:21 8:13,16
**Republic**

20:20
**requirement** 67:4
**requires** 9:18
**resources** 14:19 20:23 23:6,11,20,23
**respected** 96:3
**respond** 106:11
**responded** 59:23
**responding** 103:13
**response** 16:21 24:9 50:12,14 78:3 79:19 106:2
**responses** 8:2
**responsibilities** 32:24 43:6 63:24 67:6 108:14 114:9 120:10
**responsible** 33:22 34:7,10 108:14
**Responsive** 121:8
**rest** 84:8 125:17
**restricted** 114:5 120:5
**restructuring** 59:4
**result** 42:13 61:5 85:19
**results** 61:13
**resume** 19:18
**retain** 47:10
**retained** 125:16,24
**retaining** 44:24
**retaliated** 45:9
**retaliation** 45:11,14
**retire** 102:20
**retired** 24:2 102:18
**returning** 39:5
**revenue** 21:1
**review** 11:14,16 55:3 75:6,15,18,23
**reviewed** 11:17 13:19 14:11 53:19 103:25 104:4,13
**reviewing** 14:12 104:10
**revise** 25:17
**revised** 25:23
**revisions** 25:25
**Rick** 31:18,22 50:15,18,21,23,25 51:2,11,18,20 52:5 95:23 96:10,12,14 101:6 115:20
**Rights** 32:23 63:23 108:13 114:9 120:10
**risk** 100:12
**Robles** 4:18 12:3,10
**role** 15:1,9 16:11 23:16,18 24:1,14 25:23 34:12,15,25 44:9 60:22 89:20 120:20,23
**room** 4:22 11:6 55:13 56:4
**roughly** 18:3 22:4 23:24
**rules** 7:23
**run** 14:17 33:11
**Rund** 73:9 115:8,21
**running** 123:6

**S**

**S-A-L-C-I-D-O** 4:14
**S-C-H-R** 37:25
**S-C-H-R-A-M-M** 38:2
**sake** 98:14
**Salcido** 4:1,14,24 8:15 11:2 126:12
**salesperson** 21:23
**salvageable** 60:21
**sanctity** 107:15
**Sandridge** 52:22
**Sandy** 117:13 118:3
**scheduled** 42:18
**scheduling** 14:2
**Schramm** 14:1 36:11 37:22,24 38:4,11 54:17 92:24 93:7 98:25 99:9,14,25
**Scott** 31:19
**screaming** 90:10
**SDA** 12:23
**search** 47:14
**Section** 114:15
**security** 100:16,21
**seed** 60:25 64:11
**selective** 97:16
**semantics** 97:11,15
**sending** 84:10
**senior** 22:8 23:5,17 28:13,15 35:15,23,24 36:18 37:19 41:3 63:9
**sense** 8:2,7 9:14 70:14
**sensed** 47:1
**separate** 112:9
**series** 18:23 48:17
**serve** 23:16 24:1
**service** 15:2 16:3,6 19:23 20:11 22:1 46:22
**session** 11:4 26:14
**sessions** 26:12
**set** 65:8 79:2 87:6
**sever** 70:1
**severance** 61:1 64:12 69:13,21,25 70:8,12 82:17 83:9 85:5 87:8 90:18 91:24 92:4,5 95:16 97:5,18,21 98:9 103:15 106:12,17,20 116:11
**sexual** 26:6,8 30:24 31:6 33:20 59:10 80:7,20 96:8,22 109:25 110:12 111:25 112:7 114:7 120:7,8 124:21
**sexually** 61:7
**Shangraw** 31:18,22 50:21,25 51:11 95:19,23 101:6 102:1,6 115:20
**Shangraw's** 102:9
**shift** 68:3
**short-circuit** 118:11
**shortly** 106:22
**show** 48:17 53:9 54:11 101:21 103:19
**showed** 101:18
**shows** 54:23
**side** 120:23
**sides** 95:2
**sign** 28:7,18
**significant** 80:3

**simply**
68:18
**sir**
71:24 116:6
**sit**
29:12 42:16 63:2 78:1 94:18 100:23 109:9 115:3
**situation**
46:15 47:17 58:16 76:18 91:1,6 100:3,10 121:9,10 124:23 125:2
**situations**
33:14 124:15
**six-month**
91:18 95:13
**sleeping**
122:4
**slow**
94:23
**slowly**
10:3
**smell**
80:4
**Smitty's**
14:24 15:7,8 19:19,25
**soak**
47:3
**soft**
96:11
**sold**
21:7
**sole**
31:3
**solution**
85:24 90:20 95:16 106:14
**sooner**
36:1 64:18
**sound**
19:2 98:9
**sounded**
45:14
**sounding**
44:10,11
**sounds**
42:8 66:20 86:23 88:10 98:12,13
**source**
62:15 65:18
**sources**
62:11
**Southwest**
17:23
**speak**
4:3 39:18,22 57:3 67:16 123:22
**speaks**
120:23
**specific**
10:6 25:7 27:16 28:4 37:15 45:6 56:11 60:9 61:9 83:3 87:7 93:23 105:8
**specifically**
13:11 48:8 50:15 51:16 62:9 65:21 67:9,10,12 69:9 80:18 92:13,17,23 104:18,25 105:7 123:4
**specifics**
96:6
**spectacular**
21:22
**specter**
87:1
**spell**
4:12 23:14 37:23
**spending**
122:12
**spent**
14:19 17:13
**spirit**
84:7 85:13
**split**
83:14
**spoke**
50:15 56:17
**spoken**
60:7 82:14
**sports**
43:6
**sprinkled**
6:19
**squared**
19:17
**staff**
41:3
**staffing**
17:13
**standard**
27:2
**standing**
18:25
**standpoint**
16:24 47:12
**Star**
20:21
**start**
30:3 92:11
**started**
16:7
**state**
4:12 15:17 18:14 22:15 110:16
**stated**
123:14
**station**
15:3
**stay**
72:10,17,20 73:8 74:7 77:9 90:22 116:2
**steam**
123:20 124:14
**step**
71:4 91:1
**sticker**
71:20
**Sticking**
61:2
**stint**
22:17
**stop**
80:11 121:3
**stopped**
103:13
**store**
14:21 15:19
**stores**
15:19
**strange**
55:4,11,12,13
**strategic**
91:3
**strategy**
47:6 96:13
**strengths**
119:16,17
**stress**
91:6,8
**stressed**
97:17
**stressful**
47:11
**strike**
35:12 38:15 77:13
**string**
11:18 13:15,17,18, 21 14:7 54:16
**struck**
39:23
**student**
25:12 120:23
**Students**
120:11,17,19,22
**stuff**
98:6 123:1
**subject**
10:6 56:12 57:4 69:12 112:12,13 113:16,17
**submit**
83:8
**submitted**
5:11
**subpoena**
5:4,6
**subsided**
71:2
**substance**
57:15 78:20
**successful**
60:22
**suggest**
83:8
**suggested**
108:8 109:3
**suggesting**
82:12
**suggestion**
83:8 108:9
**suggestions**
108:3
**summarized**
58:13
**summary**
5:10
**summer**
111:12,15
**Sun**
13:2 54:7,9
**supervised**
25:25
**supervisor**
33:23 34:1 109:8, 11,13,15,20 121:3, 4,5
**supervisor's**
121:6
**supposed**
34:5
**supposition**
65:19
**surmise**
92:13
**surprise**
82:14 83:23 85:14 91:23
**surprised**
51:18 64:18 82:6, 7,10 88:21,22,23, 25 99:14 116:18
**surrounding**
60:23 96:15
**swear**
56:19
**sworn**
4:2

**systems**
100:13

**T**

**table**
65:1 69:18 82:15 106:15

**tactical**
91:3

**takes**
113:2

**taking**
34:3 106:3 112:24 121:6

**talk**
7:24 9:18 26:15 30:21 44:25 47:16 48:7 50:22 51:11, 17 66:2 67:3 101:17 112:25 113:1,4 114:12 115:13 124:14

**talked**
29:9 51:20 64:23 65:20,25 69:21 73:8 77:3 80:19 82:16 96:7 104:3 116:16

**talking**
35:17 52:15 61:20 67:4 76:25 104:6 105:9 111:14,24 115:19 123:5 124:20

**tasked**
16:13 25:11 36:12

**team**
36:14 37:2,10 42:4 68:16 94:7 99:1 110:15,16

**teambuilding**
117:16,23

**teens**
25:6

**telephone**
73:15

**telling**
31:22 42:25 45:21, 25 46:11 47:2 66:15 67:14 69:9 70:11 72:17 96:10, 14 122:3,6

**tells**
79:18 109:13 112:24

**temperature**
70:25

**ten**
56:24

**tendencies**
40:18

**tendency**
123:22

**tenure**
25:22

**term**
20:11 34:10 105:12 122:18

**terminate**
27:20 37:11 64:15 84:12,19 97:6 117:6

**terminated**
13:13 30:10 45:3 68:23 69:1 90:5 97:7,11 107:22 116:8,13,17 117:10 124:6 125:3

**terminating**
64:22,24 80:6 125:9

**termination**
6:6 10:18 27:5 28:7,10,16 29:1 30:2 36:1 41:4,21 53:12 69:18,22 70:15,19 82:11,12, 17 83:10,16,17,21 85:9 86:24 87:2 89:14 96:23 97:19 98:12,13 99:10 107:15

**terms**
43:21

**test**
80:4

**testified**
4:4 55:16 65:12 82:20 83:20 88:10 116:6 123:15 124:22

**testify**
56:10 75:17

**testifying**
8:22 10:10

**testimony**
8:21 9:2,5 48:1 75:13 104:1 108:23

**Texas**
17:24

**text**
11:18 13:15,17 14:7 49:2,5,17,22, 25 50:2,5 51:18 52:4,14 54:16 71:10 72:7,18 73:3,19,20,22 74:10,19 76:2,19 77:25 78:6 84:4,10 85:7 88:7 103:16, 20 104:8,10

**texted**
71:9 72:2

**texts**
48:18 73:11 74:5,6 103:14,17 104:3,4 115:14

**thereabouts**
16:4 18:4 23:25

**thing**
40:20 47:3 84:7 86:9 87:15 102:22

**things**
12:17 29:5,10 40:4 61:15 67:23 68:9 70:24 82:18 94:24 103:1 111:23 113:4 114:19 119:15 122:1 125:13

**thinking**
44:22 50:11 94:6 97:19

**thought**
43:16,19 45:14,17 51:22 79:20 82:5 84:24 87:5,8 91:23 100:11,19 103:8 116:9

**thoughts**
87:10

**threaten**
44:18 90:13

**threw**
56:3

**tiers**
36:16 37:4

**tight**
78:1

**time**
11:14 13:4 15:11, 20 17:4,6 19:8,10 21:8,10 22:10,11 24:2 25:6 29:16 31:10,15 36:11 39:14 43:10 46:11 47:11,18 52:12,25 53:11 57:6,11 60:11,14 62:5 68:22 70:7 76:14 84:10 87:4 90:11, 13 97:19 100:4,5,6 102:20,24 103:2 111:12 115:7 118:6

**timeline**
19:6

**timely**
17:1

**times**
5:22,23,25 25:19 32:4,5,6,7 44:7 116:6

**title**
16:5 17:22 21:12 22:7,10 23:23 24:3 108:4,8,15,16,18, 20 120:8,11,16,25

**titles**
16:7

**today**
5:9 8:13 9:2,5 14:14 29:12 42:17 63:2 70:24 94:18 100:23 115:3

**today's**
8:21 9:9 11:3 103:25

**told**
10:4 31:21 32:1,3 42:21 43:24 44:3, 6,22 58:14 60:7 62:11 66:19 72:10, 18 79:12,20 87:23 88:18,23 89:12 95:9 98:5 101:4,5, 19 109:15 111:13 115:12 116:10 119:2

**top**
83:9

**topic**
10:2 80:24 81:2

**totally**
109:12

**touched**
68:4

**tough**
112:21,23

**tournament**
58:22 59:12

**track**
91:24 116:11

**trained**
121:2

**training**
16:23 26:2,6,8,12 29:24 109:6

**transaction**
96:3

**transcript**
8:25

**transitioned**
15:21 16:11

**travelers**
103:1
**traveling**
110:15
**treated**
43:17,19,23 45:17
**trial**
8:22
**true**
89:13 117:24 120:24
**Trust**
21:9,10 22:18
**trusted**
121:4
**truth**
4:3,4
**turned**
34:7
**turns**
66:24
**type**
27:13 100:20 111:16
**types**
108:15
**Typical**
17:16
**Typically**
36:19

**U**

**Uh-huh**
73:6 93:12
**ultimately**
61:5
**uncomfortable**
80:5
**uncommon**
124:5
**undergraduate**
18:7
**understand**
7:22 8:6,9,21,23 9:1,3 57:17,22 73:21 99:18 112:18 113:1
**understanding**
33:19 114:10 116:16
**understood**
52:18 67:23,24
**unethical**
46:23
**unexpected**
45:24
**unfairly**
43:17,20
**unfolded**
38:14
**unfolds**
88:1
**union**
16:9
**university**
7:11,13 15:17 18:14 22:15 23:21 32:23 36:21 37:1 63:11,23 106:3 108:13 114:9 120:10
**unlawful**
6:5
**unpredictable**
47:11
**upset**
39:13 43:11,12,16 62:20 67:20 123:15

**V**

**Vague**
40:23 66:25 98:1 107:17
**variety**
16:7,15 46:16 79:23 100:11
**Vegas**
58:23
**venting**
123:24,25
**Verde**
15:2
**vice**
20:23 21:13,14,15 23:10,19,20,23 24:5,6,14 33:18 36:22,23
**view**
50:9 77:8 96:1
**viewpoints**
91:2
**VII**
108:16
**visit**
39:14 44:14
**voice**
43:13,14 44:17 90:11
**voluntarily**
22:22
**VP**
110:21

**W**

**wait**
9:13
**waiver**
10:11
**waiving**
10:9
**walk**
31:19 48:2 62:10
**walked**
97:23
**walking**
99:15
**walks**
90:8
**wanted**
9:22 70:25 71:1 72:10,17,19,20 73:8 77:9,15 79:12,16 84:20 96:1,2 106:7
**warning**
27:13
**ways**
36:13 70:2,3 83:15
**weaknesses**
119:17,18
**Wear**
30:25 31:6 101:18 109:24 110:4,14 111:14 112:25 113:1,4 121:10
**week**
106:12
**weekend**
92:1 110:4,6
**weeks**
10:22 13:9
**weighing**
45:16
**West**
17:24
**whatnot**
123:23
**whistleblower**
16:19
**wholeheartedly**
107:24
**wife**
101:19 103:1
**women**
30:25 44:4 61:3,7 108:7 113:15
**women's**
101:25
**wondering**
94:13
**Woods**
31:7
**word**
45:11,23,24 48:15 90:25
**words**
80:19 91:2 101:24 102:2 109:18 110:13 112:6 114:18 121:24 122:23
**work**
7:10,12 21:9 22:14 26:18 40:7 41:10,15 76:8 97:5 109:7
**work-life**
34:17
**worked**
7:13 15:2 21:15 32:22 66:7
**workforce**
22:9 24:18
**working**
15:19 16:13 36:12 102:15 116:10
**world**
21:19,20 41:9
**worry**
9:7
**wrapped**
118:8
**wrong**
49:11 84:17 116:8

**Y**

**ya**
39:11
**years**
6:18 7:1 14:19 15:10,24 18:1 19:24 20:8,10 21:3,9 22:3 23:18 25:16 40:11
**yelling**
90:10

EXHIBIT NO. 86
Salcido
4-4-2024
Cindy Bachman CR# 50763

8:45

KS
Kevin

iMessage
Aug 13, 2019 at 10:49 AM

Hi Dave. Kevin here. How are things today

Thanks for checking in.
After talking to Coach Hurley and my wife I am not leaving my job or working on an exit.
I also spoke to Rick for 15 minutes yesterday. He wanted to digest and we are meeting today at 4:45 to see what his thoughts are. His initial thought is to go directly to Crow but wanted to think about it for 24 hours.
He is not happy that Ray didn't follow his instructions on talking to the donor.
Also met w Jim Rund for an hour and a half. He's concerned w Ray's decision making on a few levels and provided some good feedback.

Ok. Let me know if I can help.

iMessage

# EXHIBIT 8

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| David Cohen,<br><br>Plaintiff,<br><br>v.<br><br>Arizona Board of Regents; and Raymond Anderson, an individual,<br><br>Defendants. | Case No. 2:21-cv-01178-PHX-GMS |

VIDEOTAPED DEPOSITION OF DAVID COHEN

Scottsdale, Arizona

April 3, 2024

Prepared by:

Meri Coash, RMR, CRR
Certified Reporter
Certification No. 50327

CERTIFIED TRANSCRIPT

I N D E X


| WITNESS | PAGE |
|---|---|
| DAVID COHEN | |
| Examination by Mr. McKIRGAN | 9 |


EXHIBITS MARKED


| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 53 | Mr. Cohen's LinkedIn profile | 10 |
| Exhibit 54 | Plaintiff's Response to Defendant Arizona Board of Regents' First Set of Interrogatories | 19 |
| Exhibit 55 | Plaintiff's Response to Defendant Arizona Board of Regents' Second Set of Interrogatories | 19 |
| Exhibit 56 | Letter dated 5-28-14 to Dave Cohen from Ray Anderson, Re: Offer Letter ABOR.COHEN000019 - 20 Confidential | 23 |
| Exhibit 57 | Letter dated 6-22-16 to Dave Cohen from Ray Anderson ABOR.COHEN001508 Confidential | 31 |
| Exhibit 58 | Letter dated 7-31-17 to Dave Cohen from Ray Anderson, Re: Bonus ABOR.COHEN001134 Confidential | 32 |
| Exhibit 59 | Healthcare Realty Trust Incorporated documents HRTI000001 - 32 | 59 |
| Exhibit 60 | Decree of Dissolution of Non-Covenant Marriage Without Minor Child | 61 |

| | | |
|---|---|---|
| Exhibit 61 | 2021 income tax return COHEN_000302 - 353 Confidential | 63 |
| Exhibit 62 | Text messages with Brad Chandler COHEN_000721 | 109 |
| Exhibit 63 | Text messages with Brad Chandler COHEN_000725 | 111 |
| Exhibit 64 | Second Amended Complaint | 112 |
| Exhibit 65 | Text messages with Bart Wear COHEN_000361 - 384 | 114 |
| Exhibit 66 | Letter dated 8-21-19 to Michael M. Crow from Michael J. Perez, Re: Termination of David C. Cohen ABOR.COHEN000045 - 52 Confidential | 123 |
| Exhibit 67 | Text messages with Scott Nelson COHEN_005704 | 135 |
| Exhibit 68 | Email dated 6-12-19, from Cohen to Anderson, Subject: 2019 Self Evaluation - Cohen, with attachments ABOR.COHEN001270 - 1273 Confidential | 174 |
| Exhibit 69 | Memorandum dated 11-5-19, to Kim Demarchi from Carrie Love, Re: David Cohen Investigation ABOR.COHEN001069 - 1122 Confidential | 178 |
| Exhibit 70 | Self-Performance Evaluation -SDA Manager dated 6-13-19 ABOR.COHEN001141 - 1142 Confidential | 180 |
| Exhibit 71 | Text messages with Jay Heiler COHEN_002655 - 2656 | 192 |
| Exhibit 72 | Text messages with Ray Anderson COHEN_004864 | 194 |
| Exhibit 73 | 2017-18 Women's Swimming & Diving Schedule | 200 |

| | | |
|---|---|---|
| Exhibit 74 | Letter dated 2-14-20, to Arizona entities from Michael J. Perez, Re: Notice of Claim filed by David Cohen Against the State of Arizona ABOR.COHEN003096 - 3126 | 232 |
| Exhibit 75 | Text messages with Tracy Smith COHEN_005897 - 5904 | 236 |
| Exhibit 76 | Text messages with Rashon Burno COHEN_004688 - 4689 | 238 |
| Exhibit 77 | azcentral article: Ex-ASU employee says he was fired after reporting athletic booster's sexual harassment, dated 2-20-20 | 239 |
| Exhibit 78 | Text messages with Rashon Burno COHEN_004809 | 240 |
| Exhibit 79 | Pete Thamel X post dated 7-12-21 | 249 |
| Exhibit 80 | Text messages with Frank Ferrara COHEN_001669 - 1703 | 253 |
| Exhibit 81 | Optimum Management Solutions invoices ABOR.COHEN001307 - 1319 Confidential | 259 |
| Exhibit 82 | Turnkey Search memo dated 2-8-15 to Potential Advisory Board Member from Turnkey Search on behalf of Vivid Seats, Ltd., Re: Vivid Seats Board of Advisors ABOR.COHEN001027 - 1033 Confidential | 270 |
| Exhibit 83 | Plaintiff's Opposition to Motion to Dismiss | 275 |

PREVIOUSLY MARKED EXHIBITS

| | |
|---|---|
| Exhibit 12 | Page 33 |
| Exhibit 2 | Page 37 |

INSTRUCTIONS NOT TO ANSWER

| | |
|---|---|
| Page 77 | Line 9 |
| Page 96 | Line 22 |
| Page 118 | Line 24 |
| Page 164 | Line 22 |

VIDEOTAPED DEPOSITION OF DAVID COHEN was taken on April 3, 2024, commencing at 9:31 a.m. at the law offices of Papetti Samuels Weiss McKirgan LLP, 16430 North Scottsdale Road, Suite 290, Scottsdale, Arizona, before Meri Coash, a Certified Reporter in the State of Arizona.

* * *

APPEARANCES:

For the Plaintiff:
PÉREZ VAUGHN & FEASBY, INC.
By: Michael J. Pérez, Esq.
600 B Street
Suite 2100
San Diego, California 92101
619-784-3550
perez@pvflaw.com

MILLER, PITT, FELDMAN & MCANALLY, PC
By: José de Jesús Rivera, Esq.
2800 North Central Avenue
Suite 840
Phoenix, Arizona 85004
602-266-5557
jrivera@mpfmlaw.com

For the Defendants:
PAPETTI SAMUELS WEISS McKIRGAN LLP
By: Robert H. McKirgan, Esq.
Jennifer Lee-Cota, Esq.
Heather A. Robles, Esq.
Anita Rocha, Esq.
16430 North Scottsdale Road
Suite 290
Scottsdale, Arizona 85254
480-800-3535
rmckirgan@pswmlaw.com
jleecota@pswmlaw.com
hrobles@pswmlaw.com
arocha@pswmlaw.com

Also present: Ray Anderson; Kwan Piensook, Esq.; Bella Santos; Michael Noonan, videographer

TRANSCRIPT OF PROCEEDINGS

09:31:20 THE VIDEOGRAPHER: We are on the record.
09:31:21 The time on the video monitor is 9:31 a.m. Here begins
09:31:27 Volume 1, Video Number 1, in the deposition of
09:31:29 David Cohen, in the matter of David Cohen versus Arizona
09:31:34 Board of Regents, et al., in the United States District
09:31:37 Court, District of Arizona, Case Number
09:31:41 2:21-cv-01178-PHX-GMS.
09:31:50 Today's date is April 3rd, 2024. Our court
09:31:55 reporter is Meri Coash. My name is Michael Noonan,
09:31:57 certified video specialist. And we represent Coash Court
09:32:01 Reporting & Video, 1802 North Seventh Street, Phoenix,
09:32:05 Arizona 85006.
09:32:07 This video deposition is taking place at the
09:32:11 law firm of Papetti Samuels Weiss & McKirgan LLP,
09:32:21 16430 North Scottsdale Road, Suite 290, Phoenix, Arizona.
09:32:24 Counsel, at this time please identify
09:32:26 yourselves and state whom you represent. Afterwards the
09:32:30 court reporter will swear in the deponent.
09:32:33 MR. McKIRGAN: Bob McKirgan on behalf of the
09:32:35 defendants. And with me today is Jenny Lee-Cota and
09:32:40 Heather Robles from our office. Ray Anderson, a
09:32:44 defendant, is also here. Kwan Piensook from ASU's general
09:32:50 counsel's office, our fellow Anita Rocha is with us, and

09:32:56 our writing intern Bella Santos is also observing.
09:32:59 MR. PÉREZ: Michael Pérez, from Pérez
09:33:02 Vaughn & Feasby, on behalf of the Plaintiff David Cohen.
09:33:06 Also with me is José Rivera.

DAVID COHEN,

called as a witness herein, having been duly sworn by the Certified Reporter, was examined and testified as follows:

09:33:20 EXAMINATION
09:33:20 BY MR. McKIRGAN:
09:33:22 Q. Morning, Mr. Cohen. Have you been deposed
09:33:25 before?
09:33:25 A. No.
09:33:26 Q. All right. You've attended depositions in this
09:33:28 case, and you kind of understand how it works, right?
09:33:30 A. Yes.
09:33:31 Q. So I'm going to dispense with the rules. I think
09:33:33 the main thing is to avoid talking over each other.
09:33:37 If I do ask you something that you do not
09:33:40 understand, please tell me and I'll rephrase it.
09:33:44 I just want to ask you, did you review any
09:33:48 documents to prepare for today's deposition?
09:33:50 A. I did.
09:33:51 Q. Were they documents -- any documents other than

09:33:54 documents that were produced in this case?
09:33:55 A. No.
09:33:57 Q. Okay. Did you meet with counsel?
09:33:58 A. Yes.
09:33:59 Q. How many times?
09:34:00 A. A phone call. And then an hour yesterday.
09:34:03 Q. Okay. All right. I want to go over your work
09:34:11 history.
09:34:14 MR. McKIRGAN: Mark this as Exhibit 53.
(Deposition Exhibit 53 was marked for
09:34:32 identification.)
09:34:32 MR. PÉREZ: Counsel, I don't know if it's
09:34:33 appropriate at this time or later to have the conversation
09:34:35 about the Atlanta Falcons.
09:34:38 MR. McKIRGAN: Yeah. So when we get to
09:34:39 that, we'll --
09:34:40 MR. PÉREZ: Perfect.
09:34:41 MR. McKIRGAN: -- we'll deal with that.
09:34:41 BY MR. McKIRGAN:
09:34:44 Q. Exhibit 53 I printed off from the Internet. Is
09:34:47 this a copy of your LinkedIn bio?
09:34:50 A. It looks like it, yes.
09:34:52 Q. Okay. And this LinkedIn bio provides your work
09:34:59 history from -- it looks like 1992 forward. Is that
09:35:04 correct?

09:35:04 A. Correct.
09:35:04 Q. All right. Is -- is it accurate?
09:35:07 A. Well, it doesn't have my current employer.
09:35:16 Q. Who's your current employer?
09:35:17 A. Hammes.
09:35:19 Q. How do you spell that?
09:35:21 A. H-a-m-m-e-s.
09:35:22 Q. And what does Hammes do?
09:35:28 A. Private equity firm that focuses on developing and acquiring medical office buildings. They're headquartered out of Milwaukee.
09:35:38 Q. Are they affiliated with Healthcare Realty?
09:35:42 A. No.
09:35:42 Q. Okay. All right. So we'll come to that.
09:35:45 So let's just start from the second page, Portland Trail Blazers, and work our way up to today.
09:35:53 So you started with the Blazers in -- excuse me -- with Spokane Indians in 1992?
09:36:02 A. Correct.
09:36:03 Q. Was that out of college?
09:36:05 A. No. I had a previous role right out of college working in the Continental Basketball Association in the Quad Cities, Quad City Thunder. And then after, they disbanded for the summer, and I got a job in -- for the Hawaii Winter Baseball league --

09:36:29 Q. Okay.
A. -- before that.
09:36:32 Q. All right. Where did you go to college?
09:36:33 A. University of Portland.
09:36:35 Q. What did you get your degree in?
09:36:37 A. Bachelor of arts in communications.
09:36:39 Q. Any higher education after that?
09:36:42 A. No.
09:36:43 Q. All right. So Spokane Indians, is that a --
09:36:47 A. It's a minor league baseball team.
09:36:51 Q. Who are they affiliated with -- or were?
09:36:55 A. Bob, you're challenging me right now.
Q. Okay.
09:36:57 A. I forget. Padres? I think it was the Padres at
09:37:01 the time.
09:37:04 Q. And you were director of ticket sales. Is that correct?
09:37:08 A. Director of ticketing.
09:37:09 Q. Yeah. And then you moved to the Portland Trail
09:37:12 Blazers?
09:37:12 A. Yes, sir.
09:37:12 Q. And what did you do at the Blazers?
09:37:16 A. Director of ticket sales.
09:37:17 Q. All right. Was that your only position there?
09:37:19 A. Yes.

09:37:19 Q. Why did you leave the Blazers?
09:37:21 A. Had an opportunity to go to the Falcons.
09:37:24 Q. While you were with the Portland Trail Blazers,
09:37:33 did you have any business with an outfit called Aspire?
09:37:38 A. Huh-uh.
09:37:39 Q. Is that no? You've got to answer verbally.
09:37:43 A. Oh, I'm sorry. No. No. I'm sorry, Bob.
09:37:46 Q. Ever heard of Aspire ticketing?
09:37:49 A. Yes.
09:37:49 Q. What do they do?
09:37:50 A. They do third-party ticketing for college
09:37:55 athletics -- programs.
09:37:57 Q. Do you know a guy named Bernie Mullin?
09:38:01 A. Yeah. Yes.
09:38:02 Q. Have you ever had any dealings with Mr. Mullin?
09:38:04 A. Not many. Well, he was at the NBA as a
09:38:09 consultant when I was with the Trail Blazers.
09:38:12 Q. What kind of dealings did you have with
09:38:15 Mr. Mullin?
09:38:15 A. He was a league employee. We would meet at
09:38:20 league meetings.
09:38:23 Q. Other -- Well, describe what kind of things you
09:38:28 would discuss with Mr. Mullin when you saw him.
09:38:31 A. When I was with the Trail Blazers?
09:38:33 Q. Correct.

09:38:36 A. Normal business. How to drive ticket revenue.
09:38:39 Q. Did the Trail Blazers have any business
09:38:43 relationship with Aspire?
09:38:45 A. Not that I was aware of.
09:38:46 Q. Did you have any business relationship with
09:38:49 Aspire while you were with the Trail Blazers?
09:38:51 A. No.
09:38:58 Q. Did Aspire ticketing and Mr. Mullin have anything
09:39:02 to do with your leaving the Portland Trail Blazers?
09:39:06 A. No.
09:39:07 Q. Okay. All right. I'm going to come back to the
09:39:09 Atlanta Falcons.
09:39:15 Next thing is Career Path Seminars,
09:39:19 January 2013 to October 2013.
09:39:21 A. Yes, sir.
09:39:22 Q. Okay. What was Career Path?
09:39:27 A. Career Path Seminars was a company that a partner
09:39:32 and I put together. He was in the pharmaceutical side. I
09:39:35 was on the sports side. And we had put that together to
09:39:39 try and help college seniors get a job in -- in the
09:39:46 respective fields of either pharmaceuticals or sports.
09:39:49 Q. Okay. And you put on seminars?
09:39:53 A. Yes.
09:39:53 Q. And you did that from -- according to your
09:39:58 LinkedIn bio, from January 2013 to October 2013?

09:40:03 A. Yeah. Really the winter.
09:40:04 Q. After October 2013, did you stay affiliated with the -- with Career Path?
09:40:11 A. No. No. We -- It was a natural break because I had gotten a -- the position with the Minnesota Vikings' new stadium project and my partner had got a job back in pharmaceutical sales.
09:40:28 Q. So did the Career Path company end at that point --
09:40:32 A. Yeah.
09:40:32 Q. -- in October of 2013?
09:40:34 A. Yeah. Yes.
09:40:36 Q. Okay. Now, you left the Falcons in May of 2012, according to your bio. See that?
09:40:48 A. Yes.
09:40:50 Q. What did you do for the six months between May of 2012 and January 2013?
09:40:58 A. Built the platform Career Path Seminars.
09:41:02 Q. Okay. When did you form Career Path Seminars?
09:41:06 A. In January, once we had the paperwork and website up, et cetera.
09:41:13 Q. So when you say you built a platform, what -- what do you mean?
09:41:17 A. A website, the -- the training materials, the PowerPoint presentations, all the -- you know, formalizing

Case 2:21-cv-01178-GMS Document 87-3 Filed 10/03/24 Page 685 of 1203



the company. It was an LLC.
Q. Okay. Then you went to the Vikings. And what did you do at the Vikings?
A. I oversaw the sales for their new stadium project. And the -- the company was actually Van Wagner. It was a third-party representative of the Minnesota Vikings.
Q. How much were you making at the Vikings when you left there?
A. Including base plus commission?
Q. Everything. Yeah.
A. Oh, 275- to 325- depending on the month, I think, when you -- if you analyzed it. We had just -- When I left, we had just really started selling the seat licenses, so that's when the commission kicked in.
Q. So you had a base salary?
A. Yeah.
Q. What was that?
A. 150,000 to 175, I believe, if I can -- if I remember correctly.
Q. And then you had some sort of commission on top of that?
A. Yes, sir.
Q. Okay. Why did you leave the Vikings?
A. Had the opportunity to come to Arizona State.

09:43:00 Q. How did that opportunity present itself to you?
09:43:02 A. Ray Anderson, who I had worked with before with the Falcons, had -- had reached out when I was in Minnesota.
09:43:10 Q. And what were the reasons, at least in your mind, why you left the Vikings to join ASU?
09:43:23 A. Family, the opportunity -- I was -- I was commuting back and forth from Atlanta to Minnesota and it was an opportunity for my family to have -- you know, be under one roof seven days a week.
09:43:36 Q. Okay. Any other reasons?
09:43:38 A. Huh-uh. No. Sorry.
09:43:40 Q. And you were at ASU from June of 2014 to December 2019.
09:43:51 A. Correct.
09:43:52 Q. Then you joined -- And we're going get into your income at ASU in a minute.
09:44:03 You joined Healthcare Realty in January of 2020?
09:44:05 A. Well, it was -- it was Healthcare Trust of America, which was -- that was the name of the company. And then it was acquired by Healthcare Realty in July, I think almost two years ago, so the name changed, new company.
09:44:26 Q. Okay. So you joined Healthcare Trust of America

09:44:32 in January of 2020?
09:44:33 A. Correct.
09:44:33 Q. And what did you do at Healthcare Realty?
09:44:39 A. Director of business development.
09:44:41 Q. And what did that entail?
09:44:43 A. Going out across the country and searching out
09:44:49 medical office building and development opportunities in
09:44:54 the medical office field.
09:44:55 Q. And your compensation with them, was it salary
09:45:03 plus some sort of bonus or commission?
09:45:05 A. Yes.
09:45:05 Q. What -- So was it commission or bonus?
09:45:08 A. It was both -- No, no, I'm sorry. It was bonus.
09:45:13 I thought you meant base. Base plus bonus.
09:45:16 Q. Okay. How was the bonus determined?
09:45:20 A. Discretionary.
09:45:22 Q. In whose discretion?
09:45:27 A. The CEO.
09:45:38 MR. McKIRGAN: Okay. I'm going to mark a
09:45:39 couple exhibits. This will be 54?
09:45:49 THE COURT REPORTER: Yes.
09:45:49 MR. PÉREZ: Counsel, did you intend to mark
09:45:51 the LinkedIn as an exhibit?
09:45:53 MR. McKIRGAN: I did. It's 53.
MR. PÉREZ: Thank you.

Let's mark -- This is 55?
(Deposition Exhibits 54 and 55 were marked for identification.)
BY MR. McKIRGAN:
Q. Exhibits 54 and 55 I'll be referring to throughout the day. Are these --
Let's start with 54. That's a copy of your response to ABOR's first set of interrogatories. Is that right?
A. I believe so.
Q. And did you review these responses before they were served on us?
A. Yes.
Q. And if you go to the last page, you swore under oath that the responses were -- or the answers were true and correct?
A. Correct.
Q. Exhibit 55 is your second set -- your response to the second set of interrogatories. Same question, did you review these and swear to their accuracy?
A. Yes, sir.
Q. Now, Falcons -- So let me try to do this carefully. Are you able to testify about the surrounding circumstances of your leaving the Falcons?
MR. PÉREZ: Objection. Calls for a legal

09:48:11 conclusion. He -- he cannot answer that question.

09:48:18 MR. McKIRGAN: Let me -- let me address you, Mr. Pérez. Is he able to testify about anything regarding his -- his leaving the Atlanta Falcons?

09:48:29 MR. PÉREZ: No, he's not. Not until we work that out with Falcons.

09:48:35 MR. McKIRGAN: Okay. Am I able to ask whether he made -- after December of 2019, after his employment with ASU ended, whether he made any effort to get a job with the Falcons?

09:48:59 MR. PÉREZ: No, you cannot. You cannot, no.

09:49:14 MR. McKIRGAN: Okay. So we'll put that issue on hold, and then we'll deal with the Falcons --

09:49:20 MR. PÉREZ: Thank you.

09:49:21 MR. McKIRGAN: -- if we have questions for you at some later point in time.

09:49:25 BY MR. McKIRGAN:

09:49:29 Q. So let's -- let's go back to your joining ASU and Mr. Anderson's initial reach-out to you. Can you describe that discussion with Mr. Anderson? Was it by phone?

09:49:43 A. Yes, sir.

09:49:44 Q. And what did you and he discuss in that phone call?

09:49:46 A. He had called and left a message. I was having a root canal.

09:49:49 Q. Oh.
09:49:50 A. And it took me --
09:49:52 Q. Kind of like today?
09:49:54 A. -- 24 hours -- yeah. So I guess I have been deposed.
Q. Yeah.
09:49:57 A. And so I -- It took me 24 hours to get back to him. And so he had reached out about the opportunity to potentially talk to him about a position at ASU.
09:50:13 Q. And so did you return the call?
09:50:14 A. Yes, sir.
09:50:15 Q. And what did you discuss in that phone call?
09:50:17 A. About the position.
09:50:20 Q. Okay. And what did Mr. Anderson tell you about the position?
09:50:22 A. It was a good position. It was the senior associate under -- in his department overseeing the ticketing and then also the opportunity to become a sport administrator for certain sports.
09:50:44 Q. Did you discuss any particular sports in this initial phone call?
09:50:49 A. I don't -- I can't recall.
09:50:51 Q. Did you discuss compensation?
09:50:53 A. I can't recall.
09:50:55 Q. And so how many discussions did you have with

09:51:01 Mr. Anderson about the job before you took the job?
09:51:03 A. If my memory serves me correct, I believe we spoke three times on the phone before I visited Arizona State.
09:51:12 Q. Okay. So the -- Let me focus on the three phone calls. I don't care which phone call it happened in. Any discussion of compensation in those phone calls?
09:51:26 A. I'm sure it came about.
09:51:27 Q. But do you recall any details?
09:51:29 A. I -- I assume that it was around what -- it was the base plus bonus.
09:51:40 Q. Any discussion of any particular sports that you would administer?
09:51:44 A. Yes. I think originally we had talked about -- Swimming, men's basketball, softball were the initial sports.
09:52:00 Q. Okay. Anything else you recall about the phone calls?
09:52:06 A. Nothing that stands out --
09:52:09 Q. Okay. Then you made a --
09:52:10 A. -- in particular.
09:52:11 Q. You made a trip to campus?
09:52:15 A. Yes, sir.
09:52:16 Q. Who did you meet with when you came out?
09:52:18 A. I met with Ray. I met with Jean Boyd. I met

09:52:27 with I think Don Bocchi, Rocky Harris, and -- and Amy Schramm.

09:52:43 MR. McKIRGAN: Okay. Let's mark this.

09:52:43 THE WITNESS: Bob, it could have been more.

09:52:45 I -- It's been a while.

09:52:47 MR. McKIRGAN: Understand.

This is 50 --

THE COURT REPORTER: 56.

(Deposition Exhibit 56 was marked for

09:53:02 identification.)

09:53:02 BY MR. McKIRGAN:

09:53:19 Q. Exhibit 56 is a letter dated May 28, 2014,

09:53:25 addressed to you. It appears to offer you employment at

09:53:32 ASU. Do you see that?

09:53:33 A. Correct.

09:53:34 Q. Okay. And is that your signature on the second

09:53:37 page acknowledging the letter?

09:53:39 A. Yes, sir.

09:53:40 Q. And the address in Duluth, Georgia, that's where

09:53:45 you were living at the time?

09:53:46 A. Yes.

09:53:47 Q. Did the offer letter marked as Exhibit 56 -- did

09:53:55 that come after your trip to ASU?

09:53:57 A. Yes. But I believe the date is wrong because

09:54:01 I -- I remember I was there Memorial Day weekend, so this

would have predated my visit.

Q. Okay. So let's go through the letter. So you're being offered the position as senior associate director. Is that correct?

A. Correct.

Q. Is that the job that you took?

A. Yes, sir.

Q. It says you will report directly to Ray and/or his designee. Was that your understanding?

A. No. My understanding, I would report directly to Ray.

Q. Well, when you acknowledged the letter and signed it, did you read that part that says you're reporting to Ray and/or his designee?

A. Well, that's what it said. That's not what I was told. So . . .

Q. What were you told?

A. I was reporting to Ray.

Q. Okay. When you got this letter, did you raise with Ray, "Hey, you know, I only want to report directly to you"?

A. Yes.

Q. When did you do that?

A. When we were on our visit.

Q. Okay. So when you got the letter -- So this

09:55:14 letter preceded your visit?
09:55:16 A. As far as the date. I've got to go back and find
09:55:19 out when Memorial Day weekend was in 2014.
09:55:23 Q. Okay.
09:55:23 A. It could have been right -- right before or after
09:55:25 this. I don't know, Bob.
09:55:26 Q. All right. Then it talks about prescreening --
09:55:34 preemployment screening activities. Do you see that? In
09:55:37 the first paragraph, employment is -- offer is contingent
09:55:43 on --
09:55:43 A. Oh, yes, I'm sorry. I thought we were going
09:55:45 down -- Yes.
09:55:46 Q. All right. Did you go through those prescreening
09:55:48 activities?
09:55:48 A. Yes, sir.
09:55:49 Q. All right. Then it talks about the key elements.
09:55:51 Do you see that?
09:55:51 A. Uh-hum. Yes.
09:55:53 Q. Your salary is going to be $175,000 a month.
09:55:57 A. Per year.
Q. Sorry.
09:55:58 A. I wish it was per month.
09:55:59 Q. So per year, right.
09:56:01 And then an annual bonus not to exceed
09:56:04 $100,000.

09:56:05 A. Yes, sir.
09:56:05 Q. And the bonus was "based upon attainment of mutually agreed metrics and goals." Do you see that?
09:56:13 A. Yes.
09:56:13 Q. All right. The bonus was not guaranteed. Is that right?
09:56:18 MR. PÉREZ: Objection. Calls for a legal conclusion.
09:56:22 You can answer.
09:56:22 THE WITNESS: Ray and I had a conversation about the bonus portion -- portion of this.
09:56:28 BY MR. McKIRGAN:
09:56:28 Q. And what was that conversation?
09:56:29 A. It was how -- how comfortable or how attainable will that bonus be.
09:56:42 Q. Okay. And did he say that the bonus would be -- was guaranteed?
09:56:46 A. He said that "As long as I am the athletic director, that you will be almost right at the bonus each year." That was his intention.
09:56:56 Q. So he used the words "almost right at"?
09:57:00 A. "Almost" or "right at."
09:57:01 Q. Did he use the word "guarantee"?
09:57:04 A. Yes. As long as he's the athletic director.
09:57:08 Q. And when did this conversation take place?

09:57:10 A. This happened when I was -- when I was there on our way back from lunch. We went to a pita place for lunch, and it was on our way back. It was almost -- it was -- I was either leaving that day or the -- or the following morning.

09:57:25 Q. Okay. So did you ever ask for this letter that you acknowledged to be amended to make the bonus guaranteed?

09:57:34 A. Well, I believe there's a -- if I recall, there's a -- there's another letter. It's some -- in here that -- that has further detail.

09:57:44 Q. Yeah, let me show that to you.

(An off-the-record discussion ensued.)

MR. McKIRGAN: Hold on a second, Mr. Cohen. And I'm having that document printed off.

THE WITNESS: Okay.

BY MR. McKIRGAN:

09:59:17 Q. All right. So the second letter, did that supersede this Exhibit 56 that we're looking at, the May 28th letter?

09:59:28 A. Until I see it, I won't be able to answer that, Bob.

09:59:33 Q. Okay. But did the second letter come after this -- the trip --

A. Yeah.

09:59:38 Q. -- on campus?
09:59:39 A. Yes, sir.
09:59:40 Q. All right. If you go to Exhibit 54, at page 3, you're asked about your work history, including salary and compensation. Do you see that?
10:00:14 A. Yes, sir.
10:00:16 Q. Go to page 4. Do you see employment for Arizona State University about the middle of the page?
10:00:35 A. Correct.
10:00:37 Q. On line "Compensation," you answered "175,000 Base Salary plus $100,000 discretionary bonus." Do you see that?
10:00:46 A. Yes, sir.
10:00:47 Q. Okay. And that is an answer that you provided under oath. Is that right?
10:00:52 A. Yes, sir.
10:00:52 MR. PÉREZ: It's like an April Fools' joke.
10:01:32 MR. McKIRGAN: Yeah.
10:01:36 BY MR. McKIRGAN:
10:01:40 Q. All right. Your salary at ASU, did it increase over time?
10:01:43 A. Yes, sir.
10:01:44 Q. And in 2019, your last year of employment, was it $191,228? Does that sound about right?
10:01:55 A. It -- I would think yes. That sounds about

10:01:57 right, Bob.
10:01:58 Q. Okay. And your bonuses over the years ranged
10:02:03 from -- Well, the highest bonus you received was $95,000.
10:02:16 Is that right?
10:02:16 MR. PÉREZ: Objection. Vague. You're
10:02:17 talking about at ASU?
10:02:19 BY MR. McKIRGAN:
10:02:21 Q. At ASU.
10:02:21 A. Yeah, I believe it was a -- it was a hundred
10:02:23 thousand the last year, and I donated 5,000 back to the
10:02:26 associate pool.
10:02:27 Q. And your bonuses there ranged from 75,000 to --
10:02:33 A. A hundred, yes.
10:02:34 Q. A hundred minus the 5-.
10:02:37 A. Correct.
10:02:37 Q. I believe your bonus in 2015 was 95,000?
10:02:57 A. That sounds right.
10:02:58 Q. When you got the 2015 bonus, would that -- when
10:03:04 would that have been? That summer of 2015? After the end
10:03:08 of the school year?
10:03:09 A. I -- I believe so. I believe that's when it's
10:03:15 paid.
10:03:15 Q. Did you raise with Mr. Anderson that the bonus
10:03:20 wasn't a hundred thousand dollars?
10:03:21 A. No. We had discussions in -- in that first year.

10:03:25 We were asked -- some of us -- I know one other person were asked to donate back to the associate pool.
10:03:32 Q. Okay.
10:03:33 A. We were happy -- I was happy to do --
Q. Okay.
10:03:36 A. -- it.
10:03:36 Q. In 2016, was your bonus $85,000?
10:03:42 A. I trust that it was, Bob. You have that information.
10:03:46 Q. Did you raise with Mr. Anderson at that time that the bonus was not a hundred thousand dollars?
10:03:53 A. Yes. We would have discussions each year during the annual review.
10:03:59 Q. So what did you say about the 2016 bonus not being $100,000 with Mr. Anderson?
10:04:08 A. I can't recall.
10:04:10 Q. What did Mr. Anderson tell you?
10:04:13 A. I can't recall even asking about it.
10:04:15 Q. Okay. So as you sit here today, do you know whether you asked Mr. Anderson about the fact that the bonus was 85,000 and not a hundred thousand in 2016?
10:04:26 A. Bob, I'm -- I can't remember specific details. I'm sure we had discussions about it.
10:04:33 Q. Yeah, but we're making a record here and I want to confirm with you -- because I don't want to hear

10:04:40 something different at trial -- whether, as you sit here
10:04:43 today, you can recall raising with Mr. Anderson the issue
10:04:46 of the difference between 100,000 and 85,000 for your 2016
10:04:53 bonus.
10:04:53 MR. PÉREZ: Objection.
10:04:56 You can answer.
10:04:56 THE WITNESS: And I'm sure we discussed it,
10:04:58 but I'm also not -- I don't want to lie. I can't
10:05:01 remember specific details, so I don't . . .
10:05:04 BY MR. McKIRGAN:
10:05:05 Q. Anything I can show you to refresh your
10:05:06 recollection?
10:05:07 A. Please.
10:05:07 Q. Do you know of anything I can show you?
10:05:09 A. Oh, oh, no. I thought you had something. I'm
10:05:12 sorry.
10:05:12 Q. I want to show you one thing.
(Deposition Exhibit 57 was marked for
10:05:38 identification.)
10:05:38 BY MR. McKIRGAN:
10:05:48 Q. Exhibit 57 is --
10:05:52 A. So we did get paid in July. Yeah.
10:05:54 Q. -- is a letter to you dated June 22, 2016. Do
10:06:00 you see that?
10:06:01 A. Yes.

10:06:02 Q. From Mr. Anderson?
10:06:03 A. Yes, sir.
10:06:04 Q. And it's informing you that you're being paid a
10:06:08 bonus of $85,000.
10:06:11 A. Correct.
10:06:12 Q. And that would be paid to you in your July 8,
10:06:17 2016, paycheck?
10:06:20 A. Correct.
10:06:20 Q. Okay. Does that help you remember whether you
10:06:22 raised anything with Mr. Anderson about not getting a
10:06:28 $100,000 bonus in 2016?
10:06:30 A. No.
10:06:30 Q. How about 2017? Do you remember what you got --
10:06:39 A. No.
10:06:40 Q. -- by way of bonus?
10:06:43 Does $75,000 sound right?
10:06:45 A. I -- I can't recall. I trust that you know, Bob.
10:06:50 You have it.
10:06:51 Q. Yeah. I'm going to find it here in a second.
(Deposition Exhibit 58 was marked for
10:08:31 identification.)
10:08:31 BY MR. McKIRGAN:
10:08:43 Q. Exhibit 58 is a letter from Mr. Anderson to you
10:08:49 dated July 31, 2017, informing you that you were getting a
10:08:55 $75,000 bonus and that would be paid to you in your

10:09:00 August 18, 2017, paycheck. Do you see that?
10:09:03 A. Yes, sir.
10:09:04 Q. All right. Do you remember raising with Mr. Anderson the fact that you weren't getting a $100,000 bonus in 2017?
10:09:16 A. I can't recall a specific conversation, but I can -- I'm sure we talked about it during my review.
10:09:26 Q. Okay. What do you recall about what you talked about?
10:09:29 A. Again, going back to the year before, I don't remember specifics. I remember -- I'm sure we had a conversation, an overall discussion, about performance and responsibilities.
10:09:43 Q. Well, you don't recall raising the difference between 100,000 and 75,000?
10:09:51 A. Not any specific -- I can't recall any specific topics discussed. Any justification or not.
10:10:05 Q. Okay. And then in 2018, do you remember what your bonus was then?
10:10:16 A. No, I don't, Bob.
10:10:17 Q. I'll show you what was marked as Exhibit 12.
10:10:29 This is a June 25, 2018, letter to you from Mr. Anderson informing you that your 2018 bonus was $80,000. Do you see that?
10:10:42 A. Yes, sir.

10:10:43 Q. Okay. Do you remember raising with Mr. Anderson, after getting the $80,000 bonus, that your bonus was not a hundred thousand dollars?
10:10:55 A. I can't remember specific discussion points, but I'm sure we discussed that -- the fact, going through each of these years, that, you know, the term "discretionary" versus "agreed upon metrics" -- it just would change each year.
10:11:17 Q. What do you mean by that?
10:11:19 A. Well, it's the -- in the -- in the -- If you go back to the original offer letter, it was mutually agreed upon metrics and goals, but then as you can see in each of these letters, it says the athletic director's discretionary bonus.
10:11:38 Q. Okay. And did you disagree with --
10:11:41 Well, let me just ask you. When you received these letters in 2016, 2017, 2018 and saw, you know, "discretionary bonus," in your mind, did you disagree with the notion that the bonus was in Mr. Anderson's discretion -- the amount of bonus -- in your mind?
10:12:03 A. Excuse me, Bob. What was -- Did I disagree that it was Ray's decision?
10:12:08 Q. Correct.
10:12:09 A. Ray was the boss. It was his --

10:12:11 Q. Well, let me -- let me rephrase the question, make sure you're understanding it.
10:12:16 When you received these bonuses in these years and you saw that the bonus was labeled the "Athletic Director's Discretionary Bonus," in your mind -- I'm not asking about what you may have raised with Mr. Anderson -- but in your mind, did you disagree with the idea that the bonus, the amount of that, was in Mr. Anderson's discretion?
10:12:40 MR. PÉREZ: Objection. Legal conclusion.
10:12:43 You can answer.
10:12:44 THE WITNESS: I can't remember at the time what was going through my mind, to be honest with you, Bob.
10:13:01 MR. PÉREZ: Bob, can I ask -- At one point Dave talked about money going back to the associate pool. I don't know if that's a bonus or not or part of the bonus. I don't know if that is part --
10:13:11 MR. McKIRGAN: Let me ask him.
10:13:12 BY MR. McKIRGAN:
10:13:12 Q. So you mentioned in 2016, I believe, you agreed to take $5,000 from the hundred thousand and put it back into the bonus pool. Is that right?
10:13:29 A. Yes, sir. Yes.
10:13:30 Q. Was that for the purpose of providing more money

10:13:32 for others?
10:13:33 A. Yes, sir.
10:13:34 Q. Okay. In the subsequent years, 2015 -- excuse
10:13:54 me -- 2016, '17, '18, was that the reason for the
10:14:00 difference between the amount of the bonus and the hundred
10:14:03 thousand dollars?
10:14:04 A. No. I -- I believe that we discussed two or
10:14:09 three of those years, donated it back to the pool.
10:14:13 Q. Which years? Do you remember?
10:14:15 A. I know the first year. I don't want to be --
10:14:21 lie -- I don't want to be wrong. Maybe --
10:14:22 Q. You can only tell me what you best remember.
10:14:25 A. Okay. Okay.
10:14:25 Q. I'm not -- and --
10:14:26 A. Maybe the second. And I -- and I believe the
10:14:28 last year --
10:14:30 Q. Okay.
10:14:30 A. -- the final bonus in 2019.
10:14:32 Q. So 2015, 2016, and 2019?
10:14:38 A. I think so, Bob.
10:14:39 Q. Okay. And 2017 and 2018, which were, I believe,
10:14:49 the 75,000, 80,000, again, you can't recall any specifics
10:14:59 in terms of your raising with Mr. Anderson the difference
10:15:03 between the amount of the bonus and $100,000. Is that
right?

A. Correct.
Q. Okay. All right. I am going to show you what was previously marked as Exhibit 2.
This is a letter dated June 10, 2014, from Mr. Anderson to you. Do you see that?
A. Yes, sir.
Q. Is this the second offer letter you were referring to in your earlier testimony?
A. I believe so. I'm -- I thought there was a second one.
Q. Okay. So Exhibit 56 was May 28, 2014, that we talked about. And then we've got this June 10, 2014, letter. And again, it's offering you a position as a senior associate athletic director?
A. Yes, sir.
Q. $175,000 a year, right?
A. Yes, sir.
Q. Okay. Anything about a bonus in this second letter?
A. I do not see it. If it's there. I don't. I don't see it.
Q. Okay. Other than Exhibit 56 and Exhibit 2, are you aware of any documentation of the offer of employment as it relates to a bonus?
A. Not to my recollection.

10:17:14 Q. If you take a look at Exhibit 55.
10:17:45 A. Where's 55? Oh, okay.
10:17:46 Q. Go to page 3. You were asked at Interrogatory
10:17:59 Number 14 to describe your -- your damages that you're
10:18:02 claiming. Do you see that?
10:18:03 A. Yes, sir.
10:18:03 Q. Then in the response, there's an objection. And
10:18:07 then subject to the objection, there's a description of
10:18:12 your damages. Do you see that --
10:18:14 A. Yes, sir.
10:18:14 Q. -- on page 4.
10:18:19 In that interrogatory, you mention not --
10:18:50 not being able to find employment in the sports world.
10:18:54 A. Yes, sir.
10:18:54 Q. And if I understand some discussions that I had
10:19:00 with your counsel, at some point you engaged a search
10:19:04 firm.
10:19:04 A. I've had many discussions with multiple search
10:19:07 firms.
10:19:08 Q. Okay. So focusing on your efforts following the
10:19:16 termination of your employment in December 2019 with ASU,
10:19:20 what have you done to look for a job in the sports world?
10:19:24 MR. PÉREZ: Objection. Misstates facts.
10:19:26 You can answer.
10:19:27 THE WITNESS: Initially -- I have not

10:19:31 searched in the last year and a half, but initially, I had conversations with the three to four primary search firms.
10:19:40 BY MR. McKIRGAN:
10:19:40 Q. And who are they?
10:19:41 A. D- -- it's DHR, Glenn Sugiyama.
10:19:47 Q. Glenn what?
10:19:48 A. Sugiyama, S-u-g-i-y-a-m-a.
10:19:55 Daniel Parker from Parker & Associates.
10:20:02 Len Perna from Turnkey, which is now ZRG. And Chad Chatlos, which is ZRG, and they merged with Len Perna -- Len Perna's group. I'm sorry.
10:20:24 Q. Is Glenn -- how do you say his last name?
10:20:27 A. Sugiyama.
10:20:28 Q. Is he with DHR?
10:20:30 A. Yes, sir.
10:20:31 Q. Anybody else?
10:20:36 A. Those are the four primary firms that specialize in college athletics.
10:20:45 Q. Anybody else that you can remember other than the four primaries?
10:20:48 A. Not off the top of my head.
10:20:50 Q. Okay. And did you retain any of these search firms to look for you?
10:20:57 MR. PÉREZ: Objection. Vague.
10:20:59 You can answer.

10:20:59 THE WITNESS: No.
10:21:00 BY MR. McKIRGAN:
10:21:01 Q. Why not?
10:21:02 A. That's just -- It's not how it works.
10:21:06 They're -- they're not agents of representation.
10:21:09 They're -- they're out sourcing opportunities, and they --
10:21:14 they will come to you. You don't hire them.
10:21:16 Q. Okay. So tell me what you discussed with
10:21:21 Mr. Sugiyama at DHR.
10:21:24 A. What opportunities would be out there that fit my
10:21:28 profile. And the -- the same answer will be with -- with
10:21:33 each of them. But if you want to go through each of them,
10:21:36 Bob, we can. That would fit my background and profile.
10:21:39 Q. When did you talk to Mr. Sugiyama?
10:21:45 A. It would be 2000 -- late 2019 through 2020.
10:22:04 Q. How many times did you talk to Mr. Sugiyama?
10:22:10 A. If I can recall correctly, Bob, two to three
10:22:17 times.
10:22:17 Q. And what did you discuss with him besides what
10:22:24 opportunities and your -- your profile?
10:22:27 A. It -- Not to play groundhog, it's a similar
10:22:31 conversation with -- with those guys, each -- each
10:22:36 discussion.
10:22:36 Q. Do you know if Mr. Sugiyama made any inquiries on
10:22:42 your behalf?

10:22:43 A. His advice to me was "Dave, now's the right -- not the right time. You're -- you're pretty toxic right now," which was interesting. They -- they -- they all used the word "toxic," which is a tough thing to hear.

10:23:00 Q. Okay. And when did he tell you that?

10:23:02 A. During these conversations.

10:23:03 Q. So late 2019 to 2020?

10:23:05 A. Yes. Those -- Bob, to be -- yes, that's when I discussed -- that's the -- Yeah.

10:23:12 Q. Did he explain to you why you were toxic?

10:23:14 A. Just the exit surrounding Arizona State.

10:23:20 Q. And what specifically surrounding the exit?

10:23:22 A. Didn't get into specifics.

10:23:24 Q. Anything else you can recall discussing with Mr. Sugiyama?

10:23:43 A. No. He had a great opportunity, too.

10:23:50 Q. What was that?

10:23:51 A. It was the leadership position in the NABC, National Association of Basketball Coaches.

10:23:58 Q. And what did you discuss with him about that?

10:24:01 A. About the opportunity.

10:24:03 Q. And did you pursue that opportunity?

10:24:05 A. I tried. And he said, "Dave, you -- you would be a good candidate, but you're just toxic."

10:24:12 Q. And when -- when you say you tried, what did you

10:24:14 do?
10:24:14 A. I tried to get engaged and -- and -- and put
10:24:18 my -- have him put my name forward.
Q. Did he --
10:24:21 A. He said, "It's not -- it's not worth the time."
10:24:23 Q. Did he refuse to put your name forward?
10:24:25 A. He said -- he said, "It would not be worth my
10:24:28 time to even put your name forward."
10:24:30 Q. Did you make any effort on your own to put your
10:24:32 name forward?
10:24:33 A. No.
10:24:33 Q. Why not?
10:24:34 A. Because everything goes through the search firm.
10:24:36 Q. Anything else you can recall discussing with
10:24:42 Mr. Sugiyama?
10:24:43 A. Not off the top of my head, Bob. Not that I can
10:24:48 recall.
10:24:49 Q. When you talked to him about you being toxic, did
10:24:55 he provide you any specifics other than the circumstances
10:25:00 surrounding your leaving Arizona State University?
10:25:03 A. No. Because there was -- you know, I was still
10:25:09 under -- I didn't discuss my exit. It was just what
10:25:14 people had heard around the industry. Because I still at
10:25:17 that time couldn't talk about it, nor should I have talked
10:25:20 about it.

10:25:21 Q. Well, did Mr. Sugiyama report to you what was being said around the industry?
10:25:36 A. He said, "The -- Your exit at ASU, there's a lot of rumors around it. And right now, Dave, you're toxic."
10:25:45 Q. Okay. And did he indicate to you what -- what he thought the sources of the rumors were?
10:25:50 A. Huh-uh.
10:25:51 Q. What's that?
10:25:52 A. No. I'm sorry, Bob.
10:25:54 Q. Do you know what the sources of the rumors are?
10:25:57 A. No.
10:25:58 Q. Do you know what the substance of the rumors were?
10:26:04 A. No.
10:26:05 Q. Do you recall that your notice of claim -- sending the notice of claim to ASU prior to the lawsuit?
10:26:25 A. Okay.
10:26:25 Q. Do you remember that --
10:26:27 A. Yes, sir.
10:26:27 Q. -- happening?
10:26:29 And that was in the media, wasn't it?
10:26:33 A. I can't recall the timing of it.
10:26:36 Q. Okay. But it eventually was in the media at some point?
10:26:47 A. Yes, sir. Yes.

Q. And your lawsuit was in the media?
A. Yes.
Q. Okay. Do you know whether your notice of claim or your lawsuit was the source of the scuttlebutt going around the industry?
A. I don't know. I could surmise. I'm sure it was.
Q. Okay. Anything else you can tell me about your conversations with Mr. Sugiyama that you haven't already told me? I just want to make sure I have exhausted your recollection.
A. No.
Q. Okay. Let's go to Daniel Parker. When -- when did you speak with Mr. Parker?
A. Around the same time, late 2019, 2020.
Q. And what did you and Mr. Parker discuss?
A. If there's any potential opportunities out there that would fit --
Q. And what --
A. -- my background.
Q. What did Mr. Parker tell you?
A. He had a similar response to what Glenn had said, that "Dave, right now is not a good time. You're pretty toxic."
Q. Okay. Did Mr. Parker make any inquiries on your behalf? Do you know?

10:28:09 A. Not that I'm aware of.
10:28:11 Q. And when did those discussions take place? Late 2019 to -- through 2020?
10:28:17 A. If my memory recalls correctly, Bob, yes.
10:28:20 Q. Did Mr. Parker explain to you why it was that you were toxic?
10:28:27 A. Around the exit at Arizona State.
10:28:31 Q. Any specifics that he provided?
10:28:33 A. No.
10:28:34 Q. Any -- Did he ever tell you why he thought you were toxic other than the circumstances surrounding your departure?
10:28:46 A. Not that I can recall.
10:28:47 Q. Anything else you can recall about your discussions with Mr. Parker?
10:28:56 A. No.
10:28:59 Q. How about Mr. Perna?
10:29:04 A. Yes, sir.
10:29:04 Q. When did you -- Is it Len?
10:29:07 A. Len, yeah. L-e-n. Perna, P-e-r-n-a.
10:29:12 Q. When did you speak to him?
10:29:13 A. Around the same period.
10:29:14 Q. Same kind of conversation?
10:29:16 A. Yes, sir.
10:29:17 Q. Did Mr. Perna explain to you -- Did he use the

10:29:21 word "toxic"?
10:29:22 A. If -- I can't remember. I -- I do remember the
10:29:24 previous two. And Len is somebody that I had known and
10:29:29 worked with for a longer period of time because he also
10:29:33 does professional sports searches, professional --
10:29:38 searches for professional sports teams in addition to
10:29:41 college. He's the biggest player in the field.
10:29:44 Q. Okay. And any specifics that you recall with
10:29:47 your discussions with Mr. Perna?
10:29:49 A. Yeah. He said I was unhirable right now.
10:29:52 Q. Did he explain why?
10:29:55 A. He didn't explain why. He said, "Dave, around
10:29:58 the exit at Arizona" -- he didn't get into specifics, but
10:30:02 he said, "Around the exit at Arizona State, Dave,
10:30:05 there's -- you're unhirable right now," which was a hard
10:30:08 thing to hear.
10:30:10 Q. Anything else you can recall him saying about why
10:30:12 you were unhirable?
10:30:13 A. Not specifics.
10:30:16 Q. How about generalities? Just your exit from ASU?
10:30:20 A. It's -- it's around the exit at Arizona State,
10:30:25 yes.
10:30:25 Q. How about -- Did Mr. Perna make any inquiries in
10:30:32 your behalf? Do you know?
10:30:33 A. Not that I -- I don't think so.

10:30:35 Q. And then Chad Chatlos?
10:30:41 A. Chatlos, C-h-a-t-l-o-s.
10:30:44 Q. When did you talk to him?
10:30:47 A. Around the same period, 2000 -- late 2019, 2020.
10:30:52 Q. And what did he tell you?
10:30:54 A. Very similar tone. I can't remember if he used 10:30:56 the -- the word "toxic" or -- or "unhirable," but at -- at 10:30:59 this point, he said, "Dave, you wouldn't be a fit for 10:31:02 colleges to look at."
10:31:04 Q. Did he say why?
10:31:10 A. Around the exit at Arizona State.
10:31:12 Q. Any specifics?
10:31:16 A. No, sir. Not that I can recall, Bob.
10:31:19 Q. Okay. Did he mention rumors?
10:31:22 A. I can't -- I can't remember.
10:31:25 Q. Okay. I think you said you talked to Glenn 10:31:30 Sugiyama three or four times. Is that right?
10:31:35 A. Glenn -- I talked -- well, I've talked to Glenn 10:31:39 three or four times since my departure, but I think around 10:31:43 the 2019, 2020 period, I talked to him at least twice 10:31:49 really about the NABC position. Sorry if I wasn't more 10:31:52 specific.
10:31:53 Q. Okay. How about Mr. Parker? How many times did 10:31:56 you talk to him about trying to find a job?
10:31:59 A. During that period?

10:32:00 Q. Yes.
10:32:00 A. Or in total?
10:32:02 Q. During that period.
10:32:02 A. Oh. Probably once or twice at most.
10:32:05 Q. How about Mr. Perna?
10:32:07 A. Probably similar -- Maybe only once with Len.
10:32:12 Q. How about Mr. Chatlos?
10:32:14 A. Once.
10:32:14 Q. When's the last time you talked to either of 10:32:21 these four about job opportunities in the sports industry?
10:32:27 A. I haven't talked to them in the last two years.
10:32:32 Q. So the discussions you've talked about were late 10:32:41 2019 through 2020. Were you still trying in 2021 and 2022 10:32:47 to talk with any search firms about job opportunities in 10:32:52 the sports field?
10:32:52 A. No. I -- I think that any future discussion 10:32:55 would have to be after this case is done. It's gone on 10:33:01 awhile.
10:33:02 Q. And was there -- Were you looking for 10:33:08 opportunities in the college sports? Pro sports?
10:33:10 A. Both.
10:33:11 Q. Your current job, Hames Private Equity --
10:33:31 A. Hammes.
10:33:32 Q. Hammes. When did you start there?
10:33:34 A. I started there in January.

10:33:36 Q. Of 2024?
10:33:37 A. Yes, sir.
10:33:43 My LinkedIn file should be updated. Oh, I didn't update it. This is dated 12-14, so it wouldn't have been updated until January of 20 -- 2024.
10:34:00 Q. What's your compensation package there?
10:34:01 A. I make 185 base and a bonus pool of 55 percent of my base pay.
10:34:13 Q. So you got -- you can get up to 55 percent of 185,000 as a bonus?
10:34:26 A. Correct.
10:34:27 Q. And is the bonus discretionary?
10:34:29 A. It's -- it's based on collaboration and work performance.
10:34:37 Q. Is there any formula involved in the determination --
10:34:41 A. No.
10:34:42 Q. -- of the bonus?
10:34:43 A. No.
10:34:44 Q. Have you received any bonuses for 2024 yet? I assume not.
10:34:56 A. No. No. It -- it will be paid out next -- first quarter of next year is what they say.
10:35:06 Q. And Hamm- -- Hammes Private Equity firm, that specializes in medical office buildings?

10:35:12 A. Yes, sir.
10:35:12 Q. Where are they based out of?
10:35:15 A. Milwaukee, Wisconsin.
10:35:17 Q. And again, you're -- Your position is what again?
10:35:24 A. The vice president of business development.
10:35:27 Q. So what do you do as vice president of business development?
10:35:31 A. It's a similar role that I had before, as I go out and cultivate new business opportunities across the country representing Hammes.
10:35:46 Q. Are they a competitor of Healthcare Realty?
10:35:51 A. Yes.
10:35:52 Q. How did you come to leaving Healthcare Realty and joining Hammes?
10:36:00 A. A search firm contacted me.
10:36:02 Q. Why did you leave Healthcare Realty?
10:36:05 A. Hammes is regarded if -- in the sports realm, they're -- they're the New York Yankees. They're the best in class in this sector.
10:36:16 Q. Okay. At Healthcare Realty, in 2023, how much money did you make there?
10:36:26 A. In 2023?
10:36:29 Q. Yeah.
10:36:30 A. I had a good year. It was about 455 grand.

10:36:40 Q. How much of that was bonus?
10:36:44 A. Okay. My base was 185. Subtract -- or whatever the variance is between that. But that also included the previous year's bonus from Healthcare -- from Healthcare Trust of America and then -- and then commission in -- in 2023 off of my -- my deals.
10:37:15 Q. Okay. I'm going to go back through that in a little bit more detail later.
10:37:20 So going back to Interrogatory Number 14, when you describe your damages -- Go to line 5 of page 4.
10:37:45 A. Yeah. Yes, sir.
10:37:48 Q. You talk about "back pay from the date of his wrongful termination through the date of a judgment in this matter."
10:37:56 So what do you consider the date of your wrongful termination?
10:38:00 MR. PÉREZ: Objection. Legal conclusion.
10:38:03 You can answer.
10:38:03 THE WITNESS: I mean, I was fired in August. I was told I was fired, but then I was officially terminated in December.
10:38:13 BY MR. McKIRGAN:
10:38:13 Q. And between August and December, were you paid?
10:38:15 A. Yes, sir.
10:38:16 Q. So if -- if we use August or December 2019 to the

10:38:35 date of judgment, during that time period, you -- you were
10:38:37 making money in your new employment?
10:38:41 A. In 2019?
10:38:42 Q. No. Well, let's start from December 2019
10:38:47 forward. When did you start replacing your income?
10:38:51 A. I started at Healthcare Trust of America in
10:38:55 January of 2020.
10:38:56 Q. Okay. So -- And you started at 175,000?
10:39:07 A. No. It -- it was -- I started out as a -- as a
10:39:10 contract employee, so I was -- I believe it was $10,000 a
10:39:16 month to -- as a test, a trial, to see if I liked it or if
10:39:25 they liked me.
10:39:26 Q. Okay. And how long did that last?
10:39:27 A. About three months.
10:39:28 Q. And then -- So that takes you to March of 2020?
10:39:33 A. Yes, sir.
10:39:33 Q. In March of 2020, how much were you making at
10:39:37 Healthcare Realty?
10:39:38 A. They converted me to a full-time employee, and --
10:39:40 and I was making 175 base.
10:39:42 Q. Plus a bonus?
10:39:43 A. Yes, sir, which was 50 percent of my base.
10:39:52 Q. At Healthcare Trust -- excuse me. Healthcare
10:39:59 Realty and then Healthcare -- excuse me. Healthcare Trust
10:40:04 of America, then Healthcare Realty, did you get benefits?

10:40:07 A. Yes, sir.
10:40:08 Q. What -- what were your benefits there?
10:40:09 A. Health and dental, vision, same typical benefits
10:40:17 I think any full-time employee gets.
10:40:19 Q. How about any sort of retirement?
10:40:21 A. Yes, sir. Well, I had a 401(k) plan that you
10:40:25 contributed to, that they contributed a small -- I can't
10:40:27 remember what the amount was, Bob.
10:40:30 Q. What kind of retirement plan did you have at ASU?
10:40:35 A. I -- I had the -- They had the -- the pension
10:40:39 one and -- and the other one. I don't know what the
10:40:42 correct term was. But I -- I did not do the pension one.
10:40:45 I did the -- Based on my age, I did the 401(k) one.
10:40:51 Q. So you made contributions to your 401(k) plan --
10:40:55 A. Yes, sir.
10:40:56 Q. -- at ASU?
10:40:56 A. Yes, sir.
10:40:57 Q. And ASU did some sort of matching?
10:41:00 A. Yes.
10:41:00 Q. And so that was similar to what you were doing --
10:41:04 what you did at Healthcare Trust and then Healthcare
10:41:08 Realty?
10:41:08 A. Correct.
10:41:09 Q. How about at Hammes?
10:41:13 A. Hammes.

10:41:15 Q. Hammes.
10:41:15 A. You'll get it right.
10:41:16 Q. What kind of benefits do you get there?
10:41:18 A. Very similar. Very similar. Health and -- 10:41:23 benefit, 401(k) contribution. They actually contribute 10:41:28 less.
10:41:28 Q. Do you know how much less?
10:41:31 A. No. I mean, I do, but I -- I can't -- I mean, 10:41:37 it's based on a percent. 2 to 3 percent.
10:41:41 Q. How about do they provide a car?
10:41:46 A. No.
10:41:46 Q. Did Healthcare Trust or Healthcare Realty provide 10:41:49 a car?
10:41:50 A. No, sir.
10:41:50 Q. How about country club dues? Did Healthcare 10:42:01 Trust of America, Healthcare Realty, or Hammes provide 10:42:05 country club dues?
10:42:06 A. No, sir.
10:42:07 Q. Did ASU pay your country club dues?
10:42:10 A. As long as it was used for business.
10:42:12 Q. So how did that work? You had monthly dues at 10:42:17 your club, correct?
10:42:19 A. Yes.
10:42:19 Q. And that was at DC Ranch?
10:42:21 A. DC Ranch country club, yeah.

10:42:24 Q. And did you own the actual membership?
10:42:26 A. Oh, I didn't, no. It was under -- Arizona State
10:42:29 owned it.
10:42:30 Q. So Arizona State paid for the membership -- the
10:42:34 initial fee?
10:42:34 A. Yes. But in my use, as I had to use it for
10:42:38 business, I couldn't just use it for personal.
10:42:41 Q. All right. And so if you used -- Let's say you
10:42:51 went to DC Ranch and played golf and it was just personal,
10:42:56 just you and some friends, how was that accounted for by
10:43:03 ASU? Was that just --
10:43:04 A. I had to pay for that.
10:43:06 Q. Okay. So did every month you go through the --
10:43:09 A. Itemization, yes.
10:43:11 Q. -- membership bill and itemize? Okay.
10:43:15 So your personal use of the country club was
10:43:18 never paid for by ASU?
10:43:19 A. Correct. Maybe the last -- the very, very last
10:43:25 bill that came, there -- there was some usage, but that
10:43:30 was just -- it was over -- you know, might have been, you
10:43:35 know . . .
10:43:35 Q. Okay. So just kind of going through these
10:43:43 categories at page 4 of Exhibit 55, Category Number 1,
10:43:54 "back pay from the date of . . . wrongful termination
10:43:56 through the date of . . . judgment."

10:43:57 So at least from August '15 through December '19, you were still being paid by ASU, right?
10:44:03 A. Correct.
10:44:03 Q. Starting in January 2020, you were making some amount per month on kind of a trial basis with Healthcare Trust of America?
10:44:14 A. Yes, sir.
10:44:15 Q. And you think it was around $10,000 a month?
10:44:17 A. That's how I started, I -- I believe.
10:44:19 Q. And then in March of 2020, you were making $175,000 --
10:44:25 A. Yes, sir.
10:44:26 Q. -- plus bonus?
10:44:27 A. Yes, sir.
10:44:27 Q. Okay. Category 2 is "front pay through at least the age of 65."
10:44:36 That's when you expect to retire?
10:44:39 A. That's a good question. I would hope it would be somewhere around there.
10:44:46 Q. Okay. But you plan to work until you retire, correct?
10:44:48 A. I have to, yes.
10:44:49 Q. And you plan to make money at whatever it is --
A. That's the only --
10:44:54 Q. -- you're doing?

10:44:54 A. Yes.
10:44:55 Q. Okay. Category 3 is "compensation for lost benefits . . . loss of fringe benefits such as reimbursement for country club dues . . . ."
10:45:24 Now, you were never reimbursed for your personal use, right?
10:45:29 A. No.
10:45:29 Q. Automobile payments. Your subsequent employers didn't pay for a car, if I understand you.
10:45:44 A. Correct.
10:45:45 Q. And loss of retirement benefits. Now, your 401(k) contributions at ASU, did you roll those over somewhere?
10:45:54 A. I believe they're in my current brokerage account or they're still -- Yeah, I believe I did, yes.
Q. Okay.
10:46:00 A. Yes.
10:46:00 Q. So you took whatever was in your 401(k) at ASU and put it somewhere else?
10:46:06 A. Correct.
10:46:06 Q. All right.
10:46:09 MR. PÉREZ: Bob, we've been going for about an hour.
10:46:11 MR. McKIRGAN: Yeah. Let's take a break here.

THE VIDEOGRAPHER: Off the record at 10:46 a.m.
(A recess ensued.)
THE VIDEOGRAPHER: Back on the record at 11:03 a.m.
BY MR. McKIRGAN:
Q. Mr. Cohen, after the break, anything you need to clarify or correct?
A. I don't think so.
Q. Okay. So during the break, you know, I went back to a 2014 calendar and Memorial Day was on --
MR. PÉREZ: May 26th.
MR. McKIRGAN: Correct. The 26th.
BY MR. McKIRGAN:
Q. This letter, Exhibit 56, came after that Memorial Day weekend.
A. Okay.
Q. Okay?
A. Yeah.
Q. So when you got the letter, given your discussions you had with Mr. Anderson during that trip to ASU when you received this letter after that trip, did you, in your mind, think the bonus should be -- you know, it doesn't say "guaranteed"?
A. No.

(Deposition Exhibit 59 was marked for identification.)

BY MR. McKIRGAN:

11:05:25 Q. Exhibit 59, I will represent to you, is the
11:05:31 documents that we subpoenaed from Healthcare Realty Trust,
11:05:39 and that they -- you know, they provided to us, which
11:05:43 includes documents regarding your income.
11:05:48 And I'd like to ask you a couple questions.
11:05:50 If you go to the document that's numbered HRT 000029
11:05:58 [sic], towards the back.
11:05:59 A. Okay. Yes.
11:06:00 Q. Now, according to your 2020 W-2 from Healthcare
11:06:14 Trust, it looks like your wages/tips and other
11:06:19 compensation was almost $116,000.
11:06:24 A. Right up here? Yes, sir.
11:06:26 Q. Correct.
11:06:27 A. It shows that.
11:06:33 Q. And your gross pay was 132,000. See that?
11:06:38 A. Yes, sir.
11:06:38 Q. Do you know if the $131,923 figure includes those
11:06:50 10,000 a month payments you got January through March?
11:06:53 A. I don't know. I would assume if it's on there --
Q. Do you know --
11:06:57 A. -- but I don't know.
11:06:57 Q. Did you receive a 1099 for those payments?

11:07:02 A. I don't recall.
11:07:03 Q. Okay. If you go to 2021, which is at --
11:07:16 MR. PÉREZ: Counsel, may I interject?
11:07:19 Don't write on the exhibits.
11:07:21 THE WITNESS: Oh, don't?
11:07:23 MR. PÉREZ: It's okay.
11:07:24 THE WITNESS: Okay.
MR. PÉREZ: It's all right.
11:07:26 MR. McKIRGAN: Yeah. All the exhibits
11:07:29 you're looking at are the official exhibits, and they go back to the court reporter.
THE WITNESS: Sorry.
MR. McKIRGAN: That's all right.
BY MR. McKIRGAN:
11:07:31 Q. 2020 --
11:07:31 MR. PÉREZ: Can I substitute out the clean
11:07:33 ver- -- I don't have a clean version. It's fine. It's
11:07:36 fine, Bob.
11:07:37 THE WITNESS: Put this away.
11:07:37 BY MR. McKIRGAN:
11:07:40 Q. Do you know -- Let me go back to 2020. Did you
11:07:43 receive a bonus for 2020?
11:07:45 A. Yes, but it wasn't paid until 2021.
11:07:50 Q. Okay. So let's look at 2021, which is the next
11:07:55 page.

11:08:03 It shows gross pay of $196,220.
11:08:07 A. Yes, sir.
11:08:07 Q. Is that what you recall?
11:08:10 A. Yes.
11:08:11 Q. Do you remember how much your bonus was for 2020?
11:08:14 A. Well, it -- In Healthcare Trust of America, the
11:08:18 bonus was half cash, half stock.
11:08:23 Q. Okay. How much was the cash?
11:08:27 A. Roughly -- So it's -- if it's around 20-,
11:08:37 25,000, if I had -- if my memory serves me.
Q. I'll show you --
MR. McKIRGAN: Let's mark that.
(Deposition Exhibit 60 was marked for
11:09:19 identification.)
11:09:19 BY MR. McKIRGAN:
11:09:34 Q. Exhibit 60 is a copy of a decree of dissolution
11:09:41 of non-covenant marriage without minor children. Do you
11:09:46 see that?
11:09:46 A. Yes, sir.
11:09:47 Q. And we pulled this from the court records.
11:09:50 Is this a copy of your divorce decree?
11:09:54 A. Yes.
11:09:55 Q. If you go to page 5, down towards the bottom,
11:10:19 there's a paragraph 15, "Bonus."
11:10:23 A. Oh, yes, sir.

11:10:24 Q. It says, "Respondent received a bonus for 2020 in the amount of $39,375.00."
11:10:29 And you're -- I believe you're the respondent. Is that accurate?
11:10:34 A. I would trust, yes, that that's more accurate than my memory.
11:10:37 Q. There's also at -- over at page 3, paragraph 5 at the bottom, there's a reference to The Country Club at DC Ranch.
11:11:04 A. Yes.
11:11:05 Q. And you're going to pay Kathy Cohen one-half of the equity in your membership in The Country Club at DC Ranch. Do you see that?
11:11:16 A. Correct.
11:11:18 Q. And did you have a membership at DC Ranch in your own name?
11:11:21 A. No.
11:11:21 Q. Did you at some point -- Well, explain to me why you're paying Kathy for one-half of a Country Club at DC Ranch.
11:11:35 A. We had it in our name. It was under the family.
11:11:39 Q. Oh, I'm sorry. Okay.
11:11:41 So that was a -- The membership at -- DC Ranch country club membership, you had one in your and Kathy's name. Is that correct?

11:11:52 A. Yes, sir.
11:11:52 Q. And then you had this other membership that was owned by ASU?
11:11:58 A. No. I had the country club membership at Arizona State. And then when that went away, when I got the new job, we got our own membership.
11:12:09 Q. Okay. All right. And after you -- you and Kathy acquired the membership in your own name, the divorce followed and you're paying her one-half of the equity of -- for that membership. Is that correct?
11:12:38 A. Yes, sir.
11:12:38 MR. PÉREZ: Objection.
11:12:39 BY MR. McKIRGAN:
11:12:41 Q. How much did you pay for that membership when you got it in your own name?
11:12:45 A. 135,000.
11:12:58 Q. All right. Let's go back to Exhibit 59.
11:13:14 And I want to -- I want to show you your 2021 tax return.
(Deposition Exhibit 61 was marked for identification.)
11:13:49 BY MR. McKIRGAN:
11:13:56 Q. Exhibit 61 is -- appears to be a copy of your 2021 tax return. Is that right?
11:14:02 A. Yes, sir.

11:14:02 Q. And you used an accounting firm out of Georgia to prepare your return?
11:14:10 A. Yes.
11:14:11 Q. If you go to the Bates Number COHEN_000306, it shows wages, salaries, tips $211,846. Do you see that?
11:14:46 A. Yes, sir.
11:14:47 Q. Was there other income besides the Healthcare Trust of America income for you and Kathy that year?
11:14:59 A. I'd have to look.
11:15:02 Q. Okay. So the gross pay, according to Exhibit 59 at Bates Number 30, shows $196,220 for gross pay. Your tax return summary shows close to 212,000. Do you understand what the difference is?
11:15:26 A. I'm sure Kathy contributed some work.
11:15:30 Q. Did -- did she work that year?
11:15:31 A. Yes. She -- she --
11:15:33 Q. Okay. I'm just asking.
11:15:34 A. Yes. Yes.
11:15:35 Q. What did she do?
11:15:38 A. I can't remember. She's done all kinds of things. Nothing full-time.
11:15:44 Q. Okay.
11:15:52 A. Is that it with this one?
11:15:54 Q. Yep.
11:15:57 Okay. 2022 is at -- on the last page of

11:16:10 Exhibit 59, Bates Number 32. So your gross pay there is
11:16:22 shown as $477,614. Do you see that?
11:16:27 A. Yes, sir.
11:16:28 Q. All right. How much of that was your base
11:16:37 salary?
11:16:37 A. Got to subtract out the 185-.
11:16:42 Q. Okay.
11:16:43 A. 170- -- 170-, 180- -- 180-ish.
11:16:48 Q. Do you remember the amount of your bonus in 2022?
11:17:00 A. No. Because I know it was -- it was the
11:17:05 transition year, so it was a hybrid between the two
11:17:09 companies. Some of it was bonus from the previous year
11:17:13 but then also the commission.
11:17:18 Q. So when -- Let me find it.
11:17:29 When Healthcare Realty took over your
11:17:34 employer, you started getting a commission as well?
11:17:37 A. Yeah. They changed the -- they changed the
11:17:39 compensation model.
11:17:41 Q. So let's make sure the record's accurate on this.
11:17:48 At Healthcare Trust, you had a base salary and a
11:17:54 commission?
11:17:55 A. At Healthcare Trust, I had a base plus a bonus,
11:18:00 which was divided between cash and stock.
11:18:02 Q. Okay. Then when Healthcare Realty took over,
11:18:05 what was the package?

11:18:06 A. It was base plus commission.
11:18:09 Q. Okay.
11:18:10 A. No -- no standard bonus.
11:18:12 Q. Right.
11:18:13 And the commission was based on a formula?
11:18:15 A. Based on what you -- you know, what you sold --
11:18:19 what you brought in, sourced.
11:18:21 Q. The -- at Healthcare Trust, the part of the bonus
11:18:30 that was stock, do you still have that stock?
11:18:35 A. Well, it vests, but then you also had to pay
11:18:38 taxes, and then they sell some stock. I'm not a
11:18:42 sophisticated -- I've never worked for a public company.
11:18:45 But when stuff vests, you have to sell some to cover the
11:18:49 taxes. So --
Q. Okay.
11:18:49 A. Yeah, I still have, you know, a few thousand
11:18:52 shares or whatever.
11:18:53 Q. So in 2022, it looks like you had a pretty good
11:19:03 year.
11:19:03 A. For me, yes.
11:19:04 Q. Then in 2023 --
11:19:13 A. We're going backwards?
11:19:14 Q. It's page before, Bates Number 31.
11:19:20 It shows gross pay of $111,900. So in 2023,
11:19:38 is that the year that Healthcare Realty took over --

11:19:42 A. Yes.
11:19:42 Q. -- Trust?
11:19:43 A. It was July of that year. So it was, like, a half year.
11:19:48 Q. And your base salary after the takeover by Healthcare Realty, did that change?
11:19:53 A. I think maybe I got a 3 percent raise, if -- if I recall.
11:20:00 Q. So it was something north of 175,000?
11:20:03 A. Yes. Yes.
11:20:06 Q. Do you know why the gross pay for the year shown is only $111,900?
11:20:13 A. Well, it was half the year. There was no bonus.
11:20:15 Q. So this 2023 W-2 only covers half the year?
11:20:23 A. Yeah.
Q. Okay.
11:20:23 A. Because it's Healthcare Realty Trust.
11:20:26 Q. Did you get a W-2 from your -- for the entity that took over Healthcare -- Which I thought was Healthcare Realty.
11:20:53 A. Do you want me to explain, Bob?
11:20:55 Q. Yep.
11:20:56 A. Okay. So 2023, Healthcare Realty is from July, whatever the closing, through December. And then when you go to -- yes -- No. 2023 is after '22. This doesn't

seem right.
Q. That's why I'm asking the question.
A. It's actually -- it's the opposite. '23 should have -- '23 was last year, right? So that should have the bonus from the previous year. Yeah, this is wrong.
Q. Okay.
A. So she gave you the wrong stuff, I think, because it doesn't add up. It doesn't make sense.
MR. PÉREZ: Don't guess.
THE WITNESS: Sorry. Yeah.
MR. PÉREZ: Don't guess.
THE WITNESS: Don't guess. Sorry.
BY MR. McKIRGAN:
Q. So the 447,000 -- excuse me -- 477,614 shown at Bates Number 32, you think that's your 2023?
A. Yes. Yes.
Q. Given the amount of money you made at Healthcare Realty in 2023 and, as you said, it was a pretty good year for you, do you expect to make more money at Hammes?
A. Hammes.
Q. Hammes?
A. No.
Q. Why not?
A. The compensation is different and a little bit more consistent, because it's bonus-based versus

11:22:43 commission-based.
11:22:44 Q. Well, you don't know yet what your bonus is for
11:22:49 2024, obviously --
11:22:51 A. No.
11:22:51 Q. -- right?
11:22:52 Is that right?
11:22:52 A. No, I don't.
11:22:53 Q. Yeah. When you joined Hammes, did -- was there a
11:23:05 discussion of how much that bonus could be?
11:23:12 A. The target is based on 55 percent of my base --
11:23:17 base salary.
11:23:17 Q. Can it exceed 55 percent of your base salary?
11:23:20 A. No.
11:23:21 Q. It's capped at 55 percent of your base salary?
11:23:24 A. Yes, sir.
11:23:24 Q. So if my math is right, 55 percent of 185,000 is
11:23:44 what? Close to a hundred thousand?
11:23:46 A. Yes.
11:23:47 Q. So why would you leave a company where you made
11:24:02 $477,000 for a company where your max you could make is
11:24:11 what? 285?
11:24:13 MR. PÉREZ: Asked and answered.
11:24:14 You can answer it again.
11:24:16 THE WITNESS: The -- the market changed for
11:24:18 Healthcare Realty. They no longer have the ability to

11:24:21 fund projects. Stock prices dipped below -- it's like 13
11:24:27 and a half right now.
11:24:28 BY MR. McKIRGAN:
11:24:31 Q. Okay. So you thought Hammes had a better future?
11:24:35 A. Yes, sir.
11:24:36 Q. All right. Going back to --
11:24:55 A. Shall we put that away?
11:24:58 Q. Yeah, you can put that away.
11:25:00 -- Exhibit 55, the answer to the second set
11:25:04 of interrogatories, page 4, we've talked about the first
11:25:12 three categories. I'm going to skip over Number 4 and
11:25:19 talk to you about -- ask you about Number 5, "compensatory
11:25:22 damages to compensate Plaintiff for the emotional distress
11:25:24 and mental anguish." Do you see that?
11:25:26 A. Yes, sir.
11:25:27 Q. All right. Okay. What are your symptoms of
11:25:30 emotional distress?
11:25:32 MR. PÉREZ: Objection. Calls for expert
11:25:34 opinion.
11:25:38 You can answer.
11:25:39 THE WITNESS: Not a day goes by that I don't
11:25:42 think about what transpired and happened, being fired and
11:25:54 locked out of a building. Having calls from coworkers.
11:26:06 I -- I used to be a great sleeper and now I'm not. Wake
11:26:13 up multiple -- I mean, I dream about -- whether it's

people I worked with or old situations at least four to five times a week. The lost opportunity of not working in sports, which was my passion and drive. I was pretty good at it. I miss it greatly. I went to my first basketball game -- first live basketball game this year. Not at Arizona State, someplace else. Just miss it greatly. It's just . . .

BY MR. McKIRGAN:

Q. Anything else?

A. It's awful. I miss working in sports.

Q. Anything else?

A. I don't know how I -- You know, it's just constantly on my mind still four and a half years later, every day. Doing a job that you don't want to do but you have to do. So . . .

Q. Anything else?

A. Not right now.

Q. Well, today's my day to exhaust your recollection, so if you think of anything, let me know.

A. Okay.

Q. But as you sit here right now, you've given me -- you've answered my question as to what your symptoms are for your emotional distress. Is that right?

A. Yes, sir.

Q. All right. Have you sought any treatment for

your emotional distress?
A. No.
Q. Have you sought -- sought any counseling?
A. No.
Q. You've said not a day goes by that you don't think about this. Does the fact that you have a lawsuit ongoing -- is that part of the reason why you think about it every day?
A. No, I actually don't think about this lawsuit until I'm -- something triggers it. I get a call from my lawyer or upcoming schedule.
Q. You said you were a great sleeper but now you're not. Have you sought treatment for any sort of sleep disorder?
A. No. No.
Q. How did you sleep last night?
A. Not well.
Q. You said you miss it greatly. Is it you miss sports? ASU?
A. I think I miss a little bit of -- I miss every- -- I miss everything. I miss the interaction with the coworkers. I miss the interaction with the coaches. The competitive side, I miss being able to build a schedule and compete and -- and be a part of a winning culture. I miss student athletes. They bring great

11:29:39 energy. I miss the multiple sports. There's something
11:29:47 new every day.
11:29:48 Q. Has your mental distress manifested itself in any
11:29:57 sort of physical way?
11:29:58 A. What do you mean?
11:30:02 Q. Rash, hair loss.
11:30:05 A. I'm fat, heavy, I guess. You look at me, yeah,
11:30:10 I've gained weight. Probably drink a little bit more to
11:30:15 soften it.
11:30:18 Q. How much weight have you gained?
11:30:20 A. I mean, not -- 10, 15 pounds. Nothing crazy. I
11:30:25 work out. I try and work out.
11:30:27 Q. How much more do you drink?
11:30:29 A. Probably double what I did before. In nights,
11:30:36 not double the amount.
11:30:41 Q. Before August 15th, 2019, how many nights a week
11:30:47 did you have drinks?
11:30:49 A. Maybe two or three.
11:30:50 Q. And now it's four to six?
11:30:53 A. If I had to guess, yeah, on average.
11:30:55 Q. And who do you have the drinks with now?
11:30:58 A. Myself.
11:30:59 Q. Have you sought any treatment?
11:31:06 A. No.
11:31:06 Q. Any counseling --

A. No.
11:31:08 Q. -- for the drinking?
11:31:09 A. No.
THE COURT REPORTER: I'm sorry?
THE WITNESS: No.
BY MR. McKIRGAN:
11:31:21 Q. Now, in your answers to interrogatories, page 4, you talk -- "Plaintiff's mental anguish and emotional distress are caused by the loss of his employment . . . ."
11:31:34 And we've talked about that, right?
11:31:35 A. Yes, sir.
11:31:36 Q. "The loss of income," do you see that? Line 14.
11:31:45 A. 14. Yes.
11:31:46 Q. So if I understand your prior testimony, you've replaced your income and, in fact, last year made a lot more money. So explain to me how loss of income is causing you distress.
11:32:06 MR. PÉREZ: Objection. Calls for a legal conclusion, expert opinion.
11:32:10 You can answer.
11:32:11 THE WITNESS: I would say the loss of income working in an industry that you want, that you're passionate about.
11:32:19 BY MR. McKIRGAN:
11:32:19 Q. So it's not the amount of dollars you're talking

11:32:22 about there?

11:32:22 MR. PÉREZ: Same objection. Calls for a

11:32:24 legal conclusion, expert opinion.

11:32:27 BY MR. McKIRGAN:

11:32:28 Q. Go ahead.

11:32:29 A. I guess, yeah.

11:32:30 Q. All right. And I'm going to get to

11:32:34 reputational -- damage caused to his reputation in his

11:32:40 particular work industry. And you reference "the manner

11:32:47 in which Defendants terminated Plaintiff." What are you

11:32:50 talking about there? Can you explain that?

11:32:53 A. I think it was being a grown man and told I'm

11:32:56 fired and walked out of the building, and then receiving

11:33:03 calls that there was a meeting after that I was told "Dave

11:33:13 is not a team player and he's no longer working here and

11:33:18 that people should not talk to him."

11:33:20 Q. So let me focus on "the manner in which

11:33:44 Defendants terminated Plaintiff, including, but not

11:33:47 limited to, walking him out of the office."

11:33:50 So who walked you out of the office?

11:33:52 A. Amy Schramm and Jean Boyd.

11:34:02 Q. And how -- You know, did they -- did they grab

11:34:03 onto you and pull you out of the office or just walk

11:34:06 alongside --

11:34:07 A. No. Just escorted me out.

11:34:08 Q. Okay. So they were walking side by side with you?
11:34:11 A. Through the hallway, down to the elevator, out.
11:34:13 Q. Did you talk to them during this walk?
11:34:15 A. Yes.
11:34:15 Q. And what did you talk about?
11:34:17 A. I said, "How did this happen?"
11:34:19 And Amy said, "I'm sorry."
11:34:21 Q. Okay. Did Jean say anything?
11:34:23 A. No.
11:34:23 Q. Anything else about walking -- the way you were walked out of the office that's causing you distress?
11:34:35 A. I said, "Can I gather my belongings?"
11:34:38 "No. You can get them back later."
11:34:41 Q. Who told you that?
11:34:42 A. Amy.
11:34:43 Q. When did you go back to get your belongings?
11:34:58 A. Weeks later.
11:34:59 Q. What caused the delay?
11:35:04 A. Well, I was told I wasn't allowed back on campus.
11:35:07 Q. Who told you that?
11:35:09 A. Ray.
11:35:09 Q. Did you make a request to come gather your things?
11:35:20 A. Did I make a request?

11:35:21 Q. Yes.
11:35:22 A. The communication went to my lawyer, Mike, who
11:35:24 told me I could go back on a weekend.
11:35:27 MR. PÉREZ: Don't go into our conversations.
11:35:31 BY MR. McKIRGAN:
11:35:31 Q. So ASU informed your counsel that you could go
11:35:34 back and get your items?
11:35:35 MR. PÉREZ: Objection.
11:35:37 I'll instruct him not to answer that
11:35:38 question.
11:35:39 MR. McKIRGAN: I'm not asking what --
11:35:41 MR. PÉREZ: The only way he would know that
11:35:42 is what I told him.
11:35:43 BY MR. McKIRGAN:
11:35:47 Q. Once you learned that you could go back and get
11:35:50 the stuff from your office, how long did it take you to go
11:35:53 do that?
11:35:54 A. A few hours.
11:35:55 Q. Did you call somebody in advance to come pick
11:36:04 that up or you just go to the office and --
11:36:06 A. Oh, no. There was security there.
11:36:08 Q. Did you call somebody in advance and say, "Hey,
11:36:12 I'm coming to pick up my stuff"?
11:36:14 A. It was predetermined, the time that I would go
11:36:16 there.

11:36:17 Q. Okay. And you walked in. And what happened?
11:36:26 A. Pulled all my stuff together and put them in boxes.
11:36:31 Q. Were any -- any of your items already boxed up?
11:36:40 A. I don't remember them being boxed up, but I remember that they had -- all the files -- the files -- some had been taken out, so they must have taken some. But a lot of the stuff had been gone through.
11:36:53 Q. So let me ask you about your office. So you had a desk. Is that right?
11:37:01 A. Yes.
11:37:02 Q. Did the desk have drawers?
11:37:04 A. Yes.
11:37:05 Q. Did the drawers lock?
11:37:06 A. I don't know. I can't remember.
11:37:10 Q. Did you have filing cabinets?
11:37:12 A. Yes.
11:37:13 Q. Did the filing cabinets lock?
11:37:15 A. Don't recall. If they did, I didn't lock them.
11:37:21 Q. Okay. And your desk drawers, if they locked, you didn't lock those either?
11:37:27 A. No.
11:37:27 Q. Were there other areas within your office where things could be stored besides desk drawers or filing cabinets?

11:37:37 A. What do you mean?
11:37:40 Q. Well, were there bookshelves? Were there things
11:37:44 where you could put papers?
11:37:45 A. Maybe on my desk.
11:37:47 Q. Okay.
11:37:48 A. I don't remember -- I don't recall having a
11:37:49 bookshelf.
11:37:49 Q. Okay. So you had a desk. Your desk had drawers.
11:37:54 You had a filing cabinet. Anything else where you might
11:37:57 have had items?
11:37:58 A. Not that I can remember.
11:37:59 Q. Okay. And when you showed up at the office, were
11:38:04 there anything in the desk drawers that you gathered when
11:38:07 you came back to get your stuff?
11:38:10 A. I gathered all my belongings.
11:38:12 Q. Yeah. But was it -- was that stuff boxed up or
11:38:15 did you have to go to the drawers and pull things out and
11:38:20 put them in a box?
11:38:21 A. I had to go into the -- I had to put the -- put
11:38:23 the stuff in my -- in the boxes myself.
11:38:24 Q. Okay. And then you said -- you said some things
11:38:26 had been gone through. Is that stuff in the filing
11:38:28 cabinet? I mean --
11:38:29 A. No, the whole office had been gone through.
Q. How could you tell?

11:38:34 A. Because the files were not -- I'm pretty
11:38:34 meticulous in where I keep things, and there was stuff
11:38:37 that were either not there or different -- they were not
11:38:41 in the spot that I would normally keep them.
11:38:43 Q. Okay. What -- what things in particular?
11:38:46 A. The stuff that was missing, I can't remember. I
11:38:51 assume it was Arizona State property and they kept it,
11:38:55 whether it was coaching contracts or -- I don't know what
11:38:58 would have been missing.
11:38:59 Q. So was anything of a personal nature missing?
11:39:07 A. I don't remember.
11:39:08 Q. Not everything in your office was personal. Is
11:39:15 that right?
11:39:15 A. No.
11:39:16 Q. I mean, most of it would have been ASU property,
correct?
11:39:21 A. Uh-huh. Correct. Yes.
11:39:22 Q. Is the fact, if -- if it happened, that somebody
11:39:28 from ASU went in there and got ASU property before you
11:39:31 showed up, is that -- does that cause you distress?
11:39:34 A. No.
11:39:36 Q. How about did you have keys to the office?
11:39:43 A. No. When I got fired in August, I had to turn --
11:39:49 turn those in right there.
11:39:50 Q. On the --

11:39:54 A. On the day --
11:39:54 Q. On the 15th?
11:39:56 A. On August -- yeah. Whenever that date was in August.
11:40:01 Q. Okay. So when you were escorted out, it was --
11:40:04 was Amy Schramm and Jean Boyd?
11:40:09 A. Yes, sir.
11:40:10 Q. It was not security, correct?
11:40:12 A. Correct.
THE COURT REPORTER: Could we take a short break?
MR. McKIRGAN: Sure.
THE COURT REPORTER: I don't have any power.
11:40:27 MR. McKIRGAN: Oh.
11:40:27 THE VIDEOGRAPHER: Off the record at
11:40:29 11:40 a.m.
11:43:21 (A recess ensued.)
11:44:23 THE VIDEOGRAPHER: And we're back on the
11:44:48 record at 11:44 a.m.
11:44:51 BY MR. McKIRGAN:
11:44:54 Q. Okay. Mr. Cohen, you mentioned that when you
11:44:58 went back to gather your personal items at the office,
11:45:01 security was waiting for you?
11:45:04 A. Yes.
11:45:04 Q. Where were they waiting for you?

11:45:06 A. Outside the office.
11:45:07 Q. Your office or the building?
11:45:08 A. The -- Both.
11:45:10 Q. Okay. So the -- When you showed up, there's
11:45:14 security --
11:45:14 A. Oh, no. Not both. It was outside the building,
11:45:17 and then we went upstairs.
11:45:19 Q. And one security guard? Two?
11:45:21 A. One.
11:45:21 Q. And that person accompanied you up -- I can't
11:45:29 remember what floor your office was on.
11:45:31 A. Fifth?
11:45:36 Q. Fifth is --
A. I think so.
11:45:36 Q. -- I think, right.
11:45:37 Accompanied you up to your office?
11:45:39 A. Yes, sir.
11:45:39 Q. And watched you gather your things?
11:45:42 A. Yes.
11:45:43 Q. Okay. Did you interact with anybody else other
11:45:48 than the security guard?
11:45:49 A. If I recall, Deana Garner-Smith walked by --
Q. Did you --
11:45:58 A. -- said "Hello." That was it.
11:46:01 Q. Okay. Anybody else?

11:46:02 A. Not that I remember.
11:46:03 Q. Okay. Did you interact with the security guard?
11:46:08 A. No.
11:46:08 Q. While you were gathering your things, where was the security guard?
11:46:13 A. Right outside the door.
11:46:14 Q. Okay. Did he watch you gather things?
11:46:17 A. Yes.
11:46:17 Q. And then the security guard walked with you out of the building?
11:46:22 A. Yes.
11:46:22 Q. Did having a security guard accompany you from outside the building up to the office and then back out of the building -- did that cause you distress?
11:46:42 A. No.
11:46:42 Q. Back to Exhibit 55, your answers to interrogatories, page 4, you reference the defendants criticizing you "to all his colleagues in an office meeting immediately thereafter . . . ." What are you referring to there?
11:47:13 A. I received a call from someone who was in the meeting. And she said, "Dave, we weren't supposed to call you or contact you, but I feel I -- I have to."
11:47:27 Q. And who was that?
11:47:28 A. That was Becky Parke.

11:47:30 Q. And what did she say to you?
11:47:33 A. She said, "Dave, I'm so sorry."
11:47:39 Q. Okay. Anything else?
11:47:39 A. And -- and I said, "Well, Becky, what -- what -- what happened? I haven't told anybody."
11:47:43 And she said, "We just got called into a mandatory immediate meeting, and Ray told everybody that you were not a team player and you're no longer employed at Arizona State, and said that you were threatening lawsuits and that no one should reach out to you."
11:48:04 Q. Anything else?
11:48:15 A. She asked about Kathy, and that was about it. Short and sweet.
11:48:25 Q. Prior to this phone call, had you threatened a lawsuit?
11:48:31 A. No.
11:48:31 Q. Had you claimed that you were being retaliated against?
11:48:35 A. Not to anybody at -- at Arizona State.
11:48:39 Q. So prior to August --
11:48:41 A. Oh, yes, I'm sorry. I did. Kevin Salcido. I said -- I met with him days before, and he had actually brought up the retaliation comment.
11:48:52 Q. Okay. We'll get there to that one.
11:48:56 So prior to August 15th, it's your testimony

11:49:06 that you never said to Ray Anderson that you were being
11:49:13 retaliated against?
11:49:14 A. I had said, I believe, in the -- When he changed
11:49:21 my sport assignments and my comp, I said, "Ray, does this
11:49:28 have any -- is this retaliation for the Bart Wear stuff
11:49:32 with the three women?"
11:49:34 Q. Okay. Any other time that you raised retaliation
11:49:38 with Ray prior to August 15th?
11:49:41 A. Not that I can recall.
11:49:43 Q. How about threatening to bring a claim prior to
11:49:49 August 15th? Ever say that to Ray?
11:49:50 A. No.
11:49:51 Q. How about Jean Boyd?
11:49:53 A. No.
11:49:53 Q. Okay. We're going to circle back to those
11:50:12 discussions.
11:50:15 A. While we're on -- Do you mind if I go back, Bob,
11:50:18 and mention about the loss of income? I thought you had
11:50:21 meant just in -- in working in the field. I had
11:50:24 aspirations of being an athletic director and was hoping
11:50:30 to be on a path and as -- as you -- It's well documented
11:50:37 athletic directors make a lot more than senior associates.
11:50:41 So sorry about that.
11:50:42 Q. So that's what you were referring to --
11:50:43 A. Yes, yes.

11:50:44 Q. -- in line 14?
11:50:45 A. I'm sorry, I thought you -- yeah, I thought you meant just from job to job.
11:50:50 Q. So the lost prospect of making more money as an athletic director is one of the causes of your emotional distress, if I'm understanding your answer?
11:51:02 MR. PÉREZ: Objection. Calls for a legal conclusion.
11:51:06 But you can answer.
11:51:06 THE WITNESS: Yes.
11:51:06 BY MR. McKIRGAN:
11:51:11 Q. And that athletic director would be in the college sports?
11:51:16 A. Yes, sir.
11:51:25 Q. Do you find it unusual that Ray Anderson would tell the staff that you were no longer employed at ASU?
11:51:36 MR. PÉREZ: Calls for speculation.
11:51:37 You can answer.
11:51:38 THE WITNESS: I have no idea.
11:51:39 BY MR. McKIRGAN:
11:51:43 Q. Would you find it unusual that Mr. Anderson said you were not a team player?
11:51:47 A. Yes.
11:51:48 Q. You thought you were a team player?
11:51:51 A. Yes.

11:51:51 Q. All right. Back to Exhibit 55, page 4. You referred to the revocation of your membership at the country club. What are you referring to there?
11:52:16 A. Well, they -- they called the country club and said, "Dave can't use it anymore."
11:52:25 Q. Okay. So it wasn't -- You say revocation of your membership. It wasn't your membership, right?
11:52:31 A. In my name, yes, correct.
11:52:33 Q. It was ASU's -- or actually, the Foundation's membership, right?
11:52:41 A. Yes.
11:52:41 Q. So you had no membership to be removed, correct?
11:52:54 A. Well, it was under my name. I had to go through the membership application at DC Ranch.
11:53:00 Q. The one that was held by --
11:53:01 A. Arizona State, yes. I was part of the directory.
11:53:07 Q. But you didn't own it.
11:53:09 A. Correct.
11:53:10 Q. And then what -- How long after August 15, 2019, did you get your own -- you and Kathy get your own membership?
11:53:19 A. Maybe the following March or April.
11:53:25 Q. Okay. And you weren't -- you weren't denied a membership. Is that right?
11:53:29 A. At?

11:53:30 Q. At DC Ranch.
11:53:31 A. Well, I had to apply for it.
11:53:33 Q. And you were not denied, right?
11:53:36 A. Oh, correct. Became members.
11:53:38 Q. Okay. You refer to your reputation "in the
11:54:04 community and in his particular work industry . . . ." Do
11:54:08 you see that at lines 14 and 15 of Exhibit 55?
11:54:12 A. Yes.
11:54:14 Q. What community are you referring to when you say
11:54:16 "reputation in the community"?
11:54:18 A. The sports industry.
11:54:19 Q. "And in his particular work industry," is that --
11:54:25 that also in the sports industry?
11:54:27 A. Is what? I'm so sorry, Bob.
11:54:27 Q. Where you say "in his particular work industry,"
11:54:29 is that also --
11:54:30 A. Yes.
Q. Okay.
11:54:31 A. Yes.
11:54:31 Q. All right. So how is your -- Well, let me ask
11:54:40 you this. What was your -- I'd like you to explain to me
11:54:47 the harm in your reputation. What's -- what's happened to
11:54:50 your reputation?
11:54:51 A. Well, I cannot get a job within the sports
11:54:55 industry.

11:54:56 Q. Okay. Anything else?
11:55:05 A. No.
11:55:18 THE WITNESS: Boy, it is cold.
THE COURT REPORTER: Pardon me?
11:55:21 THE WITNESS: It is cold. Did the AC just
11:55:22 crank up?
11:55:24 MR. McKIRGAN: Yeah, it is cold.
11:55:28 BY MR. McKIRGAN:
11:55:29 Q. When you talk about "sports industry," how -- how
11:55:31 do you define "sports industry"? Is it college sports?
11:55:34 Pro sports? Minor league sports?
11:55:39 A. Yeah, all the above.
11:55:40 Q. Anything else?
11:55:44 A. I guess you include agencies --
11:55:47 Q. Sports agencies?
11:55:48 A. -- now. Yes. They're a big player now.
11:55:51 Q. So the injury to your reputation is -- if I
11:56:05 understand your testimony, is you cannot get a job within
11:56:07 the sports industry. And I think -- Well, you've --
11:56:14 you've already testified about your efforts to get a job
11:56:16 in the sports industry. Is that right?
11:56:17 A. Yes, sir.
11:56:17 Q. And you have nothing to add to that. Is that
correct?
11:56:20 A. Well, there's others. I've -- I've called the

11:56:22 NFL directly. Bobby Gallo at the NFL. The individual
11:56:29 contacts I may have, Ron Minegar who used to work at the
11:56:33 Arizona Cardinals.
11:56:35 Q. Anybody else?
11:56:37 A. I'm sure there are more, Bob. I just have to go
11:56:44 back through my memory. Maybe I'll come back to that, if
11:56:50 that's okay.
11:56:51 Q. Well, let me show you -- Let's go to page 7 of
11:57:00 Exhibit 55. You were asked to identify potential
11:57:18 employers who you -- who you claim did not hire you as a
11:57:22 result of your alleged harm to your reputation caused by
11:57:27 defendants' alleged unlawful conduct. Do you see that?
11:57:31 A. Yes, sir.
11:57:31 Q. And there's an objection, and then subject to the
11:57:33 objection, there's a response. Line 22, ". . . Plaintiff
11:57:39 has been unable to find comparable employment in his
11:57:43 chosen field" -- Do you see that?
11:57:44 A. Yes, sir.
11:57:45 Q. -- "namely professional or collegiate athletics."
11:57:51 Do you see that?
11:57:52 A. Yes, sir.
11:57:52 Q. Okay. Then you talk about comparable jobs in
11:57:56 Arizona are under the Defendant Arizona Board of Regents'
11:58:02 supervision and control. Do you see that?
11:58:04 A. Yes.

11:58:05 Q. All right. So that would be college sports, right?
11:58:08 A. Yes.
11:58:08 Q. In Arizona?
11:58:13 A. Yes.
11:58:21 Q. And it says, ". . . Plaintiff engaged the
11:58:23 services of a search firm which did not provide any job
11:58:27 leads."
11:58:27 So did you formally engage a search firm at
11:58:31 some point?
11:58:31 A. Well, I mean, I spoke to them. That's what I
11:58:35 mean in "engagement."
11:58:37 Q. And it's "search firm," singular, but it was --
11:58:41 it was plural, right? It was the four that we talked
11:58:43 about?
11:58:43 A. Yes.
11:58:44 Q. All right. And you say, ". . . Defendant
11:58:57 Anderson admits in his deposition that he spoke with the
11:58:59 Atlanta Falcons executives and other management personnel
11:59:03 after Plaintiff's termination to the detriment of his
11:59:07 reputation." Do you see that?
11:59:09 A. Yes.
11:59:09 Q. What was it that Mr. Anderson said to the Falcons
11:59:13 that was detrimental to your reputation?
11:59:15 MR. PÉREZ: Objection. Hearsay.

You can answer.
THE WITNESS: I received a call from Greg Beadles, who's the -- who's the current president, and he said they were at a preseason game and Nick Polk said he walked into the press box and said he had just talked to Ray, and Ray was bragging that he had let me go.
BY MR. McKIRGAN:
Q. All right. So let me start with Greg. What was his last name?
A. Beadles, B-e-a-d-l-e-s.
Q. And he's president of the Falcons?
A. Yes, sir.
Q. And you spoke with him?
A. Yes.
Q. And he spoke -- He reported to you that somebody had told him that Ray --
A. Yes.
Q. -- had said he had just fired Dave Cohen?
A. Yes.
Q. Okay. So was this -- And let me just back up.
So who spoke to Greg Beadles?
A. Nick Polk, he said.
Q. Nick Polk. What -- what's his job?
A. He's no longer there. He was in charge of the salary cap for the Falcons at that time.

12:00:18 Q. And what you heard was that Mr. Polk had talked to Mr. Anderson?
12:00:27 A. That's what Greg had said.
12:00:29 Q. And what -- and what did Ray Anderson say to Mr. Polk according --
12:00:42 A. I don't know. You would have to ask them.
12:00:44 Q. Well, how do you know that it was to your detriment of your reputation if you don't know what was said?
12:00:51 A. Because that's what Greg had told me. But I don't know what happened between -- what was specifically said. All I know is what Greg had told me.
12:00:59 Q. Well, let me focus in on what Greg told you.
12:01:03 A. Okay. Okay.
12:01:03 Q. What did Greg report to you that Mr. Anderson had said to Mr. Polk?
12:01:08 A. He had said that Ray had called Nick and bragged about letting me go this week.
12:01:16 Q. So sometime after August 15th?
12:01:20 A. It was sometime -- after, yeah. Because it was -- it was during a preseason football game for the Falcons in August.
12:01:28 Q. And when did you speak with Mr. Beadles?
12:01:32 A. Then, during the game. It was a text message. Then we talked the next day.

12:01:37 Q. What did Mr. Beadles' text message say?
12:01:41 A. "Are you doing okay?"
12:01:45 Q. Anything else?
12:01:45 A. No. Then we spoke.
Q. Was --
12:01:48 A. We had time to talk the next day.
12:01:50 Q. Was that text message -- was that one of the text messages you produced?
12:01:55 A. I don't know.
12:01:56 MR. PÉREZ: I'll check, Counsel.
12:01:57 BY MR. McKIRGAN:
12:01:58 Q. And then you talked to him the next day?
12:02:00 A. Around the -- the next day or two.
12:02:01 Q. And that's when you heard Mr. Beadles describe his discussion with Mr. Polk?
12:02:11 A. He didn't -- he didn't go into any -- actually more detail. He was more concerned about me and asking about me.
12:02:16 Q. Well, did Mr. Beadles use the word "bragged"?
12:02:23 A. That's how he termed it.
12:02:24 Q. Did Mr. Polk, according to Mr. Beadles, use the word "brag"?
12:02:30 A. I would assume, since Greg said he talked to Nick.
12:02:34 Q. But you don't know what Mr. Anderson specifically

12:02:37 said to Mr. Polk?
12:02:39 A. No, I do not.
12:02:40 Q. And it's -- What you heard from Mr. Beadles is
12:02:49 the basis of your answer in Exhibit 55 at page 8 regarding
12:02:56 Mr. Anderson's reaching out to the Falcons?
12:03:00 MR. PÉREZ: Objection.
12:03:03 You can answer.
12:03:04 THE WITNESS: Yes. There was another person
12:03:06 that used to be our security with the Falcons who reached
12:03:10 out.
12:03:11 BY MR. McKIRGAN:
12:03:11 Q. Who's that?
12:03:11 A. Bob McDonough.
12:03:14 Q. When did Mr. McDonough reach out to you?
12:03:18 A. He said, "Hey, Dave, I'm sorry to hear. I
12:03:21 know" --
12:03:21 Q. No. When?
12:03:22 A. Oh, when? Around that time. You know, within
12:03:27 the five to seven days that -- that this happened.
12:03:30 Q. August?
12:03:31 A. In August. Around -- in or around August 15th.
12:03:34 Q. And was that a phone call?
12:03:36 A. Yes. Yes.
12:03:36 Q. And what did Mr. McDonough say to you?
12:03:40 A. He just expressed disappointment, sadness, and

12:03:44 said he had talked to Ray.
12:03:46 Q. Okay. And what did Mr. McDonough say that
12:03:52 Mr. Anderson had told him?
12:03:53 A. Just that I was no longer there at Arizona State.
12:03:58 Q. And that was true, right?
12:04:01 A. True. Factual.
12:04:03 Q. Anything else that supports your answer in
12:04:15 Exhibit 55 that Mr. Anderson had reached out to the
12:04:22 Falcons?
12:04:22 A. Not that I can recall, Bob.
12:04:24 MR. PÉREZ: Are you excluding Mr. --
12:04:28 MR. McKIRGAN: I'm excluding his depo- --
12:04:31 Mr. Anderson's deposition speaks for itself.
12:04:36 BY MR. McKIRGAN:
12:04:36 Q. Anything else besides what you've told me that
12:04:39 you believe Mr. Anderson did to harm your reputation?
12:04:42 A. Not that I can recall right now.
12:04:46 Q. I don't know if you answered this, but -- given
12:04:57 our prior discussion about the Falcons, but do you believe
12:05:00 that Mr. Anderson has caused you not to be able to get a
12:05:07 job with the Falcons?
12:05:09 MR. PÉREZ: I'm going to instruct him not to
12:05:11 answer that.
12:05:11 BY MR. McKIRGAN:
12:05:27 Q. Okay. All right. Let me broaden out the

12:05:29 question from Mr. Anderson to the Arizona Board of Regents
12:05:34 and ASU. Anything else that you believe the defendants in
12:05:39 this case have done that has caused you harm to your
12:05:45 reputation in the sports industry?
12:05:47 A. Not that I -- not that I can recall right now,
12:05:52 Bob.
12:05:52 Q. All right. Back to Exhibit 55. You say, line 2,
12:06:02 ". . . Plaintiff had an opportunity to be the Vice
12:06:05 President for Intercollegiate Athletics at Northern
12:06:09 Arizona University in 2017."
12:06:11 A. Yes, sir.
12:06:11 Q. And that you did not pursue the opportunity,
right?
12:06:14 A. Correct.
12:06:15 Q. That all happened before August of 2019. Is that
right?
12:06:19 A. Correct, yes.
12:06:20 Q. So any inability to get a job in 2017 with NAU
12:06:27 wasn't because of your -- the alleged retaliation?
12:06:31 MR. PÉREZ: Objection. Calls for
12:06:32 speculation.
12:06:34 You can answer.
12:06:36 THE WITNESS: No. I turned that job down.
12:06:38 BY MR. McKIRGAN:
12:06:52 Q. Now, it's true -- isn't it? -- that you really

12:06:59 have no interest in going back into college athletics?
12:07:04 MR. PÉREZ: Objection. Argumentative.
12:07:06 THE WITNESS: No, I would -- I would enjoy
12:07:08 the opportunity to work in college athletics.
12:07:11 BY MR. McKIRGAN:
12:07:11 Q. You've never told anybody that you were not going
12:07:15 back to college, you don't want that?
12:07:17 A. No.
12:07:19 Q. Or that college sports is the worst industry?
12:07:21 A. No. College sports is tough, but it's -- it's
12:07:26 a -- it's a good industry.
12:07:27 Q. Did you ever tell any of your former peers at ASU
12:07:37 that they should get out of college sports, it's the worst
12:07:40 industry?
12:07:41 A. No, not that I can recall.
12:08:25 MR. McKIRGAN: All right. Now's a good time
12:08:27 to break for lunch, if you want to break for lunch now.
12:08:31 It's --
12:08:31 MR. PÉREZ: Can we do a short lunch so --
12:08:33 MR. McKIRGAN: Yeah. Absolutely.
MR. PÉREZ: And maybe can you and I talk for
two minutes?
12:08:34 MR. McKIRGAN: Sure.
12:08:34 THE VIDEOGRAPHER: Off the record at
12:08:37 12:08 p.m.

12:08:38 (A recess ensued.)
12:45:00 (Mr. Rivera is not present.)
12:45:00 THE VIDEOGRAPHER: Back on the record at
12:45:19 12:45 p.m.
12:45:20 BY MR. McKIRGAN:
12:45:25 Q. So, Mr. Cohen, after the lunch break, anything
12:45:28 you need to correct or clarify or add?
12:45:30 A. Not right now, Bob.
12:45:32 Q. Okay. All right. You mentioned, I think, in
12:45:36 your discussions with some of these folks at search
12:45:40 firms -- I think it's NABC leadership position?
12:45:45 A. Yes.
12:45:45 Q. National Association --
12:45:47 A. Oh, the -- the one with Glenn Sugiyama?
12:45:51 Q. Yes.
A. Yeah.
12:45:52 Q. National Association of Basketball Coaches.
12:45:55 What was the -- what was the position that
12:45:56 you were referring to?
12:45:57 A. It was the executive director.
12:45:59 Q. Was that position open at the time?
12:46:01 A. Yes. They did the search.
12:46:04 Q. Do you know who filled that position?
12:46:08 A. Yes. It was President Obama's brother-in-law,
12:46:15 very well-qualified.

Q. How was President Obama's brother-in-law qualified?
A. He's a former basketball coach, knows the coaches really well. He was successful at Oregon State. He was quite honest, very transparent, well -- more qualified than me.
Q. Okay. So when you were talking with the search firms, were there particular positions or types of positions that you were looking for?
A. What do you mean, "types"?
Q. Athletic director, head of ticketing. You know, was there something that you were really trying to achieve?
A. Well, based on my background and the experience/age, you'd think if it was in the professional side, it would center more on the ticketing side. In college, it was senior associate or above.
Q. Okay. And you had mentioned the NAU job, I think, in 2017. Was that an athletic director position?
A. Yes, sir.
Q. And were you ever offered that job?
A. Yeah. I received a term sheet. I believe we -- I believe we submitted it. But yeah, I was offered it.
MR. PÉREZ: Yeah, I think I produced it in discovery, Bob.

12:47:59 MR. McKIRGAN: We'll check. I'm not sure if
12:48:01 I've seen that. But okay.
BY MR. McKIRGAN:
12:48:03 Q. So there was a formal offer?
12:48:06 A. It was a term sheet, yes.
Q. And you --
12:48:09 A. Which I -- It's not a contract. It's a term
12:48:11 sheet, so . . .
12:48:13 Q. So was the term sheet accompanied with "If you
12:48:15 accept these terms, you have the position"? Was it an
12:48:17 offer?
12:48:17 A. Correct, yes.
12:48:18 Q. And you turned it down?
12:48:22 A. Yes, sir.
12:48:23 Q. Why?
12:48:24 A. I believed at the time that I had a better job
12:48:29 at -- at Arizona State, and I was on a path with other
12:48:37 discussions that -- that I could potentially get a -- an
12:48:43 athletic director job at a bigger institution.
12:48:55 Q. So you thought staying at ASU was a better path
12:48:58 to get an AD position at a bigger institution than
12:49:02 becoming AD at NAU?
12:49:04 A. Correct.
12:49:06 Q. Was there ever discussion while you were at ASU
12:49:12 as whether you would ultimately become the athletic

12:49:17 director at ASU?
12:49:19 A. No.
12:49:19 Q. Did you ever look at Boston College --
12:49:31 A. Yes.
12:49:32 Q. -- when you were at ASU?
12:49:34 So did you have discussions with them about
12:49:36 their AD position?
12:49:37 A. I had two discussions. I had a discussion with
12:49:40 Daniel Parker, with Parker & Associates, and then I had
12:49:44 one conversation with their lead donor. And if you asked
12:49:50 me, it's a construction -- I will remember his name if
12:49:55 you need it, but . . .
12:49:56 Q. What -- When did this occur? Were you still at
12:50:00 ASU?
12:50:00 A. Yes. Yeah.
12:50:04 Q. Did it reach a point of you getting an offer?
12:50:07 A. No, no.
12:50:08 Q. Did you stop talking to them or did they stop
12:50:13 talking to you?
12:50:14 A. Well, I was told they -- they brought in three
12:50:15 candidates and I was not one of those three.
12:50:18 Q. Did you interview for the position?
12:50:21 A. Well, I talked -- I don't know -- No, not a
12:50:24 formal interview with anyone. I talked to the lead donor
12:50:27 and then the -- Daniel Parker.

12:50:29 Q. The search firm?
12:50:30 A. Yes.
12:50:31 Q. Yeah. Do you know who filled that position?
12:50:37 A. Yes. Another well-qualified candidate, Martin
12:50:43 Jarmond, who was from Ohio State, who's now the athletics
12:50:47 director at UCLA.
12:50:49 Q. And he was well-qualified?
12:50:50 A. Very much so.
12:50:51 Q. After August 15th of 2019, did -- Well, strike that.
12:51:04 After August 15, 2019, while you were on
12:51:10 administrative leave and before you were formally
12:51:16 terminated in December of 2019, were you thinking about
12:51:21 getting a new job or were you hoping that you would still
12:51:25 be at ASU after the investigation was completed? Or what
12:51:28 was your mindset in that time period in terms of "What am
12:51:31 I going to do for employment?"
12:51:33 MR. PÉREZ: Objection. Misstates facts. My
12:51:35 client was told he was terminated on August 15th.
12:51:39 You can answer the question.
12:51:40 THE WITNESS: Yeah, I started looking for a
12:51:42 job immediately. I -- When I was told I was terminated,
12:51:45 they said there was -- I couldn't even go back on campus,
12:51:49 much less get a job.
///

12:51:50 BY MR. McKIRGAN:
12:51:51 Q. You were never told at any point that you were on administrative leave?
12:51:56 MR. PÉREZ: Objection. Vague.
12:51:57 THE WITNESS: I was told -- It was after my lawyer had -- had sent a letter that we were then told that I was on administrative leave.
12:52:03 BY MR. McKIRGAN:
12:52:04 Q. And were you told that you were on administrative leave pending an investigation into the Bart Wear conduct and your claim of retaliation?
12:52:12 MR. PÉREZ: Same objection. Vague.
12:52:16 You can answer.
12:52:16 THE WITNESS: Well, I was told through Jay Heiler, who had talked to President Crow, that under no circumstances would I be welcome back at ASU.
BY MR. McKIRGAN:
Q. When was --
12:52:23 A. This was during the investigation.
12:52:26 Q. When did Jay Heiler tell you that?
12:52:28 A. It was during the negotiation, before it was complete. So it must have been fall of 2019, because I think the -- the investigation was complete in December -- is when I believe we were able to read it.
12:52:46 MR. PÉREZ: You said "negotiation." Did you

12:52:48 mean "investigation"?
12:52:49 THE WITNESS: Investigation. Sorry.
12:52:51 BY MR. McKIRGAN:
12:52:51 Q. So during the investigation, Jay Heiler reported to you that Dr. Crow had reported to him that under no circumstances would you be rehired?
12:53:05 A. Correct.
12:53:05 Q. Now, Mr. Heiler did not --
12:53:08 Were you at Mr. Heiler's deposition?
12:53:10 A. Yes.
12:53:11 Q. He didn't mention that in his testimony. Do you remember that?
12:53:14 A. I don't remember it.
12:53:15 Q. Was there a text from Mr. Heiler telling you this?
12:53:22 A. No. This was a phone call. Because I held out some glimmer of hope that -- that maybe I was going to be able to come back once all this settled.
12:53:34 Q. All right. We may come back to that.
12:53:46 A. Okay.
12:53:46 Q. All right. When was your divorce filed?
12:53:59 MR. PÉREZ: You can answer.
12:54:01 THE WITNESS: April 2022? What does it say? I guess we should have looked at the sheet.
12:54:14 MR. McKIRGAN: Case number is 2021, so it

12:54:17 was filed sometime in 2021.
12:54:19 THE WITNESS: Oh, filed or --
12:54:22 BY MR. McKIRGAN:
12:54:22 Q. Yeah, when it was filed.
12:54:23 A. Yeah, this says it was -- it was 4-25. It's
12:54:27 right after Kathy's birthday.
12:54:29 Q. No. So that's -- Let me back up.
12:54:35 Exhibit 60 is the date of the decree, which
12:54:40 is kind of the final judgment in the divorce. That's
12:54:42 April 25, 2022. What I'm asking is when did Kathy file
12:54:48 the original petition for divorce?
12:54:50 MR. PÉREZ: November 18th, 2021, per the
12:54:53 document.
12:54:53 MR. McKIRGAN: Okay.
12:54:57 BY MR. McKIRGAN:
12:54:58 Q. So November 2021?
12:54:59 A. Yeah. I guess. I wouldn't -- I don't recall.
12:55:03 Q. Has the divorce caused you any sort of stress?
12:55:08 A. Yeah.
12:55:09 Q. So in -- after August 15, 2019, and then into
12:55:33 2020, you've testified you were talking to search firms
12:55:37 looking for positions in the sports industry. Do you know
12:55:41 when in 2020 you stopped that effort?
12:55:44 A. It was -- it was about when I became full time at
12:55:52 HTA.

12:55:53 Q. So March of 2020?
12:55:55 A. Around March.
12:55:56 And -- and if we can go back there too, that's when COVID hit, so the world kind of shut down then too. There was a natural break.
12:56:05 Q. So after -- at any point after March of 2020, have you revamped or started up your efforts to find a job in the sports industry?
12:56:21 A. I'll occasionally reach out, but nothing full force. You know, nothing . . .
12:56:31 Q. And when you occasionally reach out, who -- is it to these search firm people?
12:56:35 A. Yeah, I'll reach out to -- primarily the Daniel Parker, who seems to be the most active. Actually has two searches right now.
12:56:47 Q. For you?
12:56:48 A. No, not for me. I'm not --
Q. Oh.
12:56:52 A. I'm still -- Until this thing has any closure . . .
12:56:55 Q. And it's your testimony that you don't need to engage Mr. Parker to go out there and look -- look for a job. You just need to let them know that you're interested?
12:57:11 A. Yeah, that's -- that's what it is. There's no

12:57:14 representation of someone searching for you.
Q. So --
12:57:20 A. You know, like a retainer? There's none of that,
12:57:25 that I'm aware of.
12:57:26 Q. So if Mr. Parker were to find you a job, you
12:57:37 don't -- you wouldn't pay him a fee or do anything?
12:57:39 A. He gets paid by the client.
12:57:41 Q. How about just in the industry in general? Have
12:57:57 you tried to, other than search firm people, let know --
12:58:01 let people know that you're available?
12:58:03 A. Yeah. Like I had mentioned previously, you know,
12:58:06 the contacts at the NFL, Bobby Gallo.
12:58:10 Q. How about former peers at ASU?
12:58:18 A. No.
12:58:20 MR. PÉREZ: Objection. Vague. Do you mean
12:58:27 that are still at ASU or that have gone?
12:58:37 MR. McKIRGAN: Either.
12:58:38 THE WITNESS: No.
BY MR. McKIRGAN:
12:58:44 Q. So who is Brad Chandler?
12:58:47 A. He's our former compliance officer -- or he was
12:58:54 not the head of compliance but he worked in the compliance
12:58:58 office.
12:58:58 Q. With Steve Webb?
12:58:59 A. Yes, sir.

12:59:00 Q. And he left for Bradley, I think. Is that right?
12:59:01 A. Is that where he went?
12:59:03 Q. I think.
12:59:05 A. I kind of get those midwest schools mixed up. And his name is Brad, so . . .
12:59:10 Q. Yeah. And after August of 2019, you -- you continued to communicate with Mr. Chandler. Is that right?
12:59:18 A. Yes.
12:59:18 Q. And you produced, you know, a lot of text messages. Do you text a lot?
12:59:26 A. It's an easy form of communication. Yeah.
12:59:31 MR. McKIRGAN: So I want to mark this as our next exhibit.
(Deposition Exhibit 62 was marked for identification.)
12:59:49 BY MR. McKIRGAN:
13:00:07 Q. So in August of --
13:00:11 MR. PÉREZ: Have you read it?
BY MR. McKIRGAN:
13:00:12 Q. -- 2020 --
13:00:12 THE WITNESS: Uh-huh.
13:00:12 BY MR. McKIRGAN:
13:00:13 Q. -- August 19th, you get a text from Mr. Chandler. Says, "Parker's got the Emory AD search . . . time for you

13:00:20 to get back in the game!" Do you see that?
13:00:22 A. Uh-huh.
13:00:23 Q. Did you understand the reference to "Parker" to
13:00:25 be the -- Parker, the search firm guy?
13:00:27 A. I think so.
13:00:28 Q. And you responded, "Ha! No chance I'm getting
13:00:32 back into the college biz! Put your name in and I'll give
13:00:36 DP a call for you." Do you see that?
13:00:38 A. Daniel -- Daniel Parker.
13:00:41 Q. Yeah. And then he replies. And at the end you
13:00:50 say, "Emory would be perfect for you," referring to
13:00:54 Mr. Chandler. "No, seriously, I'm not going back to
13:00:58 college. Done with that." Do you see that?
13:00:59 A. Uh-huh.
13:01:00 Q. Okay. All right. So when you said "done with
13:01:06 that," did you intend to communicate to Mr. Parker that
13:01:12 you just were no longer interested in college sports?
13:01:15 A. To Brad?
13:01:16 Q. Yeah.
13:01:17 A. No, no. I was -- was told by those guys I'm
13:01:22 toxic. Couldn't get a job.
13:01:23 Q. But you've described college sports as the worst
13:01:36 industry, right?
13:01:37 A. It's tough.
MR. McKIRGAN: Would you mark that one.

(Deposition Exhibit 63 was marked for identification.)

BY MR. McKIRGAN:

Q. This is some texting with Mr. Chandler in April and May of 2021. And on May 11th, you text Mr. Chandler: "Hey, buddy. Any update on George Mason? Where is Mitch Terrell going?" Do you see that?

A. Yes.

Q. And then he replies that the AD's ghosted him.

And then there's further response from you "Wow. That's strange. What do you think happened? It's not like someone would or could blackball you. You're too nice of a guy." Then you say, "Get out of college sports!! The worst industry." Do you see that?

A. Uh-huh.

Q. So what did you mean about that -- by that?

A. It's hard to read in a text. There's a lot of sarcasm there too.

Q. So what did you mean by "get out of college sports"?

A. It's a -- it's a -- it's a tough industry.

Q. In what way?

A. In -- in many ways. We could spend the next three hours or four hours talking about the challenges of it, which are also the greatest opportunities.

13:03:29 Q. All right. So I want to use your Second Amended
13:03:59 Complaint, which is the last version of your complaint,
13:04:03 kind of walk through the chronology of events --
A. Okay.
13:04:06 Q. -- with you.
13:04:07 MR. McKIRGAN: So we'll mark that.
(Deposition Exhibit 64 was marked for identification.)
THE WITNESS: Are we done with these? With 54 and 55?
MR. McKIRGAN: I think so.
THE WITNESS: Okay.
MR. McKIRGAN: You can put those in the
13:04:26 pile.
13:04:26 BY MR. McKIRGAN:
13:04:34 Q. So Exhibit 64 is a copy of your Second Amended
13:04:37 Complaint.
13:04:37 Did you review this document before it was
13:04:39 filed?
13:04:39 A. Yes, sir.
13:04:40 Q. And you believe it to be true and accurate?
13:04:43 A. Yes.
13:04:43 Q. When's the last time you looked at it?
13:04:46 A. Years.
13:04:51 Q. It was filed May of 2023.

13:04:55 A. Okay.
13:04:55 Q. Is that the last time you looked at it?
13:04:58 A. Probably. In and -- in around then.
13:05:01 Q. Did you look at it to prepare for the deposition?
13:05:03 A. No.
13:05:03 Q. So before we jump into the chronology, let me ask you about Bart Wear. So prior to March 14 of 2019 -- March 14 is the Pac-12 tournament game that we'll get to -- how would you describe your relationship with Mr. Wear?
13:05:26 A. Friendly. Supportive as a friend.
13:05:28 Q. Did you play golf?
13:05:30 A. Yes, sir.
13:05:30 Q. Have drinks with him?
13:05:33 A. Yes.
13:05:34 Q. Meals?
13:05:35 A. Yes.
13:05:40 Q. Did you consider him a friend to the basketball program?
13:05:43 A. Yes.
13:05:44 And the swimming program.
13:05:44 Q. Major donor?
13:05:47 MR. PÉREZ: Objection. Vague.
13:05:48 THE WITNESS: Depends on how you -- how you definiti- -- define "major." He was significant to us.

13:05:54 BY MR. McKIRGAN:
13:05:55 Q. Okay. He wasn't the -- the person who donated
13:05:58 the most money to sports, though, was he?
13:06:00 MR. PÉREZ: Objection. Vague as to ASU or
13:06:02 another school.
13:06:03 MR. McKIRGAN: To ASU.
13:06:04 THE WITNESS: No. But he was in the top
13:06:06 probably 10 to 15 percent.
BY MR. McKIRGAN:
13:06:11 Q. So prior to March 14, 2019, were you aware of
13:06:20 Mr. Wear having engaged in any, you know, sexual
13:06:26 harassment or misconduct?
13:06:28 A. No.
(Deposition Exhibit 65 was marked for
13:07:17 identification.)
13:07:17 BY MR. McKIRGAN:
13:07:23 Q. So Exhibit 65, I believe, are all the text
13:07:29 messages that you've provided with -- between you and Bart
13:07:34 Wear. And there's a few pages of Bart and others, a
13:07:38 group -- group text.
13:07:39 A. Okay.
13:07:40 Q. And I just want to go through a few with you. So
13:07:49 if you go to the page marked -- the very first page,
13:08:08 you're texting on October 8, 2017, again October 17, 2017.
13:08:15 You refer to him as "buddy"?

13:08:16 A. Uh-huh.
13:08:17 Q. Is that right?
13:08:18 That's something that you and he did in your text messages? Is that right?
13:08:21 A. Yes. Yes.
13:08:22 Q. Okay. Go to the bottom of the first page, November 1, 2017. He asks if you want to play golf. Do you see that?
13:08:38 A. Uh-huh. Yes. Sorry.
13:08:39 Q. You responded, "Would love to, but I have swimming at 11:00 a.m. on Saturday, and I'm playing Whisper Rock on Sunday with a member." Do you see that?
13:08:50 A. Yes.
13:08:51 Q. And then you text the next day, first thing in the morning, quote, I forgot the women are the only ones swimming. I'd rather golf.
13:09:02 Do you see that?
13:09:02 A. Uh-huh. Yes.
13:09:03 Q. Okay. So why were you telling him that you would rather golf than attend swimming?
13:09:09 A. Because it wasn't a meet.
13:09:11 Q. So women, when they swim without men there, that's not a meet?
13:09:18 A. No. I -- Maybe the women were only in a meet. I can't remember. It was --

Q. But this time --
A. -- November 2017.
Q. You were -- you were the administrator for swimming at that point, right?
A. Yes.
Q. Both men and women's?
A. Well, we had co-administrators.
Q. Right.
A. So yeah.
Q. But you were -- There were co-administrators, but you were administrating both women's and men's swimming?
A. Yes.
Q. Now, if the men had been swimming that day, would you have gone?
MR. PÉREZ: Objection. Argumentative. Calls for speculation.
THE WITNESS: I don't know.
BY MR. McKIRGAN:
Q. 365 -- Bates Number 365, would you go to that one?
A. Oh. Yes.
Q. This is the text exchange on January 13th, 2018. Mr. Wear texts you, quote, Need a wing man. So many hotties in Vail and only one of me! Have fun.

13:10:47 You see that?
13:10:48 A. Yes.
13:10:48 Q. And you responded with two emojis, smiley with
13:10:56 heart for eyes?
13:10:57 A. Ha-ha.
13:11:05 Q. 366. So you're texting with him about a seat,
13:11:47 and he says, "Can I get a seat anywhere close or does my
13:11:51 hundred thousand to hoops program not matter?"
13:11:53 And you text back, "Nope. It doesn't
13:11:55 matter!!"
13:11:55 I take it that was sarcasm?
13:11:57 A. Yes.
13:11:57 Q. And then another emoji, "I'll find you
13:12:01 something!!! Love ya, buddy!!" Right?
13:12:03 A. Uh-huh.
Q. Okay.
13:12:04 A. Yes.
13:12:04 Q. And then it looks like you found him a courtside
13:12:11 seat?
13:12:11 A. Yes.
13:12:12 Q. He says, "Cool. Thanks." And then you can read
13:12:14 the rest.
13:12:15 A. Uh-huh.
13:12:16 Q. Was -- That reply from Mr. Wear, was that kind
13:12:18 of typical of how he would talk to you and text with you?

13:12:22 A. Sarcastic.
13:12:25 MR. PÉREZ: Counsel, I'm not sure where you're going with this. Are you implying that my client's interaction --
13:12:34 MR. McKIRGAN: Hold on. Hold on.
13:12:35 MR. PÉREZ: Let me finish my statement.
13:12:37 MR. McKIRGAN: Well, do you have an objection?
13:12:38 MR. PÉREZ: I'm trying to ask what you're implying. Are you implying --
13:12:41 MR. McKIRGAN: I'm not -- don't need to explain my questions. You can make an objection to it.
13:12:44 MR. PÉREZ: Well, I'll ask him not to answer unless you can tell me how it's relevant.
13:12:49 MR. McKIRGAN: You can instruct him not to answer, and then we'll see where it goes.
MR. PÉREZ: Okay.
13:12:54 MR. McKIRGAN: Okay? But you're not going to coach the witness.
13:12:55 MR. PÉREZ: I'm not trying to coach the witness. I'm trying to figure out what you're getting at.
13:12:59 MR. McKIRGAN: Well, you can ask me during the break.
13:13:01 MR. PÉREZ: Then I'll tell him -- I'll instruct him not to answer.

BY MR. McKIRGAN:

Q. All right. March 5th, at the bottom, you know, he's inviting you out for a drink. And you respond yes, right?

A. Yes.

Q. Now, at some point you asked Mr. Wear to -- this is before March 14, 2019 -- to arrange for a flight for one of the players. I think a relative had died. Does that sound familiar?

A. Yes.

Q. Was the player's -- Was it his mother?

A. His brother.

Q. His brother. That's right.

A. Zylan Cheatham.

Q. And you reached out to Mr. Wear, and -- and he arranged for a private flight for the player? Is that right?

A. One way, yes.

Q. And does Mr. Wear have a -- his own private jet or does he lease jets?

A. I understand he has a jet service.

Q. He has a jet service. Okay.

And is that how he got this player to -- back home for the services?

A. I believe it was from Arizona to the Bay Area.

13:14:45 Home was here.
13:14:46 Q. Okay. So you would -- you had a pretty close relationship with Mr. Wear, wouldn't you say?
13:14:58 A. Yes, very much.
13:14:59 Q. Now, paragraph 37 of your Second Amended Complaint --
13:15:13 A. What page?
13:15:14 Q. Page 8.
13:15:16 A. Oh, page 8.
13:15:17 Q. The allegation is "At the time Mr. Anderson received the March 25 complaint" -- that would be March 25, 2019 -- "ASU was already aware that Mr. Wear inappropriately touched women when he consumed alcohol."
13:15:39 Do you see that?
13:15:39 A. Yes.
13:15:40 Q. All right. Who at ASU was already aware that Mr. Wear inappropriately touched women?
13:15:48 A. The three women.
13:15:53 Q. The three women --
13:15:58 A. They reported it to me.
13:16:00 Q. Right. But you alleged ASU was already aware.
13:16:06 A. Because I was ASU.
13:16:11 Q. Okay. So that allegation was you were -- you were aware of this?
13:16:14 A. Well, I was aware of it and Scott Nelson was

13:16:17 aware --
13:16:17 Q. Okay.
13:16:18 A. -- by March 25th.
13:16:19 Q. All right.
13:16:19 MR. PÉREZ: I think he's asking outside of
13:16:22 the --
13:16:25 MR. McKIRGAN: I'll get to that.
MR. PEREZ: -- incident.
THE WITNESS: Oh.
BY MR. McKIRGAN:
13:16:28 Q. So that's what you were aware of and what
13:16:34 Mr. Nelson was aware of, is the March 14th conduct?
13:16:37 A. Yes.
13:16:37 Q. Okay. I'm talking about -- asking about conduct
13:16:41 that occurred prior to March 14th. Were you -- What
13:16:46 conduct is -- are you referring to here?
13:16:49 A. Oh, when -- when Bart would drink, he'd become
13:16:52 very touchy, huggy.
13:16:55 Q. What -- what was the last word? Huggy?
13:17:01 A. Huggy.
13:17:02 Q. You say "inappropriately touched women." So did
13:17:11 any of these prior to March 14, 2019 -- any of that
13:17:20 conduct by Mr. Wear, were you aware of that?
13:17:24 A. Not at the time.
13:17:26 Q. Well, who at ASU --

13:17:27 A. I would watch -- You could see Bart become very
13:17:33 huggy.
Q. Okay.
13:17:34 A. So I guess I did.
Q. All right.
13:17:35 A. Yeah.
13:17:36 Q. And what you saw, did you ever think it rose to
13:17:43 the level of something that should be reported?
13:17:45 A. No.
13:17:46 Q. So in paragraph 37, when you say "ASU was already
13:17:51 aware that Mr. Wear inappropriately touched women," you're
13:17:55 not suggesting that ASU was already aware that Mr. Wear
13:18:00 had engaged in conduct that should have been reported. Is
13:18:05 that right?
13:18:05 MR. PÉREZ: Objection. Calls for a legal
13:18:10 conclusion.
13:18:10 BY MR. McKIRGAN:
13:18:10 Q. Go ahead, sir.
13:18:11 A. I'm not sure. Can you answer -- ask it again,
13:18:14 Bob?
13:18:15 MR. McKIRGAN: Why don't you repeat it?
(The record was read by the court reporter
as follows:
QUESTION: So in paragraph 37, when you say
"ASU was already aware that Mr. Wear

inappropriately touched women," you're not suggesting that ASU was already aware that Mr. Wear had engaged in conduct that should have been reported. Is that right?)

THE WITNESS: Yes.

(Deposition Exhibit 66 was marked for identification.)

BY MR. McKIRGAN:

Q. Exhibit 66 is a letter dated August 21, 2019, to Dr. Crow from your counsel.

Have you seen this letter before?

A. Maybe a long time ago.

Q. I just want to ask you about one thing in this letter. It's at the page marked with Bates Number 51 at the bottom.

A. Yes, sir.

Q. There's a reference in -- Under "Next Steps," the second paragraph, the second sentence says, "With almost no investigation, our offices -- offices have uncovered three highly credible claims of sexual misconduct in 2018 alone," referring to Bart Wear.

Do you know what those -- what that's referring to?

A. I don't.

Are we coming back to this one? I'm kind of

13:21:08 loading up on paper here.
13:21:10 Q. No. You can put that one on the stack.
13:21:21 Going back to the text with Mr. Wear, if you
13:21:25 go to Bates Number 377.
13:22:00 A. Yes.
13:22:00 Q. You see at the top, you're texting about him
13:22:17 coming to Vegas.
13:22:19 A. Yes.
13:22:19 Q. And that's referring to the Pac-12 tournament?
13:22:22 A. Yes, sir.
13:22:24 Q. And then March 6, it says, "I still have not
13:22:30 gotten check for xylem flight," then he corrects "xylem"
13:22:34 to "Zylan." Do you see that?
13:22:36 A. Correct.
13:22:36 Q. That's the flight we were talking about earlier?
13:22:42 A. Yeah. He -- Yes.
13:22:43 Q. And he was getting reimbursed for some expenses?
13:22:47 A. Half. What he had agreed. That he was going to
13:22:48 pay half and -- and our restricted budget would pay the
13:22:51 other half.
13:22:57 Q. Then we have the text with Bart on the 17th.
13:23:13 "Congrats."
13:23:21 This is after you had learned about his
13:23:25 conduct with --
13:23:27 A. Yes.

13:23:28 Q. -- Kathy Cohen and Leslie Hurley?
13:23:30 A. Yes.
13:23:31 Q. And then you text back "Thanks, Bart!" Do you
13:23:39 see that?
13:23:40 A. Uh-huh.
13:23:40 Q. Then he texts on the 20th, and that appears to be
13:23:48 the end of the texting between you and him.
13:23:51 A. Correct.
13:23:52 Q. So have you had any communications with Mr. Wear
13:23:58 since March 20, 2019?
13:24:01 A. None.
13:24:02 MR. PÉREZ: March 17th, you mean? Or you
13:24:04 mean from him?
13:24:06 BY MR. McKIRGAN:
13:24:06 Q. From -- to or from Mr. Wear.
13:24:11 A. No.
13:24:11 Q. So you never talked to Bart Wear about his
13:24:18 conduct at the March 14th game?
13:24:20 A. No. I was instructed not to.
13:24:22 Q. By who?
13:24:23 A. Ray.
13:24:24 Q. Okay. After you left ASU, did you feel like you
13:24:32 were still under that instruction not to talk to Bart?
13:24:35 A. There was no reason to talk to him.
13:24:37 Q. Why is that?

13:24:40 A. I don't have a reason to talk to him.
13:24:43 Q. Okay. Let's move to the March 14th game.
13:24:56 A. Are we done with the text messages or save it?
13:24:59 Q. You better set those to the side because I may refer to those again.
13:25:03 Okay. The March 14th game is a Pac-12 tournament game between ASU and UCLA?
13:25:18 A. Yes.
13:25:18 Q. You were at the game?
13:25:22 A. Yes, sir.
13:25:22 Q. And it was in Las Vegas?
13:25:24 A. Uh-huh. Yes. Sorry.
13:25:28 Q. What -- what arena?
13:25:29 A. In T-Mobile.
13:25:31 Q. Okay. And where did you sit for the game?
13:25:35 A. Behind the bench, team bench.
13:25:38 Q. And where did Bart Wear sit?
13:25:40 A. Behind the team bench on the opposite -- on the outside of the aisle right next to the aisle.
13:25:49 Q. How many rows behind the bench was Mr. Wear?
13:25:53 A. One.
Q. How about --
13:25:56 A. First row.
13:25:56 Q. First row? Aisle seat.
13:25:58 All right. You're in what row?

13:26:00 A. One.
13:26:01 Q. And how many seats down?
13:26:02 A. I'd be guessing. Can I guess?
13:26:10 Q. Give me -- give me your best estimate and we'll call it.
13:26:12 A. 10 to 12.
13:26:13 Q. Okay. And your wife is sitting where?
13:26:15 A. Next to me.
13:26:16 Q. Is she between you and Mr. Wear or on the outside of you?
13:26:23 A. She's on the -- she was sitting next to Leslie Hurley.
13:26:26 Q. Okay. All right. And did you sit in the same seat throughout the game?
13:26:34 A. Yes.
13:26:34 Q. Did Mr. Wear sit in the same seat throughout the game?
13:26:38 A. I assume.
13:26:42 Q. Okay. At some point Mr. Wear and your then-wife Kathy had some sort of interaction. At what point in the game did that happen?
13:26:55 A. Halftime.
13:26:56 Q. Were you there?
13:26:58 A. No.
13:26:58 Q. Did you find out while at the game or after the

13:27:07 game what he had done?
13:27:10 A. After the game.
13:27:11 Q. So while you're watching the second half,
13:27:17 you're -- you're unaware of what's -- that this has
13:27:20 happened.
13:27:21 A. Correct.
13:27:21 Q. Okay. Did Kathy or Leslie Hurley move seats at
13:27:28 all?
13:27:28 A. No.
13:27:28 Q. The interaction between Leslie Hurley and Bart
13:27:39 Wear, did that happen at halftime too?
13:27:41 A. What interactions?
13:27:43 Q. Was there -- was there not an interaction -- you
13:27:46 know, the sexual misconduct.
13:27:49 A. That was proven?
13:27:51 Q. That was the subject of the investigation and
13:27:54 that was the result of the investigation?
13:27:55 A. Well, apparently that had happened previously.
13:28:00 Previously at games at Arizona State.
13:28:02 Q. Were you aware of that?
13:28:05 A. No.
13:28:05 Q. So when did you first learn of, you know,
13:28:20 Bart Wear sexually harassing your -- your wife at this
13:28:24 March 14th game?
13:28:24 A. After the game that night.

13:28:26 Q. Where at?
13:28:27 A. We were in the lobby of the hotel getting ready to go to dinner.
13:28:31 Q. Okay. How long after the game was that?
13:28:33 A. It was an hour.
13:28:42 Q. So the -- the seat assignments for those games, are you in charge of putting Bart, you know, on the aisle and getting seats for you and Kathy and Leslie?
13:29:00 A. That was part of my responsibilities. It was.
13:29:05 Q. Had you ever seated Bart next to your wife in the past?
13:29:09 A. No.
13:29:10 Q. How about next to Mrs. Hurley?
13:29:13 A. No.
13:29:14 Q. Was there any particular reason you put Bart at the end of the aisle?
13:29:23 A. Yes. It was -- He was a single and -- he was a single at the game, and Ben Wood's wife was a single, so it -- it worked out that they could sit next to each other.
13:29:41 Q. So Ben Wood's wife sat next to Bart at that game?
13:29:46 A. Yes, sir.
13:29:47 Q. Okay. Did the seats come in pairs? Is that why --
13:29:55 A. No. No. It was just the way the math worked

13:29:58 out.

13:30:05 Q. All right. So let's go to the lobby when you first learn. So who's -- What hotel are we talking about?

A. God. It's --

13:30:14 Q. If you remember.

13:30:15 A. It's right across. I think it's the Grand. Could it be the Grand? It's -- it's right across the street from T-Mobile.

13:30:23 Q. Okay. And --

13:30:24 A. It's walkable.

13:30:26 Q. Who was present for this discussion?

13:30:28 A. It was -- I was there. Kathy was there. Leslie was there. Lindsey Wood was there. I think Ben Wood was there and maybe Rashon. I'm not -- I'm not sure if Rashon. I know Bobby had gone up to the room to change before dinner.

13:30:55 MR. PÉREZ: You should use last names. Rashon who?

13:30:58 THE WITNESS: Oh. Rashon Burno, I'm sorry.

13:31:00 BY MR. McKIRGAN:

13:31:00 Q. And -- and Bobby Hurley?

13:31:02 A. Yes, sir.

13:31:04 Q. Okay. All right. What were you told and by whom regarding Bart Wear?

13:31:08 A. Lindsey Wood said, "Dave, I -- I appreciate the
13:31:17 location of the seat, but I -- I can't sit next to Bart
13:31:23 Wear ever again."
13:31:25 I said, "Lindsey, why?"
13:31:28 She goes, "He put his arm around me. He was
13:31:32 asking me inappropriate questions."
And I go --
13:31:33 She goes, "I just don't want to -- I'd
13:31:36 rather just sit up above in the section."
13:31:42 And I said, "Well, Lindsey, that's -- that's
13:31:45 not good."
13:31:46 And Leslie Hurley says, "Kathy, you have to
13:31:50 tell Dave what happened at halftime."
13:31:52 Q. Okay. And then Kathy told you?
13:31:56 A. Yes.
13:31:56 Q. And what did she tell you?
13:31:58 A. She -- And I said, "Honey, what happened?"
13:32:00 And she said, "When we were -- Leslie and I
13:32:03 were going to get a water, we were walking through the
13:32:06 aisle," and Bart stopped and they were face to face and
13:32:13 said, "Damn, Kathy, you are beautiful. Dave is one lucky
13:32:16 guy," and he took his hands from her waist and rubbed it
13:32:19 up to the sides of her breasts.
13:32:21 Q. And that's how Kathy described it?
13:32:25 A. Yes.

13:32:26 Q. Okay. Anything else?
13:32:29 A. And -- and I said, "Honey, well, that -- that's not good."
13:32:33 And Leslie says, "Dave, you -- you don't know the half of it. He comes up to me at games in that first row and he puts his hands on my legs."
13:32:43 I go, "What?"
13:32:45 She goes, "Yeah. He sits right over there."
13:32:48 And I said, "Leslie, that -- that's not good."
13:32:53 And at this point -- And they go, "We don't want Bobby to know. We talked to the three of us and, Dave, you have to honor it."
13:33:02 And I said, "Guys, I have a duty to report. This is not -- Like, I -- I have to protect you guys, but I also have to protect the university. Like, I have a duty to report. It's my job."
13:33:19 And they said, "We can't let Bobby know. Bobby will lose his mind."
13:33:26 And -- and I said, "I don't know how to handle this, guys. I don't right now. We gotta think" --
13:33:35 They said, "Do not bring it up at dinner tonight."
13:33:37 And I said, "Okay."
13:33:39 And -- and then after dinner, we get done,

13:33:47 and I forgot if it was Kathy who represented -- they said,
13:33:56 "Talk to Leslie. Just please wait until the season's
13:34:03 over. It'll be over in a week."
13:34:07 And I said "Okay."
13:34:10 I honored their wishes for a week, five
13:34:15 days, whatever it ends up being, you know. We were out
13:34:19 the following Friday morning, so -- out of the tournament.
13:34:23 Q. Okay. Anything else you can recall about this
13:34:31 initial conversation?
13:34:32 A. Not that I can recall.
13:34:36 Q. And you told them it was your job to report?
13:34:40 A. I have a duty to report. It's my responsibility.
13:34:44 Q. As part of your job, right?
13:34:47 A. Correct.
13:34:47 Q. Okay. So they -- I think they played the next
13:34:57 day in the Pac-12 tournament, "they" being ASU. Did you
13:35:04 mention something to Jean Boyd either the day of the next
13:35:11 game against Oregon on March 15th or close thereafter that
13:35:17 there was a donor issue?
13:35:20 A. I said -- Yes. I said, "Jean, we had a -- we
13:35:23 had a donor issue. I'm not exactly sure how I can handle,
13:35:26 but right now, I have to keep it with me right now." But
13:35:36 that's it.
13:35:36 Q. And why did you --
13:35:37 A. That's all I can remember.

13:35:39 Q. Why did you tell Jean you had to keep it just with you?
13:35:42 A. To respect the women's wishes.
13:35:45 Q. So I take it you did not tell Jean Boyd that it was Bart Wear --
13:35:50 A. No.
13:35:50 Q. -- who was the donor?
13:35:52 MR. PÉREZ: Objection. Vague as to time.
13:35:54 MR. McKIRGAN: Well, that's a good objection, actually.
13:35:58 BY MR. McKIRGAN:
13:35:58 Q. So at this conversation --
13:35:59 MR. McKIRGAN: I give credit every now and then.
13:36:02 THE WITNESS: These guys, these lawyers.
BY MR. McKIRGAN:
13:36:05 Q. -- the March 15th or -- Well, the conversation that occurred with Jean was in Las Vegas?
13:36:10 A. Yes.
13:36:10 Q. So you're still there for the Pac-12 tournament?
13:36:14 A. Yes.
13:36:15 Q. And in that conversation, you did not tell Jean that it was Bart Wear who was the donor. Is that right?
13:36:22 A. No. I don't recall.
13:36:24 Q. And you did not tell him what the, quote, issue

13:36:29 was?
13:36:29 A. Correct.
13:36:32 Q. All right. And you said -- Did you tell him you
13:36:37 were collecting more details?
13:36:38 A. I don't remember saying that.
13:36:40 Q. Did you talk to anybody else at the Pac-12
13:36:59 tournament about what Bart had done?
13:37:06 A. No.
13:37:07 Q. Did you talk to Scott Nelson about what Bart had
13:37:23 done at -- at the Pac-12 tournament?
13:37:25 A. I don't recall.
(Deposition Exhibit 67 was marked for
identification.)
BY MR. McKIRGAN:
13:37:50 Q. Exhibit 67 is a text exchange between you and
13:37:54 Scott Nelson.
13:38:02 A. Yeah. Yeah.
13:38:02 Q. You see on March 14th at 10:34 p.m., Mr. Nelson
13:38:14 texts you: "Cheers, buddy . . . great one! Is Bart
13:38:18 sitting down low tomorrow? I think he's solo."
13:38:21 Do you see that?
13:38:22 A. Yes.
13:38:22 Q. So this was after the game --
A. Uh-huh.
13:38:24 Q. -- right?

13:38:25 A. Yes.
13:38:25 Q. And this would have been after you had learned
13:38:29 from --
A. Yeah, because --
13:38:31 Q. -- Leslie and Kathy and Mrs. Wood what -- what
13:38:32 had happened.
13:38:37 And you responded, "That's why Julie is
13:38:39 there." Who's Julie?
13:38:40 A. I don't know.
13:38:42 Q. And it says, "Get your ass here."
13:38:48 Was -- was he not in Vegas?
13:38:49 A. That was -- that was at 6 o'clock.
13:38:54 Q. I'm sorry.
13:38:56 A. I don't know who this is.
13:38:59 Q. I'm sorry. I'm -- I'm on the wrong line.
13:39:06 So it says, "Is Bart sitting down low? I
13:39:08 think he's solo."
13:39:10 You say: "Thanks, buddy. At dinner. Where
13:39:11 are you?"
13:39:12 And then you text, "Bart's out of control.
13:39:14 Need to talk to him. Hugged Kathy way too close. She was
13:39:18 uncomfortable."
13:39:19 A. I guess I did say something.
Q. Okay.
13:39:21 A. I don't remem- -- I didn't remember, Bob. Sorry.

13:39:23 Q. That's okay. That's why I'm showing it to you to help you remember.
13:39:28 Scott texts back: ". . . sorry, bud.
13:39:34 That's Bart, which isn't right, even with Linda around."
13:39:40 And he's, "At Park MGM watching this game."
13:39:43 And you reply: "I need to talk to Ray. He
13:39:46 was all over Ben's wife apparently. He's a lawsuit
13:39:50 waiting to happen."
13:39:51 Do you see that?
13:39:51 A. Uh-huh.
Q. Okay.
13:39:52 A. Yes.
13:39:56 Q. So did you have --
13:40:01 Well, let's get our time line. So it's
13:40:04 March 25th when you meet with Ray to tell him about this, right?
13:40:07 A. Yes.
13:40:07 Q. So between this texting with Mr. Nelson and
13:40:12 March 25th, did you talk to Mr. Nelson about --
13:40:15 A. Yes.
13:40:15 Q. -- what had happened?
13:40:16 A. Yes.
13:40:17 Q. All right. And when did that occur?
13:40:19 A. That's a good question.
13:40:23 Q. I try to ask those.

13:40:27 A. It could have been in Tulsa when -- when -- when
13:40:33 we were there.
13:40:33 Q. For the NCAA?
13:40:35 A. For the NCAA. Yeah, we were only there two
13:40:38 nights.
13:40:42 My recollection, Bob, was that most likely
13:40:48 it happened then, when we -- you know, that weekend we
13:40:53 were in Tulsa.
13:40:54 Q. Okay. So do you remember what the substance of
13:40:58 your conversation with Mr. Nelson was?
13:40:59 A. Yeah. It was about Bart and touching these women
13:41:03 and what has come across. You know, if I recall correct,
13:41:07 I said, "We -- we need to talk to Ray as soon as we get
13:41:09 back."
13:41:09 Q. Was Ray in Vegas?
13:41:13 A. Yes.
13:41:14 Q. Was Ray in Tulsa?
13:41:17 A. Yes.
13:41:18 Q. When you flew back from Vegas or flew to Tulsa,
13:41:27 were you on the same flights as Ray?
13:41:29 A. Probably not Vegas.
13:41:32 Q. How about to Tulsa?
13:41:34 A. Yes, we were on a charter.
13:41:36 Q. Did you have any meals with -- with Ray Anderson
13:41:41 between March 14th and March 25?

13:41:43 A. Yes.
13:41:43 Q. Did you have any occasion to be with Ray alone
13:41:52 between March 14th and March 25?
13:41:55 A. Yes. Plenty of times.
13:41:57 Q. Okay. Is there a reason why you told Mr. Nelson
13:42:01 about this but not Mr. Anderson?
13:42:06 A. Yes. It -- The women asked to not -- to keep
13:42:10 Ray out of it until the season was over.
13:42:12 Q. So --
13:42:19 A. He was -- he's the boss.
13:42:20 Q. Well, the reason the women asked you not to talk
13:42:28 to Ray was they -- if I understand what you were saying
13:42:32 earlier, was to protect Bobby Hurley in his coaching --
13:42:38 they didn't want to distract him from his coaching. Is
that right?
13:42:41 A. Well, they had mentioned no distractions. He has
13:42:50 distractions enough.
13:42:50 Q. So Mr. Nelson -- If you told Mr. Nelson, I mean,
13:42:53 he could have talked to Bobby, right?
13:42:56 A. That's not something that -- I don't think Scott
13:43:03 would do. I guess he could, but not that many people will
13:43:06 talk to Bobby during the season.
13:43:08 Q. Okay. Well, why didn't you go to Mr. Anderson
13:43:10 and -- and say, "Look, we -- we've got this issue, but we
13:43:15 don't want you to say anything to Coach Hurley until the

13:43:18 season's over"?
13:43:19 A. It wasn't what the women asked for.
13:43:24 Q. So in your discussions with the three women, what
13:43:37 did they want? Did they ever talk to you about what
13:43:40 should happen to Bart Wear as --
13:43:42 A. No.
13:43:42 Q. -- a result of this?
13:43:44 A. They just didn't want to be around him.
13:43:46 Q. Okay. Did they ever talk to you about he ought
13:43:48 to be disassociated from the program?
13:43:50 A. Not to me.
13:43:51 Q. To anybody else, do you know?
13:43:53 A. I don't know.
13:43:54 Q. So when you text Mr. Nelson, when you say,
13:44:14 "Bart's out of control. Need to talk to him" -- you say,
13:44:19 "Hugged Kathy way too close" -- I think you described
13:44:21 Mr. Wear as a hugger.
13:44:22 A. Uh-huh.
13:44:24 Q. So why -- why did you use the term "hugged"?
13:44:35 A. Hugged, touched.
13:44:40 Q. In your conversation with Mr. Nelson, how -- how
13:44:42 did you describe it, the one that happened after this
13:44:45 texting?
13:44:46 A. How it happened. Starting at the waist and going
13:44:51 up.

13:44:51 Q. And your conversation with Mr. Nelson, was that the only conversation you had with him prior to March 25 regarding this incident?
13:44:57
13:45:00
13:45:01 A. I can't recall. I might have had more.
13:45:06 Q. Okay. The discussions with the women, Mr. Nelson, Mr. Boyd -- any other discussions you had with anybody between the time you learned, the night of March 14th, and the time you walked into Ray's office on March 25th to tell him -- any other discussions with anybody?
13:45:15
13:45:21
13:45:26
13:45:31
13:45:34
13:45:34 A. Bobby Hurley and -- and Rashon Burno.
13:45:41 Q. Okay. The discussion with Bobby Hurley, when did that happen?
13:45:45
13:45:45 A. It happened -- if my memory serves me correct, it happened on the tarmac waiting for the players and everybody to go through security before we boarded the plane to come back, so it happened in Tulsa.
13:45:50
13:45:56
13:46:00
13:46:04 Q. And that flight back from Tulsa was after they were eliminated -- the team was eliminated from the NCAA tournament?
13:46:11
13:46:16
13:46:16 A. Correct. We had lost the day before.
13:46:18 Q. Was Ray on that flight back?
13:46:20 A. I believe so.
13:46:21 Q. Okay. And that flight would have been on -- They lost to Buffalo on March 22, so you think it was
13:46:37

13:46:41 March 23?
13:46:42 A. Yes. It was home -- It was not that day. It
13:46:45 was the next day, which, I believe, was a Saturday.
13:46:50 Q. Was Ray Anderson -- was he at the game against
13:47:07 Buffalo on March 22?
13:47:08 A. Yes.
13:47:09 Q. After they lost, did you talk to Ray about
13:47:13 anything?
13:47:14 MR. PÉREZ: Objection. Vague.
13:47:17 THE WITNESS: We had a staff dinner.
13:47:19 BY MR. McKIRGAN:
13:47:19 Q. So you had dinner with Ray and others that night?
13:47:21 A. Yes, sir.
13:47:21 Q. Season's all over, right?
13:47:26 Right?
13:47:26 A. Uh-huh. Yes. Yes. Sorry.
13:47:29 Q. Why didn't you tell Ray about this that evening,
13:47:35 about Bart Wear?
13:47:36 A. Multiple individuals around and staff.
13:47:39 Q. So this was something you wanted to discuss
13:47:45 without other people around?
13:47:46 A. Correct.
13:47:47 Q. Did you have an opportunity at the dinner to pull
13:47:56 Ray aside and say, "We've got an issue with Bart. We've
13:47:59 got to deal with this when we get back"?

13:48:02 A. No.
13:48:03 Q. How about on the flight back? Was you -- Was Ray on the flight back?
13:48:09 A. Yes.
13:48:09 Q. Opportunity on the flight back to tell him?
13:48:12 A. Same setting. A lot of people around.
13:48:14 Q. How about on the tarmac? Was Ray on the tarmac?
13:48:21 A. No.
Q. Okay.
13:48:24 A. Not with me and Bobby.
13:48:25 Q. All right. All right. So you speak to Bobby on the tarmac on March 23. What did you and he talk about regarding Bart Wear?
13:48:33 A. The incident. Notifying that we had three women that came forward on Bart inappropriately touching all three of them. And that, "Bobby, they asked me not to tell you, talk about it, until the season was over. It's over. Just so you know, I'm going to be going in to talk to Ray on Monday."
13:48:56 Q. Okay. And how did Bobby Hurley respond?
13:48:59 A. He was upset.
13:49:00 Q. Did he say what he thought should happen to Bart Wear in terms of should he be disassociated from the program, should he go to the police? Anything -- any kind of response like that?

13:49:12 A. No, not that I recall.
13:49:13 Q. Did Mr. Hurley say that he was going to speak to anybody about this or was he leaving that to you?
13:49:21 A. No. He -- he was -- he was leaving that to me. I said, "Bobby, is -- this is my role. It came to me, and -- and I'm notifying you because it was your wife. And I'm going to talk to Ray on Monday." And at that point, I told him -- I said, "I'm going to have Scott Nelson with me because it involves a donor."
Q. Okay.
13:49:42 A. He said, "Keep me up -- keep me in -- in the loop."
13:49:44 Q. Okay. All right. And then the other person you mentioned was Rashon --
13:49:53 A. Burno.
13:49:54 Q. -- Burno.
13:49:56 When did you talk to him between March 14th and March 25?
13:50:01 A. Well, I talked to -- About this incident? Because I talked -- I used to talk --
13:50:06 Q. Yeah, no. I'm focused on Bart Wear.
13:50:09 A. Oh, it would be sometime between now and then, but it was after I had talked to Bobby.
13:50:14 Q. But before you --
13:50:16 A. And it might have been -- and, Bob, it might have

been after I talked to Ray --
Q. Okay.
A. -- the way the timing goes.
Q. So what did you discuss with Rashon Burno?
A. I explained the -- the very similar incident, what had happened to the -- to the three women and that, you know, I was meeting with Ray on Monday and that, you know, I'll report back. Rashon's the associate -- he was the associate head coach.
Q. So that's why you were talking to him about this?
A. Yes.
Q. And did Mr. Burno express any opinion on what should happen to Mr. Wear?
A. No, not that I recall.
Q. Okay. So let's go to March 25. As I understand your complaint, you took Mr. Nelson with you to -- to Ray Anderson's office to report on this.
A. Yes.
Q. All right. And why did you have Mr. Nelson with you?
A. Because Bart was a donor and Scott oversees the donors --
Q. Okay.
A. -- for ASU athletics.
Q. Now, what do you recall being discussed in the

13:52:04 meeting with Mr. Anderson and Mr. Nelson?
13:52:07 A. You just want me to start?
Q. Yeah, let me --
A. Or any --
13:52:09 Q. Let me set the stage a little bit. So it's in
13:52:12 Ray's office. Is that right?
13:52:13 A. Yes, sir.
13:52:14 Q. How long did this meeting last?
13:52:15 A. 20 minutes? 15 minutes?
13:52:19 Q. And what time of the day was it?
13:52:21 A. I believe, if I can recall, it was in the morning
13:52:24 after our Monday morning managers meeting.
13:52:30 Q. Okay. And you go in there. Mr. Nelson's with
13:52:33 you when you go in --
13:52:34 A. Yes, sir.
13:52:34 Q. -- the office?
13:52:36 All right. Start there. And tell me
13:52:37 what -- who said what.
13:52:38 A. Sat down. And I said, "Ray, we had an issue that
13:52:43 happened with Bart at a -- at the Pac-12 game about 10 --
13:52:50 now 10 days ago." Felt like a week ago. "We need to make
13:52:57 you aware. And, Ray, it involves my wife, Leslie Hurley,
13:53:04 and Lindsey Wood," which is Ben Wood's wife.
13:53:10 "Personally," I said, "it's tough for me because it
13:53:13 involves Kathy, and -- my wife. And, you know, Bart is a

13:53:17 big donor and a friend" -- a former friend at that point.
13:53:23 And he goes, "Well, tell me what happened."
13:53:26 I said, "Well, it was at the -- the first
13:53:29 game, and Kathy was leaving for halftime. And she's going
13:53:34 through the aisle. Bart's sitting at the end of the
13:53:37 aisle. She's going to get a water with Leslie. And Bart
13:53:41 put his hands on her waist said, 'Boy, is Dave one lucky
13:53:45 guy,' and reached up and touched the sides of her
13:53:49 breasts." And -- and I said, "Ray, that -- you know, that
13:53:54 really violated Kathy." And I said, "Then we come to find
13:54:01 out that -- that, you know, after the game, that he had --
13:54:06 he's done similar stuff, touching the middle of Leslie
13:54:10 Hurley's thighs because there's no border in front at
13:54:14 games." But I said, "Then going back, we have Lindsey
13:54:17 Wood, who Bart was hugging, and she said she was
13:54:21 uncomfortable. And he was touching her inappropriately,
13:54:24 was asking her uncomfortable questions." And I said,
13:54:28 "Ray, I don't know exactly how to handle this, but we've
13:54:30 got to report this."
13:54:34 And Ray said --
13:54:35 And I go, "I don't know. Do you want me to
13:54:37 talk to Bart? I don't mind talking" --
13:54:39 He goes, "No, I -- I got it. I'll handle
13:54:44 it." And he said, "You know, I'm going to have a
13:54:45 conversation with Bart because I will not tolerate this."

13:54:48 He was -- he was really supportive. He was great. He was
13:54:51 great.
13:54:52 And he said, "Scott, I need you to go talk
13:54:57 to Rick Shangraw and find out is there any history that we
13:55:03 just don't know about." And he goes, "I assume that we'll
13:55:07 probably handle this how we did with Fast Eddie."
13:55:13 At that point, I don't know anything about
13:55:14 Fast Eddie except that he's a big -- he goes to baseball
13:55:17 games. Maybe he goes to other sports, but I know him --
13:55:19 that he goes to a lot of baseball games.
13:55:22 And I say, "Ray, I -- I really appreciate
13:55:26 this. And let me know how we can help."
13:55:33 And that was it, Bob.
13:55:34 Q. Okay. So by the end of the meeting --
13:55:38 So let me ask you this. You -- you were
13:55:40 there for Scott Nelson's deposition?
13:55:43 A. Yes. Yes.
13:55:44 Q. And you heard him testify about this meeting?
13:55:47 A. Yes.
13:55:47 Q. Anything you heard that you disagreed with that
13:55:50 Mr. Nelson testified to?
13:55:52 A. I can't recall. I think there were some
13:55:54 inconsistencies on him saying what I said on whether --
13:56:03 the touching of the breasts and that, but I -- I can't --
13:56:06 I can't remember what Scott -- because I know what

13:56:08 happened, so . . .
13:56:09 Q. Well, other than that inconsistency, anything
13:56:13 else you heard that Mr. Nelson testified to that when you
13:56:17 heard it, you disagreed with?
13:56:18 A. I can't remember, Bob, what -- specifically what
13:56:21 Scott said. If I saw a transcript, I might be able to --
13:56:25 to go through it.
13:56:25 Q. So at the end of the meeting, if I'm
13:56:29 understanding you, Mr. Nelson was going to go talk to
13:56:35 Mr. Shangraw to see if there were other incidents
13:56:38 involving Mr. Wear.
13:56:39 A. Correct.
Q. Is that right?
13:56:41 A. Yes.
13:56:42 Q. And Mr. Anderson was going to await a report back
13:56:48 from Mr. Nelson before taking the next step?
13:56:52 A. Yes.
13:56:52 Q. Okay. And do you know when it was that
13:56:54 Mr. Nelson came back to Mr. Anderson to report what
13:56:59 Mr. Shangraw had said?
13:57:01 A. If I remember correctly, I think it was within
13:57:03 two weeks, because Scott -- I was not in the conversation
13:57:08 that Scott had with Ray, but Scott did call me and tell me
13:57:12 that he did talk to Ray and said that there was nothing --
13:57:16 no other things reported about Bart.

13:57:20 Q. And as far as you knew at the time, there was
13:57:24 nothing further that you knew about regarding Bart other
13:57:28 than what you've been told regarding the March 14th game?
13:57:32 A. Correct. And -- and we're trained as such that
13:57:35 when we report it, you -- you leave it. You don't become
13:57:39 part of the investigation, that it just -- the appropriate
13:57:43 people take it and you trust.
13:57:45 Q. And that's all pursuant to how you were trained,
13:57:52 what you did?
13:57:52 A. Yes.
13:57:53 Q. And your report to Mr. Anderson?
13:57:56 A. Yes, sir.
13:58:00 Q. So after Mr. Nelson reported to Mr. Anderson that
13:58:13 there weren't other prior complaints about Bart Wear,
13:58:18 did -- did you -- when did you learn that that's what
13:58:22 Mr. Nelson had -- had told Ray, that Shangraw had reported
13:58:30 no other prior incidents? When did you find out that
13:58:32 information?
13:58:33 A. Scott called me some evening and told me that he
13:58:36 had talked to Ray.
13:58:37 Q. Was it shortly after his talking to Ray?
13:58:40 A. I don't know.
Q. Was it --
13:58:40 A. I would assume.
13:58:41 Q. Was it in March of 2019 or April of 2019 or --

13:58:47 A. I would think, from my memory, that it was within two weeks after we talked to Ray.
13:58:51 Q. According to your complaint at page 8, Exhibit 64, you allege, "In early April 2019, Mr. Shangraw learned of Mr. Wear's assaults . . . ." Do you see that?
13:59:16 A. Oh, down below. Okay. Yes.
13:59:18 Q. Is that -- is that about the time you would have learned of this information, that there were no prior complaints about Bart Wear?
13:59:36 A. That would fit around the time line, two weeks after March 25th.
13:59:41 Q. Now, did you have any discussions with Mr. Anderson about, once you learned that there were no prior complaints, what Mr. Anderson planned to do?
13:59:56 A. No.
13:59:57 Q. And that's because you were trained not to get involved in the investigation?
14:00:00 A. Correct.
14:00:01 Q. Is it your understanding that Mr. Anderson would conduct the investigation?
14:00:04 A. I didn't know. My duty was to report.
14:00:09 Q. And your duty is to report to Mr. Anderson?
14:00:12 A. My supervisor.
14:00:13 MR. PÉREZ: Counsel, we've been going about an hour and --

14:00:23 MR. McKIRGAN: Sure.
14:00:23 MR. PEREZ: -- 15 minutes.
14:00:23 MR. McKIRGAN: Yep.
14:00:26 MR. PEREZ: Good time?
14:00:30 MR. McKIRGAN: Yep.
14:00:30 THE VIDEOGRAPHER: Off the record at 2 p.m.
14:19:39 (A recess ensued.)
14:19:47 THE VIDEOGRAPHER: On the record at 2:19 p.m.
14:19:48 BY MR. McKIRGAN:
14:19:50 Q. Okay. Mr. Cohen, after the break, anything to clarify or correct?
14:19:54 A. I don't think so.
14:19:54 Q. All right. So going back to the conversation with the three women in the lobby of the hotel the evening of March 14th, did they tell you that they did not want Bobby to know about this before the season ended?
14:20:15 A. Yes.
14:20:15 Q. Did they mention they didn't want Ray Anderson knowing about it?
14:20:21 A. They didn't want anyone to know about it, so I probably broke their trust talking to Scott and -- and --
14:20:28 Q. Rashon?
14:20:29 A. No, no. I think Rashon was after --
Q. Okay.

14:20:32 A. -- I had talked to Ray.
14:20:33 Q. The NCAA games -- Well, let me back up.
14:20:41 The March 15th game in the Pac-12 tournament, I think, was Oregon. Was Bart Wear at that game?
14:20:47 A. I don't think so.
14:20:49 Q. How about the NCAA games? There's one in Dayton and one in Tulsa.
14:20:57 A. Yeah, no. He was not there either.
14:21:00 Q. He was not at those games? All right.
14:21:01 A. I like that you give us credit for the date being NCAA. A lot of people don't.
14:21:10 Q. That's playing the . . .
14:21:11 Okay. So in paragraph 38 of your complaint, marked as Exhibit 64, you -- you talk about Rick Shangraw learning, and then you allege that Mr. Anderson still "had not and did not initiate an investigation against Mr. Wear at that time nor report the assault and sexual harassment to any other department at ASU." Do you see that?
14:21:46 A. Yes, sir.
14:21:47 Q. Okay. So if I'm understanding you correctly, after the meeting with Scott Nelson and you with Mr. Anderson, Mr. Anderson was going to get further information from Mr. Shangraw, and was it your understanding that he was going to then reach out to Bart

14:22:08 Wear?
14:22:08 A. He had said --
14:22:09 Q. Talk to him?
14:22:10 A. Ray said he was going to handle it.
14:22:12 Q. Okay. And what was your understanding of how he
14:22:14 was going to handle it?
14:22:15 A. I didn't know.
14:22:16 Q. So was there a discussion that the way Ray was
14:22:24 going to handle it was to talk to Bart Wear and say, "This
14:22:29 is not -- This is conduct that we just don't abide"?
14:22:35 A. No, I don't.
14:22:36 MR. PÉREZ: Objection.
14:22:37 THE WITNESS: I don't know. He said that he
14:22:39 didn't -- this was not appropriate conduct but that he
14:22:42 would handle it. I don't know what that meant, Bob.
14:22:44 BY MR. McKIRGAN:
14:22:45 Q. So was it your understanding that Ray was going
14:22:47 to himself investigate?
14:22:51 MR. PÉREZ: Objection. Asked and answered.
14:22:52 THE WITNESS: I don't know.
14:22:53 BY MR. McKIRGAN:
14:22:58 Q. When you allege that Ray had neither reported the
14:23:04 assault -- he had not reported the assault and sexual
14:23:09 harassment to any other department at ASU, what department
14:23:12 are you referring to?

A. General counsel's office, Title IX, ASU Foundation.

Q. Okay. Paragraph 39, you alleged in mid-April, Mr. Heiler was informed of Bart Wear's assaults -- assault and sexual harassment. How did Mr. Heiler learn about this?

A. Jay and I were golfing.

Q. And you told him?

A. Yes, sir. Yes.

Q. Did you tell Mr. Heiler with an expectation that he was going to do something about it?

A. I didn't know what he would do about it. There was no duty to report to Jay for me. It is -- You know, he's a friend and a regent. I was notifying him that this was something that Kathy and I were working through.

Q. And you allege later in that paragraph, "Mr. Heiler was aware of Bart Wear, knew his reputation for drinking and being inappropriate . . . ." Do you see that?

A. Yes, sir.

Q. So I think Mr. Heiler testified in his deposition -- I think you were there -- that he was unaware of any prior sexual harassment by Bart Wear. Are -- are you asserting that Mr. Heiler knew about prior sexual harassment by Mr. Wear?

14:25:08 A. I don't know about the sexual harassment, but Jay was around -- he sat next to Bart Wear at the previous year's Pac-12 tournament rows behind the bench, we were not as -- as in a high-profile game, and complained to me about Bart's drinking and inappropriate comments, jokes, et cetera. But nothing about sexual harassment.
14:25:50 Q. Okay. And you were aware of his drinking and inappropriate comments, weren't you?
14:25:56 A. Yes.
14:25:57 Q. And you were aware of that prior to March 14, 2019, right?
14:26:03 A. Yes.
14:26:03 Q. Then paragraph 40, on April 22nd, Jean Boyd was informed of Mr. Wear's assault and sexual harassment. How did Mr. Boyd learn of Mr. Wear's conduct?
14:26:24 A. I had a specific conversation with Jean.
14:26:28 MR. PÉREZ: Boyd.
14:26:31 THE WITNESS: Jean Boyd, sorry.
14:26:33 BY MR. McKIRGAN:
14:26:33 Q. Okay. Why -- why were you telling Mr. Boyd about this?
14:26:35 A. He was the deputy AD.
14:26:37 Q. So this, again, was part of your job?
14:26:41 A. No. I don't think it was a duty to report. I think it was just that Jean and I worked very closely and

14:26:49 it was something that, as the number-two guy in the athletic department, he probably should know about.
14:26:55 Q. And you -- you allege Mr. Boyd had a manda- -- mandatory duty to report Mr. Wear's conduct. Do you see that?
14:27:07 A. Yes.
14:27:08 Q. Mandatory duty to report the conduct to whom?
14:27:13 A. To the Title IX officer.
14:27:19 Q. And then you allege Mr. Boyd did not report the assault and sexual harassment. Do you see that?
14:27:32 A. Yes.
14:27:32 Q. And are you asserting that Mr. Boyd did not report it to the Title IX officer?
14:27:37 A. He told me he wasn't going to. If Ray was handling it, there was no need for -- for that to happen, is what he said.
14:27:43 Q. Did he tell you that if you weren't satisfied with how Ray was handling it, that you should report it to the Title IX officer?
14:27:53 A. No, I don't recall that.
14:27:54 Q. Did you ever go to the Title IX officer --
14:28:01 A. No.
14:28:02 Q. -- about Bart?
14:28:03 A. No.
14:28:04 Q. Why not?

14:28:05 A. It was unnecessary. I reported it to my supervisor, which I was trained to do.
14:28:10 Q. At some point, did you come to the conclusion that you -- that Ray was not handling this report the way you thought it should be handled?
14:28:20 A. Yes. In the next paragraph.
14:28:22 Q. On May 3rd?
14:28:24 A. Yes.
14:28:24 Q. Did you go to the Title IX officer after May 3rd?
14:28:30 A. No.
14:28:30 Q. Why not?
14:28:31 A. That's a good question. I don't know why I didn't go to Title IX then.
14:28:42 Q. So let's go back to April 22nd with Mr. Boyd. What do you recall you saying to Mr. Boyd and what Mr. Boyd said to you regarding Bart Wear?
14:29:06 A. It's -- it's been a while, so it's -- I can't -- Bob, to be honest, I can't recall if it was in person, if it was over the phone. I -- I can't even get into the -- the when and the how. I think that I probably -- if that's being too vague, you can tell me that it's wrong -- "Jean, as a follow-up to, you know, what we had talked about a little bit in Vegas, there's some more details you should know about," and I told him about the -- the various women involved and -- and that. So I confided in

14:29:43 him.
14:29:46 Q. So did you consider Jean to be higher on the
14:29:50 organizational chart --
A. Yeah.
14:29:51 Q. -- than you?
14:29:51 A. No question, yes. Yes. He was the -- he was the
14:29:54 number-two person in the athletic department.
14:29:57 Q. Were you at -- at Mr. Boyd's deposition?
14:30:18 A. Yes.
14:30:19 Q. Do you remember Mr. Boyd testifying that you had
14:30:29 sworn him to secrecy about this?
14:30:32 A. I remember him saying that.
14:30:35 Q. Right. Did -- did you ask Jean to keep this
14:30:39 confidential?
14:30:40 A. I asked Jean to keep it between me and him.
14:30:43 Q. Did you also tell Jean that you were working on
14:30:46 this?
14:30:47 MR. PÉREZ: Objection. Vague as to time
14:30:48 again.
14:30:49 BY MR. McKIRGAN:
14:30:49 Q. This would have been in April of 2019.
14:30:52 A. No. I wasn't working on anything.
14:30:54 Q. May 3rd, the ASU-UCLA baseball game, tell me what
14:31:10 happened in your conversation with Mr. Anderson on that --
14:31:15 that date.

A. It was a typical baseball game. UCLA ranked number 2 in the country. Kathy and I went, sat with Ray and his wife Buffy. And it was a very -- you know, chill, not cold, but just a nice evening. And at some point, I -- I said, "Hey, Ray, by the way, you know, we haven't talked about this, but how did your conversation with Bart go?"

And he said he didn't have it.

And I said, "What -- what do you mean, you didn't have it?"

He goes, "Well, I just haven't had time."

And I said, "Geez, Ray." I said, "You know, we've got this Devils' Ball coming up, and, you know, Bart usually attends. He loses his mind there. What -- what are we going to do?"

He's like, "Well, if you're uncomfortable" -- No. He said, "I'll -- I'll protect Kathy."

And I said, "Well, Ray, you're the athletic director. Everybody wants" -- I said, "That's -- that's a burden that -- that you shouldn't have."

And he goes, "Well, if you're uncomfortable, then just don't go."

And I said, "Well, Ray, I, you know, kind of have to go. It's our job to be there around donors."

14:32:36 And so that was it.
14:32:37 Q. Were you sitting out in the bleachers?
14:32:43 A. We were sitting --
14:32:44 Q. Stands?
14:32:45 A. Yeah, we were sitting in seats, in his -- Ray had
14:32:48 a little box at -- up above the first base line.
14:32:52 Q. Was his wife or your wife part of this
14:32:55 conversation?
14:32:55 A. No.
14:32:56 Q. Were they present?
14:32:58 A. They were -- it was -- it's -- They're moving
14:33:02 seats. They're not, like, fixed seats. So Ray and I were
14:33:05 here. And Kathy and Buffy were three feet away. So it
14:33:12 was just a conversation between me and Ray.
14:33:13 Q. Okay. What else do you recall Mr. Anderson
14:33:21 saying in the conversation? Anything?
14:33:22 A. That was it.
14:33:23 Q. Did Mr. Wear attend -- attend the Devils' Ball?
14:33:31 A. He did not.
14:33:31 Q. Who invites people to the Devils' Ball?
14:33:39 A. Sun Devil Club.
14:33:43 Q. Do you know if Mr. Wear received an invitation?
14:33:49 A. I don't.
14:33:49 Q. So at paragraph 41, line 26, where it says,
14:34:12 quote, he was allowed to attend the Devils' Ball, he did

not actually attend?
A. He did not.
Q. Okay. All right. The next sentence in your complaint, paragraph 42, on May 13, Mr. Anderson, Mr. Wear, Mr. Boyd, and Herm Edwards went on a golfing trip together. Do you see that?
A. Yes, sir.
Q. When did you learn about this golfing trip?
A. Right -- as soon as they were -- they got back.
Q. How did you learn about it?
A. It was either through Ray's assistant, Christina, or Jean.
Q. And then the next thing you have is on May 20th, you discussed with Jean Boyd the allegations of assault and sexual harassment by Bart Wear.
A. Yes, sir.
Q. Where did that conversation take place?
A. That was -- I was in my office, and it was a conversation over the phone with Jean.
Q. Now, the -- the dates that you have in your complaint are pretty specific. How did you pinpoint some of these dates?
A. That's a good question. You know, it's -- it's been almost five years now, Bob, and I think when this was written, I think that there was nothing more important in

my life than knowing these dates. So as I sit back now, could I say May 20th? I -- I probably couldn't, Bob.

Q. So at some point, did you start preparing, like, a chronology? You know, write -- writing down dates and events?

MR. PÉREZ: I'm going to object to the extent it calls for work product or attorney-client privilege.

But you can answer otherwise.

THE WITNESS: I don't think so. I don't -- I don't recall keeping notes or -- I don't have a note -- I don't have a journal or ledger. I don't -- I don't.

BY MR. McKIRGAN:

Q. Okay. Well, let me just ask you this. As you sit here today, do you know how -- what's the basis for alleging that this conversation took place on May 20 as opposed to May 21 or --

A. When -- when this happened five years ago, that that's probably the conversation date that it happened. I mean, I sit here today, Bob, I -- I told you I -- I could probably be off -- hell, be off years in some of these answers, you know. But when this was written, that's what I . . .

Q. So let me say this. When did -- when did you first retain counsel?

14:37:18 A. After I was terminated.
14:37:26 Q. When's the first time you consulted with counsel
14:37:30 as opposed to --
MR. PÉREZ: Objection.
BY MR. McKIRGAN:
14:37:31 Q. -- retaining an attorney?
14:37:34 MR. PÉREZ: I'll let you ask -- answer the
14:37:35 question if you remember.
14:37:39 THE WITNESS: It was -- if I recall
14:37:40 correctly, it was after I had my bonus letter modified and
14:37:47 after the swimming was taken away. If I -- if I remember
14:37:55 correctly, I had one conversation with a local attorney.
14:37:58 But it was not my present attorney.
BY MR. McKIRGAN:
14:38:04 Q. And I don't want -- None of my questions are
14:38:08 designed to get you to reveal what you discussed with an
14:38:13 attorney. Okay? So please bear that in mind when I ask
14:38:15 you these questions.
14:38:16 But at some point, did you start piecing
14:38:19 together facts and chronologies for -- for a lawyer?
14:38:27 MR. PÉREZ: Objection. Privileged.
14:38:29 Instruct the witness not to answer.
14:38:31 MR. McKIRGAN: You're not going to let him
14:38:34 answer --
MR. PÉREZ: No.

14:38:35 MR. McKIRGAN: -- at what point in time he did that?
14:38:36 MR. PÉREZ: Correct.
MR. McKIRGAN: Okay.
14:38:39 MR. PEREZ: I -- I assume it would have been at the direction of his attorney, which would have been privileged and work product. Again, it wasn't me, so I don't know what those conversations were.
14:38:50 MR. McKIRGAN: I'm not going to argue, but I think asking for the date that he started doing that is not the actual work product or the privileged communication. But you need to follow your lawyer's instruction.
14:39:03 BY MR. McKIRGAN:
14:39:06 Q. So in -- in paragraph 43, you allege, "Mr. Boyd noted that Mr. Cohen 'expressed anger' . . . ." Do you see that?
14:39:15 A. Yes, sir.
14:39:16 Q. Did you express anger to Mr. Boyd?
14:39:19 A. Yes.
14:39:19 Q. And in this conversation, did Mr. Boyd tell you, "Look, if you're not happy with how Ray is handling this, go see Deana Garner-Smith"?
14:39:37 A. I don't recall that. I remember the -- the conversation more centering on the -- the golf trip that

14:39:43 they went on. But I don't remember Jean saying that, Bob.
14:39:50 Q. Anything else you can recall about this May 20th conversation with Jean Boyd?
14:39:55 A. Just that he was very apologetic, that he said, "Dave, if I knew a lot of these details" -- he goes, "I -- I would have stopped the trip."
14:40:04 Q. Did you get the impression that on May 20th, you were giving Mr. Boyd details about Bart Wear's conduct that Mr. Boyd previously did not understand?
14:40:16 A. No, I don't -- I don't -- I don't think so.
14:40:19 Q. All right. Next paragraph, May 21, Mr. Boyd confronted Mr. Anderson. Do you see that?
14:40:37 A. Yes, sir.
14:40:38 Q. How did you -- how do you know that Mr. Boyd confronted Mr. Anderson?
14:40:46 A. It was in the investigative -- I never knew that. I never knew that Jean ever spoke to Ray until the investigation report came out in December.
14:40:57 Q. So you got this from the investigative report?
14:41:00 A. Yes, sir.
14:41:00 Q. Now, in paragraph 44, you also say that "Mr. Anderson confirms that Mr. Cohen reported the conduct, as Mr. Cohen was required to do" --
14:41:33 Do you see that?
14:41:33 A. Yes, sir.

14:41:34 Q. -- "and agreed to initiate an investigation at that time."
14:41:40 See that?
14:41:41 A. Yes, sir.
14:41:41 Q. Okay. So again, you're -- you're asserting that when you've gone -- when you went to Mr. Anderson to talk to him about Bart Wear, you were doing that because you were required to do that pursuant to your training as an employee at ASU?
14:42:01 A. Yes, sir.
14:42:02 Q. And you're asserting that Mr. Anderson agreed to initiate an investigation at that time. In March -- the March 25 conversation, did Mr. Anderson say he was going to launch an investigation?
14:42:14 A. He didn't say he was going to launch an investigation. He said he was going to handle it.
14:42:20 Q. Okay. Paragraph 46. "On June 1, Mr. Wear left for vacation." Do you see that?
14:42:43 A. Yes.
14:42:44 Q. How did you know that?
14:42:45 A. Bart usually goes to San Diego for the summer.
14:42:52 Q. And when he goes to San Diego, how long does he go for typically?
14:42:57 A. The summer.
14:42:59 Q. So the months of June, July, and August?

14:43:01 A. Oh, yes. Sorry, I didn't . . .
14:43:04 Q. All right. Let's go to June 7th, paragraph 47.
14:43:35 A. Yes.
14:43:35 Q. You say that Mr. Shangraw and Mr. Cohen again
14:43:42 discussed Mr. Wear's assaults and sexual harassment. Do
14:43:46 you see that?
14:43:47 A. Yes, sir.
14:43:48 Q. How do you know that discussion took place on
14:43:51 June 7th?
14:43:52 A. Well, I had it with Rick.
14:43:57 Oh, are you talking about --
Q. Yeah.
14:43:58 A. -- a specific date?
14:43:59 Q. Yeah.
14:44:00 A. I mean, I go back to the -- that it happened on
14:44:04 that day, I must have had a calendar invite that -- that I
14:44:08 could refer to.
14:44:08 Q. Have you produced your calendar in this case? Do
14:44:12 you know?
14:44:12 A. Oh, I assume. It was ASU's calendar.
14:44:17 Q. Did you keep a separate calendar?
14:44:23 A. No.
14:44:24 Q. So why -- why were you talking to Mr. Shangraw on
14:44:37 June 7th?
14:44:37 A. Number one, he's a leader within the

14:44:45 university -- or he was at the time. He oversaw the
14:44:48 Foundation. He had a relationship with Bart, knew of all
14:44:57 the parties involved. He was a leader of ASU Enterprises
14:45:05 at the time.
14:45:06 Q. Okay. And did you ask Mr. Shangraw to do
14:45:17 anything regarding Bart Wear?
14:45:19 A. Excuse me, Bob?
14:45:20 Q. Did you ask Mr. Shangraw to do anything --
14:45:23 A. No.
14:45:23 Q. -- regarding Bart Wear's conduct?
14:45:27 A. No.
14:45:27 Q. Did you expect him to do anything about that?
14:45:29 A. I don't know if I expected, but I think he said
14:45:36 that he would discuss with Ray on getting closure to this.
14:45:41 Q. Okay. And then go on to allege that Mr. Shangraw
14:45:59 "confronted Mr. Anderson about his golf trip with Mr. Wear
14:46:02 and Coach Herm Edwards . . . ." Do you see that in
14:46:08 paragraph 47?
14:46:09 A. Yeah. Sorry. I turned the page. Yes.
14:46:11 Q. How do you know that Mr. Shangraw confronted
14:46:16 Mr. Anderson?
A. He had said that.
14:46:18 Q. Who said that?
14:46:18 A. Rick. Sorry. Rick told me that he spoke to Ray
14:46:22 about the golf trip.

14:46:24 Q. And what -- When did Rick tell you this?
14:46:26 MR. PÉREZ: I want to make sure. Rick
14:46:29 Shangraw.
14:46:29 THE WITNESS: Rick Shangraw.
MR. PÉREZ: Yes.
THE WITNESS: I'm sorry. I don't know --
14:46:31 Yes.
14:46:31 BY MR. McKIRGAN:
14:46:32 Q. And when did Mr. Shangraw tell you this?
14:46:34 A. Must have been in or around that date.
14:46:36 Q. And you allege that Mr. Anderson said he would
14:46:43 report Mr. Wear's conduct and take care of it when he
14:46:45 returned from vacation at the end of the summer.
14:46:49 So I want to make -- break that down. So
14:46:51 this is something that Mr. Shangraw reported to you --
14:46:55 A. Yes.
14:46:56 Q. -- that Mr. Anderson had said?
14:46:58 A. Yes. I wasn't -- I wasn't a part of their
14:47:01 conversation.
14:47:01 Q. And Mr. Anderson said that he, Mr. Anderson,
14:47:05 would report Mr. Wear's conduct and take care of it when
14:47:10 he returned from vacation. Who -- who is the "he"
14:47:14 returning from vacation? Mr. Wear? Mr. Anderson?
14:47:18 A. Mr. Wear. But then Ray also takes time off in
14:47:23 the summer as well.

14:47:24 Q. And so when Mr. Shangraw told you that Mr. Anderson would speak to Bart Wear after Bart returned from his vacation, did -- did that satisfy you at the time?
14:47:43 A. Not really, no.
14:47:45 Q. Why not?
14:47:49 A. I think that's just a long time to let something sit that could be handled quickly.
14:48:04 Q. And when you say "handled quickly," what --
14:48:10 A. Over a phone call.
14:48:11 Q. A phone call from Mr. Anderson to Bart Wear?
14:48:14 A. Correct. Between anybody going through this.
14:48:16 Q. So at -- as of this time, this is what you were expecting Mr. Anderson to do, was to make a phone call to Bart Wear?
14:48:28 A. No. I -- I didn't know. That's what I was told.
14:48:30 Q. At this point in time, after Mr. Shangraw reports his alleged confrontation with Mr. Anderson, had you reached a conclusion that you were unsatisfied with how Mr. Anderson was handling it?
14:48:49 A. Yeah, I was getting frustrated.
14:48:51 Q. Okay. Why didn't you go to Deana Garner-Smith at that point in time?
14:48:58 A. I don't know why there was a -- would be a point to go to Deana Garner-Smith.

14:49:05 Q. Why?
14:49:06 A. She had nothing to do with this situation.
14:49:11 Q. Why does she have nothing to do with the situation? Wasn't she the Title IX coordinator?
14:49:17 A. I didn't say that this was a Title IX issue. I didn't determine that. Ray said he was going to handle it, and when he wasn't, talked to Rick Shangraw who oversaw the donors. Rick said he would handle it. And if he didn't, he was going to get Dr. Crow involved. I don't know how any of that stuff happened, Bob. I don't.
14:49:40 Q. I'm trying to understand what you mean when this was -- this was a Title IX issue. I think that's what you just said. You received information from three women who said they were victimized by Bart Wear's sexual harassment.
14:49:58 A. Well, they didn't say they were victimized. They all said that they were touched. I didn't use the word "victimized."
Q. Okay. Well --
A. Yeah.
Q. But you had received --
14:50:08 A. Something happened, yeah.
Q. You --
14:50:09 A. Three women being inappropriately touched.
14:50:11 Q. Right. And you had received this information

14:50:12 directly from these women.
14:50:16 And throughout your complaint, you say that -- you know, you told Mr. Anderson and he had a duty to do something about it. And are you telling me that that duty's not Title IX-related? Title VII-related? Because that's what you're alleging in your complaint.
14:50:39 MR. PÉREZ: Objection. Calls for a legal conclusion.
14:50:43 You can answer.
14:50:44 THE WITNESS: Yeah, I -- I don't know. He is a donor. I don't know how everything's defined, Title IX, Title -- whatever. It just -- it was a -- I know that I had a duty to report something that had happened and I reported it.
14:50:58 BY MR. McKIRGAN:
14:50:58 Q. Okay.
14:50:58 A. And so that's what I did, Bob.
14:51:00 Q. And the duty to report is you were trained to report sexual misconduct that you saw or --
14:51:13 A. Or what was brought to us.
14:51:14 Q. Right.
14:51:38 Okay. So now we're at June 13th when you get your review.
14:51:45 A. Oh, it's not in here.
14:51:47 Q. It's actually -- So you've got your chronology

14:51:51 as to Mr. Wear, and then you have later, starting at
14:51:58 paragraph 60, another chronology --
14:52:00 A. Oh, okay.
14:52:01 Q. -- related to your reviews.
14:52:05 A. Oh, okay. Here it is.
(Deposition Exhibit 68 was marked for
14:52:36 identification.)
14:52:36 BY MR. McKIRGAN:
14:52:44 Q. Exhibit 68 is an email from you to Ray Anderson,
14:52:52 Jean Boyd, Frank Ferrara, with a cc to Christina
14:52:59 Wombacher. Do you see that?
14:53:00 A. Yes, sir.
14:53:00 Q. And it attaches your 2019 self-evaluation. Do
14:53:06 you see that?
14:53:07 A. Yes, sir.
14:53:08 Q. Who's Christina Wombacher?
14:53:11 A. Ray's assistant.
14:53:12 Q. The email's dated June 12th. When did you
14:53:19 prepare the self-evaluation? Around that time?
14:53:21 A. Around that time, yes.
14:53:23 Q. So if you go to the second page of Exhibit 68 --
14:53:38 A. Yes, sir.
14:53:39 Q. -- this is the form -- the template that is given
14:53:44 to you?
14:53:44 A. That is provided to us.

14:53:46 Q. And you don't fill out any part of this, do you?
14:53:50 A. No.
14:53:51 Q. Okay. Go to the third page. The part that you
14:54:00 filled out are these numbered paragraphs, you know,
14:54:06 starting with "A positive year with forward momentum," and
14:54:10 the paragraphs that follow, that's you?
14:54:12 A. Yes, sir.
14:54:13 Q. And then you provided the scoring in the chart
14:54:17 below?
14:54:18 A. Yes.
14:54:19 Q. And then you were -- you provided the employee
14:54:23 comments?
14:54:26 A. Oh, yes. Yes.
14:54:35 Q. We go to the next page. Under "Final Overall
14:54:45 Evaluation," you filled in that paragraph. Is that right?
14:54:48 A. Yes, sir.
14:54:48 Q. And then under "Planning (next 12 months)," under
14:54:54 "Performance," you filled in those four paragraphs. Is
that correct?
14:54:59 A. Yes.
14:54:59 Q. And under "Professional development," you added
14:55:03 those two paragraphs?
14:55:04 A. Yes, sir.
14:55:04 Q. Okay. And the idea here is you fill out a
14:55:10 self-evaluation, then you're going to meet with Ray and

14:55:13 Jean Boyd to go over your evaluation?
14:55:17 A. Well, it's typically with your supervisor. And then this last year, there were others involved.
14:55:22 Q. Okay. And in June of 2019, the others were Jean Boyd and Frank Ferrara?
14:55:28 A. Yes, sir.
14:55:29 Q. Now, you -- you gave yourself a positive review.
14:55:41 A. Yes, sir.
14:55:41 Q. On the second page -- excuse me, on the last page --
14:56:14 A. Oh, the last page.
14:56:16 Q. -- under Professional development (growth . . .), you put in that last paragraph, quote, In doing so, modifying my communication style to a softer tone and relying on Jean and Frank as partners in this effort.
14:56:44 Do you see that?
14:56:45 A. Yes, sir.
14:56:45 Q. What -- what did you mean by that?
14:56:48 A. Just very -- I can be very direct and I trust that the two partners, Jean and Frank, could help with not being so direct.
14:57:06 Q. Had you -- Well, you -- you received some executive coaching -- right? -- while you were at ASU?
14:57:20 A. Yes.
14:57:20 Q. And that was from somebody named Howland?

A. Ken Helman.
Q. Ken Helman?
A. Yes.
Q. And that was designed to help you with your approach to your peers?
A. It was a part of an overall comprehensive approach to elevate me to hopefully becoming an athletic director.
Q. How about your -- Did you also work with Sandy Hatfield Clubb?
A. Briefly.
Q. And what was the purpose of that work with her?
A. Ray and Jean hired her, if I remember correctly, to come in on some culture building.
Q. And was there an issue identified about you regarding getting along with folks in the athletic department?
A. Me personally --
Q. Yes.
A. -- isolated?
Not that I remember.
Q. Okay. Well, we'll come back to that.
Now, in your review, I believe you said, "Ticketing" -- this is on the second page, paragraph 1 -- "Ticketing - achieved mutually agreed upon goal surpassing

14:59:00 20.7 million versus a goal of 20.5 million."
14:59:05 Is that for football? All of athletics?
14:59:09 What --
14:59:09 A. That is all of athletics.
14:59:12 Q. It's true -- isn't it? -- that ticketing had not
14:59:29 met budget for the academic year ending in May of 2018?
14:59:37 A. Well, I -- I don't -- I didn't control the
14:59:41 budget.
14:59:43 Q. But ticketing did not meet budget -- isn't that
14:59:47 true? -- for that year?
14:59:49 A. If I recall.
MR. McKIRGAN: Let's mark this.
(Deposition Exhibit 69 was marked for
15:00:46 identification.)
15:00:46 BY MR. McKIRGAN:
15:01:03 Q. Exhibit 69 is a copy of the Arms- -- Armstrong
15:01:08 Teasdale report related to the independent investigation.
15:01:12 Have you seen this before?
15:01:13 A. Yes, sir.
15:01:14 Q. And your counsel was allowed to review a draft of
15:01:22 this before it was issued.
MR. PÉREZ: Objection.
BY MR. McKIRGAN:
15:01:26 Q. Do you remember that?
15:01:28 MR. PÉREZ: Speculation.

THE WITNESS: Yeah, I have no idea.
BY MR. McKIRGAN:
Q. Okay. If you go to Bates Number ABOR.COHEN001106 towards the back of the document, there's an exhibit.
A. Exhibit 5?
Q. Yep.
A. Okay.
Q. And this is a chart of the projected sales for football, men's basketball, then total ticket sales for the academic year 2018-2019.
A. Okay.
Q. And that would have been the academic year ending May of 2019, before your June review, correct?
A. Yes.
Q. Okay. And this shows that football was off projections by a little over 2.4 million.
A. Projections? No. This is a budget. I'm not -- I was not responsible for the budget.
Q. Well, you see a little asterisk that says, "The projected sales figure is the agreed upon goal at the beginning of each Fiscal Year"?
A. I don't remember ever seeing this document.
Q. Wasn't that a discussion in the June 2019 review, ticket sales being off?
A. I don't re- -- It was always an emphasis of not

15:03:30 necessarily ticket sales but attendance, which it also
15:03:33 included student attendance.
15:03:36 Q. Okay. But my question is in the June 2019
15:03:42 review, wasn't there a discussion of ticket sales --
15:03:46 football, for example -- being off from the projected
15:03:50 budget?
15:03:52 A. I don't remember.
15:03:55 Q. In your self-evaluation --
15:04:16 A. Let me pull that out.
15:04:18 Q. Again, I think I asked you this, but in -- in
15:04:38 paragraph 1 on the second page of the exhibit -- excuse
15:04:46 me, the third page, Bates Number 1272, first one,
15:04:53 "achieved mutually agreed upon goal surpassing
15:04:57 20.7 million versus a goal of 20.5 million." And I'm
15:05:02 trying to understand where that 20.5 million number comes
15:05:06 from.
15:05:08 A. I've -- Bob, I've never seen this document
15:05:10 before. All I know is that if I put the 20.5 goal, that
15:05:18 that was the goal to hit. I don't know how it compares to
15:05:25 this other one.
(Deposition Exhibit 70 was marked for
15:05:58 identification.)
15:05:58 BY MR. McKIRGAN:
15:06:11 Q. Okay. Exhibit 70 is a copy of your
15:06:20 self-evaluation, only this time the second page contains

15:06:23 some handwriting. Do you see that?
15:06:25 A. Yes.
15:06:25 Q. And that's your signature on June 27th?
15:06:33 A. Yes.
15:06:33 Q. And Mr. Anderson looks like he signed it on June 24th. See that?
15:06:42 A. Yes.
15:06:43 Q. And looks like Jean Boyd on June 13th?
15:06:52 A. It looks like three people signed -- did something.
15:06:58 Q. Ray, Frank, or Jean on June 13th?
15:07:02 A. Yeah.
15:07:05 Q. Okay. Now, in the "Supervisor Comments," there's "Concur" and "Do not concur," and "Do not concur" is checked. Do you see that?
15:07:19 A. Yes.
15:07:20 Q. And there's some handwriting there. Do you recognize that as Mr. --
15:07:23 A. Looks like Ray's.
15:07:24 Q. Okay. And I believe it says, quote, Self-awareness challenges continue. Colleagues still experiencing frustration with Dave's often negative behaviors and attitude. Critical time for demonstrating he can adapt to culture expectations.
15:07:42 Is that how you read it?

15:07:44 A. Yeah.
15:07:44 Q. And was that discussed at the June 13th review?
15:07:50 A. No. None of this was discussed.
15:07:54 Q. So it looks like Mr. Anderson signs it on the
15:08:07 24th. Do you then get to see it with his comments?
15:08:11 A. I saw it. I was instructed on the 27th by his
15:08:16 assistant, Christina, to come down and sign my review.
15:08:20 Ray was already gone on summer vacation.
15:08:22 Q. And you signed it, right?
15:08:28 A. I had to sign it. She said if I didn't, Ray said
15:08:31 I'm not going to get my bonus.
15:08:33 Q. You signed it on the 27th?
15:08:38 A. Yes.
15:08:38 Q. And did you read the comments before you signed
15:08:40 it?
15:08:40 A. Yeah. I didn't agree with them.
15:08:42 Q. Did you send an email or text or anything to Ray
15:08:47 saying, "I -- I don't agree with your comments"?
15:08:50 A. No. I was fearful of my bonus being withheld.
15:08:54 Q. Wasn't the bonus agreed to prior to June 24th?
15:09:00 A. A lot of things can happen, Bob.
15:09:03 Q. That's not my question.
15:09:08 My question is, was the bonus agreed to
15:09:12 prior to June 24th?
15:09:16 MR. PÉREZ: Objection. Calls for a legal

15:09:18 conclusion.
15:09:18 You can answer.
15:09:19 THE WITNESS: Yes.
15:09:19 BY MR. McKIRGAN:
15:09:22 Q. And that bonus was going to be the hundred thousand less the 5-?
15:09:27 A. Yes, sir.
15:09:28 Q. And that bonus discussion, that took place -- did that take place during the June 13th interview -- excuse me, review?
15:09:57 A. I -- I think -- Yes.
15:09:58 Q. Do you recall when the bonus was being discussed, at some point Frank and Jean -- Frank Ferrara and Jean Boyd, left the room and you and Mr. Anderson had a one-on-one discussion about the bonus?
15:10:29 A. Yeah, I do remember that.
15:10:31 Q. What was discussed at that point of the meeting?
15:10:33 A. It was a discussion on the expectations of the bonus.
15:10:37 Q. All right. Tell me what you said to Mr. Anderson.
15:10:40 A. I mean, if I recall, it was the expectation of getting at or near the hundred thousand dollars.
15:10:51 Q. Okay. And what -- How did Mr. Anderson respond to that?

15:10:55 A. He was fine.
15:11:01 Q. Okay. And that was the highest bonus you ever got, right?
15:11:11 A. The same as the first year.
15:11:12 Q. Okay. Was the first year also a hundred thousand minus 5-?
15:11:19 A. Correct.
15:11:20 Q. Okay. All right. So your -- your first year and 2019 were the highest you ever got?
15:11:29 A. Yes, sir. As I recall.
15:11:30 Q. And do you consider that getting a hundred-thousand-dollar bonus, which was the maximum amount you could get, as I understand your offer letter, to be retaliatory?
15:11:53 A. No.
15:11:54 Q. Now, in the June 13th meeting, were you informed that you were no longer going to be the administrator for swimming?
15:12:12 A. It was either that meeting or a meeting soon thereafter.
15:12:17 Q. Okay. And what were you told about that by Mr. Anderson?
15:12:23 A. "You are no longer going to be the head administrator for swimming."
15:12:27 Q. Did he tell you why?

15:12:28 A. More effort and concentration on basketball and ticketing.
15:12:36 Q. Okay. Did you think that was an unreasonable move by Mr. Anderson?
15:12:40 A. Well, I enjoyed swimming. The relationship with Bob Bowman, I helped recruit him with -- with Ray. And his relationship with Michael Phelps, who I -- golfed quite a bit. So I didn't know anything about swimming, but, you know, enjoyed the trajectory of where the swimming program was going. Validated, just won the national championship, so he's done well.
MR. McKIRGAN: That was -- Could you repeat the question?
(The record was read by the court reporter as follows:
QUESTION: Did you think that was an
15:13:14 unreasonable move by Mr. Anderson?)
15:13:14 THE WITNESS: It's his decision. It wasn't whether I determined it or not. That's -- was the decision.
15:13:25 BY MR. McKIRGAN:
15:13:25 Q. Did you think it was retaliatory?
15:13:27 A. Yes.
15:13:28 Q. Why?
15:13:28 A. Because he was taking away something that I

15:13:37 enjoyed and I thought I was good at.
15:13:39 Q. Do you know what the swimming coach had
15:13:44 communicated to the -- to Mr. Anderson?
15:13:46 A. No.
15:13:47 Q. How much focus did you give the swimming program
15:14:01 as opposed to the basketball program before this change?
15:14:05 A. Definitely not as much.
15:14:06 Q. And we already looked at the text with Mr. Wear.
15:14:19 At least -- there was at least one day where you'd rather
15:14:22 play golf than go to the women's swim meet.
15:14:26 MR. PÉREZ: Objection. Misstates facts.
15:14:28 THE WITNESS: No. We didn't even determine
15:14:29 if it was a meet or not. I don't know what was going on.
15:14:31 BY MR. McKIRGAN:
15:14:50 Q. So after your review, you got a
15:14:58 hundred-thousand-dollar bonus, did your title change?
15:15:01 A. No.
15:15:01 Q. Was there any reduction in your salary?
15:15:05 A. No.
15:15:05 Q. Your salary went up, didn't it?
15:15:07 A. Went up 3 percent.
15:15:09 Q. And you were still handling -- you were still the
15:15:12 administrator -- sole administrator for men's basketball?
15:15:17 A. No. I was the primary administrator, not the
15:15:20 sole. There was another administrator on there with me.

15:15:23 Q. Who was that?
15:15:25 A. Ken Landphere.
15:15:26 Q. Okay. And -- but you were considered the
15:15:28 primary?
15:15:29 A. Yes, sir.
15:15:30 Q. And men's basketball is a major revenue sport?
15:15:35 A. It's our second -- the second revenue sport
15:15:38 behind football.
15:15:39 Q. Now, in the June 13th meeting with Ray, did you
15:15:50 ever tell him that you thought your bonus was guaranteed?
15:15:56 A. I don't know if I necessarily said the word
15:15:58 "guaranteed," but there was an expectation that it would
15:16:01 be near the hundred thousand dollars, not to exceed.
15:16:05 Q. So an expectation but not a guarantee?
15:16:14 A. Correct.
15:16:15 Q. Now, you allege that there was a restructuring of
15:16:27 your bonus following this June 13th meeting. Do you
15:16:32 remember that allegation in your complaint?
15:16:33 A. Well, I don't necessarily think it's an
15:16:37 allegation. It happened.
15:16:37 Q. Okay. What was the restructuring?
15:16:39 A. That it was -- got a letter that said that it --
15:16:43 my bonus is going to be a hundred percent discretionary at
15:16:47 Ray's discretion.
15:16:49 Q. Okay. And prior to that, it -- it was not

15:16:54 discretionary?
15:16:54 A. I thought it was discretionary. I didn't know
15:16:57 where that letter was coming from, but I was told if I
15:17:00 didn't sign it, I was fired.
15:17:01 MR. McKIRGAN: Could you read back the
15:17:02 answer?
(The record was read by the court reporter
as follows:
ANSWER: I thought it was discretionary. I
didn't know where that letter was coming from,
but I was told if I didn't sign it, I was
15:17:13 fired.)
15:17:13 BY MR. McKIRGAN:
15:17:14 Q. Okay. So prior to June of 2019, you thought your
15:17:17 bonus was in Ray's -- the amount of your bonus was
15:17:20 discretionary?
15:17:21 A. Yes. In every letter, it -- it said the athletic
15:17:24 director's -- discretionary.
15:17:26 Q. All right. But let me get the letter --
A. Okay.
15:17:30 Q. -- that you signed.
15:17:31 A. Okay.
15:17:32 Q. If you go to the Armstrong Teasdale report,
15:17:39 Exhibit 69, Bates Number 1121. It's Exhibit 11.
15:18:08 A. Oh, it's the last page.

15:18:09 Q. Yeah.
15:18:10 Is this the letter you were asked to sign?
15:18:11 A. Yes, sir.
15:18:12 Q. It says, "Effective immediately, your annual -- annual bonus will be at the full discretion of the Vice President for University Athletics . . . ."
15:18:27 That's Mr. Anderson, right?
15:18:27 A. Yes, sir.
15:18:27 Q. It "will be determined consistent with policies and procedures applicable to other Sun Devil Athletic Senior Management Team members." Do you see that?
15:18:34 A. Yes, sir.
15:18:36 Q. Okay. Prior to June 19, was it your understanding that the amount of the bonus was at Mr. Anderson's discretion?
15:18:45 A. Yes.
15:18:46 Q. Okay. Given that fact, how does this letter restructure your bonus?
15:18:58 A. It was confusion.
15:19:00 Q. It's true, isn't it, that Mr. Anderson wanted you to -- Well, strike that.
15:19:15 In the June 13th meeting, was there any discussion of Bart Wear?
15:19:22 A. No, not that I recall.
15:19:25 Q. Okay. Do you remember on June 19th telling

15:19:50 Mr. Boyd, following -- following another meeting with him
15:19:59 and Ray regarding the bonus and this letter, words to the
15:20:10 effect of "Game on"?
15:20:16 A. With the bonus?
15:20:19 Q. Yeah. Let me -- let me back up.
A. Yeah.
15:20:22 Q. So on June 19, do you remember when you signed
15:20:24 this letter, you had a meeting with Jean and Ray and
15:20:27 Frank?
15:20:29 A. The review?
15:20:30 Q. No, not the review. A separate meeting following
15:20:33 the review.
15:20:34 A. I don't think there was another meeting with the
15:20:38 four of us in the -- in the same room. If I recall
15:20:43 correctly, it was the bonus, which was with only Jean.
15:20:50 Q. Well --
A. But --
15:20:52 Q. Go to page --
15:20:53 A. Bob, you may know.
15:20:55 Q. Well, I'm -- I'm going to page 17, paragraph 65
15:20:57 of your complaint.
15:21:05 A. Oh, okay. Well, yeah, you guys are right, then.
15:21:08 Sorry.
15:21:08 Q. So did I refresh your recollection about a
15:21:22 June 19 --

15:21:24 A. Yes.
15:21:24 Q. -- meeting?
15:21:25 And following that meeting, as you were walking out -- Well, let me strike that.
15:21:29 Were you angry about having to sign this June 19th letter that you call a bonus restructuring?
15:21:39 A. I think -- I don't -- I don't think the word "angry." Maybe more confused. Because what -- what was changing? And why would I have to sign a new compensation agreement?
15:21:50 Q. You were confused because nothing was really changing?
15:21:53 A. Yeah. Like, it was -- I mean, I -- getting it -- I didn't know what -- why Ray was doing this.
15:22:03 Q. Now, getting back to my original question, though, after the meeting, did you express any anger to Mr. Boyd about this June 19th letter and say words to the effect of "Game on"?
15:22:17 A. If I did, maybe "Game on" was, okay, let's go, then. Let's go. It's game on.
Q. And what did --
15:22:26 A. Let's get -- let's go accomplish some things.
15:22:29 Q. I was going to ask what you meant by that.
15:22:31 So if you said those words --
15:22:33 A. Sorry. An athletic term. Sorry.

15:22:36 Q. So if you said those words, it was meant to -- "Let's go accomplish some positive things"?
15:22:42 A. Yeah. I don't know what -- what other -- what "Game on" would mean in a negative term. I don't know what that would mean.
15:22:49 Q. At some point, did you reach out to Mr. Heiler about finding an employment law lawyer?
15:22:57 A. Yes.
15:22:58 Q. And --
15:23:01 A. Yeah. Yes.
15:23:01 Q. That was a lawyer for you, right?
15:23:03 A. It was someone that I needed to talk to about everything that was kind of spinning right then, yes.
15:23:10 Q. Okay. And you texted Mr. Heiler the evening of June 16th about a lawyer, right?
15:23:22 A. I don't know. And it was in and around that time. It was after my review and the comp letter, et cetera.
(Deposition Exhibit 71 was marked for identification.)
15:23:50 BY MR. McKIRGAN:
15:23:58 Q. Exhibit 71 is a series of text messages between you and Mr. Heiler.
15:24:13 A. Yes, sir.
15:24:13 Q. Do you see that?

15:24:15 And if you go to the middle of the first -- first page of Exhibit 71, there's a June 19th, 2019, text at 8:47 p.m. Do you see that?
15:24:26 A. Yes, sir.
15:24:28 Q. And you said, quote, I have a friend in need of help -- need help of a good employment lawyer. Do you have a non-Gilbert Beus lawyer? Can explain more in person, close quote.
15:24:40 Do you see that?
15:24:40 A. Yes, sir.
15:24:41 Q. All right. Now, you were really interested in finding a lawyer for yourself. Is that right?
15:24:47 A. Yes, sir. Yep.
15:24:49 Q. And you were asking for a non-Gilbert Beus lawyer. Do you see that?
15:24:53 A. Yes.
15:24:53 Q. And Mr. Heiler was at Beus Gilbert?
15:24:56 A. That's where he worked, yes.
15:24:57 Q. And you assumed that he could not counsel you given his role on the Board of Regents?
15:25:02 A. Correct.
15:25:02 Q. And did you meet with Mr. Heiler?
15:25:10 A. Yes.
15:25:11 Q. Did he provide you with any names?
15:25:14 A. No.

15:25:14 Q. Did you consult with a lawyer around this time?
15:25:23 A. Maybe in the next week or so.
15:25:27 Q. Okay. And if I understand your prior testimony,
15:25:32 it was -- it's not your current lawyer that you spoke to?
15:25:34 A. Correct.
15:25:35 Q. It was a local lawyer?
15:25:36 A. Yes.
15:25:37 Q. And was that local lawyer -- was he or she an
15:25:43 employment lawyer?
15:25:44 A. I believe so.
15:25:45 Q. Without revealing the substance of
15:25:50 communications, did you ever formally retain that lawyer?
15:25:53 A. No.
15:25:53 Q. When did you receive your bonus?
15:26:43 MR. PÉREZ: Objection. Vague as to time.
15:26:48 BY MR. McKIRGAN:
15:26:48 Q. In 2019?
15:26:49 A. I can't recall. Sometime in summer maybe.
(Deposition Exhibit 72 was marked for
15:27:26 identification.)
15:27:26 BY MR. McKIRGAN:
15:27:37 Q. Exhibit 72 is a text exchange between you and
15:27:41 Mr. Anderson. Do you see that?
15:27:42 A. Yes, sir.
15:27:42 Q. Okay. And on July 2, you text Mr. Anderson to

15:27:55 thank him for the bonus.
15:27:57 A. Yes.
15:27:57 Q. And "Pauletta just dropped off the bonus letter."
15:28:09 Who is Pauletta?
15:28:11 A. HR assistant, I think is her title.
15:28:17 Q. And then you go on to say, "Also, separately, I
15:28:20 apologize for any inconvenience during these talks
15:28:24 surrounding my bonus."
15:28:26 Do you see that?
15:28:26 A. Yes, sir.
15:28:27 Q. What did you mean by that?
15:28:30 A. We talked about the bonus in the -- in the
15:28:33 confusion surrounding the bonus in -- in my review.
15:28:36 Q. What -- what were you apologizing for?
15:28:41 A. Well, it's -- I'm not in a position to stand up
15:28:44 for myself, and in a review, it's hard to talk about money
15:28:49 in a review.
15:28:50 Q. But did you say something or do something that
15:28:53 required you to -- where you felt you needed to apologize?
15:28:58 A. Oh, no. No. Nothing along those lines.
15:29:00 Q. You go on to say, quote, As I told you last week,
15:29:10 I wish I could go back and not relive the conversation in
15:29:14 my review about this topic. The stress and sleepless
15:29:19 nights are not worth the money gained in that talk, close
15:29:21 quote.

15:29:23 What -- what are you referring to there in terms --
15:29:26 A. It's the same. It's -- it's standing up for -- you talking in a compensation discussion.
Q. Okay.
15:29:36 A. You guys don't have Ray's response? Because he responded.
15:29:40 Q. No, we do.
15:29:43 A. Oh. You just -- Okay.
15:29:44 Q. So as of July 2 -- Let me ask you this. You received a hundred-thousand-dollar bonus, which you gave 5,000 back to the bonus pool. Your title hadn't changed. Your salary had gone up. You had been removed as swimming administrator but you still were on basketball -- men's basketball, and you had been told to focus on ticketing, right?
15:30:16 A. Yes.
15:30:16 Q. So as of July 2, did you feel like you had been retaliated against?
15:30:22 MR. PÉREZ: Objection. Calls for a legal conclusion, misstates facts.
15:30:25 You can answer.
15:30:26 THE WITNESS: I did.
15:30:28 BY MR. McKIRGAN:
15:30:29 Q. In what way?

15:30:30 A. I was -- Swimming was taken away from me. I
15:30:34 reported to somebody new. And my -- it was more --
15:30:38 more -- there was even more enhanced confusion around my
15:30:41 bonus.
15:30:41 Q. So let's break that down.
15:30:44 So swimming was taken away from you.
15:30:46 A. Yes.
15:30:46 Q. Okay. But that's not an unreasonable move by
15:30:51 Ray, if I understand your testimony.
15:30:53 A. I mean, I wouldn't say unreasonable. He can do
15:30:56 anything he wants. I didn't -- I wanted to stay on
15:31:00 swimming.
15:31:01 Q. Okay. There was confusion around your bonus.
15:31:18 A. Yes.
15:31:18 Q. And -- and you thought that was retali- --
15:31:19 retaliatory, right?
15:31:22 A. Yes.
15:31:22 Q. Okay.
15:31:24 A. Sorry.
15:31:24 Q. And then you said something about reporting.
15:31:26 A. Yeah, it was -- I was now reporting to Frank
15:31:30 Ferrara, the CFO.
15:31:32 Q. Didn't that happen later, after July 2?
15:31:34 A. No. Because Ray was gone -- Oh, maybe it did.
15:31:40 Maybe it did. So I'm sorry. Yes. I -- I stand

15:31:45 corrected, Bob. Yes. That happened in August. I'm sorry.
15:31:49 Q. Okay. So as of July 2, the -- the things that you thought were retaliatory was the taking away of swimming and the confusion around your bonus.
15:32:10 A. Yeah. We were trending that way.
15:32:12 Q. Okay. Anything else?
15:32:13 A. But I -- I didn't -- I didn't term it "retaliation."
15:32:19 Q. Well, I'm not sure what term you used, but I'm focusing again on July 2nd. At the time you sent this email, you know, what you thought Ray had done up to that point in time that you thought was retaliation because you had made a report about Bart Wear. That's what I'm really getting at. So is there anything else to add besides what you've told me?
15:32:57 A. Not yet.
Q. What?
15:32:59 A. No. No.
15:32:59 Q. Well, if it's not yet, I --
15:33:01 A. No. No. Well, you said -- Sorry, it was my bad.
15:33:04 Q. Okay. So I'm looking at Exhibit 65. It's in the stack.
15:33:28 A. Oh. Yes.

15:33:29 Q. So going back to the -- Exhibit 65, the text-messaging about playing golf, on November 2 -- excuse me, November 1 -- Bart texts you November 1, 2017, if you want to play golf. You respond the next day, "Would love to, but I have swimming" --

15:34:57 A. Yes, sir.

15:34:58 Q. -- "at 11 a.m. on Saturday." I can tell you Saturday is November 4th.

15:35:10 On November 2, you text again, "I forgot the women are the only ones swimming. I'd rather golf. I got us a tee time at Fire Rock at 9:00 a.m. on Saturday." And again, I can tell you that November 4 is that Saturday. And at least according to the ASU Athletics website, there was a women's swim meet on November 4 at 11 a.m. at home against UCLA in Tempe.

15:35:46 So let me ask you again. So in texting with Mr. Wear here, you're telling him that you would rather go play golf than go watch the women's swim team, right?

15:36:11 MR. PÉREZ: Swim team or swim meet?

15:36:13 MR. McKIRGAN: Swim meet.

15:36:14 MR. PÉREZ: Okay. I'm going to object. Calls for speculation. We don't know if it was a meet.

15:36:19 You can answer the question.

15:36:19 THE WITNESS: Well, it's -- it's about balancing. Do you -- At the time, we have sport

15:36:23 coverage. Deana could go to the women's, and I would
15:36:28 cultivate the relationship with the donor.

(Deposition Exhibit 73 was marked for
15:36:42 identification.)

15:36:42 BY MR. McKIRGAN:

15:36:48 Q. I'll show you Exhibit 93.

THE COURT REPORTER: 73.

MR. McKIRGAN: Or, excuse me, 73.

BY MR. McKIRGAN:

15:36:55 Q. So I want to address your counsel's objection.
15:36:59 This is a printout from sundevils.com
15:37:07 showing a women's swimming and diving meet on Saturday,
15:37:16 November 4, 2017. Do you see that?

15:37:18 A. Yes.

15:37:19 Q. Okay. Does that change anything about what
15:37:23 you've just told me?

15:37:24 A. No.

15:37:44 MR. PÉREZ: Counsel, we're about an hour and
15:37:46 15 in.

15:37:48 MR. McKIRGAN: You want a break?

MR. PÉREZ: Want a break, please.

15:37:49 MR. McKIRGAN: Yep.

15:37:49 MR. PÉREZ: Thank you.

15:37:51 MR. McKIRGAN: Anytime you need one.

15:37:53 THE VIDEOGRAPHER: Off the record at

15:37:56 3:37 p.m.
15:37:57 (A recess ensued.)
15:53:37 THE VIDEOGRAPHER: Back on the record at
15:53:45 3:53 p.m.
15:53:46 BY MR. McKIRGAN:
15:53:49 Q. Mr. Cohen, during your tenure at ASU, what sports
15:53:56 did you serve as an administrator for?
15:53:58 A. At various times, softball, swimming and diving,
15:54:07 men's basketball.
15:54:09 Q. Hockey?
15:54:11 A. Oh, yes. Yes.
15:54:13 Q. Any others?
15:54:14 A. I forgot about hockey.
15:54:19 Not that I can recall. But --
Q. Okay.
15:54:21 A. Unless you know.
15:54:22 Q. No.
15:54:26 Did -- It's true, isn't it, that during
15:54:30 your tenure at ASU, there would be moves amongst
15:54:37 administrators of the nonmajor sports? Other than
15:54:42 football, basketball, there would be reassignments of --
15:54:47 of sports administrators?
15:54:48 A. Yeah. And people would -- would come in and so
15:54:51 forth.
15:54:52 Q. Okay. And that would happen to you on occasion.

15:54:57 For example, you got moved off hockey onto something else.
15:55:01 And you got moved off to softball, right?
15:55:03 A. Yes.
15:55:03 Q. Okay. So getting moved off of swimming in and of
15:55:08 itself was not unusual, was it?
15:55:13 A. Not in and of itself.
15:55:15 Q. Okay. In Exhibit 72, the text with Ray --
15:55:31 A. Yes.
15:55:31 Q. -- thanking him for the bonus, you end the text
15:55:35 with "Enjoy your time away." So by July 2nd, was
15:55:39 Mr. Anderson gone from Arizona for vacation?
15:55:42 A. Yes.
15:55:43 Q. Okay. In your complaint, Exhibit 64, at
15:55:57 paragraph 49, you allege on July 5th, you again met with
15:56:03 Mr. Anderson. Did you meet with Mr. Anderson on July 5th?
15:56:10 A. In 64?
15:56:12 Q. Excuse me. On -- It's paragraph 49 of
15:56:17 Exhibit 64.
15:56:19 A. Oh. Hold on, Bob, I'm sorry. So 49 goes back.
15:56:39 Yeah, my dates must be off, Bob. Sorry.
15:56:42 Q. So you did not meet with Mr. Cohen on July 5th?
15:56:46 MR. PÉREZ: Objection. Calls for
15:56:47 speculation.
15:56:47 THE WITNESS: I was Mr. Cohen.
15:56:49 MR. McKIRGAN: Excuse me.

THE WITNESS: I know. It's been a long day.
I -- I -- I don't think so.
BY MR. McKIRGAN:
Q. I mean, where does -- where does Mr. Anderson go for vacations? Do you know?
A. Different places.
Q. Okay. Does he spend a lot of time back in Georgia too?
A. Yes. Yes.
Q. Do you remember going -- in July, going to Georgia to meet with Mr. Cohen --
A. Did I?
Q. -- Mr. Anderson?
Yeah.
A. No.
Q. How about on July 24th? You allege you met -- again met with Mr. Anderson. Did you go back to Georgia to meet with him?
A. No. But Ray might have been back on July 24th. I don't know. I don't -- I can't remember his travel schedule.
Q. This paragraph 49, do you recall having this discussion with Mr. Anderson?
A. I remember multiple discussions with Ray. This particular one, not top of mind.

15:57:58 Q. Same with paragraph 50?
15:58:01 A. I'm sorry. What was the question, Bob? I just read it and then . . .
15:58:21 Q. Well, let me -- let me ask this question. If it turns out that Mr. Anderson was not in Arizona on July 5th and July 24th, would you agree with me that you did not meet with him to discuss Mr. Bart Wear?
15:58:39 MR. PÉREZ: On those dates?
15:58:40 BY MR. McKIRGAN:
15:58:41 Q. On those dates.
15:58:42 A. Probably.
Q. Okay.
15:58:46 A. I don't know why I was pointing . . .
THE COURT REPORTER: Pardon me?
15:58:46 THE WITNESS: I don't know why I was pointing to Bob like that. Sorry.
BY MR. McKIRGAN:
15:58:52 Q. Now, what the Armstrong Teasdale report says is that you met with Frank Ferrara on July 5th. Do you remember meeting with Frank in July?
15:59:04 A. I met with Frank every day. Is there a particular meeting that we should reference?
15:59:15 Q. No. I'm just asking if you remember meeting with Frank on July 5th.
15:59:18 A. I mean, I would meet with Frank multiple times

15:59:24 every day.
15:59:24 Q. Okay. Do you remember meeting with Frank on
15:59:29 July 5th and -- and discussing the Bart Wear situation
15:59:33 with him?
15:59:33 A. I don't remember the specific date that Frank and
15:59:36 I talked about it, but it was during the summer.
15:59:40 Q. Do you remember you were in the office, and it
15:59:43 was just you and him in the office?
15:59:45 A. I do remember when -- when Frank and I spoke, it
15:59:48 was just he and I in the office together.
15:59:50 Q. I believe July 5th was a Friday, the Friday after
15:59:57 July 4th. Do you remember going in after the 4th of July
16:00:00 into the office and it was just you and he?
16:00:03 A. I don't remember that.
16:00:03 Q. Do you remember meeting with Jim Rund on
16:00:16 July 24th to discuss the Bart Wear situation?
16:00:23 A. I remember -- I don't remember the specific date
16:00:26 talking to Jim Rund about that. If my memory -- It was
16:00:33 more in August. But again, I -- my dates could be off,
16:00:36 Bob.
16:00:36 Q. Okay. Somewhere -- Well, strike that.
16:00:56 According to your complaint at paragraph 66,
16:01:02 on August 12th, you were called in to a meeting with
16:01:07 Mr. Anderson and Mr. Ferrara. Do you see that?
16:01:12 A. Yes, sir.

16:01:13 Q. And you were informed that you were now going to be reporting to Mr. Ferrara.
16:01:18 A. Correct.
16:01:19 Q. Okay. And you put in parentheses "the man who had said that he would fire Mr. Cohen," closed paren. Do you see that?
16:01:30 A. Yes.
16:01:30 Q. All right. When did Mr. Ferrara say he was going to fire you?
16:01:35 A. Somehow -- sometime before that meeting.
16:01:38 Q. Did Mr. Ferrara have the power to fire you?
16:01:46 MR. PÉREZ: Objection. Calls for a legal conclusion, speculation.
16:01:51 You can answer.
16:01:52 THE WITNESS: Not before April -- August 12th.
16:01:55 BY MR. McKIRGAN:
16:02:01 Q. Tell me what was said to you in the August 12th, 2019, meeting with Mr. Anderson and Mr. Ferrara.
16:02:12 A. As I recall, it was before --
16:02:16 Do you just want me to just -- just talk?
16:02:18 Q. Well, let me back up. Let me just set the scene a little bit.
16:02:22 So where -- where was the meeting?
16:02:23 A. In Ray's office.

16:02:24 Q. How long did the meeting last?
16:02:26 A. Not long.
16:02:27 Q. All right. And it was you, Mr. Anderson, and Mr. Ferrara?
16:02:33 A. Yes, sir.
16:02:33 Q. Nobody else?
16:02:34 A. Not that I can remember.
16:02:36 Q. Okay. Now tell me what happened in the meeting.
16:02:43 A. We went in, and Ray told me that at the senior staff meeting, he was going to talk about a restructure and that I, for the nonsports responsibilities, would report to Frank.
16:03:04 Q. Anything else?
16:03:06 A. And I said, "Ray, that -- that doesn't make sense. Frank has no experience in ticketing. And with all due respect to Frank sitting there, he doesn't. And a few weeks ago, Frank told me that if -- if I ever reported to him, that he would fire me the next day." I said, "Ray, I'm very leery of this. And this all is -- is coming up as -- as retaliation. It just feels like it." I said, "It feels like it."
16:03:44 Q. Now -- so you told Ray that Frank had said to you, "If you ever report to me, I'm going to fire you"?
16:03:55 A. Yes.
16:03:57 Q. And you told Ray that Frank had told this to you

16:04:00 a few months ago?
16:04:02 A. Yes.
16:04:04 So can I go back --
16:04:05 Q. Sure.
16:04:06 A. -- to your question? Is that okay?
16:04:09 Q. Yeah.
16:04:09 A. So now -- now this -- the chronology does makes
16:04:13 sense. So on July 2nd, when I sent Ray the thank you for
16:04:19 the -- the bonus, his response said something along the
16:04:22 lines of --
16:04:23 Q. Changes are coming?
16:04:24 A. -- "You're welcome. And changes are coming."
Q. Yeah.
16:04:27 A. Yes. So I -- Maybe it was the 5th that I --
16:04:30 that I did go in to Frank, said, "Frank, what -- what do
16:04:33 you know about these changes?"
16:04:34 He said, "Well, Ray -- Ray is -- is
16:04:36 contemplating having you report to me." He goes, "But I
16:04:39 don't want that." He goes, "Dave, I would -- I would -- I
16:04:42 would fire you the next day. Ha-ha."
16:04:46 I go, "Frank, that's not funny, with what
16:04:48 I'm going through."
16:04:49 And I think that's probably when I told
16:04:52 Frank about the incident with Bart and the women. That
16:05:01 makes -- that now . . .

16:05:03 Q. So when Mr. Ferrara said -- made that comment to you, "If you report to me, I'll -- I'll fire you," did he say that in jest?
16:05:16 A. Well, I --
16:05:16 MR. PÉREZ: Objection. Calls for speculation what he meant.
16:05:19 BY MR. McKIRGAN:
16:05:20 Q. Well, let me ask you. How did you take it? Did you -- did you think he was joking with you? You said "ha-ha."
16:05:25 A. No. Because it happened, so I think -- think it was pretty clairvoyant.
16:05:30 Q. Did Frank fire you?
16:05:32 A. Frank was in the room.
16:05:33 Q. But did Frank fire you?
16:05:36 A. Ray fired me with Frank in the room.
16:05:38 Q. Okay. Now, going back to when Mr. Ferrara allegedly told you that if you reported to him, he would fire you and you had mentioned "ha-ha," so when you heard Frank tell you that, did you think Frank was joking?
16:05:58 A. No. I said, "Frank, that -- that's not a joking thing with everything that I'm going through right now."
16:06:05 Q. And what was everything you were going through at that point?
16:06:08 A. The -- the reporting and nothing happening with

16:06:12 the Bart Wear situation.
16:06:15 Q. Okay. And --
16:06:19 A. And the change in the bonus and so . . .
16:06:23 Q. So in your mind, was Frank joking but you did not take it as a joke because of the things that were going on?
16:06:32 A. Probably. But it ended up happening, so maybe he knew exactly what he was doing. I don't -- I don't know, Bob. You'd have to ask Frank.
16:06:40 Q. Okay. What was your relationship with -- with Frank?
16:06:46 A. I thought it was very good, very cordial. Very good, very good working relationship. I enjoyed working with Frank.
16:06:54 Q. And you texted a lot with him too?
16:06:56 A. What's that?
16:06:57 Q. You texted a lot with Frank?
16:06:58 A. A ton. Yes.
16:06:59 Q. Yeah.
16:06:59 A. A ton. A ton of texts. I'm sure it probably burned up your paper.
16:07:02 Q. Yeah. But a lot of joking, bantering?
16:07:05 A. A lot of banter, yes. A lot of banter. A lot of confiding in a lot of stuff.
16:07:12 Q. All right. So going back to August 12th, this

16:07:18 meeting with Frank and -- and Jean Boyd and
16:07:32 Mr. Anderson -- Excuse me. It's just you and
16:07:34 Mr. Anderson.
16:07:34 A. I was going to say Jean was not there.
16:07:36 Q. And Mr. Ferrara.
16:07:39 Did you say to Ray -- did you use the word
16:07:43 "retaliation"? "You're -- you're retaliating against me"?
16:07:46 A. I could have.
16:07:47 Q. But do you -- Can you sit here today and say
16:07:52 that you used that word?
16:07:53 A. Probably.
16:07:54 Q. So you probably used that word?
16:07:57 A. Yes.
16:07:57 Q. Is that right?
16:07:59 A. Yes, sir.
16:07:59 Q. What else did you say in response?
16:08:02 A. But I -- I said, "I'm on board. I -- I need this
16:08:10 job. I like this job. And if this is what it takes, I'm
16:08:15 all in."
16:08:16 Q. Did -- did you raise your voice?
16:08:20 A. I can't -- I don't remember ever raising my voice
16:08:25 towards Ray.
16:08:26 Q. Did you threaten litigation?
16:08:29 A. Not if -- unless the -- the -- the term -- if I
16:08:34 feel I'm being retaliated against -- but no, I didn't

16:08:38 threaten litigation. I wanted to keep my job. I liked my
16:08:41 job.
16:08:41 Q. Did you say you were not going to report to
16:08:45 Frank?
16:08:45 A. No, that wasn't my decision.
16:08:48 Q. Did you say you did not want to report to Frank?
16:08:50 A. I said I would prefer not reporting to Frank.
16:08:53 Q. Okay. What else do you recall saying in the
16:08:55 meeting?
16:08:56 A. I don't recall. It was a very short meeting.
16:09:01 Q. How long did the meeting last?
16:09:03 A. Less than five minutes, from my recollection.
16:09:09 Q. Anything else that you can recall being said in
16:09:11 the meeting either by you, Mr. Ferrara, or Mr. Anderson?
16:09:17 A. Not that I can recall right now, Bob.
16:09:19 Q. Okay. According to your complaint, you then went
16:09:29 and talked to Amy Schramm. Is that right?
16:09:37 A. Yes, ma'am -- yes, sir. Sorry. Sorry.
16:09:40 Q. It's paragraph 68 at page 18 of your complaint
16:09:43 marked as Exhibit 64.
16:09:46 A. Yes, sir.
16:09:47 Q. And why were you going to Ms. Schramm?
16:09:53 A. Because I felt that I was being retaliated
16:09:55 against.
16:10:02 Q. Okay. And what did Ms. Schramm tell you?

16:10:05 A. She told -- she asked me to go speak to Kevin Salcido, who's head of resources for the school.
16:10:13 Q. When you went to see Ms. Schramm, was that in her office?
16:10:16 A. Yes, sir.
16:10:16 Q. How long did that meeting last?
16:10:18 A. Probably less than 15 minutes.
16:10:19 Q. And did you tell her about the Bart Wear --
16:10:23 A. I mentioned, yes, but not in full detail.
16:10:27 Q. And you said that you had reported the Bart Wear situation to Ray?
16:10:31 A. I believe so.
16:10:32 Q. And you told her that you felt that Ray was retaliating against you?
16:10:38 A. Yes.
16:10:39 Q. And she told you to go see Mr. Salcido?
16:10:43 A. Yes, sir.
16:10:43 Q. Did she tell you anything else?
16:10:45 A. Not that I remember.
16:10:46 Q. Mr. Salcido, was he Ms. Schramm's boss?
16:10:56 A. You know, I -- I don't know how that structure works.
16:10:59 Q. In your complaint, you say that he's the vice president of human resources and chief -- chief HR officer.

16:11:06 A. Yes, sir.
16:11:07 Q. Okay. And Ms. Schramm was senior associate athletics director, human resources. So she was the HR person for the athletic department?
16:11:19 A. Yeah. But I don't know if she reported to the athletic director or if she reported to the university HR. I don't -- I don't know.
16:11:31 Q. All right. So after speaking with Ms. Schramm, did you then go to see Mr. Salcido?
16:11:35 A. Well, I sent him an -- I sent him an email, asked if he could meet this afternoon -- that afternoon.
16:11:40 Q. And did you meet with him that afternoon?
16:11:42 A. Yes, sir.
16:11:47 Q. In your complaint at paragraph 68, you allege that Mr. Salcido -- excuse me, "Mr. Salcido acknowledged that it sounded like Mr. Cohen was being retaliated against . . . ."
16:12:00 A. That is true.
16:12:01 Q. What -- what exactly did he say?
16:12:03 A. He said that specifically.
16:12:05 Q. What --
16:12:07 A. He said -- he goes, "Knowing what I'm hearing," he goes, "it -- it sounds like retaliation."
16:12:11 And I said, "Well, Kevin, I'm very fearful of losing my job."

16:12:17 He said, "That's not going to happen."
16:12:18 Q. What else did Mr. Salcido say?
16:12:33 A. That he was going to wait to -- I don't know if he was going to reach out to Ray or if he was going to wait for Ray to reach out. I don't know. He just put me at ease and said, "You're not losing your job. Just go back and -- and keep doing your job."
16:12:51 I said, "Thank you."
16:12:52 Q. Did Mr. Salcido give you some options on August 12th?
16:12:58 A. Well, he asked. He said, "Can you still work for Ray?"
16:13:01 And I said, "Absolutely."
16:13:02 Q. And did he give you options?
16:13:06 A. Such as?
16:13:07 Q. Either accept the termination, ask Ray to reconsider, negotiate an exit, or make a charge?
16:13:15 A. No, not in that meeting. There was no termination, so no. I -- I don't understand the options.
16:13:27 Q. Okay. So you also saw Jim Rund on August 12th?
16:13:35 A. Yes. That's a -- that was a standing meeting that we had. We met every two weeks.
16:13:46 Q. That was a standing meeting, you said?
16:13:48 A. Yes, sir.
16:13:49 Q. And what was his position at the time?

A. He -- Well, I think he still does as long as -- he's also interim AD, but he oversaw all of the student athlete -- or student services, student welfare, housing, food and beverage. But the -- the primary reason that -- that I would meet with Jim was to help cultivate student -- student attendance at athletic events.

Q. Okay. And I believe in your complaint at paragraph 69, you say that Mr. Rund also acknowledged the obvious retaliation -- quote, acknowledged the obvious retaliation.

A. That was more Mr. Shangraw than Mr. Rund. He -- he tried to talk to me as a friend.

Q. Who tried to talk to you as a friend?

A. Jim Rund.

Q. Okay. And did he acknowledge that there was retaliation?

A. Well, he -- he said, "This -- this -- this does not sound good. Do you -- do you think you could continue to -- to work with Ray?"

And I said, "Absolutely. I really like Ray. I just want this whole thing to just go away. And -- and go back and do the job."

Q. And then you talked to Rick Shangraw?

A. Yes.

Q. And you say that he acknowledged retaliation?

16:15:17 A. He specifically did. We met at Steak 44 before his dinner. I did not have a dinner; he did.
16:15:26 Q. And the retaliation at this point in time was what exactly? The change in reporting?
16:15:35 A. The reporting structure, the -- the bonus letter, the change of swimming, and still nothing going on -- or no -- no conclusion or clarity to the -- Bart Wear touching the women.
16:15:51 Q. Anything else?
16:15:58 A. No.
16:16:03 Q. Okay. So August 13 was a Tuesday. August 15, that makes -- that makes it a Friday. Anything happen on Wednesday or Thursday?
16:16:28 A. Well, the 15th is a Thursday.
16:16:30 Q. Excuse me, Thursday.
16:16:32 Anything happen on Wednesday, the 14th?
16:16:34 A. We had a -- I think it was an all-day coaches symposium, one-day session, at -- at Papago.
16:16:46 Q. Anything relative to Bart Wear or retaliation or anything like that on August 14th?
16:16:55 A. Well, I -- That morning right before the event started, I was visiting with Scottie Graham, and Ray walked in and said, "Hey, Ray," and he completely ignored me and said "Hello, Scottie." And I go, "Oh, okay."
16:17:17 Q. Anything else that happened on Wednesday,

16:17:21 the 14th?
16:17:21 A. Not that I can recall. Oh, I made a few phone calls that night. I tried to call Jean and -- and Amy and get some clarity on what -- what kind of was happening, because we hadn't talked since Tuesday. Amy did not call me back. Jean called me back, and there was -- he was very ambivalent about not -- not much had changed. And come to find out there was a lot of stuff going on that I didn't -- that people weren't telling me, so . . .
16:17:55 Q. Well, what was going on that you were unaware of?
16:17:58 A. Well, I was getting fired the next morning at 8 a.m.
16:18:02 Q. Okay.
16:18:03 A. So they were all having conversations. Kevin Salcido told me that.
16:18:08 Q. When did he tell you that?
16:18:09 A. After I was fired and I was told to go see him.
16:18:13 Q. Okay. Now, after this August 12th meeting, you said that you were willing to work with Ray. You wanted to keep your job. So did -- Were you then willing to accept reporting to Frank on ticketing?
16:18:36 A. Absolutely. I told Frank that too.
16:18:37 Q. When did you tell Frank that?
16:18:41 A. It was either on -- Well, Wednesday we had the coaches, so there wouldn't have been a one-on-one. I

16:18:51 believe I told him -- We had a great conversation on
16:18:54 Thursday morning before, because we had a -- we had an
16:18:59 event with campus leaders for Affinity and Herm Edwards
16:19:07 was speaking. And I was responsible for it, and so I
16:19:15 got -- I got to the office -- Frank and I were early
16:19:18 risers as it -- as it was, but I remember Frank and I
16:19:21 sharing a cup of coffee. And I said, "You know, Frank,
16:19:27 everything's going to be fine. Everything's just going to
16:19:30 be fine." And he told me later -- I ran into him -- that
16:19:33 things weren't fine, so . . .
16:19:35 Q. So is it your testimony that on August 12th, when
16:19:46 you were told you were going to be reporting to Frank
16:19:49 Ferrara, which you did not think was a good idea, that you
16:19:55 did not react in a negative way to that in terms of
16:20:01 raising your voice, complaining to others?
16:20:10 A. No. I had people come to me. And it's just --
16:20:12 I'm not a -- I'm not a loud-voiced screamer. I may get --
16:20:19 when things -- I may get quiet more than anything.
16:20:26 Q. So on August 12th, when you met with Kevin
16:20:51 Salcido, Mr. Salcido did not lay out for you the following
16:21:02 options: you could accept the change in reporting, you
16:21:06 could ask Ray to reconsider that, you can negotiate an
16:21:12 exit, or you could make a retaliation charge?
16:21:15 A. No, you had mentioned termination in there.
16:21:22 Q. Yeah, I probably had that wrong. So I'm just

16:21:24 asking --
16:21:24 A. That was the Thursday.
16:21:28 Those -- those -- those sound familiar. And
16:21:34 I said, "Well, no, I want to stay."
16:21:37 Q. All right. So did you go -- After meeting with
16:21:41 Mr. Salcido, you went and saw Ron De Shangraw [verbatim].
16:21:49 If you wanted to stay, did that mean you would necessarily
16:21:52 have to accept this change in reporting?
16:21:56 A. I believe so.
16:21:56 Q. And on August 12th, 13th, or 14th, did you go to
16:22:00 Mr. Anderson and say, "Look, I'll accept reporting to
16:22:04 Frank Ferrara?
16:22:05 A. No.
16:22:05 Q. Why not?
16:22:06 A. I never saw Ray. We were at the coaches
16:22:09 symposium and never saw him and never saw him until
16:22:13 Thursday morning.
16:22:13 Q. So it's your testimony --
16:22:15 A. But I never denied that I wouldn't work for
16:22:17 Frank. That was my job. I told him when I was told on
16:22:19 the 12th that I would -- if I had to work with Frank,
16:22:25 like, I like my job, let's go -- let's do it.
16:22:28 Q. So I'm trying to understand, then, if you're
16:22:29 willing to accept it, why are you going to all these other
16:22:32 people saying that you're being retaliated against?

16:22:35 A. Because it's -- it's a combination of things, Bob. It's not one in and of itself. It's just when you add all this stuff together, when's it going to end?
16:22:49 Q. So your testimony is that you expressed on August 12th in that meeting with Mr. Anderson and Mr. Ferrara that you were willing to accept this change in reporting?
16:23:05 A. Absolutely.
16:23:06 Q. And after telling them that, then you then went to others and said you were being retaliated against?
16:23:11 A. Yes.
16:23:12 Q. Okay. And -- but you wanted to keep your job?
16:23:16 A. Absolutely.
16:23:17 Q. So what was the purpose of speaking to others about retaliation?
16:23:28 A. Well, the -- the Jim Rund -- I mean, you want to go each one of them?
16:23:35 Q. I'm asking you why -- why you went and saw those people and said you were being retaliated against if you were willing to accept the change --
16:23:41 A. Because I wanted to protect myself because I -- so I didn't get fired.
16:23:44 Q. And on August 13th and 14th, it's your testimony you had no opportunity to speak further with Ray Anderson about this?

16:24:06 A. No.
16:24:06 Q. Were you in the office on August 13th?
16:24:12 A. Yeah, I believe so. I didn't -- I didn't hardly take any vacations.
16:24:17 Q. Was Ray in the office on August 13th?
16:24:20 A. I don't know.
16:24:21 Q. You both were at this event on August 14th?
16:24:25 A. Yes. I know he was there for at least a portion of it.
16:24:28 Q. And no opportunity to take him aside and say, "Hey, Ray, I want to talk to you about this"?
16:24:32 A. It's in front of everybody, no.
Q. How about --
16:24:34 A. It's a very private conversation.
16:24:35 Q. Did you send him a text --
16:24:37 A. No.
16:24:37 Q. -- saying, "Hey, Ray" --
16:24:39 A. Not that I -- not that I remember. But I had said two days before I wanted to stay here and work and we're going to make it happen.
16:24:48 Q. And you said that to Ray?
16:24:52 A. In the meeting with Frank.
16:24:53 Q. And you said that to Frank?
16:24:54 A. Yes.
16:24:55 Q. That's your testimony? Okay.

16:24:57 Anybody else you said?
16:24:58 A. They were the only ones in the meeting.
16:25:04 Q. Okay. And you show up August 15th, right?
16:25:07 A. Yes.
16:25:07 Q. And what happened on the 15th once you got to the office?
16:25:15 A. Do you want me to just start from the --
16:25:17 Q. Start from the top -- or the beginning.
16:25:19 A. Went in. I think it -- I can't remember what time the breakfast thing was, but it was at the football stadium. And I went in, had a cup of coffee with Frank. Said, "Frank, this is going to work. Everything's going to be fine. You and I are good friends. We'll -- we'll make everything work. It's going to be fine. It's going to be good. Got a lot of stuff to accomplish." That was it.
16:25:53 Went to the breakfast. Herm spoke. It was great. Energized the staff -- professors and whatnot. No one, Jean, Ray -- the only person who spoke to me at that from the athletic department was Becky Parke. And we're walking back. I said, "Becky, I'm getting fired today."
16:26:16 She goes, "No."
16:26:17 I said, "Oh, yeah."
16:26:19 She goes, "How do you know?"
16:26:20 And I said, "I can feel it. It's an

intuition. No one's speaking to me. They're not looking at me."

She's like, "Dave."

I said, "See."

Not -- Little did I know it wasn't going to -- it happened in -- five minutes later. So I get back to my office. Jean walks down, says, "Dave, Ray wants to talk to you about your future at Arizona State."

And I said, "Jean, am I getting fired?"

And he goes, "Yes. I'm sorry."

Q. Okay.

A. We walked down to Ray's office, sat down. Ray said, "We'll make this quick." He said, "I spoke to Dr. Crow last night. I told him you're not a team player, was going to let you go. Your time here at ASU is over. You can talk to Kevin Salcido and Amy, but your last day is today. And you can get your belongings else -- some other time."

It was a two-minute conversation.

Q. Okay. So let's break that down.

What exactly did Ray say about Dr. Crow?

A. He said he spoke to -- I don't know how -- how relevant it was. He said, "I spoke to Dr. Crow last night and told him I was letting you go." And . . .

Q. Okay. So Ray said to you that he spoke to

16:27:51 Dr. Crow and told Dr. Crow that he was letting you go.
16:27:57 Did he say that -- what Dr. Crow had said?
16:27:59 A. No. He just said he -- he said he notified him.
16:28:06 Q. Okay. And Ray said, "Today's your last day"?
16:28:10 A. Yes. Said, "Your time here at ASU is done" --
Q. Okay.
16:28:15 A. -- "immediately -- effective immediately."
16:28:20 Q. Okay. And then he said, "You can pick up your
16:28:24 belongings later"?
16:28:25 A. Yeah. "You can work with Amy or someone to pick
16:28:28 up your belongings."
16:28:29 Q. Amy Schramm?
16:28:32 A. Yes, sir. Sorry.
16:28:33 Q. Okay. And then what happened?
16:28:35 A. And then I -- Amy walked into my office. She
16:28:41 was crying. And she said, "I'm sorry, Dave."
16:28:44 I said, "Amy, so am I."
16:28:47 And she goes, "Oh, do you have your keys?"
16:28:50 I go, "It's only one key." Whatever keys I
16:28:52 had, I handed them to her.
16:28:55 She goes, "We'll make arrangements for you
16:28:57 to come back and pick up. And Kevin is expecting you.
16:29:00 You should go see him."
16:29:01 Q. Okay. And then --
16:29:02 A. I walked out and called my wife.

16:29:05 Q. Is that when you walked out with Amy --
A. Amy, yeah.
16:29:07 Q. -- and Jean?
16:29:07 A. Yeah, but Jean -- I think Amy took me all the way. Jean just took me to the elevator. And then Amy took me down.
16:29:15 Q. To the -- outside the building?
16:29:17 A. Yeah.
16:29:18 Q. Okay. Now, in the -- this meeting on August 15th, it was -- Ray was there?
16:29:34 A. Yes.
16:29:34 Q. Jean in the meeting?
16:29:35 A. Yes.
16:29:36 Q. And was Frank in the meeting?
16:29:38 A. I think so.
16:29:41 Q. Can you say for sure that --
16:29:43 A. I can't -- I can't say for sure.
Q. Okay.
16:29:44 A. I know Amy was there. I know -- I know the other ones. I can't say for sure that Frank was there.
16:29:49 Q. All right. And then I think later that same day, after you walked out of the office, is that when you spoke with Becky Parke?
16:30:05 A. No. That was -- Becky was from the breakfast to the office. And then I left. And I called my wife and --

Q. Oh, right.
A. -- called Rick Shangraw. I called Bobby Hurley. And I called Jay Heiler --
Q. Okay.
A. -- on the way to see Kevin Salcido.
Q. Now, the conversation you had with Becky Parke, that was the morning of August 15th before this meeting with Ray?
A. Correct. If -- You're referring to the phone call?
Q. No. I'm referring to your complaint at paragraph 71 at page 19.
A. Yes.
Q. That's a conversation you had before this meeting with Ray and --
A. Yes. That was on the way back from the breakfast that Becky and I walked together.
Q. Okay. And you heard Ms. Parke testify about that conversation at her deposition?
A. I can't remember specifically what she said.
Q. Well --
A. I know what -- I know what she said to me. So I can't remember what she said in -- in her deposition.
Q. Well, when you heard her testify about this discussion with you on the morning of the 15th, did you

16:31:52 react, "That's not what happened"?
16:31:56 A. There's plenty of things in these depositions
16:31:58 that are inaccurate that I'd say that to -- say that
16:32:01 about.
16:32:02 Q. Well, I'm asking you specifically about
16:32:04 Ms. Parke's deposition --
16:32:05 A. I can't remember what she said, because I know --
16:32:07 I know what was said. I lived it. Other people don't.
16:32:09 Q. So the answer to my question is no, you don't
16:32:12 recall --
A. I don't remember.
16:32:13 Q. -- thinking that?
16:32:14 A. I don't remember what she said, Bob. Sorry. I'm
16:32:16 not trying to be argumentative.
16:32:18 Q. I'm not asking if you remember what she said.
16:32:20 I'm asking if you had a reaction to what you were hearing
16:32:23 in your mind that that's not what -- that's not what was
16:32:27 said.
16:32:27 A. But I can't remember what she said. She could
16:32:30 have said specifically this and then I wouldn't have any
16:32:33 reaction, but I -- I can't remember without seeing what
16:32:36 she said. May- -- If you remind me, maybe I --
16:32:39 Q. No.
A. I can't remember, Bob --
16:32:40 Q. That's not my question.

My question is do you remember having a reaction to her testimony?
A. I don't.
Q. Okay. There we go.
Now, then you went and saw Kevin Salcido. Is that right?
A. Yes.
Q. And what did you and he discuss?
A. What my options were. And I said, "Kevin, I'm -- I'm really confused. When I left the office with you the other day, you said that this wasn't going to happen."
He said, "Well, much like I gave you options, I gave Ray options, and he chose the option that I was hoping he wasn't going to choose. He said that you're a bad employee and he's going to fire you."
He said, "I'm prepared to offer you a hundred thousand dollars," and -- and I said, "I -- I have no idea what to think, Kevin, right now."
Q. Okay. Did he offer you a specific dollar figure or a -- or a six-month severance package?
A. I thought -- I could be wrong -- I thought it was -- I thought it was a hundred thousand dollars, but I -- I could be wrong, Bob. So maybe it was 90-. Maybe it was six months' pay. I don't -- I can't remember right now.

16:34:05 Q. Anything else you can recall about your discussion with Kevin on that day?
16:34:10 A. No. It was -- it was relatively quick.
16:34:12 Q. Okay. All right. So if I'm understanding your testimony in your complaint, circling back kind of trying to sum up. Regarding the Bart Wear incident, you talked to Ray on March 25th and subsequent times. You talked to Scott Nelson. You talked to Rick Shangraw. You talked to Jean Boyd. And I'm focusing on the time before August 15th. Make sure I got all the people. You talked to Jay Heiler, right?
16:35:23 A. Yes.
16:35:23 Q. Anybody -- anybody else prior to August 15th about Bart Wear?
16:35:45 A. Not that I can recall unless I'm reminded.
16:35:49 Q. And when you were doing that, your -- your initial report to Mr. Anderson was because that's what you were trained to do --
16:35:54 A. Uh-huh.
16:35:55 Q. -- as an employee.
16:35:57 And your follow-ups with Mr. Anderson and then these conversations with others -- these other folks affiliated with ASU, that was done because you thought that's what you needed to do as an employee of ASU?
16:36:14 A. Maybe some of it was out of frustration and they

16:36:18 could have influence to try to get something done that wasn't getting done.
16:36:21 Q. And that something getting done was?
16:36:27 A. Some sort of conclusion on --
16:36:28 Q. Action against Mr. Wear?
16:36:29 A. Against -- Yeah, the situation. I don't know. I wasn't asking for anything. I just wanted it to be addressed with Bart, and it wasn't.
16:36:36 Q. Yeah, I think you also mentioned you told Bobby Hurley, Burno as well at some point before August 15th?
16:36:52 A. Bobby was involved. It's his wife. Ben Wood also was intimately aware of everything.
16:36:58 Q. So it was -- So Bobby, is that more a matter of a personal thing? That his wife's involved, he should know?
16:37:08 A. Yes.
16:37:08 Q. And how about Burno?
16:37:09 A. Burno, it's part of the basketball program.
16:37:12 Q. Same thing?
16:37:13 A. It involves the wives, yeah.
16:37:15 Q. Did you ever go to anybody outside of -- I'll call it the ASU committee -- community prior to August 15th about Bart Wear and the allegations?
16:38:04 A. Not that I --
16:38:06 MR. PÉREZ: Objection. Vague.

16:38:06 THE WITNESS: Yeah. Not -- not that I could ever recall.
16:38:08 BY MR. McKIRGAN:
16:38:09 Q. Did you ever, like, go to a reporter?
16:38:10 A. Oh, no. No. You can't talk to a reporter.
16:38:20 Other people clearly did.
16:38:22 Q. Who -- who went to a reporter about Bart Wear?
16:38:26 A. Someone did.
Q. When?
16:38:27 A. I don't know.
16:38:27 Q. Why -- why do you say someone did?
16:38:29 A. Because the story got out, and it didn't get out
16:38:31 from me.
16:38:32 Q. Which story?
16:38:33 A. The story about this whole situation and me
16:38:35 getting fired.
16:38:37 Q. So you -- your attorney sent a notice of claim, I
16:38:43 think, in -- at some point, I think, in February. Let me
16:38:47 find it.
(Deposition Exhibit 74 was marked for identification.)
BY MR. McKIRGAN:
16:39:27 Q. Exhibit 74. Have you seen this before?
16:39:30 A. I don't remember seeing it. Not for a while at
16:39:37 least.

16:39:37 Q. It's your notice of claim dated February 14th,
16:39:48 2020. It's a notice of claim filed by -- by you against
16:39:51 the State of Arizona. See that?
16:39:55 A. Yes, sir.
16:39:55 Q. Now, when you had this notice of claim filed on
16:40:09 the Board of Regents and ASU, did you understand that that
16:40:13 was going to be a public document?
16:40:14 A. No.
16:40:14 Q. Do you understand now that notices of claim
16:40:19 against the State are a public document?
16:40:22 MR. PÉREZ: Objection.
16:40:22 THE WITNESS: I do now.
16:40:23 BY MR. McKIRGAN:
16:40:28 Q. Did you want this matter to remain private?
16:40:30 MR. PÉREZ: Objection. Calls for
16:40:33 speculation.
16:40:34 You can answer.
16:40:35 THE WITNESS: Yes.
16:40:38 Can I?
16:40:39 MR. PÉREZ: Sure.
16:40:39 THE WITNESS: Yes. I was -- I was told from
16:40:40 my attorney to --
16:40:43 BY MR. McKIRGAN:
16:40:43 Q. No, no.
16:40:45 A. No. Sorry.

16:40:46 MR. PÉREZ: Thank you.
16:40:48 THE WITNESS: Sorry, guys.
16:40:49 BY MR. McKIRGAN:
16:40:50 Q. Yeah, no. Again, please don't reveal what you
16:40:52 discussed with your attorney.
16:40:55 So -- so the notice of claim was filed. You
16:40:59 didn't understand that this would become a public record?
16:41:02 A. No, I did not.
16:41:03 Q. I can tell you that notice of claims are public
16:41:09 records. And do you have any information to suggest that
16:41:17 somebody at ASU went out of their way to get a copy of
16:41:25 this notice of claim into the media's hands?
16:41:27 MR. PÉREZ: Objection. Calls for
16:41:28 speculation.
16:41:29 THE WITNESS: I would have no idea.
16:41:31 BY MR. McKIRGAN:
16:41:35 Q. Okay. Well, the reason I ask is you -- earlier
16:41:39 answer you said something about, well, somebody obviously
16:41:45 did, and I was wondering if you had any information to
16:41:47 support what you said.
16:41:48 A. I can only say that clearly the story got out,
16:41:51 and it didn't come from me, because I -- I have not -- I
16:41:54 cannot talk about this outside or should not.
16:41:59 Q. Okay. Now, you do know members of the media,
16:42:09 though, right?

16:42:10 A. I do.
16:42:10 Q. Doug Haller?
16:42:12 A. Yes.
16:42:12 Q. Pete Thamel?
16:42:14 A. Yes.
16:42:15 Q. And you communicate with those reporters?
16:42:19 MR. PÉREZ: Objection. Vague as to time.
16:42:21 THE WITNESS: I have communicated with them on various topics.
16:42:24 BY MR. McKIRGAN:
16:42:24 Q. Yeah. And have you communicated them -- with them since December of 2019?
16:42:28 A. Yes.
16:42:29 Q. Okay. Have you communicated with them regarding your lawsuit?
16:42:33 A. No.
16:42:33 Q. Tracy Smith, do you know who he is?
16:43:21 A. Former baseball coach at ASU.
16:43:23 Q. And you -- and you communicate with him?
16:43:25 A. I have communi- -- I haven't communicated with him since March -- since he went to Michigan.
16:43:29 Q. When was that?
16:43:30 A. Good question. Last couple years. I don't know how -- I forget how long he's been there, Bob.
(Deposition Exhibit 75 was marked for

identification.)
BY MR. McKIRGAN:
Q. Exhibit 75 are the texts you produced with Tracy Smith.
So there is a text on June 23rd, Bates Number 5899.
A. 5899.
Q. Mr. Smith, did he lose his job as baseball coach?
A. Yes.
Q. And did you refer him to your lawyer?
A. I gave him my lawyer's number.
Q. Why -- why did you do that?
A. He asked for it.
Q. Any other reason why?
A. No. He didn't -- he didn't know whether he was going to sue or not.
Q. What was your understanding of what his complaint was about?
A. I have no idea. I said, "I have no idea what it is, but if you want to talk to my attorney, you can."
Q. There's a text with him on July 12, 2021, at 5900.
A. Yes.
Q. Looks like you're texting a Twitter post by Pete Thamel to him.

16:46:08 A. Okay.
16:46:08 Q. Do you remember what that post was about?
16:46:10 A. I don't.
16:46:11 Q. And you say, "More to come in depositions."
16:46:15 Do you know what you were referring to
16:46:16 there?
16:46:16 A. I don't. I don't remember what the text would be
16:46:18 or what that Pete Thamel status is.
16:46:22 Q. And it looks like, if you go to 5901, you're
16:46:44 texting about the NCAA investigation into the football
16:46:47 program. Do you see that?
16:46:51 A. Which? On July 14th?
16:46:54 Q. Yeah. And -- and thereafter.
16:47:02 A. Yes. Was there a question, Bob? I'm sorry.
16:47:07 Q. Yeah, you were texting about the NCAA football
16:47:11 investigation?
16:47:11 A. Right. I was usually responding. He was --
16:47:15 Tracy was -- was talking.
16:47:17 Q. And then you have a text that says, quote,
16:47:19 Actually, my deposition will take Jean down 'cause we have
16:47:22 the right to ask anything and we can ask directly if he
16:47:26 knew of what was going on. If he gets caught lying then
16:47:31 or after, he goes to jail, close quote.
16:47:33 Do you see that?
16:47:33 A. Yes.

16:47:34 Q. Now, were you suggesting to Mr. Smith that you were going to use the deposition of Jean Boyd to have questions asked about the NCAA football investigation?
16:47:45 A. I have no idea.
16:47:46 Q. Well, what were you suggesting there in that text?
16:47:49 A. I can't remember. I have no recollection. Sorry.
16:47:57 Q. And above that, you said, "Pete thinks that they get through this season" -- That's Pete Thamel you're referring to?
16:48:04 A. Yes, sir.
(Deposition Exhibit 76 was marked for identification.)
16:49:06 BY MR. McKIRGAN:
16:49:11 Q. Exhibit 76 is some text messages with Rashon Burno. See this?
16:49:20 A. Yes, sir.
16:49:21 Q. And on the first page of Exhibit 76 -- Hold on a second.
16:49:57 Second page, I'm sorry. Looks like on September 9, 2019 -- so this is after August 15th, during the investigation before your -- before your time at ASU ends in December 2019 -- you asked for Pete Thamel's cell phone. Do you see that?

A. Yes.
Q. Why -- why did you want Pete Thamel's cell phone?
A. I talked to Pete Thamel about Bobby's contract and establishing communication in the industry, who -- I still -- still talk to Pete today, not about this deal but about other basketball stuff.
Q. So your testimony is you never talked to Pete Thamel about your lawsuit?
A. No. He had brought it up, but he -- you can't talk about the details.
Q. When did he bring it up with you?
A. After the story broke.
Q. What did he ask?
A. "Can you talk about it? Any updates?"
I said, "No. There's no updates. Can't talk about it."
Q. Was this in 2020?
A. I forgot when the story broke. Bob, if he had the story, it would be after that.
Q. I believe the story broke in February of 2020. I have a copy of the article here somewhere.
(Deposition Exhibit 77 was marked for identification.)
BY MR. McKIRGAN:
Q. Exhibit 77 is a copy of a February 20, 2020,

16:53:31 azcentral article.
16:53:34 A. Yes, sir.
16:53:35 Q. And this references the notice of claim in the first sentence. Do you see that?
16:53:42 A. Yes.
16:53:44 Q. Is this when you believe the story broke?
16:53:49 A. Actually, I don't remember reading anything at the azcentral, so this is the first time I've seen this.
16:53:57 Q. It's also, I think, in the Republic.
16:53:59 A. That's the same thing.
16:54:01 Q. Right.
16:54:01 A. Isn't it?
16:54:03 Q. Yes.
16:54:03 A. No, me, this is the first time I've seen this article.
16:54:06 Q. Okay. So you don't remember an article being published in the local paper?
16:54:10 A. I don't subscribe to the local paper.
16:54:12 Q. Well, it appears that's when the, quote, story broke. So when Mr. Thamel contacted you, is that shortly after February 20, 2020?
16:54:25 A. It must have been around this time, but I -- I don't remember.
(Deposition Exhibit 78 was marked for
16:55:01 identification.)

16:55:01 BY MR. McKIRGAN:
16:55:10 Q. Exhibit 78 is a text exchange with Rashon Burno in 2022.
16:55:25 A. Yes, sir.
16:55:25 Q. And on February 17, 2022, Mr. Burno texts you, quote, It's about to be over for our guy Herm.
16:55:41 And then you reply, quote, Really? You get that from Pete or Karpman?
16:55:45 Do you see that?
16:55:46 A. Yes, sir.
16:55:46 Q. And "Pete" is Pete Thamel?
16:55:48 A. I would -- yeah, that's who I was referring to, yes.
16:55:51 Q. He's a writer for the -- I think The Athletic, right?
16:55:54 A. No.
16:55:55 Q. Yahoo Sports?
16:55:57 A. He was Yahoo Sports. And now he writes for ESPN.
Q. That's right.
16:56:00 A. Or he does -- He's more than a writer, so . . .
16:56:03 Q. And Karpman is a reporter who covers ASU sports?
16:56:07 A. Yeah. I believe it's Sun Devil Source.
16:56:09 Q. Right.
16:56:14 So how often in this time frame, 2022, were you talking with reporters?

16:56:22 A. With fodder like this? Not about my case. Maybe something about the football program. I'm not -- My media stuff is not relevant to anybody.
16:56:41 Q. Okay. The last text on this page, you refer to somebody as an effing selfish A-hole. Do you see that?
16:56:53 A. Uh-huh.
16:56:54 Q. For the record, it's actually "Fucking selfish asshole."
16:56:58 Who are you referring to there?
16:56:59 A. Remy Martin.
16:57:01 Q. The basketball player who transferred to Kansas?
16:57:04 A. Yes.
16:57:04 Q. Have you ever spoke with Doug Haller about Ray Anderson?
16:57:21 A. About Ray?
16:57:23 Q. Yeah.
16:57:25 A. I -- I can't remember. I'm sure we talked about Ray.
16:57:32 Q. And what did you speak with Mr. Haller about regarding Ray?
16:57:47 A. I -- I can't remember. It's -- I mean, numerous topics. They could be calling me on Bobby Hurley's contract to men's basketball performance or -- it could be -- could be anything.
16:58:00 Q. How about after August 15th of 2019, what did you

talk to Mr. Haller about regarding Ray Anderson?
A. I can't recall a specific conversation, but if I'm reminded, maybe I'll know.
Q. How about in general?
A. Unless it was anything in specific, Bob, I don't -- a specific topic, I . . .
Q. Have you ever been critical with a reporter in your communications -- critical about Ray Anderson in your conversations with the reporters?
A. Never on the record. Proba- -- probably, most likely, yes, but never on the record.
Q. How about Kent Somers? Did you ever speak with him?
A. I think Kent did a -- Kent did a story when we played Kansas and got that scheduled and -- yeah, I talked to Kent.
Q. Ever talk to Kent Somers about Ray Anderson?
A. I don't remember specifically unless he -- he brought it up.
Q. When you reported to Mr. Anderson on March 25, 2019, regarding Bart Wear, did you want the university to disassociate Bart from ASU?
A. No. It wasn't my intention at all, no.
Q. Go back to Exhibit 74.
A. Oh, geez. I have 64.

17:01:09 Q. I'm sorry, not Exhibit 74. That's the wrong one.
17:01:19 It's the Armstrong Teasdale report, which is --
17:01:23 A. Oh, 69?
17:01:25 Q. Yes.
17:01:38 A. Yes.
17:01:38 Bob, are we done with the 68 and 70, the review stuff, or do you want me to keep that out to come
17:01:41 back to it?
17:01:41 Q. Better keep those out.
17:01:45 A. Okay.
17:01:46 Q. So if you go to Exhibit 3 to the report, which is
17:02:03 Bates-numbered ABOR- -- ABOR.COHEN001095 --
17:02:10 A. Yes, sir.
17:02:11 Q. -- this is an organizational chart dated
17:02:30 January 2019. Do you see that?
17:02:34 A. Yes, sir.
17:02:35 Q. And if I understand the organizational charts,
17:02:39 there was a chart for administration and then a chart for
17:02:42 sport administration.
17:02:44 A. Okay.
17:02:44 Q. Is that right? Is that how you understood it?
17:02:47 If you go to the second page. There's one for sport
17:02:52 administration.
17:02:53 A. Okay.
17:02:54 Q. And in January 2019, you were on the

17:03:07 administrative side. You're shown as "Band/Spirit Squad."
17:03:16 What is that?
17:03:16 A. The band.
17:03:17 Q. What did you do for the band?
17:03:20 A. Was the administrator for the band. Can't play
17:03:29 an instrument to --
17:03:30 Q. What did --
17:03:31 A. -- to save anything, Bob.
17:03:33 Q. What did that entail?
17:03:35 A. It was just oversight. I mean, the band's -- the
17:03:37 band is the band.
17:03:39 Q. Okay. Then you had ticketing, right?
17:03:45 Then there's reference to sports
17:03:50 administration, which is on the next page?
17:03:53 A. Do you want me to turn the page?
17:03:55 Q. Yep.
A. Okay.
17:03:56 Q. In January 2019, you had basketball -- men's
17:03:59 basketball, men and women's diving, men and women's
17:04:08 swimming, right?
17:04:09 A. Yes, sir.
17:04:09 Q. Okay. And ice hockey is now under Frank Ferrara.
17:04:13 That was something that you used to administer, correct?
17:04:16 A. I was a -- I was a junior administrator on hockey
17:04:18 with Rocky Harris. So yes. The answer is yes.

17:04:23 Q. Okay. If you go forward in the chart,
17:04:38 February 2019 on the administrative chart, you now have
17:04:45 ticketing and sports administration. And it looks like
17:04:50 band and spirit squad has been removed.
17:04:54 A. Where did the band and spirit squad -- where did
17:04:57 it go?
17:04:59 MR. PÉREZ: Deana Garner-Smith.
17:05:02 THE WITNESS: Oh.
BY MR. McKIRGAN:
17:05:04 Q. See that?
17:05:04 A. Yes. Yes, sir. I'm sorry, Bob.
17:05:09 Q. Did you consider that to be a change in status,
17:05:12 to lose the band and spirit squad administration?
17:05:16 A. No.
17:05:17 Q. If you go to the next page, you're still shown
17:05:28 for the same sports, right?
17:05:30 A. Yes, sir.
17:05:31 Q. Okay. And on both the administration and sports
17:05:36 administration, you're reporting directly to Ray Anderson,
right?
17:05:41 A. Yes, sir.
17:05:42 Q. And if you move to July 2019, it seems to be
17:05:57 quite a of bit -- bit of changes in the organizational
17:05:59 structure, right?
17:06:05 A. I've never seen this -- I don't remember seeing

17:06:07 it, I should say.
17:06:09 Q. So on the administrative side, you've got
17:06:22 culture, sports administration, revenue generation, all
17:06:28 that, and you're showing -- you're now reporting to Frank?
17:06:33 A. Yes, sir.
17:06:34 Q. And Gabe Cagwin is now reporting to Scott Nelson?
17:06:41 A. Yes.
17:06:41 Q. Before -- According to the February chart, Gabe
17:06:52 had a direct-line report to Ray?
17:06:55 A. On the one before?
17:06:56 Q. Yes. In February. Go two more.
17:07:04 A. Right here?
17:07:05 Q. Yep. You see that?
17:07:05 A. Yeah. Yes, sir.
17:07:05 Q. So Gabe was also -- his reporting line changed
17:07:11 with this reorganization?
17:07:13 A. Yes.
17:07:14 Q. And on the sports side, a number of people are
17:07:27 reporting to Jean, right?
17:07:32 A. Yes.
17:07:33 Q. But you still have a direct line to Ray?
17:07:39 A. Correct.
17:07:39 Q. So the change in reporting line for ticketing,
17:07:56 where you are now reporting to Frank instead of Ray
17:07:59 directly, that wasn't the only change made to the

17:08:04 organization of the athletic department, right?
17:08:08 A. True.
17:08:08 MR. PÉREZ: We are about that time again.
MR. McKIRGAN: For a break? Sure.
17:08:16 MR. PÉREZ: An hour and 15 minutes.
17:08:17 MR. McKIRGAN: Yeah.
17:08:18 MR. PÉREZ: So . . .
17:08:19 THE VIDEOGRAPHER: Off the record at
17:08:21 5:08 p.m.
17:08:22 (A recess ensued.)
17:22:48 THE VIDEOGRAPHER: Back on the record at
17:22:52 5:22 p.m.
17:22:53 BY MR. McKIRGAN:
17:22:55 Q. Do you still have Exhibit 75 in front of you --
17:22:57 A. I do not.
17:22:58 Q. -- the text messages?
17:23:00 A. But let me -- There it is. Tracy Smith?
17:23:09 Q. Yes.
A. Okay.
17:23:13 Q. If you go to Exhibit 75, page -- Bates
17:23:18 Number 5900. And I asked you about the -- sending the
17:23:26 Twitter post from Pete Thamel to Tracy Smith. Do you see
17:23:30 that on July 12, 2021?
17:23:33 A. Yes.
(Deposition Exhibit 79 was marked for

identification.)

BY MR. McKIRGAN:

17:23:36 Q. And Exhibit 79 --

17:23:39 MR. PÉREZ: Is that the new one?

17:23:40 MR. McKIRGAN: That's the new one.

BY MR. McKIRGAN:

17:23:42 Q. -- is a post from Pete Thamel, July 12, 2021,
17:23:49 about your lawsuit. Do you see that?

17:23:54 A. Yeah, I see it.

17:23:55 Q. Okay. So is that what you were forwarding to
17:23:57 Tracy Smith?

17:24:00 A. No, I don't -- it doesn't make -- the timing
17:24:05 doesn't make sense.

17:24:07 Q. In what way?

17:24:08 A. That wasn't -- everything happened in February?
17:24:15 The article? But yeah, apparently it is. It must have
17:24:22 been some connection.

17:24:22 Q. Well, you filed the -- The notice of claim was
17:24:27 in 2020. The lawsuit was in 2021.

17:24:29 A. Okay. Okay. That's the confusion.

17:24:30 Q. So you were sending to Tracy Smith --

17:24:36 A. Just an FYI.

17:24:43 MR. PÉREZ: Is this -- by the way, is this a
17:24:45 Twitter something? Is that what this is?

17:24:47 MR. McKIRGAN: Printed off Pete Thamel's

17:24:50 Twitter post.
17:24:51 MR. PÉREZ: Okay. It's a Twitter post.
17:24:57 THE WITNESS: Is there something on the next
17:24:58 page, Bob?
17:24:59 MR. McKIRGAN: No. We're done.
17:25:00 BY MR. McKIRGAN:
17:25:07 Q. If you go to your complaint, Exhibit 64,
17:25:09 paragraph 60.
17:25:14 A. Wow. Opened it right up. Yes.
17:25:18 Q. You allege that you were a model employee. You
17:25:33 see -- you see that?
17:25:33 A. Yes, sir.
17:25:33 Q. And you believe that to be the case?
17:25:36 A. I think I was a good employee.
17:25:39 Q. Do you think you were a model employee?
17:25:42 A. Beauty's in the eye of the beholder, I guess,
17:25:46 when you determine "model."
17:25:47 Q. All right. And the last part of that paragraph,
17:25:57 starting on line 6, you say that you were labeled "not a
17:26:09 team player," your bonus structure was changed, your
17:26:13 responsibilities were reassigned, you were demoted, and
17:26:17 ultimately fired. "The facts of the retaliation cannot be
17:26:22 more clear." Do you see that?
17:26:23 A. Yes, sir.
17:26:24 Q. All right. So I want to -- I want to go through

17:26:25 some of these things, but --
17:26:26 A. Okay.
17:26:27 Q. I just want to make sure I've got everything that
17:26:30 you allege that were acts of retaliation.
17:26:34 So based on your complaint, you said you
17:26:40 were -- one of the retaliations was being labeled not a
17:26:43 team player, your bonus structure was changed, your
17:26:49 responsibilities were reassigned, you were demoted, and
17:26:53 then ultimately fired. Any other things that you consider
17:26:58 to be things that ASU or Ray Anderson did to you that was
17:27:04 in retaliation for reporting about Bart Wear?
17:27:09 A. None that I can think of right now.
17:27:11 Q. Well, again, today's my day to exhaust --
17:27:16 A. I know.
17:27:16 Q. -- your recollection, so if there's anything
17:27:20 else, you need to tell me now because I don't want to hear
17:27:22 it for the first time at trial. Anything else?
17:27:25 A. It's fair. Accurate.
17:27:27 Q. Okay. So your responsibilities being reassigned,
17:27:34 we've already kind of -- we've talked about that. That's
17:27:37 the swimming being taken away and reporting to Frank
17:27:41 Ferrara?
17:27:41 A. Yes, sir.
17:27:41 Q. Any other thing that falls under the heading
17:27:46 responsibilities reassigned?

17:27:48 A. No.
17:27:49 Q. I think that I -- In your complaint at
17:28:09 paragraph 63, you state that "The stated reason for the
17:28:21 change," referring to the -- being taken off swimming,
17:28:25 "was to allow Mr. Cohen to focus more on ticketing."
17:28:30 Do you see that?
17:28:31 A. Yes, sir.
17:28:32 Q. All right. And I showed you some stats on ticket
17:28:39 sales versus projections and you said you hadn't seen the
17:28:43 document before.
17:28:44 A. Yes, sir.
17:28:44 Q. But you are familiar with the attendance records,
17:28:48 right? For football, for example?
17:28:51 MR. PÉREZ: Objection. Vague as to time.
17:28:52 BY MR. McKIRGAN:
17:28:53 Q. Well, while you were at ASU in charge of tickets.
17:28:57 A. Yes. And we'd have to be reminded with
17:29:00 information.
17:29:00 Q. Okay. If I have that.
17:29:35 I could tell you I looked at the ASU Sun
17:29:39 Devil website and looked at attendance figures for
17:29:43 football. I thought I had printed that out, but I don't
17:29:48 have it.
17:29:49 But do you recall that in 2017, the
17:29:57 attendance per game was 51,380, and then in 2018, it

17:30:04 was -- dropped to 48,515?
17:30:07 A. I don't remember those specific details.
17:30:10 Q. So you don't recall football attendance dropping
17:30:27 from 2017 to 2018?
17:30:30 A. Not specifically. There were all kinds of
17:30:35 various factors: the stadium renovation; certain years we
17:30:40 played Notre Dame, which drove season ticket sales. When
17:30:44 USC plays here, you drive tickets. Arizona. You know,
17:30:51 it's -- there is -- Sometimes there's a little mountain,
17:30:54 drop-off.
17:30:55 Q. But football is -- is that the biggest revenue
17:31:03 generator for the sports?
17:31:04 A. Yes, by far.
17:31:05 Q. And what -- In 2017-2018, what was the capacity
17:31:20 at Sun Devil Stadium?
17:31:21 A. I couldn't tell you.
17:31:23 Q. Were there empty seats in 2017 and 2018 for
17:31:31 football?
17:31:31 A. I'm sure there's empty seats every game.
(Deposition Exhibit 80 was marked for
17:32:27 identification.)
17:32:27 BY MR. McKIRGAN:
17:32:41 Q. Exhibit 80 are the text messages between you and
17:32:46 Frank Ferrara that you've produced.
17:32:48 A. Yes, sir.

17:32:49 Q. And it's true, isn't it, that before the change in reporting, where you were now reporting to Frank on ticketing -- that change being in, I think, August of 2019 -- you were sending Frank the information on ticket sales, right?
17:33:18 A. Updates on --
17:33:21 Q. Yes.
17:33:22 A. -- attendance per game? Yes.
17:33:22 Q. Why -- why were you doing that?
17:33:24 A. He has a common interest. Just very much like I would send text messages to Ray or Jim Rund or Dr. Crow.
17:33:34 Q. And -- and Frank was the chief financial officer for the --
17:33:38 A. Yes, sir.
17:33:39 Q. And so he would have an interest in the revenues?
17:33:41 A. Yes.
17:33:42 Q. And if we look at Exhibit 80 and you kind of flip through it, you see that you're sending him the stats on attendance for football and basketball, right?
17:33:59 A. True.
17:33:59 Q. And when you flip through this, you do see what -- what I would call a lot of bantering between the two of you.
17:34:17 A. Yes.
17:34:17 Q. And you would agree, wouldn't you, that you had a

friendly relationship with -- with Frank Ferrara?
A. Yeah. I really enjoyed Frank.
Q. But despite that relationship, in August of 2019, you were -- you were fearful that Frank would fire you?
A. Well, he told me that. I wasn't until he told me that.
Q. And we -- we already talked about that conversation -- right? -- where Frank told you that?
A. Yeah. We've talked about pretty much everything, Bob.
Q. Not quite.
Restructuring the department, that was being discussed before March of 2019, wasn't it? Reorganizing?
A. I don't know. I wasn't a part of those discussions.
Q. So if Mr. Anderson was to testify that he was considering a reorganization of the department before you reported on Bart Wear, you have no reason to disbelieve him, right?
A. No. I would believe or trust what he says.
Q. Now, one of the reasons you gave as a -- or one of the acts of retaliation you -- you gave was you were labeled not a team player. Who -- who labeled you that?
A. Well, Ray told me that when I was fired.
Q. Okay. And how else did Ray label you not a team

17:36:34 player besides telling you?
17:36:38 A. That's what he told me.
17:36:41 Q. Okay. Do you know whether he's labeled you a
17:36:51 team player to others outside of Arizona State University?
17:36:57 A. Whether I was -- was a team player or not?
17:37:01 Q. Or not. Yeah.
17:37:03 A. I don't know.
17:37:03 Q. How about within ASU? Do you know whether he
17:37:07 labeled you not a team player?
17:37:09 MR. PÉREZ: Objection. Calls for
17:37:11 speculation.
17:37:11 THE WITNESS: Yeah, I don't know what -- If
17:37:13 I wasn't there, I don't know.
17:37:14 BY MR. McKIRGAN:
17:37:14 Q. So when you allege that in your complaint, what
17:37:17 you're referring to is what Ray had told you personally?
17:37:19 A. Directly, yes.
17:37:20 Q. Now, you were interviewed during the
17:37:28 investigation by Armstrong Teasdale, right? By -- Carrie
17:37:32 Love, I believe, is her name.
17:37:33 A. Yes, sir.
17:37:35 Q. And did you tell her that you hold grudges and
17:37:39 judge people?
17:37:45 A. I don't remember.
17:37:46 Q. Is that something that you do, hold grudges and

17:37:55 judge people?
17:37:55 A. I think I judge people. I pray each Saturday
17:37:59 night at Mass to not judge, amongst other things.
17:38:03 Q. Okay. How about holding grudges?
17:38:09 A. I don't think I hold grudges. Just too old
17:38:13 anymore, Bob. It's -- You know, sometimes sits -- stuff
17:38:17 sits with you, but . . .
17:38:19 Q. All right. Sally Hatfield Clubb [verbatim], you
17:38:55 remember she came in to do this assessment of the culture
17:38:59 within the athletic department?
17:39:01 A. Yes.
17:39:01 Q. Okay. And do you recall she interviewed you at
17:39:10 some point and asked you a series of questions?
17:39:14 A. I mean, I remember having a meeting with her. I
17:39:17 don't remember precisely what she asked.
17:39:19 Q. Okay. Do you remember a question that she asked
17:39:22 of all the members of the senior management team about
17:39:26 when adversity hits, who would you share a bunker with?
17:39:31 Pick two people you'd share a bunker with and pick two
17:39:34 people that you would not share a bunker with. Do you
17:39:37 remember those questions?
17:39:37 A. Along those same lines.
17:39:40 Q. Okay. Do you know what the results of those --
17:39:42 that survey of the senior management team was on that
17:39:46 question?

17:39:48 A. No.
17:39:48 Q. Would it surprise you that -- that you had the most responses from members of the senior management team that they would not want to share a bunker with you?
17:40:07 A. I didn't know that.
17:40:11 Q. Would it surprise you?
17:40:13 A. I would --
17:40:13 MR. PÉREZ: Objection. Vague, calls for speculation.
17:40:17 THE WITNESS: I can't be in people's minds. I mean, there's a lot of confusion with the question, so -- I can't even remember what I picked, so . . .
17:40:26 BY MR. McKIRGAN:
17:40:28 Q. Did you tell her you thought that the senior management team should be shrunk?
17:40:32 A. I don't recall.
17:40:35 Q. Okay. Did you think that the senior management team should be shrunk?
17:40:40 A. I do think we had too many senior management people.
17:40:43 Q. Did you think certain people should be fired?
17:40:46 A. It wasn't my call.
17:40:48 Q. Yeah, but did you think certain people should be fired?
17:40:51 A. It wasn't my call.

17:40:52 Q. I know it's not your decision to make. But did you think that Ray should fire some people?
17:40:57 A. No.
17:41:01 Q. Let me show you this.
(Deposition Exhibit 81 was marked for identification.)
17:41:59 BY MR. McKIRGAN:
17:42:04 Q. Exhibit 81 is a series of invoices from Optimum Management Solutions, specifically Ken Helman.
17:42:23 A. Yes, sir. Sorry.
17:42:24 Q. And I -- I doubt if you've ever seen these invoices before, but I only show them to you to see if it helps refresh your recollection.
17:42:33 But it appears that Mr. Helman was giving you executive coaching --
17:42:40 A. Yes.
17:42:41 Q. -- in October -- looks like September, October, November, December 2016. See that?
17:43:05 A. Yes, sir. Yes, sir. I'm sorry.
17:43:07 Q. And when you were getting coaching from Mr. Helman, how many times were you meeting with him a month?
17:43:16 A. Oh. Good question. I -- I can't remember.
Q. Okay.
17:43:22 A. Was it once or twice a month? Sorry, Bob. I --

17:43:29 I can't remember. I mean, this was . . .
17:43:32 Q. A while ago. I understand.
17:43:35 A. Yeah. Sorry.
17:43:36 Q. Did you meet in person?
17:43:37 A. Yeah. I really enjoyed meeting with Ken.
17:43:40 Q. And where would those meetings take place?
17:43:45 A. In my office. I think that's the only place we
17:43:47 met.
17:43:47 Q. And how long would the meetings last?
17:43:49 A. My memory serves me, an hour or two, depending on
17:43:55 the -- the session.
17:43:55 Q. And what kind of things would you discuss?
17:43:58 A. Talked about a lot of stuff: management style,
17:44:05 communication, working with people, working with
17:44:10 high-profile coaches, the gamut.
17:44:13 Q. Okay. And how did it come about that Mr. Helman
17:44:21 was working with you particularly? Do you know?
17:44:24 A. I really enjoyed the opportunity to meet with
17:44:29 Ken, and it -- it was -- I think Rocky Harris was Ray's
17:44:36 deputy AD at the start. Kind of asked if I would be
17:44:39 interested in working with an executive coach, and I
17:44:44 welcomed it with open arms.
17:44:46 Q. And did you speak with Ray Anderson about doing
17:44:54 this executive coaching?
17:44:56 A. I don't remember talking a lot with Ray about it.

17:44:58 Q. But you talked to Mr. Harris about it?
17:45:00 A. Yeah. Yes. Sorry.
17:45:02 Q. And did you discuss with Mr. Harris the purpose of the consulting?
17:45:06 A. Just try to become a better leader and -- and ready to evolve into becoming an athletic director.
17:45:14 Q. Was there any issues discussed with Mr. Helman related to your style and approach in dealing with your peers, others at -- within the athletic department?
17:45:31 A. I think we all had room for improve- -- Yeah, if I would recall, it's more patience with people that don't necessarily have the attention to detail and drive that I have. There are a lot of great things that came out of it.
17:45:48 Q. Anything else you recall about the purpose of this executive coaching that you haven't already told me?
17:46:02 A. Not that -- not that I recall, but I know a good outcome that was coming out of this. When they restructured sport administrators, there was a -- there used to be co-, where everyone was equal, and then he made the recommendation to -- to have a primary and a secondary. And -- and I was very proud that his recommendation came out that -- that I would be the primary for men's basketball and working on that sport. So I was pleased with that.

Q. So when you started at ASU, were you an administrator for men's basketball?
A. Yes, sir.
Q. And you were a co-administrator?
A. Yes.
Q. And who was the other person?
A. Dawn Rogers.
Q. Okay. And did that change at some point?
A. Dawn left the athletic department, I believe, to go to Baylor at the end of the school year.
Q. Was there another co-administrator appointed?
A. Yes.
Q. Who was that?
A. There were two. There was Ken Landphere and Scottie Graham.
Q. But you remained on men's basketball?
A. Yeah, the three of us.
Q. So there was three of you?
A. Yes, sir.
Q. And then at some point, you became the sole administrator?
A. Yeah. It was after this.
Q. Okay. And then at some point, I think you said there was a -- you were the primary and somebody else was on it?

17:47:30 A. Yeah. Ken Landphere.
17:47:33 Q. I'm going back to Exhibit 69 and Bates Number --
17:48:09 A. There's no page numbers.
17:48:12 Q. Yeah, there's -- they got cut off.
17:48:14 But go to the organizational chart.
17:48:20 A. Exhibit 3?
17:48:22 Q. Exhibit 3.
17:48:23 A. The colored one? Is there a specific page?
Q. Yep.
A. Oh, okay.
17:48:26 Q. So if you go to COHEN_1095 --
17:48:30 A. Yes.
17:48:31 Q. Page through it until you get to the July 2019 organizational chart for sports administration.
17:48:40 A. Yes, sir.
17:48:41 Q. And it shows you for men's basketball, but I don't see Ken Landphere -- Oh, no, there he is. Okay. I got it.
17:48:58 So Ken, when he became -- what was his name -- What did you call the more junior --
17:49:04 A. That's funny. I don't even see Ken Landphere on here. Where is he?
17:49:07 Q. He's over to the left.
17:49:10 MR. PÉREZ: Are you on -- Which one are you on?

17:49:14 THE WITNESS: July 2019.
17:49:15 MR. McKIRGAN: Sports administration.
17:49:18 MR. PÉREZ: Sports administration.
17:49:18 THE WITNESS: Oh. I'm sorry. I'm sorry,
17:49:19 guys. Yeah, there's Ken.
17:49:20 BY MR. McKIRGAN:
17:49:20 Q. And he's shown with basketball. You see that?
17:49:23 A. I got it, yes, sir. I found it.
17:49:26 Q. So were you called the primary administrator?
17:49:29 A. For men's basketball?
17:49:31 Q. Yeah.
17:49:31 A. Yes, sir.
17:49:32 Q. And what -- what was he called? Junior
17:49:34 administrator?
17:49:34 A. No. We can't do that. I think it was secondary.
17:49:38 Q. Okay. And as secondary administrator, was --
17:49:43 he's just supposed to back you up if you were unavailable?
17:49:45 A. And vice versa. I think Ray's philosophy on that
17:49:49 that -- I don't think one person should be too close to a
17:49:55 sport and coverage and, you know, it's just -- it's a --
17:50:04 you know, more make everybody stronger.
17:50:06 Q. Okay. So having Ken Landphere being the backup
17:50:10 administrator, did you consider that to be retaliatory?
17:50:13 A. For Ken being --
17:50:15 Q. Backup basketball administrator?

17:50:17 A. For Ken?
17:50:18 Q. Yeah -- No, for you. Was that an act of
17:50:23 retaliation against you?
17:50:25 A. When Ken came on, he came on to basketball.
17:50:28 He's -- he's great. He was great to work with.
17:50:30 Q. Okay. But when that change was made to make him
17:50:33 backup administrator, did you consider that was being done
17:50:36 by Ray in retaliation for reporting on Bart Wear --
MR. PÉREZ: Objection.
BY MR. McKIRGAN:
17:50:41 Q. -- is my question --
17:50:41 MR. PÉREZ: Vague as to time.
17:50:44 BY MR. McKIRGAN:
17:50:45 Q. -- when it happened in July and August of 2019?
17:50:48 A. No, Ken was always an administrator for
17:50:51 basketball when he came on board.
17:50:55 Q. Okay. I got it. You're right.
17:50:57 A. Sorry.
17:50:57 Q. No. You corrected me which you need to do.
17:51:00 A. Hey, one time in seven hours, Bob.
17:51:02 Q. All right. So let me move on to a different
17:51:07 topic.
17:51:09 Did you receive a letter of reprimand from
17:51:11 the Pac-12, a private reprimand?
17:51:14 A. I don't know if it was private, but I did.

17:51:16 Q. And why did you receive a reprimand from the Pac-12?
17:51:21 A. There was a -- We had an incident in Utah at -- playing Utah. Utah -- the University of Utah, not the Jazz.
17:51:36 Q. And what happened?
17:51:40 A. We had multiple things happen during that.
17:51:46 Q. Okay.
17:51:47 A. Do you want me to wait?
17:51:49 Q. Yeah, go ahead. Tell me what -- what happened.
17:51:51 A. We had -- we had multiple. It was a high-intensity game, and we had a number of fouls go against us. All big men, all fouled out. And -- and I had had a conversation at halftime with Bobby Dibler, who was -- who was at the -- at the game. Bobby Dibler was the head of Pac-12 officials. And we had -- There was an official who was -- What's his name? He was a Pac-12 official that had it out for Bobby. And it was going back years from the University of Arizona game where he tossed Bobby out.
17:52:43 And anyways, long story short, I had talked to Bobby Dibler, and I said, "Hey, you know, we're going to see how this game goes." And unbeknownst, we had multiple big men getting fouled. It was -- it was one of those just crazy games. And I had talked to Bobby at --

17:53:00 at halftime. I said, "Bobby, this is -- this is the worst
17:53:03 nightmare. This is -- this is happening."
17:53:07 And he said, "Well, there's -- there's
17:53:08 nothing we can do about it."
17:53:10 And, well, long -- you know, long story
17:53:13 short, we win the game. Mickey Mitchell -- We had three
17:53:18 of our bigs foul out. We ended up -- Mickey Mitchell
17:53:24 hits two free throws at the end. We win the game. And it
17:53:29 was a great win for the program. I believe at the start
17:53:31 of that trip, we were number two or number three team in
17:53:34 the country, so -- And we had lost to Colorado. So it
17:53:36 was a big win. We didn't want to lose two.
17:53:41 And -- and we had a fan that was -- for Utah
17:53:42 that was -- that was right next -- next to our bench, and
17:53:45 he made a derogatory term to Bobby Hurley's daughter in
17:53:49 front of his -- what looked like an eight-year-old son.
17:53:53 And I took exception. And, you know, big win, et cetera.
17:54:02 And so that was it.
17:54:04 Q. Okay. So back to Exhibit 69, which is the
17:54:11 Armstrong Teasdale report, if you go to the Bates
17:54:17 Number 1109.
17:54:23 A. 1109. Yes.
17:54:32 Q. Is that the letter sent to you by the Pac-12
17:54:38 conference giving you this private reprimand?
17:54:45 A. Yes.

17:54:45 Q. Do you know why -- See at the second page of the letter, "This letter is to confirm that you've been previ- -- privately reprimanded for your actions."
17:55:02 Do you know, did Ray Anderson intercede with the Pac-12 to make sure that reprimand was private, not public?
17:55:11 A. I have no idea.
17:55:12 Q. Okay. If you go to the first page, second paragraph, it says, "We received numerous complaints about your conduct . . . ."
17:55:30 Do you see that?
17:55:30 A. Yeah. I don't know where --
17:55:36 Q. My question is, do you know who was making the complaints?
17:55:39 A. No idea. I didn't -- I didn't -- I had one five-minute conversation with -- I think it was Gloria. And that was it. I have no idea who said what.
17:55:54 Q. If you go on in that paragraph, it says, quote, You were verbally aggressive towards the fans and the officials . . . .
17:56:03 Do you see that?
17:56:03 A. Yes.
17:56:03 Q. Is that true?
17:56:05 A. I -- I did not think it. Nor was I asked about any of this incident by the Pac-12, so I don't know.

17:56:14 Q. It also goes on to say you had -- quote, you had an inappropriate and hostile interaction with an usher near the end of the game . . . .
17:56:25 A. Yeah, that was in -- in regards to what the fan said to Bobby Hurley's daughter.
17:56:32 Q. Okay. And this interaction with the usher, do you agree, was inappropriate and hostile?
17:56:40 A. I -- I would have no idea who -- who terms "inappropriate and hostile."
17:56:45 Q. Vivid Seats had a contract with ASU as the official secondary ticket market partner?
17:56:57 A. Yes.
17:56:58 MR. PÉREZ: We're moving off of this?
MR. McKIRGAN: Yeah.
BY MR. McKIRGAN:
17:57:03 Q. And that contract, I believe, started in 2015. Does that start -- sound about right?
17:57:06 A. I don't know. I didn't oversee sponsorships.
17:57:09 Q. You went on the Vivid board at some point?
17:57:13 A. I was interviewed and -- and asked to be on the board.
17:57:16 Q. And did you go on the board?
17:57:17 A. For a period of time.
Q. And --
17:57:21 A. Six months.

17:57:21 Q. Did you receive a $20,000 payment?
17:57:24 A. Yes, sir.
(Deposition Exhibit 82 was marked for
17:57:56 identification.)
17:57:56 BY MR. McKIRGAN:
17:58:02 Q. Exhibit 82 are some documents that ABOR and ASU
17:58:10 produced.
17:58:14 But if you go to Bates Number 1030 --
17:58:18 A. Yes, sir.
17:58:19 Q. -- is that your signature on that document?
17:58:22 A. Yes.
17:58:23 Q. And this is when you became a member of the board
17:58:30 in April of 2016. Is that right?
17:58:32 A. Yes, sir.
17:58:33 Q. And at the top, it says, "Vivid Seats will
17:58:42 compensate each Member twenty-thousand -- twenty-thousand
17:58:45 dollars in one lump-sum payment following 12 months of
17:58:48 Advisory Board service."
17:58:52 See that?
17:58:52 A. Yes, sir.
17:58:52 Q. Okay. So the 20,000 that was paid to you, was
17:58:56 that in -- a year later, April 2017?
17:59:02 A. I can't remember, but I can assume.
17:59:05 Q. Okay. Now, what did you do with that $20,000
17:59:09 payment?

17:59:10 A. Donated it to the Sun Devil Club general scholarship fund.
17:59:16 Q. And why did you do that?
17:59:17 A. Well, I was -- I was told that we couldn't receive money to be on a board as a member of the athletic department.
17:59:26 Q. Who told you that?
17:59:27 A. Ray.
17:59:27 Q. And how did Ray find out about it?
17:59:32 A. I don't know.
17:59:32 Q. Was there an investigation that was done into this by the general counsel's office?
17:59:38 A. There was an investigation involving Rose Bowl seats that -- but this -- this must have came out of it. I didn't hide this relationship.
17:59:48 Q. Did you know that it was -- violated policy -- ASU policy to sit on a board of a vendor?
18:00:01 A. No, I did not know that.
18:00:02 Q. Okay. Did you come to learn that later?
18:00:04 A. Yes. Yes.
18:00:05 Q. Did you think it was appropriate to sit on the board of a vendor?
18:00:16 A. Yeah, I -- I didn't have any issues. The Vivid Seats people reported to the sponsorship group, which was, you know, through the Pac-12. And that group had -- I had

18:00:28 no oversight within their account or anything. I was
18:00:35 just -- As an industry guy, I was asked to be on the
18:00:38 board.
18:00:39 Q. The text messages that you produced in this case,
18:01:00 what phone number is associated with those text messages?
18:01:03 A. 404-606-2530. It's the only text -- it's the
18:01:11 only cell phone I have.
18:01:12 Q. Give me that number again.
18:01:13 A. 404-606-2530.
18:01:17 Q. Okay. Was that a ASU phone -- ASU-issued phone?
18:01:23 A. No.
18:01:25 Q. Personal phone?
18:01:25 A. Personal phone, yes.
18:01:26 Q. Okay. Did you have an ASU-issued phone?
18:01:28 A. I think when we started, we were given an ASU
18:01:32 phone. But if we turned it back in, we got a stipend of a
18:01:36 hundred bucks a month for using our own phone.
18:01:37 Q. Did you turn your phone back in?
18:01:39 A. Yeah.
18:01:39 Q. When did you do that?
18:01:41 A. Immediately. I didn't need two phones.
18:01:43 Q. Okay. Do you know the number 480-247-0135?
18:01:49 A. No.
18:01:49 Q. Okay. Did you have an office number?
18:01:54 A. I believe I -- Yeah, I did have an office phone

18:01:59 in my office, but I can't tell you -- I mean, I couldn't
18:02:02 remember what that number was.
Q. Okay.
18:02:05 A. You'd have to look at an old business card.
18:02:07 Q. 480-727-0104 ring any bells?
18:02:13 A. I don't, Bob. I'm sorry.
18:02:15 Q. Okay. So in 2019, it's your testimony you
18:02:22 only -- you only had one cell phone?
18:02:23 A. Yes, sir.
18:02:24 Q. All right. And you only texted from one cell
18:02:26 phone?
18:02:26 A. Yes.
18:02:43 MR. McKIRGAN: All right. I'm going to --
18:02:44 I'm going to reserve for the Falcon stuff.
18:02:47 MR. PÉREZ: Okay. We should put that on the
18:02:50 record. So you're reserving -- your reservation is
18:02:53 limited to the Falcon stuff, correct? Or are you
18:02:55 reserving for --
18:02:55 MR. McKIRGAN: Give me two minutes, then, to
18:02:57 look through my notes.
18:02:59 MR. PÉREZ: Yeah, no. Absolutely. If you
18:03:00 want, we can go off the record.
18:03:01 MR. McKIRGAN: Let's go off the record.
MR. PÉREZ: Yeah.
18:03:03 MR. McKIRGAN: I want to make sure I covered

18:03:06 everything.
18:03:06 THE VIDEOGRAPHER: Off the record at
18:03:08 6:03 p.m.
18:08:37 (A recess ensued.)
18:08:37 THE VIDEOGRAPHER: Back on the record at
18:08:39 6:08 p.m.
18:08:40 BY MR. McKIRGAN:
18:08:43 Q. One of the things that are in your complaint,
18:08:46 paragraph 60, that you listed as an adverse employment
18:08:48 action was that you were demoted. Used the word
18:08:53 "demoted." How were you demoted?
18:08:55 A. Well, reporting to Frank. We had the same title,
18:09:02 so I was moved a step down.
18:09:03 Q. Well, did your title change?
18:09:08 A. No.
18:09:10 Q. And your salary went up?
18:09:13 A. Correct.
18:09:14 Q. And you still had a direct-line report to Ray on
18:09:19 men's basketball, right?
18:09:21 A. Correct.
18:09:21 Q. So when you say "demoted," you're really talking
18:09:25 about this reporting to Frank on ticketing?
18:09:28 A. Yes, sir.
18:09:29 Q. Okay. But that reporting to Frank on ticketing
18:09:33 did not involve a title change or a salary reduction. Is

that right?
18:09:37 A. No, it did not.
18:09:38 Q. Okay. Now, early in the case, we filed a motion to dismiss. In a response to the motion to dismiss -- I could show it to you -- your counsel wrote, quote, Mr. Cohen did as defendants trained him to do. And in March 2019, he reported the sexual harassment to his supervisor, Defendant -- Defendant Raymond Anderson, the head of ASU's athletics department, close quote.
18:10:13 All right. So is that a true statement?
18:10:15 A. I didn't see the date. What was the date? I -- I don't know about --
18:10:19 Q. Let me just show it to you.
A. Okay.
18:10:21 Q. And then it would be easier.
(Deposition Exhibit 83 was marked for
18:10:36 identification.)
18:10:36 BY MR. McKIRGAN:
18:10:38 Q. Exhibit 83 is Plaintiff's Opposition to Motion to Dismiss, filed on October 18, 2021.
18:10:49 And the very first paragraph on page 1 reads, quote, Plaintiff David Cohen did exactly what Defendants Arizona State University, Arizona Board of Regents, and Raymond Anderson trained him to do, and Defendants fired him for it.

18:11:13 Is that a true statement?
18:11:14 A. Yes, sir.
18:11:15 Q. So when you went to Ray in March and when you went to others to seek something happening on the Bart Wear sexual harassment, you were doing that because that's what you were trained to do?
18:11:34 A. No. I -- I never said I went to them as an official reporting. I -- I went for them to -- as friendship and to hopefully provide some influence.
18:11:48 Q. So Mr. Nelson, you brought him in because he was involved with boosters?
18:11:58 A. Correct. Because Bart was a donor.
18:12:00 Q. Right. And so that was pursuant to what you thought you should do as an employee of ASU?
18:12:06 A. Correct.
18:12:06 Q. Mr. Shangraw, did you go to him as a friend?
18:12:11 A. I went to him as -- so he could provide some influence. He was in charge. He -- Scott reported to him. That was his boss.
18:12:21 Q. And you did that because you were an employee at ASU and thought something needed to be done?
18:12:31 A. Yes. And he provided oversight over the donors.
18:12:34 Q. Okay. Jay Heiler, did you go to him as a friend or --
18:12:37 A. More as a friend.

18:12:38 Q. Okay. Jean Boyd?
18:12:41 A. Provide influence as a -- as the deputy AD.
18:12:44 Q. Again, because as an ASU employee, you thought
18:12:49 something needed to be done about Bart Wear?
18:12:51 A. I was hoping that something would get done.
18:12:53 Q. Okay. And the others, Bobby Hurley, that was
18:13:02 because you're the basketball administrator and thought he
18:13:06 needed -- needed to know?
18:13:07 A. Well, his wife was involved.
18:13:08 Q. And his wife -- So that was personal?
18:13:11 A. Well, we spoke about it because it involved our
18:13:13 wives and the basketball program.
18:13:15 Q. Okay. So part -- it was part personal?
18:13:17 A. It involved one of his assistants, much like
18:13:21 Rashon Burno.
18:13:22 Q. All right. Partly personal?
18:13:24 A. No. That was -- it's business. Involves the --
18:13:27 the basketball program --
18:13:29 Q. Okay.
18:13:30 A. -- the woman -- the wife of one of his
18:13:33 assistants.
18:13:34 Q. And so you did that because that's what you
18:13:35 thought you should do as the administrator for basketball?
18:13:39 A. Correct. That was the right thing to do.
18:13:41 Q. Jim Rund, as friend or --

18:13:49 A. That was -- he had -- he had oversight -- semi-oversight over athletics. He's currently the athletic director. And thought he could provide some influence as well.

18:13:59 Q. So you went to him because you thought that's what you should do as an ASU employee?

18:14:04 A. Last resort, yes.

18:14:05 Q. And then Amy Schramm, friend?

18:14:17 A. No. She's the -- she was the HR woman. That had nothing to do with this case. Again, she doesn't know any of the details --

Q. Okay.

18:14:23 A. -- that I told her.

18:14:26 Q. And it was Ray Anderson that fired you, right?

18:14:33 A. Yes, sir.

18:14:38 MR. McKIRGAN: Okay. All right. So I -- I'm going to reserve the rest of my time, but I don't think it needs to be limited to the Falcons. I've still got 15 minutes left, but if I use it now, I won't have any time for the Falcons, so I'm just going to reserve 15 minutes.

MR. PÉREZ: No.

18:14:55 MR. McKIRGAN: If we do -- if I do get to --

18:14:56 MR. PÉREZ: I don't think you have 15 minutes, but yeah, you can reserve --

18:15:00 MR. McKIRGAN: Whatever. Whatever.

MR. PEREZ: Sure.

18:15:01 MR. McKIRGAN: And if I do get to ask about
18:15:03 the Falcons, it probably will take up whatever time I have
18:15:07 left. So -- but I don't want to be agreeing that we're
18:15:12 only doing it on the Falcons. I've got whatever minutes
18:15:15 left I have.

18:15:16 MR. PÉREZ: Well, he's here and he's
18:15:17 available to be deposed. I guess my concern is -- That's
18:15:20 fine. My concern, though, is dragging him all the way
18:15:23 back for a 10-minute deposition, so . . .

18:15:27 MR. McKIRGAN: Yeah. Well, if -- We'll
18:15:28 figure out something. We can do it either by Zoom or when
18:15:31 he's here for something else.

18:15:34 THE WITNESS: I'm not coming here.

18:15:36 MR. McKIRGAN: I do want to get to the
18:15:37 bottom of the Falcons thing first.

18:15:39 MR. PÉREZ: Okay.

18:15:41 MR. McKIRGAN: Okay. So I think -- I think
18:15:42 we're done for the day.

18:15:44 THE VIDEOGRAPHER: Anything else for the
18:15:45 record before I close out the video?

18:15:49 This will mark the end of Video Number 1.
18:15:52 This deposition has concluded. Testimony for today has
18:15:55 come to an end. We are off the record at 6:16 p.m.

(The deposition was concluded at 6:16 p.m.)

(Signature was not requested at this time.)

__________________________________

DAVID COHEN

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Certified Reporter of the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony had and adduced upon the taking of said deposition, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 18th day of April, 2024.

Meri Coash, RMR, CRR
Certified Reporter #50327

## Exhibits

**Cohen Exhibit 053** 2:10 10:9,10,20

**Cohen Exhibit 054** 2:11 28:3

**Cohen Exhibit 055** 2:13 19:18 38:1 55:23 70:9 83:16 87:1 88:7 90:9 95:4 96:8 97:7

**Cohen Exhibit 056** 2:15 23:9,12,22 27:19 37:11,22 58:15

**Cohen Exhibit 057** 2:18 31:18,21

**Cohen Exhibit 058** 2:20 32:20,23

**Cohen Exhibit 059** 2:22 59:1,4 63:17 64:10 65:1

**Cohen Exhibit 060** 2:24 61:13,16 106:8

**Cohen Exhibit 061** 3:1 63:20,23

**Cohen Exhibit 062** 3:2 109:15

**Cohen Exhibit 063** 3:4 111:1

**Cohen Exhibit 064** 3:5 112:7,16 151:4 153:15 202:13,18 212:20 250:7

**Cohen Exhibit 065** 3:6 114:14,17 198:23 199:1

**Cohen Exhibit 066** 3:8 123:6,9

**Cohen Exhibit 067** 3:10 135:12,15

**Cohen Exhibit 068** 3:12 174:6,9,21

**Cohen Exhibit 069** 3:15 178:13,16 188:24 263:2 267:19

**Cohen Exhibit 070** 3:18 180:21,24

**Cohen Exhibit 071** 3:21 192:19,22 193:2

**Cohen Exhibit 072** 3:22 194:19,22 202:7

**Cohen Exhibit 074** 4:1 232:20,23 243:24 244:1

**Cohen Exhibit 075** 4:4 235:25 236:3 248:14,20

**Cohen Exhibit 076** 4:5 238:13,16,19

**Cohen Exhibit 077** 4:7 239:22,25

**Cohen Exhibit 078** 4:9 240:24 241:2

**Cohen Exhibit 079** 4:11 248:25 249:3

**Cohen Exhibit 080** 4:12 253:20,23 254:17

**Cohen Exhibit 081** 4:13 259:5,8

**Cohen Exhibit 082** 4:15 270:3,6

**Cohen Exhibit 083** 4:19 275:16,19

## $

**$10,000** 52:10 56:8

**$100,000** 25:25 28:11 30:15 32:11 33:4 36:24

**$111,900** 66:24 67:12

**$116,000** 59:14

**$131,923** 59:20

**$175,000** 25:19 37:16 56:11

**$191,228** 28:24

**$196,220** 61:1 64:11

**$20,000** 270:1,24

**$211,846** 64:5

**$39,375.00** 62:2

**$477,000** 69:20

**$477,614** 65:2

**$5,000** 35:22

**$75,000** 32:16,25

**$80,000** 33:24 34:2

**$85,000** 30:7 32:4

**$95,000** 29:3

## 0

**000029** 59:9

## 1

**1** 8:5 55:23 115:7 167:17 177:24 180:11 199:3 275:21 279:23

**10** 37:4,12 73:11 114:8 127:6 146:20,21

**10,000** 59:21

**10-minute** 279:11

**100,000** 31:3 33:15

**1030** 270:8

**1099** 59:25

**10:34** 135:18

**10:46** 58:2

**11** 188:24 199:7,14

**1109** 267:21,22

**1121** 188:24

**11:00** 115:11

**11:03** 58:5

**11:40** 81:16

**11:44** 81:19

**11th** 111:5

**12** 33:21 127:6 175:17 236:21 248:23 249:7 270:17

**12-14** 49:4

**1272** 180:12

**12:08** 98:25

**12:45** 99:4

**12th** 174:18 205:23 206:16,18 210:25 215:10, 20 218:18 219:11,19 220:10,21 221:5

**13** 70:1 162:4 217:11

**132,000** 59:18

**135,000** 63:16

**13th** 116:23 173:22 181:8, 11 182:2 183:9 184:16 187:9,17 189:22 220:10 221:23 222:2,5

**14** 38:4 51:9 74:12,13 86:1 88:7 113:7,8 114:10 119:7 121:22 156:10

**14th** 121:12,15 125:18 126:2,6 128:24 135:18 138:25 139:3 141:8 144:17 150:3 152:16 217:16,20 218:1 220:10 221:23 222:7 233:1 237:12

**15** 56:1 61:24 73:11 87:19 88:7 103:11 106:20 114:8 146:9 152:2 200:19 213:7 217:11 248:5 278:19,21, 25

**150,000** 16:19

**15th** 73:16 81:2 84:25 85:8,11 93:19 95:21 103:9,19 133:18 134:17 153:3 217:14 223:3,5 226:10 227:7,25 230:10, 13 231:10,23 238:22 242:25

**16430** 8:17

**16th** 192:15

**17** 36:4 114:24 190:20 241:5

**170-** 65:8

**175** 16:19 52:20

**175,000** 28:10 52:8 67:9

**17th** 124:21 125:12

**18** 33:1 36:4 212:19 275:20

**180-** 65:8

**180-ish** 65:8

**1802** 8:13

**185** 49:7 51:2

**185,000** 49:10 69:16

**185-** 65:6

**18th** 106:12

**19** 56:2 189:13 190:7,25 227:12

**1992** 10:24 11:18

**19th** 109:24 189:25 191:6, 17 193:2

**2**

**2** 37:3,22 54:9 56:15 97:7 152:6 160:2 194:25 196:10,18 197:23 198:3 199:2,9

**2.4** 179:16

**20** 49:5 125:10 146:9 163:16 239:25 240:21

**20,000** 270:21

**20-** 61:9

**20.5** 178:1 180:14,15,18

**20.7** 178:1 180:14

**2000** 40:15 47:4

**2012** 15:13,17

**2013** 14:14,25 15:2,11,17

**2014** 17:13 23:12 25:3 37:4,11,12 58:11

**2015** 29:16,18,19 36:3,19 269:16

**2016** 30:7,14,21 31:3,23 32:7,11 34:17 35:21 36:4, 19 259:18 270:13

**2017** 32:13,24 33:1,5 34:17 36:21 97:10,18 100:19 114:24 115:7 116:2 199:3 200:13 252:24 253:4,17 270:22

**2017-2018** 253:14

**2018** 33:18,22,23 34:17 36:21 116:23 123:21 178:6 252:25 253:4,17

**2018-2019** 179:10

**2019** 17:14 20:8 28:23 36:18,19 38:21 40:15 41:7 44:14 45:3 47:4,20 48:13 51:25 52:3,4 73:16 87:19 97:15 103:9,11,13 104:22 106:20 109:6 113:7 114:10 119:7 120:12 121:22 123:9 125:10 150:25 151:4 156:11 159:21 174:13 176:4 179:13,23 180:3 184:9 188:14 193:2 194:17 206:19 235:12 238:22,24 242:25 243:21 244:15,25 245:18 246:2,22 254:4 255:3,13 263:13 264:1 265:14 273:7 275:7

**2020** 17:19 18:1 40:15 41:7 44:14 45:3 47:4,20 48:13 52:7,15,17 56:4,10 59:12 60:15,21,22 61:5 62:1 106:21,23 107:1,6 109:21 233:2 239:17,20, 25 240:21 249:19

**2021** 48:13 60:2,23,24 63:19,24 105:25 106:1,12, 16 111:5 236:21 248:23 249:7,19 275:20

**2022** 48:13 64:25 65:9 66:18 105:23 106:10 241:3,5,24

**2023** 50:21,23 51:6 66:21, 24 67:14,23,25 68:15,18 112:25

**2024** 8:10 49:1,5,20 69:3

**20th** 125:6 162:13 163:2 166:2,7

**21** 123:9 163:17 166:11

**212,000** 64:12

**22** 31:23 67:25 90:15 141:25 142:5

**22nd** 156:13 158:14

**23** 68:3,4 142:1 143:12

**23rd** 236:5

**24** 21:4,7

**24th** 181:6 182:5,20,24 203:16,19 204:6 205:16

**25** 33:22 106:10 120:11,12 138:25 139:3 141:2 144:18 145:15 167:13 243:20

**25,000** 61:10

**25th** 121:3 137:15,19 141:9 151:11 230:7

**26** 161:24

**26th** 58:12,13

**275-** 16:12

**27th** 181:3 182:6,12

**28** 23:12 37:11

**285** 69:21

**28th** 27:20

**290** 8:17

**2:19** 152:9

**2:21-cv-01178-phx-gms** 8:9

**2nd** 198:11 202:10 208:8

**3**

**3** 28:3 38:3 54:9 57:2 62:7 67:7 186:21 244:11 263:6, 7

**30** 64:11

**31** 32:24 66:23

**32** 65:1 68:15

**325-** 16:12

**365** 116:20

**366** 117:6

**37** 120:5 122:10,24

**377** 124:4

**38** 153:14

**39** 155:3

**3:37** 201:1

**3:53** 201:4

**3rd** 8:10 158:7,9 159:23

**4**

**4** 28:7 38:11 51:10 55:23 70:10,11 74:7 83:17 87:1 199:12,14 200:13

**4-25** 106:5

**40** 156:13

**401(k)** 53:6,13,14 54:5 57:12,18

**404-606-2530** 272:6,9

**41** 161:24

**42** 162:4

**43** 165:15

**44** 166:21 217:1

**447,000** 68:14

**455** 50:25

**46** 167:17

**47** 168:2 169:18

**477,614** 68:14

**48,515** 253:1

**480-247-0135** 272:22

**480-727-0104** 273:5

**49** 202:14,17,19 203:22

**4th** 199:8 205:12

**5**

**5** 51:10 61:23 62:7 70:12 179:5

**5,000** 29:10 196:12

**5-** 29:14 183:6 184:6

**50** 23:7 52:22 204:1

**51** 123:14

**51,380** 252:25

**53** 10:9,10,20 18:24

**54** 18:20 19:2,5,7 28:3 112:10

**55** 19:1,2,5,18 38:1,2 49:7, 9 55:23 69:10,12,14,16 70:9 83:16 87:1 88:7 90:9

95:4 96:8 97:7 112:10

**56** 23:8,9,12,22 27:19 37:11,22 58:15

**57** 31:18,21

**58** 32:20,23

**5899** 236:6,7

**59** 59:1,4 63:17 64:10 65:1

**5900** 236:22 248:21

**5901** 237:9

**5:08** 248:9

**5:22** 248:12

**5th** 119:2 202:14,15,21 204:5,19,24 205:3,11 208:14

**6**

**6** 124:11 136:12 250:19

**60** 61:13,16 106:8 174:2 250:8 274:9

**61** 63:20,23

**62** 109:15

**63** 111:1 252:3

**64** 112:7,16 151:4 153:15 202:13,16,18 212:20 243:25 250:7

**65** 56:16 114:14,17 190:20 198:23 199:1

**66** 123:6,9 205:22

**67** 135:12,15

**68** 174:6,9,21 212:19 214:14 244:6

**69** 178:13,16 188:24 216:8 244:3 263:2 267:19

**6:03** 274:3

**6:08** 274:6

**6:16** 279:25

**7**

**7** 90:8

**70** 180:21,24 244:6

**71** 192:19,22 193:2 227:12

**72** 194:19,22 202:7

**73** 200:3,7,8

**74** 232:20,23 243:24 244:1

**75** 235:25 236:3 248:14,20

**75,000** 29:12 33:15 36:22

**76** 238:13,16,19

**77** 239:22,25

**78** 240:24 241:2

**79** 248:25 249:3

**7th** 168:2,9,24

**8**

**8** 32:6 95:4 114:24 120:8,9 151:3 218:12

**80** 253:20,23 254:17

**80,000** 36:22

**81** 259:5,8

**82** 270:3,6

**83** 275:16,19

**85,000** 30:21 31:3

**85006** 8:14

**8:47** 193:3

**9**

**9** 238:22

**90-** 229:23

**93** 200:6

**95,000** 29:16

**9:00** 199:11

**9:31** 8:4

**A**

**A-HOLE** 242:5

**a.m.** 8:4 58:2,5 81:16,19 115:11 199:7,11,14 218:12

**abide** 154:10

**ability** 69:25

**ABOR** 270:6

**ABOR's** 19:8

**ABOR-** 244:12

**ABOR.COHEN001095** 244:12

**ABOR.COHEN001106** 179:3

**Absolutely** 98:20 215:13 216:20 218:22 221:8,13 273:21

**AC** 89:5

**academic** 178:6 179:10,12

**accept** 101:10 215:16 218:21 219:21 220:8,11,24 221:6,20

**accompanied** 82:10,16 101:9

**accompany** 83:12

**accomplish** 191:22 192:2 223:15

**account** 57:14 272:1

**accounted** 55:10

**accounting** 64:1

**accuracy** 19:20

**accurate** 11:2 62:4,5 65:19 112:21 251:18

**achieve** 100:13

**achieved** 177:25 180:13

**acknowledge** 216:15

**acknowledged** 24:12 27:7 214:15 216:8,9,25

**acknowledging** 23:17

**acquired** 17:22 63:8

**acquiring** 11:10

**act** 265:2

**action** 231:5 274:10

**actions** 268:3

**active** 107:14

**activities** 25:8,14

**acts** 251:4 255:22

**actual** 55:1 165:11

**AD** 101:21,22 102:7 109:25 156:22 216:2 260:20 277:2

**AD's** 111:9

**adapt** 181:24

**add** 68:8 89:23 99:7 198:15 221:3

**added** 175:21

**addition** 46:6

**address** 20:2 23:19 200:10

**addressed** 23:13 231:8

**administer** 22:13 245:23

**administrating** 116:11

**administration** 244:18,19,23 245:14 246:3,13,18,19 247:3 263:14 264:2,3

**administrative** 103:12 104:3,7,9 245:1 246:2 247:2

**administrator** 21:19 116:3 184:17,24 186:23,24,25 196:14 201:7 245:5,24 262:2,21 264:9,14,16,23,25 265:7,15 277:7,23

**administrators** 201:20,22 261:19

**admits** 91:18

**advance** 77:19,22

**adverse** 274:9

**adversity** 257:18

**advice** 41:1

**Advisory** 270:18

**affiliated** 11:12 12:11 15:2 230:23

**Affinity** 219:3

**afternoon** 214:11,12

**age** 53:13 56:16

**agencies** 89:14,15

**agents** 40:5

**aggressive** 268:19

**agree** 182:16,18 204:6 254:25 269:7

**agreed** 26:3 34:7,11 35:21 124:18 167:1,11 177:25 179:20 180:13 182:20,23

**agreeing** 279:5

**agreement** 191:10

**ahead** 75:5 122:18 266:10

**aisle** 126:19,24 129:7,16 131:20 147:5,6

**alcohol** 120:13

**all-day** 217:17

**allegation** 120:10,23 187:18,20

**allegations** 162:14 231:23

**allege** 151:4 153:16 154:22 155:16 157:3,9 165:15 169:15 170:11 187:16 202:14 203:16 214:14 250:10 251:4 256:15

**alleged** 90:11,12 97:19 120:21 155:3 171:18

**allegedly** 209:18

**alleging** 163:16 173:6

**allowed** 76:20 161:25 178:20

**alongside** 75:24

**ambivalent** 218:7

**amended** 27:7 112:1,16 120:5

**America** 17:21,25 51:5 52:6,25 54:16 56:6 61:6 64:8

**amount** 34:20 35:8 36:5, 24 53:8 56:5 62:2 65:9 68:17 73:15 74:25 184:13 188:15 189:14

**Amy** 23:1 75:21 76:8,16 81:6 212:17 218:3,5 224:16 225:10,12,15,17 226:1,2,4,5,19 278:8

**analyzed** 16:13

**and/or** 24:8,14

**Anderson** 8:23 17:2 20:20 21:14 22:1 29:23 30:10,15,17,20 31:2 32:1, 10,23 33:4,23 34:1 35:6 36:23 37:5 58:21 85:1 86:15,21 91:18,23 93:2,4, 15 94:25 96:3,8,16,20 97:1 120:10 138:24 139:6, 23 142:4 146:1 149:15,19 150:11,13 151:13,14,19, 22 152:19 153:16,23 159:24 161:15 162:4 166:12,15,22 167:6,11,13 169:16,21 170:11,17,20, 23 171:2,11,14,18,20 173:3 174:9 181:5 182:4 183:14,21,24 184:22 185:4,17 186:3 189:7,20 194:23,25 202:11,15 203:4,13,17,23 204:5 205:24 206:19 207:3 211:2,3 212:14 220:11 221:5,24 230:17,21 242:14 243:1,8,17,20 246:19 251:10 255:16 260:23 268:4 275:8,24 278:14

**Anderson's** 20:19 34:20 35:8 95:5 96:13 145:17 189:15

**anger** 165:16,19 191:16

**angry** 191:5,8

**anguish** 70:14 74:8

**Anita** 8:25

**annual** 25:24 30:13 189:4,5

**answers** 19:15 74:7 83:16 163:22

**anymore** 87:5 257:6

**Anytime** 200:24

**apologetic** 166:4

**apologize** 195:7,19

**apologizing** 195:14

**apparently** 128:18 137:7 249:16

**appears** 23:13 63:23 125:6 240:19 259:14

**applicable** 189:10

**application** 87:14

**apply** 88:2

**appointed** 262:11

**approach** 177:5,7 261:8

**April** 8:10 28:17 87:22 105:23 106:10 111:4 150:25 151:4 156:13 158:14 159:21 206:15 270:13,22

**Area** 119:25

**areas** 78:23

**arena** 126:13

**argue** 165:9

**argumentative** 98:2 116:16 228:14

**Arizona** 8:6,8,14,17 16:25 22:3 28:7 41:11 42:20 45:7 46:13,14,21 47:11 55:2,4 63:4 71:6 80:7 84:9,19 87:16 90:3, 23 91:4 96:4 97:1,10 101:17 119:25 128:19 202:11 204:5 224:8 233:3 253:8 256:4 266:19 275:23

**arm** 131:5

**arms** 260:22

**Arms-** 178:16

**Armstrong** 178:16 188:23 204:18 244:2 256:19 267:20

**arrange** 119:7

**arranged** 119:16

**arrangements** 225:21

**article** 239:21 240:1,15, 16 249:16

**arts** 12:6

**asks** 115:7

**aspirations** 85:20

**Aspire** 13:4,8 14:3,6,8

**ass** 136:10

**assault** 153:18 154:23 155:4 156:14 157:10 162:14

**assaults** 151:5 155:4 168:5

**asserting** 155:24 157:12 167:5,11

**assessment** 257:9

**asshole** 242:8

**assignments** 85:4 129:6

**assistant** 162:11 174:17 182:7 195:5

**assistants** 277:14,21

**associate** 21:17 24:3 29:11 30:2 35:16 37:14 100:17 145:8,9 214:2

**associates** 39:8 85:22 102:9

**Association** 11:22 41:19 99:13,17

**assume** 22:10 49:21 59:22 80:7 94:23 127:18 148:5 150:24 165:5 168:20 270:23

**assumed** 193:19

**asterisk** 179:19

**ASU** 17:6,13,17 20:9,18 21:9 23:14,23 28:20 29:6, 8 38:21 43:3,16 46:20 53:9,16,18 54:19 55:11,17 56:2 57:12,18 58:22 63:3 72:19 77:6 80:15,19 86:16 97:2 98:12 101:20,24 102:1,5,14 103:15 104:16 108:13,16 114:4,6 120:12, 16,21,22 121:25 122:10, 12,25 123:2 125:22 126:7 133:16 145:24 153:19

154:24 155:1 167:9 169:3 176:23 199:13 201:6,19 224:15 225:5 230:23,24 231:22 233:6 234:11 235:18 238:23 241:21 243:22 251:10 252:16,20 256:8 262:1 269:10 270:6 271:17 272:10,15 276:14, 21 277:3 278:6

**ASU's** 8:24 87:9 168:20 275:9

**ASU-ISSUED** 272:10,14

**ASU-UCLA** 159:23

**athlete** 216:3

**athletes** 72:25

**athletic** 26:18,24 34:13 35:4 37:14 85:20,22 86:5, 12 100:11,19 101:19,25 157:2 159:7 160:19 177:7, 16 188:17 189:10 191:25 214:4,6 216:6 223:20 241:14 248:1 257:10 261:6,9 262:9 271:5 278:3

**athletics** 13:12 39:18 90:19 97:9 98:1,4 103:5 145:24 178:2,4 189:6 199:13 214:3 275:9 278:2

**Atlanta** 10:14 14:12 17:8 20:4 91:19

**attaches** 174:13

**attainable** 26:14

**attainment** 26:2

**attend** 115:20 161:18,25 162:1

**attendance** 180:1,2 216:6 252:12,21,25 253:3 254:8,19

**attended** 9:15

**attends** 160:14

**attention** 261:12

**attitude** 181:23

**attorney** 164:6,12,13,17 165:6 232:17 233:22 234:5 236:20

**attorney-client** 163:7

**August** 33:1 51:19,23,25 56:1 73:16 80:23 81:3,4 84:20,25 85:8,11 87:19 93:19,22 95:20,21 97:15 103:9,11,19 106:20 109:6, 18,24 123:9 167:25 198:1 205:19,23 206:16,18 210:25 215:10,20 217:11, 20 218:18 219:11,19 220:10 221:5,23 222:2,5,7 223:3 226:10 227:7 230:10,13 231:10,23 238:22 242:25 254:3 255:3 265:14

**Automobile** 57:8

**average** 73:20

**avoid** 9:19

**await** 149:15

**aware** 14:4 37:23 45:1 108:4 114:10 120:12,16, 21,24,25 121:1,11,12,23 122:11,12,25 123:2 128:20 146:22 155:17 156:7,10 231:12

**awful** 71:10

**awhile** 48:18

**azcentral** 240:1,8

**B**

**B-E-A-D-L-E-S** 92:10

**Bachelor** 12:6

**back** 14:11 15:6 17:8 20:18 21:7 25:2 27:2,3 29:10 30:2 33:10 34:11 35:16,22 36:8 51:7,9,12 55:24 58:4,10 59:10 60:11,21 63:17 70:6 76:14,17,20 77:3,7,15 79:14 81:18,22 83:13,16 85:15,17 87:1 90:6 92:20 97:7 98:1,7 99:3 103:23 104:16 105:18,19 106:7 107:3 110:1,7,12 117:9 119:24 123:25 124:3 125:3 137:3 138:14,19 141:17,18,22 142:25 143:2,3,5 145:8 147:14 149:15,19 152:14 153:2 158:14 162:9 163:1 168:15 177:22 179:4 188:5 190:5 191:15 195:22 196:12 199:1 201:3 202:19 203:7,17,19 206:22 208:3 209:17 210:25 215:7 216:22 218:6 223:21 224:6 225:22 227:16 230:5 243:24 244:8 248:11 263:2 264:17 266:18 267:19 272:16,18 274:5 279:11

**background** 40:13 44:19 100:14

**backup** 264:22,25 265:7

**backwards** 66:22

**bad** 198:22 229:15

**balancing** 199:25

**Ball** 160:13 161:18,20,25

**band** 245:3,4,5,11 246:4, 5,13

**band's** 245:10

**Band/spirit** 245:1

**banter** 210:23

**bantering** 210:22 254:22

**Bart** 85:5 104:10 113:7 114:18,19 121:17 122:1 123:21 124:21 125:3,17, 23 126:17 128:10,23 129:7,10,15,21 130:25 131:2,20 134:5,23 135:7, 9,19 136:16 137:4 138:11 140:5 142:18,24 143:13, 15,22 144:21 145:21 146:20,25 147:6,15,22,25 149:25 150:2,14 151:9 153:4,25 154:9 155:4,17, 23 156:2 157:23 158:16 160:6,13 162:15 166:8 167:7,21 169:2,6,10 171:2,11,15 172:14 189:23 198:14 199:3 204:7 205:3,16 208:24 210:1 213:8,10 217:7,19 230:6,14 231:8,23 232:7 243:21,22 251:11 255:18 265:8 276:4,12 277:4

**Bart's** 136:20 140:15

147:5 156:5

**base** 16:10,16 18:14 22:11 28:11 49:7,8 51:2 52:20,22 65:4,20,22 66:1 67:5 69:10,11,12,14 161:6

**baseball** 11:25 12:10 148:8,10 159:23 160:1 235:18 236:8

**based** 26:2 49:13 50:2 53:13 54:9 66:5,6 69:10 100:14 251:5

**basis** 56:5 95:4 163:15

**basketball** 11:22 22:15 41:19 71:4,5 99:17 100:3 113:18 179:9 185:1 186:6, 23 187:6 196:14,15 201:9, 21 231:18 239:6 242:11, 23 245:18,19 254:19 261:24 262:2,16 263:16 264:7,10,25 265:4,16 274:19 277:7,12,18,23

**Bates** 64:4,11 65:1 66:23 68:15 116:20 123:14 124:4 179:3 180:12 188:24 236:5 248:20 263:2 267:20 270:8

**Bates-numbered** 244:12

**Bay** 119:25

**Baylor** 262:10

**Beadles** 92:3,10,21 93:23 94:14,19,21 95:3

**Beadles'** 94:1

**bear** 164:17

**beautiful** 131:21

**Beauty's** 250:16

**Becky** 83:25 84:4 223:20, 21 226:23,24 227:6,17

**beginning** 179:21 223:8

**begins** 8:4

**behalf** 8:21 9:3 40:25 44:25 46:24

**behaviors** 181:23

**beholder** 250:16

**believed** 101:16

**Bella** 9:1

**bells** 273:5

**belongings** 76:13,17 79:15 224:17 225:9,11

**Ben** 129:18,21 130:14 146:23 231:11

**Ben's** 137:7

**bench** 126:16,18,20 156:3 267:14

**benefit** 54:5

**benefits** 52:25 53:2,3 54:3 57:3,11

**Bernie** 13:13

**Beus** 193:7,14,17

**beverage** 216:4

**big** 89:16 147:1 148:8 266:13,24 267:12,17

**bigger** 101:19,21

**biggest** 46:7 253:11

**bigs** 267:7

**bill** 55:15,19

**bio** 10:21,23 14:25 15:14

**birthday** 106:6

**bit** 51:8 68:24 72:20 73:8 146:5 158:23 185:8 206:23 246:23

**biz** 110:7

**blackball** 111:12

**Blazers** 11:16,17 12:20, 22 13:1,3,17,24 14:2,6,9

**bleachers** 161:2

**board** 8:7 90:23 97:1 193:20 211:17 233:6 265:16 269:19,21,22 270:12,18 271:5,17,22 272:3 275:23

**boarded** 141:16

**Bob** 8:21 12:12 13:7 23:4 25:6 27:22 29:1 30:8,22 32:17 33:20 34:22 35:14, 15 36:20 40:13,17 41:8 42:16 43:9 45:4 47:13 53:8 57:22 60:18 67:21 85:17 88:14 90:5 95:13 96:10 97:6 99:8 100:25 122:20 136:25 138:6 144:25 148:13 149:5 154:15 158:18 162:24 163:2,20 166:1 169:7 172:10 173:17 180:17 182:21 185:6 190:19 198:1 202:19,20 204:2,16 205:20 210:9 212:15 221:2 228:13,24 229:23 235:24 237:14 239:18 243:5 244:6 245:8 246:11 250:4 255:10 257:6 259:25 265:20 273:6

**Bobby** 90:1 108:12 130:16,22 132:12,18,19 139:13,19,22 141:11,12 143:10,11,16,20 144:5,23 152:17 227:2 231:9,11,13 242:22 266:14,15,18,20, 22,25 267:1,15 269:5 277:6

**Bobby's** 239:3

**Bocchi** 23:1

**bonus** 18:10,12,13,14,15 22:11 25:24 26:2,5,11,15, 16,19 27:7 28:11 29:3,16, 18,23 30:7,11,14,21 31:4 32:4,11,15,25 33:5,19,23 34:2,14,18,19,20 35:4,5,8, 17,18,23 36:5,18,24 37:18,24 49:7,10,12,18 51:1,4 52:21 56:13 58:23 60:22 61:5,7,24 62:1 65:9, 12,22 66:3,8 67:13 68:5 69:2,9 164:10 182:11,19, 20,23 183:5,8,12,15,19 184:2,12 186:16 187:10, 17,23 188:15 189:5,14,18 190:2,4,15 191:6 194:14 195:1,3,8,12,13 196:11,12 197:4,13 198:5 202:9 208:9 210:3 217:5 250:20 251:7

**bonus-based** 68:25

**bonuses** 29:2,12 35:3 49:20

**bookshelf** 79:7

**bookshelves** 79:2

**boosters** 276:11

**border** 147:13

**boss** 34:25 139:10 213:20 276:19

**Boston** 102:3

**bottom** 61:23 62:8 115:6 119:2 123:15 279:17

**Bowl** 271:13

**Bowman** 185:6

**box** 79:18 92:5 161:6

**boxed** 78:4,5 79:16

**boxes** 78:3 79:20

**Boy** 89:3 147:7

**Boyd** 22:25 75:21 81:6 85:13 133:17 134:4 141:6 156:13,15,17,18,20 157:3, 9,12 158:14,15,16 159:10 162:5,14 165:15,19,21 166:3,8,9,11,14 174:10 176:1,5 181:8 183:14 190:1 191:17 211:1 230:9 238:2 277:1

**Boyd's** 159:8

**Brad** 108:20 109:5 110:18

**Bradley** 109:1

**brag** 94:22

**bragged** 93:17 94:19

**bragging** 92:6

**break** 15:4 57:24 58:7,10 81:11 98:17 99:6 107:5 118:23 152:11 170:14 197:5 200:20,21 224:20 248:4

**breakfast** 223:10,17 226:24 227:16

**breasts** 131:23 147:9 148:24

**Briefly** 177:11

**bring** 72:25 85:10 132:22 239:11

**broaden** 96:25

**broke** 152:22 239:12,18, 20 240:6,20

**brokerage** 57:14

**brother** 119:12,13

**brother-in-law** 99:24 100:1

**brought** 66:7 84:23 102:20 173:20 239:9 243:19 276:10

**bucks** 272:17

**bud** 137:3

**buddy** 111:6 114:25 117:14 135:19 136:18

**budget** 124:19 178:6,8,9 179:17,18 180:6

**Buffalo** 141:25 142:5

**Buffy** 160:3 161:13

**build** 72:23

**building** 18:7 70:23 75:13 82:2,6 83:10,13,14 177:14 226:7

**buildings** 11:10 49:25

**built** 15:18,22

**bunker** 257:18,19,20 258:4

**burden** 160:21

**burned** 210:21

**Burno** 130:20 141:11 144:15,16 145:4,12 231:10,17,18 238:17 241:2,5 277:15

**business** 13:4 14:1,2,5 18:4 50:6,7,10 54:20 55:7 273:4 277:17

## C

**C-H-A-T-L-O-S** 47:2

**cabinet** 79:9,23

**cabinets** 78:16,18,25

**Cagwin** 247:6

**calendar** 58:11 168:16, 18,20,21

**call** 10:6 20:23 21:10,12, 21 22:6 72:10 77:19,22 83:21,22 84:14 92:2 95:22 105:16 110:8 127:5 149:23 171:10,11,14 191:6 218:3,5 227:10 231:22 254:22 258:22,25 263:20

**called** 9:7 13:4 20:24 84:6 87:4 89:25 93:17 150:19 205:23 218:6 225:25 226:25 227:2,3 264:9,13

**calling** 242:22

**calls** 19:25 22:6,7,18 26:7 70:18,23 74:18 75:2,14 86:7,17 97:20 116:17 122:15 163:7 173:7 182:25 196:20 199:22 202:22 206:12 209:5 218:3 233:15 234:13 256:10 258:8

**campus** 22:22 28:1 76:20 103:23 219:3

**canal** 20:25

**candidate** 41:24 103:4

**candidates** 102:21

**cap** 92:25

**capacity** 253:14

**capped** 69:14

**car** 54:10,13 57:9

**card** 273:4

**Cardinals** 90:3

**care** 22:6 170:12,21

**Career** 14:13,16,17 15:3, 8,18,19

**carefully** 19:23

**Carrie** 256:19

**case** 8:8 9:16 10:1 48:17 97:3 105:25 168:18 242:1 250:13 272:4 275:3 278:10

**cash** 61:7,8 65:23

**categories** 55:23 70:11

**Category** 55:23 56:15 57:2

**caught** 237:22

**caused** 74:9 75:8 76:19 90:11 96:20 97:3 106:18

**causing** 74:17 76:12

**cell** 238:24 239:2 272:7 273:8,10

**center** 100:16

**centering** 165:25

**CEO** 18:18

**certified** 8:12 9:8

**cetera** 15:21 156:6 192:18 267:17

**CFO** 197:22

**Chad** 39:10 47:1

**challenges** 111:24 181:21

**challenging** 12:12

**championship** 185:11

**chance** 110:6

**Chandler** 108:20 109:7, 24 110:12 111:4,5

**change** 34:7 67:6 130:16 186:6,16 200:15 210:3 217:4,6 219:21 220:8 221:6,20 246:12 247:23, 25 252:4 254:1,3 262:8 265:6 274:14,25

**changed** 17:23 65:17 69:24 85:3 196:12 218:7 247:15 250:20 251:7

**changing** 191:9,12

**charge** 92:24 129:7 215:17 219:23 252:16 276:18

**chart** 159:3 175:8 179:8 244:14,18 246:1,2 247:8 263:5,14

**charter** 138:23

**charts** 244:17

**Chatlos** 39:10 47:1,2 48:7

**Cheatham** 119:14

**check** 94:10 101:1 124:12

**checked** 181:15

**Cheers** 135:19

**chief** 213:24 254:12

**children** 61:17

**chill** 160:3

**choose** 229:14

**chose** 229:13

**chosen** 90:17

**Christina** 162:11 174:10, 16 182:7

**chronologies** 164:20

**chronology** 112:3 113:6 163:4 173:25 174:2 208:7

**circle** 85:15

**circling** 230:5

**circumstances** 19:24 42:19 45:11 104:16 105:6

**Cities** 11:23

**City** 11:23

**claim** 43:15,16 44:3 85:10 90:10 104:11 232:17 233:1,2,5,9 234:6,12 240:3 249:18

**claimed** 84:17

**claiming** 38:5

**claims** 123:20 234:9

**clairvoyant** 209:12

**clarify** 58:8 99:7 152:12

**clarity** 217:7 218:4

**class** 50:20

**clean** 60:16,17

**clear** 250:23

**client** 103:19 108:7

**client's** 118:3

**close** 64:12 69:17 117:7 120:2 133:18 136:21 140:16 193:8 195:24 237:23 264:19 275:9 279:22

**closed** 206:5

**closely** 156:25

**closing** 67:24

**closure** 107:20 169:14

**club** 54:15,17,19,22,25 55:16 57:4 62:8,12,19,24 63:4 87:3,4 161:21 271:1

**Clubb** 177:10 257:8

**co-** 261:20

**co-administrator** 262:4, 11

**co-administrators** 116:7,10

**coach** 100:3 118:19,20 139:25 145:9 169:17 186:2 235:18 236:8 260:21

**coaches** 41:19 72:22 99:17 100:3 217:17 218:25 220:15 260:15

**coaching** 80:8 139:13,14 176:23 259:15,20 260:24 261:16

**Coash** 8:11,12

**coffee** 219:7 223:11

**Cohen** 8:6 9:3,6,12 27:14 58:7 62:11 81:21 92:18 99:6 125:1 152:11 165:16 166:22,23 168:4 201:6 202:21,24 203:11 206:5 214:16 252:5 275:6,22

**COHEN_000306** 64:4

**COHEN_1095** 263:11

**cold** 89:3,5,7 160:4

**collaboration** 49:13

**colleagues** 83:18 181:21

**collecting** 135:4

**college** 11:20,21 12:3 13:11 14:20 39:18 46:7

48:20 86:13 89:10 91:1 98:1,4,7,9,10,13 100:17 102:3 110:7,13,17,22 111:13,19

**colleges** 47:9

**collegiate** 90:19

**Colorado** 267:11

**colored** 263:8

**combination** 221:1

**comfortable** 26:14

**comment** 84:23 209:1

**comments** 156:5,8 175:12 181:13 182:5,14, 18

**commission** 16:10,15,21 18:10,12 51:5 65:13,16,21 66:1,5

**commission-based** 69:1

**committee** 231:22

**common** 254:10

**communi-** 235:20

**communicate** 109:7 110:16 235:6,19

**communicated** 186:3 235:8,11,14,20

**communication** 77:2 109:12 165:12 176:14 239:4 260:14

**communications** 12:6 125:9 194:12 243:8

**community** 88:6,9,10 231:22

**commuting** 17:8

**comp** 85:4 192:17

**companies** 65:12

**company** 14:17 15:8 16:1,5 17:21,24 66:12 69:19,20

**comparable** 90:16,22

**compares** 180:19

**compensate** 70:13 270:16

**compensation** 18:9 21:23 22:7 28:5,10 49:6 57:2 59:14 65:18 68:24 191:9 196:4

**compensatory** 70:12

**compete** 72:24

**competitive** 72:23

**competitor** 50:12

**complained** 156:4

**complaining** 219:15

**complaint** 112:2,17 120:6,11 145:16 151:3 153:14 162:4,21 173:2,6 187:18 190:21 202:13 205:22 212:16,19 213:23 214:14 216:7 227:11 230:5 236:17 250:7 251:5 252:2 256:15 274:8

**complaints** 150:14 151:9,14 268:9,14

**complete** 104:22,23

**completed** 103:15

**completely** 217:23

**compliance** 108:21,22

**comprehensive** 177:6

**concentration** 185:1

**concern** 279:9,10

**concerned** 94:17

**concluded** 279:24

**conclusion** 20:1 26:8 35:10 51:17 74:19 75:3 86:8 122:16 158:3 171:19 173:8 183:1 196:21 206:13 217:7 231:4

**concur** 181:14

**conduct** 90:12 104:10 121:12,14,16,23 122:13 123:3 124:24 125:18 151:20 154:10,14 156:15 157:4,7 166:8,23 169:10 170:12,21 268:10

**conference** 267:24

**confided** 158:25

**confidential** 159:14

**confiding** 210:24

**confirm** 30:25 268:2

**confirms** 166:22

**confrontation** 171:18

**confronted** 166:12,15 169:16,20

**confused** 191:8,11 229:10

**confusion** 189:19 195:13 197:3,13 198:5 249:20 258:11

**Congrats** 124:22

**connection** 249:17

**considered** 187:3

**consistent** 68:25 189:9

**constantly** 71:13

**construction** 102:11

**consult** 194:1

**consultant** 13:17

**consulted** 164:2

**consulting** 261:4

**consumed** 120:13

**contact** 83:23

**contacted** 50:16 240:20

**contacts** 90:2 108:12

**contemplating** 208:18

**Continental** 11:22

**contingent** 25:9

**continue** 181:21 216:18

**continued** 109:7

**contract** 52:10 101:7 239:3 242:23 269:10,16

**contracts** 80:8

**contribute** 54:5

**contributed** 53:7 64:14

**contribution** 54:5

**contributions** 53:14 57:12

**control** 90:24 136:20 140:15 178:7

**conversation** 10:13 26:10,13,25 33:6,12 40:22 45:23 102:10 133:9 134:12,17,22 138:10 140:21 141:1,2 147:25 149:22 152:14 156:16 159:24 160:6 161:8,14,16 162:17,19 163:16,19 164:12 165:21,25 166:3 167:13 170:19 195:22 219:1 222:14 224:19 227:6,14,19 243:2 255:8 266:14 268:16

**conversations** 39:2 41:6 44:8 77:4 165:8 218:14 230:22 243:9

**converted** 52:19

**Cool** 117:21

**coordinator** 172:4

**copy** 10:21 19:7 61:16,21 63:23 112:16 178:16 180:24 234:11 239:21,25

**cordial** 210:12

**correct** 10:25 11:1,19 12:17 13:25 17:15 18:2 19:16,17 22:2 23:15 24:4, 5 28:9 29:15 32:5,8 34:24 37:1 49:11 53:12,23 54:22 55:18 56:3,21 57:10,20 58:8,13 59:16 62:14,25 63:10 80:16,17 81:8,9 87:8,12,18 88:4 89:24 97:14,17 99:7 101:12,23 105:7 124:14 125:8 128:6 133:14 135:2 138:12 141:14,21 142:22 149:12 150:4 151:18 152:12 165:3 171:12 175:19 179:13 184:7 187:15 193:21 194:5 206:3 227:9 245:23 247:22 273:17 274:17,20 276:12,15 277:24

**corrected** 198:1 265:19

**correctly** 16:20 40:17 45:4 149:21 153:21 164:10,12 177:13 190:15

**corrects** 124:12

**counsel** 8:18 10:3,12 18:22 38:16 60:3 77:6 94:10 118:2 123:10 151:24 163:25 164:2 178:20 193:19 200:18 275:5

**counsel's** 8:25 155:1 200:10 271:12

**counseling** 72:3 73:25

**country** 18:6 50:11 54:15,17,19,25 55:16 57:4 62:8,12,19,24 63:4 87:3,4 160:2 267:11

**couple** 18:20 59:8 235:23

**court** 8:8,10,12,20 18:21 23:8 60:11 61:20 74:4 81:10,13 89:4 122:22 185:14 188:7 200:7 204:14

**courtside** 117:18

**cover** 66:13

**coverage** 200:1 264:20

**covered** 273:25

**covers** 67:14 241:21

**COVID** 107:4

**coworkers** 70:23 72:22

**crank** 89:6

**crazy** 73:11 266:25

**credible** 123:20

**credit** 134:13 153:11

**critical** 181:23 243:7,8

**criticizing** 83:18

**Crow** 104:15 105:5 123:10 172:9 224:14,21, 23 225:1,2 254:11

**crying** 225:16

**cultivate** 50:10 200:2 216:5

**culture** 72:25 177:14 181:24 247:3 257:9

**cup** 219:7 223:11

**current** 11:3,4 48:22 57:14 92:3 194:4

**cut** 263:4

**D**

**D-** 39:5

**damage** 75:8

**damages** 38:4,9 51:10 70:13

**Dame** 253:7

**Damn** 131:21

**Daniel** 39:8 44:12 102:9, 25 107:13 110:9

**date** 8:10 23:24 25:2 51:12,13,15 52:1 55:24,25 81:3 106:8 153:11 159:25 163:19 165:10 168:13 170:10 205:5,17 275:11

**dated** 23:12 31:23 32:24 37:4 49:4 123:9 174:18 233:1 244:14

**dates** 162:20,22 163:1,4 202:20 204:8,10 205:19

**daughter** 267:15 269:5

**Dave** 35:16 41:1,23 43:4 44:22 46:12,14 47:8 75:14 83:22 84:2 87:5 92:18 95:15 131:1,13,21 132:4, 13 147:7 166:5 208:19 224:3,7 225:16

**Dave's** 181:22

**David** 8:6 9:3,6 275:22

**Dawn** 262:7,9

**day** 19:6 23:25 25:3 27:4 58:11,16 70:21 71:14,18 72:5,8 73:2 81:1 93:25 94:6,12,13 115:14 116:14 133:16,17 141:21 142:2,3 146:10 168:16 186:9 199:4 203:1 204:21 205:1 207:18 208:20 224:16 225:4 226:21 229:11 230:2 251:13 279:20

**days** 17:10 84:22 95:19 133:6 146:21 222:19

**Dayton** 153:7

**DC** 54:24,25 55:9 62:8,12, 15,19,24 87:14 88:1

**De** 220:6

**deal** 10:18 20:13 142:25 239:5

**dealing** 261:8

**dealings** 13:15,18

**deals** 51:6

**Deana** 82:22 165:23 171:22,25 200:1 246:7

**December** 17:14 20:8 38:21 51:21,23,25 52:4 56:2 67:24 103:13 104:23 166:18 235:12 238:24 259:18

**decision** 34:23 185:18,20 212:5 259:1

**decree** 61:16,21 106:8

**defendant** 8:24 90:23 91:17 275:8

**defendants** 8:22 75:10, 18 83:17 97:2 275:6,23,25

**defendants'** 90:12

**define** 89:10 113:25

**defined** 173:11

**definiti-** 113:25

**degree** 12:5

**delay** 76:19

**demonstrating** 181:23

**demoted** 250:21 251:8 274:10,11,21

**denied** 87:23 88:3 220:19

**dental** 53:3

**department** 21:17 153:19 154:24 157:2 159:7 177:17 214:4 223:20 248:1 255:12,17 257:10 261:9 262:9 271:6 275:9

**departure** 45:12 47:19

**depending** 16:12 260:10

**Depends** 113:24

**depo-** 96:12

**deponent** 8:20

**deposed** 9:12 21:5 279:9

**deposition** 8:5,15 9:23 10:10 19:2 23:9 31:18 32:20 59:1 61:13 63:20 91:18 96:13 105:9 109:15 111:1 112:7 113:4 114:14 123:6 135:12 148:16 155:22 159:8 174:6 178:13 180:21 192:19 194:19 200:3 227:19,23 228:6 232:20 235:25 237:20 238:2,13 239:22 240:24 248:25 253:20 259:5 270:3 275:16 279:11,24

**depositions** 9:15 228:2 237:4

**deputy** 156:22 260:20 277:2

**derogatory** 267:15

**describe** 13:22 20:19 38:4 51:10 94:14 113:9 140:22

**description** 38:8

**designed** 164:16 177:4

**designee** 24:9,14

**desk** 78:10,12,20,24 79:4, 8,13

**detail** 27:11 51:8 94:17 213:9 261:12

**details** 22:9 30:22 31:9 135:4 158:23 166:5,8 239:10 253:2 278:11

**determination** 49:16

**determine** 172:6 186:12 250:17

**determined** 18:15 185:19 189:9

**detriment** 91:20 93:8
**detrimental** 91:24
**developing** 11:9
**development** 18:4,7 50:6,8 175:21 176:12
**Devil** 161:21 189:10 241:22 252:21 253:15 271:1
**Devils'** 160:13 161:18,20, 25
**DHR** 39:5,14 40:9
**Dibler** 266:14,15,22
**died** 119:8
**Diego** 167:21,22
**difference** 31:3 33:14 36:5,23 64:13
**dinner** 129:3 130:17 132:22,25 136:18 142:10, 12,23 217:2
**dipped** 70:1
**direct** 176:19,21 247:21
**direct-line** 247:9 274:18
**direction** 165:6
**directly** 24:8,10,20 90:1 173:1 237:21 246:19 247:25 256:17
**director** 12:16,18,23 18:4 24:3 26:19,24 37:14 85:20 86:5,12 99:20 100:11,19 101:19 102:1 103:6 160:20 177:8 214:3,6 261:6 278:3
**director's** 34:13 35:5 188:18
**directors** 85:22
**directory** 87:16
**disagree** 34:15,19,22 35:7
**disagreed** 148:20 149:4
**disappointment** 95:25
**disassociate** 243:22
**disassociated** 140:10 143:23
**disbanded** 11:24
**disbelieve** 255:18
**discovery** 100:25
**discretion** 18:17 34:20 35:9 187:24 189:5,15
**discretionary** 18:16 28:11 34:6,14,18 35:5 49:12 187:23 188:1,2,9, 16,18
**discuss** 13:23 20:22 21:12,20,23 40:19 41:20 42:22 44:15 142:20 145:4 169:14 204:7 205:16 229:8 260:12 261:3
**discussed** 31:7 33:17 34:5 36:7 40:8 41:9 145:25 162:14 164:16 168:5 182:2,3 183:12,17 234:5 255:13 261:7
**discussing** 41:14 42:14 205:3
**discussion** 20:20 22:7, 12 27:13 33:12 34:4 40:23 48:16 69:9 94:15 96:19 101:24 102:8 130:12 141:12 154:8 168:8 179:23 180:4 183:8,15,18 189:23 196:4 203:23 227:25 230:2
**discussions** 21:25 29:25 30:12,23 38:15,18 45:2,15 46:9 48:12 58:21 85:16 99:10 101:18 102:6,8 140:3 141:5,6,9 151:12 203:24 255:15
**dismiss** 275:4,20
**disorder** 72:14
**dispense** 9:18
**dissolution** 61:16
**distract** 139:14
**distractions** 139:16,17
**distress** 70:13,17 71:23 72:1 73:3 74:9,17 76:12 80:20 83:14 86:6
**District** 8:7,8
**divided** 65:23
**diving** 200:12 201:8 245:19
**divorce** 61:21 63:8 105:21 106:9,11,18
**document** 27:15 59:9 106:13 112:18 179:4,22 180:17 233:7,10 252:10 270:10
**documentation** 37:23
**documented** 85:21
**documents** 9:23,25 10:1 59:5,7 270:6
**dollar** 229:19
**dollars** 29:24 30:11 34:3 36:6 74:25 183:23 187:13 229:17,22 270:17
**Don** 23:1
**donate** 30:2
**donated** 29:10 36:8 114:2 271:1
**donor** 102:10,24 113:22 133:19,21 134:7,23 144:9 145:21 147:1 173:11 200:2 276:12
**donors** 145:22 160:25 172:8 276:22
**door** 83:6
**double** 73:14,15
**doubt** 259:11
**Doug** 235:2 242:13
**DP** 110:8
**draft** 178:20
**dragging** 279:10
**drawers** 78:12,14,20,24 79:8,13,17
**dream** 70:25
**drink** 73:8,13 119:3 121:17
**drinking** 74:2 155:18 156:5,7
**drinks** 73:17,21 113:14
**drive** 14:1 71:3 253:8 261:12
**drop-off** 253:10
**dropped** 195:3 253:1
**dropping** 253:3
**drove** 253:7
**due** 207:16
**dues** 54:15,17,19,21 57:4
**Duluth** 23:19
**duly** 9:7
**duty** 132:14,17 133:12 151:21,22 155:13 156:24 157:4,7 173:3,13,18
**duty's** 173:5

**E**

**earlier** 37:8 124:15 139:13 234:17
**early** 151:4 219:5 275:3
**ease** 215:6
**easier** 275:15
**easy** 109:12
**Eddie** 148:6,8
**education** 12:7
**Edwards** 162:5 169:17 219:3
**effect** 190:3 191:18
**effective** 189:4 225:7
**effing** 242:5
**effort** 20:9 42:9 106:23 176:15 185:1
**efforts** 38:20 89:20 107:7
**eight-year-old** 267:16
**elements** 25:16
**elevate** 177:7
**elevator** 76:3 226:5
**eliminated** 141:19

**email** 174:9 182:17 198:12 214:10

**email's** 174:18

**emoji** 117:13

**emojis** 117:3

**Emory** 109:25 110:11

**emotional** 70:13,17 71:23 72:1 74:8 86:5

**emphasis** 179:25

**employed** 84:8 86:16

**employee** 13:20 52:10,19 53:4 167:9 175:11 229:15 230:20,24 250:10,14,15 276:14,20 277:3 278:6

**employer** 11:3,4 65:16

**employers** 57:8 90:10

**employment** 20:9 23:13 25:9 28:7,23 37:23 38:13, 21 52:2 74:9 90:16 103:17 192:7 193:6 194:9 274:9

**empty** 253:17,19

**end** 15:8 29:19 110:10 125:7 129:16 147:5 148:14 149:8 170:13 202:9 221:3 262:10 267:8 269:3 279:23,25

**ended** 20:9 152:17 210:7 267:7

**ending** 178:6 179:12

**ends** 133:6 238:24

**Energized** 223:18

**energy** 73:1

**engage** 91:9 107:22

**engaged** 38:16 42:2 91:6 114:11 122:13 123:3

**engagement** 91:12

**enhanced** 197:3

**enjoy** 98:3 202:10

**enjoyed** 185:5,9 186:1 210:13 255:2 260:5,18

**ensued** 27:13 58:3 81:17 99:1 152:7 201:2 248:10 274:4

**entail** 18:5 245:9

**Enterprises** 169:3

**entity** 67:18

**equal** 261:20

**equity** 11:9 48:22 49:24 62:12 63:9

**escorted** 75:25 81:5

**ESPN** 241:18

**establishing** 239:4

**estimate** 127:4

**et al** 8:7

**evaluation** 175:15 176:1

**evening** 142:17 150:19 152:15 160:4 192:14

**event** 217:21 219:3 222:7

**events** 112:3 163:5 216:6

**eventually** 43:23

**every-** 72:21

**everything's** 173:11 219:8 223:12

**evolve** 261:6

**EXAMINATION** 9:10

**examined** 9:8

**exceed** 25:24 69:12 187:13

**exception** 267:17

**exchange** 116:23 135:15 194:22 241:2

**excluding** 96:11,12

**excuse** 11:17 34:22 36:3 52:23,24 68:14 169:7 176:9 180:11 183:9 199:2 200:8 202:17,25 211:2 214:15 217:15

**executive** 99:20 176:23 259:15 260:21,24 261:16

**executives** 91:19

**exhaust** 71:18 251:13

**exhausted** 44:9

**exhibit** 10:9,10,20 18:23 19:18 23:9,12,22 27:19 28:3 31:18,21 32:20,23 33:21 37:3,11,22 38:1 55:23 58:15 59:1,4 61:13, 16 63:17,20,23 64:10 65:1 70:9 83:16 87:1 88:7 90:9 95:4 96:8 97:7 106:8 109:14,15 111:1 112:7,16 114:14,17 123:6,9 135:12, 15 151:4 153:15 174:6,9, 21 178:13,16 179:4,5 180:11,21,24 188:24 192:19,22 193:2 194:19, 22 198:23 199:1 200:3,6 202:7,13,18 212:20 232:20,23 235:25 236:3 238:13,16,19 239:22,25 240:24 241:2 243:24 244:1,11 248:14,20,25 249:3 250:7 253:20,23 254:17 259:5,8 263:2,6,7 267:19 270:3,6 275:16,19

**exhibits** 18:20 19:2,5 60:4,9,10

**exit** 41:11,12 42:22 43:3 45:7 46:13,14,20,21 47:11 215:17 219:23

**expect** 56:17 68:19 169:12

**expectation** 155:10 183:22 187:12,14

**expectations** 181:24 183:18

**expected** 169:13

**expecting** 171:14 225:22

**expenses** 124:17

**experience** 207:15

**experience/age** 100:15

**experiencing** 181:22

**expert** 70:18 74:19 75:3

**explain** 41:10 45:5,25 46:11,12 62:18 67:21 74:16 75:11 88:21 118:12 193:7

**explained** 145:5

**express** 145:12 165:19 191:16

**expressed** 95:25 165:16 221:4

**extent** 163:7

**eye** 250:16

**eyes** 117:4

F

**face** 131:20

**fact** 30:20 33:4 34:5 72:6 74:15 80:18 189:17

**factors** 253:6

**facts** 38:23 103:18 164:20 186:11 196:21 250:22

**Factual** 96:6

**fair** 251:18

**Falcon** 273:14,17

**Falcons** 10:14 13:2 14:12 15:13 17:3 19:22,24 20:4, 6,10,13 91:19,23 92:11,25 93:22 95:5,9 96:9,19,21 278:18,20 279:4,6,17

**fall** 104:22

**falls** 251:24

**familiar** 119:9 220:3 252:12

**family** 17:7,9 62:21

**fan** 267:13 269:4

**fans** 268:19

**Fast** 148:6,8

**fat** 73:7

**fearful** 182:19 214:24 255:4

**Feasby** 9:3

**February** 232:18 233:1 239:20,25 240:21 241:5 246:2 247:8,11 249:15

**fee** 55:5 108:6

**feel** 83:23 125:22 196:18 211:25 223:25

**feels** 207:20,21

**feet** 161:13

**fellow** 8:25

**felt** 146:21 195:19 212:23 213:13

**Ferrara** 174:10 176:5 183:13 197:22 204:19 205:24 206:2,8,11,19 207:4 209:1,17 211:5 212:14 219:13 220:12 221:6 245:22 251:22 253:24 255:1

**field** 18:8 46:7 48:15 85:19 90:17

**fields** 14:21

**figure** 59:20 118:21 179:20 229:19 279:13

**figures** 252:21

**file** 49:3 106:10

**filed** 105:21 106:1,2,4 112:19,25 233:2,5 234:6 249:18 275:3,20

**files** 78:6 80:1

**filing** 78:16,18,24 79:9,22

**fill** 175:1,24

**filled** 99:23 103:3 175:4, 15,18

**final** 36:18 106:9 175:14

**financial** 254:12

**find** 25:2 32:19 38:13 47:24 65:14 86:15,21 90:16 107:7 108:5 117:13 127:25 147:10 148:4 150:17 218:8 232:19 271:9

**finding** 192:7 193:12

**fine** 60:17,18 184:1 219:8, 9,10 223:13,14 279:10

**finish** 118:6

**fire** 199:11 206:5,9,11 207:18,23 208:20 209:2, 13,15,19 229:15 255:4 259:2

**fired** 51:19,20 70:22 75:13 80:23 92:18 188:4, 12 209:16 218:11,17 221:22 223:21 224:9 232:16 250:22 251:9 255:24 258:21,24 275:25 278:14

**firm** 8:16 11:9 38:17 42:13 49:24 50:16 64:1 91:7,9,13 103:1 107:12 108:9 110:4

**firms** 38:19 39:2,17,23 48:14 99:11 100:8 106:21

**Fiscal** 179:21

**fit** 40:10,13 44:17 47:8 151:10

**five-minute** 268:16

**fixed** 161:12

**flew** 138:19

**flight** 119:7,16 124:12,15 141:18,22,24 143:2,3,5

**flights** 138:20

**flip** 254:17,21

**floor** 82:11

**focus** 22:5 75:17 93:13 186:5 196:15 252:5

**focused** 144:21

**focuses** 11:9

**focusing** 38:20 198:11 230:9

**fodder** 242:1

**folks** 99:10 177:16 230:22

**follow** 165:12 175:6

**follow-up** 158:22

**follow-ups** 230:21

**food** 216:4

**Fools'** 28:17

**football** 93:21 178:2 179:9,15 180:5 187:8 201:21 223:10 237:10,15 238:3 242:2 252:13,22 253:3,11,18 254:19

**force** 107:10

**forget** 12:14 235:24

**forgot** 115:15 133:1 199:9 201:13 239:18

**form** 15:19 109:12 174:23

**formal** 101:4 102:24

**formalizing** 15:25

**formally** 91:9 103:12 194:12

**formula** 49:15 66:5

**forward** 10:24 42:3,6,8, 10 52:5 143:15 175:5 246:1

**forwarding** 249:10

**foul** 267:7

**fouled** 266:13,24

**fouls** 266:12

**found** 117:18 264:8

**Foundation** 155:2 169:2

**Foundation's** 87:9

**frame** 241:24

**Frank** 174:10 176:5,15,20 181:11 183:13 190:9 197:21 204:19,20,21,24, 25 205:2,5,9 207:12,15, 16,17,22,25 208:15,21,24 209:13,14,15,16,20,21 210:4,9,11,14,17 211:1 212:4,6,7 218:21,22,23 219:5,6,7,12 220:12,20,21 222:22,23 223:11,12 226:14,20 245:22 247:4, 24 251:21 253:24 254:2,4, 12 255:1,2,4,8 274:12,22, 24

**free** 267:8

**Friday** 133:7 205:11 217:12

**friend** 113:11,18 147:1 155:14 193:5 216:12,13 276:16,23,25 277:25 278:8

**friendly** 113:11 255:1

**friends** 55:10 223:13

**friendship** 276:9

**fringe** 57:3

**front** 56:15 147:13 222:12 248:14 267:16

**frustrated** 171:21

**frustration** 181:22 230:25

**Fucking** 242:7

**full** 106:24 107:9 189:5 213:9

**full-time** 52:19 53:4 64:21

**fun** 116:25

**fund** 70:1 271:2

**funny** 208:21 263:21

**future** 48:16 70:4 224:8

**FYI** 249:22

G

**Gabe** 247:6,8,15

**gained** 73:8,10 195:24

**Gallo** 90:1 108:12

**game** 71:5 92:4 93:21,24 110:1 113:8 125:18 126:2, 6,7,9,15 127:14,17,21,25 128:1,2,24,25 129:4,18,21 133:18 135:23 137:5 142:4 146:20 147:4,11 150:3 153:3,5 156:4 159:23 160:1 190:3 191:18,19,20 192:4 252:25 253:19 254:8 266:12,15,19,23 267:6,8 269:3

**games** 128:19 129:6 132:5 147:14 148:9,10 153:2,7,10 266:25

**gamut** 260:15

**Garner-smith** 82:22 165:23 171:22,25 246:7

**gather** 76:13,23 81:22 82:18 83:7

**gathered** 79:13,15

**gathering** 83:4

**gave** 68:7 176:7 196:11 229:12,13 236:11 255:21, 22

**geez** 160:12 243:25

**general** 8:24 108:8 155:1 243:4 271:1,12

**generalities** 46:20

**generation** 247:3

**generator** 253:12

**George** 111:6

**Georgia** 23:19 64:1 203:8,11,17

**ghosted** 111:9

**Gilbert** 193:17

**give** 110:7 127:4 134:13 153:11 186:5 215:9,14 272:8 273:19

**giving** 166:8 259:14 267:24

**Glenn** 39:5,6,12 44:21 47:16,18 99:14

**glimmer** 105:17

**Gloria** 268:16

**goal** 177:25 178:1 179:20 180:13,14,18,19

**goals** 26:3 34:12

**God** 130:5

**golf** 55:9 113:12 115:7,16, 20 165:25 169:16,25 186:10 199:2,4,10,18

**golfed** 185:7

**golfing** 155:7 162:5,8

**good** 21:16 41:24 44:22 50:25 56:18 66:18 68:18 71:3 98:11,16 131:11 132:3,10 134:9 137:24 152:4 158:12 162:23 186:1 193:6 210:12,13 216:18 219:13 223:13,15 235:23 250:14 259:23 261:17

**gotta** 132:21

**grab** 75:22

**Graham** 217:22 262:15

**grand** 50:25 130:7,8

**great** 41:16 70:24 72:12, 25 135:19 148:1,2 219:1 223:18 261:13 265:5 267:9

**greatest** 111:25

**greatly** 71:4,6 72:18

**Greg** 92:2,8,21 93:3,10, 12,13,15 94:23

**gross** 59:18 61:1 64:10, 11 65:1 66:24 67:11

**groundhog** 40:21

**group** 39:11 114:20 271:24,25

**grown** 75:12

**growth** 176:12

**grudges** 256:22,25 257:4,5

**guarantee** 26:23 187:14

**guaranteed** 26:5,17 27:8 58:24 187:10,12

**guard** 82:8,21 83:2,5,9,12

**guess** 21:4 68:9,11,12 73:7,20 75:6 89:14 105:24 106:17 122:4 127:3 136:23 139:21 250:16 279:9

**guessing** 127:3

**guy** 13:13 110:4 111:13 131:22 157:1 241:6 272:2

**guy,'** 147:8

**guys** 40:22 110:20 132:14,15,21 134:15 190:22 196:6 234:2 264:5

**H**

**H-A-M-M-E-S** 11:7

**Ha** 110:6

**ha-ha** 117:5 208:20 209:10,19

**hair** 73:6

**half** 39:1 61:7 67:4,13,14 70:2 71:13 124:18,19,20 128:3 132:5

**halftime** 127:22 128:11 131:13 147:4 266:14 267:1

**Haller** 235:2 242:13,19 243:1

**hallway** 76:3

**Hames** 48:22

**Hamm-** 49:24

**Hammes** 11:5,8 48:23,24 49:24 50:11,15,18 53:24, 25 54:1,16 68:19,20,21 69:8 70:4

**handed** 225:20

**handle** 132:21 133:21 147:18,23 148:6 154:4,6, 9,15 167:16 172:6,8

**handled** 158:5 171:8,9

**handling** 157:15,18 158:4 165:22 171:20 186:22

**hands** 131:22 132:6 147:7 234:12

**handwriting** 181:1,17

**happen** 76:7 127:21 128:11 137:8 140:5 141:13 143:22 145:13 157:15 182:21 197:23 201:25 215:1 217:12,16 222:20 229:11 266:7

**happened** 22:6 27:1 70:22 78:1 80:18 84:5 88:22 93:11 95:19 97:15 111:11 128:5,18 131:13, 17 136:6 137:21 138:7 140:22,24 141:14,15,17 145:6 146:20 147:2 149:1 159:24 163:18,19 168:15 172:10,22 173:13 187:20 198:1 207:8 209:11 217:25 223:5 224:6 225:14 228:1 249:15 265:14 266:6,10

**happening** 43:20 209:25 210:7 218:4 267:2 276:4

**happy** 30:4 165:22

**harassing** 128:23

**harassment** 114:12 153:18 154:24 155:5,23, 25 156:1,6,14 157:10 162:15 168:5 172:15 275:7 276:5

**hard** 46:15 111:17 195:16

**harm** 88:22 90:11 96:16 97:3

**Harris** 23:1 245:25 260:19 261:1,3

**Hatfield** 177:10 257:8

**Hawaii** 11:25

**head** 39:21 42:16 100:11 108:22 145:9 184:23 213:2 266:16 275:9

**heading** 251:24

**headquartered** 11:11

**Health** 53:3 54:4

**Healthcare** 11:12 17:18, 20,22,25 18:3 50:12,14, 17,21 51:4 52:6,18,23,24, 25 53:21 54:12,15,16 56:5 59:5,12 61:6 64:7 65:15, 20,22,24 66:8,25 67:6,17, 19,20,23 68:17 69:25

**hear** 30:25 41:4 46:16 95:15 251:16

**heard** 13:8 42:23 93:1 94:14 95:3 148:18,20 149:3,4 209:19 227:18,24

**hearing** 214:23 228:16

**Hearsay** 91:25

**heart** 117:4

**Heather** 8:23

**heavy** 73:7

**Heiler** 104:15,20 105:4,8, 14 155:4,5,10,17,21,24 192:6,14,23 193:17,22 227:3 230:11 276:23

**Heiler's** 105:9
**held** 87:15 105:16
**hell** 163:21
**Helman** 177:1,2 259:9,14, 21 260:16 261:7
**helped** 185:6
**helps** 259:13
**Herm** 162:5 169:17 219:3 223:17 241:6
**Hey** 24:20 77:22 95:15 111:6 160:5 217:23 222:11,17 265:20 266:22
**hide** 271:15
**high-intensity** 266:12
**high-profile** 156:4 260:15
**higher** 12:7 159:2
**highest** 29:3 184:2,9
**highly** 123:20
**hire** 40:7 90:10
**hired** 177:13
**history** 10:8,24 28:4 148:4
**hit** 107:4 180:19
**hits** 257:18 267:8
**hockey** 201:10,13 202:1 245:22,24
**hold** 20:13 27:14 118:5 202:19 238:19 256:22,25 257:5
**holding** 257:4
**home** 119:24 120:1 142:2 199:14
**honest** 35:13 100:5 158:18
**Honey** 131:17 132:2
**honor** 132:13
**honored** 133:5
**hoops** 117:8
**hope** 56:18 105:17
**hoping** 85:20 103:14 229:14 277:5
**hostile** 269:2,7,9
**hotel** 129:2 130:3 152:15
**hotties** 116:25
**hour** 10:6 57:23 129:5 151:25 200:18 248:5 260:10
**hours** 21:4,7 77:18 111:24 265:20
**housing** 216:3
**Howland** 176:25
**HR** 195:5 213:24 214:3,6 278:9
**HRT** 59:9
**HTA** 106:25
**hugged** 136:21 140:16, 19,20
**hugger** 140:17
**hugging** 147:15
**huggy** 121:18,19,20 122:2
**Huh-uh** 13:5 17:12 43:7
**human** 213:24 214:3
**hundred** 29:9,13,14,24 30:11,21 34:3 35:22 36:5 69:17 117:8 183:5,23 184:5 187:13,23 229:17, 22 272:17
**hundred-thousand-dollar** 184:12 186:16 196:11
**Hurley** 125:1 127:12 128:7,10 129:13 130:22 131:12 139:13,25 141:11, 12 143:20 144:2 146:22 227:2 231:10 277:6
**Hurley's** 147:13 242:22 267:15 269:5
**hybrid** 65:11

**I**

**ice** 245:22
**idea** 35:7 86:19 175:24 179:1 219:13 229:18 234:15 236:19 238:4 268:7,15,17 269:8
**identification** 10:11 19:3 23:10 31:19 32:21 59:2 61:14 63:21 109:16 111:2 112:8 114:15 123:7 135:13 174:7 178:14 180:22 192:20 194:20 200:4 232:21 236:1 238:14 239:23 240:25 249:1 253:21 259:6 270:4 275:17
**identified** 177:15
**identify** 8:18 90:9
**immediately** 83:19 103:22 189:4 225:7 272:21
**implying** 118:3,10
**important** 162:25
**impression** 166:7
**improve-** 261:10
**inability** 97:18
**inaccurate** 228:3
**inappropriate** 131:6 155:18 156:5,8 269:2,7,9
**inappropriately** 120:13, 17 121:21 122:11 123:1 143:15 147:16 172:24
**incident** 121:8 141:3 143:14 144:19 145:5 208:24 230:6 266:3 268:25
**incidents** 149:10 150:17
**include** 89:14
**included** 51:3 180:2
**includes** 59:7,20
**including** 16:10 28:4 75:18
**income** 17:17 52:5 59:7 64:7,8 74:12,15,16,21 85:18
**inconsistencies** 148:23
**inconsistency** 149:2
**inconvenience** 195:7
**increase** 28:20
**independent** 178:17
**Indians** 11:18 12:9
**individual** 90:1
**individuals** 142:19
**industry** 42:23 43:2 44:5 48:10 74:22 75:9 88:6,11, 12,13,15,25 89:9,10,19,21 97:4 98:9,11,14 106:22 107:8 108:8 110:23 111:14,21 239:4 272:2
**influence** 231:1 276:9,18 277:2 278:4
**information** 30:9 150:18 151:8 153:24 172:13,25 234:10,19 252:18 254:4
**informed** 77:6 155:4 156:14 184:16 206:1
**informing** 32:3,24 33:23
**initial** 20:19 21:21 22:15 55:5 133:9 230:17
**initially** 38:25 39:1
**initiate** 153:17 167:1,12
**injury** 89:17
**inquiries** 40:24 44:24 46:23
**institution** 101:19,21
**instruct** 77:9 96:22 118:15,25 164:22
**instructed** 125:19 182:6
**instruction** 125:23 165:13
**instrument** 245:6
**intend** 18:22 110:16
**intention** 26:20 243:23

**interact** 82:20 83:2

**interaction** 72:21,22 118:4 127:20 128:10,13 269:2,6

**interactions** 128:12

**intercede** 268:4

**Intercollegiate** 97:9

**interest** 98:1 254:10,15

**interested** 107:24 110:17 193:11 260:21

**interesting** 41:3

**interim** 216:2

**interject** 60:3

**intern** 9:1

**Internet** 10:20

**interrogatories** 19:8,19 70:10 74:7 83:17

**interrogatory** 38:3,12 51:9

**interview** 102:22,24 183:9

**interviewed** 256:18 257:12 269:20

**intimately** 231:12

**intuition** 224:1

**investigate** 154:18

**investigation** 103:15 104:10,19,23 105:1,2,4 123:19 128:16,17 150:6 151:17,20 153:17 166:18 167:1,12,14,16 178:17 237:10,16 238:3,23 256:19 271:11,13

**investigative** 166:16,19

**invitation** 161:22

**invite** 168:16

**invites** 161:20

**inviting** 119:3

**invoices** 259:8,12

**involve** 274:25

**involved** 49:15 151:17 158:25 169:3 172:9 176:3 231:11,14 276:11 277:9, 11,14

**involves** 144:9 146:22,25 231:20 277:17

**involving** 149:11 271:13

**isolated** 177:20

**issue** 20:13 31:2 133:19, 21 134:25 139:24 142:24 146:19 172:5,12 177:15

**issued** 178:21

**issues** 261:7 271:23

**Itemization** 55:14

**itemize** 55:15

**items** 77:7 78:4 79:10 81:22

**IX** 155:1 157:8,13,19,21 158:9,13 172:4,5,12 173:12

**IX-RELATED** 173:5

### J

**jail** 237:23

**January** 14:14,25 15:17, 20 17:18 18:1 48:25 49:5 52:7 56:4 59:21 116:23 244:15,25 245:18

**Jarmond** 103:5

**Jay** 104:14,20 105:4 155:7,13 156:1 227:3 230:11 276:23

**Jazz** 266:5

**Jean** 22:25 75:21 76:9 81:6 85:13 133:17,20 134:1,4,18,22 156:13,16, 18,25 158:22 159:2,13,15, 16 162:12,14,19 166:1,3, 17 174:10 176:1,4,15,20 177:13 181:8,11 183:13 190:8,15 211:1,4 218:3,6 223:19 224:7,9 226:3,4,5, 12 230:9 237:20 238:2 247:19 277:1

**Jenny** 8:22

**jest** 209:3

**jet** 119:19,21,22

**jets** 119:20

**Jim** 205:15,18 215:20 216:5,14 221:16 254:11 277:25

**job** 11:24 14:20 15:6 20:10 22:1 24:6 38:22 47:24 48:10,14,22 63:6 71:14 86:3 88:24 89:18,20 91:7 92:23 96:21 97:18,23 100:18,21 101:16,19 103:14,22,24 107:7,23 108:5 110:21 132:17 133:11,13 156:23 160:25 211:18 212:1,2 214:25 215:6,7 216:22 218:20 220:20,22 221:12 236:8

**jobs** 90:22

**join** 17:6

**joined** 17:16,18,25 69:8

**joining** 20:18 50:15

**joke** 28:17 210:5

**jokes** 156:5

**joking** 209:9,20,21 210:4, 22

**José** 9:4

**journal** 163:12

**judge** 256:23 257:1,2,3

**judgment** 51:13 52:1 55:25 106:9

**Julie** 136:7,8

**July** 17:22 31:22 32:6,24 67:3,23 167:25 194:25 196:10,18 197:23 198:3, 11 202:10,14,15,21 203:10,16,19 204:5,6,19, 20,24 205:3,11,12,16 208:8 236:21 237:12 246:22 248:23 249:7 263:13 264:1 265:14

**jump** 113:6

**June** 17:13 31:23 33:22 37:4,12 167:17,25 168:2, 9,24 173:22 174:18 176:4 179:13,23 180:3 181:3,6, 8,11 182:2,20,24 183:9 184:16 187:9,17 188:14 189:13,22,25 190:7,25 191:6,17 192:15 193:2 236:5

**junior** 245:24 263:20 264:13

**justification** 33:17

### K

**Kansas** 242:11 243:15

**Karpman** 241:8,21

**Kathy** 62:11,19 63:7 64:8, 14 84:12 87:20 106:10 125:1 127:20 128:7 129:8 130:13 131:12,14,21,24 133:1 136:5,21 140:16 146:25 147:4,10 155:15 160:2,18 161:13

**Kathy's** 62:25 106:6

**keeping** 163:11

**Ken** 177:1,2 187:2 259:9 260:5,19 262:14 263:1,17, 19,21 264:5,22,24 265:1, 4,15

**Kent** 243:12,14,16,17

**Kevin** 84:21 213:1 214:24 218:14 219:19 224:16 225:22 227:5 229:5,9,18 230:2

**key** 25:16 225:19

**keys** 80:22 225:18,19

**kicked** 16:15

**kind** 9:16 13:18,22 21:3 45:23 53:9 54:3 55:22 56:5 106:9 107:4 109:4 112:3 117:24 123:25 143:24 160:24 192:13 218:4 230:5 251:20 254:17 260:12,20

**kinds** 64:20 253:5

**knew** 150:1,2 155:17,24 166:5,16,17 169:2 210:8 237:22

**knowing** 152:20 163:1 214:22

**Kwan** 8:24

L

**L-E-N** 45:20

**label** 255:25

**labeled** 35:4 250:19 251:6 255:23 256:3,9

**Landphere** 187:2 262:14 263:1,17,21 264:22

**Las** 126:11 134:18

**late** 40:15 41:7 44:14 45:2 47:4 48:12

**launch** 167:14,15

**law** 8:16 192:7

**lawsuit** 43:16 44:1,4 72:6,9 84:15 137:7 235:15 239:8 249:8,19

**lawsuits** 84:10

**lawyer** 72:11 77:2 104:6 164:20 192:7,11,15 193:6, 7,12,15 194:1,4,6,8,9,12 236:10

**lawyer's** 165:12 236:11

**lawyers** 134:15

**lay** 219:20

**lead** 102:10,24

**leader** 168:25 169:3 261:5

**leaders** 219:3

**leadership** 41:18 99:11

**leads** 91:8

**league** 11:25 12:10 13:20,21 89:11

**learn** 128:22 130:3 150:15 155:5 156:15 162:8,10 271:19

**learned** 77:15 124:23 136:2 141:7 151:5,8,13

**learning** 153:16

**lease** 119:20

**leave** 13:1 16:24 50:17 69:19 103:12 104:3,7,10 150:5

**leaving** 14:9 19:24 20:4 27:4 42:20 50:14 144:3,4 147:4

**ledger** 163:12

**Lee-cota** 8:22

**leery** 207:19

**left** 15:13 16:9,14 17:6 20:24 109:1 125:22 167:17 183:14 226:25 229:10 262:9 263:23 278:19 279:5,7

**legal** 19:25 26:7 35:10 51:17 74:18 75:3 86:7 122:15 173:7 182:25 196:20 206:12

**legs** 132:6

**Len** 39:9,11 45:19,20 46:3 48:6

**Leslie** 125:1 127:11 128:7,10 129:8 130:13 131:12,18 132:4,9 133:2 136:5 146:22 147:6,12

**letter** 23:12,17,22 24:2, 12,19,25 25:1 27:6,10,18, 20,23 31:23 32:23 33:22 34:11 37:4,7,13,19 58:15, 20,22 104:6 123:9,11,14 164:10 184:13 187:22 188:3,10,17,19 189:2,17 190:2,8 191:6,17 192:17 195:3 217:5 265:23 267:23 268:2

**letters** 34:13,17

**letting** 93:18 224:24 225:1

**level** 122:8

**licenses** 16:15

**lie** 31:8 36:11

**life** 163:1

**limited** 75:19 273:17 278:18

**Linda** 137:4

**Lindsey** 130:14 131:1,4, 10 146:23 147:14

**lines** 88:7 195:20 208:10 257:22

**Linkedin** 10:21,23 14:25 18:23 49:3

**listed** 274:9

**litigation** 211:23 212:1

**live** 71:5

**lived** 228:8

**living** 23:20

**LLC** 16:1

**LLP** 8:16

**loading** 124:1

**lobby** 129:2 130:2 152:15

**local** 164:12 194:6,8 240:17,18

**location** 131:2

**lock** 78:14,18,19,21

**locked** 70:23 78:20

**long** 26:18,24 52:13 54:20 77:16 87:19 123:12 129:4 146:8 167:22 171:7 203:1 207:1,2 212:11 213:6 216:1 235:24 260:9 266:21 267:5

**longer** 46:4 69:25 75:15 84:8 86:16 92:24 96:4 110:17 184:17,23

**looked** 105:24 112:23 113:2 186:8 252:20,21 267:16

**loop** 144:12

**lose** 132:19 236:8 246:13 267:12

**loses** 160:14

**losing** 214:25 215:6

**loss** 57:3,11 73:6 74:9,12, 16,21 85:18

**lost** 57:2 71:2 86:4 141:21,25 142:7 267:11

**lot** 43:3 74:15 78:8 85:22 109:10,11 111:17 143:6 148:10 153:12 166:5 182:21 203:7 210:15,17, 22,23,24 218:8 223:15 254:22 258:11 260:13,25 261:13

**loud-voiced** 219:17

**love** 115:10 117:14 199:4 256:20

**low** 135:20 136:16

**lucky** 131:21 147:7

**lump-sum** 270:17

**lunch** 27:2,3 98:17,19 99:6

**lying** 237:22

M

**made** 20:8,9 22:20,22 40:24 53:14 68:17 69:19 74:15 198:14 209:1 218:2 247:25 261:20 265:6 267:15

**main** 9:19

**major** 113:22,25 187:6

**make** 27:7 35:2 42:9 44:9, 24 46:23 49:7 50:22 56:23 65:19 68:8,19 69:20 76:23,25 85:22 118:12 146:21 170:2,14 171:14 207:14 215:17 219:23 222:20 223:14 224:13 225:21 230:10 249:12,13 251:3 259:1 264:21 265:6 268:5 273:25

**makes** 208:7,25 217:12

**making** 16:8 30:24 52:2, 17,20 56:4,10 86:4 268:13

**man** 75:12 116:24 206:4

**management** 91:19 189:11 257:17,24 258:3, 15,17,19 259:9 260:13

**managers** 146:12

**manda-** 157:3

**mandatory** 84:7 157:4,7

**manifested** 73:3

**manner** 75:9,17

**March** 52:15,17 56:10 59:21 87:22 107:1,2,6 113:7,8 114:10 119:2,7 120:11,12 121:3,12,15,22 124:11 125:10,12,18 126:2,6 128:24 133:18 134:17 135:18 137:15,19 138:25 139:3 141:2,8,9,25 142:1,5 143:12 144:17,18 145:15 150:3,25 151:11 152:16 153:3 156:10 167:12,13 230:7 235:21 243:20 255:13 275:7 276:3

**mark** 10:9 18:19,22 19:1 23:3 61:12 109:13 110:25 112:6 178:12 279:23

**marked** 10:10 19:2 23:9, 22 31:18 32:20 33:21 37:3 59:1 61:13 63:20 109:15 111:1 112:7 114:14,23 123:6,14 135:12 153:15 174:6 178:13 180:21 192:19 194:19 200:3 212:20 232:20 235:25 238:13 239:22 240:24 248:25 253:20 259:5 270:3 275:16

**market** 69:24 269:11

**marriage** 61:17

**Martin** 103:4 242:10

**Mason** 111:6

**Mass** 257:3

**matching** 53:18

**materials** 15:24

**math** 69:16 129:25

**matter** 8:6 51:14 117:8,10 231:13 233:14

**max** 69:20

**maximum** 184:12

**May-** 228:22

**Mcdonough** 95:13,14,24 96:2

**Mckirgan** 8:16,21 9:11 10:9,15,18,19 18:19,24 19:4 20:2,7,12,15,17 23:3, 6,11 26:12 27:14,17 28:18,19 29:7 31:10,20 32:22 35:19,20 39:3 40:2 51:22 57:24 58:6,13,14 59:3 60:9,13,14,20 61:12, 15 63:13,22 68:13 70:3 71:8 74:6,24 75:4 77:5,11, 14 81:12,14,20 86:11,20 89:7,8 92:7 94:11 95:11 96:12,14,24 97:24 98:5, 16,20,23 99:5 101:1,3 104:1,8,17 105:3,25 106:3,14,15 108:17,19 109:13,17,20,23 110:25 111:3 112:6,11,13,15 114:1,6,9,16 116:19 118:5,7,11,15,18,22 119:1 121:7,10 122:17,21 123:8 125:14 130:21 134:9,11, 13,16 135:14 142:11 152:1,3,5,10 154:16,21 156:19 159:20 163:13 164:5,14,23 165:1,4,9,14 170:8 173:15 174:8 178:12,15,23 179:2 180:23 183:4 185:12,21 186:14 188:5,13 192:21 194:16,21 196:24 199:20 200:5,8,9,20,22,24 201:5 202:25 203:3 204:9,17 206:17 209:7 232:3,22 233:13,23 234:3,16 235:10 236:2 238:15 239:24 241:1 246:9 248:4, 6,13 249:2,5,6,25 250:5,6 252:15 253:22 256:14 258:13 259:7 264:2,6 265:10,13 269:14,15 270:5 273:13,19,23,25 274:7 275:18 278:16,23 279:1,3,12,16,19

**meals** 113:16 138:24

**meant** 18:14 85:19 86:3 154:15 191:23 192:1 209:6

**media** 43:21,23 44:1 234:24 242:3

**media's** 234:12

**medical** 11:10 18:7,8 49:25

**meet** 10:3 13:20 22:24 115:21,23,24 137:15 175:25 178:9 186:10,13 193:22 199:14,19,20,22 200:12 202:15,21 203:11, 18 204:7,25 214:11,12 216:5 260:4,18

**meeting** 75:14 83:19,22 84:7 145:7 146:1,8,12 148:14,18 149:8 153:22 183:17 184:16,19 187:9, 17 189:22 190:1,8,11,13 191:2,3,16 204:20,22,23 205:2,15,23 206:10,19,24 207:1,8,10 211:1 212:9, 10,11,14 213:6 215:18,21, 23 218:18 220:5 221:5 222:22 223:2 226:9,12,14 227:7,14 257:14 259:21 260:5

**meetings** 13:21 260:6,9

**member** 115:12 270:12, 16 271:5

**members** 88:4 189:11 234:24 257:17 258:3

**membership** 55:1,4,15 62:12,15,23,24 63:2,4,6,8, 10,14 87:2,7,10,12,14,21, 24

**Memorial** 23:25 25:3 58:11,15

**memory** 22:2 45:4 61:10 62:6 90:6 141:14 151:1 205:18 260:10

**men** 115:22 116:6,14 245:19 266:13,24

**men's** 22:15 116:11 179:9 186:23 187:6 196:14 201:9 242:23 245:18 261:24 262:2,16 263:16 264:10 274:19

**mental** 70:14 73:3 74:8

**mention** 38:12 47:14 85:18 105:11 133:17 152:19

**mentioned** 35:21 81:21 99:9 100:18 108:11 139:16 144:14 209:19 213:9 219:24 231:9

**merged** 39:10

**Meri** 8:11

**message** 20:24 93:24 94:1,7

**messages** 94:8 109:11 114:18 115:4 126:3 192:22 238:16 248:16 253:23 254:11 272:4,5

**met** 22:25 84:22 178:6 202:14 203:16,17 204:19, 21 215:22 217:1 219:19 260:8

**meticulous** 80:2

**metrics** 26:3 34:7,12

**MGM** 137:5

**Michael** 8:11 9:2 185:7

**Michigan** 235:21

**Mickey** 267:6,7

**mid-april** 155:3

**middle** 28:8 147:12 193:1

**midwest** 109:4

**Mike** 77:2

**million** 178:1 179:16 180:14,15

**Milwaukee** 11:11 50:3

**mind** 17:5 34:18,21 35:5, 7,13 58:23 71:13 85:17 132:19 147:22 160:14 164:17 203:25 210:4 228:17

**minds** 258:10

**mindset** 103:16

**Minegar** 90:2

**Minnesota** 15:5 16:6 17:4,8

**minor** 12:10 61:17 89:11

**minus** 29:14 184:6

**minute** 17:17

**minutes** 98:22 146:9

152:2 212:12 213:7 224:6 248:5 273:19 278:19,21, 25 279:6

**misconduct** 114:12 123:21 128:14 173:19

**missing** 80:6,9,10

**misstates** 38:23 103:18 186:11 196:21

**Mitch** 111:6

**Mitchell** 267:6,7

**mixed** 109:4

**model** 65:18 250:10,15, 17

**modified** 164:10

**modifying** 176:14

**momentum** 175:5

**Monday** 143:19 144:7 145:7 146:12

**money** 35:16,25 50:22 52:2 56:23 68:17,19 74:16 86:4 114:3 195:16,24 271:5

**monitor** 8:4

**month** 16:12 25:19,22 52:11 55:13 56:5,8 59:21 259:22,25 272:17

**monthly** 54:21

**months** 15:16 52:14 167:25 175:17 208:1 269:25 270:17

**months'** 229:24

**morning** 9:12 27:5 115:15 133:7 146:11,12 217:21 218:11 219:2 220:17 227:7,25

**mother** 119:11

**motion** 275:3,4,19

**mountain** 253:9

**move** 126:2 128:7 185:4, 17 197:8 246:22 265:21

**moved** 12:19 202:1,2,4 274:13

**moves** 201:19

**moving** 161:11 269:13

**Mullin** 13:13,15,19,23 14:8

**multiple** 38:18 70:25 73:1 142:19 203:24 204:25 266:7,11,24

**mutually** 26:3 34:11 177:25 180:13

N

**NABC** 41:18 47:21 99:11

**named** 13:13 176:25

**names** 130:18 193:24

**national** 41:19 99:13,17 185:11

**natural** 15:4 107:5

**nature** 80:10

**NAU** 97:18 100:18 101:22

**NBA** 13:16

**NCAA** 138:3,4 141:19 153:2,7,12 237:10,15 238:3

**necessarily** 180:1 187:11,19 220:7 261:12

**needed** 192:12 195:19 230:24 276:21 277:4,8

**negative** 181:22 192:4 219:14

**negotiate** 215:17 219:22

**negotiation** 104:21,25

**Nelson** 120:25 121:12 135:9,16,18 137:18,19 138:10 139:5,18 140:14, 21 141:1,6 144:9 145:16, 19 146:1 148:21 149:3,9, 16,19 150:13,16 153:22 230:8 247:6 276:10

**Nelson's** 146:13 148:16

**NFL** 90:1 108:12

**nice** 111:13 160:4

**Nick** 92:4,22,23 93:17

94:24

**night** 72:16 128:25 141:7 142:12 218:3 224:14,23 257:3

**nightmare** 267:2

**nights** 73:14,16 138:5 195:24

**non-covenant** 61:17

**non-gilbert** 193:7,14

**nonmajor** 201:20

**nonsports** 207:11

**Noonan** 8:11

**Normal** 14:1

**north** 8:13,17 67:9

**Northern** 97:9

**note** 163:11

**noted** 165:16

**notes** 163:11 273:20

**notice** 43:15,16 44:3 232:17 233:1,2,5 234:6,9, 12 240:3 249:18

**notices** 233:9

**notified** 225:3

**notifying** 143:14 144:6 155:14

**notion** 34:19

**Notre** 253:7

**November** 106:12,16 115:7 116:2 199:2,3,8,9, 12,14 200:13 259:18

**now's** 41:1 98:16

**number** 8:5,8 38:4 51:9 55:23 64:4,11 65:1 66:23 68:15 70:11,12 105:25 116:20 123:14 124:4 160:2 168:25 179:3 180:12,15 188:24 236:6, 11 247:18 248:21 263:2 266:12 267:10,21 270:8 272:5,8,22,24 273:2 279:23

**number-two** 157:1 159:7

**numbered** 59:9 175:4

**numbers** 263:3

**numerous** 242:21 268:9

O

**oath** 19:15 28:15

**Obama's** 99:24 100:1

**object** 163:6 199:21

**objection** 19:25 26:7 29:5 31:5 35:10 38:7,8,23 39:24 51:17 63:12 70:18 74:18 75:2 77:8 86:7 90:14,15 91:25 95:6 97:20 98:2 103:18 104:4,12 108:15 113:23 114:4 116:16 118:8,12 122:15 134:8,10 142:9 154:12,19 159:18 164:4,21 173:7 178:22 182:25 186:11 194:15 196:20 200:10 202:22 206:12 209:5 231:25 233:11,15 234:13 235:7 252:14 256:10 258:8 265:9

**observing** 9:1

**obvious** 216:9

**occasion** 139:2 201:25

**occasionally** 107:9,11

**occur** 102:13 137:23

**occurred** 121:15 134:18

**October** 14:14,25 15:2,11 114:24 259:17 275:20

**off-the-record** 27:13

**offer** 23:13,22 25:9 34:11 37:7,23 101:4,11 102:16 184:13 229:16,19

**offered** 24:3 100:21,23

**offering** 37:13

**office** 8:23,25 11:10 18:7, 8 49:25 75:19,20,23 76:12 77:16,20 78:9,23 79:12,24 80:12,22 81:22 82:1,2,11, 16 83:13,18 108:23 141:8 145:17 146:6,16 155:1 162:18 205:7,8,10,13

206:25 213:4 219:5 222:2, 5 223:6 224:7,12 225:15 226:22,25 229:10 260:7 271:12 272:24,25 273:1

**officer** 108:21 157:8,13, 19,21 158:9 213:25 254:12

**offices** 123:19

**official** 60:10 266:17,18 269:11 276:8

**officially** 51:20

**officials** 266:16 268:20

**Ohio** 103:5

**one's** 224:1

**one-day** 217:18

**one-half** 62:11,19 63:9

**one-on-one** 183:15 218:25

**ongoing** 72:7

**open** 99:21 260:22

**Opened** 250:9

**opinion** 70:19 74:19 75:3 145:12

**opportunities** 18:7 40:6, 10,20 44:16 48:10,14,20 50:10 111:25

**opportunity** 13:2 16:25 17:1,7,9 21:8,18 41:16,21, 22 71:2 97:8,12 98:4 142:23 143:5 221:24 222:10 260:18

**opposed** 163:17 164:3 186:6

**opposite** 68:3 126:18

**Opposition** 275:19

**Optimum** 259:8

**option** 229:13

**options** 215:9,14,19 219:21 229:9,13

**Oregon** 100:4 133:18 153:4

**organization** 248:1

**organizational** 159:3 244:14,17 246:23 263:5, 14

**original** 34:11 106:11 191:15

**originally** 22:14

**outcome** 261:18

**outfit** 13:4

**oversaw** 16:4 169:1 172:8 216:2

**oversee** 269:18

**overseeing** 21:17

**oversees** 145:21

**oversight** 245:10 272:1 276:22 278:1

**owned** 55:3 63:3

**P**

**P-E-R-N-A** 45:20

**p.m.** 98:25 99:4 135:18 152:6,9 193:3 201:1,4 248:9,12 274:3,6 279:25

**Pac-12** 113:8 124:9 126:6 133:16 134:20 135:6,10 146:20 153:3 156:3 265:24 266:2,16,17 267:23 268:5,25 271:25

**package** 49:6 65:25 229:20

**Padres** 12:14

**pages** 114:19

**paid** 29:22 31:22 32:3,6, 25 49:22 51:23 55:4,17 56:2 60:23 108:7 270:21

**pairs** 129:23

**Papago** 217:18

**paper** 124:1 210:21 240:17,18

**papers** 79:3

**paperwork** 15:20

**Papetti** 8:16

**paragraph** 25:9 61:24 62:7 120:5 122:10,24 123:18 153:14 155:3,16 156:13 158:6 161:24 162:4 165:15 166:11,21 167:17 168:2 169:18 174:2 175:15 176:13 177:24 180:11 190:20 202:14,17 203:22 204:1 205:22 212:19 214:14 216:8 227:12 250:8,18 252:3 268:9,18 274:9 275:21

**paragraphs** 175:4,6,18, 22

**Pardon** 89:4 204:14

**paren** 206:5

**parentheses** 206:4

**Park** 137:5

**Parke** 83:25 223:20 226:23 227:6,18

**Parke's** 228:6

**Parker** 39:8 44:12,13,15, 20,24 45:5,15 47:23 102:9,25 107:14,22 108:5 110:3,4,9,16

**Parker's** 109:25

**part** 24:13 35:17,18 66:8 72:7,24 87:16 129:9 133:13 150:6 156:23 161:7 170:18 175:1,3 177:6 231:18 250:18 255:14 277:13

**parties** 169:3

**Partly** 277:16

**partner** 14:17 15:6 269:11

**partners** 176:15,20

**passion** 71:3

**passionate** 74:23

**past** 129:11

**path** 14:13,16,17 15:3,8, 18,19 85:21 101:17,20

**patience** 261:11

**Pauletta** 195:3,4

**pay** 49:8 51:12 54:19 55:12,24 56:15 57:9 59:18 61:1 62:11 63:14 64:10,11 65:1 66:10,24 67:11 108:6 124:19 229:24

**paycheck** 32:7 33:1

**paying** 62:19 63:9

**payment** 270:1,17,25

**payments** 57:8 59:21,25

**peers** 98:12 108:13 177:5 261:9

**pending** 104:10

**pension** 53:10,12

**people** 42:23 71:1 75:16 107:12 108:9,10 139:21 142:21 143:6 150:7 153:12 161:20 181:9 201:23 218:9 219:16 220:25 221:19 228:8 230:10 232:6 247:18 256:23 257:1,2,19,20 258:20,21,23 259:2 260:14 261:11 271:24

**people's** 258:10

**percent** 49:7,9 52:22 54:9 67:7 69:10,12,14,16 114:8 186:21 187:23

**PEREZ** 121:8 152:2,4 165:5 279:2

**perfect** 10:17 110:11

**performance** 33:12 49:14 175:18 242:23

**period** 45:22 46:4 47:4, 20,25 48:3 52:1 103:16 269:23

**Perna** 39:9,11 45:17,20, 25 46:9,23 48:5

**Perna's** 39:11

**person** 30:1 82:10 95:8 114:2 144:13 158:18 159:7 193:8 214:4 223:19 260:4 262:6 264:19

**personal** 55:7,9,16 57:6 80:10,12 81:22 231:14

272:12,13 277:10,13,16

**personally** 146:24 177:18 256:16

**personnel** 91:19

**Pete** 235:4 236:24 237:8 238:9,10,24 239:2,3,5,7 241:8,11 248:22 249:7,25

**petition** 106:11

**pharmaceutical** 14:18 15:7

**pharmaceuticals** 14:21

**Phelps** 185:7

**philosophy** 264:18

**Phoenix** 8:13,17

**phone** 10:6 20:20,22 21:12,21 22:3,5,6,7,17 84:14 95:22 105:16 158:19 162:19 171:10,11, 14 218:2 227:9 238:25 239:2 272:5,7,10,12,13, 14,16,17,18,25 273:8,11

**phones** 272:21

**physical** 73:4

**pick** 77:19,23 225:8,10,22 257:19

**picked** 258:12

**piecing** 164:19

**Piensook** 8:24

**pile** 112:14

**pinpoint** 162:21

**pita** 27:2

**place** 8:15 26:25 27:2 45:2 162:17 163:16 168:8 183:8,9 260:6,7

**places** 203:6

**Plaintiff** 9:3 70:13 75:10, 18 90:15 91:6 97:8 275:22

**Plaintiff's** 74:8 91:20 275:19

**plan** 53:6,9,14 56:20,23

**plane** 141:17

**planned** 151:14

**Planning** 175:17

**platform** 15:18,22

**play** 40:21 113:12 115:7 186:10 199:4,18 245:5

**played** 55:9 133:15 243:15 253:7

**player** 46:7 75:15 84:8 86:22,24 89:16 119:16,23 224:14 242:11 250:20 251:7 255:23 256:1,4,5,9

**player's** 119:11

**players** 119:8 141:15

**playing** 115:11 153:13 199:2 266:4

**plays** 253:8

**pleased** 261:25

**plenty** 139:4 228:2

**plural** 91:14

**point** 15:9 20:16 35:15 38:16 43:24 47:8 62:18 91:10 102:16 104:2 107:6 116:4 119:6 127:19,20 132:11 144:8 147:1 148:7 158:3 160:4 163:3 164:19 165:1 171:17,23,24 183:13,17 192:6 198:13 209:24 217:3 231:10 232:18 257:13 262:8,20, 23 269:19

**pointing** 204:13,16

**points** 34:4

**police** 143:24

**policies** 189:9

**policy** 271:16,17

**Polk** 92:4,22,23 93:1,5,16 94:15,21 95:1

**pool** 29:11 30:2 35:16,23 36:8 49:7 196:12

**portion** 26:11 222:8

**Portland** 11:16 12:4,19 13:3 14:9

**position** 12:24 15:5 21:9, 13,15,16 24:3 37:13 41:18 47:21 50:4 99:11,18,21,23 100:19 101:10,21 102:7, 22 103:3 195:15 215:25

**positions** 100:8,9 106:22

**positive** 175:5 176:7 192:2

**post** 236:24 237:2 248:22 249:7 250:1,2

**potential** 44:16 90:9

**potentially** 21:9 101:18

**pounds** 73:11

**power** 81:13 206:11

**Powerpoint** 15:25

**pray** 257:2

**preceded** 25:1

**precisely** 257:15

**predated** 24:1

**predetermined** 77:24

**preemployment** 25:8

**prefer** 212:7

**prepare** 9:23 64:2 113:4 174:19

**prepared** 229:16

**preparing** 163:3

**prescreening** 25:7,13

**preseason** 92:4 93:21

**present** 17:1 99:2 130:12 161:10 164:13

**presentations** 15:25

**president** 50:6,7 92:3,11 97:9 99:24 100:1 104:15 189:6 213:24

**press** 92:5

**pretty** 41:2 44:22 66:18 68:18 71:3 80:1 120:2 162:21 209:12 255:9

**previ-** 268:3

**previous** 11:21 46:3 51:4 65:12 68:5 156:2

**previously** 37:3 108:11 128:18,19 166:9

**prices** 70:1

**primaries** 39:20

**primarily** 107:13

**primary** 39:2,17 186:24 187:4 216:4 261:21,24 262:24 264:9

**printed** 10:20 27:15 249:25 252:22

**printout** 200:11

**prior** 43:16 74:14 84:14, 20,25 85:8,10 96:19 113:7 114:10 121:15,22 141:2 150:14,17 151:8,14 155:23,24 156:10 182:20, 24 187:25 188:14 189:13 194:3 230:13 231:22

**private** 11:9 48:22 49:24 119:16,19 222:14 233:14 265:24,25 267:24 268:5

**privately** 268:3

**privilege** 163:8

**privileged** 164:21 165:7, 11

**Pro** 48:20 89:11

**Proba-** 243:10

**procedures** 189:10

**PROCEEDINGS** 8:1

**produced** 10:1 94:8 100:24 109:10 168:18 236:3 253:24 270:7 272:4

**product** 163:7 165:7,11

**professional** 46:5,6 90:19 100:15 175:21 176:12

**professors** 223:18

**profile** 40:11,13,20

**program** 113:19,21 117:8 140:10 143:24 185:10 186:5,6 231:18 237:11 242:2 267:9 277:12,18

**programs** 13:12

**project** 15:6 16:5

**projected** 179:8,20 180:5

**projections** 179:16,17 252:9

**projects** 70:1

**property** 80:7,15,19

**prospect** 86:4

**protect** 132:15,16 139:13 160:17 221:21

**proud** 261:22

**proven** 128:15

**provide** 42:19 54:10,12, 16 91:7 193:24 276:9,17 277:2 278:3

**provided** 28:14 45:8 59:6 114:18 174:25 175:8,11 276:22

**providing** 35:25

**public** 66:12 233:7,10 234:7,9 268:6

**published** 240:17

**pull** 75:23 79:17 142:23 180:9

**pulled** 61:20 78:2

**purpose** 35:25 177:12 221:14 261:3,15

**pursuant** 150:8 167:8 276:13

**pursue** 41:22 97:12

**put** 14:18,19,22 20:12 35:22 42:2,3,6,8,9 57:19 60:19 70:7,8 78:2 79:3,18, 19 110:7 112:13 124:2 129:15 131:5 147:7 176:13 180:18 206:4 215:5 273:15

**puts** 132:6

**putting** 129:7

**Pérez** 9:2 10:12,17 18:22, 25 19:25 20:3,5,11,14 26:7 28:17 29:5 31:5 35:10,15 38:23 39:24 51:17 57:22 58:12 60:3,6, 8,16 63:12 68:9,11 69:22 70:18 74:18 75:2 77:4,8, 12 86:7,17 91:25 94:10 95:6 96:11,22 97:20 98:2, 19,21 100:24 103:18 104:4,12,25 105:22 106:12 108:15 109:19 113:23 114:4 116:16 118:2,6,9,13,17,20,24 121:5 122:15 125:12 130:18 134:8 142:9 151:24 154:12,19 156:17 159:18 163:6 164:4,7,21, 25 165:3 170:2,5 173:7 178:22,25 182:25 186:11 194:15 196:20 199:19,21 200:18,21,23 202:22 204:8 206:12 209:5 231:25 233:11,15,20 234:1,13 235:7 246:7 248:3,5,7 249:4,23 250:2 252:14 256:10 258:8 263:24 264:3 265:9,12 269:13 273:15,21,24 278:22,24 279:8,18

### Q

**Quad** 11:23

**qualified** 100:2,5

**quarter** 49:23

**question** 19:19 20:1 35:1 56:18 68:2 71:22 77:10 97:1 103:20 122:24 137:24 158:12 159:6 162:23 164:8 180:3 182:22,23 185:13,16 191:15 199:23 204:2,4 208:5 228:9,25 229:1 235:23 237:14 257:16,25 258:11 259:23 265:11 268:13

**questions** 20:15 59:8 118:12 131:6 147:17 164:15,18 238:3 257:13, 21

**quick** 224:13 230:3

**quickly** 171:8,9

**quiet** 219:18

**quote** 115:15 116:24 134:25 161:25 176:13 181:20 193:5,8 195:21,25 216:9 237:19,23 240:19 241:6,7 268:18 269:1 275:5,9,22

### R

**raise** 24:19 29:23 30:10 67:7 211:20

**raised** 32:10 35:6 85:7

**raising** 31:2 33:3,14 34:1 36:23 211:21 219:15

**ran** 219:9

**Ranch** 54:24,25 55:9 62:9,13,15,20,24 87:14 88:1

**ranged** 29:2,12

**ranked** 160:1

**Rash** 73:6

**Rashon** 130:15,16,19,20 141:11 144:14 145:4 152:23,24 238:16 241:2 277:15

**Rashon's** 145:8

**Ray** 8:23 17:2 22:25 24:8, 11,14,18,20 26:10 34:25 76:22 84:7 85:1,4,8,11 86:15 92:6,16 93:4,17 96:1 125:21 137:6,15 138:13,15,17,20,24 139:2, 8,12 141:22 142:4,7,12, 17,24 143:3,7,19 144:7 145:1,7,16 146:19,22 147:9,18,20 148:11 149:23,24 150:16,20,21 151:2 152:19 153:1 154:4, 8,17,22 157:14,18 158:4 160:2,5,12,19,24 161:5, 12,14 165:22 166:17 169:14,24 170:24 172:6 174:9 175:25 177:13 181:11 182:8,10,17 185:6 187:9 190:2,8 191:14 197:9,24 198:12 202:7 203:19,24 207:9,14,19,22, 25 208:8,17 209:16 211:6, 22 213:11,13 215:4,5,12, 16 216:19,20 217:22,23 218:19 219:22 220:15 221:24 222:5,11,17,21 223:19 224:7,12,21,25 225:4 226:10 227:8,15 229:13 230:7 242:13,15, 18,20 243:1,8,17 246:19 247:9,21,24 251:10 254:11 255:24,25 256:16 259:2 260:23,25 265:8 268:4 271:8,9 274:18 276:3 278:14

**Ray's** 34:23 141:8 146:6 162:11 174:17 181:19 187:24 188:15 196:6 206:25 224:12 260:19 264:18

**Raymond** 275:8,24

**re-** 179:25

**reach** 84:10 95:14 102:16 107:9,11,13 153:25 192:6 215:4,5

**reach-out** 20:19

**reached** 17:3 21:8 95:9 96:8 119:15 147:8 171:19

**reaching** 95:5

**react** 219:14 228:1

**reaction** 228:16,21 229:2

**read** 24:13 104:24 109:19 111:17 117:21 122:22 181:25 182:14 185:14 188:5,7 204:3

**reading** 240:7

**reads** 275:22

**ready** 129:2 261:6

**realm** 50:18

**Realty** 11:12 17:18,22 18:3 50:12,14,17,21 52:18,24,25 53:22 54:12, 16 59:5 65:15,24 66:25 67:6,17,20,23 68:18 69:25

**reason** 36:4 72:7 125:24 126:1 129:15 139:5,11 216:4 234:17 236:14 252:3 255:18

**reasons** 17:5,11 255:21

**reassigned** 250:21 251:8,19,25

**reassignments** 201:21

**recall** 21:22,24 22:9,17 27:9 30:16,18 31:2 32:17 33:6,8,14,16 36:22 40:17 41:14 42:14,17 43:15,22 45:13,14 46:8,17 47:13 60:1 61:3 67:8 78:19 79:6 82:22 85:9 96:10,17 97:5 98:15 106:17 133:8,10 134:24 135:11 138:12 141:4 144:1 145:14,25 146:11 148:22 157:20 158:15,18 161:15 163:11 164:9 165:24 166:2 178:11 183:12,22 184:10 189:24 190:14 194:18 201:14 203:22 206:20 212:8,10,13,15 218:2 228:10 230:1,15 232:2 243:2 252:24 253:3 257:12 258:16 261:11,15, 17

**recalls** 45:4

**receive** 59:25 60:22 194:14 265:23 266:1 270:1 271:5

**received** 29:3 34:17 35:3 49:20 58:22 62:1 83:21 92:2 100:22 120:11 161:22 172:13,21,25 176:22 196:11 268:9

**receiving** 75:13

**recess** 58:3 81:17 99:1 152:7 201:2 248:10 274:4

**recognize** 181:18

**recollection** 31:12 37:25 44:10 71:19 138:6 190:24 212:12 238:7 251:15 259:13

**recommendation** 261:21,23

**reconsider** 215:17 219:22

**record** 8:3 30:24 58:1,4 81:15,19 98:24 99:3 122:22 152:6,8 185:14 188:7 200:25 201:3 234:7 242:7 243:10,11 248:8,11 273:16,22,23 274:2,5 279:22,25

**record's** 65:19

**records** 61:20 234:10 252:12

**recruit** 185:6

**reduction** 186:18 274:25

**refer** 88:5 114:25 126:5 168:17 236:10 242:4

**reference** 62:8 75:9 83:17 110:3 123:17 204:22 245:13

**references** 240:3

**referred** 87:2

**referring** 19:5 37:8 83:20 85:24 87:3 88:9 99:19 110:11 121:16 123:21,23 124:9 154:25 196:1 227:9, 11 237:5 238:11 241:12 242:9 252:4 256:16

**refresh** 31:11 190:24 259:13

**refuse** 42:6

**regarded** 50:18

**regent** 155:14

**Regents** 8:7 97:1 193:20 233:6 275:24

**Regents'** 90:23

**rehired** 105:6

**reimbursed** 57:5 124:17

**reimbursement** 57:4

**related** 174:4 178:17 261:8

**relates** 37:24

**relationship** 14:3,5 113:9 120:3 169:2 185:5,7 200:2 210:10,13 255:1,3 271:15

**relative** 119:8 217:19

**relevant** 118:14 224:23 242:3

**relive** 195:22

**relying** 176:15

**remain** 233:14

**remained** 262:16

**remem-** 136:25

**remember** 16:20 23:25 30:22 31:9 32:9,13 33:3, 11,18 34:1,4 35:12 36:9, 12 39:19 43:18 46:2 47:6, 15 53:8 61:5 64:20 65:9 78:5,6,15 79:6,11 80:6,11 82:11 83:1 102:11 105:12, 13 115:25 130:6 133:25 135:5 136:25 137:2 138:9 148:25 149:5,21 159:10, 12 164:8,11 165:24 166:1 177:13,21 178:24 179:22 180:7 183:16 187:18 189:25 190:7 203:10,20, 24 204:20,23 205:2,5,7,9, 12,14,15,17 207:7 211:21 213:19 219:6 222:18 223:9 227:20,23 228:7,11, 13,15,19,21,24 229:1,24 232:24 237:2,7 238:7 240:7,16,23 242:17,21 243:18 246:25 253:2 256:24 257:9,14,15,16,21 258:12 259:23 260:1,25 270:23 273:2

**remind** 228:22

**reminded** 230:15 243:3 252:17

**removed** 87:12 196:13 246:4

**Remy** 242:10

**renovation** 253:6

**reorganization** 247:16 255:17

**Reorganizing** 255:13

**repeat** 122:21 185:12

**rephrase** 9:21 35:1

**replaced** 74:15

**replacing** 52:5

**replies** 110:10 111:9

**reply** 117:24 137:6 241:7

**report** 24:8,10,20 43:1 93:15 132:14,17 133:11, 12 145:8,17 147:19 149:15,19 150:5,11 151:21,22 153:18 155:13 156:24 157:4,7,9,13,18 158:4 166:18,19 170:12, 21 173:13,18,19 178:17 188:23 198:14 204:18 207:12,23 208:18 209:2 212:3,6 230:17 244:2,11 247:9 267:20 274:18

**reported** 92:15 105:4,5 120:20 122:8,13 123:4 149:25 150:13,16 154:22, 23 158:1 166:22 170:15 173:14 197:2 207:17 209:18 213:10 214:5,6 243:20 255:18 271:24 275:7 276:18

**reporter** 8:11,20 9:8 18:21 23:8 60:11 74:4 81:10,13 89:4 122:22 185:14 188:7 200:7 204:14 232:4,5,7 241:21 243:7

**reporters** 235:6 241:25 243:9

**reporting** 8:13 24:13,18 197:20,21 206:2 209:25 212:7 217:4,5 218:21 219:12,21 220:8,11 221:7 246:19 247:4,6,15,19,23, 24 251:11,21 254:2 265:8 274:12,22,24 276:8

**reports** 171:17

**represent** 8:12,19 59:4

**representation** 40:5 108:1

**representative** 16:6

**represented** 133:1

**representing** 50:11

**reprimand** 265:23,24 266:1 267:24 268:5

**reprimanded** 268:3

**Republic** 240:9

**reputation** 75:8 88:5,10, 22,23 89:17 90:11 91:21, 24 93:8 96:16 97:4 155:17

**reputational** 75:8

**request** 76:23,25

**required** 166:23 167:8 195:19

**reservation** 273:16

**reserve** 273:14 278:17, 20,25

**reserving** 273:16,18

**resort** 278:7

**resources** 213:2,24 214:3

**respect** 134:3 207:16

**respective** 14:21

**respond** 119:3 143:20 183:24 199:4

**responded** 110:6 115:10 117:3 136:7 196:7

**respondent** 62:1,4

**responding** 237:17

**response** 19:8,18 38:7 44:21 90:15 111:10 143:25 196:6 208:9 211:16 275:4

**responses** 19:11,15 258:3

**responsibilities** 33:13 129:9 207:11 250:21 251:8,19,25

**responsibility** 133:12

**responsible** 179:18 219:4

**rest** 117:22 278:17

**restricted** 124:19

**restructure** 189:18 207:10

**restructured** 261:19

**restructuring** 187:16,21 191:6 255:12

**result** 90:11 128:17 140:7

**results** 257:23

**retain** 39:22 163:25 194:12

**retainer** 108:3

**retaining** 164:6

**retali-** 197:15

**retaliated** 84:17 85:2 196:19 211:25 212:23 214:16 220:25 221:10,19

**retaliating** 211:7 213:14

**retaliation** 84:23 85:5,7 97:19 104:11 198:9,13 207:20 211:7 214:23 216:9,10,16,25 217:3,19 219:23 221:15 250:22 251:4,11 255:22 265:3,8

**retaliations** 251:6

**retaliatory** 184:14 185:22 197:16 198:4 264:23

**retire** 56:17,20

**retirement** 53:5,9 57:11

**return** 21:10 63:19,24 64:2,12

**returned** 170:13,22 171:2

**returning** 170:23

**revamped** 107:7

**reveal** 164:16 234:4

**revealing** 194:11

**revenue** 14:1 187:6,7 247:3 253:11

**revenues** 254:15

**review** 9:22 19:11,20 30:13 33:7 112:18 173:23 176:7 177:23 178:20 179:13,23 180:4 182:2,7 183:10 186:15 190:10,11, 12 192:17 195:13,16,17, 23 244:7

**reviews** 174:4

**revocation** 87:2,6

**Rick** 148:4 153:15 168:10 169:24 170:1,2,4 172:7,8 216:23 227:2 230:8

**ring** 273:5

**risers** 219:6

**Rivera** 9:4 99:2

**Road** 8:17

**Robles** 8:23

**Rocha** 8:25

**Rock** 115:12 199:11

**Rocky** 23:1 245:25 260:19

**Rogers** 262:7

**role** 11:21 50:9 144:5 193:20

**roll** 57:12

**Ron** 90:2 220:6

**roof** 17:10

**room** 130:16 183:14 190:14 209:14,16 261:10

**root** 20:25

**rose** 122:7 271:13

**Roughly** 61:9

**row** 126:23,24,25 132:6

**rows** 126:20 156:3

**rubbed** 131:22

**rules** 9:18

**rumors** 43:4,6,10,12 47:14

**Rund** 205:15,18 215:20 216:8,11,14 221:16 254:11 277:25

**S**

**S-U-G-I-Y-A-M-A** 39:7

**sadness** 95:25

**salaries** 64:5

**salary** 16:16 18:9 25:19 28:4,11,20 65:5,20 67:5 69:11,12,14 92:25 186:18, 20 196:13 274:16,25

**Salcido** 84:21 213:2,16, 20 214:9,15 215:2,9 218:15 219:20 220:6 224:16 227:5 229:5

**sales** 12:16,23 15:7 16:4 179:8,9,20,24 180:1,4 252:9 253:7 254:5

**Sally** 257:8

**Samuels** 8:16

**San** 167:21,22

**Sandy** 177:10

**Santos** 9:1

**sarcasm** 111:18 117:11

**Sarcastic** 118:1

**sat** 129:21 146:19 156:2 160:2 224:12

**satisfied** 157:17

**satisfy** 171:3

**Saturday** 115:11 142:3 199:7,8,11,12 200:12 257:2

**save** 126:3 245:8

**scene** 206:22

**schedule** 72:11,24 203:21

**scheduled** 243:15

**scholarship** 271:2

**school** 29:20 114:5 213:2 262:10

**schools** 109:4

**Schramm** 23:2 75:21 81:6 212:17,22,25 213:3 214:2,8 225:12 278:8

**Schramm's** 213:20

**scoring** 175:8

**Scott** 120:25 135:9,16 137:3 139:20 144:8 145:21 148:3,16,25 149:6, 22,23 150:19 152:22 153:22 230:8 247:6 276:18

**Scottie** 217:22,24 262:15

**Scottsdale** 8:17

**screamer** 219:17

**screening** 25:8

**scuttlebutt** 44:4

**search** 38:16,18 39:2,22 42:13 48:14 50:16 91:7,9, 13 99:10,22 100:7 103:1 106:21 107:12 108:9 109:25 110:4

**searched** 39:1

**searches** 46:5,6 107:15

**searching** 18:6 108:1

**season** 139:8,22 143:17 152:17 238:10 253:7

**season's** 133:2 140:1 142:14

**seat** 16:14 117:6,7,19 126:24 127:14,16 129:6 131:2

**seated** 129:10

**seats** 127:2 128:7 129:8, 23 161:5,12 253:17,19 269:10 270:15 271:14,24

**secondary** 261:22 264:15,16 269:11

**secrecy** 159:11

**section** 131:9

**sector** 50:20

**security** 77:21 81:8,23 82:5,8,21 83:2,5,9,12 95:9 141:16

**seek** 276:4

**Self-awareness** 181:21

**self-evaluation** 174:13, 19 175:25 180:8,25

**selfish** 242:5,7

**sell** 66:11,13

**selling** 16:14

**semi-oversight** 278:2

**seminars** 14:13,17,22 15:18,19

**send** 182:17 222:15 254:11

**sending** 43:16 248:21 249:21 254:4,18

**senior** 21:16 24:3 37:14 85:22 100:17 189:11 207:9 214:2 257:17,24 258:3,14,17,19

**seniors** 14:20

**sense** 68:8 207:15 208:8 249:13

**sentence** 123:18 162:3 240:4

**separate** 168:21 190:11

**separately** 195:6

**September** 238:22 259:17

**series** 192:22 257:13 259:8

**serve** 201:7

**served** 19:12

**serves** 22:2 61:10 141:14 260:10

**service** 119:21,22 270:18

**services** 91:7 119:24 216:3

**session** 217:18 260:11

**set** 19:8,18,19 70:9 126:4 146:5 206:22

**setting** 143:6

**settled** 105:18

**Seventh** 8:13

**severance** 229:20

**sexual** 114:11 123:20 128:14 153:18 154:23 155:5,23,25 156:1,6,14 157:10 162:15 168:5 172:14 173:19 275:7 276:5

**sexually** 128:23

**Shangraw** 148:4 149:10, 20 150:16 151:4 153:15, 24 168:4,23 169:5,8,15,20 170:3,4,9,15 171:1,17 172:7 216:11,23 220:6 227:2 230:8 276:16

**share** 257:18,19,20 258:4

**shares** 66:17

**sharing** 219:7

**sheet** 100:22 101:5,8,9 105:24

**short** 81:10 84:13 98:19 212:10 266:21 267:6

**shortly** 150:21 240:20

**show** 27:12 31:11,14,17 33:21 37:2 61:11 63:18 90:8 200:6 223:3 259:4,12 275:5,13

**showed** 79:12 80:20 82:4 252:8

**showing** 137:1 200:12 247:4

**shown** 65:2 67:11 68:14 245:1 246:15 264:7

**shows** 59:17 61:1 64:5, 11,12 66:24 179:15 263:16

**shrunk** 258:15,18

**shut** 107:4

**sic** 59:10

**side** 14:18,19 72:23 76:1 100:16 126:4 245:1 247:2, 18

**sides** 131:23 147:8

**sign** 182:7,10 188:4,11 189:2 191:5,9

**signature** 23:16 181:3 270:10

**signed** 24:12 181:5,9 182:9,12,14 188:21 190:7

**significant** 113:25

**signs** 182:4

**similar** 40:21 44:21 47:6 48:6 50:9 53:20 54:4 145:5 147:12

**single** 129:17,18

**singular** 91:13

**sir** 12:21 14:15 16:23 19:21 20:21 21:11 22:23 23:18 24:7 25:15 26:1 28:2,6,13,16,22 32:2 33:2, 25 35:24 36:2 37:6,15,17 38:6,10,14 39:15 43:19,25 45:18,24 47:13 49:2 50:1 51:11,24 52:16,22 53:1,6, 15,17 54:14,18 56:7,12,14 59:15,19 61:2,19,25 63:1, 11,25 64:6 65:3 69:15 70:5,15 71:24 74:11 81:7 82:17 86:14 89:22 90:13, 18,21 92:12 97:11 100:20 101:14 108:25 112:20 113:13 122:18 123:16 124:10 126:10 129:22 130:23 142:13 146:7,15 150:12 153:20 155:9,20 162:7,16 165:18 166:13, 20,25 167:4,10 168:7 174:12,15,22 175:7,16,23 176:6,8,17 178:19 183:7 184:10 187:5 189:3,8,12 192:24 193:4,10,13 194:24 195:10 199:6 205:25 207:5 211:15 212:18,21 213:5,17 214:1, 13 215:24 225:13 233:4 238:12,18 240:2 241:4,10 244:13,16 245:21 246:11, 17,21 247:5,14 250:12,24 251:23 252:7,11 253:25 254:14 256:21 259:10,19 262:3,19 263:15 264:8,12 270:2,9,14,20 273:9 274:23 276:2 278:15

**sit** 30:19 31:1 71:21 126:15,17 127:13,16 129:19 131:2,9 163:1,15, 20 171:8 211:9 271:17,21

**sits** 132:8 257:6,7

**sitting** 127:7,11 135:20 136:16 147:5 161:2,3,5 207:16

**situation** 172:2,4 205:3, 16 210:1 213:11 231:6 232:15

**situations** 71:1

**six-month** 229:20

**skip** 70:11

**sleep** 72:13,16

**sleeper** 70:24 72:12

**sleepless** 195:23

**small** 53:7

**smiley** 117:3

**Smith** 235:17 236:4,8 238:1 248:17,22 249:11, 21

**softball** 22:15 201:8 202:2

**soften** 73:9

**softer** 176:14

**sold** 66:6

**sole** 186:23,25 262:20

**solo** 135:20 136:17

**Solutions** 259:9

**someplace** 71:6

**Somers** 243:12,17

**son** 267:16

**sophisticated** 66:12

**sort** 16:21 18:10 53:5,18 72:13 73:4 106:18 127:20 231:4

**sought** 71:25 72:3,13 73:23

**sound** 28:24 32:16 119:9 216:18 220:3 269:17

**sounded** 214:16

**sounds** 28:25 29:17 214:23

**source** 44:4 241:22

**sourced** 66:7

**sources** 43:6,10

**sourcing** 40:6

**speak** 44:13 45:21 93:23 143:11 144:2 171:2 213:1 221:24 242:19 243:12 260:23

**speaking** 214:8 219:4 221:14 224:1

**speaks** 96:13

**specialist** 8:12

**specialize** 39:17

**specializes** 49:25

**specific** 30:22 31:9 33:6, 16 34:4 47:22 156:16 162:21 168:13 205:5,17 229:19 243:2,5,6 253:2 263:8

**specifically** 41:12 93:11 94:25 149:5 214:20 217:1 227:20 228:5,20 243:18 253:5 259:9

**specifics** 33:11 36:22 41:13 42:19 45:8 46:8,13, 19 47:12

**speculation** 86:17 97:21 116:17 178:25 199:22 202:23 206:13 209:6 233:16 234:14 256:11 258:9

**spell** 11:6

**spend** 111:23 203:7

**spinning** 192:13

**spirit** 246:4,5,13

**Spokane** 11:18 12:9

**spoke** 22:3 91:11,18 92:13,15,21 94:4 166:17 169:24 194:4 205:9 223:17,19 224:13,22,23, 25 226:22 242:13 277:11

**sponsorship** 271:24

**sponsorships** 269:18

**sport** 21:18 85:4 187:6,7 199:25 244:19,22 261:19, 24 264:20

**sports** 14:19,21 21:19,20 22:12,16 38:13,22 46:5,6 48:10,15,20 50:18 71:3,10 72:19 73:1 86:13 88:11, 13,24 89:9,10,11,15,19,21 91:1 97:4 98:9,10,13 106:22 107:8 110:17,22 111:14,20 114:3 148:9 201:6,20,22 241:17,18,21 245:13 246:3,16,18 247:3, 18 253:12 263:14 264:2,3

**spot** 80:4

**squad** 245:1 246:4,5,13

**stack** 124:2 198:24

**stadium** 15:6 16:4 223:11 253:6,15

**staff** 86:16 142:10,19 207:10 223:18

**stage** 146:5

**stand** 195:15 197:25

**standard** 66:3

**standing** 196:3 215:21, 23

**stands** 22:19 161:4

**start** 11:15 19:7 48:24 52:4,5 92:8 146:2,17 163:3 164:19 223:7,8 260:20 267:9 269:17

**started** 11:17 16:14 48:25 52:6,8,9 56:9 65:16 103:21 107:7 165:10 217:22 262:1 269:16 272:15

**starting** 56:4 140:24 174:1 175:5 250:19

**state** 8:19 16:25 22:4 28:8 41:11 42:20 45:7 46:14,21 47:11 55:2,4 63:5 71:6 80:7 84:9,19 87:16 96:4 100:4 101:17 103:5 128:19 224:8 233:3,10 252:3 256:4 275:23

**stated** 252:3

**statement** 118:6 275:10 276:1

**States** 8:7

**stats** 252:8 254:18

**status** 237:8 246:12

**stay** 15:2 197:11 220:4,7 222:19

**staying** 101:20

**Steak** 217:1

**step** 149:16 274:13

**Steps** 123:17

**Steve** 108:24

**stipend** 272:16

**stock** 61:7 65:23 66:9,11 70:1

**stop** 102:18

**stopped** 106:23 131:20 166:6

**stored** 78:24

**story** 232:12,14,15 234:21 239:12,18,19,20 240:6,19 243:14 266:21 267:5

**strange** 111:11

**street** 8:13 130:9

**stress** 106:18 195:23

**strike** 103:9 189:21 191:4 205:21

**stronger** 264:21

**structure** 213:21 217:5 246:24 250:20 251:7

**student** 72:25 180:2 216:2,3,6

**stuff** 66:13 68:7 77:16,23 78:2,8 79:14,16,20,22 80:2,6 85:5 147:12 172:10 210:24 218:8 221:3 223:15 239:6 242:3 244:7 257:6 260:13 273:14,17

**style** 176:14 260:13 261:8

**subject** 38:8 90:14 128:16

**submitted** 100:23

**subpoenaed** 59:5

**subscribe** 240:18

**subsequent** 36:3 57:8 230:7

**substance** 43:12 138:9 194:11

**substitute** 60:16

**subtract** 51:2 65:6

**successful** 100:4

**sue** 236:16

**suggest** 234:10

**suggesting** 122:12 123:2 238:1,5

**Sugiyama** 39:5,7,13 40:9,14,16,24 41:15 42:15 43:1 44:8 47:17 99:14

**Suite** 8:17

**sum** 230:6

**summary** 64:12

**summer** 11:24 29:19 167:21,24 170:13,25 182:8 194:18 205:6

**Sun** 161:21 189:10 241:22 252:20 253:15 271:1

**Sunday** 115:12

**sundevils.com** 200:11

**supersede** 27:19

**supervision** 90:24

**supervisor** 151:23 158:2 176:2 181:13 275:8

**support** 234:20

**supportive** 113:11 148:1

**supports** 96:7

**supposed** 83:22 264:17

**surmise** 44:6

**surpassing** 177:25 180:13

**surprise** 258:2,6

**surrounding** 19:23 41:11,12 42:20 45:11 195:8,13

**survey** 257:24

**swear** 8:20 19:20

**sweet** 84:13

**swim** 115:22 186:10 199:14,18,19,20

**swimming** 22:15 113:21 115:11,16,20 116:4,12,14 164:11 184:18,24 185:5,8, 10 186:2,5 196:13 197:1, 6,12 198:5 199:5,10 200:12 201:8 202:4 217:6 245:20 251:21 252:4

**swore** 19:14

**sworn** 9:7 159:11

**symposium** 217:18 220:16

**symptoms** 70:16 71:22

## T

**T-MOBILE** 126:14 130:9

**takeover** 67:5

**takes** 52:15 170:24 211:18

**taking** 8:15 149:16 185:25 198:4

**talk** 21:9 40:14,16 42:24 47:3,24 48:14 51:12 70:12 74:8 75:16 76:4,6 89:9 90:22 94:6 98:21 117:25 125:23,24 126:1 133:2 135:6,9 136:21 137:6,19 138:13 139:11,22 140:4,9, 15 142:7 143:12,17,18 144:7,17,20 147:22 148:3 149:9,24 153:15 154:3,9 167:6 192:12 195:16,24 206:21 207:10 216:12,13 222:11 224:8,16 232:5 234:23 236:20 239:5,10, 14,16 243:1,17

**talked** 22:14 33:7,8 35:16 37:12 42:18,24 47:16,18, 20 48:9,11,12 70:10 74:10 91:14 92:5 93:1,25 94:12, 23 96:1 102:23,24 104:15 125:17 132:12 139:19 144:19,20,23 145:1 150:20 151:2 153:1 158:22 160:6 172:7 195:12 205:6 212:17 216:23 218:5 230:6,7,8,10 239:3,7 242:17 243:15 251:20 255:7,9 260:13 261:1 266:21,25

**talking** 9:19 29:6 74:25 75:11 100:7 102:18,19 106:21 111:24 121:14 124:15 130:3 145:10 147:22 150:21 152:22 168:11,23 196:4 205:18 237:18 241:25 260:25 274:21

**talks** 25:7,16 195:7

**target** 69:10

**tarmac** 141:15 143:7,12

**tax** 63:19,24 64:12

**taxes** 66:11,14

**team** 12:10 75:15 84:8 86:22,24 126:16,18 141:19 189:11 199:18,19 224:14 250:20 251:7 255:23,25 256:4,5,9 257:17,24 258:3,15,18 267:10

**teams** 46:6

**Teasdale** 178:17 188:23 204:18 244:2 256:19 267:20

**tee** 199:11

**telling** 105:14 115:19 156:20 173:4 189:25 199:17 218:9 221:9 256:1

**Tempe** 199:15

**template** 174:23

**tenure** 201:6,19

**term** 34:6 53:12 100:22 101:5,7,9 140:19 191:25 192:4 198:8,10 211:24 267:15

**termed** 94:20

**terminated** 51:21 75:10, 18 103:13,19,22 164:1

**termination** 38:21 51:13, 16 55:24 91:20 215:16,19 219:24

**terms** 36:23 101:10 103:16 143:23 196:2 219:14 269:8

**Terrell** 111:7

**test** 52:11

**testified** 9:8 89:20 106:21 148:21 149:3 155:21

**testify** 19:23 20:3 148:18 227:18,24 255:16

**testifying** 159:10

**testimony** 37:8 74:14 84:25 89:18 105:11 107:21 194:3 197:9 219:11 220:18 221:4,23 222:25 229:2 230:5 239:7 273:7 279:24

**text** 93:24 94:1,7 105:14 109:10,11,24 111:5,17 114:17,20 115:4,14 116:23 117:9,25 124:3,21 125:3 126:3 135:15 136:20 140:14 182:17 186:8 192:22 193:2 194:22,25 199:9 202:7,9 222:15 236:5,21 237:7,19 238:6,16 241:2 242:4 248:16 253:23 254:11 272:4,5,6

**text-messaging** 199:2

**texted** 192:14 210:15,17 273:10

**texting** 111:4 114:24 117:6 124:6 125:7 137:18 140:23 199:16 236:24 237:10,15

**texts** 116:24 125:6 135:19 137:3 199:3 210:20 236:3 241:5

**Thamel** 235:4 236:25 237:8 238:10 239:3,8 240:20 241:11 248:22 249:7

**Thamel's** 238:24 239:2 249:25

**thanking** 202:9

**then-wife** 127:19

**thighs** 147:13

**thing** 9:19 14:13 31:17 41:4 46:16 107:19 115:14 123:13 162:13 209:22 216:21 223:10 231:14,19 240:10 251:24 277:24 279:17

**things** 13:22 64:21 76:24 78:24 79:2,17,21 80:2,5

82:18 83:4,7 149:25 182:21 191:22 192:2 198:3 210:5 219:10,18 221:1 228:2 251:1,9,10 257:3 260:12 261:13 266:7 274:8

**thinking** 103:13 228:12

**thinks** 238:9

**third-party** 13:11 16:6

**thought** 18:14 25:11 31:15 37:9 43:6 45:10 67:19 70:4 85:18 86:2,24 101:20 143:22 158:5 186:1 187:10 188:2,9,14 197:15 198:4,12,13 210:12 229:21,22 230:23 252:22 258:14 276:14,21 277:3,7,23 278:3,5

**thousand** 29:10,24 30:11,21 34:3 35:22 36:6 66:16 69:17 117:8 183:6, 23 184:5 187:13 229:17, 22

**threaten** 211:23 212:1

**threatened** 84:14

**threatening** 84:9 85:10

**throws** 267:8

**Thunder** 11:23

**Thursday** 217:13,14,15 219:2 220:2,17

**ticket** 12:16,23 14:1 179:9,24 180:1,4 252:8 253:7 254:4 269:11

**ticketing** 12:18 13:8,11 14:8 21:18 100:11,16 177:24,25 178:5,9 185:2 196:15 207:15 218:21 245:12 246:3 247:23 252:5 254:3 274:22,24

**tickets** 252:16 253:8

**time** 8:4,18 10:13 12:15 20:16 23:20 28:21 30:10 35:12 41:2 42:5,8,24 44:14,22 46:4 48:9 52:1 77:24 85:7 92:25 94:6 95:18 98:16 99:21 101:16 103:16 106:24 109:25 112:23 113:2 116:1 120:10 121:24 123:12 134:8 137:14 141:7,8 146:10 150:1 151:7,10 152:4 153:18 159:18 160:11 164:2 165:1 167:2, 12 169:1,4 170:24 171:4, 7,13,17,23 174:19,20 180:25 181:23 192:17 194:1,15 198:11,13 199:11,25 202:10 203:7 215:25 217:3 223:10 224:15,18 225:5 230:9 235:7 238:23 240:8,14,22 241:24 248:3 251:17 252:14 265:12,20 269:23 278:17,20 279:4

**times** 10:5 22:3 40:16,18 47:17,19,23 71:2 139:4 201:8 204:25 230:7 259:21

**timing** 43:22 145:3 249:12

**tips** 64:5

**title** 155:1 157:8,13,19,21 158:9,13 172:4,5,12 173:5,11,12 186:16 195:5 196:12 274:12,14,25

**today** 8:22 11:16 21:3 30:19 31:2 163:15,20 211:9 223:21 224:17 239:5 279:24

**today's** 8:10 9:23 71:18 225:4 251:13

**told** 24:16,17 44:9 51:20 75:12,14 76:15,20,21 77:3,13 84:5,7 92:16 93:10,12,13 96:3,15 98:6 102:20 103:19,22 104:2,5, 6,9,14 110:20 130:24 131:14 133:11 139:5,18 144:8 150:3,16,19 155:8 157:14 158:24 163:20 169:24 171:1,16 173:3 184:21 188:3,11 195:21 196:15 198:16 200:16 207:9,17,22,25 208:23 209:18 213:1,13,16 218:15,17,22 219:1,9,12 220:20 224:14,24 225:1 231:9 233:21 255:5,8,24 256:2,16 261:16 271:4,7 278:13

**tolerate** 147:25

**tomorrow** 135:20

**ton** 210:18,20

**tone** 47:6 176:14

**tonight** 132:23

**top** 16:21 39:21 42:16 114:7 124:6 203:25 223:8 270:15

**topic** 195:23 243:6 265:22

**topics** 33:17 235:9 242:22

**tossed** 266:19

**total** 48:2 179:9

**touched** 120:13,17 121:21 122:11 123:1 140:20 147:8 172:17,24

**touching** 138:11 143:15 147:12,16 148:24 217:8

**touchy** 121:18

**tough** 41:4 98:10 110:24 111:21 146:24

**tournament** 113:8 124:9 126:7 133:7,16 134:20 135:7,10 141:20 153:4 156:3

**toxic** 41:2,4,10,24 42:18 43:4 44:23 45:6,11 46:1 47:7 110:21

**Tracy** 235:17 236:3 237:18 248:17,22 249:11, 21

**Trail** 11:16 12:19 13:3,17, 24 14:2,6,9

**trained** 150:4,8 151:16 158:2 173:18 230:18 275:6,24 276:6

**training** 15:24 167:8

**trajectory** 185:9

**transcript** 8:1 149:6

**transferred** 242:11

**transition** 65:11

**transparent** 100:5

**transpired** 70:22

**travel** 203:20

**treatment** 71:25 72:13 73:23

**trending** 198:6

**trial** 31:1 52:11 56:5 251:17

**triggers** 72:10

**trip** 22:22 23:23 27:24 58:21,22 162:6,8 165:25 166:6 169:16,25 267:10

**true** 19:15 96:5,6 97:25 112:21 178:5,10 189:20 201:18 214:18 248:2 254:1,20 268:23 275:10 276:1

**trust** 17:20,25 30:8 32:17 51:5 52:6,23,24 53:21 54:12,16 56:6 59:5,13 61:6 62:5 64:8 65:20,22 66:8 67:2,17 150:7 152:22 176:19 255:20

**Tuesday** 217:11 218:5

**Tulsa** 138:1,8,17,19,22 141:17,18 153:8

**turn** 80:23,24 245:15 272:18

**turned** 97:23 101:13 169:19 272:16

**Turnkey** 39:9

**turns** 204:5

**twenty-thousand** 270:16

**Twitter** 236:24 248:22 249:24 250:1,2

**two-minute** 224:19

**types** 100:8,10

**typical** 53:3 117:25 160:1

**typically** 167:23 176:2

U

**UCLA** 103:6 126:7 160:1 199:15

**Uh-huh** 80:17 109:22 110:2,14 111:15 115:1,9, 18 117:15,23 125:5 126:12 135:24 137:10 140:18 142:16 230:19 242:6

**Uh-hum** 25:18

**ultimately** 101:25 250:22 251:9

**unable** 90:16

**unavailable** 264:17

**unaware** 128:4 155:23 218:10

**unbeknownst** 266:23

**uncomfortable** 136:22 147:16,17 160:17,22

**uncovered** 123:20

**understand** 9:16,21 23:6 38:15 57:9 64:13 74:14 89:18 110:3 119:21 139:12 145:15 166:9 172:11 180:15 184:13 194:3 197:9 215:19 220:23 233:6,9 234:7 244:17 260:2

**understanding** 24:9,10 35:2 86:6 149:9 151:19 153:21,25 154:5,17 189:14 230:4 236:17

**understood** 244:21

**unhirable** 46:10,15,18 47:7

**United** 8:7

**university** 12:4 28:8 42:20 97:10 132:16 169:1 189:6 214:6 243:21 256:4 266:4,19 275:23

**unlawful** 90:12

**unnecessary** 158:1

**unreasonable** 185:3,17 197:8,10

**unsatisfied** 171:19

**unusual** 86:15,21 202:5

**upcoming** 72:11

**update** 49:4 111:6

**updated** 49:3,5

**updates** 239:14,15 254:6

**upset** 143:21

**upstairs** 82:7

**usage** 55:19

**USC** 253:8

**usher** 269:2,6

**Utah** 266:3,4 267:13

V

**vacation** 167:18 170:13, 22,23 171:3 182:8 202:11

**vacations** 203:5 222:4

**vague** 29:5 39:24 104:4, 12 108:15 113:23 114:4 134:8 142:9 158:21 159:18 194:15 231:25 235:7 252:14 258:8 265:12

**Vail** 116:25

**Validated** 185:10

**Van** 16:5

**variance** 51:3

**Vaughn** 9:3

**Vegas** 124:7 126:11 134:18 136:11 138:15,19, 21 158:23

**vendor** 271:17,22

**ver-** 60:17

**verbally** 13:6 268:19

**verbatim** 220:6 257:8

**versa** 264:18

**version** 60:17 112:2

**versus** 8:6 34:7 68:25 178:1 180:14 252:9

**vests** 66:10,13

**vice** 50:6,7 97:8 189:5 213:23 264:18

**victimized** 172:14,16,18

**video** 8:4,5,12,13,15 279:22,23

**VII-RELATED** 173:5

**Vikings** 16:2,3,7,8,24 17:6

**Vikings'** 15:5

**violated** 147:10 271:16

**vision** 53:3

**visit** 24:1,24 25:1

**visited** 22:3

**visiting** 217:22

**Vivid** 269:10,19 270:15 271:23

**voice** 211:20,21 219:15

**Volume** 8:5

W

**W-2** 59:12 67:14,18

**wages** 64:5

**wages/tips** 59:13

**Wagner** 16:5

**waist** 131:22 140:24 147:7

**wait** 133:2 215:3,5 266:9

**waiting** 81:23,25 137:8 141:15

**Wake** 70:24

**walk** 75:23 76:4 112:3

**walkable** 130:11

**walked** 75:13,20 76:12 78:1 82:22 83:9 92:5 141:8 217:23 224:12 225:15,25 226:1,22 227:17

**walking** 75:19 76:1,11 131:19 191:4 223:21

**walks** 224:7

**wanted** 142:20 189:20 197:11 212:1 218:19 220:7 221:12,21 222:19 231:7

**watch** 83:7 122:1 199:18

**watched** 82:18

**watching** 128:3 137:5

**water** 131:19 147:6

**ways** 111:23

**Wear** 85:5 104:10 113:7, 10 114:11,19 116:24 117:24 119:6,15,19 120:3, 12,17 121:23 122:11,12, 25 123:3,21 124:3 125:9, 15,17 126:17,20 127:9,16, 19 128:11,23 130:25 131:3 134:5,23 140:5,17 142:18 143:13,23 144:21 145:13 149:11 150:14 151:9 153:4,17 154:1,9 155:17,23,25 156:2 158:16 161:18,22 162:5, 15 167:7,17 169:6,16 170:23,24 171:2,11,15 174:1 186:8 189:23 198:14 199:17 204:7 205:3,16 210:1 213:8,10 217:7,19 230:6,14 231:5, 23 232:7 243:21 251:11 255:18 265:8 276:5 277:4

**Wear's** 151:5 155:4 156:14,15 157:4 166:8 168:5 169:10 170:12,21 172:14

**Webb** 108:24

**website** 15:20,24 199:13 252:21

**Wednesday** 217:13,16, 25 218:24

**week** 17:10 71:2 73:16 93:18 133:3,5 146:21 194:2 195:21

**weekend** 23:25 25:3 58:16 77:3 138:7

**weeks** 76:18 149:22 151:2,10 207:17 215:22

**weight** 73:8,10

**Weiss** 8:16

**welcomed** 260:22

**welfare** 216:3

**well-qualified** 99:25 103:4,7

**whatnot** 223:18

**when's** 48:9 112:23 164:2 221:3

**Whisper** 115:12

**wife** 127:7 128:23 129:10, 18,21 137:7 144:6 146:22, 23,25 160:3 161:7 225:25 226:25 231:11 277:9,10, 20

**wife's** 231:14

**win** 267:6,8,9,12,17

**wing** 116:24

**winning** 72:24

**winter** 11:25 15:1

**Wisconsin** 50:3

**wishes** 133:5 134:3

**withheld** 182:19

**wives** 231:20 277:12

**woman** 277:20 278:9

**Wombacher** 174:11,16

**women** 85:6 115:15,22, 24 120:13,17,18,19 121:21 122:11 123:1 138:11 139:7,11 140:2,3 141:5 143:14 145:6 152:15 158:25 172:13,24 173:1 199:10 208:24 217:8

**women's** 116:6,11 134:3 186:10 199:14,18 200:1, 12 245:19

**won** 185:10

**wondering** 234:19

**Wood** 130:14 131:1 136:5 146:23 147:15 231:11

**Wood's** 129:18,21 146:23

**word** 26:23 41:4 46:1 47:7 94:19,22 121:19 172:17 187:11 191:7 211:6,10,12 274:10

**words** 26:21 190:2 191:17,24 192:1

**work** 10:7,23 11:16 20:5 28:4 49:13 54:21 56:20 64:14,15 73:12 75:9 88:6, 12,15 90:2 98:4 163:7 165:7,11 177:9,12 215:11 216:19 218:19 220:19,21 222:19 223:12,14 225:10 265:5

**worked** 17:2 46:4 66:12 71:1 108:22 129:19,25 156:25 193:18

**working** 11:22 71:2,10 74:22 75:15 85:19 155:15 159:16,22 210:13 260:14, 17,21 261:24

**works** 9:16 40:4 213:22

**world** 38:13,22 107:4

**worst** 98:9,13 110:22 111:14 267:1

**worth** 42:5,7 195:24

**Wow** 111:11 250:9

**write** 60:4 163:4

**writer** 241:14,20

**writes** 241:18

**writing** 9:1 163:4

**written** 162:25 163:22

**wrong** 23:24 36:11 68:5,7 136:15 158:21 219:25 229:21,23 244:1

**wrongful** 51:13,16 55:24

**wrote** 275:5

**X**

**xylem** 124:12

**Y**

**ya** 117:14

**Yahoo** 241:17,18

**Yankees** 50:19

**year** 25:20,23 26:20 28:23 29:10,20,25 30:12 33:10 34:8 36:10,16 37:16 39:1 49:23 50:25 64:8,15 65:11,12 66:19,25 67:3,4, 11,13,14 68:4,5,18 71:5 74:15 175:5 176:3 178:6, 10 179:10,12,21 184:4,5,8 262:10 270:22

**year's** 51:4 156:3

**years** 17:23 29:2 34:6 35:4 36:3,8,9 48:11 71:13 112:24 162:24 163:18,21 235:23 253:6 266:19

**yesterday** 10:6

**York** 50:19

**Z**

**Zoom** 279:13

**ZRG** 39:9,10

**Zylan** 119:14 124:13

# EXHIBIT 9

**In the Matter of:**

*Cohen*

*vs*

***Arizona Board of Regents, and Anderson***

---

*Videotaped Deposition of Raymond Anderson (Vol II)*

*April 18, 2024*

---

GRIFFIN GROUP
INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

IN UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Cohen, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>Arizona Board of Regents, and Raymond Anderson, an individual,<br><br>Defendants. | No. 2:21-cv-01178-GMS |

VIDEOTAPED DEPOSITION OF RAYMOND ANDERSON
VOLUME II

Phoenix, Arizona
April 18, 2024
10:03 a.m.

REPORTED BY:
Kellie L. Olney, RPR
AZ Certified Reporter No. 50223

PREPARED FOR:
The Court
(Original)

I N D E X


| EXAMINATION BY | PAGE |
|---|---|
| MR. ROWLETT | 4 |

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| (No exhibits marked.) | | |

VIDEOTAPED DEPOSITION OF RAYMOND ANDERSON was taken on April 18, 2024, commencing at 10:03 a.m., at the law offices of Miller, Pitt, Feldman & McAnally, P.C., 2800 North Central Avenue, Suite 840, Phoenix, Arizona, before Kellie L. Olney, RPR, a Certified Reporter for the State of Arizona.

APPEARANCES:

For the Plaintiff:

Perez Vaughn & Feasby, Inc.
By: CHRISTOPHER W. ROWLETT, ESQ.
600 B Street, Suite 2100
San Diego, California 92101

For the Defendants:

Papetti Samuels Weiss McKirgan, LLP
By: JENNIFER LEE-COTA, ESQ.
ROBERT McKIRGAN, ESQ. (Appeared telephonically)
16430 North Scottsdale Road, Suite 290
Scottsdale, Arizona 85254

Arizona State University
Office of General Counsel
By: KWAN PIENSOOK, ESQ.
300 East University Drive, Suite 335
Tempe, Arizona 85287

Also present:

Michael Noonan, Videographer
Kathy Cohen
David Cohen

THE VIDEOGRAPHER: We are on the record. Today's date is April 18th, 2024. The time on the video monitor is 10:03 a.m. Mountain Standard Time.

This is the video deposition of Raymond Anderson in the matter of David Cohen versus Arizona Board of Regents, et al., in the United States District Court for the District of Arizona, Case No. 2:21-cv-01178-GMS.

Our location today is the law firm of Miller, Pitt, Feldman & McAnally, PC, 2800 North Central Avenue, Suite 840, Phoenix, Arizona.

The court reporter is Kellie Olney representing Griffin Group International, 3200 East Camelback Road, Suite 177, Phoenix, Arizona 85018.

My name is Mike Noonan, certified legal video specialist, representing the firm of VideoDep Incorporated, located in Phoenix, Arizona.

Counsel will now state their appearance and affiliations for the record, in addition to anyone else appearing on their behalf, beginning with the noticing firm.

Afterward, the court reporter will swear in the deponent.

MR. ROWLETT: Thank you. My name is Christopher Rowlett. I represent Plaintiff Dave Cohen.

Mr. Cohen and Kathy Cohen are also present.

MS. LEE-COTA: Jennifer Lee-Cota on behalf of Defendants. And I have Bob McKirgan on the cellphone, and I have Kwan Piensook, who is from the office of general counsel at ASU.

RAYMOND ANDERSON,

a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. ROWLETT:

Q. Good morning, Mr. Anderson.

**A. Good morning.**

Q. Does Arizona State University take sexual harassment seriously?

**A. I certainly have been of the impression always they take sexual harassment.**

Q. How often did athletic department employees receive training on sexual harassment reporting and policies?

**A. Certainly annually. How many times a year I don't recall, but certainly annually.**

Q. What is your best recollection about what

employees were supposed to do when they received a report of sexual harassment or witnessed sexual harassment?

**A. Report to the Title IX coordinator. In our case, it was Deana Garner-Smith, or to HR first and foremost by requirement, mandated required reporting to the Title IX officer.**

Q. Okay. And this goes for -- is this true for any employee that receives notification of a sexual harassment report?

**A. That's correct. That's my understanding.**

Q. Even if you didn't witness it firsthand, if you become aware of sexual harassment, you need to report it to HR and the Title IX coordinator; is that correct?

**A. You're supposed to report mandatorily if you become aware of harassment.**

Q. And that's regardless of the source of that information. You become aware of it, you report it; is that correct?

**A. You report it.**

Q. Is the name -- who is Becky Nemmers? You may know her as Becky Parke.

**A. Becky Parke.**

Q. She was an employee of yours in the Sun Devil Athletics Department?

**A. She was. Her department is marketing, and she is a senior associate athletic director post-promotion. When I got there, she was an associate athletic director.**

Q. Was she -- are you aware if during her time at Arizona State University she's been the victim of sexual harassment?

**A. Not aware.**

Q. Did she receive any inappropriate text messages from a former coach that you're aware of?

**A. Not that I recall. Not that I'm aware of, no.**

Q. Who is Abby Boustead?

**A. Abby Boustead.**

Q. "Boe-Stead." "Bow-stead."

**A. I believe she may have been an Adidas employee.**

Q. Are you aware of any altercations between Ms. Boustead and Scottie Graham in which Scottie Graham told Ms. Boustead he was going to, quote: Choke her out?

**A. Not that I recall.**

Q. Did anyone ever bring any issues to your attention about Mr. Graham's relationship with Ms. Boustead?

**A. Not that I recall.**

Q. Greg McElroy didn't come to you and report this

to you?
A. **I don't recall McElroy reporting anything about Amy [verbatim] Boustead. I don't recall.**
Q. Who is Eddie Sandridge? Sandidge, sorry. Sandidge.
A. **He is a former -- or I think he's still currently an ASU donor. I'm not sure. He is an alumni, but he certainly has been around the athletic department.**
Q. Was he also referred to as "Fast Eddie"?
A. **Yes.**
Q. Did Fast Eddie -- withdrawn.
Did you ever receive any information regarding Fast Eddie's sexual harassment of staff members?
A. **From campus. I don't recall if it was HR or someone from campus, but certainly was made aware that there was a -- an allegation, a complaint against Fast Eddie for some sort of sexual harassment or inappropriate conduct, yes.**
Q. How was that handled?
A. **It was handled by HR and Title IX.**
Q. Did you have any involvement in that at all?
A. **No, other than to -- to be made aware of what the action against Eddie was going to be. And I think there was some disassociation or some reprimand or some**

**conditions put on him, but I wasn't involved in that determination.**

Q. Is Mr. Sandidge, or "Fast Eddie," still a donor of Sun Devil Athletics today?

**A. That I know of.**

Q. When we -- withdrawn.

The last time we were here, we had -- I was asking you questions at the end about when you found out about Bart Wear's sexual harassment of Kathy Cohen and others at the Pac-12 Men's Basketball Tournament.

Do you recall that line of questioning?

**A. I recall that line of questioning.**

Q. Yeah.

**A. I don't know if anybody determined, except for you, that it was sexual harassment --**

Q. Okay.

**A. -- per se. I certainly didn't --**

Q. Okay.

**A. -- say sexual harassment had occurred. So don't put words in my mouth.**

Q. Oh, fair enough.

Are you familiar with a report conducted by Armstrong Teasdale, a law firm hired by the -- by Arizona State University?

**A. I am.**

Q. Do you know if they made any findings as to whether or not credible threats -- I'm sorry. Withdrawn.

Do you know if they made any findings regarding whether credible allegations of sexual harassment were made against Bart Wear?

**A. As I recall, they determined that there had been some inappropriate conduct on Bart Wear's behalf. That was a conclusion.**

**They also concluded that there was no retaliation, and they also included -- concluded that Dave Cohen was an unreliable witness.**

Q. So you do recall this --

**A. I do recall very well.**

Q. So you do recall -- it wasn't my words, in fact. They said there was credible -- you received credible reports of sexual harassment by Bart Wear. Do you recall that part of the report?

**A. That I received credible reports?**

Q. Mm-hm.

**A. I received reports. I don't recall the specifics of whether or not it said "credible reports" or any reports.**

Q. And you -- do you -- do you believe the reports you received around sexual harassment were credible?

A. **From whom?**

Q. Anyone, regarding Bart Wear.

A. **Yes.**

Q. Who reported credibly to you that Bart Wear had inappropriately touched women at the Pac-12 tournament in Las Vegas?

A. **No one. I got that from the report, and I gave credit to the report that was done by the external independent attorneys that made the conclusions, and so I was not questioning their conclusions.**

Q. So until November 5 -- withdrawn.

I'll represent to you that the copy of the report that I have received is dated November 5th of 2019. Prior to November 5th of 2019, you had not received any credible reports of Bart Wear's conduct at the Pac-12 tournament in Las Vegas?

MS. LEE-COTA: Object to form.

You can answer.

A. **Depends on how you define "credible." I define "credible" as once it was determined by that investigation and it was reported out by the independent investigation that there was credible, then I accepted that.**

Q. BY MR. ROWLETT: Okay. In -- maybe we can agree on this: On March 25th of 2019, Dave Cohen told

you that Bart Wear had -- inappropriately had touched Kathy Cohen and two other women in -- at the Pac-12 men's basketball tournament, correct?

**A. David Cohen and Scott Nelson appeared in my office and described what -- David was doing the talking -- Bart Wear had done to Kathy Cohen.**

Q. And in your words, there may be some inappropriate touching or some unwelcome touching. Do you recall that testimony from your first deposition?

**A. Yes.**

Q. So at least in March -- on March 25th of 2019, you'd received reports of inappropriate touching and unwelcome touching by Bart Wear at the men's basketball tournament in Las Vegas, Nevada, correct?

**A. That's what Dave Cohen alleged in the presence of Scott Nelson, yes.**

Q. And when was the last time -- I'm sorry. Withdrawn.

When was the next time after March 25th that you talked to Dave Cohen about Bart Wear's conduct?

**A. I didn't talk to Dave Wear -- Dave Cohen. I think the last time I talked to him where he brought up Bart Wear was at a baseball game in May, and no time in between did Dave come to me talking about Bart Wear, an investigation, or anything else related to that.**

Q. That's exactly what I want. So May -- so May is about -- let's see, what, March 25th to May 3rd is five, six weeks?

**A. Could you count?**

Q. Ballpark.

**A. Ballpark.**

Q. Ballpark, five weeks. March 25th --

**A. Ballpark.**

Q. -- to May 3rd, right?

**A. (No audible response.)**

Q. In those intervening five weeks, you had no conversations with Dave Cohen about Bart Wear and his conduct at the men's basketball tournament, correct?

**A. No.**

Q. Okay. Had you had conversations with anyone from March 25 to that May -- that May baseball game?

**A. Not that I recall.**

Q. At this point in time, were you still waiting on information from Scott Nelson or Rick Shangraw regarding Bart Wear?

**A. No. I think two or three weeks after, I had asked Scott Nelson to talk to Rick Shangraw. I believe it was two or three weeks after that Scott Nelson reported that there was nothing to report from Rick Shangraw.**

Q. All right. So it sounds like between March 25th and this May baseball game, you had a conversation with Scott Nelson about the investigation you'd asked him to conduct -- or maybe that's an overstatement -- the information you asked him to gather regarding Bart Wear and other allegations against him --

**A. Yeah, certainly --**

Q. -- is that accurate?

**A. -- wasn't an investigation. I'm glad you corrected yourself.**

**Asked him to go to Rick Shangraw and see if there had been any prior information or complaints or anything regarding Bart Wear that had to do with inappropriate conduct and needed to get some more information, if he could go get it before we talked to Bart Wear.**

Q. Okay. And what did Scott Nelson tell you?

**A. He said -- as I recall, he said Rick Shangraw had nothing to report.**

Q. At that point, why didn't you talk to Bart Wear?

**A. Because I didn't have an opportunity to talk to Bart Wear and, very frankly, hadn't heard anybody else, including Dave Cohen, mention anything about Bart Wear.**

**So I was going to talk to Bart Wear at a time that I thought was appropriate.**

Q. On March 25th, Dave said, "Should I talk to Bart Wear?"

And you said, "No, no. I'll talk to Bart Wear."

Isn't that correct?

MS. LEE-COTA: Object to form.

**A. Dave asked, "Should I talk to Bart Wear?"**

**I said, "I'll talk to Bart Wear, Dave. I'll handle it."**

Q. BY MR. ROWLETT: So as of March 25th, you had told Dave Cohen that you were going to be speaking with Bart Wear about Bart Wear's conduct in Las Vegas at the men's basketball tournament, correct?

MS. LEE-COTA: Object to form.

**A. Dave Cohen and Bart Wear were really good buddies. What I was hearing was hard to fathom, particularly as calm and as unemotional he was, if this happened to his wife, Kathy Cohen.**

**And so I wanted to get more information before I went to Bart Wear because, very frankly, under the circumstances, I had reason to doubt what Dave was saying was fully true and not self-serving.**

**So I was going to talk to Bart Wear at an**

**appropriate time and place.**

Q. BY MR. ROWLETT: How is Dave's bringing this issue to you on March 25th self-serving?

**A. Because it happened -- apparently happened almost two weeks earlier. I'm with Dave and Bobby and Kathy and a number of folks for the entire interim time, and they did not bring anything to me when we were together all this time.**

**And so when you have that incredible lack of reporting during that time and knowing how close they were -- they were as close as any donor-buddy relationship that I had seen.**

**And so when I'm hearing this and Scott Nelson is there and they're just kind of very blandly explaining it, it was hard to fathom, very frankly, that this was something that was -- that you -- you -- you just felt compelled to move on because he didn't feel compelled to move on.**

Q. That wasn't my question. My question was how was it self-serving?

**A. How was it self-serving?**

Q. Yeah. On March 25th, how was it self-serving? You said it was a self-serving statement on March 25th. How so?

**A. Self-serving in that the period of time for**

**reporting had been stretched out, and so it was self-serving for Dave to be able to -- whatever he was conjuring up in his mind.**

Q. So your testimony, as you sit here, is that on March 25th, Dave Cohen was lying to you about Bart Wear's conduct in Las Vegas, and he'd taken the intervening 10 to -- 10 days to two weeks to conjure up the lie he told you on March 25th?

**A. I didn't say --**

MS. LEE-COTA: Object to form.

**A. I didn't say he was a lie [verbatim]. I said it was hard for me to visit it, to fathom it. I didn't call him a liar. I didn't say he was lying. Those are your words, Counselor. But I certainly had pause under the circumstances and wanted to proceed cautiously on everyone's behalf.**

Q. BY MR. ROWLETT: On March 25th, you had received a report of sexual harassment; is that correct?

MS. LEE-COTA: Object to form.

**A. I had not received a report of sexual harassment. I had been notified by Dave, with Scott standing there at his side, not validating the report, of inappropriate touching or behavior with his wife. There was no sexual harassment report.**

Q. BY MR. ROWLETT: Okay. In the training that

you received as an Arizona State employee, what was the difference between inappropriate touching and sexual harassment?

**A. Oh, I don't think they make a distinction, per se.**

Q. You're making a distinction, though, correct?

**A. I call it inappropriate touching. Inappropriate behavior is what was reported to me.**

Q. In your last deposition, you testified that you'd received reports of inappropriate touching -- I'm sorry. Yeah, withdrawn.

In your last deposition, you testified that you'd received reports on March 25th of inappropriate touching and unwelcome touching.

**A. That's correct.**

Q. Why didn't you report that to the Title IX coordinator?

**A. Why didn't I report it to the Title IX coordinator?**

Q. Yes, sir.

**A. I wish I had. And that was a mistake, because I gave too much benefit of the doubt to Dave Cohen and to Scott Nelson and to Bart that some way, shape, or form, this was something that was so bizarre and so confusing and, very frankly, under the circumstances, so**

**unbelievable, I made the mistake of not instructing Dave Cohen to go directly -- and/or Scott Nelson to go directly to Title IX, and I should have done the same.**

**If I had known what I know now and had it to do over again, I would do exactly that. I made the mistake --**

Q. Okay.

**A. -- in that moment.**

Q. All right. So when did you first report this to a Title IX coordinator?

**A. I didn't report to the Title IX coordinator. Title IX, an investigation had been launched by -- by Deana Garner-Smith, and I think Jodi Preudhomme, once Dave went and, apparently, finally reported to somebody directly.**

Q. It sounds like -- and I'm not trying to put words in your mouth, but it sounds like to me that as of March 25th, you thought that whatever happened in Las Vegas with Bart Wear and these three women was something that could be handled within the Sun Devil Athletics Department? Is that --

**A. No. No --**

Q. Is that fair?

**A. -- that's -- that's not correct.**

**What I thought then was if it was -- what was**

**being reported under the circumstances was so bizarre and unbelievable, particularly given the folks involved. Dave and Bart Wear, again, were bosom buddies. I think they -- my impression was Bart and Dave were as tight as any donor-administrator relationship we had.**

**And so to hear this report, very frankly, under the circumstances, particularly given the delay in bringing it to me when we were together hours and hours and hours, was just almost unbelievable, like it was made up.**

**So I didn't make any determination other than, you know, I'm going to -- we need to see if I can talk to Bart at the appropriate time. That was a mistake.**

Q. So at this baseball game in May, did Ray ask you -- sorry. Withdrawn.

At this baseball game in May, did Dave ask you how the conversation with Bart Wear went?

**A. He asked me had I spoken with Bart Wear. It was at a baseball game. I think it was the UCLA game in May, May 3rd or 4th. And everyone was gathered in a little sitting area that they have for the AD.**

Q. And what did you tell him?

**A. I told him I hadn't spoken to him, that I hadn't had the appropriate opportunity.**

Q. Did you have Bart Wear's cell phone number?

**A. I don't recall if I had Bart Wear's cell phone number.**
Q. If you wanted to talk to Bart Wear, how would you get in touch with him?
**A. Oh, did I have his cell number then?**
Q. Mm-hm.
**A. I've got a lot of cell numbers.**
Q. Sure.
**A. So, yeah, I suppose it's in my -- in my -- still remains in my contacts, I would imagine.**
Q. So between March 25th and May 3rd, you certainly could have picked up the phone and called Bart Wear if you wanted to, correct?
MS. LEE-COTA: Object to the form.
**A. Yeah, I could have. I thought this kind of conversation was the kind that would be face to face, particularly when you're talking about allegations of inappropriate conduct and behavior, particularly when it's going to be involved between what were supposedly two very close friends and their families, including their wives, as I understood it.**
Q. BY MR. ROWLETT: How did Dave -- withdrawn.
When was the next time you saw Bart Wear face to face after March 25th?
**A. We were -- we were up in Carmel with Herman**

**Edwards for a day and a half.**

Q. And was this the golf trip?

**A. This was a previously planned golf trip that had been canceled, and so this was a make-up trip with a smaller group.**

Q. And who was on this trip?

**A. Myself, Jean Boyd, Herm Edwards, and Bart Wear, who wanted to spend more time with Herman.**

Q. How did you get up to Carmel?

**A. We flew on a NetJet type of service that Bart Wear has.**

Q. Where did you golf up there?

**A. I think we -- I think the name of the course -- I think we might have golfed at the -- Herm's course that's owned by Clint Eastwood. And then I think we golfed at another course up there. I think it starts with an M. Monterey, maybe.**

Q. Monterey Peninsula Country Club?

**A. Maybe. I can't recall.**

Q. This was your first face-to-face meeting with Bart Wear since you received allegations that he inappropriately had touched and -- touched in an unwelcome manner three women at the men's basketball tournament in Las Vegas, correct?

MS. LEE-COTA: Object to form.

**A. Yeah. It is the first time I had seen Bart since then.**

Q. BY MR. ROWLETT: Did you talk about -- did you raise the issue with him then? You said you were together for a day and a half.

**A. Yeah, no. Another mistake on my part. I should have forced that conversation and not really worried about whether it would upset the mood of Herman's hosting us up at his place. I should have grabbed time. And that was another mistake that I made, by not forcing it despite the uncomfortable surroundings in doing so.**

Q. When was the next time after your May golfing trip that you saw Bart Wear face to face?

**A. I can't -- I can't recall the last time.**

Q. Was that the last time you saw Bart Wear face to face?

**A. As far as I can recall. I don't think Bart was around subsequent to that.**

Q. Did you -- withdrawn.

I believe that you testified before that in the summers, oftentimes, you will return to Georgia where you have --

**A. Correct.**

Q. -- a residence; is that correct?

**A. That's correct.**

Q. Was that true in the summer of 2019, that you left the Phoenix area and went back to Georgia for a time?

**A. Yes.**

Q. Was that why you didn't talk to Bart Wear through the summer of 2019?

MS. LEE-COTA: Object to form.

**A. Was that why?**

Q. BY MR. ROWLETT: Yeah, because you weren't in Phoenix?

**A. I was in Phoenix, and I think Bart Wear -- just about everyone else goes somewhere else in the summer around here.**

Q. Yeah. Is that why you didn't raise the issue with Bart Wear is that you weren't in the same city? You couldn't get face to face; is that why you didn't talk to him?

MS. LEE-COTA: Object to form.

**A. Well, I wanted -- I was going and wanted to, if I was going to do this, be face to face, yeah.**

Q. BY MR. ROWLETT: Did Rick Shangraw ever tell you you need to report Bart Wear's behavior?

**A. That I need to report Bart Wear's behavior?**

Q. Mm-hm.

**A. I don't recall Rick saying I needed to report Bart Wear's behavior, because he and everyone else with whom Dave spoke in the interim could make that claim they should have reported behavior. No, he didn't say, "You've got to report the behavior."**

Q. Okay. Did you tell Rick Shangraw that you were leaving town for the summer, but when you got back to Phoenix, you would take care of the situation with Bart Wear?

**A. I don't recall telling Rick Shangraw that.**

Q. After the May baseball game, when was the next time Dave Cohen raised the Bart Wear situation with you?

**A. Don't remember him raising that situation with me post that.**

Q. The last time you recall Dave Cohen talking about Bart Wear with you was May 3rd or 4th of 2019 at that -- at the Sun Devil baseball game?

**A. That's correct. I don't recall Dave circling back directly to me trying to talk about Bart Wear.**

Q. That issue didn't come up -- withdrawn.

The issue of Bart Wear and your handling of Bart Wear's conduct didn't come up in the context of Dave Cohen's performance review in June of 2019?

**A. Nope.**

Q. That issue didn't come up in July of 2019?

Dave didn't bring the issue to you again in July of 2019?

**A. Dave didn't bring Bart Wear as an issue.**

Q. So it's your testimony that Dave Cohen mentioned Bart Wear's conduct two times: once on March 25th and once at a baseball game in May about five, six weeks later?

**A. To me directly?**

Q. Yes.

**A. That's correct.**

Q. When did you decide to terminate Dave Cohen?

**A. I decided to terminate Dave Cohen when we had explained in a meeting that we were going to complete our restructure as it related to him, and he was going to report directly to Frank Ferrara on the business and revenue side, and he was going to continue to report to me as the administrator for basketball.**

**And he determined that he was not going to do that, didn't have to do it, and made that very clear to Frank Ferrara.**

**Frank reported it to me, and it became very clear that this was the last straw, this insubordination with Dave following a series of prior things conductwise and how he failed to interact appropriately with other folks, the various things that were brought to my**

attention as real problems with Dave Cohen.

It was the accumulation of things, and this was the final straw: The reports of inappropriate expensing that the university had to investigate, Vivid Seats taking board money from a vendor, repeated disrespect and treatment of colleagues in our management team, and a number of other things that, finally, this was the straw.

The efforts to have executive coaching multiple times come in to try to help Dave Cohen become a better teammate and a better employee and a better overall contributor did -- apparently did not work.

The -- the fact that we had coaches specifically wanting him off of their assignments because he was not bringing value and, in some cases, just felt that he didn't care, a combination of things, and then we get to the point where he is going to tell us, your -- he is not going to agree to the restructure as it -- as it related to him.

Accumulation of those things, this was the final straw when he essentially said, "I'm not doing the restructure. I'm not reporting to Frank. You can't make me do this. This is not right."

That's when I determined that enough was enough. It was time to go. This was after giving him a

**$95,000 bonus that was supposed to be less than that, but he begged me, on behalf of Kathy and his kids, that "I've got to have this money."**

**And so I relented with the thought that, okay, we are -- we're ready. We can go forward. He is ready to go. We can save this.**

**And then it didn't happen on that day when he determined that, no matter what, he was not going to report to Frank Ferrara according to the restructure that we thought was in the best interests of our department, after a number of other folks had been restructured and assigned. Dave Cohen was the one who determined he was not going to comply, and that was the final straw.**

Q. Sorry if my question was unclear. I was looking for a date. Was that date August 12th?

**A. That was August 12th. He was in my office, and when it became clear that he was resisting, then made the determination I was going to inform my boss, the president, that the time had -- had come. This was something that was just not going to be tolerable, this insubordination.**

Q. So when did you first call President Crow regarding Dave Cohen's termination?

**A. It would be either that night or the night --**

**or the night after.**

Q. Either the night of the 12th or the night of August 13th?

**A. Yes, it -- yeah, as I recall. It was not long after my determination that I was going to alert the president, because we were going to take prompt action.**

Q. And did you call President Crow whenever you decided to terminate an employee from the athletics department?

**A. I alerted him. Not an employee, per se, but typically senior folks or a coach or an assistant coach. I would give him, certainly, a heads-up so that he didn't hear about it or read about it externally.**

Q. And what did President Crow tell you when you called him?

**A. I can't recall if we were text messaging or calling, but I know the message was clearly: You have the authority. Do what you think is necessary and right under the circumstances.**

**And that is typically his response.**

Q. When did you first talk to Kevin Salcido about Dave Cohen's termination?

**A. I can't recall whether that was after we made the determination or he had -- we had brought in Amy Schramm or Kevin. I can't recall talking with Kevin**

**Salcido prior to that.**

Q. Did Kevin Salcido tell you it was not a good idea to terminate Dave Cohen?

**A. I don't recall Kevin Salcido telling me it was not a good idea to terminate --**

Q. Did Kevin Salcido express any concern about your decision to terminate Dave Cohen?

**A. I can't recall specifically Kevin having any direct discussion saying, "I'm concerned about this."**

Q. What do you recall Mr. Salcido saying about Dave Cohen's termination?

**A. I don't recall Mr. Salcido saying much. I think I recall there may have been -- there -- there was a meeting, I think, orchestrated by Amy Schramm and maybe Kevin, and I think this occurred after Dave was informed that he was being terminated.**

Q. On the morning of August 15th, did Frank Ferrara come to you and report on a meeting that he had with Dave Cohen that morning?

**A. He mentioned something about after the prior, a very heated conversation, that Dave had come in and tried to smooth things over. He mentioned it. You know, he -- "Dave came in, and he's got a different attitude about it," something to that effect.**

Q. And did that change your decision on Dave

Cohen, terminating Dave Cohen?

**A. No, because that -- my decision had been made prior to that, not after the fact, going back and -- you know, wanting to be nice to Frank after the fact, that did not change any thought of mine because he'd already demonstrated that this was the last straw in terms of how I had to react and protect, in advance, our organization.**

Q. What did you tell Frank when he told you that Dave came in with a -- I believe your testimony was -- different attitude and wanted to smooth things over? What did you tell Frank?

**A. I said, "Too little, too late," something to that effect. You know, anybody after the fact can play nice. I said I already made the determination and -- and had the discussion with my president.**

Q. Did anyone at Arizona State University express concern about your decision to terminate Dave Cohen?

**A. Express concern?**

Q. Mm-hm.

**A. I don't recall anybody expressing concern.**

Q. At some point -- withdrawn.

What did you tell Dave Cohen on August 15th, the day that you informed him he was being terminated? What did you tell him?

A. I told him that we were going a different direction now. It was very clear that this was not working. He was not a culture fit, wasn't prepared to get better, and with this latest insubordination, it was time. I couldn't -- I couldn't do any more without, very frankly, jeopardizing our culture. He had to go. Gave him every opportunity. Couldn't save him.

Q. Did you tell him to pack up his things in his office?

A. I don't know if I told him to pack up. I said HR, as we typically do, will -- talk to HR, in this case Amy, and it may have been Frank or whomever. But I didn't say, "Pack up your office and get out."

We don't do that way. We get the HR folks and tell them very -- as -- as kindly as we can, "You will meet with HR folks, and they'll talk you through what needs to be done to be able to exit out."

Q. Did someone escort Dave Cohen out of the building on August 15th?

A. I think a combination of Amy and Jean Boyd were assigned. That's my understanding.

Q. Who was in the room when you informed Dave Cohen that he was terminated on August 15?

A. I think it was -- as my recall, it would have been Amy and maybe Jean Boyd. I don't think Frank was

**in there. So I -- as I recall, it was Amy and Jean Boyd.**

Q. In that meeting you had with Frank Ferrara on the morning you terminated Dave Cohen, did you tell Frank that Dave was manipulating him?

**A. I don't recall telling Frank that Dave was manipulating him.**

Q. Who made the decision to place Dave Cohen on administrative leave rather than terminating his employment immediately?

**A. It may have been Amy Schramm or Kevin. I didn't -- I didn't get -- I wasn't in that conversation, per se. Once it's handed over to HR, then they will make those determinations.**

Q. You were not involved in that determination?

**A. I was not involved in that.**

Q. How did you find out about that decision?

**A. They -- Amy, I think, must have reported it back to me. I don't recall specifically.**

Q. Other than the night of either August 12th or 13th, when you spoke to President Crow, how many other conversations did you have with President Crow about Dave Cohen?

**A. Oh, I don't recall the number of conversations. We certainly had conversations about the general**

**restructuring of our department, which he had recommended, and I had too many direct reports, and I needed to focus, if I could, more on donor and fundraising and some of the other development things. So -- but no specific, per se, discussions regarding Dave.**

Q. Did President Crow, to your knowledge, ever speak to Dave Cohen directly about things like attendance and ticketing at sporting events?

**A. Well, certainly, we would have group meetings where we would report out to the president and senior management people, and so President Crow would be there. And we would report on ticketing and affinity and donor relations and operations and coaching statuses, a variety of things.**

**And so, yes, in those meetings, President Crow would converse with everybody, and I'm sure he conversed with Dave Cohen.**

Q. Are you aware that President Crow would call Dave Cohen directly and speak to him specifically about ticketing, affinity, attendance, these issues?

**A. That he would call him directly? No. I don't control what President Crow -- who he calls and when he calls them and why he wants to call, no, and they don't report those things to me.**

Q. Did you ever talk to President Crow about this lawsuit?

**A. No.**

Q. When was the first time Dave Cohen said the word "retaliation" to you regarding Bart Wear?

**A. The first time Dave Cohen mentioned retaliation to me regarding Bart Wear was when we fired him. I fired him, and that's when -- the first time he told me, "You can't do that. You know, this is just retaliation. And you're exposed. There is a lawsuit waiting to happen."**

**And he kind of went off. He had never mentioned retaliation at all.**

Q. And it is your testimony the last time he'd even raised Bart Wear as an issue was May 3rd or 4th, correct?

**A. To me directly.**

Q. To you directly, the last time was May 3rd or 4th?

**A. Dave Cohen did not mention Bart Wear to me any time other than those two times. To me directly, no.**

Q. So that's -- doing some quick math -- a little over three months from the last time that Dave Cohen, per your testimony, had mentioned anything about Bart Wear, about three -- a little over three months from

when the last time he mentioned it to you to when you terminated him on August 15th, correct?

**A. To me directly.**

Q. Are you aware that he spoke to anyone else about it?

**A. I am certainly aware that he was going to others talking, but never came to me directly.**

Q. Did you hear about those conversations from anyone else?

**A. Yeah. They would say, you know, Dave is -- Shangraw -- at some point, Shangraw, Jean, Frank, at some point before August 12th, certainly would say -- certainly, each of them at some point say, "Dave's got this thing about Bart Wear, but he wants to keep it to himself, and he doesn't want to report it to Title IX."**

**That's what they would tell me.**

Q. And did you have a conversation with Dave about these -- about these statements he's making about Bart Wear?

**A. No.**

Q. When did -- how long after -- withdrawn.

How long after Dave Cohen's termination did an investigation begin regarding Bart Wear's conduct in Las Vegas?

MS. LEE-COTA: Object to foundation.

**A. I don't know the specific date. I wasn't involved in initiating the investigation.**

Q. BY MR. ROWLETT: In September -- this would have been weeks after Dave Cohen was terminated -- Bart Wear flew with the football team to a football game at Michigan State University, correct?

**A. I -- he may have. I don't recall, per se.**

Q. Were you on that trip to East Lansing?

**A. I was on the team charter. The operation charter, that's a different plane. We do some donor trips where it's a donor trip for folks who contribute at a certain level, and they would typically take a separate charter, do their own -- do their own arrangements, et cetera. So he may have been on there.**

Q. Do you know if at that point the investigation had began into Bart Wear's conduct in Las Vegas?

**A. I'm not --**

MS. LEE-COTA: Object to form.

**A. I'm not aware of when the investigation began.**

Q. BY MR. ROWLETT: The investigating -- investigating -- I'm sorry. Withdrawn.

The investigation concluded sometime in November of 2019. Is that your -- is that your recollection?

**A. I don't know --**

MS. LEE-COTA: Object to form.

**A. I don't know when it concluded.**

Q. BY MR. ROWLETT: Did Bobby Hurley ever have any conversations with you about Bart Wear?

**A. Not until December, after Dave was terminated.**

Q. So that's a yes, at least in December, Bobby Hurley had the conversation with you about Bart Wear?

**A. Yes, in December was the first time I've had any conversation with --**

Q. What was the conversation like with Mr. Hurley? What did you discuss?

**A. Why Dave was gone, and going forward, what was -- you know, what was our expectations, what we were planning to do, how we were going to do it, that he still had our complete support. That was the conversation.**

Q. Did you have a conversation with Bobby Hurley in around August 15th when you terminated Dave Cohen's employment?

**A. I don't -- I don't recall having a conversation with Bobby regarding terminating Dave's employment.**

Q. When Dave Cohen was terminated, was a new senior management team member appointed to be the primary administrator for men's basketball?

**A. We always had double administrators. I don't**

**know if one was elevated in the moment. Scott Nelson worked some with basketball. Ken Landphere worked some with basketball. I don't think there was some announcement of who was stepping in as the so-called primary.**

Q. When did you commun- -- when was the first time you communicated to Bobby Hurley that Dave Cohen was no longer going to be acting as the administrator -- or an administrator for men's basketball?

**A. I don't think I had to report to Coach Hurley. Coach Hurley is the head coach. When he knew someone had been separated, he, I assumed, knew that then one of the others would step in. But I didn't have a conversation where I have to call and talk to the head coach about a decision we had made in our structure, in our administration. I don't recall calling and explaining to Bobby Hurley.**

Q. Did you send an email to Bobby Hurley about this?

**A. I don't recall.**

Q. Did you send a text message to Bobby Hurley about this?

**A. I don't recall.**

Q. The first conversation you recall having with Bobby Hurley following your August 15th -- withdrawn.

You said you decided on August 12th.

The first conversation you had about Dave Cohen with Bobby Hurley after August 12th when you decided to terminate Dave Cohen was sometime in December?

**A. That's my recall, correct.**

Q. And, again, what was discussed during that conversation regarding Bart Wear specifically?

MS. LEE-COTA: Object to form.

**A. Yeah. Well, one of the things we definitely discussed was -- and this is after Dave had been formally terminated. I went and talked to Bobby, and I said very clearly, "Bobby, why didn't you ever mention anything to me? Why didn't you tell me -- if this was happening to Leslie or anyone else, why didn't you tell me?"**

**And what he said was, "I told Dave, and I thought that was my duties."**

**"And why didn't you tell me?"**

**"Well, Bart may have made it uncomfortable, but there was never any thought on our mind that Bart was sexually harassing or doing anything to that level. So I reported it to Dave, and I thought that was all I needed to do."**

**That's what Bobby Hurley told me.**

Q. BY MR. ROWLETT: Okay. And did Bobby Hurley

have any opinions about whether Bart Wear should be allowed to attend men's basketball games that he expressed to you?

**A. I don't think he expressed to me. What I expressed to Bobby is that my understanding is that Bart was not going to be around. He had received notification that he was supposed to separate from the program. So my understanding is that I think you can set that aside. We need to move on. You need to move on. We need to move on. Bart shouldn't be around.**

**What we do with Dave was a decision I had to make for the good of this industry -- I mean, the good of this organization, this athletic department, this team, and so we're moving on.**

Q. And after that conversation, did Bart Wear attend any more men's basketball games?

**A. Not that I'm aware of. I'm -- I'm told he did.**

Q. That -- Bobby Hurley didn't report that back to you?

**A. Yeah. He said Bart Wear was -- no. I told him Bart Wear was not going to be around, and then, subsequently, Bobby and I had a text conversation where he said Bart was around at one game and apparently upset Leslie, in particular.**

Q. So it sounds like Leslie was bothered by Bart

Wear's conduct?

**A. Well, he said it upset Leslie.**

Q. How much money did Arizona State University pay you in 2019?

**A. I don't recall.**

Q. Other than your compensation from Arizona State University, did you have any other sources of revenue in 2019?

**A. No, not that I recall. Your typical investments, your own self-produced income through investment returns, et cetera. No.**

Q. Did you have any speaking engagements outside of Arizona State University you were paid for in 2019?

**A. No. I don't -- I don't take speaking engagements and honorariums. If they're offered, I donate them back.**

Q. How much money did you make from Arizona State University in 2020?

**A. I -- I don't recall. I don't keep a running list of those totals.**

Q. Estimate. Did you make more than $100,000 in 2019 from Arizona State University?

**A. Yes.**

Q. Did you make more than $500,000 from Arizona State University in 2019?

A. **Yes.**
Q. Did you make more than $1 million from Arizona State University in 2019?
A. **Yes.**
Q. Did you make more than $2 million from Arizona State University in 2019?
A. **2019? I don't recall.**
Q. Did you make more than $1.5 million from Arizona State University in 2019?
A. **I don't recall specifically.**
Q. The best of your recollection, it was more than $1 million, but you can't be any more specific than that about 2019, correct?
MS. LEE-COTA: Object to form.
A. **I don't recall how much I made per year in '18, '19, '20, '21, '22, '23. I am well compensated, to be sure.**
Q. BY MR. ROWLETT: Did you make more than $1 million from Arizona State University in 2020?
A. **Yes.**
Q. Did you make more than $1 million from Arizona State University in 2021?
A. **Yes.**
Q. Did you make more than $1 million from Arizona State University in 2022?

**A. Mm-hm.**
Q. Did you make more than $1 million from Arizona State University in 2023?
**A. Yes.**
Q. And your current contract with Arizona State University expires when?
**A. '26. February of '26.**
Q. And how much is your contract worth annually, your current contract with Arizona State University?
**A. It's the same contract I had as the athletic director, and that is a base of 950,000.**
Q. And what sort of bonus compensation do you receive in addition to your base of $950,000?
**A. Based on academic and team sports performance. It varies. And then I am compensated as a professor of practice at the law school.**
Q. Varies from what to what? What was the -- what was the biggest bonus compensation you ever received for Arizona State University?
**A. Oh, I don't recall. It's been since 2015 that I've received bonus compensation, including bonuses that I disclaim and waive to put into the bonus pool, and I can't -- I don't have those numbers, per se.**
Q. What was your lowest year of bonus compensation?

**A. I don't recall.**

MR. ROWLETT: Let's take a quick break.

THE VIDEOGRAPHER: Off the record at 10:59 a.m.

(Recess taken from 10:59 a.m. until 11:06 a.m.)

THE VIDEOGRAPHER: Back on the record at 11:06 a.m.

MR. ROWLETT: I have no further questions for the witness.

MS. LEE-COTA: Nothing from us.

We'll read and sign.

THE VIDEOGRAPHER: This will mark the end of video number 1. This deposition has concluded.

We are off the record at 11:06 a.m.

(Deposition concluded at 11:06 a.m.)

_________________________
RAYMOND ANDERSON

STATE OF ARIZONA )
) ss.
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

[X] Review and signature was requested; any changes made by the witness will be attached to the original transcript.

[ ] Review and signature was waived/not requested.

[ ] Review and signature not required.

I CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

Dated at Phoenix, Arizona, this 30th day of April, 2024.

/s/ Kellie L. Olney

___________________________________

KELLIE L. OLNEY, RPR
Certified Reporter
Arizona CR No. 50223

* * * * *

I CERTIFY that GRIFFIN GROUP INTERNATIONAL has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).

/s/ Pamela A. Griffin

_____________________________________

GRIFFIN GROUP INTERNATIONAL
Registered Reporting Firm
Arizona RRF No. R1005

GRIFFIN GROUP INTERNATIONAL -ERRATA SHEET - CHANGES IN TESTIMONY

3200 East Camelback Road Suite 177 Phoenix, Arizona 85018

Cohen vs Arizona Board of Regents, and Anderson-Videotaped Deposition of Raymond-Anderson (Vol II)-April 18, 2024

Errata & Signature due no later than June 7, 2024.

| PAGE | LINE | CORRECTIONS/CHANGES | REASON |
|---|---|---|---|
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |
| ____ | ____ | ____________________________ | ______________________________ |

_________________________          ________

SIGNATURE OF WITNESS          DATE

**$**

**$1** 43:2,12,19,21,24 44:2
**$1.5** 43:8
**$100,000** 42:21
**$2** 43:5
**$500,000** 42:24
**$95,000** 28:1
**$950,000** 44:13

**1**

**1** 45:12
**10** 17:7
**10:03** 4:3
**10:59** 45:3,4
**11:06** 45:4,6,13,14
**12th** 28:16,17 29:2 33:20 36:12 40:1,3
**13th** 29:3 33:21
**15** 32:23
**15th** 30:17 31:23 32:19 36:2 38:18 39:25
**177** 4:14
**18** 43:15
**18th** 4:2
**19** 43:16

**2**

**20** 43:16
**2015** 44:20
**2019** 11:14,25 12:11 24:2,7 25:16,23,25 26:2 37:23 42:4,8, 13,22,25 43:3,6,7, 9,13
**2020** 42:18 43:19
**2021** 43:22
**2022** 43:25
**2023** 44:3
**2024** 4:2
**21** 43:16
**22** 43:16
**23** 43:16
**25** 13:16
**25th** 11:25 12:11,19 13:2,7 14:2 15:3, 12 16:3,22,23 17:5,8,17 18:13 19:18 21:11,24 26:6
**26** 44:7
**2800** 4:10
**2:21-cv-01178-gms** 4:8

**3**

**3200** 4:13
**3rd** 13:2,9 20:20 21:11 25:16 35:15,18

**4**

**4th** 20:20 25:16 35:15, 19

**5**

**5** 11:11
**5th** 11:13,14

**8**

**840** 4:11
**85018** 4:14

**9**

**950,000** 44:11

**A**

**a.m.** 4:3 45:3,4,6,13,14
**Abby** 7:12,13
**academic** 44:14
**accepted** 11:22
**accumulation** 27:2,20
**accurate** 14:9
**acting** 39:8
**action** 8:24 29:6
**AD** 20:21
**addition** 4:19 44:13
**Adidas** 7:15
**administration** 39:16
**administrative** 33:9
**administrator** 26:17 38:24 39:8,9
**administrators** 38:25
**advance** 31:7
**affiliations** 4:19
**affinity** 34:13,21
**Afterward** 4:22
**agree** 11:25 27:18
**alert** 29:5
**alerted** 29:10
**allegation** 8:17
**allegations** 10:5 14:6 21:17 22:21
**alleged** 12:15
**allowed** 41:2
**altercations** 7:16
**alumni** 8:7
**Amy** 8:3 29:24 30:14 32:12,20,25 33:1, 11,18
**and/or** 19:2
**Anderson** 4:5 5:7,14 45:16
**announcement** 39:4
**annually** 5:23,24 44:8
**apparently** 16:4 19:14 27:12 41:23
**appearance** 4:18
**appeared** 12:4
**appearing** 4:20
**appointed** 38:23
**appropriately** 26:24
**April** 4:2
**area** 20:21 24:3
**Arizona** 4:5,7,11,14,17 5:16 7:6 9:24 18:1 31:17 42:3,6,13, 17,22,24 43:2,5,9, 19,21,24 44:2,5,9, 19
**Armstrong** 9:23
**arrangements** 37:14
**assigned** 28:12 32:21
**assignments** 27:14
**assistant** 29:11
**associate** 7:2,3

**assumed**
39:12
**ASU**
5:5 8:7
**athletic**
5:20 7:2,3 8:8 41:13 44:10
**athletics**
6:25 9:4 19:21 29:8
**attend**
41:2,16
**attendance**
34:9,21
**attention**
7:22 27:1
**attitude**
30:24 31:11
**attorneys**
11:9
**audible**
13:10
**August**
28:16,17 29:3 30:17 31:23 32:19, 23 33:20 36:2,12 38:18 39:25 40:1,3
**authority**
29:18
**Avenue**
4:10
**aware**
6:13,16,18 7:5,8, 10,11,16 8:16,23 34:19 36:4,6 37:19 41:17

**B**

**back**
24:3 25:7,19 31:3 33:19 41:18 42:16 45:5
**Ballpark**
13:5,6,7,8
**Bart**
9:9 10:6,8,17 11:2, 4,15 12:1,6,13,20, 23,24 13:12,20 14:6,14,17,21,24, 25 15:1,4,5,9,10, 14,17,22,25 17:5 18:23 19:19 20:3, 4,13,17,18,25 21:1,3,12,23 22:7, 10,21 23:1,14,16, 18 24:6,12,16,23, 24 25:2,8,12,16, 19,21,22 26:3,5 35:5,7,15,20,24 36:14,18,23 37:4, 16 38:4,7 40:7,19, 20 41:1,5,10,15, 20,21,23,25
**base**
44:11,13
**baseball**
12:23 13:16 14:2 20:14,16,19 25:11, 17 26:6
**Based**
44:14
**basketball**
9:10 12:3,13 13:13 15:15 22:23 26:17 38:24 39:2,3,9 41:2,16
**Becky**
6:21,22,23
**began**
37:16,19
**begged**
28:2
**begin**
36:23
**beginning**
4:20
**behalf**
4:20 5:2 10:8 17:16 28:2
**behavior**
17:23 18:8 21:18 24:23,24 25:2,4,5
**benefit**
18:22
**biggest**
44:18
**bizarre**
18:24 20:1
**blandly**
16:14
**board**
4:6 27:5
**Bob**
5:3
**Bobby**
16:5 38:3,6,17,21 39:7,17,18,21,25 40:3,11,12,24,25 41:5,18,22
**Boe-stead**
7:14
**bonus**
28:1 44:12,18,21, 22,24
**bonuses**
44:21
**bosom**
20:3
**boss**
28:19
**bothered**
41:25
**Boustead**
7:12,13,17,18,23 8:3
**Bow-stead**
7:14
**Boyd**
22:7 32:20,25 33:2
**break**
45:2
**bring**
7:21 16:7 26:1,3
**bringing**
16:2 20:8 27:15
**brought**
12:22 26:25 29:24
**buddies**
15:18 20:3
**building**
32:19
**business**
26:15

**C**

**call**
17:13 18:7 28:23 29:7 34:19,22,24 39:14
**called**
21:12 29:15
**calling**
29:17 39:16
**calls**
34:23,24
**calm**
15:19
**Camelback**
4:13
**campus**
8:15,16
**canceled**
22:4
**care**
25:8 27:16
**Carmel**
21:25 22:9
**case**
4:7 6:5 32:11
**cases**
27:15
**cautiously**
17:15
**cell**
20:25 21:1,5,7
**cellphone**
5:3
**Central**
4:10
**certified**
4:15 5:9
**cetera**
37:14 42:11
**change**
30:25 31:5
**charter**
37:9,10,13
**Choke**
7:18
**Christopher**
4:25
**circling**
25:18
**circumstances**
15:23 17:15 18:25 20:1,7 29:19
**city**
24:16
**claim**
25:3
**clear**
26:19,22 28:18 32:2
**Clint**
22:15
**close**
16:10,11 21:20
**Club**
22:18
**coach**
7:10 29:11 39:10, 11,15
**coaches**
27:13
**coaching**
27:9 34:14
**Cohen**
4:5,25 5:1 9:9 10:12 11:25 12:2, 4,6,15,20,21 13:12 14:25 15:13,17,20 17:5 18:22 19:2 25:12,15 26:4,11, 12 27:1,10 28:12 30:3,7,19 31:1,18, 23 32:18,23 33:4, 8,23 34:8,18,20 35:4,6,20,23 37:4 38:22 39:7 40:2,4
**Cohen's**
25:23 28:24 29:22 30:11 36:22 38:18
**colleagues**
27:6

**combination**
27:16 32:20
**commun-**
39:6
**communicated**
39:7
**compelled**
16:17,18
**compensated**
43:16 44:15
**compensation**
42:6 44:12,18,21, 25
**complaint**
8:17
**complaints**
14:13
**complete**
26:13 38:15
**comply**
28:13
**concern**
30:6 31:18,19,21
**concerned**
30:9
**concluded**
10:10,11 37:22 38:2 45:12,14
**conclusion**
10:9
**conclusions**
11:9,10
**conditions**
9:1
**conduct**
8:19 10:8 11:15 12:20 13:13 14:4, 15 15:14 17:6 21:18 25:22 26:5 36:23 37:16 42:1
**conducted**
9:22
**conductwise**
26:23
**confusing**
18:25
**conjure**
17:7
**conjuring**
17:3
**contacts**
21:10
**context**
25:22
**continue**
26:16
**contract**
44:5,8,9,10
**contribute**
37:11
**contributor**
27:12
**control**
34:23
**conversation**
14:3 20:17 21:16 23:7 30:21 33:12 36:17 38:7,9,10, 16,17,20 39:14,24 40:2,7 41:15,22
**conversations**
13:12,15 33:22,24, 25 36:8 38:4
**converse**
34:17
**conversed**
34:17
**coordinator**
6:4,14 18:17,19 19:10,11
**copy**
11:12
**correct**
6:11,14,19 12:3,14 13:13 15:7,15 17:18 18:6,15 19:24 21:13 22:24 23:24,25 24:1 25:18 26:10 35:16 36:2 37:6 40:5 43:13
**corrected**
14:11
**counsel**
4:18 5:5
**Counselor**
17:14
**count**
13:4
**Country**
22:18
**court**
4:7,12,22
**credible**
10:2,5,16,17,19, 22,25 11:15,19,20, 22
**credibly**
11:4
**credit**
11:8
**Crow**
28:23 29:7,14 33:21,22 34:7,12, 16,19,23 35:1
**culture**
32:3,6
**current**
44:5,9

**D**

**date**
4:2 28:16 37:1
**dated**
11:13
**Dave**
4:25 10:12 11:25 12:15,20,21,24 13:12 14:25 15:3, 9,10,13,17,23 16:5 17:2,5,21 18:22 19:1,14 20:3,4,16 21:22 25:3,12,15, 18,23 26:1,3,4,11, 12,23 27:1,10 28:12,24 29:22 30:3,7,11,15,19, 21,23,25 31:1,10, 18,23 32:18,22 33:4,5,6,8,23 34:6, 8,18,20 35:4,6,20, 23 36:10,17,22 37:4 38:5,12,18,22 39:7 40:2,4,10,16, 22 41:11
**Dave's**
16:2 36:13 38:21
**David**
4:5 12:4,5
**day**
22:1 23:5 28:7 31:24
**days**
17:7
**Deana**
6:5 19:13
**December**
38:5,6,8 40:4
**decide**
26:11
**decided**
26:12 29:8 40:1,3
**decision**
30:7,25 31:2,18 33:8,17 39:15 41:11
**Defendants**
5:3
**define**
11:19
**delay**
20:7
**demonstrated**
31:6
**department**
5:20 6:25 7:1 8:9 19:21 28:11 29:9 34:1 41:13
**Depends**
11:19
**deponent**
4:23
**deposition**
4:4 12:9 18:9,12 45:12,14
**determination**
9:2 20:11 28:19 29:5,24 31:15 33:15
**determinations**
33:14
**determined**
9:14 10:7 11:20 26:18 27:24 28:8, 13
**development**
34:4
**Devil**
6:24 9:4 19:20 25:17
**difference**
18:2
**direct**
30:9 34:2
**direction**
32:2
**directly**
19:2,3,15 25:19 26:8,15 34:8,20,22 35:17,18,21 36:3,7
**director**
7:2,4 44:11
**disassociation**
8:25
**disclaim**
44:22
**discuss**
38:11
**discussed**
40:6,10
**discussion**
30:9 31:16
**discussions**
34:5
**disrespect**
27:5
**distinction**
18:4,6
**District**
4:6,7
**donate**
42:16
**donor**
8:7 9:3 34:3,13

37:10,11
**donor-administrator** 20:5
**donor-buddy** 16:11
**double** 38:25
**doubt** 15:23 18:22
**duly** 5:8
**duties** 40:17

## E

**earlier** 16:5
**East** 4:13 37:8
**Eastwood** 22:15
**Eddie** 8:4,10,12,18,24 9:3
**Eddie's** 8:14
**Edwards** 22:1,7
**effect** 30:24 31:14
**efforts** 27:9
**elevated** 39:1
**email** 39:18
**employee** 6:9,24 7:15 18:1 27:11 29:8,10
**employees** 5:20 6:1
**employment** 33:10 38:19,21
**end** 9:8 45:11
**engagements** 42:12,15
**entire** 16:6
**escort** 32:18
**essentially** 27:21
**Estimate** 42:21
**et al** 4:6
**events** 34:9
**everyone's** 17:16
**EXAMINATION** 5:12
**examined** 5:10
**executive** 27:9
**exit** 32:17
**expectations** 38:13
**expensing** 27:3
**expires** 44:6
**explained** 26:13
**explaining** 16:15 39:17
**exposed** 35:10
**express** 30:6 31:17,19
**expressed** 41:3,4,5
**expressing** 31:21
**external** 11:8
**externally** 29:13

## F

**face** 21:16,23,24 23:14, 16,17 24:17,21
**face-to-face** 22:20
**fact** 10:16 27:13 31:3, 4,14
**failed** 26:24
**fair** 9:21 19:23
**familiar** 9:22
**families** 21:20
**Fast** 8:10,12,14,18 9:3
**fathom** 15:18 16:15 17:12
**February** 44:7
**feel** 16:17
**Feldman** 4:10
**felt** 16:17 27:16
**Ferrara** 26:15,20 28:9 30:18 33:3
**final** 27:3,21 28:14
**finally** 19:14 27:7
**find** 33:17
**findings** 10:1,4
**fired** 35:7,8
**firm** 4:9,16,21 9:23
**firsthand** 6:12
**fit** 32:3
**flew** 22:10 37:5
**focus** 34:3
**folks** 16:6 20:2 26:25 28:11 29:11 32:14, 16 37:11
**football** 37:5
**forced** 23:7
**forcing** 23:11
**foremost** 6:6
**form** 11:17 15:8,16 17:10,19 18:24 21:14 22:25 24:8, 19 37:18 38:1 40:8 43:14
**formally** 40:11
**forward** 28:5 38:12
**found** 9:8
**foundation** 36:25
**Frank** 26:15,20,21 27:22 28:9 30:17 31:4,9, 12 32:12,25 33:3, 5,6 36:11
**frankly** 14:24 15:22 16:15 18:25 20:6 32:6
**friends** 21:20
**fully** 15:24
**fundraising** 34:4

## G

**game** 12:23 13:16 14:2 20:14,16,19 25:11, 17 26:6 37:5 41:23
**games** 41:2,16
**Garner-smith** 6:5 19:13
**gather** 14:5
**gathered** 20:20
**gave** 11:7 18:22 32:7
**general** 5:5 33:25
**Georgia** 23:22 24:3
**give** 29:12
**giving** 27:25
**glad** 14:10
**golf** 22:2,3,12
**golfed** 22:14,16
**golfing** 23:13
**good** 5:14,15 15:17 30:2,5 41:12
**grabbed** 23:10
**Graham** 7:17
**Graham's** 7:22
**Greg** 7:25

**Griffin**
4:13
**group**
4:13 22:5 34:10

**H**

**half**
22:1 23:5
**handed**
33:13
**handle**
15:11
**handled**
8:20,21 19:20
**handling**
25:21
**happen**
28:7 35:11
**happened**
15:20 16:4 19:18
**happening**
40:14
**harassing**
40:21
**harassment**
5:17,19,21 6:2,3, 10,13,16 7:7 8:14, 18 9:9,15,19 10:5, 17,25 17:18,21,24 18:3
**hard**
15:18 16:15 17:12
**head**
39:11,14
**heads-up**
29:12
**hear**
20:6 29:13 36:8
**heard**
14:24
**hearing**
15:18 16:13
**heated**
30:21
**Herm**
22:7
**Herm's**
22:14
**Herman**
21:25 22:8
**Herman's**
23:9
**hired**
9:23
**honorariums**
42:15
**hosting**
23:9
**hours**
20:8,9
**HR**
6:5,14 8:15,21 32:11,14,16 33:13
**Hurley**
38:3,7,10,17 39:7, 10,11,17,18,21,25 40:3,24,25 41:18

**I**

**idea**
30:3,5
**imagine**
21:10
**immediately**
33:10
**impression**
5:18 20:4
**inappropriate**
7:9 8:19 10:8 12:8, 12 14:15 17:23 18:2,7,8,10,13 21:18 27:3
**inappropriately**
11:5 12:1 22:22
**included**
10:11
**including**
14:25 21:20 44:21
**income**
42:10
**Incorporated**
4:17
**incredible**
16:9
**independent**
11:9,21
**industry**
41:12
**inform**
28:19
**information**
6:18 8:13 13:19 14:5,13,16 15:21
**informed**
30:16 31:24 32:22
**initiating**
37:2
**instructing**
19:1
**insubordination**
26:22 28:22 32:4
**interact**
26:24
**interests**
28:10
**interim**
16:6 25:3
**International**
4:13
**intervening**
13:11 17:7
**investigate**
27:4
**investigating**
37:20,21
**investigation**
11:21,22 12:25 14:3,10 19:12 36:23 37:2,15,19, 22
**investment**
42:11
**investments**
42:10
**involved**
9:1 20:2 21:19 33:15,16 37:2
**involvement**
8:22
**issue**
16:3 23:4 24:15 25:20,21,25 26:1,3 35:15
**issues**
7:21 34:21
**IX**
6:4,7,14 8:21 18:16,18 19:3,10, 11,12 36:15

**J**

**Jean**
22:7 32:20,25 33:1 36:11
**Jennifer**
5:2
**jeopardizing**
32:6
**Jodi**
19:13
**July**
25:25 26:1
**June**
25:23

**K**

**Kathy**
5:1 9:9 12:2,6 15:20 16:6 28:2
**Kellie**
4:12
**Ken**
39:2
**Kevin**
29:21,25 30:2,4,6, 8,15 33:11
**kids**
28:2
**kind**
16:14 21:15,16 35:12
**kindly**
32:15
**knew**
39:11,12
**knowing**
16:10
**knowledge**
34:7
**Kwan**
5:4

**L**

**lack**
16:9
**Landphere**
39:2
**Lansing**
37:8
**Las**
11:6,16 12:14 15:14 17:6 19:19 22:24 36:14 37:16
**late**
31:13
**latest**
32:4
**launched**
19:12
**law**
4:9 9:23 44:16
**lawsuit**
35:2,10
**leave**
33:9
**leaving**
25:7
**Lee-cota**
5:2 11:17 15:8,16 17:10,19 21:14 22:25 24:8,19 36:25 37:18 38:1 40:8 43:14 45:9
**left**
24:3
**legal**
4:15
**Leslie**
40:14 41:24,25 42:2

**level** 37:12 40:21
**liar** 17:13
**lie** 17:8,11
**list** 42:20
**located** 4:17
**location** 4:9
**long** 29:4 36:21,22
**longer** 39:8
**lot** 21:7
**lowest** 44:24
**lying** 17:5,13

**M**

**made** 8:16,23 10:1,4,6 11:9 19:1,5 20:10 23:10 26:19 28:18 29:23 31:2,15 33:8 39:15 40:19 43:15
**make** 18:4 20:11 25:3 27:23 33:14 41:12 42:17,21,24 43:2, 5,8,18,21,24 44:2
**make-up** 22:4
**making** 18:6 36:18
**management** 27:6 34:12 38:23
**mandated** 6:6
**mandatorily** 6:15
**manipulating** 33:5,7
**manner** 22:23
**March** 11:25 12:11,19 13:2,7,16 14:2 15:3,12 16:3,22,23 17:5,8,17 18:13 19:18 21:11,24 26:6
**mark** 45:11
**marketing** 7:1
**math** 35:22
**matter** 4:5 28:8
**Mcanally** 4:10
**Mcelroy** 7:25 8:2
**Mckirgan** 5:3
**meet** 32:16
**meeting** 22:20 26:13 30:14, 18 33:3
**meetings** 34:10,16
**member** 38:23
**members** 8:14
**men's** 9:10 12:3,13 13:13 15:15 22:23 38:24 39:9 41:2,16
**mention** 14:25 35:20 40:12
**mentioned** 26:5 30:20,22 35:6,13,24 36:1
**message** 29:17 39:21
**messages** 7:9
**messaging** 29:16
**Michigan** 37:6
**Mike** 4:15
**Miller** 4:9
**million** 43:2,5,8,12,19,21, 24 44:2
**mind** 17:3 40:20
**mine** 31:5
**mistake** 18:21 19:1,6 20:13 23:6,10
**Mm-hm** 10:20 21:6 24:25 31:20 44:1
**moment** 19:8 39:1
**money** 27:5 28:3 42:3,17
**monitor** 4:3
**Monterey** 22:17,18
**months** 35:23,25
**mood** 23:8
**morning** 5:14,15 30:17,19 33:4
**Mountain** 4:3
**mouth** 9:20 19:17
**move** 16:17,18 41:9,10
**moving** 41:14
**multiple** 27:9

**N**

**needed** 14:15 25:1 34:3 40:23
**Nelson** 12:4,16 13:19,22, 23 14:3,18 16:13 18:23 19:2 39:1
**Nemmers** 6:21
**Netjet** 22:10
**Nevada** 12:14
**nice** 31:4,15
**night** 28:25 29:1,2 33:20
**Noonan** 4:15
**North** 4:10
**noticing** 4:20
**notification** 6:9 41:7
**notified** 17:21
**November** 11:11,13,14 37:23
**number** 16:6 20:25 21:2,5 27:7 28:11 33:24 45:12
**numbers** 21:7 44:23

**O**

**Object** 11:17 15:8,16 17:10,19 21:14 22:25 24:8,19 36:25 37:18 38:1 40:8 43:14
**occurred** 9:19 30:15
**offered** 42:15
**office** 5:4 12:5 28:17 32:9,13
**officer** 6:7
**oftentimes** 23:22
**Olney** 4:12
**operation** 37:9
**operations** 34:14
**opinions** 41:1
**opportunity** 14:23 20:24 32:7
**orchestrated** 30:14
**organization** 31:8 41:13
**overstatement** 14:5
**owned** 22:15

**P**

**Pac-12** 9:10 11:5,16 12:2
**pack** 32:8,10,13
**paid** 42:13
**Parke** 6:22,23
**part** 10:18 23:6
**pause** 17:14

**pay**
42:3
**PC**
4:10
**Peninsula**
22:18
**people**
34:12
**performance**
25:23 44:14
**period**
16:25
**Phoenix**
4:11,14,17 24:3, 11,12 25:8
**phone**
20:25 21:1,12
**picked**
21:12
**Piensook**
5:4
**Pitt**
4:10
**place**
16:1 23:9 33:8
**Plaintiff**
4:25
**plane**
37:10
**planned**
22:3
**planning**
38:14
**play**
31:14
**point**
13:18 14:21 27:17 31:22 36:11,12,13 37:15
**policies**
5:22
**pool**
44:22
**post**
25:14
**post-promotion**
7:2
**practice**
44:16
**prepared**
32:3
**presence**
12:15
**present**
5:1
**president**
28:20,23 29:6,7,14 31:16 33:21,22 34:7,11,12,16,19, 23 35:1
**Preudhomme**
19:13
**previously**
22:3
**primary**
38:24 39:5
**prior**
11:14 14:13 26:23 30:1,20 31:3
**problems**
27:1
**proceed**
17:15
**professor**
44:15
**program**
41:8
**prompt**
29:6
**protect**
31:7
**put**
9:1,20 19:16 44:22

**Q**

**question**
16:19 28:15
**questioning**
9:11,12 11:10
**questions**
9:8 45:7
**quick**
35:22 45:2
**quote**
7:18

**R**

**raise**
23:4 24:15
**raised**
25:12 35:15
**raising**
25:13
**Ray**
20:14
**Raymond**
4:4 5:7 45:16
**react**
31:7
**read**
29:13 45:10
**ready**
28:5
**real**
27:1
**reason**
15:23
**recall**
5:24 7:11,20,24 8:2,3,15 9:11,12 10:7,13,14,15,18, 21 12:9 13:17 14:19 21:1 22:19 23:15,18 25:1,10, 15,18 29:4,16,23, 25 30:4,8,10,12,13 31:21 32:24 33:1, 6,19,24 37:7 38:20 39:16,20,23,24 40:5 42:5,9,19 43:7,10,15 44:20 45:1
**receive**
5:21 7:9 8:13 44:13
**received**
6:1 10:16,19,21,25 11:13,15 12:12 17:18,20 18:1,10, 13 22:21 41:6 44:18,21
**receives**
6:9
**recess**
45:4
**recollection**
5:25 37:24 43:11
**recommended**
34:2
**record**
4:1,19 45:3,5,13
**referred**
8:10
**Regents**
4:6
**related**
12:25 26:14 27:19
**relations**
34:14
**relationship**
7:22 16:12 20:5
**relented**
28:4
**remains**
21:10
**remember**
25:13
**repeated**
27:5
**report**
6:2,4,10,13,15,18, 20 7:25 9:22 10:18 11:7,8,13 13:24 14:20 17:18,20,22, 24 18:16,18 19:9, 11 20:6 24:23,24 25:1,5 26:15,16 28:9 30:18 34:11, 13,25 36:15 39:10 41:18
**reported**
11:4,21 13:24 18:8 19:14 20:1 25:4 26:21 33:18 40:22
**reporter**
4:12,22 5:9
**reporting**
5:21 6:6 8:2 16:10 17:1 27:22
**reports**
10:17,19,21,22,23, 24 11:15 12:12 18:10,13 27:3 34:2
**represent**
4:25 11:12
**representing**
4:12,16
**reprimand**
8:25
**required**
6:6
**requirement**
6:6
**residence**
23:25
**resisting**
28:18
**response**
13:10 29:20
**restructure**
26:14 27:18,22 28:9
**restructured**
28:12
**restructuring**
34:1
**retaliation**
10:11 35:5,6,9,13
**return**
23:22
**returns**
42:11
**revenue**
26:16 42:7
**review**
25:23
**Rick**
13:19,22,24 14:12, 19 24:22 25:1,6,10
**Road**
4:13

**room** 32:22
**Rowlett** 4:24,25 5:13 11:24 15:12 16:2 17:17, 25 21:22 23:3 24:10,22 37:3,20 38:3 40:25 43:18 45:2,7
**running** 42:19

**S**

**Salcido** 29:21 30:1,2,4,6, 10,12
**Sandidge** 8:4,5 9:3
**Sandridge** 8:4
**save** 28:6 32:7
**school** 44:16
**Schramm** 29:25 30:14 33:11
**Scott** 12:4,16 13:19,22, 23 14:3,18 16:13 17:21 18:23 19:2 39:1
**Scottie** 7:17
**Seats** 27:4
**self-produced** 42:10
**self-serving** 15:24 16:3,20,21, 22,23,25 17:2
**send** 39:18,21
**senior** 7:2 29:11 34:11 38:23
**separate** 37:13 41:7
**separated** 39:12
**September** 37:3
**series** 26:23
**service** 22:10
**set** 41:9
**sexual** 5:16,19,21 6:2,9, 13 7:6 8:14,18 9:9, 15,19 10:5,17,25 17:18,20,24 18:2
**sexually** 40:21
**Shangraw** 13:19,22,25 14:12, 19 24:22 25:6,10 36:11
**shape** 18:23
**side** 17:22 26:16
**sign** 45:10
**sir** 18:20
**sit** 17:4
**sitting** 20:21
**situation** 25:8,12,13
**smaller** 22:5
**smooth** 30:22 31:11
**so-called** 39:4
**sort** 8:18 44:12
**sounds** 14:1 19:16,17 41:25
**source** 6:17
**sources** 42:7
**speak** 5:9 34:8,20
**speaking** 15:13 42:12,14
**specialist** 4:16
**specific** 34:5 37:1 43:12
**specifically** 27:14 30:8 33:19 34:20 40:7 43:10
**specifics** 10:22
**spend** 22:8
**spoke** 25:3 33:21 36:4
**spoken** 20:18,23
**sporting** 34:9
**sports** 44:14
**staff** 8:14
**Standard** 4:3
**standing** 17:22
**starts** 22:16
**state** 4:18 5:16 7:6 9:24 18:1 31:17 37:6 42:3,6,13,17,22,25 43:3,6,9,19,22,25 44:3,5,9,19
**statement** 16:23
**statements** 36:18
**States** 4:6
**statuses** 34:14
**step** 39:13
**stepping** 39:4
**straw** 26:22 27:3,8,21 28:14 31:6
**stretched** 17:1
**structure** 39:15
**subsequent** 23:19
**subsequently** 41:22
**Suite** 4:11,14
**summer** 24:2,7,13 25:7
**summers** 23:22
**Sun** 6:24 9:4 19:20 25:17
**support** 38:15
**suppose** 21:9
**supposed** 6:1,15 28:1 41:7
**supposedly** 21:19
**surroundings** 23:11
**swear** 4:22
**sworn** 5:8

**T**

**taking** 27:5
**talk** 12:21 13:22 14:21, 23 15:1,3,5,9,10, 25 20:12 21:3 23:3 24:6,18 25:19 29:21 32:11,16 35:1 39:14
**talked** 12:20,22 14:16 40:11
**talking** 12:6,24 21:17 25:15 29:25 36:7
**team** 27:6 37:5,9 38:23 41:14 44:14
**teammate** 27:11
**Teasdale** 9:23
**telling** 25:10 30:4 33:6
**terminate** 26:11,12 29:8 30:3,5,7 31:18 40:4
**terminated** 30:16 31:24 32:23 33:4 36:2 37:4 38:5,18,22 40:11
**terminating** 31:1 33:9 38:21
**termination** 28:24 29:22 30:11 36:22
**terms** 31:6
**testified** 5:10 18:9,12 23:21
**testimony** 12:9 17:4 26:4 31:10 35:14,24
**text** 7:9 29:16 39:21 41:22
**thing** 36:14
**things** 26:23,25 27:2,7,

16,20 30:22 31:11 32:8 34:4,8,15,25 40:9

**thought** 15:2 19:18,25 21:15 28:4,10 31:5 40:17,20,22

**threats** 10:2

**ticketing** 34:9,13,21

**tight** 20:4

**time** 4:2,3 7:5 9:7 12:17,19,22,23 13:18 15:1 16:1,6,8,10,25 20:13 21:23 22:8 23:1,10,13,15,16 24:4 25:12,15 27:25 28:20 32:5 35:4,6,8,14,18,21,23 36:1 38:8 39:6

**times** 5:23 26:5 27:10 35:21

**Title** 6:4,7,14 8:21 18:16,18 19:3,10,11,12 36:15

**today** 4:9 9:4

**Today's** 4:2

**told** 7:18 11:25 15:13 17:8 20:23 31:9 32:1,10 35:8 40:16,24 41:17,20

**tolerable** 28:21

**totals** 42:20

**touch** 21:4

**touched** 11:5 12:1 22:22

**touching** 12:8,12,13 17:23 18:2,7,10,14

**tournament** 9:10 11:5,16 12:3,14 13:13 15:15 22:24

**town** 25:7

**training** 5:21 17:25

**treatment** 27:6

**trip** 22:2,3,4,6 23:14 37:8,11

**trips** 37:11

**true** 6:8 15:24 24:2

**truth** 5:9,10

**type** 22:10

**typical** 42:9

**typically** 29:11,20 32:11 37:12

**U**

**UCLA** 20:19

**unbelievable** 19:1 20:2,9

**unclear** 28:15

**uncomfortable** 23:11 40:19

**understanding** 6:11 32:21 41:5,8

**understood** 21:21

**unemotional** 15:19

**United** 4:6

**university** 5:16 7:6 9:24 27:4 31:17 37:6 42:3,7,13,18,22,25 43:3,6,9,19,22,25 44:3,6,9,19

**unreliable** 10:12

**unwelcome** 12:8,13 18:14 22:23

**upset** 23:8 41:23 42:2

**V**

**validating** 17:22

**varies** 44:15,17

**variety** 34:15

**Vegas** 11:6,16 12:14 15:14 17:6 19:19 22:24 36:14 37:16

**vendor** 27:5

**verbatim** 8:3 17:11

**versus** 4:5

**victim** 7:6

**video** 4:2,4,15 45:12

**Videodep** 4:16

**visit** 17:12

**Vivid** 27:4

**W**

**waiting** 13:18 35:10

**waive** 44:22

**wanted** 15:21 17:15 21:3,13 22:8 24:20 31:11

**wanting** 27:14 31:4

**Wear** 10:6,17 11:2,4 12:1,6,13,21,23,24 13:12,20 14:6,14,17,22,24,25 15:1,4,6,9,10,14,17,22,25 19:19 20:3,17,18 21:3,13,23 22:7,11,21 23:14,16 24:6,12,16 25:9,12,16,19,21 26:3 35:5,7,15,20,25 36:14,19 37:5 38:4,7 40:7 41:1,15,20,21

**Wear's** 9:9 10:8 11:15 12:20 15:14 17:6 20:25 21:1 24:23,24 25:2,22 26:5 36:23 37:16 42:1

**weeks** 13:3,7,11,21,23 16:5 17:7 26:7 37:4

**whomever** 32:12

**wife** 15:20 17:23

**withdrawn** 8:12 9:6 10:3 11:11 12:18 18:11 20:15 21:22 23:20 25:20 31:22 36:21 37:21 39:25

**witnessed** 6:2

**wives** 21:21

**women** 11:5 12:2 19:19 22:23

**word** 35:5

**words** 9:20 10:15 12:7 17:14 19:17

**work** 27:12

**worked** 39:2

**working** 32:3

**worried** 23:8

**worth** 44:8

**Y**

**year** 5:23 43:15 44:24

# EXHIBIT 10

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA**

**David Cohen v. ASU, Arizona Board of Regents and Raymond Anderson**

(Case No. 2:21-CV-01178-GMS)

**Joint Submission Summarizing Informal Discovery Conference Issue**
**<u>Scheduled for March 27, 2024 at 1:45 p.m.</u>**

Plaintiff David Cohen ("Plaintiff") asserts claims against defendants Raymond Anderson ("Mr. Anderson") and the Arizona Board of Regents ("ABOR")(collectively, the "Defendants"), for violations of Title VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e), Title IX of the Education Amendments of 1972 (20 U.S.C. § 1687 *et seq.*), and 42 U.S.C. § 1983.

The dispute before the Court relates to the deposition of Arizona State University President Michael Crow. Plaintiff noticed President Crow's deposition on February 29, 2024. Defendants believe Plaintiff is not entitled to this deposition.

Plaintiff's position is that President Crow has personal, firsthand knowledge of relevant facts to this case, including the University's handling of credible sexual harassment allegations and the decision to terminate Plaintiff. At least four separate ASU witnesses (defendant Raymond Anderson, former Regent Jay Heiler, Coach Bobby Hurley, and Rick Shangraw, the former CEO of ASU Enterprise Partners) testified to having telephone and/or face-to-face conversations with President Crow about the circumstances surrounding Plaintiff's report of sexual harassment by an ASU donor and Plaintiff's subsequent termination. Mr. Heiler, for example, testified that he spoke with President Crow regarding Plaintiff both before and after Plaintiff's termination. Moreover, Plaintiff believes that President Crow was involved in the decision to initially rescind defendant Ray Anderson's decision to terminate Plaintiff and place Plaintiff on administrative leave while ASU conducted an investigation. The law is clear that "a party seeking to

prevent a deposition carries a heavy burden to show why discovery should be denied" and must "show good cause by demonstrating harm or prejudice that will result from the discovery." *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063 (9th Cir. 2004). Moreover, courts have confirmed that a party seeking to prevent an "apex deposition" have a "heavy burden." Lastly, in this case, Plaintiff is not a low-level employee but rather a senior member of ASU's athletic department that interacted with defendant Anderson and President Crow on a regular basis in the performance of his job.

Defendant asserts that, given Dr. Crow's duties and obligations, Plaintiff must show he has "direct personal factual information ***and*** the information to be gained is not available through any other sources" to justify deposing him. *Coleman v. Schwarzenegger*, CIV S-90-0520LKKJFMP, 2008 WL 4300437, at *2 (E.D. Cal. Sept. 15, 2008) (emphasis added), *citing and quoting Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir.2007); *see also Beaulieu v. Bd. of Trustees of Univ. of W. Fla*., 2007 WL 9734885, at *4-5 (N.D. Fla. July 18, 2007) (university president was a high ranking official not subject to deposition given failure to show that the president directed the complained-of action or that the sought-after information was not available from another source). No such showing has been made. Plaintiff mischaracterizes the testimony to date regarding Dr. Crow's alleged personal involvement in the underlying facts. Regardless, Plaintiff has not explained (despite being asked) what information Plaintiff seeks that is uniquely in Dr. Crow's possession. By Plaintiff's own allegation, Anderson "immediately" terminated (i.e., without consulting Dr. Crow) Cohen's employment on August 15, 2019, and that Cohen was later, on the same day, put on paid administrative leave pending an investigation. Defendants have explained how the decision to put Cohen on administrative leave was made, including that Dr. Crow was not involved in that decision. Defendants have offered to provide that explanation under oath through the testimony of another witness or via an interrogatory answer or statement.

# EXHIBIT 11

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA**

**David Cohen v. ASU, Arizona Board of Regents and Raymond Anderson**

(Case No. 2:21-CV-01178-GMS)

**Joint Submission Summarizing Informal Discovery Conference Issue**
**<u>Scheduled for September 19, 2024at 2:00 p.m.</u>**

The disputes relate to (i) the deposition of ASU President Michael Crow, and (ii) the exclusion of documents containing Plaintiff's private financial information.

As to the first dispute, Plaintiff's position is that President Crow is necessary for this case. Per the deposition testimony of several of Defendant's witnesses, Dr. Crow has personal, firsthand knowledge of relevant facts to this case, including the University's handling of credible sexual harassment allegations and the decision to terminate Plaintiff. Witnesses and documents prove President Crow had knowledge of the circumstances surrounding Plaintiff's report of sexual harassment by an ASU donor and Plaintiff's subsequent termination. Plaintiff has prepared, and will gladly share with this Court, a list of numerous examples of such evidence. Moreover, Plaintiff believes that President Crow was involved in the decision to initially rescind defendant Ray Anderson's decision to terminate Plaintiff and place Plaintiff on administrative leave while ASU conducted an investigation. The law is clear that "a party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied" and must "show good cause by demonstrating harm or prejudice that will result from the discovery." *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063 (9th Cir. 2004). Moreover, courts have confirmed that a party seeking to prevent an "apex deposition" has a "heavy burden." Lastly, in this case, Plaintiff is not a low-level employee but rather a senior member of ASU's athletic department that interacted with defendant Anderson and President Crow on a regular basis in the performance of his job. Defendant Ray Anderson reports directly to

President Crow.

Moreover, even if Dr. Crow was truly unaware, as Defendants claim, then his deposition would still be justified. The thrust of Plaintiff's claims center on ASU's failure to provide meaningful action to prevent further sexual assault and Ray Anderson/ASU's cover-up/sweeping under the rug of the sexual assault claims. If President Crow had never been informed of a major donor sexually assaulting multiple women, and had not been informed that Plaintiff, a senior member of his staff, was terminated in response to Plaintiff's continual demands for action, then this probative evidence of the athletic program's cover-up culture could only be proved via Dr. Crow's direct deposition testimony.

The Court has already determined that in order for Plaintiff to take the deposition of Dr. Crow, he must identify "specific relevant information that is proportional to his claims and that he cannot reasonably achieve through other sources." (Doc. 73). Plaintiff has made no such showing. There is no evidence that Dr. Crow was involved in the decision to put Plaintiff on paid leave pending the investigation or that he had anything to do with Plaintiff's termination. To depose Dr. Crow, Plaintiff must show he has "direct personal factual information and the information to be gained is not available through any other sources" to justify deposing him. *Coleman v. Schwarzenegger*, 2008 WL 4300437, at *2 (E.D. Cal. Sept. 15, 2008). No such showing has been made; this request should be denied.

The second issue before the Court concerns personal documents containing Plaintiff's private financial information. Plaintiff's position is that these disputed documents were improperly obtained by Defendant when they were taken from Plaintiff's office before he was able to remove his personal belongings following his termination. Plaintiff also asserts that Defendant copied the contents of these documents to capture Plaintiff's private financial information, and now seek to use this information against Plaintiff in the instant action. Accordingly, Plaintiff has a right to exclude these documents from evidence. Defendant's assert that the

documents have remained confidential, and Plaintiff has not suffered any harm as a result of Defendants' conduct. Additionally, Defendant's assert that any claim for invasion of privacy would be time barred by statute. Plaintiff seeks from this Court: (a) the ability to claw back the improperly obtained, personal documents, and/or (b) leave to amend the Complaint to include any appropriate causes of action for the breach of privacy.

Employees have no privacy right to their work office, desk, or computer. *See e.g., O'Connor v. Ortega*, 480 U.S. 709 (1987). The records at issue were not in a locked area and were discovered while ASU searched Plaintiff's office for ASU property after Plaintiff had been placed on leave. During the search, an ASU employee came across a checkbook that referenced a transaction with Vivid Seats, an ASU vendor. The ASU employee photographed the records because of Plaintiff's prior history of improper dealings with Vivid Seats. The records were turned over to the independent investigator. That file was produced in September 2022 and the photos of the financial records were designated confidential pursuant to the Protective Order. The documents have not otherwise been publicized. There is no authority that would require Defendants to return the documents to Plaintiff – the information isn't subject to any privilege, nor was it inadvertently disclosed. Should ASU decide to use this information at trial, Plaintiff can file a motion in limine to exclude that evidence. There is also no basis to allow amendment—the records at were produced two years ago—Plaintiff cannot seek amendment at this late stage.

# EXHIBIT 12

[Placeholder for Document to be Filed Pending Defendant Approval of Process and Otherwise Lodged]

# EXHIBIT 13

SUN DEVIL ATHLETICS

EMAILED TO EMPLOYEE

December 12, 2019

Dave Cohen
Administration

Dear Dave,

Effective August 15, 2019, you were relieved of your job duties and responsibilities as Senior Associate Athletics Director, and have continued on paid administrative leave since that time. Effective December 13, 2019, we are ending your employment with Arizona State University (ASU) in accordance with SPP 1010 – Termination for University Staff. December 13, 2019 will be your final date of employment at ASU.

In releasing you from your job duties and responsibilities you are no longer authorized to act on behalf of Sun Devil Athletics.

We're providing several reminders on matters which you need to remain mindful.

First, as a former employee, you will always be regarded as a booster. NCAA legislation restricts various actions by boosters. Please do not hesitate to call the main number for the Athletic Compliance Office (480-965-5760) should you have any questions about what activities are permissible or are not permissible. We're also including a brochure that covers permissible and impermissible activities for your future reference.

Second, personally identifiable information about students is protected under federal and state law and cannot be disclosed to any third party. With our release of you from your employment responsibilities, you no longer have a legitimate educational interest to access protected information. The privacy of the information previously disclosed to you in the course of your duties survives your employment relationship with us.

You currently hold a car lease in your name which is paid for by Earnhardt Lexus. By Friday, December 13, 2019 at 5pm you are to respond to Mike Chismar as to whether you will return the car to Earnhardt Lexus or assume payment on the lease. You are responsible for maintaining the proper insurance coverage for the courtesy car.

You held a membership under your name at The Country Club at DC Ranch, Scottsdale, Arizona. The Membership is owned by the Sun Angel Foundation and was transferred out of your name. Your last day of usage was August 18, 2019. Your final paycheck will include taxation in the amount of $251.08 for monthly country club taxation for June and July and $255.49 for your courtesy car. Attached are your August statements for DC Ranch Country Club and your Sun Devil Club visa. Similar to previous months the Sun Devil Club is in need of documentation for charges and reimbursement by check to Sun

Arizona State University
PO Box 872505, Tempe, AZ 85287-2505
(480) 965-3482 sparkycares@asu.edu
www.thesundevils.com

Devil Club for any personal charges. Please provide this information to Joseph Hewitt, jhewitt1@asu.edu, 480.727.4458.

Your current health benefits will end on Sunday, December 15, 2019. Attached, you will find an "Information Sheet for Exiting Employees." This form provides information on benefits coverage, COBRA, vacation, and final wages. If you have questions about your benefits, you may contact the Office of Human Resources, Employee Service Center (ESC), at 1-855- 278-5081 for further assistance.

Final paychecks are normally issued as a hard check, available seven (7) days following your effective termination date. If you would like to have your final paycheck direct deposited, send an email to Ryan.N.Wells@asu.edu indicating your authorization to defer your final paycheck so that it is direct deposited on the next payday following your termination date. Without your authorization, your final paycheck will be mailed to the home address on file. Your final paycheck will be paid at your regular rate of pay through December 13, and will include any accrued vacation, not to exceed the amount earned for one year of service, determined by length of service and FTE per SPP 702-01: Vacation Leave Benefit. The standard payroll deductions will be withheld from this final check.

Your current ASURITE login with access to the Exchange Server/Outlook will no longer be active after December 13, 2019.

If you have any questions, you may contact Norma Abbl, Senior Human Resources Consultant, Office of Human Resources, at 480-727-2517.

Sincerely,

Raymond E. Anderson

Ray Anderson
Vice President and Director of Athletics

cc: Norma Abbl, OHR Partner
Department File
OHR Personnel Records File

Attachments:
SPP 1010: Termination for University Staff
Information Sheet for Exiting Employees

# EXHIBIT 14

**In the Matter of:**

*DAVID COHEN*

*vs*

***ARIZONA BOARD OF REGENTS and RAYMOND ANDERSON***

---

*Robert Hurley*

*December 27, 2023*

---

GRIFFIN GROUP INTERNATIONAL
3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DAVID COHEN, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>ARIZONA BOARD OF REGENTS and RAYMOND ANDERSON, an individual,<br><br>Defendants. | Case No. 2:21-CV-01178-GMS |

DEPOSITION OF ROBERT "BOBBY" HURLEY

Phoenix, Arizona
December 27, 2023
10:43 a.m.

REPORTED BY:
JOVANNA ROMAN, RPR
Certified Reporter
Certificate No. 50725

PREPARED FOR:
ASCII/CONDENSED COPY

(Copy)

DEPOSITION OF ROBERT "BOBBY" HURLEY was taken on December 27, 2023, commencing at 10:43 a.m., at the law offices of MILLER PITT FELDMAN & MCANALLY, 2800 N. Central Avenue, Suite 840, Phoenix, Arizona 85004, before JOVANNA ROMAN, a Certified Reporter in the State of Arizona.

COUNSEL APPEARING:

For the Plaintiff:

PEREZ VAUGHN & FEASBY
By: Mr. Michael Perez
600 B Street, Suite 2100
San Diego, California 92101

MILLER PITT FELDMAN & MCANALLY
By: Mr. Jose de Jesus Rivera
2800 N. Central Avenue, Suite 840
Phoenix, Arizona 85004

For the Defendants:

PAPETTI SAMUELS WEISS MCKIRGAN
By: Ms. Jennifer Lee-Cota
Ms. Heather Robles
16430 N. Scottsdale Road, Suite 290
Scottsdale, Arizona 85254

ALSO PRESENT:

Ms. Kwan Piensook
Mr. Barry Mitchell

# I N D E X


| WITNESS: | PAGE |
|---|---|
| ROBERT "BOBBY" HURLEY | |
| Examination By Mr. Perez | 4 |


# E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| No. 27 | Notice of Deposition | 55 |
| No. 28 | Amended Notice of Deposition | 56 |
| No. 29 | Notice of Deposition | 57 |
| No. 30 | Interview Notes - Hurley | 71 |
| No. 31 | Interview Notes - Anderson | 73 |
| No. 32 | E-mail | 80 |
| No. 33 | E-mail | 94 |
| No. 34 | E-mail | 105 |
| No. 35 | Contract Documents | 112 |
| No. 36 | Contract Documents | 113 |
| No. 37 | E-mail | 115 |

ROBERT "BOBBY" HURLEY,

a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. PEREZ:

Q. Good morning, Coach.

**A. Good morning.**

Q. Before we get started, I'll introduce everyone in the room on our side. Mike Perez, counsel for David Cohen. Also present is his wife, Kathy Cohen. And present is Jose Rivera, also counsel for Mr. Cohen.

Would you like to introduce everyone.

MS. LEE-COTA: Jennifer Lee-Cota, counsel for Arizona Board of Regents and Ray Anderson. And we have Heather Robles, also counsel for Arizona Board of Regents and Ray Anderson. And then on the phone we have Kwan Piensook, who is associate general counsel of ASU.

And I'll just -- and then also Barry Mitchell who is representing.

MR. MITCHELL: Yeah, Barry Mitchell, Mitchell Stein Carey Chapman, representing Coach Hurley.

MR. PEREZ: Thank you.

BY MR. PEREZ:

Q. Could you please state your full name and spell your name for the record.

**A. It's Robert, R-O-B-E-R-T, Matthew, M-A-T-T-H-E-W, Hurley, H-U-R-L-E-Y.**

Q. Mr. Hurley, have you ever been deposed before?

**A. Yes.**

Q. Okay. On how many occasions?

**A. Two.**

Q. Do you remember those occasions?

**A. Yes.**

Q. Okay. Could you please tell us about the two times you were deposed.

**A. I had a car accident my rookie year in the NBA and it was a case against the other driver. And then --**

Q. And in that incident you were the plaintiff?

**A. I was --**

Q. You were the party?

**A. Witness to what had happened.**

Q. Okay. And then this other incident?

**A. It was an insurance case that I had a policy for that was related to that accident.**

Q. Do you remember approximate year that those depositions took place?

**A. I believe 1994 was the first one and then the other one was years later. I'm not sure the exact year.**

Q. But a long time ago.
**A. Yes.**
Q. Okay. So what I'll do is I'll run through what we call our admonitions. They're really just our ground rules for how a deposition take places. And for the most part, a lot of the kind of missteps that people do in their depositions are things we're accustomed to and so we'll try to prepare you for those, okay?
**A. Okay.**
Q. So the first is you understand you're testifying today under penalty of perjury, meaning it's as if you were testifying in a court of law?
**A. Yeah.**
Q. Okay. And we're entitled to your best most accurate testimony. Is there any reason why we cannot get your best most accurate testimony today?
**A. No.**
Q. Okay. And then as we move forward with the deposition, on your left is the court reporter. As you can see, the court reporter is taking down everything we discuss and so it's important that we not talk over each other. Does that make sense?
**A. Okay.**
Q. So I'll ask a question, I'll pause, then you'll answer.

**A. Okay.**

Q. All right. It's also important that we have audible responses so if you nod your head or shake your head, I may ask you to say is that a yes or is that a no, but the more we can give audible responses it's easier for the court reporter.

**A. Got it.**

Q. All right. Your counsel will have an opportunity to object during this deposition. It's a very standard process in a deposition. Normally, the objection is to preserve a position for the record so you'll still answer the question unless your attorney tells you not to answer the question. Does that make sense?

**A. Okay.**

Q. In other words if I ask you a question and he objects, but he doesn't tell you not to answer the question, I'll just pause until you answer the question.

**A. Got it.**

Q. All right. Obviously, one of the things we are concerned about and your counsel is concerned about is that we not go into any attorney-client communication so that will be an area where he'll object, but even before you answer a question, if you have a concern that it might involve attorney-client information, then take a beat and talk to your counsel, okay?

**A. Okay.**

Q. All right. During the course of today's deposition we would like to get your best testimony. Sometimes you'll be required to try to give us an answer based on your best recollection. We are entitled to those best recollections or your best calculations. We're not entitled or we don't want you to guess. Does that make sense?

**A. Yes.**

Q. So I'll give you an example. If I asked you what the size of the table is in this room, you could look at the size of the table and you could give me an answer; correct?

**A. Yeah.**

Q. It might not --

**A. Roughly.**

Q. -- be spot on, but it would be, you know, roughly eight feet and that would be your answer and you could even qualify it as such, okay? Yes?

**A. Yes.**

Q. Okay. But if I asked you what the size of the table is in my kitchen at home, you would have --

**A. Hard time with that, yeah.**

Q. Correct. So that would be a guess and then we wouldn't want you to do that.

**A. Got it.**

Q. Okay. Also as we go forward, one of the things that will happen in your deposition is at the end of the deposition you'll have -- get the transcript and you'll have a chance to review the transcript and make changes, and edits, and comments. Does that make sense?

**A. Okay.**

Q. All right. But if you do that after the fact, we'll be able to comment on the fact that you made those changes down the road, okay?

**A. Got it.**

Q. So to the extent that we can get your complete testimony today, even if you wanted to change or clarify something, if you do that today that would be most helpful for everyone, okay?

**A. Yeah.**

Q. All right. During the course of today's deposition we'll take a couple of breaks. Usually around every hour, hour and 15 minutes we'll take a break so you can just know that that's coming, okay?

**A. Yeah.**

Q. But if you need a break for some reason, then just let us know, let your counsel know and we'll get to it as soon as we possibly can.

**A. Okay.**

Q. All right. We typically will continue the question until we get to a natural breaking point, but feel free to let us know.

**A. Okay.**

Q. All right. And there may be opportunities where you feel like a break is necessary because, as we talked about, there's attorney-client information. In those instances, just lean over to your counsel and you can say I've got a question about this that relates to attorney-client communications. We'll just break at that point if you need to, okay?

**A. Okay.**

MR. PEREZ: All right. And then, counsel, I do want to make sure that Mr. Mitchell is representing you today and therefore the objections that relate to him directly as his attorney will come from Mr. Mitchell; correct? In other words, you won't be objecting for him not to answer questions. That will come from Mr. Mitchell.

MR. MITCHELL: I guess play it by ear.

MS. LEE-COTA: If I think there's an objection, I will make an objection.

MR. PEREZ: Well, you certainly can make an objection, but I don't believe you'll be entitled to instruct him not to answer given that he's got counsel present.

BY MR. PEREZ:
Q. Okay. Let's start with -- normally at this point in a deposition we would go through your whole history, your education, your background, all that stuff. I think it's fair to say, and I think you probably realize, that most of your life story is out there on the Google machine so we won't cover all of that.
**A. Okay.**
MR. MITCHELL: Thank you.
MR. PEREZ: You're welcome.
BY MR. PEREZ:
Q. I mean, we know where you went to school, where you coached, and you're a public figure.
So what I'd like to do is maybe kind of move fast-forward to your relationship with the parties in this case and also when you came to ASU.
**A. Okay.**
Q. Let me start with an appreciation for in this case we will be talking about Mr. Cohen's deposition -- or termination and as part of that termination we'll be also talking about certain incidents involving Mr. Bart Wear. Do you know who Mr. Wear is?
**A. Yes, I do.**
Q. Okay. And incidents that occurred at various ASU events, including basketball events, but the key event that

we'll probably refer to most commonly is the Las Vegas tournament, which I believe was the Pac-12 tournament; correct?

**A. Yes.**

Q. Okay. And you're familiar with those facts?

**A. Yes.**

Q. All right. And so when we talk about the incidents or we talk about the reporting, often that's what we'll be talking about is what happened at that Las Vegas tournament.

The second thing is as we walk through, I do want to get a sense of who you knew and when you knew them so I'll start with this. Before you came to ASU and before anyone contacted you about a job at ASU, did you have relationships with Dave Cohen?

**A. Before ASU?**

Q. Before ASU.

**A. No.**

Q. Did you have any relationship with Ray Anderson?

**A. No.**

Q. Did you have any relationship with Bart Wear?

**A. No.**

Q. Did you have any relationship with President Crow?

**A. No.**

Q. All right. So there comes a time when you are

approached to come to ASU to be the head basketball coach; correct?

**A. Yes.**

Q. Do you remember who contacted you?

**A. I -- I -- my attorney at the time, my agent Jordan Baison, spoke with ASU about the position that was open. He then forwarded that to me and then there was I believe a phone call that was arranged with -- with me and Dave Cohen initially.**

Q. Do you remember who your attorney first spoke to at ASU?

**A. I couldn't say for sure.**

Q. Okay. Approximately what time frame was this?

**A. This was in the middle of March at some point. The season had ended for us and for Arizona State.**

Q. March of what year, 2000 --

**A. '14 I think.**

Q. Okay. And so describe for me that first conversation with Mr. Cohen.

**A. I thought it was very positive, had really good energy, had a, you know, a vision for, you know, what he thinks the basketball program could be at Arizona State and so I was enthusiastic, excited.**

Q. Would it be fair to say that you two, Mr. Cohen and yourself, were aligned on what that vision was?

**A. I felt like he -- yeah, we were connected. We had a good call and I liked a lot of the ingredients of what ASU could be and I thought Dave, you know, outlined that very well.**

Q. So after the call what happened?

**A. Some time went by and, you know, as they were -- as ASU I assume was sorting out which direction they wanted to go and then there was further communication. There was another call with Ray Anderson and Dave sometime after.**

Q. And was that the first time that you spoke to Mr. Anderson?

**A. Yes.**

Q. Okay. And how did that conversation go?

**A. I thought it was a solid call, you know. It was, you know, typical, you know, first introductory kind of interview just to get some of my opinions on what I would do to run a basketball program, kind of your standard first interview I guess.**

Q. And did that call again leave you with an impression of Mr. Cohen?

**A. What -- what impression you're saying?**

Q. Yes.

**A. Again, I think Dave was encouraging me to stay the course with the process. My feeling was that in situations like this things move a little faster. It wasn't moving**

**quite as fast, the hiring process, and so I think that's where he was very helpful.**

Q. Were you a little frustrated with the pace of the process?

**A. Just I -- you know, I, again, I understand the business and the nature of it and the magnitude of a decision like that when you're hiring a men's basketball coach so I was trying to be understanding of how long it was taking, but at the same time I thought at times that they might be looking in a different direction.**

Q. And I assume -- I don't know -- I'm a wrestler so I don't know anything about basketball.

**A. Yeah.**

Q. But I assume that that pace at the college level also includes a decision on your part to need to come in and start doing things like recruiting and putting your systems in place?

**A. Yes, at that time it's critical to -- to have -- the more time you have the better off you are.**

Q. Okay. And so you leave that call and then what happens next?

**A. A little more time goes by and then we -- you know, Dave got on the phone with me to encourage me to meet, you know, with Ray, which we met at the Final Four.**

Q. And so still in March?

**A. No, this now is closer to April. Again, I'm not sure in 2014 when that Final Four took place, but it was getting a lot closer to April at that point.**

Q. Okay. And so who met and where was that Final Four?

**A. We -- it was in Indianapolis and we met in a hotel room and I'm -- I think it was Ray's room. I'm not 100 percent sure, but we had about an hour conversation about a lot of things, about running a basketball program, building a program.**

Q. And, again, who was at that meeting?

**A. It was Ray and Dave.**

Q. Okay. At this point were people talking about numbers, was it to that level of specificity yet?

**A. No.**

Q. Okay. And what came of that meeting?

**A. I mean, I thought it was solid. I thought, you know, that I felt good about what I did in the interview and how I presented my ideas and I thought I was getting good signals from Dave and Ray.**

Q. Were you at that time interviewing with other programs?

**A. I had interviewed with one other program, but that was a few weeks earlier.**

Q. Okay. Was that other program also pressing you on

decisions and wanting to move forward quicker?

**A. They decided to go a different direction.**

Q. Okay. So now as you leave that meeting, now we're late March, early April?

**A. Yeah.**

Q. What happens next?

**A. Well, I had finished my responsibilities at the Final Four. I do some corporate work there usually every year. I met with Ray and Dave and then my wife and I had planned vacation to Aruba. We were heading out of town for that.**

Q. So kind of the end of the season break?

**A. Yes, the players, you know, season is over there. I was able to escape for a couple days, yeah.**

Q. And did anything happen during that break while you were on vacation?

**A. No. I just -- again, I felt like if I had nailed the interview that I would have been offered the job at that point so when a few more days went by I was just -- I figured that there was another candidate that they might go with. That was just my opinion.**

Q. Okay. Did you during that time have back and forth conversations with Dave about how things were going? Did you feel like you could pick up the phone and call him?

**A. Yes.**

Q. And did that occur during that time period?
**A. I'm sure that we had a call, yeah, even when I was there, but Dave also I know was speaking with my agent, Jordan Baison, quite a bit and Jordan would, you know, give me updates about where things were at.**
Q. Describe for me what the state of ASU basketball was in at the time.
**A. It wasn't great. The condition wasn't great. I've seen worse, but, yeah, it -- you know, it was going to be a lot of work to repair it.**
Q. Was there a sense on your part that accepting the job also meant coming to a team that was going to support you?
**A. Yeah, of course.**
Q. For everything, for recruiting, for systems, for training facilities, the whole nine yards?
**A. Yes.**
Q. And did you feel that you got that in your communications with Dave?
**A. Yes.**
Q. Did you also feel that going forward that the things that you needed, that Dave and ASU would be there for you?
**A. Yes.**
Q. Okay. All right. Then what happens next?

**A. What happens next?**

Q. Yes.

**A. Well, I just -- again, I thought I would be back at Buffalo and I was surprised to hear that they were offering me the job and my agent was calling me to get me on the phone and then fly back to the United States sooner than I had intended.**

Q. Who was offering you the job, ASU?

**A. ASU, yes.**

Q. And so --

**A. And I had a very -- only a few hours to say yes because it was getting very late in the process.**

Q. Okay. So it was kind of hurry up and wait and then all of a sudden boom.

**A. Yeah.**

Q. You had to move quickly.

You came to Arizona?

**A. I flew back to Buffalo first. I did a Zoom call with President Crow that night and then I was on a plane the next day to -- to Arizona.**

Q. Okay. Do you remember who communicated with you first about ASU wanting to offer you the job?

**A. I know that -- I know that it was Jordan Baison first to me. He was able to get ahold of me first and then I spoke to Ray and Dave after that.**

Q. All right. And your attorney was working through all the details, negotiating the --

**A. Yes.**

Q. Contract price, everything?

**A. Yes.**

Q. And then you fly to Arizona for kind of an official signing and press release and all that?

**A. Yes.**

Q. Okay. So that's roughly April 2014?

**A. Yes.**

Q. All right. When you then start working at ASU, do you start immediately, do you fly in immediately and begin working?

**A. Yes.**

Q. Okay. Makes sense.

**A. Yeah.**

Q. And were you able to assemble a team at that point?

**A. Yeah, I had already turned around a program at Buffalo so I -- there's a way to operate that I'm pretty familiar with and it's kind of just getting a feel for meeting with the players and, you know, putting them through workouts for the time that I have left in the spring to work with them, to see which players wanted to stay through a coaching change, and then you're also seeing**

**what players are available to recruit so you can try and start building it and putting it together.**

Q. Did you bring coaches over as well?

**A. Yeah, I was interviewing coaches. That was definitely certainly part of it too, yes.**

Q. Did you bring any coaches from Buffalo?

**A. I did.**

Q. And who was that?

**A. It was Levy Watkins, who was a full-time assistant, and then Ben Wood who was in our operations. He was with me at Buffalo.**

Q. Did they come over right away?

**A. They did.**

Q. Okay. And so during that process you still are communicating with Dave throughout that initial startup of your job there?

**A. Of course, yeah.**

Q. And did you feel that everything that you had been promised, at least as it related to Dave, was being delivered?

**A. Yes.**

Q. And did you feel like Dave became kind of an important part of your team at that time?

**A. Yes.**

Q. All right. And then so now -- now what happens

during the off season as you move to your first season, what are the things that you are putting in place, who are you hiring, and significantly who are you communicating those things to?

**A. Dave. I mean as you're talking about budgets, what we have available for all the resources that we need to run the program, giving him recruiting updates, talking about our schedule. We did a tour where I was kind of brought around different locations in the state of Arizona to introduce me to the community so a lot of, you know, outreach things like that that we also did.**

Q. Were you communicating with Ray Anderson during that time as well?

**A. Not very often.**

Q. Would it be fair to say Dave was really your point of contact at the university?

**A. Yes.**

Q. And you were placed with that as your point of contact?

**A. Yes.**

Q. All right. And so let's try to kind of do a big picture on this. During the course of your time at Arizona, did you feel that that initial interaction you had with Dave, somebody who you could partner with, who could help you in the program, who you could turn to for your

point of contact, did you feel like he served in that capacity the entire time he was at ASU?

**A. Yes.**

Q. Did you ever feel that he was anything but a true partner in your basketball program?

**A. I connected with Dave and I trusted Dave and I knew that he would fight to advance our program. He shared my passion for wanting to make Arizona State basketball something special.**

Q. And did you also lean on Dave for things like setting up your schedule and arranging flights and all of those kind of programmatic issues that you would hand off to an administrator?

**A. Yes. We have our own director of basketball operations, but, you know, we worked -- he worked very closely with Dave on a number of those issues.**

Q. Who was the director of basketball operations?

**A. It was Ben Wood.**

Q. Okay. And besides Dave and Ben, were there other people that you were leaning on as administrators for operational support?

**A. Not particularly. I had kind of funneled just about everything through Dave and then if we needed something program related, Dave would go to whatever department was responsible for that and help facilitate it.**

Q. And would you typically funnel your needs, budgetary in other words, would those funnel from Dave up through the university, whether it was Ray Anderson or elsewhere?

**A. Yeah, he would go to the business office or communicate directly with Ray about different requests that we had and things that we needed for the program.**

Q. Did you ever feel that he wasn't doing a good job communicating your needs or your interests?

**A. No.**

Q. Did you ever feel a need to go around Dave to communicate to Ray Anderson because your message wasn't being communicated properly?

**A. No.**

Q. All right. All right. So as the program then begins to build, you also have the opportunity to bring over other coaches over the course of time; correct?

**A. Yes.**

Q. Does Dave help you with that as well?

**A. Yes.**

Q. And maybe tell me about some of those coaches.

**A. Well, he would sit in in interviews and meetings and have communication with potential guys that we're looking to hire as a part of the decision. Ultimately, I would decide who I'd like to hire and then, you know, Dave**

**would have conversation and just kind of give it the green light.**

Q. He would defer to you?

**A. Yeah.**

Q. Okay. And would he also help you with things like salaries for those coaches to do things that you needed to do to bring those guys over?

**A. Yeah, Dave worked hard to try and increase our -- our assistant coach salary pool so that we could get better qualified people in those positions and retain coaches that we needed to retain.**

Q. During this process of building your program, were there also kind of infrastructure needs at ASU that needed to be addressed?

**A. Yes.**

Q. Did he also advocate for you in that regard?

**A. Yes.**

Q. During the course of this building of a program, did you have an opportunity to meet Kathy Cohen?

**A. I did.**

Q. Okay. And you're married?

**A. Yes.**

Q. And your wife is?

**A. Leslie Hurley.**

Q. And did Dave have an opportunity to meet Leslie?

A. **Yes.**
Q. And did all of you have an opportunity to meet Kathy as well?
A. **Yes.**
Q. So would it be fair to say that there was a -- became a growing friendship between the four of you?
A. **Yes.**
Q. Would it also be fair to say that you did things outside of basketball as couples?
A. **Yes.**
Q. And maybe you and Dave as individuals?
A. **Yes.**
Q. You guys golfed together?
A. **Golf together, go to dinner, things like that, yes.**
Q. Would you say that Dave was knowledgeable about basketball?
A. **Yes.**
Q. So to the extent he also shared your vision, he also was somebody that had an understanding, certainly not the understanding you had, but one that you felt appreciated what you were trying to accomplish?
A. **Yes, and would always ask questions and want to learn and, you know, so it was a good partnership.**
Q. Great. Okay. So now let's fast-forward. You're

at ASU and there comes a time when an incident occurs at the Pac-12 championship in Las Vegas.

During that time, both Ms. Cohen and Ms. Woods both have an unwelcomed and inappropriate contact with Bart Wear, correct, you became aware of that?

**A. When?**

Q. Yes. It happened at the game; correct? I'll get to the when.

**A. Okay. Yes, I was told that it happened at the game, yes.**

Q. Yes. And so my next question was, but you were not aware of it when it happened; correct?

**A. Yes.**

Q. And, in fact, during that game it is my understanding that Ms. Hurley also became aware of what happened; correct?

**A. Yes.**

Q. All right. But a decision was made that given the circumstances of the intensity of the Pac-12 tournament, that that would not be conveyed to you at that time. Are you aware of that?

**A. Yes.**

Q. And so as a result of that, when do you first become aware of the incident occurring?

**A. The Monday after the season ended I believe. It**

**was the Monday after, yeah.**

Q. And so you go to the Pac-12 tournament?

**A. Finished that, get ready for the NCAA and do our tournament bracket announcement party, go to a tournament. You know we have our games and I was told Monday after the NCAA tournament.**

Q. Do you remember where the NCAA tournament was at that year?

**A. It was in Dayton initially and then it was in Columbus, Ohio I believe.**

Q. So the regionals were in Dayton?

**A. Well, we had the play-in. It's called the play-in game there.**

Q. Okay.

**A. And that was an NCAA tournament game. I think it was Tulsa. No, it was Tulsa. Tulsa, Oklahoma, yeah.**

Q. Right. So the -- so it's kind of a fishtail to get into the tournament; correct?

**A. What's that? I'm sorry. Fishtail?**

Q. In wrestling that's how we call brackets.

The play-in is like a -- it's you had to win the game in order to get into the tournament?

**A. I mean, I think it's technically you're in the field. It's just an additional game that needs to be played and won, but yeah.**

Q. And you won that game?
**A. Yes.**
Q. And then you go to the second round?
**A. Yes.**
Q. Is it --
**A. First round.**
Q. Okay. So --
**A. It's called first round.**
Q. So you're in the first round and do you remember who you played in that game?
**A. We played Buffalo.**
Q. Okay. And did you win that game?
**A. We did not.**
Q. Okay. Was -- was Dave and Ray and everybody at that game, do you recall?
**A. I know Dave was there. I believe Ray was. I think I remember still walking through the tunnel with him after it ended, yes.**
Q. Okay. And so you then come back to Arizona; correct?
**A. Yeah, we fly -- NCAA flew us back, yes.**
Q. All right. So after that tournament loss, then you come back and how do you learn about the incident?
**A. Dave told me in my office about what happened and then I later spoke to my wife about it, about her part in**

**it.**
Q. And that was Monday?
**A. Yes.**
Q. All right. Tell me about that conversation, please.
MR. MITCHELL: So the fact of the communication I understand you want -- you want the personal marital communication?
**THE WITNESS: No.**
MR. MITCHELL: You want him to share -- tell me how you're asking.
MR. PEREZ: No, I'm asking him about the conversation that he and Dave had.
MR. MITCHELL: Thank you.
MR. PEREZ: Thank you.
BY MR. PEREZ:
Q. Your counsel is concerned that we don't go into communications with your wife and -- and I'll avoid that.
**A. Okay.**
Q. But I'm concerned about or asking about the communication you had with Mr. Cohen.
**A. Yeah, Dave and I were very upset as he was telling me. Just I was infuriated that that behavior took place, that, you know, people that -- that we both care about were involved in it and an additional coach on my staff so I**

**felt terrible for the women involved in it and Dave was very determined to make sure that, you know, this -- this gets taken to Ray Anderson notably and is dealt with.**

Q. And do you remember the precise date of that meeting?

**A. I do not, but I think if you look back to the games we played --**

Q. Sure.

**A. -- you could find it pretty easily.**

Q. Okay. So you have the conversation and what is -- how does Dave communicate to you that he is going to kind of tend to this issue?

**A. That he was going to take it to Ray immediately and, you know, that Bart is -- is not going to be around this program again.**

Q. And you're referring to Bart Wear?

**A. Yes.**

Q. Let's talk a little bit about Bart Wear. So Bart Wear did you know him prior to this incident?

**A. I did.**

Q. And how did you know him?

**A. He was, you know, a donor, you know, for football and basketball and, you know, he also would go to a number of our games. Sometimes when we did charter somewhere he would be on the flights. We -- I probably played golf with**

**Bart maybe three or four times. He had a charity dinner that I went to with him and his wife and Dave and his wife and so, yeah, there were social interactions.**

Q. And did you develop an opinion as to Bart's personality?

**A. Just --**

MR. MITCHELL: First I want you to -- I want you to hear that question and he'll ask the follow-up.

**THE WITNESS: Can you just repeat it then.**

BY MR. PEREZ:

Q. Did you develop an opinion as to Bart's personality?

**A. Yes.**

Q. And what was that opinion?

**A. Bart is kind of like the life of the party type of guy, just very loud, you know, liked -- liked to drink. You know I noticed him just having a good time.**

Q. Okay. Tell me about like to drink. What is that, what do you mean by that?

**A. Well, I mean he -- we were getting ready to play a game in Vegas and he -- it was an afternoon game and he had come up to where we were doing our team meetings and just to say hello and I could tell that he had already, you know, had a few drinks in him. I could smell it on him and it was very early in the day so just thought that was**

**unusual.**

Q. Did you know him on more than one occasion to be drunk while he was around ASU events?

**A. Yes, but that would be me just assuming that I know exactly what that means.**

Q. Sure.

**A. But, yeah, I mean he was that type of guy that always had a drink in his hand pretty much most of the time I was around him.**

Q. Okay. Right. You didn't do a breathalyzer --

**A. Yeah.**

Q. -- but you have experience?

**A. Yeah.**

Q. So and did you know his personality to change when he started to drink more?

**A. Just I think he would get loud. He would be more vocal. You could just -- you know, that would be the main thing I observed, yeah.**

Q. Did you know if he had a reputation for being inappropriate when he was drinking?

**A. I -- I did not.**

Q. Did you have an opinion as to whether or not he made inappropriate remarks or jokes when he was drinking?

**A. I did not.**

Q. Did you know of other people in the ASU family

commented on how Mr. Wear was when he was drinking?

MS. LEE-COTA: Object to form.

MR. MITCHELL: You can answer.

**THE WITNESS: What's that?**

MR. MITCHELL: You can answer. She made an objection.

**THE WITNESS: Oh, okay.**

MR. MITCHELL: If you -- if you understand the question --

**THE WITNESS: Could you just repeat the question now just so I.**

MR. PEREZ: Sure.

MR. MITCHELL: Now you knew you're going to have to repeat it.

BY MR. PEREZ:

Q. Did you ever have an occasion when people from the ASU community told you about how Mr. Bart Wear was when he had been drinking?

MS. LEE-COTA: Object to form.

**THE WITNESS: I mean I did not, yeah.**

BY MR. PEREZ:

Q. Did you have an experience to hear from people in the ASU community about how Mr. Bart Wear was around women that were not his wife during any of the basketball events?

MS. LEE-COTA: Object to form.

**THE WITNESS: No.**

BY MR. PEREZ:

Q. All right. And so Mr. Wear was a donor. On kind of a random scale, let's say of 1 to 10, with 10 being a very significant donor, where would you put Mr. Wear on that scale from your experience at ASU?

MS. LEE-COTA: Object to form.

**THE WITNESS: I would say he was one of our top donors just when you combine the football and basketball.**

BY MR. PEREZ:

Q. So 8, 9, up in that area?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yeah, that's fair.**

BY MR. PEREZ:

Q. And were you ever told to make certain accommodations for Mr. Wear because of him being a significant donor?

**A. I'm sure I was introduced to him by someone in our athletic administration, but I can't remember directly when that took place, but that's common practice when you're talking about a donor like him. And as a new coach, you want to try and build relationships with these type of people because they're important to, you know, the well-being of the program.**

Q. You mentioned, for example, like was he given access to basketball practices?

**A. Yes.**

Q. Was he ever in the team locker room?

**A. I don't believe so.**

Q. Did he ever interact with the players?

**A. Yes.**

Q. Did he have access to seats at games?

**A. Well, I'm not sure how that process took place for him, whether he was connected through our ticket office or whatever, but he was -- yeah, I did know that he was at our games quite frequently, yes.**

Q. He had good seats often --

**A. Yes.**

Q. Correct? The seats that I probably couldn't get.

**A. Well, yeah, his seats were actually right in our bench so I did see Bart quite a bit, yes.**

Q. And then you also mentioned events, there was a charity event. What was that event?

**A. It was -- it was -- it was fight night. It was for -- I forgot the disease. Parkinson's I believe, yeah. It's a big event here in Phoenix.**

Q. And was he one of the -- on the board of that foundation or?

**A. I believe he just every year bought a table at**

**this big dinner that -- big fundraising dinner.**
Q. And you would sit as his guest at --
**A. One of his guests, yeah. I did it one year with him, yes.**
Q. And you also said football. He was a donor for football as well?
**A. I believe so, yes.**
Q. All right. Did Mr. Wear like to talk about his donor status?
**A. He never talked about like numbers and money directly with me that way.**
Q. Okay. I know that on a few occasions Mr. Wear probably had the opportunity to use his planes or his jet service to fly people around. Were you aware of that?
**A. Yes.**
MS. LEE-COTA: Object to form.
BY MR. PEREZ:
Q. Did you every fly with Mr. Wear anywhere?
**A. I did not, but I believe his plane was used to bring me from Buffalo to Arizona for my press conference.**
Q. And in one occasion I believe there was a funeral that some players were taken to.
**A. Yes.**
Q. Do you remember that incident?
**A. Yes. One of my players, Zylan Cheatham's brother**

**was murdered and he -- we used Bart's plane to fly him after the funeral services to Stanford to play in a game that same day.**

Q. Do you remember who arranged for that trip?

**A. Dave worked with administration to get approvals and talk to Bart and get him to do it, yeah.**

Q. So Mr. Cohen helped arrange through the administration for the use of Mr. Wear's plane?

**A. Yes.**

Q. Were you ever aware of Mr. Wear giving or attempting to give gifts to your players?

**A. No.**

Q. Were you ever aware of him attempting to give cash to your players?

**A. No.**

Q. Were you ever aware of an incident where cash had been given to players and it was taken back because it was inappropriate?

**A. No.**

Q. Okay. All right. So we left off you were talking about that first meeting with Dave in March where he was describing what had happened and after Dave says, I'll take care of it. That's where we left off.

Did you feel like you needed to go and have a conversation directly with Ray Anderson at that time?

**A. No.**
Q. And why is that?
**A. Because 99.9 percent of all the communication was me through Dave from the moment I got there. My -- my direct communication with Ray was if we were doing something socially, if we were at a golf outing or we happened to run into each other at a basketball game or a football game. All the meat and potatoes of things that I needed for the program or communication that was always flowed from me to Dave to Ray.**
Q. And you were comfortable with that?
**A. Yes.**
Q. Because you trusted Dave?
**A. Yes.**
Q. And even with something important like this that involved harassment that included, amongst other people, your wife, you trusted Dave would deal with this situation?
**A. Yes.**
MS. LEE-COTA: Object to form.
BY MR. PEREZ:
Q. And so after that meeting you assumed that Dave goes and talks to Mr. Anderson?
**A. Yes.**
Q. Okay. Did Dave come back to you and tell you that he spoke to Mr. Anderson?

**A. He did.**
Q. Okay. Do you remember what he told you?
**A. Just that he -- he had a meeting with Ray, that he told him everything and it was going to get taken care of.**
Q. Now, it be fair to say that you were pretty upset about that interaction; correct?
**A. Yeah.**
Q. That you had heard something and you were upset about what you had heard; correct?
**A. You mean the incident?**
Q. With Leslie and --
**A. Of course, yes.**
Q. Do you remember Dave's reaction to when he heard about it? In other words, did his level of upset, anger, whatever you want to call it, match yours?
**A. Yes.**
MS. LEE-COTA: Object to form, foundation.
BY MR. PEREZ:
Q. And I guess what I'm getting at, did you feel that he sensed not just the urgency, but the seriousness of the problem that he would convey that to Mr. Anderson?
**A. Yes.**
MS. LEE-COTA: Object to form.
BY MR. PEREZ:
Q. Was Mr. Woods in that first discussion?

**A. No, but I had a private conversation with him after I found out just to -- just to tell him how I felt and how bad I felt for him that he is going through that with his wife.**

Q. Did you also communicate to Mr. Woods that Dave was going to be talking to Mr. Anderson?

**A. Yes.**

Q. Did Mr. Woods have a problem with that?

**A. No.**

Q. Would it be fair to say that he also was comfortable with Dave being the messenger?

MS. LEE-COTA: Object to foundation.

BY MR. PEREZ:

Q. Yes?

**A. Yes.**

Q. So Dave has a conversation and then what happens next? When do you next hear about what's going on?

**A. I mean, there's a period of time where, you know, there's not a lot of things happening. I -- and I assumed that processes like this have to take their course and there was -- there was no urgency to have anything done instantly because our season had ended and there was going to be no real interaction with Bart Wear for any of the people that I needed to protect in the program from him.**

Q. Let's talk a little bit about kind of Title 9

rules. Did you feel -- do you feel now that you are a mandatory reporter?

**A. Yes.**

Q. And you base that at least in part on your training that you received at ASU?

**A. Yes.**

Q. And would it be fair to say that on a regular basis annually perhaps you had various trainings from ASU for sexual harassment, HR, Title 9, those types of incidents?

**A. Yes.**

Q. And based on that training and experience, did you feel that at that time when you heard about what had happened with Leslie and Kathy and Ms. Woods, that you had a duty to report that?

**A. Yes, I did.**

Q. And did you fulfill that duty?

**A. Yes.**

Q. And how did you fulfill that duty?

**A. Well, I reported it with -- through our discussion with my supervisor who I report to. I -- Dave and I worked together, but as I've discussed, the whole time Dave is the communicator with Ray and that was -- that was I thought once I -- Dave and I spoke on it and he told me he was going to go speak to Ray that my responsibilities with it**

**have been completed.**

Q. In other words, it's fair to say that based on your training from ASU, that you felt that reporting it to your supervisor satisfied that reporting requirement?

**A. Yes.**

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. And would it be also fair to say that you didn't feel that anything further needed to be done to satisfy your reporting mandate?

**A. Yes.**

Q. And then did you also believe that Dave reporting it to Ray would satisfy his reporting requirement?

**A. Yes.**

Q. And so for you, the important thing that it went from Dave to Ray Anderson and then from there to the appropriate authorities?

**A. Yes.**

Q. Okay. So now a period of time elapses, as you just said, and during that period of time do you have further communications with Dave about what's going on with this?

**A. Yeah, I mean it's -- there's no direct communication, but we would talk in the office or on the phone and -- and I just was noticing more frustration that**

**something wasn't being done sooner, but there's no specific moment that I could point to a phone call or a meeting in my office because we met quite a bit so there was just updates, you know, throughout that period.**

Q. And did Dave tell you during these interactions that he was continually bringing it up with Mr. Anderson?

**A. Yes.**

Q. Did Dave tell you about other people that he had met with and spoke about this?

**A. I believe he brought up Rick Shangraw's name, that he had met with him as well, yeah.**

Q. Did he also talk about Jay Heiler as somebody he had spoke to?

**A. Don't remember that.**

Q. Okay. Did he talk about other people in the department like Scott Nelson?

**A. Yes.**

Q. Okay. So he'd also talked to Scott Nelson about it?

**A. Yes.**

Q. Did he talk about Jean Boyd as one of the people he had talked to?

**A. Don't remember on Jean.**

Q. And so does Dave convey to you a frustration that he's talking to people and that things aren't being done?

**A. Yes.**

Q. Could you sense from Dave in you knowing him and relationship with him that that was a source of frustration for him?

**A. Yes. Dave was the type of person in the workplace with me and my interactions with him that if you asked him to do something he was going to go do it. Some people you ask them to do something and then they just don't do it and you just wonder why the work hasn't been completed, but very task oriented. If say Dave I need this, I need an answer on this at least, I would get an answer from Dave so I think he would get frustrated when people, you know, wouldn't do the same.**

Q. And would it be fair to say that that had even exponential significance given that it involved your wife, and his wife, and Ben Woods's wife?

MS. LEE-COTA: Object to form.

**THE WITNESS: I mean, yes because we -- you know, it's our responsibility to protect the program and people that we care about and people that we work with so for something like that to go on it was something we couldn't tolerate.**

BY MR. PEREZ:

Q. So how long does this go on before you have kind of that next communication with Dave saying something has

got to change?

**A. It was starting to run into the summer. Again, just it was a number of years ago and I know that Dave was continuing to be frustrated about it until the early part of summer.**

Q. There was an incident, and I'm not sure if you're aware of it, so there's an incident in May, early part of May, could have been mid May, when Herm Edwards, Bart Wear, and Ray Anderson fly to California to play golf.

**A. Yes.**

Q. Were you aware of that incident?

**A. I was told by Dave about it after the fact.**

Q. What was your reaction to hearing about that?

**A. Personally I was furious that that took place knowing what credible women had that are, you know, in our program what they had to experience with -- with Bart and I just -- I thought it was inappropriate that Ray decided to go play golf with Herm Edwards and Bart.**

Q. And were you aware at that time whether or not Ray had a conversation with Bart Wear?

**A. I -- I was not aware of it, no.**

Q. What did you believe at that point?

**A. I would assume that he had said something to him, but I -- I was pretty surprised that he was still willing to go play golf with him considering what he was alleged to**

**have done.**

Q. With regards to kind of the process moving forward, would you have expected that somebody would have contacted you or contacted your wife to learn about the facts of what had happened?

**A. I'm not sure about these processes and how they work and timetable of how they investigate stuff like this, but I would have assumed that might have been done quicker.**

Q. I guess my question is, and I'm trying to keep this timeline in order, so at the time of the golf tournament or the golf junket on or about May 13th, had anybody approached you or your wife to ask about the facts of the case?

**A. No.**

Q. Had anybody approached you or your wife about lodging a complaint or doing any other process to move the investigation along?

**A. No.**

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. Okay. So I think now we're into the summer and you said -- I think you said that you still hadn't heard anything; correct?

**A. Yeah.**

Q. All right. And so when was the next conversation

you remember having with Dave Cohen about the lack of progress?

**A. I don't -- again, I don't have like a direct date or, you know, a conversation that I remember at this point, but I know it was talked about and discussed.**

Q. Do you remember a conversation with Dave wherein he conveys to you that Mr. Anderson has not yet spoken to Bart Wear and he has not had an opportunity to speak with him yet?

**A. I believe I do remember Dave saying something to that effect, yes.**

Q. And do you remember that one of Mr. Anderson's excuses was that Bart either was in the process or had already left for the summer?

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: I'm not sure on that specifically.**

BY MR. PEREZ:

Q. Do you think that Mr. Anderson could have had a conversation with Bart Wear that didn't have to be in person?

MS. LEE-COTA: Object to form.

**THE WITNESS: I mean, I don't see how it wasn't possible to have had a conversation. That's just my opinion.**

BY MR. PEREZ:

Q. I mean given that they were on a plane to California; correct?

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. Yes?

**A. Yes.**

Q. And they were -- spent a weekend together in California golfing.

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. Correct?

**A. Yes.**

Q. All right. And did you also become aware that after the golf trip that -- did Dave tell you that Rick Shangraw was very upset about that golf trip?

**A. He did, yeah.**

Q. And did Dave tell you that Rick Shangraw then scheduled a lunch and had another conversation with Ray Anderson about why he wasn't dealing with the Bart Wear situation?

**A. I don't remember that, but I do remember Dave talking about Rick getting involved with encouraging Ray to do something, yeah.**

Q. Now, during this process, I want to talk about

Mr. Cohen's performance again. Was he still meeting your needs as administrator for the basketball program?

**A. Absolutely.**

Q. Did his work product, his responsiveness, his -- his meeting expectations, did those all continue to move forward in the same level that you had experienced?

**A. Yes.**

Q. You were very satisfied with him?

**A. Absolutely.**

Q. Okay. And so then does there come a time when Dave begins to tell you that he's concerned that this constant communication with Ray Anderson about not advancing the investigation is creating problems for him with Ray?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. Do you remember what he tells you?

**A. I just -- again, I don't have a specific phone call, date, you know, but he would just say kind of he's getting on thin ice with everybody just because he's -- you know his encouragement to try and get someone to take action on this and I think it was -- it was starting to -- he felt -- Dave felt in telling me that it was starting to cause a division there for him.**

Q. And to go back to your original point, kind of a continuing or growing frustration that that task was not being accomplished, is that fair to say?

MS. LEE-COTA: Object to form.

**THE WITNESS: Can you say that again.**

BY MR. PEREZ:

Q. What you had testified earlier that Dave is task oriented; correct?

**A. Yeah.**

Q. So that -- that growing frustration that the task that he had been set out to do wasn't being accomplished.

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. And so we get towards the end of the summer and so we'll just say the end of July. At that point in time, had anybody approached you or your wife about the investigation or filing a complaint or any kind of contact about what had happened?

**A. No.**

Q. And at any point during that time, did you feel that you needed to go around Dave because he was not a good messenger on this subject?

MS. LEE-COTA: Object to form.

**THE WITNESS: No.**

BY MR. PEREZ:

Q. So you still trusted that he was doing what he could?

**A. Yes.**

Q. All right. And so then let's talk about then August comes around?

**A. Yeah.**

Q. And in August there is a discussion about a reorganization and reassignments. Are you familiar with that happening within the athletic department?

**A. I remember Dave talking to me about his reporting structure changed and that he -- he was -- he was no longer on swimming.**

Q. And what did he say about that, if you remember?

**A. That he was frustrated about it.**

Q. Also, do you also remember there came a time on or about that same time when he was told that he would now be reporting to Frank Ferrara instead of his other reporting directly to Ray Anderson?

**A. Yes.**

Q. And do you remember what he said about that?

**A. No. I just remember he told me and he was upset about it.**

Q. Do you remember also conversations with Mr. Cohen about how he felt that his bonuses were being impacted, his

salary was being impacted by this effort to get Ray Anderson to report the incident?

MS. LEE-COTA: Object to form.

**THE WITNESS: I know that they changed or David told me they changed his bonus structure. I'm not sure like what the reasoning is for that though, but that they did do that apparently. That's what Dave had told me, yes.**

BY MR. PEREZ:

Q. And did he also tell you that he was frustrated with that?

**A. Yes.**

Q. Did he tell you whether he thought that was fair or unfair and why?

**A. I mean, I think Dave because of the success of the men's basketball program the prior two years and that he felt like he earned his bonus because he had done a good job.**

Q. Let's talk a little bit about that success. So obviously the team was doing well?

**A. Yeah, we had back-to-back NCAA tournaments. It was the first time in I don't know how many years. A long time though, yeah.**

Q. And you were playing some high level teams. I think you might have --

**A. Yeah, we beat Kansas two years in a row, yeah.**

Q. And Kentucky? Did you play Kentucky that year as well?

**A. I don't think so.**

Q. Okay. Tell me when you played some of those games outside of conference like at Kansas or at Kentucky, how would you schedule those games?

**A. Well, we would -- we put feelers out to see what programs were looking to start a series, and you know we -- we -- I'd have a point man on the coaching staff that was handling scheduling and then we would work, you know, through Dave, our sports administrator, get his input on just all those opportunities that might be out there.**

Q. And would Dave help to facilitate those potential new match-ups?

**A. Yes.**

Q. Did you ever feel or did anyone on your program ever felt that Dave wasn't doing everything he could to support your goals and needs?

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: I never had a coach on my staff that said anything negative about Dave.**

BY MR. PEREZ:

Q. There's been some allegations in this case that Mr. Cohen has racist tendencies, and although those haven't

been in any reports that we've ever seen, I do want to make sure that I know as he interacted with the basketball program, did you ever experience any racist tendencies of Mr. Cohen?

MS. LEE-COTA: Object to form.

**THE WITNESS: Dave was very well liked by our players.**

BY MR. PEREZ:

Q. And your coaches?

**A. Yes.**

Q. Did you ever know him to make off color or racist remarks that you felt were inappropriate?

**A. No.**

MR. PEREZ: Probably a good place to take a short break. Ten minutes?

MR. MITCHELL: Yes.

(Recess from 11:44 a.m. to 12:01 p.m.)

BY MR. PEREZ:

Q. I'm going to show you what's been marked as -- we'll mark as Exhibit 27.

(Deposition Exhibit No. 27 marked for identification.)

Attached as Exhibit 27 is a notice of deposition. The date for that deposition was April 11th, 2023. Have you seen this deposition notice?

**A. Now, yes.**
Q. On the third page is an attachment A. That makes a request for documents. Do you see that?
**A. Third page, yes.**
Q. I think the page you're on, yes.
**A. Yeah.**
Q. Have you seen that before now?
**A. No.**
Q. Okay. Exhibit 28 is an amended notice of deposition and this was for your deposition that was to occur on December 11th.
(Deposition Exhibit No. 28 marked for identification.)
Do you recall seeing this notice?
**A. No.**
Q. Again, on page 3 is a request for documents. Do you see that?
**A. Yes.**
Q. Same request. I'll tell you it's the same request. Do you recall seeing that before today?
**A. No.**
Q. All right. And this deposition you were unable to attend because you were sick?
**A. Yes.**
Q. All right. And I believe you had every intention

of attending up until the day of?

**A. Yes.**

Q. Show you what we'll mark as Exhibit 29.

(Deposition Exhibit No. 29 marked for identification.)

The deposition for today's date and you'll see the language is the same. Have you seen this document before?

**A. I have not.**

Q. This is the first time you're seeing it?

**A. Yes.**

Q. Okay. And on page 3, again, is the same request for documents. Do you see that?

**A. Yes.**

Q. All right. Did you bring any documents with you today?

**A. No.**

Q. In this request for documents, I want to make sure I understand how you have attempted to comply with this request. Have you provided all text messages, and you might want to look at this -- these requests under request for production one, all communications between you and any person relating to David Cohen? Have you provided those communications or searched for those communications?

**A. Searched for -- no.**

Q. Okay. You have not?

**A. No.**

Q. Okay. Have you -- the second question is, have you searched for all communications between you and David Cohen?

**A. No.**

Q. Okay. And the -- when it says communications, I'm referring to e-mails, texts, any other form of communication that you might have, old fashion letter writing. You have not searched for those?

**A. No.**

Q. Request for production number three, produce all communication between you and any person relating to sexual harassment by Bart Wear or any investigation relating to the sexual harassment by Bart Wear. Do you see that?

**A. Yes.**

Q. Did you search for those communications?

**A. No.**

Q. How do you typically communicate with people?

**A. I would say phone call would be my main source, after that text, and then e-mail number three.**

Q. And so you do have I assume e-mail communications and text communications between yourself and Mr. Cohen?

**A. I do.**

Q. Okay. And would it be fair to say you have e-mail

and text communications between you and Mr. Anderson?
**A. Yes.**
Q. And at least an occasion -- occasional text or e-mail communication with President Crow?
**A. Yes.**
Q. Who else in the athletic -- you mentioned other administrators that you might communicate with. Would that also be e-mails and text communications?
**A. Yes.**
Q. Now, with regards to these incidents, particularly with regards to the sexual harassment of Bart Wear, I'm imagining you were only talking to a very few people about that; correct?
**A. Yes.**
Q. But one of those people was probably your assistant coach?
**A. Yes.**
Q. Do you have e-mails or text communications with him about the sexual harassment by Bart Wear?
**A. I have not checked that.**
Q. Okay. So you're not sure?
**A. Not sure.**
Q. Okay. We're going to ask counsel and we will circle back on this to make sure that we have those communications, okay?

**A. Okay.**

Q. And we're going to ask that you provide those.

I understand also that there came a time not too long ago where your telephone was switched out; correct?

**A. Yes.**

Q. So your cell phone is provided by ASU?

**A. Yes.**

Q. Do you remember when that occurred?

**A. Based on looking back at certain text messages recently, I believe it's like February of 2020.**

Q. Okay. And I tend to break my phone a lot so usually when I get a new phone, I have them download the texts so that I don't lose things, photos of my kids, that kind of stuff. Were you able to do that?

**A. I -- I -- I'm not great at technology and that's not my department and I just don't know how they were or not transferred to the new phone, but that's just what happened when it was -- when it was done.**

Q. You mentioned your ASU phone. Do you have a personal cell phone as well?

**A. I do.**

Q. Might there be communications of the type we've been referring to on your personal cell phone?

**A. No.**

Q. You only use those for separate things?

**A. Yeah, that's for my family and close friends.**

Q. Okay. And so Dave would not be in any of those communications?

**A. No. Well, on my personal maybe. He has my personal.**

Q. Okay. So we'll ask for you to search that as well.

**A. Okay.**

Q. I know you just said you're not a technology guy. Do you have a laptop?

**A. I do.**

Q. Given to you by ASU?

**A. Yes.**

Q. And is that something that you -- do you have a desktop as well?

**A. I do not, no.**

Q. So everything you do is on your laptop?

**A. Laptop, yes.**

Q. Okay. And then your -- you communicate using your ASU e-mail address?

**A. Yes.**

Q. And so we'll ask you to search those as well.

**A. Okay.**

Q. Do you also have a personal e-mail address and a

Google or a Yahoo account?

**A. Yeah, I have that. Yes, Gmail.**

Q. Okay. And would it be possible that some of those communications are in your Gmail account, for example, with Dave?

**A. I don't think so.**

Q. Do you use that often?

**A. No.**

Q. All right. So it's primarily your ASU e-mail?

**A. Yes.**

Q. And I think you already testified that you don't use e-mail a lot.

**A. No, I don't.**

Q. Okay. And then do you do hard copies of anything? Do you print out e-mails or texts or is that something you ever do?

**A. Do I print them out?**

Q. Yes.

**A. No.**

Q. A few people do. Okay. So thank you. I just waned to make sure I understood what you had done and what we can do.

Who is your carrier, by the way, for your cell phone service?

**A. It's Verizon. I'm not 100 percent of that. I**

**should probably know that too but.**

Q. All right. Let's return to where we left off. We were talking about the end of the summer and I believe your last testimony was that you -- nobody had still contacted you at the end of July about investigation, filing complaints, anything of that nature. You also then begin to hear from David, correct me if I'm wrong, frustration with reorganization, bonus structure, swim program.

There comes a time in -- on or about August 12th where David Cohen and Mr. Anderson have a meeting and at that meeting tempers kind of flare. Were you aware of that meeting when it happened?

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: Not -- I was out of town. I was told that Dave had met with Ray, but I was not around at that point.**

BY MR. PEREZ:

Q. Do you remember who told you that?

**A. Dave.**

Q. Okay. And did he tell you at that time that one of the subjects was again how nothing had been done on the investigation?

**A. Yeah.**

Q. Did he also tell you that he felt that he was being retaliated against because he continued to bring up

this issue of ASU not doing anything about what he had reported?

MS. LEE-COTA: Object to form.

**THE WITNESS: My recollection is that he did not use that word, but he did say that he felt like he was in trouble.**

BY MR. PEREZ:

Q. And then -- where were you? You said you weren't in town.

**A. I was in Napa. I was -- my wife and I went there prior to the semester starting.**

Q. And so how long were you in Napa, do you remember?

**A. Three days, probably three or four days.**

Q. Okay. So August 12th was the day of the meeting. On August 15th Mr. Cohen is fired. Does there come a time when you have a conversation with Dave about his termination?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. And explain for me what he tells you.

**A. He was very upset. You know, he just basically told me that he just got let go and that it was a morning conversation and so I was just -- I was shocked.**

Q. Do you recall if that conversation was on the same

date that he had been fired?

**A. Yes.**

Q. Do you recall that he told you he had been fired, using that word?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. You said you were shocked. Convey to me what your thoughts were in terms of what that might mean for your program losing Dave Cohen.

**A. Well, I -- at the time I felt like it was, you know, a breach of trust, just that someone that was very valuable to what we were doing was let go and I wasn't spoken to about it so I -- I felt like that was something that I should have had at least a conversation or some input about a move that was made like that.**

Q. So you kind of predicted my next question. You didn't have a conversation with Ray Anderson?

**A. I did not.**

Q. He did not tell you it was coming?

**A. No.**

Q. And nobody conveyed to you that it was on its way, that Dave was going to be terminated?

**A. No.**

MS. LEE-COTA: Object to form.

BY MR. PEREZ:
Q. Did anybody communicate with you earlier about any reorganizations in the department as it related to Dave?
**A. No.**
Q. Was that something that was a little frustrating to you to hear that Dave, the guy that you saw as your point of contact and your direct communication to Ray Anderson, was now not going to be reporting directly to Ray Anderson?
MS. LEE-COTA: Object to form.
**THE WITNESS: I mean, at the time I didn't look at it like that.**
BY MR. PEREZ:
Q. How did you look at it, if you remember?
**A. Well, I -- I was more on a personal side just disappointed for Dave that he was going through that and particularly with the understanding of what we had done, you know, with the basketball program for the two straight years and the timing of this happening for him didn't make sense to me.**
Q. Ticket sales were up; correct?
**A. Yes.**
Q. Donor relations pretty good?
**A. Yes.**
MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. Did you feel that there was anything that you were wanting in your program that Dave was able to provide but he was not providing?

**A. No.**

Q. So you find out that Dave has been fired. You weren't consulted. Do you remember who you told or what your reaction was to that?

MS. LEE-COTA: Object to form.

**THE WITNESS: I was called shortly after and I was conferenced in on a call with Ray, Jean Boyd, Ken Landphere. I'm not sure if anyone else was in there or not because, again, I was out of town. I was just on a phone call with those guys.**

BY MR. PEREZ:

Q. So all this occurred during your three-day vacation?

**A. Yeah.**

Q. Great vacation.

**A. Yeah, no it was wonderful news.**

Q. Yes, and I'm sure your wife appreciated you being on the phone.

Do you remember what you were told -- so that conversation you just described with Ray and the others, was that on the same day that Dave had been fired?

**A. Yes.**

Q. Do you remember what occurred during that conversation?

**A. Just basically straightforward that Dave, you know, had some issues over there and he -- they recognized that he's been good to you and you guys have a great friendship, but we're going to -- you know, we're going in another direction and I wasn't happy with it, with that decision and I kind of let them know that on the call, and they said that they would try to find someone who would be very supportive of our basketball program.**

Q. Do you remember if during that call they told you that Dave had been fired?

MS. LEE-COTA: Object to form.

**THE WITNESS: I don't remember that specifically.**

BY MR. PEREZ:

Q. Okay. In other words, did they talk about it as a termination or did they talk about it as kind of a voluntary split?

MS. LEE-COTA: Object to form.

**THE WITNESS: I didn't -- I didn't look at it as a voluntary split.**

BY MR. PEREZ:

Q. Did they talk about it like it was some short term

leave or something that where a final decision had not been made?

MS. LEE-COTA: Object to form.

**THE WITNESS: Not to my knowledge, no.**

BY MR. PEREZ:

Q. Would it be fair to say the way it was communicated to you, it sounds like they're telling you they're going to find somebody new.

**A. Yes.**

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. That a final decision had been made.

**A. Yes.**

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. Correct?

**A. Yes.**

Q. And that Dave would no longer be working at ASU with the basketball program.

**A. Yes.**

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. Okay. So you have the conversation and then what happens when you get back from Napa?

**A. Just, you know, trying to get to work again. I**

have the players coming back to campus. It was a personal side to -- to, you know, obviously not -- losing Dave, value he brought to the program and trying to work with a new structure and new people and trying, you know, move forward.

Q. Do you remember roughly around that time period shortly after coming back from Napa wherein you had a conversation with Ray Anderson about the investigation?

A. I do not.

Q. Let me show you some more documents. I'm going to show you a document that's been marked as 21 and it's marked as 21 because it's been used in prior depositions.

Have you ever seen this document before?

A. I have not.

Q. Okay. There came a time when you were interviewed by ASU in connection with the Bart Wear incident; correct?

A. Yes.

Q. Do you remember being contacted by ASU?

A. Yes.

Q. Okay. And then you sat for an interview probably with counsel present?

A. Yes.

Q. All right. And I want to get into this in more detail, but for now I just want to ask you -- there's another document here I'll show you. This one will be 30.

(Deposition Exhibit No. 30 marked for identification.)

And I'm giving you these documents. You don't have to review them in detail. You're welcome to, but also don't want to -- I don't want you to feel like I'm hiding anything. These are the notes from the investigation. In other words, when you were interviewed those are the notes from your interview. Have you ever seen that document before?

**A. Not these notes, no.**

Q. Okay. So I'll get into these notes in more detail, but what I want to do is I want to refer you to page -- on the bottom right of the notes you're looking at you'll see 23, 22, all the way up through 26. If you could go to page 23, 25, please.

**A. 23, 25.**

Q. Okay. And you'll see there's a reference to an 8/18 meeting. Do you see that?

**A. Yes.**

Q. Okay. Take a moment to review that.

**A. I read that paragraph only, right?**

Q. Yes.

**A. Yeah.**

Q. I just want to make sure, does that now refresh your recollection of when you met with Ray Anderson?

**A. It does.**
Q. Okay. And that 8/18 meeting sound; correct?
**A. That sounds like it would happen because we would be back starting school at that point, yeah.**
Q. Okay. And in that meeting, do you remember what Mr. Anderson tells you about what's going on with the Bart Wear situation?
**A. As I read the content of what I have in these notes, yes. I now see that.**
Q. What does he say?
**A. Basically that he wasn't -- first time he was hearing about it so I was really surprised.**
Q. That wasn't consistent with what Dave Cohen had told you; correct?
**A. Yes.**
Q. Were you aware that Mr. Anderson had actually heard about it on March 25th just as Dave Cohen had told you?
MS. LEE-COTA: Object to form, foundation.
**THE WITNESS: Can you repeat that.**
BY MR. PEREZ:
Q. Yes. Were you aware that Mr. Anderson had heard about it on March 25th just as Dave Cohen had told you?
MS. LEE-COTA: Same objection.
**THE WITNESS: I mean, I'm aware of it because**

**Dave told me he was going to meet with Ray. That's how I'm aware that that meeting took place.**

BY MR. PEREZ:

Q. Even though Mr. Anderson apparently is telling you on 8/18 that it's the first time he's hearing about it.

**A. Yes.**

MS. LEE-COTA: Object to form, foundation.

BY MR. PEREZ:

Q. Show you what we're -- we're going to bounce back from different exhibits. I'll show you Exhibit 31.

(Deposition Exhibit No. 31 marked for identification.)

Those are the notes from Mr. Anderson's interview, and I'm going to refer you to page 2139. And if you look at the second paragraph from the bottom, I'll represent to you that this Exhibit 31 is the interview notes with Mr. Ray Anderson. You'll see on page 1 it has Mr. Anderson's name.

On the bottom, second to last paragraph, do you see that first time came home two weeks after it occurred Wednesday in Vegas game this Thursday 14th understood this occurred. First heard 3/25. Do you see that?

**A. I do.**

Q. So in his interview Mr. Anderson acknowledges that

he learned about it in -- on March 25th, and I can show you other documents, but really what I'm trying to figure out is why did Mr. Anderson, if you know, tell you that it was the first he was hearing about it on August 18th?

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: I have no idea.**

BY MR. PEREZ:

Q. Had Mr. Anderson been dishonest with you before about matters with respect to the program?

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: I mean, I'd have to think back to that. I can't -- no specific event comes to mind right now.**

BY MR. PEREZ:

Q. You may not be able to answer this question. Again looking at Ray Anderson's notes, page 2141 on the bottom right. Ray -- I believe this is Ray's voice saying Bobby embarrassed such a deal ever made of it. And I'm looking at on page 2141. If you count from the bottom, it would be three up from the bottom.

MR. MITCHELL: Three paragraphs up?

MR. PEREZ: Three paragraphs up. The last sentence in that third paragraph. In other words, the paragraph begins with Bobby never checked in.

BY MR. PEREZ:

Q. So if you look at 2141.
**A. Yeah.**
Q. And you see Bobby never checked in?
**A. Yeah.**
Q. And here he's referring to that you never inquired about what was going on with the investigation.
MS. LEE-COTA: Object to form and foundation.
BY MR. PEREZ:
Q. And you're welcome to read the whole paragraph, but I really want to talk about those last three or four sentences in that paragraph because I want to understand if you know what Mr. Anderson is referring to.
So in the last four sentences he says, Bobby embarrassed such a deal ever made of it. Never thought inappropriate and certainly not sex harassment. Have not talked to Ben Wood, has never approached me or anyone else.
**A. What's the question?**
Q. My question is, did you ever convey to Ray Anderson that you didn't believe that this sexual harassment occurred or that it wasn't a big deal?
**A. Never.**
Q. Did you ever convey to him that you didn't think it was inappropriate?
**A. Never.**
Q. Did you ever convey to Mr. Anderson that you were

embarrassed that such a big deal was made over this?

**A. Never.**

Q. Would it be fair to say that you felt the exact opposite of those things?

**A. Yes.**

Q. Thank you. I'm done with this document.

So I want to go back to this discussion that you had with Mr. Anderson on the 18th. He says to you apparently that this is the first he's hearing about it. Did you ask him why nothing had happened up to that point? I mean, was that why he said this the first time hearing about it?

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: That's what he said so it was hard for me at that point to really like go at him about why something hasn't been done yet, but now with Dave gone, like I had to directly talk to him about these instances and what is happening with it because there was -- I had no other trust that anybody else could do it at that point except me.**

BY MR. PEREZ:

Q. Did -- now, up to this point, August 18th, again I want to be clear, nobody has approached you about interviewing you, talking to Leslie, investigation, filing a report, any of those things?

**A. No.**

Q. That's correct?

**A. Yes.**

Q. Okay. So then do you have an opportunity to discuss with Ray Anderson at that time that Mr. Cohen had said that he had been talking to him about it?

**A. I didn't feel comfortable doing that with Ray considering what had just happened with Dave. It was more of -- of my focus was going to be making sure that it was clearly communicated what happened and I -- and that's all that was mattering to me. I couldn't change what happened with Dave, but I certainly didn't feel like it was in my best interest to contest Ray on that, whether he knew or not.**

Q. Explain that to me. What do you mean you don't think it was in your best interest?

**A. Well, because, you know, it's just we -- we -- I ran all my communication through Dave. I had plenty conversations with Dave that he spoke to Ray about the harassment and so I know Dave did his part. So if I was being told at that time that he first heard about it, I just -- I just didn't think it was good for me to go after him or go at Ray about it.**

Q. Implicit in your answer, and what I'm going to ask you about is, are you concerned about what Ray's reaction

might have been if you, and I'll use the word confronted him, about Dave told me this or my understanding was this was occurring?

MS. LEE-COTA: Object to form.

**THE WITNESS: It just was not in my best interest to do that especially considering what happened with Dave.**

BY MR. PEREZ:

Q. Being fired?

**A. Yes.**

Q. Were you concerned that Ray might retaliate against you if you had that conversation with him?

MS. LEE-COTA: Object to form.

**THE WITNESS: No because I was in too much of a stable position and the success that I've had with the program at the time.**

BY MR. PEREZ:

Q. Thank you. Tell me a little bit about your relationship with Ray. So you testified previously that most of your communications were through Dave. Was Ray somebody that you had a friendship with?

**A. It was cordial.**

Q. So not quite a friendship, but it was professional?

**A. Yes.**

Q. And, similarly, with his wife and your wife?

**A. Yeah, his wife, Buffy, and my wife I think probably had a better personal relationship than me and Ray did.**

Q. Did you have a sense or feeling about how Ray was as a manager with other people?

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: Can you repeat that.**

BY MR. PEREZ:

Q. Sure. Did you have a sense of how Ray was a manager with other people?

MS. LEE-COTA: Object to form and foundation.

**THE WITNESS: It's hard for me to like speculate on what he was like with other coaches, other programs. That's -- yeah, I don't know.**

BY MR. PEREZ:

Q. And I guess what I'm getting at, did he have a reputation, for example, for being emotional?

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: I don't know.**

BY MR. PEREZ:

Q. Okay. Did he have a reputation for being harsh with other coaches?

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: I mean, stern and sometimes in**

**some of those meetings a little tense, but he's kind of running the whole athletic department so it's understandable.**

BY MR. PEREZ:

Q. I'll show you an e-mail I'll mark as 32.

(Deposition Exhibit No. 32 marked for identification.)

Read from the bottom up.

**A. Okay.**

Q. In this communication Ray seems to be critical of Dave, think his words are Dave is being pissy. Do you see that?

**A. Yeah, I see it.**

Q. Were you aware of that type of interaction that Ray had with his employees?

MS. LEE-COTA: Object. To form and foundation.

**THE WITNESS: I'm not around in that setting to know that.**

BY MR. PEREZ:

Q. Okay. Did you feel that Dave was being pissy around you because of kind of different people being involved in interacting with you?

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: I haven't noticed that.**

BY MR. PEREZ:

Q. Again, I think you testified that as far as you could tell it was business as usual with Dave?

**A. Yes.**

MS. LEE-COTA: Object to form, foundation.

BY MR. PEREZ:

Q. All right. So let's go back to the conversation on the 18th. In the conversation on the 18th, did you have a discussion about Bart Wear being involved with the athletic department at that time?

**A. Yes.**

Q. And what did you tell Mr. Anderson?

**A. After reviewing the notes that I had, a lot of things happened and just frustration that, you know, nothing is happening and that, you know, outlining exactly what happened to all the women, again based on my notes and what I wrote, he told me that this was the first time he knew about it so, yeah.**

Q. Was there a discussion about what Bart Wear's involvement was going to be around the program going forward?

**A. Well, I was kind of very strong about him not being around our basketball program anymore and I can't make decisions about what the university wants to do with somebody, but just I wanted to be very firm on that and**

**he -- I think he agreed with that with me.**

Q. And he had said Bart Wear won't be around the basketball program?

**A. Yes.**

Q. And did you have any more detailed discussion about what that meant, not being around the program?

**A. I just -- it was just a blanket statement, like don't want him around.**

Q. I guess what I'm getting at is, was there -- did that mean I don't want him around practices, I don't want him, you know, interacting with me or did that mean you didn't want him anywhere near basketball games or certainly around your wife and Ms. Cohen and Ms. Woods?

**A. Yes.**

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. And was that you think communicated clearly to Mr. Anderson?

**A. Yes.**

Q. And I think your testimony is that he agreed with that?

**A. Yes.**

Q. I'm going to go back to this Exhibit 21. And on Exhibit 21 I'll go to page 10 of that document.

MS. LEE-COTA: Counsel, can you give me the

Bates label on that.

MR. PEREZ: I actually don't --

MR. MITCHELL: I've got it here. It's 1953.

MR. PEREZ: Page 10 is 1953?

MR. MITCHELL: Yes.

BY MR. PEREZ:

Q. And you'll see where it says post incident reports and conduct?

**A. Yes.**

Q. Now, this is the official report from the person who did the investigation, Kari Love?

**A. Yes.**

Q. And I believe that's the person who you interviewed with?

**A. Yes.**

Q. Okay. So this is her report that she reports to Kim Demarchi from ASU's general counsel's office.

**A. Okay.**

Q. All right. And so in the post incident report you see that there's a discussion, first paragraph, on Monday, March 25th, 2019 Mr. Cohen spoke with Mr. Anderson. Do you see that?

**A. Yes.**

Q. Okay. And then you'll also see, if you kind of scroll down, that Mr. Nelson was at that meeting. Do you

see that?

**A. Yes, I do.**

Q. All right. And then you go down even the next paragraph it talks about they all recalled these facts consistent with one another, including Mr. Anderson. Do you see that?

**A. Yes.**

Q. All right. And you'll also see that in that last paragraph Mr. Nelson is told by Mr. Anderson to go speak with Rick Shangraw and convey to him what had occurred.

**A. Yeah.**

Q. Okay. On the next page, so 1954, about halfway down you'll see that there was another conversation on May 7th between Mr. Anderson and Mr. Cohen.

And then a couple paragraphs down, on May 21 it says Mr. Boyd spoke with Mr. Anderson regarding the Wear report. So again it's another communication with Mr. Anderson.

And then if you go to -- I'm sorry. On that May 7th, 2019, so stay on that page 1954. You see one of the things they discussed was the golf outing. Mr. Anderson explained to Mr. Cohen that he did not think that a golf trip with Mr. Wear was an appropriate or private enough setting to have such a serious conversation. Do you see that?

A. **Yes.**

Q. So that's the time frame, May 7th roughly, that there had been this golf outing and that Mr. Anderson and Mr. Cohen had a conversation about the outing.

And then you'll see on your next page, 1955, that -- and I'll point you to two different paragraphs. At the top, first Mr. Cohen has lunch with Mr. Shangraw. Do you see that?

A. **Yes.**

Q. And then go down four paragraphs and it says Mr. Shangraw then has lunch with Mr. Anderson. It's the fourth paragraph.

A. **Yes, I see it.**

Q. And in that communication, Mr. Shangraw talks about the golf outing and explains that he did not -- and I'm quoting, explained that he did not think the trip was the appropriate setting for such a serious conversation. Mr. Anderson assured Mr. Shangraw that he would speak with Mr. Wear as soon as Mr. Wear returned to Tempe at the end of the summer. Do you see that?

A. **Yes.**

Q. Were you aware that any of that was occurring, those conversations?

A. **Dave was keeping me in the loop on a lot of these conversations and meetings.**

Q. And all of this that I just read to you, these are all consistent with what Dave told you in realtime; correct?

**A. Yes.**

Q. So there's nothing in here that strikes you other than Mr. Anderson's dishonesty.

MS. LEE-COTA: Object to form.

**THE WITNESS: Based on what he told me in the office and, yeah.**

BY MR. PEREZ:

Q. Right. I mean, he's met with all these people.

**A. Yes.**

Q. He told you on August 18th that's the first he's hearing of it.

**A. Yes.**

MS. LEE-COTA: Object to form and foundation.

BY MR. PEREZ:

Q. And did you ever have an opportunity to speak to Mr. Anderson later and confront him about the fact that it appeared that when he told you that August 18th was the first he was hearing about it that that was not truthful?

**A. I did not.**

Q. Okay. All right. I'm done with that exhibit.

There came a time in December of that same year, 2019, where Mr. Anderson -- I'm sorry. Where

Mr. Wear was at a basketball game when you were playing I believe Louisiana. Do you recall that incident?

**A. I do.**

Q. Okay. So let me just make sure I have our time frames correct.

So you talk to Mr. Anderson on the 18th. Do you have any other conversations with Mr. Anderson between the 18th and roughly December 8th, that Louisiana basketball game, about the Bart Wear situation?

**A. I do.**

Q. And what was that conversation?

**A. It was one or two days before that game and Ray came to practice, which was rare, and he -- we talked after practice was over and he basically assured me that the Bart Wear situation is being handled, that, you know, with home games coming up that I don't have to worry or be concerned about his presence.**

Q. Do you remember what you said back to him or in exchange?

**A. Well, I was just thankful that it was -- that he would not have any access, you know, to be able to go to games since my wife was still there, Ben Woods's wife was still there and thought it was very inappropriate for him to still be in that setting.**

Q. And now at this point by December, you had now

interviewed with Carrie Love from the Tisdale law firm. The report had been concluded in November. So would it be fair to say that you felt finally there was progress on this investigation?

**A. Yes.**

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. Did you learn at some point -- this report, Exhibit 31, is dated November 5th. Did you learn at some point that the university had found, as referenced in the report, that those three women had in fact been sexually harassed?

**A. Yes.**

Q. And how did you learn of that?

**A. I had the report.**

Q. Okay. So you knew that their finding was that Bart Wear had done something inappropriate, it constituted sexual harassment, and that was official finding of the university?

**A. Yes.**

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. So then when you have this conversation with Ray on or about early December, that gives you a sense that finally things are happening?

**A. Yes.**

Q. So then what happens at the game against Louisiana?

**A. We played the game. I coached it like I normally do. We won. I felt good about it. I was heading to the tunnel and my wife like lost it with me because apparently Bart Wear was at the game. I didn't see him because I don't really notice people at the game when I'm concentrating on coaching it, but he -- I was told by my wife that he was sitting courtside.**

**So, you know, as happy as you feel, it just kind of got brought back to all the bad feelings and had a very heated conversation with Ken Landphere right after the game, who was our new sports -- basketball sports administrator just about why he was in the building.**

Q. And what was Mr. Landphere's response to that?

**A. He I felt appeared to be very understanding of why I was upset.**

Q. Did he have an explanation?

**A. He did not.**

Q. Did he know how it was that Mr. Wear found himself with those seats? It sounds like they were courtside seats, is that right?

**A. As I was told --**

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: After the fact he was sitting opposite from us on the baseline so they were right on the floor, not courtside, but on the floor.**

BY MR. PEREZ:

Q. And he didn't know how he got those seats?

**A. What's that?**

Q. Ken Lambert --

**A. Yeah, Landphere. Not at the time he did not know how you know.**

Q. Okay. Do you know how seats are generally assigned at games? Is that something that ASU controls?

**A. Yes, I would -- I would think so. I mean, our players and my tickets that I get personally are, you know, are different than how you would go and purchase tickets, but I would assume. I don't know.**

Q. Certainly I would think the seats that, for example, that are right around the players, those kind of VIP seats right behind the team, are those controlled by ASU?

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: I really don't know how they're distributed or how they would get ahold of those tickets.**

BY MR. PEREZ:

Q. Well, would you, for example, if you had your brother was in town, would you reach out to somebody and

say can I get a couple seats for the game?

**A. Yeah, typically for situations like that we would go to our basketball administrator. Like if we had special guests, you know, James Harden, someone of that caliber, we would try and accommodate them and get them courtside for the visibility of having someone like that, you know. So, yeah, I believe the school would have some level of control for those tickets like that.**

Q. And so you would go to somebody like, and when he was there, Dave Cohen?

**A. Dave. Yeah, Dave would then go to the ticket office and work with them to see if those seats were available.**

Q. But you don't know exactly how it was that Bart Wear ended up courtside, you don't know how he got those seats?

**A. No. No idea.**

Q. When you spoke to Ray Anderson a couple days before the game and he told you that kind of the situation had been resolved or that they were -- you didn't have to deal with Mr. Wear anymore, did he explain to you about the conversation he had had with Bart Wear?

MS. LEE-COTA: Object to form.

**THE WITNESS: He did not.**

BY MR. PEREZ:

Q. Do you know if he even had a conversation with Bart Wear?

**A. I do not.**

Q. So all you know is that Mr. Anderson told you that you wouldn't have to deal with him anymore, but he didn't give you any more details than that?

**A. No.**

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. As you sit here today, as far as you know he never had a conversation Bart Wear?

**A. No idea.**

MS. LEE-COTA: Object to form, foundation.

BY MR. PEREZ:

Q. All right. And so do you get an opportunity to speak with Mr. Anderson that evening after the game?

**A. Yeah, I got home and I called him.**

Q. And how did that conversation go?

**A. Not well.**

Q. Tell me about that conversation.

**A. It was -- it was heated. It was confrontational. I was very upset that Bart was -- was in there particularly, you know, knowing what Ray had told me just like two days earlier about him not being around the program at all or be around the women that he assaulted,**

**harassed, whatever the term is. So, yeah, I was very frustrated and -- and we were both kind of yelling at each other going back and forth on the phone.**

Q. What was his excuse for why Bart Wear was there?

MS. LEE-COTA: Object to form.

**THE WITNESS: I specifically don't remember what he said with regards to, you know, why Bart was there, but he was very defensive about just challenging him in that sense.**

BY MR. PEREZ:

Q. Explain that. How was he defensive?

**A. Just he got -- you know, the conversation just went up notches in intensity.**

Q. I mean, did it feel like he was still trying to protect Bart Wear?

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: I was just more in the moment of just like how could this happen and how could we be this incompetent that something like this could happen.**

BY MR. PEREZ:

Q. And at that time did you -- were you able to ask him questions about like how could it come to this, how could he get seats, what did you tell him, what were the expectations? Did you have those types of conversation at that time?

MS. LEE-COTA: Object to form.

**THE WITNESS: It was -- it was a quick phone call, probably two to three minutes. Ray was very upset that I was upset and we just -- you know it was just -- it was not productive at all. I wasn't getting anywhere.**

BY MR. PEREZ:

Q. Do you remember if you had a chance to tell him that, look the university has already issued a report that says these women were harassed, how are we allowing this man still to be at our events?

MS. LEE-COTA: Object to form.

**THE WITNESS: That was the context of the call.**

BY MR. PEREZ:

Q. And then what did you do after you hung up the phone?

**A. I had a conversation with my wife. Tried to, yeah.**

Q. Did you also have a conversation with Mr. Cohen?

**A. I don't remember for sure.**

Q. Do you remember sending an e-mail to Mr. Anderson at that time?

**A. I do.**

Q. Please take a moment to look at Exhibit 33.

(Deposition Exhibit No. 33 marked for

identification.)

All right. I'm going to ask you a little bit about this e-mail. So on December 8th you send an e-mail and you mention in your e-mail that you, referring to Mr. Anderson, had prior knowledge that he was going to be in attendance. Do you see that?

**A. Yeah.**

Q. How did you determine that Mr. Anderson had prior knowledge?

**A. When I read this e-mail, I -- I could not know that he did have prior knowledge so I don't remember back to how I knew that specifically, but I had to have known it from someone that who was credible or else I probably would not have added it in the e-mail, but I cannot remember to tell you specifically how I got that information.**

Q. But you intended to put those words in. I think your next sentence you talk about how he doesn't warn you, right? So you obviously felt that he knew and that he could have told you about it in advance.

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. And then you even go so far as to say that this was very misleading and I feel I have been lied to. Do you see that?

**A. Yes.**

Q. And so this is at least the second instance where you probably could say that he had lied to you about information, the first being on the 18th where he said he wasn't aware of it until then, and now you have this instance.

Did you have an occasion to confirm after the fact that Mr. Anderson wasn't being straightforward with you about his communications with Bart Wear?

MS. LEE-COTA: Object to form and foundation.

**THE WITNESS: Could you repeat the question, please.**

BY MR. PEREZ:

Q. Suer. I guess I'm trying to figure out if you were able to press him any further on what was being communicated to Bart Wear and how that was being communicated to Bart Wear?

MS. LEE-COTA: Same objection.

**THE WITNESS: I do not. I just know it was a disconnection between what I'm -- I was being told at that point and then what the reality of what was actually happening.**

BY MR. PEREZ:

Q. And then you say, I'm getting tired of you continuing to mention the Cohen as it relates to this

situation. Do you see that?

**A. Yes.**

Q. Do you know why --

**A. That was most likely a part of our conversation that -- that we had, the quick conversation that referenced them as maybe based on our friendship that we have but.**

Q. But as you sit here today you don't remember exactly why you reference them?

**A. Not the exact words, but they were brought up.**

Q. And you say you're getting tired of it, so it sounds like he had done that before?

MS. LEE-COTA: Object to form.

**THE WITNESS: I don't remember. I can't say. I'm not like -- I created this e-mail. This is what I felt that night. I can't -- but I'm not a writer or something, you know what I mean, so like, yeah.**

BY MR. PEREZ:

Q. Okay.

**A. I mean the contact or the content is pretty spot on to what I was feeling that night about all the circumstances that were happening.**

Q. You mentioned there's something about a numeric scale on sexual assault. Do you see that?

**A. I remember that now that I see it on the e-mail.**

Q. What was that?

**A. Well, Ray had on the call kind of said that things that happened to the women were only like a two or a three on a scale.**

THE COURT REPORTER: I'm sorry. Is it okay if we take a quick restroom break?

MR. PEREZ: Absolutely. Let's take five minutes.

(Recess from 12:59 p.m. to 1:06 p.m.)

BY MR. PEREZ:

Q. Mr. Cohen, I'm reminding you that you're under oath. It is 1:06. I'm sorry. Mr. Hurley.

You're not under oath yet.

Mr. Hurley, I'm reminding you that you're still under oath. My hope is that we'll be done before 2 o'clock. That's my goal.

Back to this e-mail of December 8th, which is Exhibit 33. You talked about the numeric scale and you said that he -- Mr. Anderson had said he had attributed a two or a three on the scale. Do you remember that?

**A. Yes.**

Q. What was your conversation with him about -- I see here you reference Buffy and Kimmy. Like did you have that conversation with him as well about his scale?

**A. No, I was frustrated that that terminology was used and that a rating system was assigned to what someone**

**went through so that was just frustration on the part of my e-mail.**

Q. And then the next page there's a reference to monetary gain. Do you know what that relates to?

**A. I was just -- we were trying to express to Ray that -- you know, my -- my goal is just, like I said in the e-mail, to protect my program, protect the people associated to it. There's nothing else, no other motives.**

Q. And was he trying to insinuate that you were trying to use this for some other purpose?

**A. I -- not that I know of. I don't remember the phone call specifically enough to say that that was a part of it, but if I am adding that in there there's most likely a reason.**

Q. So this is dated December 8th, 2019. Do you remember were you in the middle of contract negotiations or something at that time?

**A. No.**

Q. So you just can't remember why that's in there?

**A. No.**

Q. Okay. A few sentences down it also talks about Bart Wear has been granted by ASU, the basketball program because of his donor status extraordinary access is what you termed.

We've talked a little about the access that

he had; correct?

A. **Yeah.**

Q. Is there anything else that we haven't talked about in terms of access that Mr. Wear had to ASU that you felt was extraordinary?

A. **Not that we didn't cover.**

Q. Okay. One thing that strikes me a little bit as odd is his ability to walk in and out of facilities. Was that access that he had that other people didn't have?

A. **Not to my knowledge. I don't really -- I'm not involved in the game management part of it so how he got the tickets and how he got to the seats he had I can't really comment to that.**

Q. But even -- even beyond then so, for example, I think about my own days like having, for example, somebody, an outsider come into a practice or something. That would -- I can't imagine that happening without the coach authorizing that.

A. **Yeah.**

Q. So when he would come to basketball program practices, for example, was that access that you gave him?

A. **I would get notification from Dave or he never came to a practice after Dave was gone, but, yeah, I would get some notice that, hey, this donor would like to come and watch practice.**

Q. Okay. And then you also say, you mention that he's sitting directly behind the ASU cheerleaders. Is that because at that game in Louisiana that's where his seats were now located?

**A. Yeah, my wife told me after the game that's where he was seated.**

Q. And there's a reference there that says, next paragraph, Leslie should be able to feel safe in Desert Financial and not terrified. Was there a sense that you had that Leslie, your wife, felt terrified about going to games because she might run into Bart Wear?

**A. Yes.**

Q. Did you have a sense that from Mr. Woods that his wife felt the same way?

**A. Yes.**

Q. Did you have a sense from Dave that his wife felt the same way?

**A. Yes.**

Q. Had you conveyed this information to Ray in your conversation the night before or that night when you had talked about all these things?

**A. I just felt relief because I felt like it's being handled and again I wouldn't have to worry about this person doing what he did to the other women.**

Q. And you're referring to the conversation you had a

few days before the game?

**A. Yes. At practice, yes.**

Q. Okay. And then you said my counsel has informed me that ASU decides who is able to purchase tickets. Do you see that?

**A. Yes.**

Q. And it specifically talks about season tickets, Bart could be denied season tickets. Do you see that?

**A. Yes.**

Q. Did you know if those tickets that Bart was sitting in, Mr. Wear was sitting in that evening were season tickets that he had purchased?

**A. I wasn't sure.**

Q. But in any event, you felt that ASU had the ability to prevent him from sitting in those seats?

**A. Yes.**

Q. And then so now jumping to Mr. Anderson's response. Actually, let me rephrase this question.

First of all, I notice on this e-mail string you sent to Ray Anderson and Michael Crow and Barry Mitchell. Mr. Mitchell is your counsel. Michael Crow, that's President Crow's address?

**A. Yes.**

Q. All right. Were you in the habit of sending e-mails to Mr. Crow?

**A. No.**

Q. So this was a little atypical?

**A. Yes.**

Q. Okay. And so then Mr. Anderson replies to all of these people. And at his response is certainly not apologetic, would that be fair to say?

MS. LEE-COTA: Object to form.

**THE WITNESS: Can I look at it and review it again.**

BY MR. PEREZ:

Q. Absolutely. I think you have it. It's at the top of that.

**A. Yeah.**

Q. I'm repeating the question. Would it be fair to say that Mr. Anderson's response was not apologetic?

**A. Yes.**

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. And does he ever try to explain how you made judgments and conclusions -- I'm sorry. How you made judgments and conclusions, not to mention false allegation and baseless allegations?

**A. No.**

Q. So he makes this statement, but you've never had a conversation with him?

A. No.
Q. Okay. I'll finish that. You never had a conversation with him in detail about why he said this and what he meant by this?
A. Yes.
Q. Did you ever hear back from Mr. Crow?
A. I did.
Q. And when did you hear back? Did he respond to that e-mail?
A. I don't know if he responded to the e-mail, but I also have a text message that I had sent to President Crow separately so that he knew that this e-mail was coming to his e-mail.
Q. So your recollection is you sent the -- a text to Mr. Crow at about the same time that you sent the e-mail; correct?
A. Yes.
Q. Okay. And my understanding from conversations with counsel is you don't believe you have that text anymore; is that correct?
A. It's not on my phone for the reasons I talked about.
Q. And so you send a text to Mr. Crow and then President Crow responds. Let me give you what I'll mark as -- I'm going to put these together, although I just saw

these for the first time today, so I'm going to put them -- looks like they're the same string so I'll call it Exhibit 34.

(Deposition Exhibit No. 34 marked for identification.)

Why did you put Mr. -- President Crow on your e-mail exchange and your text exchange?

**A. Because I was getting nowhere with Ray and there was nothing -- there was no -- nothing was changing and I had no choice.**

Q. Would it be fair to say that you felt the same frustration that Dave was feeling with regards to interacting with Ray Anderson on the subject?

MS. LEE-COTA: Object to form and foundation.

**THE WITNESS: I don't know how those guys were interacting specifically and directly, but I was very frustrated that someone that -- you know, we had the report and it all was validated and I was told things and those things were not happening anymore and nothing was being done about it so I just felt like I had nowhere to go at this point but to involve President Crow.**

BY MR. PEREZ:

Q. When you answered the last question, you said this report. You're referring to Exhibit 21, the university's official report on the subject?

A. Yes.

Q. Okay. And when you talk about nowhere else to go given his response, does that include a sense that Mr. Anderson had lied to you about dealing with the situation?

MS. LEE-COTA: Object to form.

THE WITNESS: Just felt like this was another poor example of just getting nowhere and, you know, just he shouldn't have been allowed at the games. That's not what I was told was going to happen so I was just frustrated that, you know, I was -- I was -- had one expectation based on what someone told me and then it was something different.

BY MR. PEREZ:

Q. So in your efforts to get President Crow involved, is this the e-mail that he sent -- or the text that he sends in response to your text to him?

A. It appears to be, yes.

Q. Okay. And do you remember exactly the content of your text to him and what it said?

A. My text?

Q. Your text that prompted this response.

A. Yes, I believe it was -- it was just trying to give him -- make him aware that I was sending him an e-mail so could you please look for it.

Q. You don't remember the exact words?
**A. I don't. Sorry.**
Q. All right. And so take a moment and look at President Crow's response.
Okay. So President Crow notes that the communication that seems to have occurred was between counsel. Do you see that? Yes?
**A. Through his counsel. I assume that's Bart's counsel.**
Q. Yes. In other words, does this help you or refresh your recollection as to whether or not Mr. Anderson ever spoke to Mr. Wear about this situation?
**A. It doesn't.**
MS. LEE-COTA: Object to form.
BY MR. PEREZ:
Q. And then President Crow says that I will now ban him formally from all ASU athletic events. Do you see that?
**A. Yes.**
Q. Had you been led to believe that he had already been formally banned?
**A. In that practice I was told that two days before our game.**
Q. Have you had any other conversation with President Crow after this text about this incident?

A. No.
Q. Do you recall having any conversation with President Crow about the report and the findings of the report?
A. I did not.
Q. Do you recall having any conversations with President Crow about how Ray Anderson handled this situation with Bart Wear?
A. No, I don't.
Q. Now, in your e-mail, Exhibit 33, we've talked about a number of the things that you said in your e-mail, Ray Anderson maybe knowing in advance, about donor status having extraordinary access. The e-mail speaks for itself. Did Mr. Crow ever respond to any of those specific allegations in the e-mail?
MS. LEE-COTA: Object to form.
THE WITNESS: I do not remember Dr. Crow responding to the e-mail. I know this happened, but I don't remember.
BY MR. PEREZ:
Q. And when you say this, you were pointing to Exhibit 34?
A. Yes, the text.
Q. You got a text response?
A. Yes.

Q. I want to talk about a couple of incidents, one of which I forgot to talk about earlier.

Had there ever been incidents that you were aware of where Mr. Wear had been drunk or otherwise acted inappropriately at an ASU basketball game?

MS. LEE-COTA: Object to form.

**THE WITNESS: There was a -- it was the time that, you know, he had came out to a game in Vegas and he -- I could tell, I talked about it earlier, that you could tell he had been drinking and, you know, smelt like alcohol, but, yeah, that was the one that I remember because it was by our team meeting room.**

BY MR. PEREZ:

Q. Do you remember a game where he came out onto the basketball court during a game?

**A. I mean, when I'm coaching a game I don't really notice a lot of stuff that goes on.**

Q. Were you aware that he had previously walked out onto the court and had been subsequently reprimanded by the Pac-12?

**A. I do remember something like that, maybe during the Arizona game, yes.**

Q. Do you remember exactly what he did?

**A. I think he maybe went after an official or I -- I can't really specifically remember exactly what he did.**

Q. Do you remember people saying at that time that Mr. Wear, as a donor and a member of the ASU community, was reflecting poorly on ASU for that kind of conduct?

MS. LEE-COTA: Object to form.

**THE WITNESS: Prior to the incident happening with the women, I think some of -- some of Bart's stuff was tolerated, you know, because there wasn't, you know, a specific incident that was worthy of us trying to take any action against him for any reason.**

BY MR. PEREZ:

Q. Getting reprimanded by the Pac-12 was not one of those instances?

**A. We likely viewed it as a bad moment and he had done a lot of positive for, you know, the football and basketball program at that time.**

Q. Okay. Thank you.

I want to also talk about an incident that we've heard about in this case where Mr. Cohen was sent a letter by the Pac-12 for events that occurred at the Utah basketball game. Are you familiar with the incident I'm talking about?

**A. Yes.**

Q. Can you tell me what your understanding is what happened at that event.

**A. It was -- it was a very, very hostile game, very**

**tough game and I -- maybe I believe Dave spoke to our head of officials maybe after that game or something just about how the game was officiated.**

Q. Do you know where that game was at?

**A. I believe it was at Utah.**

Q. Part of the hostility; correct?

**A. Yes.**

Q. Was it also the crowd's hostility, was that the hostility you're talking about?

**A. Yeah, it was a hostile crowd.**

Q. Okay. And do you remember that -- what Dave's conversation with the official was about?

**A. Not -- not specifically, no. I don't remember that.**

Q. Would it help -- do you remember that it was not about the way he officiated a game, but about the actions of the fans at the game?

MS. LEE-COTA: Object to form.

**THE WITNESS: I -- I -- I'd have to see the report from the head of officials or the Pac-12 to remember that, but I do remember they were being verbally abusive, the fans were, to our players and I think families as well.**

BY MR. PEREZ:

Q. Do you remember at that game Dave doing anything that you felt was inappropriate?

**A. No, not to my -- I mean, I was coaching a game, but I did not see Dave do anything that I felt was inappropriate.**
Q. And, in fact, you just said that he talked to the head official. You think that was after the game; correct?
**A. I thought it was, yes.**
Q. Okay. And so it wasn't a game time interaction with the head official, it was post game?
**A. Not -- not what my memory back to it is, yes.**
Q. I have a series of documents I'm going to show you. This is Exhibit 35.
(Deposition Exhibit No. 35 marked for identification.)
And I'm going to ask you a very specific question. I'm not going to get into the terms of your contract. What I want to do is I want to emphasize. Exhibit 35 there's a reference at the first page that head coach contract with ASU primarily to comply with Title 9 reporting requirements. Do you see that?
**A. Yes.**
Q. And then if you turn to 2003, there's a whole heading on Title 9 reporting requirements. Do you see that?
**A. Where am I looking at?**
Q. The bottom of the document is 2003.

A. Yeah. Top paragraph?

Q. The top two paragraphs, but the heading is Title 9 reporting.

A. Yes.

Q. Okay. And so I want to make sure that I understand. This, at least as has been indicated to you and the other coaches on this string, that Title 9 reporting requirements was very important and was now going to be integrated into your head coaching contracts; correct?

A. Yes.

Q. You understood that?

A. Yes.

Q. And this was consistent with the training and the information that had been conveyed to you by the university towards how you were to treat situations like sexual harassment and other Title 9 reporting issues?

A. Yes.

Q. Show you what I've marked as Exhibit 36.

(Deposition Exhibit No. 36 marked for identification.)

And what I'm going to refer to you in Exhibit 36 is two things. So first is if you look into the amendment three to your contract, page 2, and I'm looking at headings 4 and 5.

Do you see that there now in your proposed coaching contract has NCAA reporting and cooperation provision, but also a new Title 9 provision calling coaches to report and their obligations thereunder?

**A. Yes.**

Q. Okay. In other words, consistent with how you answered previously, it's fair to say that everybody was taking these reporting obligations seriously; correct?

MS. LEE-COTA: Object to form.

**THE WITNESS: Yes.**

BY MR. PEREZ:

Q. Did you believe that Mr. Cohen took these obligations seriously?

**A. Yes.**

Q. Do you believe that everyone in the athletic department was properly advised to take these types of harassment and Title 9 issues seriously?

**A. Yes.**

Q. All right. Now I'm going to look at Exhibit 36, the e-mail since we're in this document, page 2022, which is the second page, has an e-mail from Dave Cohen to Mr. Anderson and Ken Landphere about men's basketball staffing.

MR. MITCHELL: We don't have that.

MR. PEREZ: It should say good morning Dave

second page.
MR. MITCHELL: 2022.
MR. PEREZ: Yeah, should be the second page.
I'll mark this as Exhibit 37 and then I'll remove the other from Exhibit 35. I think these were accidentally stapled together.
(Deposition Exhibit No. 37 marked for identification.)
BY MR. PEREZ:
Q. This is Exhibit 37. I just want to take a quick look at that e-mail and in that e-mail Dave is advocating, Mr. Cohen is advocating for your staffing for men's basketball programs?
**A. Yes.**
Q. And that was consistent with what you felt he did well for your program?
**A. Yes.**
Q. Were you aware whether or not Dave Cohen ever had an opportunity to be an athletic director at another university?
**A. I think Dave did bring up another opportunity that he passed up.**
Q. Now, you've been around the sports world long enough to know that some of those opportunities are pretty important career opportunities.

**A. Yes.**

Q. And would it also be fair to say that the right opportunity has to be in place, otherwise it could be a dead end?

**A. Yes.**

Q. But at the same time, would you agree that being a head coach or being an athletic director is a unique opportunity for a person's career in sports?

**A. Yes.**

MS. LEE-COTA: Object to form.

BY MR. PEREZ:

Q. And would you also agree that, and maybe you've thought about this, that trying to shift careers and to do something else besides being a head coach or being an athletic director would not be as fulfilling as the job you currently have?

MS. LEE-COTA: Object to form, foundation.

**THE WITNESS: That's how I feel, yes.**

BY MR. PEREZ:

Q. And at least to some extent when you've reached the level you've reached, it also is not likely to be as financially rewarding either?

**A. I would agree.**

Q. There's been some suggestions that Mr. Cohen was not a team player and that he did not fit into ASU's

culture. Would you agree with that statement?

**A. No.**

Q. Did you feel like he was a team player, at least your interactions with him?

**A. He was a fierce advocate for advancing men's basketball.**

Q. Did you feel that he fit in with the culture that you were trying to instill at least within your program?

**A. Yes.**

MR. PEREZ: So, counsel, what I'd like to propose, because I'm almost done, is I'd like to take five minutes and go through my notes and see if there's anything else and then I think we can wrap up pretty soon. I don't know if you have questions, but otherwise we'll probably be done in 15 minutes or less.

MR. MITCHELL: Okay. Perfect.

MR. PEREZ: Thank you.

(Recess from 1:36 p.m. to 1:43 p.m.)

MR. MITCHELL: We'll read and sign.

MR. PEREZ: Back on the record. Coach Hurley, thank you very much for coming today. I appreciate your forthrightness. We will follow up with counsel about trying to get texts and e-mails.

**THE WITNESS: Okay.**

MR. PEREZ: But otherwise we'll -- you'll

receive the transcript. We'll read and sign pursuant to Arizona practice. Yes?

MR. MITCHELL: Thank you.

THE WITNESS: Thank you.

(Deposition concludes at 1:43 p.m.)

____________________________

ROBERT HURLEY

STATE OF ARIZONA )
) ss.
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

[X] Review and signature was requested; any changes made by the witness will be attached to the original transcript.
[ ] Review and signature was waived/not requested.
[ ] Review and signature not required.

I CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

Dated at Phoenix, Arizona, this 17th day of January, 2024.

________/s/Jovanna Roman________________
JOVANNA ROMAN, RPR
Certified Reporter
Arizona CR No. 50725

* * * * *

I CERTIFY that GRIFFIN GROUP INTERNATIONAL, has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).

______/s/Pamela A. Griffin____________
GRIFFIN GROUP INTERNATIONAL
Registered Reporting Firm
Arizona RRF No. R1005

GRIFFIN GROUP INTERNATIONAL -ERRATA SHEET - CHANGES IN TESTIMONY

3200 East Camelback Road Suite 177 Phoenix, Arizona 85018

DAVID COHEN vs ARIZONA BOARD OF REGENTS and RAYMOND ANDERSON-Robert -Hurley-December 27, 2023

Errata & Signature due no later than the Februrary 23rd, 2024.

| PAGE | LINE | CORRECTIONS/CHANGES | REASON |
|---|---|---|---|
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |
| ____ | ____ | ____________________________ | _______________________________ |

_________________________ ________

SIGNATURE OF WITNESS DATE

GRIFFIN GROUP INTERNATIONAL -ERRATA SHEET - CHANGES IN TESTIMONY

3200 East Camelback Road Suite 177 Phoenix, Arizona 85018

Cohen vs Arizona Board of Regents, and Anderson-Robert -Hurley-December 27, 2023

Errata & Signature due no later than the Februrary 23rd, 2024.

| PAGE | LINE | CORRECTIONS/CHANGES | REASON |
|---|---|---|---|
| | | | |

SIGNATURE OF WITNESS DATE

**1**

**1** 35:4 73:17
**10** 35:4 82:24 83:4
**100** 16:8 62:25
**11:44** 55:17
**11th** 55:24 56:11
**12:01** 55:17
**12:59** 98:8
**12th** 63:10 64:14
**13th** 47:11
**14** 13:17
**14th** 73:21
**15** 9:19 117:15
**15th** 64:15
**18th** 74:4 76:8,22 81:8 86:13,20 87:6,8 96:4
**1953** 83:3,4
**1954** 84:12,20
**1955** 85:5
**1994** 5:24
**1:06** 98:8,11
**1:36** 117:18
**1:43** 117:18

**2**

**2** 98:15 113:24
**2000** 13:16
**2003** 112:21,25
**2014** 16:2 20:9
**2019** 83:21 84:20 86:25 99:15
**2020** 60:11
**2022** 114:20 115:2
**2023** 55:25
**21** 70:11,12 82:23,24 84:15 105:24
**2139** 73:14
**2141** 74:16,19 75:1
**22** 71:14
**23** 71:14,15,16
**25** 71:15,16
**25th** 72:17,23 74:1 83:21
**26** 71:14
**27** 55:20,21,23
**28** 56:9,12
**29** 57:3,4

**3**

**3** 56:16 57:12
**3/25** 73:22
**30** 70:25 71:1
**31** 73:10,11,16 88:9
**32** 80:5,6
**33** 94:24,25 98:17 108:10
**34** 105:3,4 108:22
**35** 112:11,12,17 115:5
**36** 113:19,20,23 114:19
**37** 115:4,7,10

**4**

**4** 113:25

**5**

**5** 113:25
**5th** 88:9

**7**

**7th** 84:14,20 85:2

**8**

**8** 35:12
**8/18** 71:18 72:2 73:5
**8th** 87:8 95:3 98:16 99:15

**9**

**9** 35:12 41:25 42:9 112:18,22 113:2,7, 17 114:3,17
**99.9** 39:3

**A**

**a.m.** 55:17
**ability** 100:8 102:15
**Absolutely** 50:3,9 98:6 103:11
**abusive** 111:21
**accepting** 18:11
**access** 36:2,8 87:21 99:23,25 100:4,9, 21 108:13
**accident** 5:13,21
**accidentally** 115:5
**accommodate** 91:5
**accommodations** 35:17
**accomplish** 26:22
**accomplished** 51:3,11
**account** 62:1,4
**accurate** 6:15,16
**accustomed** 6:7
**acknowledges** 73:25
**acted** 109:4
**action** 50:23 110:9
**actions** 111:16
**added** 95:14
**adding** 99:13
**additional** 28:24 30:25
**address** 61:21,25 102:22
**addressed** 25:14
**administration** 35:20 38:5,8
**administrator** 23:13 50:2 54:12 89:15 91:3
**administrators** 23:20 59:7
**admonitions** 6:4
**advance** 23:7 95:19 108:12
**advancing** 50:13 117:5
**advised** 114:16
**advocate** 25:16 117:5
**advocating** 115:11,12
**afternoon** 32:21
**agent** 13:5 18:3 19:5
**agree** 116:6,12,23 117:1
**agreed**

82:1,20
**ahold** 19:24 90:22
**alcohol** 109:11
**aligned** 13:25
**allegation** 103:22
**allegations** 54:24 103:22 108:15
**alleged** 46:25
**allowed** 106:9
**allowing** 94:9
**amended** 56:9
**amendment** 113:24
**Anderson** 4:16,18 12:19 14:9,11 22:12 24:3,12 31:3 38:25 39:22,25 40:21 41:6 43:16 44:6 46:9 48:7,19 49:20 50:12 52:19 53:2 59:1 63:10 65:18 66:8,9 70:8 71:25 72:6,16,22 73:4, 17,25 74:3,8 75:12,19,25 76:8 77:5 81:12 82:18 83:21 84:5,9,14, 16,18,22 85:3,11, 18 86:19,25 87:6,7 91:18 92:4,16 94:21 95:5,8 96:8 98:18 102:20 103:4 105:13 106:4 107:11 108:7,12 114:22
**Anderson's** 48:12 73:13,18 74:16 86:6 102:17
103:15
**anger** 40:14
**announcement** 28:4
**annually** 42:8
**anymore** 81:23 91:21 92:5 104:20 105:19
**apologetic** 103:6,15
**apparently** 53:7 73:4 76:9 89:6
**appeared** 86:20 89:17
**appears** 106:18
**appreciated** 26:22 67:21
**appreciation** 11:18
**approached** 13:1 47:12,15 51:17 75:16 76:23
**approvals** 38:5
**approximate** 5:22
**Approximately** 13:13
**April** 16:1,3 17:4 20:9 55:24
**area** 7:22 35:12
**Arizona** 4:16,17 13:15,22 19:17,20 20:6 22:9,23 23:8 29:19 37:20 109:22
**arrange** 38:7
**arranged** 13:8 38:4
**arranging** 23:11
**Aruba** 17:10
**assault** 97:23
**assaulted** 92:25
**assemble** 20:17
**assigned** 90:11 98:25
**assistant** 21:10 25:9 59:16
**associate** 4:19
**assume** 14:7 15:11,14 46:23 58:22 90:15 107:8
**assumed** 39:21 41:19 47:8
**assuming** 33:4
**assured** 85:18 87:14
**ASU** 4:19 11:16,24 12:13,14,16,17 13:1,6,11 14:3,7 18:6,22 19:8,9,22 20:11 23:2 25:13 27:1 33:3,25 34:17,23 35:6 42:5,8 43:3 60:7, 20 61:13,21 62:9 64:1 69:18 70:16, 18 90:11,19 99:22 100:4 101:2 102:4, 14 107:17 109:5 110:2,3 112:18
**ASU's** 83:17 116:25
**athletic** 35:20 52:10 59:6 80:2 81:10 107:17 114:15 115:19 116:7,15
**Attached** 55:23
**attachment** 56:2
**attempted** 57:19
**attempting** 38:11,13
**attend** 56:23
**attendance** 95:6
**attending** 57:1
**attorney** 7:12 10:16 13:5,10 20:1
**attorney-client** 7:21,24 10:7,10
**attributed** 98:18
**atypical** 103:2
**audible** 7:3,5
**August** 52:6,8 63:10 64:14,15 74:4 76:22 86:13,20
**authorities** 43:17
**authorizing** 100:18
**avoid** 30:18
**aware** 27:5,12,15,21,24 37:14 38:10,13,16 46:7,11,19,21 49:14 63:12 72:16, 22,25 73:2 80:14 85:22 96:5 106:24 109:4,18 115:18

**B**

**back** 17:22 19:3,6,18 29:19,21,23 31:6 38:17 39:24 51:1 59:24 60:10 69:24 70:1,7 72:4 73:9 74:11 76:7 81:7 82:23 87:18 89:12 93:3 95:11 98:16 104:6,8 112:9 117:20
**back-to-back** 53:21
**background** 11:4
**bad** 41:3 89:12 110:13
**Baison** 13:6 18:4 19:23
**ban** 107:16
**banned** 107:21
**Barry** 4:20,22 102:20
**Bart** 11:21 12:21 27:5 31:14,16,18 32:1, 15 34:17,23 36:17 38:6 41:23 46:8, 16,18,20 48:8,13, 20 49:20 58:14,15 59:11,19 70:16 72:6 81:9,19 82:2 87:9,14 88:17 89:7 91:14,22 92:2,11, 22 93:4,7,15 96:9, 16,17 99:22 101:11 102:8,10 108:8
**Bart's** 32:4,11 38:1 107:8 110:6
**base** 42:4
**based** 8:5 42:12 43:2 60:10 81:16 86:8 97:6 106:11

**baseless**
103:22
**baseline**
90:2
**basically**
64:22 68:4 72:11 87:14
**basis**
42:8
**basketball**
11:25 13:1,22 14:17 15:7,12 16:9 18:6 23:5,8,14,17 26:9,17 31:23 34:24 35:10 36:2 39:7 50:2 53:16 55:2 66:18 68:11 69:19 81:23 82:3, 12 87:1,9 89:14 91:3 99:22 100:20 109:5,15 110:15, 20 114:22 115:13 117:6
**Bates**
83:1
**beat**
7:24 54:1
**begin**
20:12 63:6
**begins**
24:16 50:11 74:24
**behavior**
30:23
**Ben**
21:10 23:18,19 45:16 75:16 87:22
**bench**
36:17
**big**
22:21 36:22 37:1 75:20 76:1
**bit**
18:4 31:18 36:17 41:25 44:3 53:19 78:18 95:2 100:7
**blanket**
82:7
**board**
4:16,17 36:23
**Bobby**
4:1 74:18,24 75:3, 13
**bonus**
53:5,17 63:8
**bonuses**
52:25
**boom**
19:14
**bottom**
71:13 73:15,19 74:17,19,20 80:8 112:25
**bought**
36:25
**bounce**
73:9
**Boyd**
44:21 67:11 84:16
**bracket**
28:4
**brackets**
28:20
**breach**
65:12
**break**
9:19,22 10:6,10 17:12,15 55:15 60:12 98:5
**breaking**
10:2
**breaks**
9:18
**breathalyzer**
33:10
**bring**
21:3,6 24:16 25:7 37:20 57:15 63:25 115:21
**bringing**
44:6
**brother**
37:25 90:25
**brought**
22:9 44:10 70:3 89:12 97:9
**budgetary**
24:2
**budgets**
22:5
**Buffalo**
19:4,18 20:20 21:6,11 29:11 37:20
**Buffy**
79:2 98:22
**build**
24:16 35:23
**building**
16:10 21:2 25:12, 18 89:15
**business**
15:6 24:5 81:3

**C**

**calculations**
8:6
**caliber**
91:4
**California**
46:9 49:3,9
**call**
6:4 13:8 14:2,5,9, 14,19 15:20 17:24 18:2 19:18 28:20 40:15 44:2 50:20 58:20 67:11,14 68:9,12 94:3,13 98:1 99:12 105:2
**called**
28:12 29:8 67:10 92:17
**calling**
19:5 114:3
**campus**
70:1
**candidate**
17:20
**capacity**
23:2
**car**
5:13
**care**
30:24 38:23 40:4 45:20
**career**
115:25 116:8
**careers**
116:13
**Carey**
4:23
**Carrie**
88:1
**carrier**
62:23
**case**
5:14,20 11:16,18 47:13 54:24 110:18
**cash**
38:13,16
**cell**
60:7,21,24 62:24
**Certified**
4:3
**challenging**
93:8
**championship**
27:2
**chance**
9:5 94:7
**change**
9:13 20:25 33:14 46:1 77:11
**changed**
52:12 53:4,5
**changing**
105:9
**Chapman**
4:23
**charity**
32:1 36:19
**charter**
31:24
**Cheatham's**
37:25
**checked**
59:20 74:24 75:3
**cheerleaders**
101:2
**choice**
105:10
**circle**
59:24
**circumstances**
27:19 97:21
**clarify**
9:13
**clear**
76:23
**close**
61:2
**closely**
23:16
**closer**
16:1,3
**coach**
4:8,23 13:1 15:8 25:9 30:25 35:22 54:21 59:16 100:17 112:18 116:7,14 117:20
**coached**
11:13 89:4
**coaches**
21:3,4,6 24:17,21 25:6,10 55:9 79:14,23 113:7 114:3
**coaching**
20:25 54:10 89:9 109:16 112:1 113:9 114:2
**Cohen**
4:11,12,13 12:15 13:8,19,24 14:20 25:19 27:3 30:21 38:7 48:1 52:24 54:25 55:4 57:23 58:5,23 63:10 64:15 65:10 72:13, 17,23 77:5 82:13 83:21 84:14,22 85:4,7 91:10 94:19 96:25 98:10

110:18 114:12,21 115:12,18 116:24
**Cohen's** 11:19 50:1
**college** 15:14
**color** 55:11
**Columbus** 28:10
**combine** 35:9
**comfortable** 39:11 41:11 77:7
**comment** 9:9 100:13
**commented** 34:1
**comments** 9:6
**common** 35:21
**commonly** 12:1
**communicate** 24:6,12 31:11 41:5 58:19 59:7 61:20 66:2
**communicated** 19:21 24:13 69:7 77:10 82:17 96:16, 17
**communicating** 21:15 22:3,12 24:9
**communication** 7:21 14:8 24:23 30:7,8,21 39:3,5,9 43:24 45:25 50:12 58:9,13 59:4 66:7 77:18 80:10 84:17 85:14 107:6
**communications** 10:10 18:19 30:18 43:21 57:22,24 58:4,7,17,22,23 59:1,8,18,25 60:23 61:4 62:4 78:20 96:9
**communicator** 42:23
**community** 22:10 34:17,23 110:2
**complaint** 47:16 51:18
**complaints** 63:6
**complete** 9:12
**completed** 43:1 45:9
**comply** 57:19 112:18
**concentrating** 89:9
**concern** 7:23
**concerned** 7:20 30:17,20 50:11 77:25 78:11 87:16
**concluded** 88:2
**conclusions** 103:20,21
**condition** 18:8
**conduct** 83:8 110:3
**conference** 37:20 54:6
**conferenced** 67:11
**confirm** 96:7
**confront** 86:19
**confrontational** 92:21
**confronted** 78:1
**connected** 14:1 23:6 36:10
**connection** 70:16
**consistent** 72:13 84:5 86:2 113:14 114:6 115:15
**constant** 50:12
**constituted** 88:17
**consulted** 67:7
**contact** 22:16,19 23:1 27:4 51:18 66:7 97:19
**contacted** 12:14 13:4 47:4 63:4 70:18
**content** 72:8 97:19 106:19
**contest** 77:13
**context** 94:12
**continually** 44:6
**continue** 10:1 50:5
**continued** 63:25
**continuing** 46:4 51:2 96:25
**contract** 20:4 99:16 112:16, 18 113:24 114:2
**contracts** 113:9
**control** 91:7
**controlled** 90:18
**controls** 90:11
**conversation** 13:19 14:13 16:8 25:1 30:4,13 31:10 38:25 41:1,16 46:20 47:25 48:4, 6,20,24 49:19 64:16,24,25 65:15, 18 67:24 68:3 69:23 70:8 78:12 81:7,8 84:13,24 85:4,17 87:11 88:23 89:13 91:22 92:1,11,18,20 93:12,24 94:17,19 97:4,5 98:21,23 101:20,25 103:25 104:3 107:24 108:2 111:12
**conversations** 17:23 52:24 77:19 85:23,25 87:7 104:18 108:6
**convey** 40:21 44:24 65:8 75:18,22,25 84:10
**conveyed** 27:20 65:22 101:19 113:15
**conveys** 48:7
**cooperation** 114:2
**copies** 62:14
**cordial** 78:22
**corporate** 17:8
**correct** 8:13,24 10:17 12:3 13:2 24:17 27:5,7, 12,16 28:18 29:20 36:15 40:6,9 47:23 49:3,12 51:8 59:13 60:5 63:7 66:21 69:16 70:16 72:2, 14 77:2 86:3 87:5 100:1 104:16,20 111:6 112:5 113:10 114:8
**counsel** 4:11,13,15,17,19 7:8,20,25 9:23 10:8,13,24 30:17 59:23 70:21 82:25 102:3,21 104:19 107:7,8,9 117:10, 22
**counsel's** 83:17
**count** 74:19
**couple** 9:18 17:14 84:15 91:1,18 109:1
**couples** 26:9
**court** 6:12,19,20 7:6 98:4 109:15,19
**courtside** 89:10,22 90:3 91:5,15
**cover** 11:7 100:6
**created** 97:14
**creating** 50:13
**credible** 46:15 95:13
**critical** 15:18 80:10
**Crow** 12:23 19:19 59:4 102:20,21,25 104:6,11,15,23,24 105:6,21 106:15 107:5,16,25 108:3, 7,14,17
**Crow's** 102:22 107:4
**crowd** 111:10
**crowd's** 111:8
**culture** 117:1,7

D

**date**
31:4 48:3 50:20 55:24 57:6 65:1
**dated**
88:9 99:15
**Dave**
12:15 13:8 14:3,9, 23 15:23 16:12,20 17:9,23 18:3,19,22 19:25 21:15,19,22 22:5,15,24 23:6, 10,16,19,23,24 24:2,11,19,25 25:8,25 26:11,16 29:14,16,24 30:13, 22 31:1,11 32:2 38:5,21,22 39:4, 10,13,17,21,24 41:5,11,16 42:21, 22,24 43:12,16,21 44:5,8,24 45:2,5, 10,11,25 46:3,12 48:1,6,10 49:15, 18,22 50:11,24 51:7,22 52:11 53:7,15 54:12,14, 18,22 55:6 61:3 62:5 63:15,19 64:16 65:10,23 66:3,6,16 67:3,6, 25 68:4,13 69:18 70:2 72:13,17,23 73:1 76:16 77:8, 12,18,19,20 78:2, 7,20 80:11,21 81:3 85:24 86:2 91:10, 11 100:22,23 101:16 105:12 111:1,24 112:2 114:21,25 115:11, 18,21
**Dave's**
40:13 111:11
**David**
4:11 53:5 57:23 58:4 63:7,10
**day**
19:20 32:25 38:3 57:1 64:14 67:25
**days**
17:14,19 64:13 87:12 91:18 92:24 100:15 102:1 107:22
**Dayton**
28:9,11
**dead**
116:4
**deal**
39:17 74:18 75:14, 20 76:1 91:21 92:5
**dealing**
49:20 106:4
**dealt**
31:3
**December**
56:11 86:24 87:8, 25 88:24 95:3 98:16 99:15
**decide**
24:25
**decided**
17:2 46:17
**decides**
102:4
**decision**
15:7,15 24:24 27:18 68:9 69:1,12
**decisions**
17:1 81:24
**defensive**
93:8,11
**defer**
25:3
**delivered**
21:20
**Demarchi**
83:17
**denied**
102:8
**department**
23:25 44:16 52:10 60:17 66:3 80:2 81:10 114:16
**deposed**
5:5,12
**deposition**
6:5,19 7:9,10 8:3 9:3,4,18 11:3,19 55:21,24,25 56:10, 12,22 57:4,6 71:1 73:11 80:6 94:25 105:4 112:12 113:20 115:7
**depositions**
5:23 6:7 70:12
**describe**
13:18 18:6
**describing**
38:22
**Desert**
101:8
**desktop**
61:16
**detail**
70:24 71:4,12 104:3
**detailed**
82:5
**details**
20:2 92:6
**determine**
95:8
**determined**
31:2
**develop**
32:4,11
**dinner**
26:14 32:1 37:1
**direct**
39:5 43:23 48:3 66:7
**direction**
14:7 15:10 17:2 68:8
**directly**
10:16 24:6 35:20 37:11 38:25 52:19 66:8 76:17 101:2 105:16
**director**
23:14,17 115:19 116:7,15
**disappointed**
66:16
**disconnection**
96:20
**discuss**
6:21 77:5
**discussed**
42:22 48:5 84:21
**discussion**
40:25 42:20 52:8 76:7 81:9,19 82:5 83:20
**disease**
36:21
**dishonest**
74:8
**dishonesty**
86:6
**distributed**
90:22
**division**
50:25
**document**
57:7 70:11,13,25 71:9 76:6 82:24 112:25 114:20
**documents**
56:3,16 57:13,15, 18 70:10 71:3 74:2 112:10
**donor**
31:22 35:3,5,18,22 37:5,9 66:23 99:23 100:24 108:12 110:2
**donors**
35:9
**download**
60:13
**drink**
32:16,18 33:8,15
**drinking**
33:20,23 34:1,18 109:10
**drinks**
32:24
**driver**
5:14
**drunk**
33:3 109:4
**duly**
4:2
**duty**
42:15,17,19

E

**e-mail**
58:21,22,25 59:4 61:21,25 62:9,12 80:5 94:21 95:3,4, 10,14 97:14,24 98:16 99:2,7 102:19 104:9,10, 12,13,15 105:7 106:16,24 108:10, 11,13,15,18 114:20,21 115:11
**e-mails**
58:8 59:8,18 62:15 102:25 117:23
**ear**
10:19
**earlier**
16:24 51:7 66:2 92:24 109:2,9
**early**
17:4 32:25 46:4,7 88:24
**earned**
53:17
**easier**
7:5
**easily**
31:9
**edits**
9:6
**education**
11:4
**Edwards**
46:8,18

**effect**
48:11
**effort**
53:1
**efforts**
106:15
**elapses**
43:19
**embarrassed**
74:18 75:14 76:1
**emotional**
79:18
**emphasize**
112:16
**employees**
80:15
**encourage**
15:23
**encouragement**
50:22
**encouraging**
14:23 49:23
**end**
9:3 17:12 51:15,16 63:3,5 85:19 116:4
**ended**
13:15 27:25 29:18 41:22 91:15
**energy**
13:21
**enthusiastic**
13:23
**entire**
23:2
**entitled**
6:14 8:5,7 10:23
**escape**
17:14
**evening**
92:16 102:11
**event**
11:25 36:19,22 74:12 102:14 110:24
**events**
11:25 33:3 34:24 36:18 94:10 107:17 110:19
**exact**
5:25 76:3 97:9 107:1
**EXAMINATION**
4:6
**examined**
4:4
**exchange**
87:19 105:7
**excited**
13:23
**excuse**
93:4
**excuses**
48:13
**exhibit**
55:20,21,23 56:9, 12 57:3,4 71:1 73:10,11,16 80:6 82:23,24 86:23 88:9 94:24,25 98:17 105:3,4,24 108:10,22 112:11, 12,17 113:19,20, 23 114:19 115:4,5, 7,10
**exhibits**
73:10
**expectation**
106:11
**expectations**
50:5 93:24
**expected**
47:3
**experience**
33:12 34:22 35:6 42:12 46:16 55:3
**experienced**
50:6
**explain**
64:21 77:15 91:21 93:11 103:19
**explained**
84:22 85:16
**explains**
85:15
**explanation**
89:19
**exponential**
45:15
**express**
99:5
**extent**
9:12 26:19 116:20
**extraordinary**
99:23 100:5 108:13

**F**

**facilitate**
23:25 54:14
**facilities**
18:16 100:8
**fact**
9:8,9 27:14 30:6 46:12 86:19 88:11 90:1 96:8 112:4
**facts**
12:5 47:5,12 84:4
**fair**
11:5 13:24 22:15 26:5,8 35:14 40:5 41:10 42:7 43:2,8 45:14 51:3 53:13 58:25 69:6 76:3 88:3 103:6,14 105:11 114:7 116:2
**false**
103:21
**familiar**
12:5 20:21 52:9 110:20
**families**
111:22
**family**
33:25 61:2
**fans**
111:17,22
**fashion**
58:9
**fast**
15:1
**fast-forward**
11:15 26:25
**faster**
14:25
**February**
60:11
**feel**
10:2,6 17:24 18:18,21 20:21 21:18,22 22:23 23:1,4 24:8,11 38:24 40:19 42:1, 13 43:9 51:21 54:17 67:2 71:5 77:7,12 80:21 89:11 93:14 95:24 101:8 116:18 117:3,7
**feelers**
54:8
**feeling**
14:24 79:5 97:20 105:12
**feelings**
89:12
**feet**
8:18
**felt**
14:1 16:18 17:17 26:21 31:1 41:2,3 43:3 50:24 52:25 53:17 54:18 55:12 63:24 64:5 65:11, 14 76:3 88:3 89:5, 17 95:18 97:14 100:5 101:10,14, 16,22 102:14 105:11,20 106:7 111:25 112:2 115:15
**Ferrara**
52:18
**field**
28:24
**fierce**
117:5
**fight**
23:7 36:20
**figure**
11:13 74:2 96:14
**figured**
17:20
**filing**
51:18 63:5 76:24
**final**
15:24 16:2,4 17:8 69:1,12
**finally**
88:3,25
**Financial**
101:9
**financially**
116:22
**find**
31:9 67:6 68:10 69:8
**finding**
88:16,18
**findings**
108:3
**finish**
104:2
**finished**
17:7 28:3
**fired**
64:15 65:1,3 67:6, 25 68:13 78:9
**firm**
81:25 88:1
**fishtail**
28:17,19
**fit**
116:25 117:7
**flare**
63:11
**flew**
19:18 29:21
**flights**
23:11 31:25
**floor**
90:3
**flowed**

39:10
**fly**
19:6 20:6,12 29:21 37:14,18 38:1 46:9
**focus**
77:9
**follow**
117:22
**follow-up**
32:8
**football**
31:22 35:9 37:5,6 39:8 110:14
**forgot**
36:21 109:2
**form**
34:2,19,25 35:7,13 37:16 39:19 40:17, 23 43:6 45:17 47:19 48:15,22 49:4,10 50:15 51:4,12,24 53:3 54:20 55:5 58:8 63:13 64:3,18 65:5,25 66:10,25 67:9 68:14,21 69:3,10,14,21 72:19 73:7 74:5,10 75:7 76:13 78:4,13 79:7,12,19,24 80:16,24 81:5 82:15 86:7,16 88:6,21 89:25 90:20 91:23 92:8, 13 93:5,16 94:1,11 95:20 96:10 97:12 103:7,17 105:14 106:6 107:14 108:16 109:6 110:4 111:18 114:9 116:10,17
**formally**
107:17,21
**forthrightness**
117:22
**forward**
6:18 9:2 17:1 18:21 47:3 50:6 70:5 81:21
**forwarded**
13:7
**found**
41:2 88:10 89:21
**foundation**
36:24 40:17 41:12 48:15 54:20 63:13 72:19 73:7 74:5,10 75:7 76:13 79:7, 12,19,24 80:17,24 81:5 86:16 89:25 90:20 92:13 93:16 96:10 105:14 116:17
**fourth**
85:12
**frame**
13:13 85:2
**frames**
87:5
**Frank**
52:18
**free**
10:3
**frequently**
36:12
**friends**
61:2
**friendship**
26:6 68:7 78:21,23 97:6
**frustrated**
15:3 45:12 46:4 52:15 53:10 93:2 98:24 105:17 106:10
**frustrating**
66:5
**frustration**
43:25 44:24 45:3 51:2,10 63:7 81:14 99:1 105:12
**fulfill**
42:17,19
**fulfilling**
116:15
**full**
5:1
**full-time**
21:9
**fundraising**
37:1
**funeral**
37:21 38:2
**funnel**
24:1,2
**funneled**
23:22
**furious**
46:14

**G**

**gain**
99:4
**game**
27:7,10,14 28:13, 15,22,24 29:1,10, 12,15 32:21 38:2 39:7,8 73:21 87:1, 9,12 89:2,4,7,8,14 91:1,19 92:16 100:11 101:3,5 102:1 107:23 109:5,8,14,15,16, 22 110:20,25 111:1,2,3,4,16,17, 24 112:1,5,7,8
**games**
28:5 31:7,24 36:8, 12 54:5,7 82:12 87:16,22 90:11 101:11 106:9
**gave**
100:21
**general**
4:19 83:17
**generally**
90:10
**gifts**
38:11
**give**
7:5 8:4,10,12 18:4 25:1 38:11,13 82:25 92:6 104:24 106:24
**giving**
22:7 38:10 71:3
**Gmail**
62:2,4
**goal**
98:15 99:6
**goals**
54:19
**golf**
26:14 31:25 39:6 46:9,18,25 47:10, 11 49:15,16 84:21, 23 85:3,15
**golfed**
26:13
**golfing**
49:9
**good**
4:8,9 13:20 14:2 16:18,20 24:8 26:24 32:17 36:13 51:22 53:17 55:14 66:23 68:6 77:22 89:5 114:25
**Google**
11:6 62:1
**granted**
99:22
**great**
18:8 26:25 60:16 67:19 68:6
**green**
25:1
**ground**
6:4
**growing**
26:6 51:2,10
**guess**
8:7,24 10:19 14:18 40:19 47:9 79:17 82:9 96:14
**guest**
37:2
**guests**
37:3 91:4
**guy**
32:16 33:7 61:10 66:6
**guys**
24:23 25:7 26:13 67:14 68:6 105:15

**H**

**H-U-R-L-E-Y**
5:4
**habit**
102:24
**halfway**
84:12
**hand**
23:12 33:8
**handled**
87:15 101:23 108:7
**handling**
54:11
**happen**
9:3 17:15 72:3 93:18,19 106:10
**happened**
5:18 12:9 14:5 27:7,9,12,16 29:24 38:22 39:7 42:14 47:5 51:19 60:19 63:12 76:10 77:8, 10,11 78:6 81:14, 16 98:2 108:18 110:24
**happening**
41:19 52:10 66:19 76:18 81:15 88:25 96:22 97:21 100:17 105:19 110:5
**happy**
68:8 89:11
**harassed**
88:12 93:1 94:9
**harassment**
39:16 42:9 58:14, 15 59:11,19 75:15, 20 77:20 88:18

113:17 114:17
**hard** 8:23 25:8 62:14 76:15 79:13
**Harden** 91:4
**harsh** 79:22
**he'll** 7:22 32:8
**head** 7:3,4 13:1 111:1, 20 112:5,8,17 113:9 116:7,14
**heading** 17:10 89:5 112:22 113:2
**headings** 113:25
**hear** 19:4 32:8 34:22 41:17 63:7 66:6 104:6,8
**heard** 40:8,9,13 42:13 47:22 72:17,22 73:22 77:21 110:18
**hearing** 46:13 72:12 73:5 74:4 76:9,11 86:14,21
**heated** 89:13 92:21
**Heather** 4:17
**Heiler** 44:12
**helped** 38:7
**helpful** 9:14 15:2
**Herm** 46:8,18
**hey** 100:24
**hiding** 71:6
**high** 53:24
**hire** 24:24,25
**hiring** 15:1,7 22:3
**history** 11:3
**home** 8:22 73:20 87:15 92:17
**hope** 98:14
**hostile** 110:25 111:10
**hostility** 111:6,8,9
**hotel** 16:6
**hour** 9:19 16:8
**hours** 19:11
**HR** 42:9
**hung** 94:15
**Hurley** 4:1,23 5:4,5 25:24 27:15 98:11,13 117:21
**hurry** 19:13

**I**

**ice** 50:21
**idea** 74:6 91:17 92:12
**ideas** 16:19
**identification** 55:22 56:13 57:5 71:2 73:12 80:7 95:1 105:5 112:13 113:21 115:8
**imagine** 100:17
**imagining** 59:12
**immediately** 20:12 31:13
**impacted** 52:25 53:1
**Implicit** 77:24
**important** 6:21 7:2 21:23 35:24 39:15 43:15 113:8 115:25
**impression** 14:20,21
**inappropriate** 27:4 33:20,23 38:18 46:17 55:12 75:15,23 87:23 88:17 111:25 112:3
**inappropriately** 109:5
**incident** 5:15,19 27:1,24 29:23 31:19 37:24 38:16 40:10 46:6, 7,11 53:2 70:16 83:7,19 87:2 107:25 110:5,8,17, 20
**incidents** 11:21,24 12:8 42:10 59:10 109:1, 3
**include** 106:3
**included** 39:16
**includes** 15:15
**including** 11:25 84:5
**incompetent** 93:19
**increase** 25:8
**Indianapolis** 16:6
**individuals** 26:11
**information** 7:24 10:7 95:15 96:4 101:19 113:15
**informed** 102:3
**infrastructure** 25:13
**infuriated** 30:23
**ingredients** 14:2
**initial** 21:15 22:23
**initially** 13:9 28:9
**input** 54:12 65:16
**inquired** 75:5
**insinuate** 99:9
**instance** 96:2,6
**instances** 10:8 76:17 110:12
**instantly** 41:22
**instill** 117:8
**instruct** 10:24
**insurance** 5:20
**integrated** 113:9
**intended** 19:7 95:16
**intensity** 27:19 93:13
**intention** 56:25
**interact** 36:6
**interacted** 55:2
**interacting** 80:23 82:11 105:13,16
**interaction** 22:23 40:6 41:23 80:14 112:7
**interactions** 32:3 44:5 45:6 117:4
**interest** 77:13,16 78:6
**interests** 24:9
**interview** 14:16,18 16:18 17:18 70:20 71:8 73:14,16,25
**interviewed** 16:23 70:15 71:7 83:14 88:1
**interviewing** 16:21 21:4 76:24
**interviews** 24:22
**introduce** 4:10,14 22:10
**introduced** 35:19
**introductory** 14:15
**investigate** 47:7
**investigation** 47:17 50:13 51:17 58:14 63:5,22 70:8 71:7 75:6 76:24 83:11 88:4
**involve** 7:24 105:21

**involved**
30:25 31:1 39:16 45:15 49:23 80:23 81:9 100:11 106:15
**involvement**
81:20
**involving**
11:21
**issue**
31:12 64:1
**issued**
94:8
**issues**
23:12,16 68:5 113:17 114:17

**J**

**James**
91:4
**Jay**
44:12
**Jean**
44:21,23 67:11
**Jennifer**
4:15
**jet**
37:13
**job**
12:14 17:18 18:12 19:5,8,22 21:16 24:8 53:18 116:15
**jokes**
33:23
**Jordan**
13:5 18:4 19:23
**Jose**
4:12
**judgments**
103:20,21
**July**
51:16 63:5
**jumping**
102:17
**junket**
47:11

**K**

**Kansas**
54:1,6
**Kari**
83:11
**Kathy**
4:12 25:19 26:3 42:14
**keeping**
85:24
**Ken**
67:11 89:13 90:7 114:22
**Kentucky**
54:2,6
**key**
11:25
**kids**
60:14
**Kim**
83:17
**Kimmy**
98:22
**kind**
6:6 11:14 14:15,17 17:12 19:13 20:6, 21 21:22 22:8,21 23:12,22 25:1,13 28:17 31:11 32:15 35:3 41:25 45:24 47:2 50:20 51:1,18 60:15 63:11 65:17 68:9,19 80:1,22 81:22 83:24 89:12 90:17 91:19 93:2 98:1 110:3
**kitchen**
8:22
**knew**
12:12 23:7 34:13 77:13 81:18 88:16 95:12,18 104:12
**knowing**
45:2 46:15 92:23 108:12
**knowledge**
69:4 95:5,9,11 100:10
**knowledgeable**
26:16
**Kwan**
4:18

**L**

**label**
83:1
**lack**
48:1
**Lambert**
90:7
**Landphere**
67:12 89:13 90:8 114:22
**Landphere's**
89:16
**language**
57:7
**laptop**
61:11,18,19
**Las**
12:1,9 27:2
**late**
17:4 19:12
**law**
6:12 88:1
**lean**
10:8 23:10
**leaning**
23:20
**learn**
26:24 29:23 47:4 88:8,9,14
**learned**
74:1
**leave**
14:19 15:20 17:3 69:1
**led**
107:20
**Lee-cota**
4:15 10:20 34:2, 19,25 35:7,13 37:16 39:19 40:17, 23 41:12 43:6 45:17 47:19 48:15, 22 49:4,10 50:15 51:4,12,24 53:3 54:20 55:5 63:13 64:3,18 65:5,25 66:10,25 67:9 68:14,21 69:3,10, 14,21 72:19,24 73:7 74:5,10 75:7 76:13 78:4,13 79:7,12,19,24 80:16,24 81:5 82:15,25 86:7,16 88:6,21 89:25 90:20 91:23 92:8, 13 93:5,16 94:1,11 95:20 96:10,18 97:12 103:7,17 105:14 106:6 107:14 108:16 109:6 110:4 111:18 114:9 116:10,17
**left**
6:19 20:23 38:20, 23 48:14 63:2
**Leslie**
25:24,25 40:11 42:14 76:24 101:8, 10
**letter**
58:9 110:19
**level**
15:14 16:14 40:14 50:6 53:24 91:7 116:21
**Levy**
21:9
**lied**
95:24 96:3 106:4
**life**
11:6 32:15
**light**
25:2
**located**
101:4
**locations**
22:9
**locker**
36:4
**lodging**
47:16
**long**
6:1 15:8 45:24 53:22 60:4 64:12 115:23
**longer**
52:12 69:18
**loop**
85:24
**lose**
60:14
**losing**
65:10 70:2
**loss**
29:22
**lost**
89:6
**lot**
6:6 14:2 16:3,9 18:10 22:10 41:19 60:12 62:12 81:13 85:24 109:17 110:14
**loud**
32:16 33:16
**Louisiana**
87:2,8 89:3 101:3
**Love**
83:11 88:1
**lunch**
49:19 85:7,11

**M**

**M-A-T-T-H-E-W**
5:3
**machine**
11:6
**made**
9:9 27:18 33:23 34:5 65:16 69:2,12 74:18 75:14 76:1

103:19,20

**magnitude**
15:6

**main**
33:17 58:20

**make**
6:22 7:13 8:7 9:5,6 10:14,21,22 23:8 31:2 35:16 55:1,11 57:18 59:24 62:21 66:19 71:24 81:24 87:4 106:24 113:5

**makes**
20:15 56:2 103:24

**making**
77:9

**man**
54:10 94:10

**management**
100:11

**manager**
79:6,11

**mandate**
43:10

**mandatory**
42:2

**March**
13:14,16 15:25 17:4 38:21 72:17, 23 74:1 83:21

**marital**
30:8

**mark**
55:20 57:3 80:5 104:24 115:4

**marked**
55:19,21 56:12 57:4 70:11,12 71:1 73:11 80:6 94:25 105:4 112:12 113:19,20 115:7

**married**
25:21

**match**
40:15

**match-ups**
54:15

**mattering**
77:11

**matters**
74:9

**Matthew**
5:3

**meaning**
6:11

**means**
33:5

**meant**
18:12 82:6 104:4

**meat**
39:8

**meet**
15:24 25:19,25 26:2 73:1

**meeting**
16:11,16 17:3 20:22 31:5 38:21 39:21 40:3 44:2 50:1,5 63:11,12 64:14 71:18 72:2,5 73:2 83:25 109:12

**meetings**
24:22 32:22 80:1 85:25

**member**
110:2

**memory**
112:9

**men's**
15:7 53:16 114:22 115:12 117:5

**mention**
95:4 96:25 101:1 103:21

**mentioned**
36:1,18 59:6 60:20 97:22

**message**
24:12 104:11

**messages**
57:20 60:10

**messenger**
41:11 51:23

**met**
15:24 16:4,6 17:9 44:3,9,11 63:15 71:25 86:11

**Michael**
102:20,21

**mid**
46:8

**middle**
13:14 99:16

**Mike**
4:11

**mind**
74:12

**minutes**
9:19 55:15 94:3 98:7 117:12,15

**misleading**
95:24

**missteps**
6:6

**Mitchell**
4:20,22 10:14,16, 18,19 11:9 30:6, 10,14 32:7 34:3,5, 8,13 55:16 74:21 83:3,5 102:21 114:24 115:2 117:16,19

**moment**
39:4 44:2 71:20 93:17 94:24 107:3 110:13

**Monday**
27:25 28:1,5 30:2 83:20

**monetary**
99:4

**money**
37:10

**morning**
4:8,9 64:23 114:25

**motives**
99:8

**move**
6:18 11:14 14:25 17:1 19:16 22:1 47:16 50:5 65:16 70:4

**moving**
14:25 47:2

**murdered**
38:1

**N**

**nailed**
17:17

**Napa**
64:10,12 69:24 70:7

**natural**
10:2

**nature**
15:6 63:6

**NBA**
5:13

**NCAA**
28:3,6,7,15 29:21 53:21 114:2

**needed**
18:22 23:23 24:7 25:6,11,13 38:24 39:9 41:24 43:9 51:22

**negative**
54:22

**negotiating**
20:2

**negotiations**
99:16

**Nelson**
44:16,18 83:25 84:9

**news**
67:20

**night**
19:19 36:20 97:15, 20 101:20

**nod**
7:3

**notably**
31:3

**notches**
93:13

**notes**
71:6,8,10,11,13 72:9 73:13,17 74:16 81:13,16 107:5 117:12

**notice**
55:23,25 56:9,14 89:8 100:24 102:19 109:17

**noticed**
32:17 80:25

**noticing**
43:25

**notification**
100:22

**November**
88:2,9

**number**
23:16 31:23 46:3 58:12,21 108:11

**numbers**
16:14 37:10

**numeric**
97:22 98:17

**O**

**oath**
98:11,12,14

**object**
7:9,22 34:2,19,25 35:7,13 37:16 39:19 40:17,23 41:12 43:6 45:17 47:19 48:15,22 49:4,10 50:15 51:4,12,24 53:3 54:20 55:5 63:13 64:3,18 65:5,25 66:10,25 67:9 68:14,21 69:3,10, 14,21 72:19 73:7 74:5,10 75:7 76:13 78:4,13 79:7,12, 19,24 80:16,24 81:5 82:15 86:7,16

88:6,21 89:25 90:20 91:23 92:8, 13 93:5,16 94:1,11 95:20 96:10 97:12 103:7,17 105:14 106:6 107:14 108:16 109:6 110:4 111:18 114:9 116:10,17

**objecting**
10:17

**objection**
7:10 10:21,23 34:6 72:24 96:18

**objections**
10:15

**objects**
7:16

**obligations**
114:4,8,13

**observed**
33:18

**occasion**
33:2 34:16 37:21 59:3 96:7

**occasional**
59:3

**occasions**
5:7,9 37:12

**occur**
18:1 56:11

**occurred**
11:24 60:9 67:16 68:2 73:21,22 75:20 84:10 107:6 110:19

**occurring**
27:24 78:3 85:22

**occurs**
27:1

**odd**
100:8

**offer**
19:22

**offered**
17:18

**offering**
19:5,8

**office**
24:5 29:24 36:10 43:24 44:3 83:17 86:9 91:12

**official**
20:7 83:10 88:18 105:25 109:24 111:12 112:5,8

**officials**
111:2,20

**officiated**
111:3,16

**Ohio**
28:10

**Oklahoma**
28:16

**open**
13:6

**operate**
20:20

**operational**
23:21

**operations**
21:10 23:15,17

**opinion**
17:21 32:4,11,14 33:22 48:25

**opinions**
14:16

**opportunities**
10:5 54:13 115:24, 25

**opportunity**
7:8 24:16 25:19,25 26:2 37:13 48:8 77:4 86:18 92:15 115:19,21 116:3,8

**opposite**
76:4 90:2

**order**
28:22 47:10

**oriented**
45:10 51:8

**original**
51:1

**outing**
39:6 84:21 85:3,4, 15

**outlined**
14:3

**outlining**
81:15

**outreach**
22:11

**outsider**
100:16

**P**

**p.m.**
55:17 98:8 117:18

**Pac-12**
12:2 27:2,19 28:2 109:20 110:11,19 111:20

**pace**
15:3,14

**paragraph**
71:21 73:15,19 74:23,24 75:9,11 83:20 84:4,9 85:12 101:8 113:1

**paragraphs**
74:21,22 84:15 85:6,10 113:2

**Parkinson's**
36:21

**part**
6:5 11:20 15:15 18:11 21:5,23 24:24 29:25 42:4 46:4,7 77:20 97:4 99:1,12 100:11 111:6

**parties**
11:15

**partner**
22:24 23:5

**partnership**
26:24

**party**
5:17 28:4 32:15

**passed**
115:22

**passion**
23:8

**pause**
6:24 7:17

**penalty**
6:11

**people**
6:6 16:13 23:20 25:10 30:24 33:25 34:16,22 35:24 37:14 39:16 41:24 44:8,15,21,25 45:7,12,20 58:19 59:12,15 62:20 70:4 79:6,11 80:22 86:11 89:8 99:7 100:9 103:5 110:1 109:13 110:10 111:23 114:11,25 115:3,9 116:11,19 117:10,17,20,25

**percent**
16:8 39:3 62:25

**Perez**
4:7,11,24,25 10:13,22 11:1,10, 11 30:12,15,16 32:10 34:12,15,21 35:2,11,15 37:17 39:20 40:18,24 41:13 43:7 45:23 47:20 48:18 49:1, 5,11 50:17 51:6,14 52:1 53:9 54:23 55:8,14,18 63:17 64:7,20 65:7 66:1, 13 67:1,15 68:17, 24 69:5,11,15,22 72:21 73:3,8 74:7, 14,22,25 75:8 76:21 78:8,17 79:9,16,21 80:4,20 81:1,6 82:16 83:2, 4,6 86:10,17 88:7, 22 90:4,23 91:25 92:9,14 93:10,20 94:6,14 95:22 96:13,23 97:17 98:6,9 103:10,18 105:22 106:14 107:15 108:20

**Perfect**
117:16

**performance**
50:1

**period**
18:1 41:18 43:19, 20 44:4 70:6

**perjury**
6:11

**person**
45:5 48:21 57:23 58:13 83:10,13 101:24

**person's**
116:8

**personal**
30:8 60:21,24 61:5,6,25 66:15 70:1 79:3

**personality**
32:5,12 33:14

**personally**
46:14 90:13

**Phoenix**
36:22

**phone**
4:18 13:8 15:23 17:24 19:6 43:25 44:2 50:19 58:20 60:7,12,13,18,20, 21,24 62:24 67:13, 22 93:3 94:2,16 99:12 104:21

**photos**
60:14

**pick**
17:24

**picture**
22:22

**Piensook**
4:19

**pissy**
80:11,21

**place**
5:23 15:17 16:2 22:2 30:23 35:21 36:9 46:14 55:14 73:2 116:3

**places**
6:5

**plaintiff**
5:15

**plane**
19:19 37:19 38:1,8 49:2

**planes**
37:13

**planned**
17:10

**play**
10:19 32:20 38:2 46:9,18,25 54:2

**play-in**
28:12,21

**played**
28:25 29:10,11 31:7,25 54:5 89:4

**player**
116:25 117:3

**players**
17:13 20:22,24 21:1 36:6 37:22,25 38:11,14,17 55:7 70:1 90:13,17 111:22

**playing**
53:24 87:1

**plenty**
77:18

**point**
10:2,11 11:2 13:14 16:3,13 17:19 20:18 22:15,18 23:1 44:2 46:22 48:4 51:1,16,21 54:10 63:16 66:7 72:4 76:10,15,19, 22 85:6 87:25 88:8,10 96:21 105:21

**pointing**
108:21

**policy**
5:20

**pool**
25:9

**poor**
106:8

**poorly**
110:3

**position**
7:11 13:6 78:15

**positions**
25:10

**positive**
13:20 110:14

**possibly**
9:24

**post**
83:7,19 112:8

**potatoes**
39:8

**potential**
24:23 54:14

**practice**
35:21 87:13,14 100:16,23,25 102:2 107:22

**practices**
36:2 82:10 100:21

**precise**
31:4

**predicted**
65:17

**prepare**
6:8

**presence**
87:17

**present**
4:12 10:25 70:21

**presented**
16:19

**preserve**
7:11

**President**
12:23 19:19 59:4 102:22 104:11,24 105:6,21 106:15 107:4,5,16,24 108:3,7

**press**
20:7 37:20 96:15

**pressing**
16:25

**pretty**
20:20 31:9 33:8 40:5 46:24 66:23 97:19 115:24 117:13

**prevent**
102:15

**previously**
78:19 109:18 114:7

**price**
20:4

**primarily**
62:9 112:18

**print**
62:15,17

**prior**
31:19 53:16 64:11 70:12 95:5,8,11 110:5

**private**
41:1 84:24

**problem**
40:21 41:8

**problems**
50:13

**process**
7:10 14:24 15:1,4 19:12 21:14 25:12 36:9 47:2,16 48:13 49:25

**processes**
41:20 47:6

**produce**
58:12

**product**
50:4

**production**
57:22 58:12

**productive**
94:5

**professional**
78:24

**program**
13:22 14:17 16:9, 10,23,25 20:19 22:7,25 23:5,7,24 24:7,15 25:12,18 31:15 35:25 39:9 41:24 45:19 46:16 50:2 53:16 54:17 55:3 63:8 65:10 66:18 67:3 68:11 69:19 70:3 74:9 78:16 81:20,23 82:3,6 92:25 99:7, 22 100:20 110:15 115:16 117:8

**programmatic**
23:12

**programs**
16:22 54:9 79:15 115:13

**progress**
48:2 88:3

**promised**
21:19

**prompted**
106:22

**properly**
24:13 114:16

**propose**
117:11

**proposed**
114:1

**protect**
41:24 45:19 93:15 99:7

**provide**
60:2 67:3

**provided**
57:20,23 60:7

**providing**
67:4

**provision**
114:3

**public**
11:13

**purchase**
90:14 102:4

**purchased**
102:12

**purpose**
99:10

**put**
35:5 54:8 95:16 104:25 105:1,6

**putting**
15:16 20:22 21:2 22:2

**Q**

**qualified**
25:10

**qualify**
8:19

**question**
6:24 7:12,13,15, 17,23 10:2,9 27:11 32:8 34:9,11 47:9 58:3 65:17 74:15 75:17,18 96:11 102:18 103:14 105:23 112:15

**questions**
10:18 26:23 93:22 117:14

**quick**
94:2 97:5 98:5 115:10

**quicker**
17:1 47:8

**quickly**
19:16

**quoting**
85:16

**R**

**R-O-B-E-R-T**
5:3

**racist**
54:25 55:3,11

**ran**
77:18
**random**
35:4
**rare**
87:13
**rating**
98:25
**Ray**
4:16,18 12:19 14:9 15:24 16:12,20 17:9 19:25 22:12 24:3,6,12 29:14,16 31:3,13 38:25 39:5,10 40:3 42:23,25 43:13,16 46:9,17,19 49:19, 23 50:12,14 52:19 53:1 63:15 65:18 66:7,8 67:11,24 70:8 71:25 73:1,17 74:16,17 75:18 77:5,7,13,19,23 78:11,19,20 79:3, 5,10 80:10,15 87:12 88:23 91:18 92:23 94:3 98:1 99:5 101:19 102:20 105:8,13 108:7,12
**Ray's**
16:7 74:17 77:25
**reach**
90:25
**reached**
116:20,21
**reaction**
40:13 46:13 67:8 77:25
**read**
71:21 72:8 75:9 80:8 86:1 95:10 117:19
**ready**
28:3 32:20
**real**
41:23
**reality**
96:21
**realize**
11:5
**realtime**
86:2
**reason**
6:15 9:22 99:14 110:9
**reasoning**
53:6
**reasons**
104:21
**reassignments**
52:9
**recall**
29:15 56:14,20 64:25 65:3 87:2 108:2,6
**recalled**
84:4
**received**
42:5
**recently**
60:11
**recess**
55:17 98:8 117:18
**recognized**
68:5
**recollection**
8:5 64:4 71:25 104:14 107:11
**recollections**
8:6
**record**
5:2 7:11 117:20
**recruit**
21:1
**recruiting**
15:16 18:15 22:7
**refer**
12:1 71:12 73:14 113:22
**reference**
71:17 97:8 98:22 99:3 101:7 112:17
**referenced**
88:10 97:5
**referring**
31:16 58:8 60:24 75:5,12 95:4 101:25 105:24
**reflecting**
110:3
**refresh**
71:24 107:11
**regard**
25:16
**Regents**
4:16,17
**regionals**
28:11
**regular**
42:7
**relate**
10:15
**related**
5:21 21:19 23:24 66:3
**relates**
10:9 96:25 99:4
**relating**
57:23 58:13,14
**relations**
66:23
**relationship**
11:15 12:19,21,23 45:3 78:19 79:3
**relationships**
12:15 35:23
**release**
20:7
**relief**
101:22
**remarks**
33:23 55:12
**remember**
5:9,22 13:4,10 19:21 28:7 29:9,17 31:4 35:20 37:24 38:4 40:2,13 44:14,23 48:1,4,6, 10,12 49:22 50:18 52:11,14,16,21,22, 24 60:9 63:18 64:12 66:14 67:7, 23 68:2,12,15 70:6,18 72:5 87:18 93:6 94:7,20,21 95:11,14 97:7,13, 24 98:19 99:11,16, 19 106:19 107:1 108:17,19 109:11, 14,21,23,25 110:1 111:11,13,15,20, 21,24
**reminding**
98:10,13
**remove**
115:4
**reorganization**
52:9 63:8
**reorganizations**
66:3
**repair**
18:10
**repeat**
32:9 34:10,14 72:20 79:8 96:11
**repeating**
103:14
**rephrase**
102:18
**replies**
103:4
**report**
42:15,21 53:2 76:25 83:10,16,19 84:17 88:2,8,11,15 94:8 105:17,24,25 108:3,4 111:20 114:4
**reported**
42:20 64:2
**reporter**
4:3 6:19,20 7:6 42:2 98:4
**reporting**
12:8 43:3,4,10,12, 13 52:11,18 66:8 112:19,22 113:3,8, 17 114:2,8
**reports**
55:1 83:7,16
**represent**
73:16
**representing**
4:21,23 10:14
**reprimanded**
109:19 110:11
**reputation**
33:19 79:18,22
**request**
56:3,16,19,20 57:12,18,20,21 58:12
**requests**
24:6 57:21
**required**
8:4
**requirement**
43:4,13
**requirements**
112:19,22 113:8
**resolved**
91:20
**resources**
22:6
**respect**
74:9
**respond**
104:8 108:14
**responded**
104:10
**responding**
108:18
**responds**
104:24
**response**
89:16 102:18 103:5,15 106:3,17, 22 107:4 108:24
**responses**
7:3,5
**responsibilities**
17:7 42:25
**responsibility**

45:19
**responsible** 23:25
**responsiveness** 50:4
**restroom** 98:5
**result** 27:23
**retain** 25:10,11
**retaliate** 78:11
**retaliated** 63:25
**return** 63:2
**returned** 85:19
**review** 9:5 71:4,20 103:8
**reviewing** 81:13
**rewarding** 116:22
**Rick** 44:10 49:15,18,23 84:10
**Rivera** 4:13
**road** 9:10
**Robert** 4:1 5:3
**Robles** 4:17
**rookie** 5:13
**room** 4:11 8:11 16:7 36:4 109:12
**roughly** 8:16,17 20:9 70:6 85:2 87:8
**round** 29:3,6,8,9
**row** 54:1
**rules** 6:4 42:1
**run** 6:3 14:17 22:7 39:7 46:2 101:11
**running** 16:9 80:2

**S**

**safe** 101:8
**salaries** 25:6
**salary** 25:9 53:1
**sales** 66:21
**sat** 70:20
**satisfied** 43:4 50:8
**satisfy** 43:9,13
**scale** 35:4,6 97:23 98:3, 17,19,23
**schedule** 22:8 23:11 54:7
**scheduled** 49:19
**scheduling** 54:11
**school** 11:12 72:4 91:7
**Scott** 44:16,18
**scroll** 83:25
**search** 58:17 61:7,23
**searched** 57:24,25 58:4,10
**season** 13:15 17:12,13 22:1 27:25 41:22 102:7,8,12
**seated** 101:6
**seats** 36:8,13,15,16 89:22,23 90:5,10, 16,18 91:1,12,16 93:23 100:12 101:3 102:15
**semester** 64:11
**send** 95:3 104:23
**sending** 94:21 102:24 106:24
**sends** 106:17
**sense** 6:22 7:13 8:8 9:6 12:12 18:11 20:15 45:2 66:20 79:5,10 88:24 93:9 101:9, 13,16 106:3
**sensed** 40:20
**sentence** 74:23 95:17
**sentences** 75:11,13 99:21
**separate** 61:1
**separately** 104:12
**series** 54:9 112:10
**seriousness** 40:20
**served** 23:1
**service** 37:14 62:24
**services** 38:2
**set** 51:11
**setting** 23:11 80:18 84:24 85:17 87:24
**sex** 75:15
**sexual** 42:9 58:13,15 59:11,19 75:19 88:18 97:23 113:16
**sexually** 88:11
**shake** 7:3
**Shangraw** 49:16,18 84:10 85:7,11,14,18
**Shangraw's** 44:10
**share** 30:10
**shared** 23:7 26:19
**shift** 116:13
**shocked** 64:24 65:8
**short** 55:15 68:25
**shortly** 67:10 70:7
**show** 55:19 57:3 70:10, 11,25 73:9,10 74:1 80:5 112:10 113:19
**sick** 56:23
**side** 4:11 66:15 70:2
**sign** 117:19
**signals** 16:20
**significance** 45:15
**significant** 35:5,18
**significantly** 22:3
**signing** 20:7
**similarly** 79:1
**sit** 24:22 37:2 92:10 97:7
**sitting** 89:10 90:1 101:2 102:11,15
**situation** 39:17 49:21 72:7 87:9,15 91:19 97:1 106:5 107:12 108:8
**situations** 14:24 91:2 113:16
**size** 8:11,12,21
**smell** 32:24
**smelt** 109:10
**social** 32:3
**socially** 39:6
**solid** 14:14 16:17
**sooner** 19:6 44:1
**sorting** 14:7
**sound** 72:2
**sounds** 69:7 72:3 89:22 97:11
**source** 45:3 58:20
**speak** 4:3 42:25 48:8 84:9 85:18 86:18

92:16
**speaking**
18:3
**speaks**
108:13
**special**
23:9 91:3
**specific**
44:1 50:19 74:12 108:14 110:8 112:14
**specifically**
48:17 68:16 93:6 95:12,15 99:12 102:7 105:16 109:25 111:13
**specificity**
16:14
**speculate**
79:14
**spell**
5:1
**spent**
49:8
**split**
68:20,23
**spoke**
13:6,10 14:10 19:25 29:25 39:25 42:24 44:9,13 77:19 83:21 84:16 91:18 107:12 111:1
**spoken**
48:7 65:14
**sports**
54:12 89:14 115:23 116:8
**spot**
8:17 97:19
**spring**
20:24
**stable**
78:15
**staff**
30:25 54:10,21
**staffing**
114:23 115:12
**standard**
7:9 14:17
**Stanford**
38:2
**stapled**
115:5
**start**
11:2,18 12:13 15:16 20:11,12 21:2 54:9
**started**
4:10 33:15
**starting**
46:2 50:23,24 64:11 72:4
**startup**
21:15
**state**
5:1 13:15,22 18:6 22:9 23:8
**statement**
82:7 103:24 117:1
**States**
19:6
**status**
37:9 99:23 108:12
**stay**
14:23 20:25 84:20
**Stein**
4:23
**stern**
79:25
**story**
11:6
**straight**
66:18
**straightforward**
68:4 96:8
**strikes**
86:5 100:7
**string**
102:19 105:2 113:7
**strong**
81:22
**structure**
52:12 53:5 63:8 70:4
**stuff**
11:4 47:7 60:15 109:17 110:6
**subject**
51:23 105:13,25
**subjects**
63:21
**subsequently**
109:19
**success**
53:15,19 78:15
**sudden**
19:14
**Suer**
96:14
**suggestions**
116:24
**summer**
46:2,5 47:21 48:14 51:15 63:3 85:20
**supervisor**
42:21 43:4
**support**
18:12 23:21 54:19
**supportive**
68:11
**surprised**
19:4 46:24 72:12
**swim**
63:8
**swimming**
52:13
**switched**
60:4
**sworn**
4:2
**system**
98:25
**systems**
15:17 18:15

**T**

**table**
8:11,12,22 36:25
**taking**
6:20 15:9 114:8
**talk**
6:21 7:25 12:7,8 31:18 37:8 38:6 41:25 43:24 44:12, 15,21 49:25 52:5 53:19 68:18,19,25 75:10 76:17 87:6 95:17 106:2 109:1, 2 110:17
**talked**
10:6 37:10 44:18, 22 48:5 75:16 87:13 98:17 99:25 100:3 101:21 104:21 108:10 109:9 112:4
**talking**
11:19,21 12:9 16:13 22:5,7 35:22 38:20 41:6 44:25 49:23 52:11 59:12 63:3 76:24 77:6 110:21 111:9
**talks**
39:22 84:4 85:14 99:21 102:7
**task**
45:10 51:2,7,10
**team**
18:12 20:17 21:23 32:22 36:4 53:20 90:18 109:12 116:25 117:3
**teams**
53:24
**technically**
28:23
**technology**
60:16 61:10
**telephone**
60:4
**telling**
30:22 50:24 69:7 73:4
**tells**
7:12 50:18 64:21 72:6
**Tempe**
85:19
**tempers**
63:11
**Ten**
55:15
**tend**
31:12 60:12
**tendencies**
54:25 55:3
**tense**
80:1
**term**
68:25 93:1
**termed**
99:24
**terminated**
65:23
**termination**
11:20 64:17 68:19
**terminology**
98:24
**terms**
65:9 100:4 112:15
**terrible**
31:1
**terrified**
101:9,10
**testified**
4:4 51:7 62:11 78:19 81:2
**testifying**
6:10,12
**testimony**
6:15,16 8:3 9:13 63:4 82:20
**text**
57:20 58:21,23 59:1,3,8,18 60:10 104:11,14,19,23 105:7 106:16,17,

20,21,22 107:25 108:23,24
**texts** 58:8 60:14 62:15 117:23
**thankful** 87:20
**thereunder** 114:4
**thin** 50:21
**thing** 12:11 33:18 43:15 100:7
**things** 6:7 7:19 9:2 14:25 15:16 16:9 17:23 18:5,22 22:2,4,11 23:10 24:7 25:5,6 26:8,14 39:8 41:19 44:25 60:14 61:1 76:4,25 81:14 84:21 88:25 98:1 101:21 105:18,19 108:11 113:23
**thinks** 13:22
**thought** 13:20 14:3,14 15:9 16:17,19 19:3 32:25 42:23 46:17 53:13 75:14 87:23 112:6 116:13
**thoughts** 65:9
**three-day** 67:16
**Thursday** 73:21
**ticket** 36:10 66:21 91:11
**tickets** 90:13,14,22 91:8 100:12 102:4,7,8, 10,12
**time** 6:1 8:23 12:25 13:5,13 14:6,10 15:9,18,19,22 16:21 17:22 18:1,7 20:23 21:23 22:13, 22 23:2 24:17 27:1,3,20 32:17 33:8 38:25 41:18 42:13,22 43:19,20 46:19 47:10 50:10 51:16,21 52:16,17 53:22,23 57:10 60:3 63:9,20 64:15 65:11 66:11 70:6, 15 72:11 73:5,20 76:11 77:5,21 78:16 81:10,17 85:2 86:24 87:4 90:8 93:21,25 94:22 99:17 104:15 105:1 109:7 110:1,15 112:7 116:6
**timeline** 47:10
**times** 5:12 15:9 32:1
**timetable** 47:7
**timing** 66:19
**tired** 96:24 97:10
**Tisdale** 88:1
**Title** 41:25 42:9 112:18, 22 113:2,7,17 114:3,17
**today** 6:11,16 9:13,14 10:15 56:20 57:16 92:10 97:7 105:1 117:21
**today's** 8:2 9:17 57:6
**told** 27:9 28:5 29:24 34:17 35:16 40:2,4 42:24 46:12 52:17, 22 53:5,7 63:15,18 64:23 65:3 67:7,23 68:12 72:14,17,23 73:1 77:21 78:2 81:17 84:9 86:2,8, 13,20 89:9,24 91:19 92:4,23 95:19 96:20 101:5 105:18 106:10,12 107:22
**tolerate** 45:22
**tolerated** 110:7
**top** 35:9 85:7 103:11 113:1,2
**tough** 111:1
**tour** 22:8
**tournament** 12:2,10 27:19 28:2,4,6,7,15,18, 22 29:22 47:11
**tournaments** 53:21
**town** 17:10 63:14 64:9 67:13 90:25
**training** 18:16 42:5,12 43:3 113:14
**trainings** 42:8
**transcript** 9:4,5
**transferred** 60:18
**treat** 113:16
**trip** 38:4 49:15,16 84:23 85:16
**trouble** 64:6
**true** 23:4
**trust** 65:12 76:19
**trusted** 23:6 39:13,17 52:2
**truth** 4:3,4
**truthful** 86:21
**Tulsa** 28:16
**tunnel** 29:17 89:6
**turn** 22:25 112:21
**turned** 20:19
**type** 32:15 33:7 35:23 45:5 60:23 80:14
**types** 42:9 93:24 114:16
**typical** 14:15
**typically** 10:1 24:1 58:19 91:2

**U**

**Ultimately** 24:24
**unable** 56:22
**understand** 6:10 15:5 30:7 34:8 57:19 60:3 75:11 113:6
**understandable** 80:3
**understanding** 15:8 26:20,21 27:15 66:17 78:2 89:17 104:18 110:23
**understood** 62:21 73:22 113:12
**unfair** 53:14
**unique** 116:7
**United** 19:6
**university** 22:16 24:3 81:24 88:10,19 94:8 113:15 115:20
**university's** 105:24
**unusual** 33:1
**unwelcomed** 27:4
**updates** 18:5 22:7 44:4
**upset** 30:22 40:5,8,14 49:16 52:22 64:22 89:18 92:22 94:3,4
**urgency** 40:20 41:21
**usual** 81:3
**Utah** 110:19 111:5

**V**

**vacation** 17:10,16 67:17,19
**validated** 105:18
**valuable** 65:13
**Vegas** 12:1,9 27:2 32:21 73:21 109:8
**verbally** 111:21
**Verizon** 62:25
**viewed** 110:13

**VIP**
90:18
**visibility**
91:6
**vision**
13:21,25 26:19
**vocal**
33:17
**voice**
74:17
**voluntary**
68:20,23

**W**

**wait**
19:13
**walk**
12:11 100:8
**walked**
109:18
**walking**
29:17
**waned**
62:21
**wanted**
9:13 14:7 20:24 81:25
**wanting**
17:1 19:22 23:8 67:3
**warn**
95:17
**watch**
100:25
**Watkins**
21:9
**Wear**
11:21,22 12:21 27:5 31:16,18,19 34:1,17,23 35:3,5, 17 37:8,12,18 38:10 41:23 46:8, 20 48:8,20 49:20 58:14,15 59:11,19 70:16 72:7 81:9 82:2 84:16,23 85:19 87:1,9,15 88:17 89:7,21 91:15,21,22 92:2, 11 93:4,15 96:9, 16,17 99:22 100:4 101:11 102:11 107:12 108:8 109:4 110:2
**Wear's**
38:8 81:19
**Wednesday**
73:21
**weekend**
49:8
**weeks**
16:24 73:20
**well-being**
35:25
**wife**
4:12 17:9 25:23 29:25 30:18 32:2 34:24 39:17 41:4 45:15,16 47:4,12, 15 51:17 64:10 67:21 79:1,2 82:13 87:22 89:6,10 94:17 101:5,10,14, 16
**win**
28:21 29:12
**women**
31:1 34:23 46:15 81:16 88:11 92:25 94:9 98:2 101:24 110:6
**won**
28:25 29:1 89:5
**wonderful**
67:20
**Wood**
21:10 23:18 75:16
**Woods**
27:4 40:25 41:5,8 42:14 82:13 101:13
**Woods's**
45:16 87:22
**word**
64:5 65:4 78:1
**words**
7:15 10:17 24:2 40:14 43:2 68:18 71:7 74:23 80:11 95:16 97:9 107:1, 10 114:6
**work**
17:8 18:10 20:24 45:9,20 47:7 50:4 54:11 69:25 70:3 91:12
**worked**
23:15 25:8 38:5 42:21
**working**
20:1,11,13 69:18
**workouts**
20:23
**workplace**
45:5
**world**
115:23
**worry**
87:16 101:23
**worse**
18:9
**worthy**
110:8
**wrap**
117:13
**wrestler**
15:11
**wrestling**
28:20
**writer**
97:15
**writing**
58:10
**wrong**
63:7
**wrote**
81:17

**Y**

**Yahoo**
62:1
**yards**
18:16
**year**
5:13,22,25 13:16 17:9 28:8 36:25 37:3 54:2 86:25
**years**
5:25 46:3 53:16,22 54:1 66:19
**yelling**
93:2

**Z**

**Zoom**
19:18
**Zylan**
37:25

# EXHIBIT 15

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DAVID COHEN, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>ARIZONA BOARD OF REGENTS and RAYMOND ANDERSON, an individual,<br><br>Defendants. | Case No. 2:21-CV-01178-GMS |

DEPOSITION OF ROBERT "BOBBY" HURLEY

Phoenix, Arizona
December 27, 2023
10:43 a.m.

REPORTED BY:
JOVANNA ROMAN, RPR
Certified Reporter
Certificate No. 50725

PREPARED FOR:
ASCII/CONDENSED COPY

(Copy)

I N D E X


| WITNESS: | PAGE |
|---|---|
| ROBERT "BOBBY" HURLEY | |
| Examination By Mr. Perez | 4 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| No. 27 | Notice of Deposition | 55 |
| No. 28 | Amended Notice of Deposition | 56 |
| No. 29 | Notice of Deposition | 57 |
| No. 30 | Interview Notes - Hurley | 71 |
| No. 31 | Interview Notes - Anderson | 73 |
| No. 32 | E-mail | 80 |
| No. 33 | E-mail | 94 |
| No. 34 | E-mail | 105 |
| No. 35 | Contract Documents | 112 |
| No. 36 | Contract Documents | 113 |
| No. 37 | E-mail | 115 |

Robert Hurley
December 27th, 2023
**Exhibit No. 34**
Jovanna Roman, RPR

VZW Wi-Fi 8:46 AM 100%

Dr Michael

Yesterday 10:09 PM

I am just catching up with my emails and this note. It is my wife's birthday weekend, and she just got back from a trip so I have not been checking throughout the day.

In any event I am also surprised that Mr. Ware was in attendance at any ASU event. He had indicated through his counsel that he was not going to be a part of ASU athletics in the future. I think our folks took him at his word.

I will now ban him formally from all ASU athletic events. I am traveling to NYC

iMessage

VZW Wi-Fi 8:46 AM 100%

1 Dr Michael

In any event I am also surprised that Mr. Ware was in attendance at any ASU event. He had indicated through his counsel that he was not going to be a part of ASU athletics in the future. I think our folks took him at his word.

I will now ban him formally from all ASU athletic events. I am traveling to NYC tomorrow but I will see that this gets implemented.

I am sorry that this didn't get implemented.

Michael

# EXHIBIT 16

PEREZ VAUGHN & FEASBY INC

600 B Street, Suite 2100
San Diego, CA 92101

619 784 3550 office
619 460 0437 fax

www.pvflaw.com

August 21, 2019

**Protected Communication**
**Pursuant to Rule of Evidence 408**

**VIA ELECTRONIC MAIL AND OVERNIGHT DELIVERY**

Michael M. Crow, President
Arizona State University
Office of the President
300 E. University, Suite 410
Tempe, Arizona 85281

**Re: Termination of David C. Cohen**

Dr. Crow:

Our law firm represents David and Kathy Cohen in connection with the termination of Mr. David Cohen, and Mr. Cohen's retaliation claim against his former employer, Arizona State University ("ASU"). Please direct any further communications regarding the Cohens to my attention.

As you may be aware, on March 25, 2019, Mr. Cohen reported inappropriate and unlawful behavior by a significant ASU athletics booster, Bart Wear, to the Vice President for University Athletics, Ray Anderson. ASU did not investigate the complaint or in any way address Mr. Wear's conduct. Over the following five months, Mr. Cohen raised the issue several times with Mr. Anderson and other people affiliated with ASU and the athletics department. Still, the complaint went unaddressed. On August 15, 2019, ASU terminated Mr. Cohen's employment after restructuring his bonus plan, reducing his responsibilities, and transferring him to an executive who threatened to terminate his employment on day one. Unfortunately, faced with a credible complaint, ASU chose to protect a prominent donor and terminate the employee who reported the inappropriate and unlawful conduct without conducting even a superficial investigation.

This letter details Mr. Cohen's complaints to ASU, ASU's abject failure to investigate the complaint or address the conduct, and ASU's retaliation against Mr. Cohen for his role in protecting ASU's reputation and integrity against a salacious booster.

**Bart Wear's Unlawful Conduct**

On Thursday, March 14, 2019, the ASU Men's Basketball team played a game against the University of California, Los Angeles at the Pac-12 tournament in Las Vegas,

Nevada. The Sun Devils beat the Bruins 83-72. Following the game, Lindsey Wood, the wife of Special Assistant to Head Coach Ben Wood, told Mr. Cohen that Bart Wear inappropriately touched her. During the game, Ms. Wood sat next to Mr. Wear behind the team bench. Throughout the game, Mr. Wear rubbed her back and asked inappropriate personal questions. Ms. Wood was so upset by this that she asked Mr. Cohen to ensure she did not sit next to Mr. Wear at the game the following night against Oregon. This disclosure was made in front of Kathy Cohen and Leslie Hurley, the wife of Head Men's Basketball Coach Bobby Hurley.

During this conversation, Mrs. Cohen shared a similar experience she had with Mr. Wear during that same game. During halftime of the March 14, 2019 game, Mr. Wear approached Mrs. Cohen, put his hands on her waist, moved his hands up the side of her body to the sides of her breast, and simultaneously said, "You are way too beautiful for Dave." Mrs. Cohen said this was not the first time Mr. Wear had touched her inappropriately or made her feel uncomfortable.

Mrs. Hurley then explained to Mr. Cohen how Mr. Wear often made her feel uncomfortable. She said that Mr. Wear would frequently approach her during ASU games (where she had a seat with an aisle that allowed people to approach her), and he would inappropriately put his hand on her leg while talking with her. Mrs. Hurley went so far as to ask other people sitting with her to stand in front of her when Mr. Wear approached so as to prevent him from touching her.

These reports angered and saddened Mr. Cohen who wanted to address the issue immediately. All three women asked Mr. Cohen not to raise the issue with Mr. Wear or report it to either Mr. Anderson or Mr. Hurley until after the basketball season ended one week later. Mr. Cohen honored their wishes. Mr. Cohen, however, ensured that Mr. Wear was seated far from the women during Friday's semi-final game against the University of Oregon. The Sun Devils lost to the Ducks in the Pac-12 semi-finals, earned an 11 seed in the West Regional in Tulsa, Oklahoma, and lost their first-round game against Buffalo on Friday, March 22, 2019, ending their season.

**Mr. Cohen Reports Mr. Wear's Conduct to ASU**

On Monday, March 25, 2019, Mr. Cohen reported Mr. Wear's inappropriate and unlawful conduct to Mr. Anderson (the "Wear Complaint"). That Monday was the first business day after the end of the men's basketball season. Mr. Cohen honored the victims' wishes, waited until the basketball season concluded, and reported the conduct immediately thereafter.

Because the conduct related to a prominent ASU athletics booster, Mr. Cohen asked Scott Nelson (Senior Associate Athletic Director, Executive Director of the Sun Devil Club) to join the meeting. Mr. Cohen believed Mr. Nelson should be involved because the Sun Devil Club has a stated mission of "***promoting and protecting*** Arizona State through Sun Devil Athletics." (Emphasis added.) Certainly, Mr. Nelson would

want to know about and investigate the inappropriate and unlawful conduct of a Sun Devil Club member.

Mr. Cohen was nervous about reporting Mr. Wear's conduct to Mr. Anderson. Mr. Wear and Mr. Anderson are very close. Mr. Wear supported Mr. Anderson throughout his tenure as Vice President of University Athletics and Mr. Anderson told Mr. Cohen to grant Mr. Wear great access to ASU athletics programs because he "writes checks."

During the March 25 meeting, Mr. Anderson was very receptive and supportive of the victims. He told Mr. Cohen that Mr. Wear's conduct was unacceptable and he would address it immediately. At the conclusion of the meeting, Mr. Anderson asked Mr. Nelson to have a conversation with Rick Shangraw (the Chief Executive Officer of ASU Enterprise Partners) who oversees all fundraising efforts at ASU. Mr. Nelson was instructed to ask Rick Shangraw if any other incidents regarding Mr. Wear or any other donors were reported.

As directed, Mr. Nelson met with Mr. Shangraw. Mr. Shangraw was unaware of any other reports of unlawful conduct by Mr. Wear, but acknowledged the accusations were serious and should be addressed immediately. Mr. Nelson was instructed to have Mr. Anderson address the issue with Mr. Wear immediately.

**ASU Fails to Investigate the Conduct or Address the Complaint**

In violation of its own policy, ASU failed to investigate the accusations or address Mr. Wear's conduct in any way. On Friday, May 3, 2019, the ASU baseball team played a home game against UCLA. ASU lost 2-3. Mr. Cohen sat with Mr. Anderson at the game. Assuming Mr. Anderson did what he said he was going to do, and what Mr. Shangraw instructed him to do, Mr. Cohen asked how the conversation with Mr. Wear went. Mr. Cohen was shocked to find out that Mr. Anderson had not raised the issue with Mr. Wear. Mr. Cohen said his failure to address the complaint was "not good" and expressed concerns about the upcoming event which Mr. Wear typically attends (the Devils' Ball on Friday, May 10). Mr. Anderson told Mr. Cohen not to worry because Mr. Wear would not "do anything with" Mrs. Cohen when Mr. Anderson was around. When Mr. Cohen pressed the issue, Mr. Anderson told him not to worry about it. At this point, six weeks had passed since Mr. Cohen first reported Mr. Wear's unlawful conduct to ASU and nothing had been done.

Shortly after this May 3, 2019 conversation, Mr. Anderson went on a golfing trip to the San Francisco Bay Area with Mr. Wear, Herm Edwards (ASU Head Football Coach), and Jean Boyd (Executive Senior Associate Athletic Director). All four flew on Mr. Wear's private plane. Mr. Anderson did not raise the issue with Mr. Wear before, during, or immediately after this trip.

When Mr. Cohen learned that Mr. Anderson failed to investigate or address Mr. Wear's conduct, he reached out to Mr. Shangraw directly. Mr. Cohen and

Mr. Shangraw met for coffee on or about May 16, 2019 to discuss Mr. Anderson's conduct since receiving the complaint about Mr. Wear. Mr. Shangraw was upset to learn that Mr. Anderson did not address the issue with Mr. Wear (ignoring the direction sent through Mr. Nelson in March), went on a golfing trip with him, and involved Mr. Edwards in the trip as well. Mr. Shangraw agreed to address the issue with Mr. Anderson directly.

On Friday, June 7, 2019, Mr. Shangraw called Mr. Anderson to ask for an update on the handling of the Wear Complaint. Mr. Anderson confirmed that he never addressed it with Mr. Wear. Mr. Shangraw told Mr. Anderson to address the issue with Mr. Wear immediately and report back to Mr. Shangraw on the contents of the conversation. This was 11 weeks after Mr. Cohen's initial complaint, five weeks after his follow up conversation at the baseball game, and still nothing had been done.

Mr. Cohen was dismayed by the University's complete disregard for the complaints lodged and ASU's failure to take the allegations seriously. This was an institution Mr. Cohen cared and cares about deeply. This was also the institution that supposedly had "zero tolerance" for inappropriate sexual behavior. Indeed, according to the Arizona Republic,

> "Here [at ASU] it's this notion we build into our culture of maximum diligence for the safety of our athletes," Crow said. "***It's zero tolerance***. You can't always prevent something from happening, ***but you can take immediate action the second you hear about it***. My reaction to the facts of the Penn State case going all the way back to the incident that was reported by the assistant coach (Mike McQueary) to the head coach (Joe Paterno) to the athletic director (Tim Curley) was that the assistant coach and the head coach were remiss in their duty. I would have fired both of them, I don't care who they are. And if I got fired after that, they'd still be fired." . . . If we heard from someone complaints of physical abuse, sexual abuse, inappropriate conduct, ***the first thing we would do is investigate***," Crow said. "If it turns out these things were true, all those people would be turned over to the police or fired." (Emphasis added.)
>
> \- Michael M. Crow

**<u>ASU Retaliates Against Mr. Cohen</u>**

On June 13, 2019, Mr. Cohen had his annual performance review. Mr. Boyd and Frank Ferrara (Senior Associate Athletic Director, Chief Financial Officer) were also present in this review. The review was generally positive.[1]

---

[1] In fact, Mr. Cohen's reviews have always been positive and he has received the highest bonuses in his department for four straight years at ASU, including Spring of 2019. This evidences ASU's true satisfaction with Mr. Cohen's employment.

During the review Mr. Cohen was informed that he would no longer be an administrator for the ASU swimming program. Immediately prior to this review, Mr. Cohen's responsibilities included overseeing all ticketing for ASU athletics, and being the primary administrator responsible for the men's basketball and swimming programs. The stated reason for this change was to allow Mr. Cohen to focus more on ticketing. At the time, however, revenue from ticketing across all sports was up, and the football team played to 91% capacity despite being mired in four straight six-loss seasons during a four-year stadium renovation. This reason was clear pretext for ASU's first retaliatory adverse employment action against Mr. Cohen.

Also during the June 13, 2019 review, Mr. Cohen was informed that his bonus for that year would be $75,000. However, after speaking with Mr. Cohen, Mr. Anderson informed Mr. Cohen he would receive a $95,000 bonus in 2019. This reflected ASU's overall satisfaction with Mr. Cohen's employment.

After the performance review and Mr. Cohen had received his bonus, Mr. Cohen exchanged text messages with Mr. Anderson, thanking him for the bonus. Mr. Anderson referenced "changes" being made to the athletic department. Mr. Cohen asked Mr. Ferrara about those "changes" and whether Mr. Cohen would report to Mr. Ferrara. Mr. Ferrara said that if Mr. Cohen reported to him, he would fire him the next day.

On June 19, 2019, Mr. Cohen was called into a meeting with Mr. Anderson, Mr. Boyd and Mr. Ferrara. At that meeting, Mr. Anderson informed Mr. Cohen his new bonus structure would be completely at Mr. Anderson's discretion. He was told that he could either agree to this change or start looking for a new job. Mr. Cohen signed the new bonus plan which represented a significant change in Mr. Cohen's compensation structure. With this change, Mr. Cohen no longer had any guaranteed bonus pool, and nearly 40% of his overall compensation was completely at Mr. Anderson's discretion.

On Monday, August 12, 2019, Mr. Cohen was called into a meeting with Mr. Anderson and Mr. Ferrara. At this meeting, Mr. Anderson informed Mr. Cohen that he would now be reporting to Mr. Ferrara instead of Mr. Anderson. Mr. Cohen told Mr. Anderson that he viewed this, along with the change in bonus structure and stripping of responsibilities for the swimming program as retaliation for reporting Mr. Wear's inappropriate and unlawful conduct.

When challenged, Mr. Anderson lied. He said Mr. Cohen didn't say anything about the sexual misconduct of Bart Wear until three months after the basketball season ended. Mr. Cohen reminded Mr. Anderson that he first reported the conduct the Monday after the season concluded and Mr. Nelson was in the room when the initial complaint was made. Mr. Anderson then asked Mr. Cohen why he didn't "do anything" about the complaint and Mr. Cohen reminded Mr. Anderson that he reported the complaint to the head of the athletic department who asked Mr. Cohen to let him handle it. He then said that neither Mr. Cohen nor Mr. Shangraw was going to tell him how or when to "talk to a fucking donor."

Mr. Cohen next met with Amy Schramm (Senior Associate Athletics Director, Human Resources) to discuss his complaint and ASU's retaliation. This was the first time Ms. Schramm, the head of human resources for the athletic department, heard about Mr. Wear's inappropriate and unlawful conduct. She told Mr. Cohen to meet with Kevin Salcido (Vice President of Human Resources and Chief HR Officer). Mr. Cohen met with Mr. Salcido on August 12, 2019 at 2:00 p.m. in Mr. Salcido's office. Mr. Salcido acknowledged that it sounded like Mr. Cohen was being retaliated against for reporting Mr. Wear's conduct and demanding Mr. Anderson investigate and address the issue.

Next, Mr. Cohen met with James Rund (Senior Vice President of Education Outreach and Student Services) on Monday, August 12 and Mr. Shangraw on Tuesday, August 13. Both Mr. Rund and Mr. Shangraw acknowledged the obvious retaliation and asked if Mr. Cohen's relationship with Mr. Anderson was irreparable. Mr. Cohen told both of them he wanted to keep his job and find a way to move forward with ASU.

Two days later, on August 15, 2019, ASU terminated Mr. Cohen's employment effective immediately. Mr. Anderson told Mr. Cohen he wasn't a "team player" or "cultural fit." Clearly, this was a reference to Mr. Cohen's insistence that ASU investigate and address Mr. Wear's inappropriate and unlawful conduct.[2]

On the morning of his termination, Mr. Cohen spoke with Becky Parke (Sr. Associate Athletic Director, Marketing) about his complaint and subsequent retaliation. Ms. Park said, "This is why women don't come forward – nothing ever happens." Sadly, she is correct. With its mishandling of the Wear Complaint and subsequent retaliation against Mr. Cohen, ASU shows it learned nothing from the "Me Too" movement. It does not believe women and would rather protects its own monetary self-interest and avoid confronting a donor than root out people who use their positions of power, influence and access to demean and degrade women.

In addition to violating state and federal whistleblower protection laws, ASU's decision to terminate Mr. Cohen violates its own policy for the "Protection of Employees from Reprisal for Whistleblowing" (Policy No. 6-914). The purpose of the policy is "to prohibit supervisory personnel from taking adverse personnel action against an employee … as a result of the employee's good faith disclosure of alleged wrongful conduct to a public body. … An employee who discloses and subsequently suffers an adverse personnel action as a result is subject to the protection of this Policy."

---

[2] A jury will certainly understand that Mr. Anderson was telling Mr. Cohen that a team player supports the bottom line of booster dollars, a team player is willing to look the other way, and the "culture" into which Mr. Cohen was supposed to fit was one in which inappropriate conduct is ignored to protect major donors.

**ASU Athletics Department's Previous Failure to Address Complaints**

Unfortunately, this wasn't the first time ASU Athletics failed to investigate or respond to a complaint of inappropriate conduct. In 2015, Mr. Cohen was told by Greg McElroy that an ASU athletics employee threatened to "choke out" a female Adidas representative. Mr. McElroy asked Mr. Cohen how to handle the issue, and Mr. Cohen recommended that Mr. McElroy take the issue to Mr. Anderson. When presented with this complaint, Mr. Anderson instructed Mr. McElroy to "bury it." Clearly, Mr. Anderson and the ASU athletics department has a pattern and practice of ignoring credible complaints in violation of ASU policy.

**Next Steps**

Mr. Cohen rejects the severance package offered to him on August 15, 2019.[3] Mr. Cohen loves Arizona State University. He has many deep friendships and indelible memories at ASU. The last thing Mr. Cohen wants is for ASU to become a punchline on late night talk shows or the next poster child of the #MeToo movement. ASU should not be uttered in the same breath as Michigan State and Penn State, yet ASU's conduct suggests it learned little from other university level institutional failures.

Obviously, Bart Wear is a predator and a misogynist. Our experience informs us that he was likely a predator in Minnesota, and he has been a predator at ASU. With almost no investigation, our offices have uncovered three highly credible claims of sexual misconduct in 2018 alone. It's an embarrassing association for a university that espouses "zero tolerance" when it comes to claims of sexual harassment or sexual inappropriateness.

Bart Wear does not deserve Mr. Cohen's silence, and ASU should not continue to shield Bart Wear from the reckoning that is coming. Truly the only question is how close ASU will be aligned with Bart Wear when that day arrives.

Until that day, Dave and Kathy Cohen are not going to hide from threats that Dave was underperforming and spurious suggestions that Kathy's allegations are not credible. The time of blaming victims and sweeping claims under the rug are gone. Done. Over.

Dave Cohen was retaliated against. Kathy Cohen (and Leslie Hurley and Lindsey Wood) are not going to shrink from a predatory booster. These claims will be taken seriously, either on campus or at the courthouse.

**Litigation Hold**

In light of the potential for litigation, ASU has a legal duty to preserve any and all documentation, electronically-stored information, and other things that may be in its

[3] It is worth noting that the "offer" was not conveyed in writing. This is highly unusual when presenting a six-month severance package to an employee who is supposedly underperforming.

possession, custody, or under your control related in any way to the Wear Complaint, any investigation of the Wear Complaint, Mr. Cohen's employment, and subsequent termination. The Cohens demand immediate action on ASU's part to preserve all documents and information, including all physical and electronically-stored information that may contain evidence relevant to their claims. This includes, but is not limited to, email and other electronic communications including text messages, electronically stored documents, images, graphics, recordings, spreadsheets and databases, calendars, telephone records and logs, internet usage files, deleted files, cache files, user information, payroll documents, pay stubs, and other data. Further, this litigation hold demand applies to all information and materials kept on any personal computer, cell phone, USB drives, email accounts, cloud storage accounts, archives, backup and disaster recovery tapes, discs, drives, cartridges, voicemail, and other data in the possession, custody, or control of Mr. Anderson, Dr. Crow, Mr. Shangraw, Mr. Nelson, Mr. Ferrara, Mr. Hurley, Mr. Rund, Mr. Salcido, and any other individual who became aware of the Wear Complaint or was in any way involved in the termination of Mr. Cohen's employment. All operating systems, software, applications, hardware, operating manuals, codes, keys, and other support information needed to fully search, use, and access the electronically stored information must also be preserved. Finally, all relevant electronically-stored images must be maintained in their present form, which must include deleted messages and emails as referenced above. The failure to preserve evidence will have serious implications in any future legal action. The failure to halt document destruction protocols and implement electronic information retention protocols will be perceived as the intentional spoliation of evidence.

If I do not hear back from you by August 26, 2019, the Cohens have authorized me to take all action necessary to protect their rights in this matter, including filing a complaint detailing Mr. Wear's conduct and ASU's woefully inadequate and retaliatory response. Thank you in advance for your prompt attention to this matter.

Very truly yours,

Michael J. Pérez
of
PEREZ VAUGHN & FEASBY Inc.

cc: José A. Cárdenas, Senior Vice President and General Counsel, ASU
Larry Edward Penley, Chair, Arizona Board of Regents